1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3
UNITED STATES OF AMERICA,          )    No. 12 CR 723-1
4                                  )
                   Plaintiff,      )
5                                  )
         v.                        )    Chicago, Illinois
6                                  )    January 3, 2014
ADEL DAOUD,                        )    1:35 p.m.
7                                  )
                   Defendant.      )    Motion Hearing
8

9              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
10

11   APPEARANCES:

12   For the Government:      HON. ZACHARY T. FARDON
                              United States Attorney, by
13                            MR. WILLIAM RIDGWAY
                              MR. BOLLING W. HAXALL,
14                            Assistant United States Attorneys
                              219 South Dearborn Street
15                            Suite 500
                              Chicago, Illinois  60604
16

17   For the Defendant:      DURKIN & ROBERTS
                              2446 North Clark Street
18                            Chicago, Illinois  60614
                              BY:  MR. THOMAS A. DURKIN
19                                 MR. JOSHUA G. HERMAN

20

21

22

23           TRACEY DANA McCULLOUGH, CSR, RPR
                  Official Court Reporter
24             219 South Dearborn Street
                      Room 1426
25             Chicago, Illinois 60604
                    (312) 435-5570

1          THE CLERK:  12 CR 723, USA versus Adel Daoud.

2          THE COURT:  Good morning, Mr. Daoud.  How are you.

3          DEFENDANT DAOUD:  I'm all right.  How are you?

4          THE COURT:  Well, actually we're afternoon now.  All

5     right.

6          MR. RIDGWAY:  Good afternoon, Your Honor.  William

7     Ridgway and Bolling Haxall on behalf of the United States.

8          MR. DURKIN:  Good afternoon, Judge.  Tom Durkin and

9     Joshua Herman on behalf of the defendant, who's obviously

10    present and in custody.

11         THE COURT:  Yes, and in custody.  And we've spoken.

12         MR. DURKIN:  Last I checked.

13         THE COURT:  Okay.  A couple of things today.  First

14    of all, the Court did get your most recent submission of an

15    article, is that correct?

16         MR. DURKIN:  Yes.

17         THE COURT:  And your position?

18         MR. RIDGWAY:  We received it as well, Your Honor.

19    And we have no, I guess no objection to it being part of the

20    record.

21         THE COURT:  All right.  For whatever it's worth.  The

22    Court can always use some additional reading.  Not in this

23    case, but I'll take it.

24         MR. DURKIN:  I wanted to mention it today, and I

25    didn't want to mention it without having given everybody a copy

1    of it.

2              THE COURT:  All right.

3              MR. DURKIN:  That's all.

4              THE COURT:  The Court does acknowledge that the Court

5    has a copy.  The Court also would like to point out before we

6    get started on the motions that are germane to the proceedings

7    today, that there were some CIPA motions pending.  And unless

8    this Court somehow has overlooked it, the Court didn't receive

9    a response.  There was going to be an ex parte presentation

10   from the defense.

11             MR. HERMAN:  That's correct.  We had asked -- there

12   had been a deadline for the filing of a defense --

13             THE COURT:  There was a September deadline.

14             MR. HERMAN:  A defense, a defense position paper I

15   guess you would say as to what our defenses would be for the

16   Court to consider.  That was -- we never noticed that up.

17             THE COURT:  You filed a motion for I think a

18   three-week extension and --

19             MR. HERMAN:  A second extension, and I think that was

20   when motions were flying back and forth and there was the issue

21   of the consolidation of the cases, which obviously had some

22   bearing on what positions we would set forth in --

23             THE COURT:  And so, in other words, there hasn't been

24   one filed yet.

25             MR. HERMAN:  There hasn't been one.

```
 1              THE COURT:  And you still would like to reserve the

 2    right to file something.

 3              MR. HERMAN:  I think so.

 4              THE COURT:  Just to make clear, we're not dealing

 5    with CIPA today.

 6              MR. DURKIN:  No.

 7              THE COURT:  All right.

 8              MR. DURKIN:  Other than the portion of our motion

 9    that seeks permission to attend the ex parte proceeding.

10              MR. HERMAN:  Correct.

11              MR. DURKIN:  That portion we can argue in public I

12    believe.

13              THE COURT:  Well, the Court isn't going to hear any

14    argument on that at all today.  We'll deal with the motions --

15    the only motions the Court's going to deal with are 51, 54, and

16    70.  Those are the ones that deal with the FISA related

17    materials and surveillance materials.  Those are the ones the

18    Court's going to deal with today.

19              MR. RIDGWAY:  That was our understanding as well,

20    Your Honor.

21              MR. DURKIN:  Right.

22              THE COURT:  All right.  And we can set another date,

23    a future date soon after for your response or your written

24    response on the CIPA materials.  And if there's something else

25    you wish to file, to have some sort of hearing, which I don't
```

```
 1    think you'll be able to have.  But you can do some filing on

 2    that.   That's separate from the proceedings today.

 3              MR. RIDGWAY:  And just --

 4              MR. DURKIN:   The argument that I had intended to

 5    discuss, which I think is part of the first motion is for us to

 6    be part of the FISA proceeding, which our argument is you can

 7    extrapolate the CIPA provisions which permit counsel to be

 8    there even though it never happens, to be part of the FISA

 9    proceeding regarding the other surveillance.  That's I believe

10    part of what we're -- at least that's what I prepared to argue

11    today.

12              MR. RIDGWAY:  Your Honor, I understood that we would

13    be arguing about whether they would be present for any FISA

14    suppression related hearings.

15              MR. DURKIN:  Yes.

16              MR. RIDGWAY:  And that's fine.  I didn't understand

17    there to be anything about the CIPA at this hearing.

18              THE COURT:  All right.

19              MR. DURKIN:  And I'm the one that misspoke.  That's

20    correct.

21              THE COURT:  It's FISA.

22              MR. DURKIN:  FISA, yes.

23              THE COURT:  Not CIPA.  All right.  As long as we're

24    all on the same page with that.

25              MR. DURKIN:  Yes.
```

1          MR. RIDGWAY:  And if I could inject one point on the

2     CIPA.  I do -- defense counsel has been very generous with us

3     in terms of getting us extensions and so, but I will say the

4     CIPA filing's been on file for -- since March of last year.  It

5     is something that we would like to have dealt with.  And so in

6     particular because we don't want to have any reason to delay

7     the trial date in this case.  I just ask that we can

8     expeditiously handle that.

