IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 CR 723 |
| | ) | Judge Sharon Johnson Coleman |
| ADEL DAOUD, | ) | |
| | ) | |
| Defendant. | ) | |

**COUNSELS' EMERGENCY MOTION FOR AN EVIDENTIARY HEARING
TO DETERMINE THE MENTAL COMPETENCY OF THE DEFENDANT**

Attorneys, **THOMAS ANTHONY DURKIN**, **JANIS D. ROBERTS**, and **JOSHUA G. HERMAN**[1], attorneys for Defendant **ADEL DAOUD**, along with his parents, Ahmed and Mona Daoud, pursuant to 18 U.S.C. § 4241 *et seq.*, as well as the Due Process and Effective Assistance of Counsel clauses of the Fifth and Sixth Amendments to the Constitution, respectfully moves this Court for its order requiring an evidentiary hearing to determine whether there is reasonable cause to believe that Defendant may presently suffer from a mental disease or defect that renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.[2]

In support of this motion, Counsel show to the Court the following:

---

[1] Durkin Roberts & Grohman associate attorney, Robin V. Waters, has assisted in the defense of Mr. Daoud and the drafting of this pleading. She will be seeking leave to file an appearance as additional counsel at the next court appearance.

[2] So as to permit counsel to better assist Defendant at this hearing, counsel would also request in a separate pleading that the Court enter its order, consistent with the provisions of 18 U.S.C. § 4241(b) & 4247(b), permitting further mental health evaluation and analysis at either the Chicago Metropolitan Correctional Center ("MCC") or a suitable facility designated by the Attorney General of the United States. This pleading will also request the underlying data relied upon by Diana S. Goldstein, Ph.D., ABPP, of the Isaac Rey Forensic Group in her report to the Court dated September 26, 2015. Suffice it to say, for now, counsel and their consulting experts believe there are grounds to challenge Dr. Goldstein's conclusion that Mr. Daoud is presently competent to stand trial. This motion will be filed as soon as counsel can obtain the affidavits of their experts—all of whom practice outside Chicago, Illinois.

1. As the Court is aware from the prolonged and somewhat extraordinary pre-trial proceedings in this matter,[3] the issue of Defendant Daoud's mental health and competency has been a recurring issue.

2. On June 23, 2015, the Court granted the oral request of counsel for a psychiatric examination and testing of defendant by either Dr. Emily Keram or Stephen Xenakis (Dkt. #170). This request was based upon the information made available to the parties and the Court concerning the incident at the MCC on May 23, 2015, which now forms the basis of the third charge filed against Defendant in case number 15 CR 487 alleging among other things, assault with the intent to commit murder upon a fellow inmate at the MCC in violation of 18. U.S.C. § 113(a)(1) that is now pending in front of Judge Samuel Der-Yeghiayan. A copy of the transcript of the June 23, 2015, hearing is attached hereto as Exhibit A. It should be noted that at this hearing Mr. Daoud told the Court, among other things: "I would with the following condition be willing to plead guilty to like whatever the hell you want to charge me for if you all admit that you're part of the Illuminati and that you arrested me because I'm a Muslim…." (TR. p. 11).

3. After Defendant was seen by Dr. Xenakis, on July 29, 2015, counsel orally informed the Court of their own continued misgivings, and the misgivings of Dr. Xenakis, regarding Defendant's mental competency to stand trial. As a result, and at the request of defense counsel, the Court entered its order that day requiring that a psychological examination be conducted by the Isaac Ray Center. (Dkt. # 174). The parties agreed that the examination be conducted by the Isaac Ray Center so as to avoid the need for Defendant to be placed into the

---

[3] As the Court and the parties well know, as a result of its FISA ruling on January 29, 2014, the government took an interlocutory appeal that attracted national attention and a delay of over twelve months for it to be resolved by the Seventh Circuit and for the Supreme Court to deny Defendant's Petition for Certiorari. *See*, *United States v. Daoud*, 761 F.3d 678 (7th Cir. 2014), *cert. denied* (U.S. Feb. 23, 2015)(No. 14-794).

custody of the Attorney General for placement in a suitable facility pursuant to 18 U.S.C. § 4247(b).