9          MR. DURKIN:  We can do that.

10         THE COURT:  The Court agrees.  That was one of the

11    reasons I brought it up today.  Just to make sure it's on the

12    radar, but not being dealt with.

13         MR. DURKIN:  I appreciate that.  I assume you can

14    understand, though, that our submission will be different now

15    that the cases are consolidated.

16         THE COURT:  And I'm not going to presume what you

17    will be submitting, but --

18         MR. DURKIN:  Oh, no, but I mean I -- we didn't

19    intentionally delay because we were not interested.  It was --

20    we just thought it would be difficult to present in one

21    pleading if we still didn't know what was happening with the

22    consolidation.

23         THE COURT:  If the Court hadn't thought that you were

24    still interested, the Court would have ruled as the Court had

25    stated in its motion that I would rule without your

1    submissions.

2            MR. DURKIN:  I kind of figured that.

3            THE COURT:  So the Court understands that you still

4    have a desire to --

5            MR. DURKIN:  Thank you.

6            THE COURT:  -- make a presentation, and we'll set a

7    time period at the close of this proceeding today.

8            MR. DURKIN:  That's fine.  Thank you.

9            THE COURT:  All right.  And so since it's your

10   motion, if defense wants to either stand to the side or

11   whichever.  You can be seated.  However you want to do it.

12           MR. DURKIN:  What I was hoping to do is I'd like to

13   argue -- Mr. Herman would like to argue the discovery related

14   motion.

15           MR. HERMAN:  Right.  The non-FISA discovery motion

16   that fits into the surveillance and investigation.  And as I

17   think you'll see that there will be overlap.  That is just a

18   natural outcome of the way the arguments and the issues are

19   framed.  And Mr. Durkin will argue the FISA and the FAA related

20   motions.

21           THE COURT:  All right.  All right.  That will be

22   fine.  What the Court will suggest is that why doesn't

23   everybody including Mr. Daoud have a seat at the table.  And

24   that way we can be a little bit more organized in how we go

25   about this.

1           MR. DURKIN:  That's fine.

2           THE COURT:  And defense may proceed when they're

3    ready, and then the government may respond.  Understanding by

4    all that this Court has reviewed all of the submissions, and

5    this Court will also note that although, and that you have

6    presented an article and there may be some references to other

7    proceedings, that this Court is focused on what's going on in

8    this case and what's relevant to this case and not an overall

9    view of the surveillance system and all the news that surrounds

10   it that may have nothing whatsoever to do with this case.

11   Keeping that in mind in your arguments, proceed.

12          MR. DURKIN:  Well, thank you, Judge.  And thanks,

13   first of all, for giving us the opportunity to argue, because I

14   think this is a significant motion at a significant time in our

15   history involving this growth of the national security state.

16   And I understand that things may or may not be relevant to the

17   bigger picture from the Snowden matter, but that goes to the

18   heart of the problem.  We don't know that.  And that's one of

19   the biggest problems here.

20          I would respectfully submit that the opinions of --

21   and I'm assuming you were talking when you just mentioned other

22   cases, the two opinions that have been widely publicized by

23   both -- regarding the 215 issue by Judge Leon in Washington and

24   Judge Pauley in New York.  Those opinions I think are germane

25   to the bigger picture that I think is at stake here.  I think

1    what is at stake here is a genuine issue of transparency and

2    the effectiveness of the adversary system, which is at the

3    heart of this, and I think going to our fundamental premise.

4    And I don't think I'm to a point where I can jump and argue the

5    unconstitutionality as Judge Leon has set out, or conversely

6    the lawfulness of the 215 regarding -- that Judge Pauley found.

7            But nevertheless I think that issue is there, and I

8    think it could be relevant in this case depending on what we

9    discover and depending on what is presented to you in the FISA

10   proceedings.  And that's why I think that this is the case, if

11   there was ever a case where the adversary system should be

12   permitted to have access to the FISA proceeding.  We've set it

13   out -- I mean, I think our reply brief is probably the most

14   comprehensive response that I could make to the entire issue.

15   But we set our argument out there.

16           We are both cleared counsel.  I believe, you know,

17   and if it's not part of the record, I'd make it part of the

18   record.  If you need a submission, I would do it, but I was

19   part of the Military Commissions in Guantanamo Bay.  I was

20   counsel originally in the 911 conspiracy case.  And in the

21   course of that proceeding and the Military Commissions I was

22   granted a top secret SCI clearance, which I believe is the

23   highest clearance you can possibly get.  I was privy to all

24   kinds of classified, confidential evidence in that case.  I

25   think there is no question that there's adequate protection

1    involved simply under the procedures and the protective orders.

2          And I think where we're at is that I believe that

3    there are questions about the viability of the adversarial

4    system in this country at least insofar as terrorism related

5    cases are concerned.  And with all due respect, I think you can

6    kind of take your side of where you want to come out in history

7    on this, because I don't think I'm overstating it to say we are

8    at a crossroads here.  The Snowden leaks have created an

9    enormous controversy in this country over what's going on, and

10   the consequences of a nontransparent intelligence agency

11   operating in the dark.

12         And I'm not going to get into whether *The New York*

13   *Times* is right in praising Snowden or calling for whatever.

14   But the fact remains is that there is a tremendously serious

15   debate going on in this country over I believe what happened in

16   this case.  I believe that that program was used in some

17   fashion in this case.  I can't prove it.  I don't have any

18   access to be able to prove it, but -- and Mr. Herman will

19   address it in more detail with respect to the discovery side of

20   it, but the timing all fits as well.  And he, he will address

21   that later.