4. On August 18, 2015, the parties appeared before the Court for a status hearing, which only raised further doubts in the minds of defense counsel that Defendant was not competent to stand trial. As the Court will recall, and as the transcript of the hearing attached as Exhibit B confirms, Defendant asked leave to address the Court because as he stated: "I've got a lot on my chest, man." (TR., p. 10). And, as the record shows, he most certainly did.

5. First, Defendant told the Court that "Anwar al-Awlaki Raham said to the Muslims in America, do not trust the disbelievers." (TR., p. 11). After ranting further about how Muslims were "slaughtered" in Bosnia and "burned alive" in Myanmar, Defendant insisted "[t]his world is united in a war against Islam," and that the plotters of this conspiracy could only be "devil worshipers" and the "Illuminati." (TR., p. 12). Defendant went on to explain to the Court that the Illuminati were seeking to "destroy all religions, especially Islam," and that they think they are "gods and that they are guided by divine spirits" who instead are "guided or misguided by devils." Defendant went on to add that the Illuminati had talked of blowing up Mecca and Medina, "like [the U.S.] did to Japan in World War II." (TR., p. 13).

6. Defendant then went on to tell the Court that "all the members—all the government are members of the Illuminati." Not wanting to "get into who the Illuminati is," Defendant told the Court that he knows that his case is a "hoax," his "trial is a hoax" and, asking that the Court not take offense, that he thought "the jury is Freemasons hired by the judge, you know." (*sic*) Not to be outdone, Defendant then told the Court that "all the judges and the prosecutors who represent them, *the lawyers who represent me* they're all members of the government who know each other,

3

believe in the same thing and *work together,* and they're conspiring against me." (TR., p. 14, 15) (emphasis added).

7. Interestingly enough, and as will become significant in light of further events that have transpired since August forming the basis of this motion, the Court instructed Mr. Daoud that it would not allow him to address the Court any further, and that he would have to rely upon his counsel in the future. And, to make the Court's instruction or request clearer, counsel told Mr. Daoud on the record that "if he wishes for us to file pleadings, we can incorporate some of his requests," if they are appropriate. (TR., pp. 16-17).

8. Also noteworthy, and as will become relevant to this motion, the Court informed counsel at the close of the August status hearing that it "would suggest that his family if they say should they be here, that they be here, because I think they need to hear what their son is saying."[4] (TR., p. 19). Counsel informed the Court it would order the transcript and provide it to Mr. Daoud's parents. (*Id.*).

9. On September 26, 2015, a report from the Isaac Ray Forensic Group was delivered to the Court and the parties. The report prepared by Diana S. Goldstein, Ph.D., ABBP, Director of Neuropsychology and Licensed Clinical Psychologist, opined as follows:

> "Mr. Daoud's psychiatric status is sufficiently stable, and his intellectual/cognitive capabilities sufficiently intact, for him to follow, understand, interpret and participate meaningfully in upcoming proceedings, and to aid his attorney meaningfully in a legal defense: he is <u>competent to stand trial or otherwise proceed.</u>"

Exhibit C, p. 16 (emphasis in original).

10. After receiving the report from Dr. Goldstein, the parties appeared before the Court

---

[4] To the best of counsel's recollection, this was the only time a family member was not present when Mr. Daoud appeared in court. As is reflected in the transcript, Mr. Daoud's father was in Egypt tending to a family illness and his mother was at work. (TR., pp. 5-6)

on October 5, 2015. Counsel for Defendant informed the Court at that time that the defense may take issue with Dr. Goldstein's report and request an evidentiary hearing.