22         THE COURT:  All right.  Can you -- now that the Court

23   has given you a lot of latitude in your prefacing remarks, can

24   you be more specific to the case here as to what you are asking

25   for in this case here.

1          MR. DURKIN:  What I'm asking for right now and what I

2     want to argue about right now is simply the ability to

3     participate in the FISA hearing.  I'm asking very seriously for

4     you to consider permitting cleared counsel to be part of this

5     process, because I think the lack of transparency and the

6     suspicion surrounding this program and the controversy that's

7     going on demands it.  And in this case -- and that's the reason

8     I gave you the Mearsheimer article.  And I'm not trying to

9     belabor it.  But the reason I found that article interesting is

10    that that's an article that's written by a political scientist

11    of significant repute.  It is -- and he is not a flaming

12    liberal by any stretch of the imagination.  And some --

13          THE COURT:  Whatever that means.

14          MR. DURKIN:  Well, people accuse me of that at times.

15    He is a very serious political scientist.  And I think that

16    some of the comments he makes here are relevant to what we're

17    talking about today.  He's talking about, you know, core

18    principles of a liberal society trampling on the rule of law.

19    And he's talking about secrecy.  He's talking about, you know,

20    the exaggerated fear of foreign threats that permeates the

21    American national security establishment.  It is unsurprising

22    that Presidents Bush and Obama have pursued policies that

23    endanger liberal democracy at home.

24          Now, I'm not trying to be dramatic.  But this -- I

25    genuinely believe that he's right.  And I genuinely believe

1    what we've put in our pleading here is accurate.  I don't

2    believe that the U.S. Attorney's office gets the straight

3    information from the intelligence agencies.  I simply don't

4    believe it because I know how other cases operate.  I know what

5    happens in the normal give and take with prosecutors.  It

6    doesn't happen in these types of cases.  We don't get the kinds

7    of responses that we get in this case in any other type of

8    cases.

9            And I said in our pleading I think it really calls

10   out for an independent judiciary to get involved.  Judge

11   Pauley, with all due respect to him, starts out his opinion --

12           THE COURT:  And the Court really doesn't want to get

13   into discussion, Mr. Durkin, on the recent decisions on either

14   side of what the judges say.

15           MR. DURKIN:  But here's -- what I'm getting at is

16   what Mearsheimer is talking about, what Pauley talks about,

17   what everybody is talking about, which is the use of fear to

18   quiet any criticism of what's going on.  And the use of fear to

19   back off the judiciary.  And that I think is what's going on.

20   I understand that you have to follow precedent.  I understand

21   that the law is a certain way.  But I don't believe that you

22   can rely simply on the representations of the U.S. Attorney's

23   office.  Not because they're hiding anything, but because

24   things are being hidden from them.

25           I do not understand, for example, why we can't get a

1    simple answer of what happened here.  Is that because it's too

2    secret to know?  What possibly could have happened here in this

3    case that would be too secret for us to know about?  And if it

4    is, why can't we then be told in secret as part of the -- as

5    cleared counsel and as part of the protective order?  There's

6    no reason not to be.  And that's what's at stake here.  And I

7    understand you don't want -- I won't -- some other time I'll

8    give you my argument on Pauley versus Leon.  But what we're

9    talking about is this case and what happened.

10            And I'll defer to Mr. Herman to give you more of the

11   timeline as to why we suspect that there is something there.

12   But what I'm saying bluntly is if it's there and we're right,

13   then we should get to challenge the constitutionality of the

14   FAA, because he is a criminal defendant entitled to that.  And

15   we shouldn't have to play semantics about whether the evidence

16   was used or derived from or whatever way they want to parse it.

17   It's a simple proposition.  Was something used or not?  We

18   believe it was.

19            THE COURT:  All right.  Thank you, Mr. Durkin.  I'm

20   going to allow -- before you step up, Mr. Herman, I'm going to

21   allow the government if they wish to respond at this point to

22   the request to participate in the FISA hearing.

23            MR. RIDGWAY:  Thank you, Judge.  Respectfully

24   regarding some of the information that we've seen and the

25   responses, much of that I believe is not really applicable to

1    the facts of this case.  And so I want to focus on the facts in
2    this case here.

3         This is an individual we provided notice to that
4    information was collected through a traditional FISA.  That
5    means that a federal judge made a decision that there was
6    probable cause the defendant was acting as an agent of a
7    foreign power.  Now, I understand the defense has moved to
8    suppress that FISA, and that's, and that's its right.  But it's
9    important to keep in mind, though, that Your Honor is going
10   have the opportunity to assess whether the judge was correct in
11   making that assessment in terms of probable cause.

12        And Your Honor will also have the opportunity to
13   assess the allegations that we've heard surrounding this case
14   from the defense.  And there's a procedure for that review
15   that's critical here, and that procedure is laid out in the
16   statute.  If the Attorney General submits a declaration saying
17   that permitting the defense access to the hearing would harm
18   national security, as Attorney General Holder has done here, if
19   that's the case, then the default is that the proceedings are
20   held in camera and ex parte.  And that is the default that has
21   been followed for over 35 years now in FISA litigation.

22        And, Your Honor, I don't believe that the filings we
23   received from the defense that -- what the defense has offered
24   you has given you a reason to deviate from what really is
25   decades of precedent.  There are articles related to

1   disclosures obviously.  And, of course, there is a lot of media

2   associated generally with surveillance and the NSA and things

3   like that.

4          THE COURT:  Well, it's not just the media, is it, Mr.

5   Ridgway?  I mean, hasn't there have been some facts that have

6   come out to --

7          MR. RIDGWAY:  There certainly have, Your Honor, and

8   I'm certainly not an expert in that area, and I won't be able

9   to weigh in on that.  But I -- so there has been a great deal

10  of information.

11         THE COURT:  Some things have changed since the last

12  30 years.  That's what the Court is saying.  I'm sure that

13  that's what Mr. Durkin is also saying.