11. Notwithstanding the Court's prior warning not to communicate with it other than through counsel, on November 12, 2015, unbeknownst to counsel, Defendant sent a letter to the Court with copies to the prosecutor telling the Court: "I do not understand why I am in jail." A copy of this letter, marked Exhibit C, is also attached hereto. In addition to declaring his innocence, Defendant expressed to the Court his hope that if God were to will it, and the Court read and understood the Koran, that perhaps it "will become a Muslim; like the Queen Sheba, in Surah 27, who became a Muslim at the hands of King Solomon." Defendant also expressed his opinion that Americans were "Islamophobic," and that he could not get a fair trial even with 12 random Americans. Thus, he requested that the Court permit someone not part of his family to go to a foreign country for trial and that he would "agree" to a trial in either Egypt, Saudi Arabia, Kuwait, Iran, Lebanon, Pakistan, Malaysia, Singapore, Moroco (sic), Algeria, Tounisia (sic) or Mexico."

12. It is counsel's understanding, according to a letter from Defendant dated November 30, 2015, but not received until December 2, 2015, that the Court's clerk sent the letter back to Mr. Daoud, saying that he has "to mail the letter to [counsel] and [the judge's] prosecutors." The letter went on to say that Defendant would not mind having "a conference [with] the Judge, and/or her attorneys, or even the FBI and discuss my case." (sic) The letter further went on to add other issues concerning his mental health that counsel have shared with their experts pursuant to the attorney/client privilege.

13. Suffice it to say, from all of the above matters coming to counsel's attention since

5

receiving the report of Dr. Goldstein in late September, and further observations by counsel in meetings with Defendant and those of his parents in visits at the Special Housing Unit ("SHU") at the MCC, as well as a meeting conducted at the U.S. Attorney's Office on December 4, 2015, with Defendant and his parents, counsel continue to harbor a serious good faith belief that Defendant is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.[5] As such, counsel respectfully submit that this Court should, and must, conduct an evidentiary hearing regarding Defendant's competency to stand trial.

      14.      18 USC § 4241(a) provides as follows:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a). "The test for competency is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'"

---

[5] Counsel have attached their respective declarations in support of this belief, marked Exhibits D-1 to D-3, respectively. While these meetings with counsel are obviously privileged, to the extent these meetings are relevant to assist the Court in understanding the basis for counsel's conclusions in their declarations, counsel would be willing to discuss these matters further on the record with the Court *ex parte* and *in camera.* This motion will be supplemented as soon as is practicable by affidavits or declarations from the defense experts who have examined and tested Defendant. Suffice it to say for now, these experts support the request for an evidentiary hearing, contest some of the findings of Dr. Goldstein, and believe further examination is in order based, among other things, upon the obvious mental deterioration of Defendant from the prolonged detention in the SHU.

*United States v. Garrett*, 903 F.2d 1105, 1116 (7th Cir. 1990) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)).

15.     A hearing must thus be held when there is "reasonable cause to believe" that a defendant is incompetent, as that term is defined by the statute. *United States v. Anzaldi*, 800 F.3d 872, 877 (7th Cir. 2015); *United States v. Graves*, 98 F.3d 258, 262 (7th Cir. 1996) (finding error in district court's failure to hold a competency hearing). Further, "significant weight is given to counsel's representations concerning his client's competence." *United States v. Savage*, 505 F.3d 754, 760 (7th Cir. 2007).

16.     The hearing is conducted pursuant to the provisions of 18 U.S.C. § 4247(d), which provides as follows:

> At a hearing ordered pursuant to this chapter the person whose mental condition is the subject of the hearing shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him pursuant to section 3006A. The person shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing.

18 U.S.C. § 4247(d).

17.     This hearing is all the more necessary in light of the upcoming jury trial on January 5, 2015, and the fact that it is increasingly becoming counsel's professional opinion that that, perhaps the only reasonable alternative available to Defendant is to ask leave of Court to enter a plea of guilty, while at the same time maintaining his innocence, as permitted by the Supreme Court in its seminal opinion of *North Carolina v. Alford,* 400 U.S. 25 (1970). While the government will not agree to such a plea, the Seventh Circuit acknowledges that such pleas are nonetheless available. *See*, U.S. Attorney's Manual, § 9-16.015 "Approval Required for Consent

to Alford Plea"; *United States v. Bey*, 748 F.3d 774, 775, (7th Cir. 2014).