14         MR. RIDGWAY:  Yes, Your Honor.  But it's important to

15  keep in mind that those reports don't, they don't change the

16  case law.  The case law still is what it is.  And more

17  importantly, it relates to information that's really not at

18  issue here.  So to be specific, FISA Amendments Act, we've

19  heard a lot about that.  That's part of the statute that's

20  related to many of these disclosures.  And the government has

21  represented in its previous filing, and I can do so again, that

22  if in this case the government was intending to use any

23  information obtained or derived from the FISA Amendments Act in

24  the case against Adel Daoud in which he is aggrieved party,

25  then we would provide notice.  And no notice has been provided

 1    in this case because those aren't the facts -- that's not the

 2    facts of this case.  And so --

 3            THE COURT:  And is it correct that you have on at

 4    least two occasions before this Court stated on the record that

 5    this is traditional FISA material, not FAA related, is that

 6    correct?

 7            MR. RIDGWAY:  That's correct, Your Honor, that we

 8    provided notice for a traditional FISA, not for FAA related

 9    acquisition.  So the information that has been -- that has --

10    that the defense has talked about really doesn't have bearing

11    on the issues in this case.  And so I don't think it gives

12    reason for you to deviate from the precedents that we laid out

13    in our filing.  Case after case of judges finding that it was

14    appropriate to review a FISA, review its legality ex parte and

15    in camera.

16            THE COURT:  Thank you very much.  Mr. Durkin, very

17    brief reply if there is one or no.

18            MR. DURKIN:  Well, I think --

19            THE COURT:  Not a new speech.  Just a brief reply.

20            MR. DURKIN:  I think we addressed it in our reply.

21    The government's history of ex parte proceedings has not shown

22    to be very reliable based on the opinions that have come out of

23    the FISA court.  So I think that knocks that argument down

24    completely, and I'll defer to what we wrote in the reply.

25            THE COURT:  Great.  Thank you, Mr. Durkin.  All

1   right.  Mr. Herman.

2           MR. HERMAN:  Judge, I want to thank you as well.  And

3   as we said before, I'm going to focus on document No. 54 which

4   was filed, which was our motion for additional discovery

5   regarding the government's surveillance and investigation of

6   Adel Daoud.  There will be some overlap because, as I said

7   before, I think the overlap's natural.

8           One of the things that you had said before Mr. Durkin

9   got up and possibly as a preemptive strike is that you had read

10  everything.  Well, the fact of the matter is is that we

11  haven't.

12          THE COURT:  Well, let me say this:  Read everything

13  that you have submitted to me.

14          MR. HERMAN:  Well, we haven't read everything that's

15  out there.  One of the government's most substantial pleadings

16  was the response to one of the motions that Mr. Durkin

17  addressed, which was our motion to participate in the FISA

18  hearing.  That document, as you know, and as the public knows

19  and as we are limited to knowing is substantially redacted.  We

20  can only guess what's in there, in that document.  And that

21  arrives at one of the themes to our motion for discovery, which

22  is targeted at non-FISA related information but information

23  that is very significant to the case and some defenses that we

24  anticipate raising, specifically that of entrapment, which is

25  the issue of transparency.

1        And we think that there's some spill over and bleed

2   over from this intelligence agency mentality of secrecy and in

3   the investigation of Adel Daoud into what is more of a

4   traditional discovery request here into material that is both

5   relevant and we believe material to this case, specifically as

6   to issues of entrapment and Mr. Daoud's predisposition or lack

7   thereof, and the steps, the extraordinary steps that the

8   government took in inducing Mr. Daoud.

9        As Mr. Durkin said, there's some facts here.  And I

10  want to -- as high as he was, I want to get down into the weeds

11  just a little bit to frame the importance of our discovery

12  requests here.  In the indictment -- excuse me, in the criminal

13  complaint that was filed in this case one of the first dates we

14  see is October 2011, which is significantly just after Mr.

15  Daoud turned 18.  In the discovery, and the government may say

16  they've turned over voluminous discovery, and that's absolutely

17  correct.  And I will say that the government has been -- the

18  prosecutors here have been very cooperative in working out

19  disputes and issues so we wouldn't have to bring them to the

20  Court.  So I'd like to commend them for that.

21       But at the same time to echo a theme that Mr. Durkin

22  said, we just don't know that they know everything.  In fact,

23  we believe that they don't know everything that's out there,

24  and certain materials have been held up in the declassification

25  channel.  So just not -- simply not provided.  So we're making

1   these --

2           THE COURT:  And what again are you basing that on?

3           MR. HERMAN:  We're basing it on --

4           THE COURT:  Your not knowing what they might not know

5   that you think they know but you don't know.

6           MR. HERMAN:  It's common sense based on everything

7   that Mr. Durkin said in the terms of the lack of candor that

8   the intelligence agencies had even before the FISC, the Foreign

9   Intelligence Surveillance Court.  How many times they've

10  been -- the intelligence agencies and the government have been

11  chided for not being honest.  How many times they've had to

12  come and correct themselves.  Judge Bates' opinion, Judge

13  Walton's opinion.  Judge Bates' opinion, and this will -- I

14  want to segue back into this timeline here -- is significant we

15  believe.  And I'm not trying to go afield into the FAA

16  arguments, but like I said, there is an overlap.

17          That opinion was dated I believe October 3rd, 2011.

18  Again, it's significant.  And this is just not tin foil hat

19  paranoia here.  We believe that there's a basis.  October 2011

20  is also significant because it's a date where Mr. Daoud and his

21  family traveled to Saudi Arabia for a Hajj, for a traditional

22  Muslim pilgrimage.  Around that time we're also seeing

23  communications and e-mail traffic regarding the downloading of

24  certain speeches from Anwar al-Awlaki, who was droned and

25  killed by the government in September of 2011.  Judge Bates'

1    opinion discussed what I believe what's known as the upstream

2    collection of data, which was the snaring of international

3    communications through undersea cables.