18. Counsels' opinion that an *Alford* plea is in Defendant's interest, assuming mental competency, is based upon the following rather irrefutable facts. First, since 9/11 no Defendant has ever been acquitted in a domestic terrorism case such as this, or any domestic terrorism case for that matter. Second, while Defendant has by relative standards an arguably strong entrapment defense, it is absurd to believe that in light of the recent terrorist attacks in Paris on November 13, 2015, and—worse yet—the most deadly terrorist attack on American soil since 9/11 in San Bernardino, California just a few days ago on December 2, 2015 that prompted, among other things, a Presidential address on terrorism to the nation on December 6, 2015, that anyone of the Muslim faith charged with domestic terrorism can find a jury that will be able to view this evidence impartially. This is especially so in light of Defendant's admitted strong religious beliefs and the very nature of the defense of entrapment. That is, as a matter of law, the defense will be admitting to the fact that Defendant—out of a sense of misguided religious belief aided by the government's undercover tactic of telling him that its purported Saudi Arabian Imam implicitly approved of an attack on American soil—pushed the button on the FBI's fake bomb on the date in question. Third, and finally, the government has informed counsel that it will not consent to a bench trial which is the only realistic solution to the overwhelmingly prejudicial situation in which Defendant now finds himself. Put another way, it is simply asking too much for a jury to accept and follow the law in such a highly technical defense in light of the national and world-wide passions that have been inflamed by the recent terrorist attacks.[6]

---

[6] It should go without saying, that Counsel are not asking that Defendant be permitted to enter such a plea at this point. Defendant has not consented to such a plea, and persists in his innocence. However, but for their concerns about mental competence, counsel would seriously urge such a plea for the above reasons—

8

19. Counsel are mindful of the age of this case and the number of times this trial has had to have been continued. In hindsight, counsel regret ever obtaining the pyrrhic FISA victory, the government interlocutory appeal of which constituted a significant portion of the delay. Likewise, in addition to the interlocutory appeal,[7] a significant portion of the delay must be said necessarily to be attributable to Defendant's mental deterioration while housed at the MCC. There is no question as even this Court observed at the June 23, 2015, status hearing[8], and has been observed by virtually everyone else including his parents who have had occasion to observe him the most, that Defendant has seriously deteriorated over the course of more than six months since being put in the SHU after the event leading to the third case.

20. Notwithstanding repeated pleas from the family, neither counsel, nor attempts at intercession by prosecutors, have been able to secure Defendant's release from the SHU for understandable security reasons of the BOP. As a result, it is counsel's advice to Defendant and his family that, under these impossible circumstances, an *Alford* plea may well be the only realistic alternative—assuming the evidence does not demonstrate that Defendant is, indeed, not competent to stand trial, something about which counsel and Dr. Xenakis have serious doubts at this stage of the proceedings.[9] *See* the attached affidavit of Dr. Xenakis marked Exhibit E.

21. These concerns as to Mr. Daoud's competency are now also shared by Dr. Scott

---

especially since the Federal Rules of Criminal Procedure wrongheadedly preclude a Defendant from obtaining a bench trial without the consent of the government and the Court. *See*, Fed. R. Crim. P. 23(a).
[7] *See,* footnote 2, *infra*.
[8] *See*, Ex. A. (TR., p. 14-15).
[9] Defendant's prolonged detention in the SHU is becoming its own *bete noire* and, even to counsel and his parents—much less Dr. Xenakis—Defendant's mental deterioration is no doubt being exacerbated by such a prolonged stay in the SHU. *See also*, Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006); *United States v. Basciano*, 369 F. Supp. 2d 344 (E.D.N.Y., 2005).