4         We believe based on that, and that's where we assert

5    our good faith basis for the strong possibility which we

6    believe is true that Mr. Daoud's communications were not simply

7    as the document that we submitted.  And I believe our final

8    pleading under seal we report this was not an investigation

9    that simply happened to be opened from an unsolicited source

10   providing information to the FBI in May of 2012.  The complaint

11   talks about communications in October of 2011.  We have in

12   discovery communications and e-mails long before then.  Perhaps

13   the government knows how that information was then collected

14   through various databases of Google or YouTube because it's

15   very strangely organized in a manner that we who have been

16   practicing and receiving discovery in a lot of cases are not

17   used to seeing the way that has been organized.

18        There is also a significant concern of -- and this

19   ties directly into materiality and relevance because of this

20   entrapment defense.  We think it's very telling if the

21   government is watching and monitoring Mr. Daoud for several

22   months in order to, in order to make a determination of whether

23   he is, for lack of a better word or phrase, a fitting candidate

24   for yet another government sting operation.  We know, and I

25   know you don't want to hear about other cases, but young Muslim

1    males are often prime candidates for government sting

2    operations.

3            Probably the most similar case is the case of -- in

4    Portland of -- against Mohamed Osman Mohamud, who was known

5    as the Christmas tree bomber.  What's the analogy and the fact

6    that I want to impress about that case is the defendant also in

7    that case represented by Steve Wade -- Steve Sady and Steve Wax

8    I believe, who are very experienced attorneys, I believe one is

9    the Federal Defender from the district if I'm not mistaken,

10   made requests to the government for the surveillance

11   authorities that were used.

12           The case went to trial.  There was nothing about

13   Section 215 or the FAA disclosed.  In fact, there was just a

14   traditional FISA notice.  And I'm responding to something that

15   Mr. Ridgway said about providing the notice and to your

16   question about them not knowing -- we not knowing what they

17   don't know or et cetera, et cetera.  After conviction after a

18   jury trial Mr. Mohamud was provided notice that I believe it

19   was Section 215 was, in fact, used in that case.  And we

20   spelled this out in our briefs.

21           In the case in Colorado that's pending right now,

22   Muratov, again there was a traditional FISA notice.  Mr.

23   Muratov and his counsel were just -- were recently provided

24   with information that the FAA was, in fact, used.  And the link

25   to Mr. Daoud's case is that both Mr. Daoud and Mr. Muratov were

1    mentioned by Senator Feinstein on December 27th, 2012 in her

2    Senate floor speech.  And I'm bringing that up because I don't

3    want docket No. 70 to not go mentioned, which is when we posed

4    the question that Senate legal counsel Frankel essentially said

5    all the information they're receiving is from the Executive

6    Branch.

7              We're quite frankly being whipsawed here.  And we

8    think that our -- just all of our discovery requests, both FISA

9    and our traditional FISA -- or traditional discovery requests,

10   and I'm calling it traditional, but it's a little -- even

11   though within the confines of Rule 16 and Brady we believe it's

12   not what you see every day.  We're being forced to make these

13   requests, and we believe transparency compels the answering to

14   them.

15             I want to make one final point about the specific

16   request we made regarding Exhibit A to our docket 54, which is

17   the 2002 FBI manual regarding the operation of undercover

18   guidelines, which I found on Google just looking around for

19   some stuff.  And so it's out there.  It's not a secret.  The

20   government does not deny that it's not applicable authority in

21   this case.  This is an incredibly important document to look

22   over closely with respect to the issues of entrapment, which

23   are spelled out on pages 16 and 17.

24             On page 17 there's an issue -- there's a sentence

25   when an undercover employee learns that persons under

1    investigation intend to commit a violent crime, he or she shall

2    try to discourage the violence.  In this case, Your Honor, we

3    had two online undercover employees, and this is spelled out in

4    the complaint, who in mid-May 2012 reached out to Adel Daoud

5    online and started conversations, purporting to be totally

6    independent of each other, but essentially creating an echo

7    chamber of extremism that Adel Daoud began to -- Mr. Daoud

8    began to engage them in conversations.  They're working for the

9    FBI.  They're operating --

10            THE COURT:  You said they started it, but then you

11   just said that --

12            MR. HERMAN:  They were communicating --

13            THE COURT:  -- that he engaged them in conversation.

14            MR. HERMAN:  They were communicating with each other.

15   Mr. Daoud didn't send an e-mail to one of these fellas, whoever

16   they were.  If they were actually two people or if it was just

17   one person posing as two people.  They contacted him.  And I

18   believe that's again spelled out in the complaint.  One of

19   these OCEs then invited -- said, hey, I have a flesh and blood

20   person that you can meet, a real terrorist.

21            What's interesting here and we -- Mr. Durkin said

22   this on I believe day one when we were on the case that if you

23   look in the indictment -- or at the complaint, excuse me, pages

24   40 -- paragraphs 41 through 43, there's an incredibly important

25   moment in the case when Mr. Daoud is confronted by his sheikh

1    during Itikaf, which is a period of prayer and contemplation

2    during the Ramadan period.  After this confrontation, another

3    individual said he wasn't interested in participating in any

4    type of activity.  Mr. Daoud spoke with the UCE, the flesh and

5    blood agent, who said he was going to get the real fatwa.  This

6    was in mid-August 2012.

7            The next meeting that the -- that Mr. Daoud had with

8    the UCE was on August 23rd, 2012, when the UCE assured Mr.

9    Daoud that this jihad had to be in his heart after Mr. Daoud

10   was expressing doubts.  On August 22nd, 2012, one day before

11   this meeting, we understand from discovery that the FBI

12   constructed the fake bomb that Mr. Daoud subsequently tried to

13   detonate.  That is hardly compliance with the FBI guidelines.

14   It's directly material to the issue of predisposition, to the

15   issue of inducement.