Bresler, Ph.D., who conducted initial neuropsychological testing of Mr. Daoud in August of 2013, and who also recently reviewed Dr. Goldstein's report. According to Dr. Bresler, Dr. Goldstein conducted multiple tests to assess Mr. Daoud's neurocognitive functioning, but only did one test, the Minnesota Multiphasic Personality Inventory, 2nd edition (MMPI-2), to examine his personality functioning. It is Dr. Bresler's concern that notwithstanding Dr. Goldstein's exhaustive testing, that Dr. Goldstein may have summarily dismissed Mr. Daoud's significant elevations in Paranoia, Mania, and Schizophrenia revealed by Dr. Goldstein's own testing without sufficient explanation as to why she concludes that Mr. Daoud has no significant mental illness. According to Dr. Bresler, Mr. Daoud's extremely high scores on the MMPI-2 are strongly correlated with severe mental illness.

22. Dr. Goldstein's report, under the heading "Clinical Interpretation," states as follows:

> Clinical scales reveal significant elevations on three scales (Paranoia: T = 90; Mania: T = 85; and Schizophrenia: T = 72). While such a profile can be associated with serious psychopathology (psychotic disorders and mania), a review of the subscales, critical endorsements and discussion with Mr. Daoud explains these elevations as more idiosyncratic, and not clinically meaningful. In association with the specifics of his legal case, Mr. Daoud endorsed items that indicate he believes he is being followed, plotted against, talked about, that others have something personally against him or are trying to influence his mind or harm him, etc. Each of these endorsements is associated with what Mr. Daoud now knows was an undercover operation in which the Government surveilled him, engaged him with an undercover FBI agent, ultimately arrested him and is now prosecuting him. He specifically denies any such "symptoms" or beliefs outside of his legal case.

Dr. Goldstein's Report, p. 13.

23. Dr. Bresler believes, and will so testify, that these highly elevated scales regarding Paranoia, Mania, and Schizophrenia are indeed—as even Dr. Golstein's acknowledges— associated with serious psychopathology such as psychotic disorders and mania that should not be

dismissed as "idiosyncratic and not clinically meaningful." *Id.*

24. Thus, for all of the above reasons, an evidentiary hearing pursuant to 18 U.S.C. §§ 4241 and 4147(d) is mandated.

25. This motion is made in good faith and not for purposes of delay. Suffice it to say, in that Defendant remains in custody, no harm can be said to inure to the public or the government. Nor, for that matter can the government be heard to complain based upon its investigative decisions that have brought us to this juncture. There were other alternatives available to the FBI and the U.S. Attorney's Office in the course of its investigation other than creating a fake bomb sting operation. The discovery is replete with evidence that should have put the FBI, the intelligence agencies, the Department of Justice, and the U.S. Attorney's Office on notice that Defendant suffered from some type of mental condition and harbored absurd and fanciful ideas such as employing "flying cars" to conduct alleged operations. This case did not have to result in the position in which we now find ourselves. As such, and not unlike the famous egg shell skulled plaintiff all lawyers learn about in first-year Torts class, the government takes its defendants as it finds them, and sadly, this is whom they chose to lock up.

        Respectfully submitted,

        /s/Thomas Anthony Durkin
        **THOMAS ANTHONY DURKIN,**

        /s/Janis D. Roberts
        **JANIS D. ROBERTS,**

        /s/Joshua G. Herman
        **JOSHUA G. HERMAN,**
        Attorneys for Defendant.

**DURKIN ROBERTS & GROHMAN**
2446 North Clark
Chicago, Illinois 60614
(312) 913-9300
tdurkin@durkinroberts.com
jdroberts@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

## **CERTIFICATE OF SERVICE**

Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing Counsel's Emergency Motion For an Evidentiary Hearing to Determine the Mental Competency of Defendant was served on December 7, 2015, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN**

**DURKIN ROBERTS & GROHMAN**
2446 North Clark
Chicago, Illinois 60614
(312) 913-9300
tdurkin@durkinroberts.com
jdroberts@durkinroberts.com