16           And before I take up any more time, we pose questions

17   on page 4 of our reply and also -- on docket No. 69, and also

18   on docket No. 70 at the bottom of page 4 to page 5, which is

19   the question in response to Senate legal counsel Frankel.  We

20   submit that answering those questions go a long way in

21   resolving these discovery issues.  And submitting documents for

22   in camera review or to cleared counsel may also be solutions

23   that could balance the interests in this case.

24           THE COURT:  Thank you, Mr. Herman.  Response by the

25   government.  Mr. Ridgway.

1          MR. RIDGWAY:  Thank you, Judge.  I just have a few

2     points I wanted to address.  First, comments about the e-mails

3     that were collected and provided to the defense in this case

4     and the date range regarding those e-mails.  Those were

5     collected via a traditional FISA.  And I've said that before,

6     but that's worth saying again.  And in terms of -- and this is

7     not even limited to FISA context or search warrant context.

8     When someone does a court order to collect information from an

9     account, information that is stored in the e-mail account will

10    also be retrieved pursuant to that search warrant.

11          So associating the timing of a particular e-mail that

12    was collected and provided to the defense, it doesn't

13    necessarily have any correlation with, for example, when the

14    investigation actually commenced, if that makes sense.  When

15    there's stored -- when someone has e-mails stored in their

16    account and there's a search warrant executed, the stored

17    e-mail communications are also provided pursuant to that search

18    warrant.

19          With regard -- there is some discussion in terms of

20    classified materials.  And, Your Honor, we had briefed the CIPA

21    issue, and so I don't want to go too much into that except to

22    say that there is a vehicle for handling classified

23    information.  There is classified information in this case, and

24    we have used the CIPA in order to apprise Your Honor of that

25    information.  And so I think that's the appropriate vehicle for

1    handling any classified information in this case.  That's the

2    same, the same procedure that's used in any case involving

3    classified information.

4            Finally, with respect to the communications with the

5    online undercover employees and the communications with the

6    undercover agent, obviously the defense has a different

7    interpretation of how those communications transpired.  If I

8    could cite some points at which I would submit that the

9    government was trying to discourage Mr. Daoud from carrying out

10   the attack, I'm sure there would be -- there's going to be

11   argument about that.  The important point, though, is for

12   discovery.  They have all of those communications.

13           The online undercover employees preserved, and we

14   disclosed all of those communications.  They have all the

15   electronic communications with the undercover agent.  They have

16   recordings of all the meetings with the undercover agent.  And

17   I'm certain that they're going to have very -- have arguments

18   associated with that information.  But for purposes of

19   discovery it's important to keep in mind that they have those

20   materials for them to review and to make argument.  If you have

21   no further questions, I'll just rest on my filing.

22           THE COURT:  And furthermore, maybe you did already

23   address it, but if you can address it again where they're

24   speaking of the procedures.  You want to save that for the

25   CIPA, or do you want to at least make a few more comments.

1          MR. RIDGWAY:  You mean in terms of the ex parte in

2     camera?

3          THE COURT:  Right.

4          MR. RIDGWAY:  Well, they certainly will be very

5     similar to the ones, my remarks regarding the FISA in the sense

6     that there is a statutory regime that provides for ex parte

7     submissions.  And in this case as in any other circumstance

8     those are what we have requested and that we have submitted

9     information justifying that in this particular case.  Apart

10    from that in terms of the particular cases, I think those are

11    outlined in our brief.  And I believe they've actually already

12    responded to that aspect of the CIPA issue.

13         THE COURT:  Thank you.

14         MR. HERMAN:  Just one brief point.  Mr. Ridgway said

15    we have all the e-mails.  We have all the information.  That

16    may be true as to the communications.  And we don't know if it

17    is, but we'll take his word for it I guess.  But what we're

18    asking for in our discovery motion is -- and particularly as it

19    pertains to these guidelines, is what information led the UCE

20    in the meeting to say -- to talk about the sheikh.  You know,

21    to use the religious card, the iman card.  How that plays into

22    issues of predisposition.

23         And the government in their brief raised the Rule 16

24    (a) 2 issue in terms of nondisclosure of investigatory memos

25    and reports and what not.  I think we've addressed that in our

1    reply, but it goes without saying that Brady trumps Rule 16 (a)

2    2, Brady's constitutional provisions.  And Brady is also

3    important for the issue of impeachment.  And if a government

4    witness will testify as to an individual, Mr. Daoud's

5    predisposition, it would be material to the cross-examination

6    of that witness as to the government's calculated efforts to

7    get around the issue of predisposition vis-a-vis ratcheting up

8    the inducement, and in this specific factual instance playing

9    the religious card.  Thanks.

10              THE COURT:  Thank you.  Mr. Ridgway, does anyone want

11   to -- you want to respond to the last argument --

12              MR. RIDGWAY:  Sure, Your Honor.

13              THE COURT:  -- versus Brady trumping --

14              MR. RIDGWAY:  So long as I'm -- I think I understand

15   it.  And to the extent, you know, materials related to I guess

16   playing the religious card and things --

17              THE COURT:  The predisposition issue for purposes of

18   their entrapment defense.

19              MR. RIDGWAY:  And so I guess what I don't understand

20   its discoverability under any rule in terms of -- what matters

21   is what -- the ultimate issue is whether law enforcement

22   persuaded or induced the defendant in this case.  And what's

23   relevant to that is what they did and said to the defendant,

24   and that's all been disclosed.

25              To the extent there is Giglio information about any

1  of the individuals who will be testifying, we haven't yet

2  provided all those materials.  And to the extent those exist,

3  and we obviously will do so before trial as we do in any of our

4  cases.  So if there -- if particular impeaching material, we

5  would either bring it to Your Honor or disclose it.  But

6  there's nothing that I can think of at this point that would be

7  responsive to that.

8          THE COURT:  Well, the slight difference as you said

9  as you do in any of the cases is that this wouldn't be just

10  possibly any old Giglio material.  This is material that might

11  have another door closed because his last name isn't Smith.

12          MR. RIDGWAY:  Well, certainly it is different in the

13  sense that there are classified materials in this case.  And

14  because of that there could be different procedures and maybe

15  something that has to be filed via CIPA.  That said, the

16  underlying rules still all apply in terms of Brady, Giglio,

17  Rule 16.  Our obligations are the same.  The procedures for,

18  for those -- for carrying out those obligations are a little

19  bit different in a case involving classified material.  But the

20  underlying rights are the same for a defendant.

21          THE COURT:  Thank you.

22          MR. RIDGWAY:  Thank you.

23          THE COURT:  Anything further?  Have we covered all

24  the motions that the Court is going to address?  I believe I've

25  heard argument that I need.  Mr. Durkin, you want to wind up.

1          MR. DURKIN:  Well, only in the sense that I don't

2     understand what would be so terrible to let us participate in

3     this.  And just that little discussion right there would solve

4     so many problems if we knew that.  And that's what's wrong

5     here.  Okay.  Typically I trust what a guy like Ridgway tells

6     me.  We have conversations lawyer to lawyer.  And I say what

7     really went on here.  This goes on every day in every kind of

8     case that's in front of you here.  For the 40 years I've been

9     practicing law I've relied on the integrity of the U.S.

10    Attorney's office to tell me what really happened.  And if I'm

11    satisfied, I shut up.  Sometimes I don't shut up.

12          But that usually -- that normal give and take doesn't

13    exist anymore.  And I can't make that point any stronger to

14    you.  It doesn't exist because I don't think they're getting

15    the full story.  It's not because they're lying to us.  But

16    what kind of answer is it to say if we decide we're going to

17    use something, we're going to give notice?  Does that mean

18    implicit in that then that they did -- they obviously must have

19    gotten something, but they're just not going to use it?

20          THE COURT:  Well, also the other side is just because

21    you're not satisfied, does that mean that there's something

22    there?

23          MR. DURKIN:  No, but vice versa why can't they tell

24    us that  then?  What's the problem with telling us that?  If

25    they can't tell it to us lawyer to lawyer, then why can't

1    cleared counsel be permitted to know that?

2              THE COURT:  Well, isn't it true, Counsel, you just

3    said, we've told you everything.  We told you what we have and

4    what is going to be FA -- what isn't FAA and what is FISA

5    traditional.  We've given them what we have, but you say but

6    you know what, I might believe him, but he doesn't know

7    everything.  And, therefore, we can't believe him.

8              MR. DURKIN:  But I don't hear them saying that.  What

9    I hear them saying is we're not going to use it.  And if we use

10   it, we'll let them know.  That's what I hear them saying.

11   They're not saying it was never used.  They're not saying 215

12   never came into play here or FAA never came into play.  Senator

13   Feinstein says it does.  And then her counsel says, well, if

14   she said that, she didn't mean to say it.  Or maybe she meant

15   to say something else.

16             THE COURT:  And the Court's going to put Senator

17   Feinstein's comments on the other side over here.

18             MR. DURKIN:  But that's -- I understand.  But my

19   point is is that I don't hear them saying it wasn't used.  If

20   it wasn't used, we could all go home.  There's nothing else to

21   talk about other than the typical stuff.  But that's what's

22   happening, because we aren't part of the process.  I don't know

23   what they've told you.  I don't know why cleared counsel can't

24   see what they tell you.  I don't know why we have to have a

25   different system for the prosecution of terrorism cases in this

1    country.  And that's what's happening.

2        And if it continues, if they just get to say the

3    rules are the rules and there's nothing extraordinary about

4    this case, if there's nothing extraordinary about this case,

5    then there won't be anything extraordinary about very many

6    other cases.  And we can just go by the rules, the rules that

7    the intelligence agencies have created, which keeps the

8    adversarial process out of it.

9        And I don't mean to belabor it.  But how could it be

10   said that any harm could come if we were permitted to do that?

11   And that's what I'm asking you to do.  Because it would -- I'll

12   tell you what it would do an enormously good thing for.  It

13   would give some faith to people who are losing faith in the

14   ability of the judiciary to even control their own courtrooms

15   in criminal prosecutions.  And I don't think you want to end up

16   with two different kinds of prosecutions going on.  We're going

17   to have secret courts and then we're going have the regular

18   courts.  And I guess we'll have everything -- everything will

19   be fair in a mail fraud case or a bank robbery case or, you

20   know, a postal theft case.  But when it comes to terrorism,

21   that's just too frightening.

22       And that's what's happening.  Maybe that's too big a

23   picture and maybe I'm Chicken Little, the sky is falling, but I

24   don't think so.

25       THE COURT:  Well, I think the terminology you used

1    earlier, fear can work both ways.  When you talk about the fear

2    of the courts, it can work both ways.  It can work from your

3    end saying that the sky is falling, or it can work from the

4    other end.

5         MR. DURKIN:  I understand that.  But what I'm saying

6    is is that if people lose faith in an independent judiciary to

7    be able to provide transparency to the proceedings, then we've

8    lost everything.  And that's what's happening.  Maybe it's not

9    just this case.  But it's the snowball of this case and that

10   case.  And now we're saying -- now, it's 35 years of these

11   rules working well.  Working well for the intelligence agencies

12   maybe, but not necessarily working well for the Portland

13   bomber.

14        And why should we permit that?  That's all I'm

15   asking.  I'm not asking you to rule anything unconstitutional.

16   I'm simply saying step up and simply say the time has come.

17   This case, it would be appropriate for the adversarial process

18   to be permitted and for cleared counsel to have access to this.

19   That might solve everything.  It might not.  But it would go a

20   long way to restoring a lot of lost faith in this country.

21   Thank you.

22        THE COURT:  Well, this Court doesn't know if its

23   ruling will be that grandiose, Mr. Durkin, but the Court keeps

24   in mind your argument.  Thank you.

25        MR. DURKIN:  I'm suggesting it is.

1          THE COURT:  The Court will take a look at it and see

2    first in the context of this particular defendant and his

3    rights.  All right.  Thank you.

4          The Court -- before we conclude here, there is in

5    addition to the -- setting a date for the CIPA motions or

6    response from the defendant, on docket No. 70, which has been

7    addressed here somewhat, the government never filed a response

8    to defendant's motion.  Do you want to stand on your -- unless

9    I'm mistaken.

10          MR. RIDGWAY:  Your Honor, I believe that's in

11    reference to the FAA if I'm correct.

12          THE COURT:  Yes.

13          MR. RIDGWAY:  In which case we would ask to rest on

14    our -- the surreply we've submitted.  I think we've submitted

15    enough on the FAA.

16          THE COURT:  The Court thought so.  But since I wanted

17    to make sure the record was clear.  And do you wish to stand on

18    that as being your response, is that correct?

19          MR. RIDGWAY:  Correct.

20          THE COURT:  All right.  And as to CIPA, how long did

21    you want to respond?  Two weeks, three weeks.

22          MR. DURKIN:  I'm sorry?

23          THE COURT:  How long do you want to respond?

24          MR. DURKIN:  I heard numbers --

25          THE COURT:  Two weeks, three weeks.

1          MR. DURKIN:  Could I beg you for four only because

2     Mr. Herman and I are starting a trial in that NATO 3 case on

3     Monday in the state court.  And as you know --

4          THE COURT:  Sure.  I can give you four.  I'm just

5     looking at also our time on the other end.

6          MR. DURKIN:  Will that screw things up if we took

7     four?

8          MR. RIDGWAY:  I don't believe so.  I don't know that

9     a reply would be necessary.  So I think with that we would be

10    able to -- and I guess we could -- I'll look at the response

11    before I think a reply is necessary.  But I'd like to try to

12    expedite that.

13         THE COURT:  Well, since we're not -- since we aren't

14    sure whether or not you'll need a reply and the arguments are

15    pretty well known here, why don't we do the four weeks that you

16    need.

17         MR. DURKIN:  Thank you.

18         THE COURT:  But then we'll have -- just put in a

19    built-in seven days for the reply.

20         MR. DURKIN:  And the other problem, are you aware

21    that Miss Roberts broke her hip and --

22         THE COURT:  Yes.  And how is she?

23         MR. DURKIN:  She's okay.  She had blood clots in her

24    lungs which have been --

25         THE COURT:  That's what you were dealing with?

1          MR. DURKIN:  -- naturally complicated.  Yes, so

2    we're -- our three man firm is somewhat handicapped.

3          THE COURT:  I was going to say I trust you're playing

4    appropriate nurse maid.

5          MR. DURKIN:  You know, believe it or not I'm better

6    than I thought.

7          THE COURT:  Yes.  All right.  Well, good.

8          MR. DURKIN:  But I don't like it, I'll tell you that.

9          THE COURT:  I'm sure she doesn't either.

10          MR. DURKIN:  Thank you.

11          THE COURT:  All right.  Thank you very much.  And we

12    will set -- do we have a status date set, Mrs. Hunt?

13          MR. RIDGWAY:  I don't believe we do, Your Honor.

14          THE COURT:  We do not.

15          MR. RIDGWAY:  It may make sense to have one.

16          THE COURT:  All right.  So we have four weeks from

17    today will be the date for the response to the CIPA motions.

18          MR. DURKIN:  Right.

19          THE CLERK:  That's January 31st.

20          THE COURT:  Seven days thereafter for the reply.

21          THE CLERK:  February 11th.

22          THE COURT:  And so --

23          MR. RIDGWAY:  And just so I'm clear, actually just --

24    sorry.  In terms of the CIPA I understand that their responses,

25    in fact, will be ex parte.  So I don't think there will be a

1    need for a reply.

2              THE COURT:  There won't be a reply.

3              MR. RIDGWAY:  There will not be a reply.

4              THE COURT:  Right.

5              MR. RIDGWAY:  It will just be --

6              THE COURT:  So why don't we just do this, I'm looking

7    at -- I'll be on trial.  How about Thursday, February 6th

8    status date.

9              MR. DURKIN:  That should be fine.

10             MR. RIDGWAY:  That's fine, Your Honor.

11             THE COURT:  Or we can set it on -- how is

12   February 5th?  That's our normal --

13             MR. DURKIN:  Either one works, Judge.

14             THE COURT:  That's our normal status date.  Mrs.

15   Hunt, does that look fine?

16             THE CLERK:  Yes.

17             MR. DURKIN:  Judge.

18             THE COURT:  Yes.

19             MR. DURKIN:  The 6th would be better only because of

20   this, it's possible I could be on trial in Indiana in the

21   Northern District, but I don't think so.  But Mr. Herman has a

22   problem on the 5th.  He could be here on the 6th if I can't.

23             THE COURT:  All right.  Then we'll do 9:45 on the 6th

24   for status.

25             MR. DURKIN:  Thank you, Judge.

1          THE COURT:  All right.  Is there anything else,

2   government, that I need to address today that you can think of?

3          MR. RIDGWAY:  I don't believe so, Your Honor.

4          THE COURT:  All right.  And what about you, Mr.

5   Durkin, for Mr. Daoud?  All right.  Everything okay, Mr. Daoud?

6          MR. DURKIN:  He says he's okay.

7          THE COURT:  All right.  Good.  All right.  Thank you

8   very much for your submissions, Counsel.

9          MR. DURKIN:  Thanks, Judge.

10          MR. RIDGWAY:  Thank you, Judge.

11                       CERTIFICATE

12          I HEREBY CERTIFY that the foregoing is a true,

13   correct and complete transcript of the proceedings had at the

14   hearing of the aforementioned cause on the day and date hereof.

15

16   /s/TRACEY D. McCULLOUGH              February 10, 2014

17   Official Court Reporter                  Date
     United States District Court
18   Northern District of Illinois
     Eastern Division
19

20

21

22

23

24

25