1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION

3  UNITED STATES OF AMERICA,     )  No. 12 CR 723-1
                            )
4             Plaintiff,    )
                            )
5         v.            )  Chicago, Illinois
                            )  August 18, 2016
6  ADEL DAOUD,             )  9:50 a.m.
                            )
7             Defendant.    )  Hearing

8          TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
9

10  APPEARANCES:

11  For the Government:    HON. ZACHARY T. FARDON
                       United States Attorney, by
12                   MR. WILLIAM RIDGWAY
                       MR. BOLLING W. HAXALL,
13                   Assistant United States Attorneys
                       219 South Dearborn Street
14                   Suite 500
                       Chicago, Illinois  60604
15

16  For the Defendant:    DURKIN & ROBERTS
                       2446 North Clark Street
17                   Chicago, Illinois  60614
                       BY:  MR. THOMAS A. DURKIN
18                         MS. ROBIN V. WATERS

19                   LAW OFFICE OF JOSHUA G. HERMAN
                       53 West Jackson Boulevard
20                   Suite 1650
                       Chicago, Illinois  60604
21                   BY:  MR. JOSHUA G. HERMAN

22

23       TRACEY DANA McCULLOUGH, CSR, RPR
           Official Court Reporter
24       219 South Dearborn Street
              Room 1426
25       Chicago, Illinois  60604
            (312) 435-5570

1          THE CLERK:  12 C 723, USA versus Adel Daoud for a

2     hearing.

3          THE COURT:  You all can start.

4          MR. RIDGWAY:  Good morning, Your Honor.  William

5     Ridgway and Bolling Haxall on behalf of the United States.

6          THE COURT:  Good morning.

7          MR. DURKIN:  Good morning, Judge.  Thomas Durkin,

8     Josh Herman, and Robin Waters on behalf of the defendant, who's

9     present.

10          THE COURT:  All right.  Thank you.

11          MR. DURKIN:  And in custody.

12          THE COURT:  All right.  And -- hello, Mr. Daoud.

13          DEFENDANT DAOUD:  Hello.

14          THE COURT:  Good.  All right.  Is everyone ready to

15     proceed --

16          MR. HAXALL:  I believe we are.

17          THE COURT:  -- with the hearing today?

18          MR. DURKIN:  I think so.

19          THE COURT:  All right.

20          MR. DURKIN:  Two issues.  One, I assume we -- your

21     clerk told us you were going to just defer any ruling on the

22     motion, emergency motion we filed.  I assume we can take that

23     up at the end of the day.

24          THE COURT:  You can take it up at the end of the day,

25     or you can take it up tomorrow, but I'm sure a lot of the

1    information that we're going to have anyway is going to overlap
2    and be assisting the Court.
3              MR. DURKIN:  Right.
4              THE COURT:  So --
5              MR. DURKIN:  The second.
6              THE COURT:  -- yes.
7              MR. DURKIN:  I'm sorry.
8              THE COURT:  Go ahead.
9              MR. DURKIN:  The second issue is when we went to
10   visit Mr. Daoud in the lockup, there was a package of
11   materials.
12             THE COURT:  All right.  Wait.  If you're going to --
13   I need you to -- we want to make sure we get this all on the
14   record, so ...
15             MR. DURKIN:  I said there was a package of materials
16   that the marshals had left in the corner.  And when I picked it
17   up, I went to give it to him, and I said what is it.  He said
18   it's the material you sent me, which was --
19             THE COURT:  Who's he?  Mr. Daoud?
20             MR. DURKIN:  He, the client.  My client.
21             THE COURT:  Oh.
22             MR. DURKIN:  Said that it was a letter we had sent
23   him on August 4th with some documents.  And there was also what
24   appears to be several pages of yellow legal pad with his
25   handwriting.  I went to look.  He said, he said that was his

1    speech or position paper.  I went to look at it.  He said he

2    didn't want me to read it.  He did say -- he summarized it.  He

3    said I -- in short if I -- I'm paraphrasing.  He said that he

4    wanted to take a position that he was competent and work

5    against us at this hearing.  And I said he's entitled to do

6    whatever he wants to do as far as I'm concerned.

7              THE COURT:  Well --

8              MR. DURKIN:  Not like that he can disrupt things, but

9    I told him there was nothing I could say about that.

10             THE COURT:  All right.  Well, as far as anybody doing

11   whatever they want in my courtroom, that's not going to happen.

12             MR. DURKIN:  Of course.

13             THE COURT:  Not even Mr. Daoud gets to do that.  And

14   so but, you know, he can -- if you put him on the stand and

15   that's what he says, you know, then obviously as you say, he

16   tells it as he sees it, so ...

17             MR. DURKIN:  That's fine.

18             THE COURT:  All right.  Mr. Daoud gets to have a seat

19   at the table along with his lawyers.

20             MR. DURKIN:  Judge, could I have a minute to speak to

21   the government.

22             THE COURT:  You may.

23        (Brief pause.)

24             MR. HAXALL:  I think we're prepared to begin.  Judge,

25   I just wanted to address one matter.  In looking at the

1    exhibits the defense has prepared, there was going to be

2    significant overlap.  Obviously the same letters and reports.

3    I believe both sides are willing to stipulate to the foundation

4    for the admission of a binder labeled as defense exhibits.  And

5    I will just refer to their exhibit numbers, if that's

6    acceptable to the Court.

7                THE COURT:  That's fine with me.  All right.

8                MR. DURKIN:  We have a binder for you, Judge.

9                THE COURT:  Good.  I like binders.  Kidding.  But

10   I'll accept them.  All right.  So --

11               MR. DURKIN:  I was kind of impressed.  We kind of

12   look like Jenner & Block.  Wait till you see this.

13               THE COURT:  All right.  So are we ready to go,

14   though?

15               MR. DURKIN:  Yes.

16               THE COURT:  I am.

17               MR. HAXALL:  Yes.

18               THE COURT:  We need to make the best use of our time

19   today.  We'll be going straight through as much as we can, but

20   at 12:15 I have a hard stop.  All right.

21               MR. DURKIN:  I understand that.

22               THE COURT:  All right.  So --

23               MR. DURKIN:  And just so it's clear, I believe what

24   we've agreed to is that there's -- there are no foundational

25   objections to any of these exhibits, and they all will be

1    admitted.

2            THE COURT:  Is that correct?

3            MR. HAXALL:  That's correct.

4            THE COURT:  Thank you.

5            MS. WATERS:  Judge, here's that binder.

6        (Documents tendered.)

7            THE COURT:  All right.

8            MR. HAXALL:  And just for the record one copy is

9    already at the witness stand as well.

10           THE COURT:  Is on the witness stand.  Thank you.

11           MR. HAXALL:  Yes, Judge.

12           THE COURT:  All right.

13           MR. HAXALL:  And the government would call Dr.

14   Richart DeMier.

15           THE COURT:  All right.  Thank you very much.

16     RICHART DeMIER, GOVERNMENT'S WITNESS, DULY SWORN

17           MR. DURKIN:  And just so the record is clear, we have

18   some potential witnesses that are here in the audience.  One is

19   Dr. Xenakis, who's our expert.

20           THE COURT:  Is there a motion to exclude witnesses?

21           MR. DURKIN:  No, there's not.  That's what I was

22   going to say.

23           THE COURT:  All right.  Thank you.  Sir, please

24   keep -- you can move the mike and bend it to your comfort

25   level.  The water is there for you to serve yourself if you

DeMier - direct by Haxall

1    need to.

2              THE WITNESS:  Thank you.

3              THE COURT:  All right.  And keep your voice up so

4    that everyone can hear you clearly, and give the Court a chance

5    to rule on objections if there are any.  All right.

6              THE WITNESS:  Yes, ma'am.

7              THE COURT:  Anytime you're ready, Mr. Haxall.

8              MR. HAXALL:  Thank you, Your Honor.

9                      DIRECT EXAMINATION

10   BY MR. HAXALL:

11   Q    Sir, can you please state and spell your name.

12   A    My name is Richart DeMier.  First name is spelled

13   R-I-C-H-A-R-T as in Tom.  Last name is D-E capital M-I-E-R.

14   Q    Sir, how are you currently employed?

15   A    I work as a psychologist at the United States Medical

16   Center for federal prisoners.

17   Q    And where is that located?

18   A    Springfield, Missouri.

19   Q    How long have you held that position?

20   A    It will be 22 years in October.

21   Q    What are your responsibilities in that position?

22   A    My primary responsibilities are evaluation of defendants

23   referred on court order for forensic evaluations.  I also

24   evaluate sentenced prisoners who might be in need of mental

25   health hospitalization.

DeMier - direct by Haxall

1    Q    I'd like to first talk a little bit about your educational

2    history.  Could you please describe for the Court your college

3    degree and then your postgraduate studies.

4    A    Certainly.  I received a bachelors degree in psychology at

5    the University of Missouri.  I received a masters degree in

6    clinical psychology at the University of Wisconsin at Oshkosh.

7    And I received my Ph.D degree in clinical psychology at the

8    University of Wisconsin in Milwaukee in 1994.

9    Q    Could you also please describe for the Court your work

10   history up till the present.  What were your positions?

11   A    My first position after graduating with my Ph.D was a

12   postdoctoral fellowship in forensic psychology.  A postdoctoral

13   fellowship is a year of specialized training beyond the

14   doctoral degree in a particular specialty.  I completed that

15   postdoctoral fellowship at the U.S. Medical Center in forensic

16   psychology.  At, at the end of that year I was fortunate enough

17   to be able to obtain a staff position.  I've been there ever

18   since.  So that's been my primary employment.  I also do some

19   college teaching.

20   Q    Can you please describe your teaching experience in your

21   field.

22   A    Yes.  I've been teaching at a small liberal arts college

23   called Drury.  That's D-R-U-R-Y University since about 2003.  I

24   have taught a small number of classes at two other schools.

25   There was a nursing school, and I taught one class that was an

DeMier - direct by Haxall

1   online class for the Chicago School of Professional Psychology.

2   Q    Have you published anything in your field?

3   A    Yes, I have.

4   Q    Can you describe in general terms what you've published,

5   and then if you could be more specific as to forensic

6   psychology and evaluations for competency.

7   A    Certainly.  Almost all my publications are in forensic

8   psychology save two that resulted from my dissertation, which

9   had nothing to do with forensic psychology.  I have written a

10  number of book chapters, articles published in professional

11  journals, and I'm co-author of three books.  Some of the --

12  I'll just go through them one at a time.  I won't hit on

13  everything that's on my CV.

14          But I am co-author of a book chapter that focuses on

15  how to conduct competency evaluations that was published in an

16  edited book in 2007.  I've written a couple of articles or

17  rather co-authored two articles about competency restoration

18  treatment.  I'm co-author of two books on mental health case

19  law.  One focusing on competency and one focusing on sanity.

20  Q    Are you board certified in any discipline?

21  A    I'm board certified by the American Board of Forensic --

22  or I'm sorry.  The American Board of Professional Psychology,

23  and the board certification specialty is in forensic

24  psychology.

25  Q    Well, what is required to become board certified in

10

DeMier - direct by Haxall

1   forensic psychology?

2   A    At that time I went through the process, there was a

3   credential review.  That was followed by a submission of

4   practice samples, where board certified specialists looked at

5   samples of a person's professional work.  If those are deemed

6   acceptable, and mine were, then there is a three-hour oral

7   examination.

8   Q    How many board certified forensic psychologists are there

9   in the United States, if you know?

10  A    Somewhere around 330.

11  Q    And do you have any position or role with the board that

12  certifies forensic psychologists?

13  A    I do.

14  Q    Can you please describe that for the Court.

15  A    Yes.  Since 2008 I have been involved as a member of the

16  faculty of examiners.  So now I am one of the people that

17  reviews work samples or practice samples submitted by

18  candidates for board certification.  And I'm one of the people

19  that conducts oral examinations.  Also since January of 2015

20  I've been a member of the Board of Directors for that

21  organization.  And beginning in January of next year I'll take

22  over the role of National Chair of Examinations.

23  Q    Are you familiar with the competency standard in federal

24  criminal cases?

25  A    Yes, I am.

DeMier - direct by Haxall

1  Q    Can you please describe your understanding of that
2  standard.
3  A    Certainly.  The, the standard looks at whether or not a
4  person has a mental disease or defect as a result of which they
5  would lack a factual or rational understanding of the
6  proceedings against them or be unable to properly assist in
7  their defense.
8  Q    What is a competency examination?
9  A    A competency examination is a, a methodology -- a method
10 of interviewing somebody and gathering other types of
11 information to answer the questions, you know, that arise from
12 the statute.  Does the person have a mental illness, does the
13 person have factual and rational understanding of the
14 proceedings against them.  What are their abilities in terms of
15 being able to work with the defense attorney.
16 Q    Approximately how many competency evaluations have you
17 completed in your career?
18 A    An estimate would be 350 to 400.
19 Q    How do you personally define the role of an examiner in a
20 competency evaluation?
21 A    The role of the examiner should be a person who's
22 qualified to determine whether or not somebody has the mental
23 disease or defect that's identified in the statute.  And
24 somebody that has experience in psychology or psychiatry who
25 can gather the right types of information necessary to evaluate

DeMier - direct by Haxall

1  somebody's abilities.

2  Q    When you conduct a competency examination, is there a

3  bright line or a specific score you look for to determine

4  whether or not a defendant is competent?

5  A    Well, there's certainly no score.  There is no single test

6  that will offer a definitive answer as to whether somebody is

7  competent or not.  You know, the -- in terms of whether there's

8  a bright line, that's kind of a difficult question.  The

9  language in the statute seems pretty clear.  But when you apply

10 it to, to actual people, it's sometimes a little bit less

11 clear.  And I have evaluated people that are very near that

12 line where you can make an argument they are competent or an

13 argument that they're not competent.

14 Q    What is your personal practice when you find a defendant

15 that is near that line?

16 A    I always offer the opinion that they are not competent to

17 proceed.

18 Q    Why is that?

19 A    Well, essentially there are two types of errors that I

20 could make.

21         MR. DURKIN:  Excuse me.  I missed that question.  Can

22 I have that question read back.

23         THE COURT:  Sure.  Miss McCullough.

24    (Record read.)

25         THE COURT:  And, Mr. Durkin, when you have an

DeMier - direct by Haxall

1   objection or want to interject, you're going to have to either

2   talk louder or put the mike by you, because I can't hear you

3   and I'll go straight by it.

4           MR. DURKIN:  All right.

5           THE COURT:  All right.  Thank you.

6   BY MR. HAXALL:

7   Q    And my follow-up question, Dr. DeMier, was why do you

8   error on the side of a finding of incompetency?

9   A    The reason is because there are essentially two types of

10  errors I can make.  And I consider what those errors are and

11  what the potential consequences would be.  So if I offer an

12  opinion that somebody is not competent but they really are,

13  they really have those abilities but I just wasn't able to

14  determine that, then the likely consequence of that error is

15  that that person is going to be hospitalized for a period of

16  time.  And I think that's kind of a self-correcting error.

17  Because during the hospitalization, it should become evident

18  that I was wrong and they do have those abilities.

19          The other type of error I think is much more grave in

20  its consequences.  If I give an opinion that somebody is

21  competent to proceed and they're really not, then that person

22  might go through a legal proceeding at a time that they don't

23  have those abilities, and the proceeding is unfair and they

24  could be convicted and punished when they weren't able to

25  exercise the rights that they have to have to go through a

DeMier - direct by Haxall

1    trial.

2    Q    Approximately how many times have you testified as an

3    expert in federal court?

4    A    About 75 times.

5    Q    How many of those times approximately involved competency

6    determinations?

7    A    The majority have been.  I would estimate around 60 of

8    those times.

9    Q    Have you testified for both the prosecution and the

10   defense?

11   A    Yes.

12   Q    Have you testified more frequently for one or the other?

13   A    I've testified in competency evaluations -- or in

14   competency hearings much more frequently for the prosecution.

15   Q    Why is that?

16   A    I think the reason is that when I or one of my colleagues

17   at the U.S. Medical Center offers an opinion that a person is

18   not competent, there's usually not an hearing about the matter.

19   That opinion is generally accepted, and the person is committed

20   for competency restoration treatment.  So there's really rarely

21   an argument if I'm arguing that somebody is not competent.

22         MR. HAXALL:  Your Honor, at this time the government

23   would tender Dr. DeMier pursuant to Rule 702 as a witness

24   qualified to render an opinion in the field of forensic

25   psychology with respect to the defendant's competency.

DeMier - direct by Haxall

1    THE COURT:  Any objection?

2    MR. DURKIN:  No.

3    THE COURT:  All right.  There's no objection.  And he

4  will be so deemed as an expert.  Proceed.

5  BY MR. HAXALL:

6  Q    Doctor, what was your initial assignment, or how did you

7  become involved in this case?

8  A    Well, Mr. Daoud was referred to our facility on the basis

9  of Judge Coleman's court order, and I was assigned to do his

10  evaluation by my supervisor.

11  Q    Do you see the individual for whom you completed that

12  evaluation present in court today?

13  A    I do.

14  Q    Could you please point to that person and describe an

15  article of clothing that person is wearing.

16    MR. DURKIN:  Judge, we'll stipulate he can identify

17  the man he examined.

18    THE COURT:  All right.  So stipulated that it is Mr.

19  Daoud in question.  Proceed.

20  BY MR. HAXALL:

21  Q    And, Dr. DeMier, did you prepare a report detailing your

22  involvement and findings in this case?

23  A    Yes, I did.

24  Q    And if you could you please turn in the binder in front of

25  you to what's labeled -- it's under this Defendant's 2 tab.

DeMier - direct by Haxall

1    Is that a copy of the competency report you prepared
2 in this case?
3 A    Yes, it is.
4    MR. HAXALL:  Your Honor, the government would ask
5 that Dr. DeMier be able to refer to his report as necessary
6 during his testimony to refresh his recollection.
7    MR. DURKIN:  That's fine.
8    THE COURT:  Any objection?
9    MR. DURKIN:  No.
10    THE COURT:  All right.  No objection.  Proceed.
11    MR. HAXALL:  Thank you, Your Honor.
12 BY MR. HAXALL:
13 Q    Doctor, in your report you generally lay out categories of
14 information you reviewed in this evaluation, is that correct?
15 A    That's correct.
16 Q    I'd like to discuss with you some of those categories.
17 And I'm going to kind of refer to the first one as materials
18 related to the underlying criminal cases.
19    Why is it important for you to review those
20 materials?
21 A    Well, part of my task as the person evaluating the
22 defendant's competency is to understand -- is to determine
23 whether or not the defendant understands the evidence against
24 him or the, the charges against him.  And so I can't really do
25 that if I don't understand those materials myself.

DeMier - direct by Haxall

1   Q    Calling your attention to the next what I'm going to call

2   category, which is labeled No. 7 on page 3 of your report,

3   "Forensic Psychological Evaluation Submitted by Diana

4   Goldstein, Ph.D."

5            Did you review that report as well?

6   A    Yes, I did.

7   Q    Why did you review another examiner's report?

8   A    Well, it's -- I think one of the hallmarks of doing this

9   type of evaluation is to look at a lot of different

10  information.  Information that's -- information of all sorts.

11  And when something is provided to me, especially an evaluation

12  by another professional, I think it would be negligent not to

13  review that.

14  Q    Calling your attention to the next category, which I'm

15  going to refer to as testing results.  Did you review the

16  results of testing completed by Dr. Goldstein and her staff?

17  A    I reviewed them to the extent that they were discussed in

18  her report.

19  Q    Did you review any testing completed by any defense mental

20  health professional in this case?

21  A    Yes.

22  Q    How did you obtain those items?

23  A    A Doctor -- Dr. Scott Bresler sent those to me directly.

24  Q    And is that B-R-E-S-L-E-R?

25  A    Yes.

DeMier - direct by Haxall

Q    And I'd like to just go through some of those tests and
maybe you could explain to the Court what they're designed to
evaluate.

        Starting with the -- first of all, when was Dr.
Bresler's testing done?  Do you know?

A    It was done in 2013.  I'd have to look at my report, but I
think it was October and August of 2013.

Q    Are you familiar with the Wechsler, W-E-C-H-S-L-E-R, Adult
Intelligence Scale?

A    Yes.

Q    What is that designed to test?

A    It's a comprehensive test of intelligence.  When somebody
needs an IQ test, that is the most commonly given measure.

Q    What is the Wechsler Memory Scale?

A    That's very similar to the IQ test, but it focuses
specifically on a person's memory capabilities.

Q    How about the California Verbal Learning Test?

A    As the name suggests, it's a test that looks at a person's
ability to learn information that's presented verbally.

Q    The Trail Making Test?

A    That's a test that's used to assess cognitive flexibility.
It involves a person shifting their focus between two different
types of stimuli.

Q    Validity Indicator Profile?

A    That test is designed to assess the potential that

DeMier - direct by Haxall

1  somebody is feigning or exaggerating or malingering cognitive

2  deficits.

3  Q    How about the Minnesota Multiphasic Personality Test?

4  A    That's probably the most common personality inventory used

5  in the field.  It's been around for decades.  Although there

6  are different versions of it, but it's just an assessment of a

7  person's current personality functioning.

8  Q    And how about the Personality Assessment Inventory?

9  A    It's very similar to the MMPI.

10 Q    Were there any tests completed by the defense that you

11 declined to review?

12 A    Not that I'm aware of.  I reviewed everything that was

13 sent to me.

14 Q    Now, the test results provided to you by Dr. Bresler, how

15 did they differ from the test results described in Dr.

16 Goldstein's report?

17 A    Overall they differed minimally.  The -- some of the

18 findings were remarkably consistent.  For example, the IQ

19 scores were exactly the same.  And that's actually quite

20 unusual.  There were some differences on some of the scales of

21 the Minnesota Multiphasic Personality Inventory.

22 Q    I'd like to talk about those for, for a second.

23       Between Dr. Bresler's tests in 2013 and Dr.

24 Goldstein's test in 2015, was there an increase -- or what was

25 the approximate difference in the paranoia scale of the MMPI?

DeMier - direct by Haxall

1  A    I believe the difference was a T score of 13 points.  A T

2  score is kind of a standardized way of looking at, at scores.

3  And I think his score increased from 80 to 93.

4  Q    Is that an approximate or --

5  A    I don't recall for sure.  But it is 12 or 13 points

6  greater I believe.

7  Q    Did that surprise you when you looked at the results?

8  A    Not particularly.

9  Q    Why not?

10 A    A couple of reasons.  First these are not tests where

11 you're going to get the exact same results every time.

12 Q    Why is that?

13 A    Well, the MMPI, the Minnesota Multiphasic Personality

14 Inventory has 567 questions.  And most people that take it even

15 if they only take it a week apart aren't going to answer all

16 the questions the same way.  It's also a test that is sensitive

17 to changes in what's going on in a person's life.  Changes in

18 their mood, changes in their circumstances.  And so that could

19 be a reason.  And it's also not -- the magnitude of the

20 difference is not so great that it jumped off the page at me.

21 Q    Now, I want to refer to the difference in the mania score

22 of the MMPI between Dr. Bresler's 2013 test and Dr. Goldstein's

23 2015 test.  How -- what was the difference or change there?

24 A    There was a significant increase.

25 Q    And did you consider that increase?

DeMier - direct by Haxall

1  A    I did.

2  Q    Did it ultimately change your conclusions in this case?

3  A    It did not.

4  Q    Why not?

5  A    There was so much information in this case.  This is just

6  one small piece of information.  And, you know, while I, while

7  I attended to it and I thought about it, in the overall scheme

8  it was not so meaningful that it had an impact on my opinion.

9  In general, you know, I think testing can be helpful.  As I

10 said before, there's no single test or test score that's going

11 to decide this issue.  And I paid more attention to my

12 interactions with Mr. Daoud and the clinical interviews than

13 testing that had been done previously.

14 Q    Did you conduct or request additional testing of Mr. Daoud

15 other than what you received from the other mental health

16 professionals?

17 A    No, I did not.

18 Q    Why not?

19 A    Again, two reasons.  The first is that I was struck by the

20 remarkable consistency between the, the two evaluations.  And I

21 did not have any reason to suspect that I would get

22 meaningfully different results if I were to do the same tests

23 over again.

24      Second, I tend to be pretty careful in my selection

25 of psychological tests in a competency evaluation.  And I

DeMier - direct by Haxall

1   believe that testing should only be used if there's reason to
2   believe that the results of that test are going to help you
3   form your opinion.
4   Q    Were there any tests that you believed weren't completed
5   that might have had a significant impact on your findings?
6   A    No.
7   Q    In the course of your evaluation of defendant, did you
8   develop any information that caused you to doubt the validity
9   of the prior testing?
10  A    No.
11  Q    Moving on to the next category and individuals that you
12  spoke to in this case.
13           Other than Dr. Bresler, were there other mental
14  health professionals from the defense team that you spoke to?
15  A    I did have a conversation with Dr. Xenakis.
16  Q    And is that X-E-N-A-K-I-S?
17  A    Yes.
18  Q    And in your conversation with Dr. Xenakis what did he tell
19  you about his view of the defendant's mental status?
20  A    He told me that he perceived some disorganization of
21  thought.
22  Q    What does that mean?
23  A    Disorganization of thought is, is kind of an umbrella term
24  for a number of psychotic symptoms that have to do with whether
25  or not a person can think in a, a rational or logical or

DeMier - direct by Haxall

1  sometimes we use the word linear fashion.  Where there's easily
2  discernable connections between the person's ideas.
3  Q    Did Dr. Xenakis indicate to you that he believed the
4  defendant was suffering from delusional disorder?
5  A    He did not.
6  Q    Did Dr. Xenakis --
7         MR. DURKIN:  Can we get a time frame on this
8  conversation, Judge.
9         MR. HAXALL:  Sure.
10        THE COURT:  Yes.
11 BY MR. HAXALL:
12 Q    Do you recall approximately when your conversation with
13 Dr. Xenakis would have been?  Or if it's in your report, if you
14 could refer to that.
15 A    I believe it was near the end of the evaluation.  I don't
16 have the date in my report.  But I, I believe it was probably
17 the last week before the report was completed.
18        MR. HAXALL:  Your Honor, if I could --
19        THE COURT:  Which would be what?
20        THE WITNESS:  I'm sorry.
21        MR. HAXALL:  Your Honor, may I actually interject.
22 BY MR. HAXALL:
23 Q    Is your memory exhausted as to the date you spoke to Dr.
24 Xenakis?
25 A    I'm sorry?

DeMier - direct by Haxall

1   Q    Do you remember the date you spoke to him?

2   A    I don't remember the exact date.  I remember when it was

3   in relation to the completion of the evaluation.

4            MR. HAXALL:  Your Honor, if I could ask the witness

5   to refer to page 6, it's already admitted, of his report.

6            THE COURT:  Turn to page 6, please.

7            THE WITNESS:  There it is.  I spoke to Dr. Xenakis on

8   May 2nd.

9   BY MR. HAXALL:

10  Q    And was that your only conversation with Dr. Xenakis?

11  A    Yes.

12  Q    So when I'm asking you about what Dr. Xenakis told you,

13  can we just understand that was from that conversation?

14  A    Yes.

15  Q    Okay.  So --

16           THE COURT:  And just so the record is clear, May 2nd

17  of this year.

18           THE WITNESS:  Sorry?

19           THE COURT:  This year.

20           THE WITNESS:  Yes.

21  BY MR. HAXALL:

22  Q    Now, what, if anything, did Dr. Xenakis indicate to you

23  about his belief as to whether or not the defendant was

24  experiencing hallucinations?

25  A    He told me that he believed Mr. Daoud was probably

DeMier - direct by Haxall

1    experiencing hallucinations.

2    Q    Did Dr. Xenakis indicate the basis of that belief?

3    A    He said it was based on his appearance in court.  Mr.

4    Daoud's appearance in court.

5    Q    How did Dr. Xenakis -- I'm sorry.  I apologize.

6        Have you also had the opportunity to review a report

7    prepared by Dr. Xenakis dated July 27th of this year?

8    A    Yes.

9    Q    In addition to Dr. Xenakis, did you speak to any other

10   members of the defendant's defense team?

11   A    I spoke to Dr. Bresler briefly.  The majority of that

12   conversation was just about how -- the most efficient way for

13   him to send me his testing data.  I spoke to Mr. Durkin, Mr.

14   Daoud's attorney.

15   Q    And about how long did you speak with Mr. Durkin for, if

16   you remember?

17   A    About 35 minutes.

18   Q    Going back to kind of the categories of items you

19   reviewed.  Did you also review records from Psychology Data

20   Systems?

21   A    I did.

22   Q    What is that?

23   A    That is the Bureau of Prisons electronic record keeping

24   system for notes from psychologists.  It is -- for years it was

25   a freestanding system.  Now it's part of the larger electronic

DeMier - direct by Haxall

1   medical record.

2   Q    So you were able to access those remotely?

3   A    Yes.

4   Q    And did you also review certain documents prepared by the

5   defendant in this case?

6   A    Yes, I did.

7   Q    I'm going to ask you about a few of them in particular.

8   Did you receive some of them kind of at the time of your

9   evaluation?

10  A    Yes.

11  Q    Did the defendant prepare any for you while he was at your

12  facility?

13  A    Yes, he wrote two documents for me.

14  Q    And subsequent to your evaluation, is it true that the

15  government sent you some additional writings to review?

16  A    That's correct.

17  Q    And finally, did you review approximately 600 pages of a

18  document entitled, quote, "Not Guilty by Me" Volumes 1 through

19  4?

20  A    No.

21  Q    Were they ever provided to you?

22  A    No.

23  Q    In your conversation with Dr. Xenakis did he indicate that

24  he was relying on those documents?

25  A    He did not tell me anything about those documents.

DeMier - direct by Haxall

1  Q    Did Mr. Durkin ask you to review them or indicate that he
2  would send them to you?

3         MR. DURKIN:  Well, Judge -- Judge, excuse me.  I
4  object to the -- if they want to go into the whole
5  conversation, but I don't think they can cherry pick something
6  in the negative that wasn't said without getting into the whole
7  conversation.

8         THE COURT:  Well, you're here to clear it up.
9  Overruled.

10 BY MR. HAXALL:

11 Q    Now, moving on from kind of the categories of items that
12 you did review.  I'd like to talk to you about the actual
13 evaluation period.

14         Approximately when was the defendant initially
15 received at your facility?

16 A    March 17th, 2016.

17 Q    When did you first meet with the defendant?

18 A    The following day.

19 Q    And overall how many times did you meet with the
20 defendant?

21 A    I had individual interviews with him on eight occasions.
22 I saw him on some other occasions when I was doing rounds on
23 the living unit or when I was out on the recreation yard.  My
24 office is just a few steps away from his living unit.

25 Q    And when did the evaluation period where Mr. Daoud was at

DeMier - direct by Haxall

1   the facility end?

2   A    I believe it was May 1st or May 2nd.

3   Q    So he was at your facility for approximately a month and a
4   half, is that --

5   A    He was at our facility for closer to two months.  The
6   court order by statute allowed for 45 days.  Once we contacted
7   the U.S. Marshals to bring him back to the jurisdiction, it was
8   probably another couple of weeks before he actually left.

9   Q    I'd like to first talk to you about your initial meeting
10  with Mr. Daoud on or about March 18th then.

11       What was your initial perception of him?

12  A    Well, he struck me initially as friendly, outgoing, almost
13  gregarious.  He had a lot of energy.  He laughed and smiled.
14  He was easily able to understand the questions that I was
15  asking, and he provided pointed responses to those questions.
16  It was not difficult to keep him on track.  During that initial
17  interview I did not notice any signs or symptoms of severe
18  mental illness or psychotic disorder.

19  Q    In your experience with 350 to 400 evaluations has that
20  happened before?

21  A    Yes.

22  Q    How?

23  A    There are times that people --

24            MR. DURKIN:  Objection to the what.  Can we ask --

25            THE COURT:  As to the form of the question sustained.

DeMier - direct by Haxall

1   BY MR. HAXALL:

2   Q    Can you please describe instances in which you've observed

3   individuals during your initial meeting and believed that they

4   were suffering from a mental disease or defect.

5   A    Yes.  There are people whose symptoms are so severe that

6   they're immediately apparent and the type of people that were

7   they in the community, you would call an ambulance and have

8   them taken to the emergency room.  They're just obviously and

9   grossly psychotic.  Some of the things that I've noticed in

10  patients that I've seen are people that are talking nonstop

11  without any ability to interact in a meaningful way.  People

12  that are -- seem to be yelling at things that aren't there.

13  People that are catatonic.  I mean, they're completely

14  unresponsive.

15       So there are -- they're not particularly common.  But

16  there are circumstances where you can tell within the first few

17  minutes that this person is seriously mentally ill.

18  Q    Now, during this initial meeting with the defendant did

19  you have conversations with him about whether or not he was

20  experiencing auditory or visual hallucinations?

21  A    Yes.

22  Q    What did he tell you?

23  A    He told me that he wasn't and that he never had.  And he

24  kind of seemed a little not in a confrontational way, but a

25  little put out with the question.  My impression was that he

DeMier - direct by Haxall

1  was a bit exasperated at having been asked that question by so
2  many mental health professionals.
3  Q    In course of the approximately two months that the
4  defendant was at the facility, were there any indications to
5  you that the defendant was actually experiencing
6  hallucinations?
7  A    No.
8  Q    Putting aside your personal meeting with the defendant,
9  are there any systems in place for you to receive this
10 information from other staff members?
11 A    Yes.
12 Q    Can you please describe that for the Court.
13 A    Certainly.  There's a lot of traffic on his living unit.
14 There are correctional officers that make rounds at least every
15 30 minutes.  While they do not necessarily have specialized
16 training, they work on a mental health unit and have interacted
17 with many people with mental health disorders.  There are
18 psychiatric nurses that make rounds on the unit.
19 Administrative officials.  The warden of the facility.  It's
20 not uncommon for somebody to call me and say I saw such and
21 such person and I'm worried about them.  They were acting
22 strangely or they said something odd.  So I always follow up on
23 that.  That's kind of informal.
24          We also have a meeting every weekday at the beginning
25 of the day where we review the nursing reports from the

DeMier - direct by Haxall

1  previous night, and that meeting is attended by case management

2  staff, psychiatric nurses, correctional officers.  Essentially

3  we're getting filled in on anything that happened on the

4  evening or overnight staffs.

5  Q    Either informally or during these meetings did staff

6  members indicate to you any symptoms that would lead you to

7  believe that Mr. Daoud was experiencing hallucinations?

8  A    No.  In fact, they noted the opposite.  They asked me why

9  he was on a locked living unit, and they came to me saying we

10  don't see any mental health symptoms that would require him to

11  be on this unit.  What's going on?  Why is he here?

12          MR. DURKIN:  I'm going to object to that on hearsay

13  grounds.

14          THE COURT:  I'm sorry?

15          MR. DURKIN:  I object on hearsay grounds.  And if not

16  hearsay, then I need a foundation for all those conversations.

17          THE COURT:  All right.  Well, there should be a

18  foundation set.  So objection sustained for foundation.

19  BY MR. HAXALL:

20  Q    Do you recall when you had conversations with staff, or

21  who was present for these conversations when these statements

22  were made to you?

23  A    I don't recall specifically.  I remember the gist of the

24  conversation.  But I could not name the officer or identify the

25  date that it took place.

DeMier - direct by Haxall

1  Q    Did you receive any disciplinary report or reports of
2  other violations by the defendant while he was at your
3  facility?
4  A    I want to make sure I understand the question.  I reviewed
5  disciplinary reports that formed the basis for one of the
6  charges, but he did not receive any disciplinary reports during
7  his time at our facility.
8  Q    Did you have the chance to observe the defendant's
9  interactions with other inmates at the facility?
10 A    Yes.
11 Q    Can you please describe what you saw.
12 A    I recall Mr. Daoud speaking to people in the cells
13 adjacent to his or across the hall.  I also observed him on the
14 recreation yard speaking to other people who were being
15 evaluated.
16 Q    And was there anything about his interactions that caused
17 you concern about whether or not he was hallucinating or
18 otherwise psychotic?
19 A    No.  They seemed like perfectly normal conversations.  If
20 I could -- with a caveat.  I didn't listen to the whole
21 conversation.  But when I would come across him and he's in the
22 middle of a conversation with somebody, there was --
23         MR. DURKIN:  Judge, again I'm going to object to this
24 general conversations without better foundation.
25         THE COURT:  Objection sustained.

DeMier - direct by Haxall

BY MR. HAXALL:

Q    Now, in addition to the approximately eight interviews or formal interviews with the defendant and your other observations that you described, did the defendant provide you with other information related to your evaluation in any other format?

A    He wrote me -- he wrote two documents that were rather lengthy that he prepared specifically for me.

Q    And did you review them?

A    Yes.

Q    Dr. DeMier, I'd ask you to look at what's labeled as Defendant's 11 and Defendant's 12.  Just if you could confirm that those are copies of the letters that you received from Mr. Daoud.

A    Yes, they are.

Q    Now, we noted before, Doctor, that you are familiar with the federal competency standard from 18 U.S.C. 4241.  I want to talk to you first about the first prong that you described, whether a defendant is presently suffering from a mental disease or defect.

      I want to talk about one specific mental disease or defect.  Are you familiar with delusional disorder?

A    Yes, I am.

Q    What is that?

A    That is a psychotic disorder.  Psychotic disorders broadly

DeMier - direct by Haxall

1    are disorders where the central feature is a lack of contact

2    with reality.  Delusional disorder has as its primary symptom

3    the presence of delusions.

4    Q    And have you encountered in your career individuals who

5    are suffering from delusional disorder?

6    A    Yes.

7    Q    How frequently?

8    A    Not particularly frequently because it's a very rare

9    disorder.  I think it's a disorder that's probably over-

10   represented at a facility like ours.  I would estimate I've

11   probably seen 20 to 25 people -- 15 to 25 people with

12   delusional disorder.

13   Q    How do you determine whether a person suffers from

14   delusional disorder?  What are the symptoms or hallmarks?

15   A    Well, the hallmark is a delusional belief.

16   Q    What is a delusion?

17   A    A delusion is a firmly held false belief that persists

18   even in the face of contrary evidence.  So it's not possible to

19   use logic or reason to convince somebody that a delusional

20   belief is not true.  There are some other more nuanced aspects

21   of delusional beliefs that I think are diagnostically

22   significant.  People that hold delusional beliefs tend to hold

23   them with incredible intensity or with great tenacity.  Of

24   course, that is part of the reason that you can't convince them

25   that their beliefs are not true.

DeMier - direct by Haxall

1    They are often preoccupied with those beliefs.  They
2  seem to have a hard time talking about or thinking about
3  anything else.  They often seem very invested in convincing the
4  person they're talking to that the beliefs are true.  Can
5  become frustrated or upset if, if a person continues to say
6  that I don't believe that that is true.  Delusional beliefs
7  tend to be bothersome to the person.  They're -- they're
8  experienced as -- yes, let me rephrase that.  They're
9  associated with negative emotions.

10 Q    Are you familiar with something called the DSM-V?

11 A    Yes.

12 Q    What is that?

13 A    It stands for the Diagnostic and Statistical Manual of
14 Mental Disorders.  It is currently in the 5th edition.  The DSM
15 is the classification system for mental disorders published by
16 the American Psychiatric Association.

17 Q    Is it relied upon, the DSM, by experts in your field?

18 A    Yes.

19 Q    I'd like to direct your attention, sir, to page 16 of your
20 report.  And I'll give you a second to find it.

21 A    Okay.  I'm there.

22 Q    Did you include in your report that DSM-V definition of a
23 delusion?

24 A    Yes, I did.

25 Q    And is it consistent with what you just told the Court

DeMier - direct by Haxall

1   about your understanding of what a delusion is?

2   A    Yes.

3   Q    I want to call your attention to one specific provision

4   that it's a false belief that is firmly held, quote, despite

5   what almost everyone else believes.

6            Does how widespread a belief is actually impact

7   whether it's a delusion or not?

8   A    Yes, it does.

9   Q    And I'm going to call your attention to page 7 of Dr.

10  Xenakis' report, which I believe is under tab 6 in the binder

11  in front of you.

12  A    I'm sorry.  You said page 7?

13  Q    Yes, sir.  The first sentence of the first paragraph where

14  Dr. Xenakis writes, "The finding that a belief is not

15  delusional because it is held by others is flawed."

16            In your view is that consistent or inconsistent with

17  the DSM-V definition?

18  A    I think that that's inconsistent.  There are some --

19            THE COURT:  Wait one second.

20            MR. DURKIN:  Excuse me.  What page?

21            THE COURT:  Page 7.

22            MR. DURKIN:  Thank you.

23  BY MR. HAXALL:

24  Q    Do you need me to ask the question again, or are you --

25  A    No.  I think that's inconsistent.  There are cases where a

DeMier - direct by Haxall

1   delusion might be held by two or three people.  In fact,

2   there's even a diagnosis of shared delusional disorder.  But

3   when you're looking at large groups of people that hold the

4   same belief, by definition that is no longer a delusion.

5   Q    How does that interact with religious beliefs?

6   A    It can be difficult to distinguish between a devoutly held

7   religious belief and a delusional belief because almost all

8   religions have elements that taken on their face would seem

9   impossible.  You know, a deity speaking to somebody through a

10  burning bush or a man coming back to life.  You know, if that

11  happened in other contexts, we would have concerns about a

12  person's mental state.

13          But religious ideas are not delusions mainly because

14  they're broadly held, but there are also some more nuanced

15  reasons that we can differentiate them from delusions.  For

16  example, I mentioned before that delusional beliefs are often

17  associated with negative emotions.  That's not the case at all

18  for religion.  People who are devoutly religious tend to derive

19  peace and comfort and good feelings from, from their religions.

20  Also people who are religious tend not to be preoccupied to the

21  same extent as somebody who is delusional.  I mean, a person

22  may have -- may be very devout and devote a lot of time and

23  thought to their religious beliefs, but that doesn't mean they

24  can't talk about other things or enjoy other activities.

25  Q    What is an overvalued idea?

DeMier - direct by Haxall

1  A    An overvalued idea is an idea that somebody has that is

2  disproportionately important to them.  An idea where how much

3  that idea means to them is inconsistent with the population in

4  general.

5  Q    And is it true, Doctor, on page 22 of your report that you

6  include the DSM-V definition of overvalued --

7  A    Yes.

8  Q    -- overvalued idea?  And what is the difference between an

9  overvalued idea and a delusional belief?

10 A    An overvalued idea does not rise to the level of a break

11 in contact with reality.  It is not a false idea, a

12 demonstrably false idea in the same context as a delusion.

13 Q    Now, if a person suffers from delusional disorder, are

14 they necessarily incompetent to stand trial?

15 A    No.

16 Q    Why not?

17 A    Well, competency looks at functional abilities.

18 Competency is all about what a person can or cannot do.  And

19 there is no mental illness -- that may be an overstatement.

20 There are very few mental illnesses that would automatically

21 render somebody incompetent.  Profound mental retardation

22 probably would.  Advanced Alzheimer's disease probably would.

23 But in terms of the psychotic disorders, many people -- in

24 fact, most people who have schizophrenia or who have delusional

25 disorder and are charged with crimes are nevertheless competent

DeMier - direct by Haxall

1  to proceed.

2  Q    Is delusional disorder treatable?

3  A    Yes.

4  Q    What is the recommended course of treatment?

5  A    Because it is a psychotic disorder and delusions are a

6  psychotic symptom, the treatment of choice is anti-psychotic

7  medication.

8  Q    Now, in your report you note that the defendant expressed

9  beliefs that you refer to as unusual or idiosyncratic as

10  opposed to delusional, is that correct?

11  A    That's correct.

12  Q    I'd like to discuss some of those with you.  In the course

13  of your evaluation, did you discuss with the defendant the

14  function and operation of the criminal justice system?

15  A    Yes, I did.

16  Q    Generally why did you do that?

17  A    Well, it's an essential part of the evaluation process.  I

18  can't imagine doing a competency evaluation where you don't ask

19  the person about his or her understanding of how the system

20  works.

21  Q    Did the defendant express any beliefs that you found

22  relevant to his view of the criminal justice system?

23  A    Yes.

24  Q    Can you please describe those for the Court.

25  A    Yes.  He had a very sound factual understanding of how the

DeMier - direct by Haxall

1  legal system is supposed to work.  He understood the, the

2  roles, the different participants and the different choices

3  that a defendant would have to make.  But he also voiced very

4  unusual beliefs about Freemasons and the Illuminati.

5  Q    Can you describe what he -- what the defendant told you

6  about Freemasons.

7  A    He said that Freemasons are a secret society, and that he

8  believes that most of the people in corporate America and in

9  government are members of the Freemason organization.

10 Q    Now, did you -- based on your own understanding of

11 Freemasons, were there elements of what the defendant discussed

12 with respect to Freemasons that you found true?

13 A    Yes.  Freemasons are a fraternal organization.  It's a

14 very large organization.  It's been around I believe for over

15 200 years, and they do have secret rituals as, as part of their

16 fraternal organization.

17 Q    What is your understanding of the pervasiveness of

18 individuals viewing Freemasons as having an inordinate power in

19 this country?

20      MR. DURKIN:  Your Honor, I object to this.  This is

21 beyond his area of expertise.

22      THE COURT:  Counsel.

23      MR. HAXALL:  Your Honor, I think part of what he did

24 is look at how widely held some of these beliefs are and that

25 informs partial --

DeMier - direct by Haxall

1        THE COURT:  Well, why don't you rephrase your

2    question, and then the Court will consider it in that vein.

3        MR. HAXALL:  Sure.

4        THE COURT:  Proceed.

5    BY MR. HAXALL:

6    Q    Sir, did you consider how widely held beliefs about

7    Freemasons were in our society?

8    A    Yes.

9    Q    Where did you get that information from?

10   A    It's easily accessible in popular culture.

11   Q    Can you give some examples.

12   A    The book -- the very popular book and movie *The Da Vinci*

13   *Code* talks about Freemasonry.  The -- there's an episode of *The*

14   *Simpsons* where one of the cartoon characters joins the

15   Stonecutters, which is very obviously and transparently a

16   poking fun at Freemasonry.  It's been my experience working in

17   the field of psychology that many people have some degree of

18   paranoid beliefs about Freemasons or other secret ruling

19   societies.

20   Q    Based on your understanding then of the popular culture

21   view of Freemasons and your own experience as a forensic

22   psychologist, how did the defendant's statements about

23   Freemasonry comport with the popular belief that you've seen

24   previously?

25   A    I did not find that they differed significantly.

DeMier - direct by Haxall

1   Mr. Daoud told me that he downloaded a lot of what he called
2   weird books about Freemasons and the Illuminati.  He described
3   himself as a conspiracy theorist.  He --
4            MR. DURKIN:  Judge, I'm going to object.  We were
5   talking about the Freemasons, not the Illuminati.
6            THE COURT:  Not who?
7            MR. DURKIN:  Not the Illuminati.  Those are two
8   separate issues, and they're identified separately in his
9   report.
10           THE COURT:  They are.  But if he said that came up at
11  the same time, the Court's going to allow it.  Otherwise, sir,
12  you'll leave the Illuminati references for whenever that issue
13  particularly comes up.  Proceed.
14           THE WITNESS:  Yes, ma'am.
15  BY MR. HAXALL:
16  Q    So was there anything else with respect to the Freemasons
17  that you wanted to address there?
18  A    No.
19  Q    Let's talk about the Illuminati then.  Did you have
20  conversations with the defendant and/or receive writings from
21  him discussing the Illuminati?
22  A    Yes, I did.
23  Q    What did the defendant relay to you his belief was with
24  respect to the Illuminati?
25  A    He said that the Illuminati are also a secret ruling class

DeMier - direct by Haxall

1   that are the highest levels of government.  He said he didn't

2   know if a person had to be a Freemason before they became a

3   member of the Illuminati, but he thought that was probably the

4   case.  It was not and is not all together clear to me where

5   that line between Freemasons and Illuminati is drawn.  But he

6   said the Illuminati are at a higher rank and hold higher

7   positions of power.  He said that some members of the

8   Illuminati have very aggrandized views of themselves and they

9   even believe themselves to be gods.  And he said that the --

10  one of the roles of the Illuminati is to bring forth the

11  Antichrist.

12  Q    What, if anything, did the defendant express with respect

13  to Judge Coleman being a member of Illuminati to you?

14  A    He told me that he suspected that she was.  But when I

15  pressed him on that, he acknowledged that he did not know that

16  for certain.

17  Q    I'd like to now address -- you're aware that the defendant

18  wrote or purported to write a letter to President Obama, is

19  that correct?

20  A    Yes.

21  Q    Did you discuss that topic with the defendant?

22  A    Yes.

23  Q    Can you please describe for the Court what the defendant

24  told you about his letter.

25  A    He told me that he sent a letter to President Obama.  And

DeMier - direct by Haxall

1   he said that shortly after he thought the President would have

2   received that letter, the President visited an Islamic school.

3   And he attributed that visit -- let me rephrase that.  He said

4   he believed the reason the President visited an Islamic school

5   was kind of as a slap in the face to the defendant, as a

6   specific reaction to his letter.

7   Q    With respect to the defendant's belief as to Freemasons,

8   the Illuminati, and the circumstances surrounding his letter to

9   President Obama, in your opinion did these opinions rise to the

10  level of delusion?

11  A    In my opinion they do not.

12  Q    Why not?

13  A    Because they lack some of those more nuanced -- well, two

14  reasons actually.  First, they are widely held to varying

15  degrees.  They're widely held.  They are the topic of --

16          MR. DURKIN:  Judge --

17          THE WITNESS:  -- many books --

18          MR. DURKIN:  Judge, I'm going to object.  I don't

19  mind going into this, but I'm going to object to this repeated

20  widely held without more --

21          THE COURT:  The Court agrees.  Objection sustained.

22  BY MR. HAXALL:

23  Q    Beyond the widely held nature and its impact on the DSM-V

24  definition, what conversations or communications did you have

25  with the defendant that caused you to believe that these

DeMier - direct by Haxall

1  weren't delusions?

2  A    The first thing would be his, his identification of

3  himself as a conspiracy theorist and the things that he said he

4  liked to read about them.  So in that aspect he's not different

5  from many other people.  Second, he did not seem to hold those

6  beliefs with the same tenacity or the same intensity as people

7  hold delusional beliefs.

8  Q    Can you give examples of that.

9  A    Yes.  He was, he was able to question those beliefs.  He

10  did not become upset or irritated with me when I challenged

11  those beliefs.  When I've dealt with people who have delusions,

12  they push back very strongly and get offended or have other

13  emotional reactions like anger when it's suggested that those

14  beliefs aren't true.

15       Mr. Daoud, on the other hand, was able to think

16  critically about those, those things.  I asked what his

17  evidence was.  And he acknowledged he did not have any evidence

18  that Judge Coleman was a member of the Illuminati.  I asked him

19  if these are things that he thinks are true or that he knows

20  are true.  And his response to that question even though he

21  said I know they're true because of the way society is, I mean,

22  he was able to consider that question and think about it in a

23  way that suggests that his beliefs are more malleable or open

24  to change if he gets other information than I would expect to

25  see in a person with a delusional disorder.

DeMier - direct by Haxall

1  Q    Did the defendant indicate an example of when he actually

2  changed his opinion on an unusual belief?

3  A    Yes.  Mr. Daoud said that for approximately a year he

4  believed that the U.S. government was responsible for the

5  terrorist attacks of September 11th, 2001.  That's certainly

6  another belief that I've heard from places other than Mr.

7  Daoud.  It's not a very -- this is not a belief that's specific

8  to him.  He told me that after thinking about it carefully and

9  examining the evidence, he did not believe that there was

10  evidence to support that belief.  And after about a year he

11  changed his mind.

12  Q    Is an ability to change mind consistent or inconsistent

13  with a delusion?

14  A    It's inconsistent.

15  Q    Calling your attention to --

16          MR. DURKIN:  Well, Judge, excuse me.  But can, can we

17  refer to the delusion to which that question just referred?

18          THE COURT:  Can -- you want, you want to repeat what

19  you just said.

20          MR. HAXALL:  Sure.

21  BY MR. HAXALL:

22  Q    With respect to the defendant's changed opinion as to the

23  9/11 attack, would you have expected somebody to hold that as a

24  delusion to be able to change their mind?

25          MR. DURKIN:  I object to that because, first of all,

DeMier - direct by Haxall

1   he never elicited from this witness that he considered that to

2   be delusional.  The only question I remember him answering was

3   something to the effect that that's something that other people

4   believe.  But I, I did not hear him elicit first whether --

5   that that was a delusion.

6           THE COURT:  All right.  Let's go back and make clear

7   as to what he's referring to.

8   BY MR. HAXALL:

9   Q    The defendant's stated prior belief that 9/11 -- his

10  conspiracy theories around that, would that have constituted a

11  delusion?

12  A    In my opinion it would not.

13  Q    And why is that?

14  A    Because this is another belief that's held by a size --

15  not a majority, but a sizable portion of the population.  I

16  mean, we're talking thousands of people.  There are

17  demonstrators at the 9/11 Memorial that state that this was a

18  conspiracy of the U.S. government, and that the U.S. government

19  bombed the buildings.  You can find a lot of stuff about this

20  on the internet.  I believe there have been books written about

21  this.  So this is not, you know, one person's idiosyncratic

22  unusual belief.  There is a subculture of people who believe

23  that.

24          MR. DURKIN:  Well, Judge, just for the record I want

25  to object to this entire line of questioning and move to strike

DeMier - direct by Haxall

1    it.  The entire line of questioning began by taking him through

2    his report regarding idiosyncratic beliefs and mental illness.

3    And the idiosyncratic beliefs on page 16 that Mr. Haxall

4    referred him to were specifically just to Freemasons and the

5    Illuminati.  And this is like setting up a, a stalking horse

6    here.  You know, now, we throw something else out as a

7    delusion.  We're going to knock that down.

8         THE COURT:  Well, the Court disagrees.  The objection

9    is overruled.  What I'm hearing him saying is that this is not

10   an unusual belief.  So we'll just leave that at that.  I'm

11   looking at each one of them separately as a different issue

12   that possibly is coming up, and I'll listen to how he treats

13   them.  Proceed.

14   BY MR. HAXALL:

15   Q    Dr. DeMier, I'm going to call your attention to page 4 of

16   Dr. Xenakis' report, which is again tab 6 in the binder in

17   front of you.  And I'm going to call your attention to the very

18   last line of the paragraph at the top of the page.  Quote, any

19   effort to challenge his thinking is countered by assertions

20   that all parties except for his family and him are influenced

21   and under the control of alien forces and Illuminati.

22        Was that your experience with Mr. Daoud?

23   A    No.

24   Q    How did your experience differ?

25   A    He never mentioned alien forces at all.

DeMier - direct by Haxall

1  Q    How about with respect to challenging him and his views on
2  the Illuminati?
3  A    Again, he seemed to be somewhat malleable.  He did not
4  change his opinion, but he seemed to have an ability to
5  consider evidence that would either support or refute that
6  opinion in a way that would be very unusual for a person with a
7  delusional disorder -- the symptom of a delusion.
8  Q    I'm going to call your attention to an additional
9  provision on page 3 of Dr. Xenakis' report.  It's going to
10 be -- I'm going to read it to you, Doctor.  To this -- quote,
11 To this day -- and this is in the top paragraph on the page --
12 he, referring to Daoud, believes that alien creatures are
13 undertaking elaborate plans to destroy civilization.
14        Did the defendant make any such reference to you?
15 A    No.
16 Q    In your dealings with Mr. Daoud did you find him to be in
17 any way secretive about his unusual beliefs?
18 A    No.  Instead he seemed very open and willing to talk about
19 them with me.
20 Q    And did he volunteer them on his own, or did you always
21 have to ask about them first?
22 A    He volunteered some of them on his own.
23 Q    Also on page 3, quote, His, referring to Mr. Daoud,
24 current belief that reptiles occupy the positions of power in
25 the U.S. government.  He is convinced that U.S. leaders,

DeMier - direct by Haxall

1  including the judge and officers of this court, are disguised
2  reptiles intending to harm him and God fearing people.

3           And then continue on page 6.  "He," referring to Mr.
4  Daoud, "believes without reservation that reptilian forces have
5  overtaken and operate the United States government and are
6  conspiring against him."

7           Did you and Mr. Daoud have conversations about
8  reptiles?

9  A    On one occasion, yes, we did.

10 Q    And how did that come up?

11 A    It came up because Mr. Daoud was using this idea of
12 reptiles inhabiting people, inhabiting people as an example of
13 mental illness and drawing a contrast between that and why he
14 told me that he believed.  He seemed to be making fun of people
15 that held that belief.

16 Q    Dr. DeMier, I'm going to ask you to look at the tab
17 Defendant's 9.  Do you have it?

18 A    Yes.

19 Q    Okay.  Looking towards the bottom of that page.  Quote,
20 People believe that you are not even human but reptiles,
21 literally reptiles, lizards with makeup.

22           Was that the first time that you saw a reference to
23 reptiles in this case?

24 A    I believe so.

25 Q    And what is your view or opinion as to what Mr. Daoud is

DeMier - direct by Haxall

1   expressing there?

2   A    He follows that up with, "Mrs. Coleman, you killed my

3   cellee for saying hi for me.  Don't you think that's crazy?"

4   He's drawing -- he's using that as an example of something that

5   he does not believe to again show the contrast between his

6   beliefs and beliefs that he thinks are truly ill.

7   Q    In the report you received from Dr. Goldstein how many

8   times does it make reference to Mr. Daoud's belief in

9   reptilians?

10  A    It's not mentioned.

11  Q    In the information provided by Dr. Bresler how many times

12  does it make reference to the defendant's belief in reptilians?

13        MR. DURKIN:  Well, objection.  Objection.  It's not

14  in the White Sox year book either.  There's a million things it

15  might not be in.

16        THE COURT:  Objection's noted.  Answer the question.

17        THE WITNESS:  What Dr. Bresler provided to me was

18  psychological testing.  But there was no reference in that to

19  reptiles.

20  BY MR. HAXALL:

21  Q    Other than what you talked about, your conversation with

22  Mr. Daoud, did he raise reptilians with you at all?

23  A    No.

24  Q    In your conversation with Dr. Xenakis did he raise

25  reptilians?

DeMier - direct by Haxall

1    A    No.

2    Q    Other than at -- up to the point that you prepared your

3    report, other than this reference, was there any other

4    indication of a reference to reptilians?

5    A    No.

6    Q    I'm going to now call your attention to what's under the

7    Defendant's 13 tab in the binder, the letter received

8    July 20th, 2016.

9              MR. DURKIN:  What number?  What number, Mr. Haxall?

10             MR. HAXALL:  It's your 13.  Defendant's 13.

11             MR. DURKIN:  Thank you.

12   BY MR. HAXALL:

13   Q    And I believe there's both a handwritten and a typed

14   version, whichever is easier for you.

15             Sir, calling your attention to the portion "perhaps

16   you did not accept my invitation to Islam because you're a

17   reptile."  Have you reviewed that since you completed your

18   first report?

19   A    Yes.

20   Q    And does this change your ultimate conclusions in the

21   case?

22   A    No.

23   Q    Why not?

24   A    Well, I -- the way I read this I am not convinced that he

25   believes that.  It looks to me like he is being provocative.

DeMier - direct by Haxall

1    In fact, if you look at the handwritten letter as opposed to
2    the, the transcript of it, what he wrote is maybe because I am
3    not part of the Illuminati, and then he crossed out part of the
4    Illuminati and changed it to maybe because I am not a reptile,
5    I cannot be part of the Illuminati.  It's like as -- my belief
6    is as he was writing this, he likely found a way to make it
7    more provocative and more outlandish.
8    Q    Calling your attention to the heading of this document,
9    "United States of America, thugs versus Adel Daoud, hostage."
10   Is that consistent with or inconsistent with what you just
11   talked about?
12   A    That's consistent.  I think that's also provocative.  It's
13   taking a jab at the Court.
14   Q    Going back to your experience in dealing with individuals
15   you evaluated for competency.  Would you find it typical or
16   unusual for a person to have a dramatic shift in beliefs over a
17   short period of time?
18   A    I think that would be unusual.  If you're talking about
19   the development of delusions, I think that would be very
20   unusual.  Certainly beliefs can change rapidly, you know, with
21   the advent of new information.  But I would not expect somebody
22   to develop a belief like this within the relatively short
23   amount of time since I saw Mr. Daoud and he was laughing at
24   that belief.
25   Q    Doctor, do you have any opinion as to whether the

DeMier - direct by Haxall

1   defendant suffered from delusional disorder at the time of your
2   opinion -- at the time of your evaluation?
3   A    Yes.
4   Q    What is that opinion?
5   A    I --
6           MR. DURKIN:  Objection.  I -- objection.
7           THE COURT:  Basis.
8           MR. DURKIN:  Objection to the relevance of just at
9   the time of his evaluation.  The question is is he competent to
10  stand trial today.
11          THE COURT:  That is the question.  However, that --
12  answering that question does not prevent this question.  So
13  your objection is overruled.
14          THE WITNESS:  It was my opinion that he did not meet
15  the criteria for delusional disorder.
16  BY MR. HAXALL:
17  Q    Now, have you had cases in all these cases you've handled
18  in which you received information after your initial findings
19  which caused you to change your mind?
20  A    Yes.
21  Q    Have you received any information subsequent to the
22  preparation of your report that caused you to change your
23  opinion in this case?
24  A    No.  I've received information, but none of it persuaded
25  me to change my mind.

DeMier - direct by Haxall

1  Q    Were you able to formulate an opinion as to whether the
2  defendant suffered from any mental disease or defect at the
3  time of your evaluation?
4  A    Yes.  It was my opinion that he had no mental illness.
5  Q    Has any recently received information changed your
6  opinion?
7  A    No.
8  Q    So putting aside the mental disease or defect portion of
9  4241, I'd like to discuss the other statutory competency
10  provisions.  First, whether or not the defendant is able to
11  understand the nature and consequences of the proceedings
12  against him.
13        Did you evaluate the defendant as to that prong of
14  this statutory test?
15  A    Yes.
16  Q    How did you do that?
17  A    I did it with a rather lengthy clinical interview where I
18  asked him questions in a semi-structured format about the
19  nature of the charges against him and about the roles of people
20  involved in courtroom proceedings, and about the various
21  decisions that criminal defendants have to make.
22  Q    And in your discussions with the defendant did he indicate
23  that he was able to understand the nature and consequences of
24  the proceedings?
25  A    He seemed to think that he was able to do that.  More

DeMier - direct by Haxall

1    importantly, I believe --

2            MR. DURKIN:  Judge, excuse me.  If that's a

3    conversation, can we have the foundation for the conversation.

4            THE COURT:  Objection sustained.  Let's get a

5    foundation.

6    BY MR. HAXALL:

7    Q    At the conclu -- how many times did you discuss these

8    issues with the defendant?  How many interviews?

9    A    I believe there is one interview that focused on them

10   specifically, but I'm sure I talked about them to some extent

11   during other interviews also.  I mean, in the evaluation

12   process you're always gathering information, and I might pick

13   up something he said that reflects the understanding of his

14   legal system even if we're talking about something different.

15   Q    In your report do you break this into two main categories,

16   charges and penalties and general legal knowledge?

17   A    Yes.

18   Q    Did the defendant indicate that he understood the nature

19   of the charges against him and the penalties?

20           MR. DURKIN:  Same objection.  Foundation.

21           THE COURT:  Objection's overruled.  I'll allow it.

22   Proceed.

23           THE WITNESS:  Yes, he was able to talk in great

24   detail about the specific charges against him, the evidence

25   that he expected that would be brought out in court if he were

DeMier - direct by Haxall

1  to go to trial.  And he had a good understanding of the

2  possible penalties that could occur if he were found guilty.

3  BY MR. HAXALL:

4  Q    How about the category that you labeled general legal

5  knowledge?  Can you speak to that, please.

6  A    Yes.  During the interview where I talked to him about

7  that, he displayed detailed and accurate knowledge about the

8  legal system that goes far beyond what I usually see among

9  people that I evaluate.

10  Q    Can you give a specific example.

11  A    Yes.  When we were talking about potential pleas that a

12  defendant can enter, I asked if he had heard of the plea no

13  contest.  And he immediately asked is that like an Alford plea?

14  Most criminal defendants that I evaluate don't understand what

15  an Alford plea is.  I think most of the general public is not

16  familiar with that plea.

17  Q    Did you discuss the differences between no contest and an

18  Alford plea with him?

19  A    Yes.

20  Q    And what was your perception of how he addressed the

21  distinctions?

22  A    He was able to understand that distinction quickly and

23  easily.

24  Q    Now, did you find that any of the defendant's, the way you

25  termed them, unusual or idiosyncratic beliefs impacted his

DeMier - direct by Haxall

1  ability to understand the nature and consequences of the
2  proceedings against him?
3  A    No.
4  Q    I'd like to kind of move on to the next prong of the
5  competency test, his ability to assist properly in his defense.
6            How do you evaluate that?
7  A    That's evaluated not just by asking questions about the
8  person's relationship with an attorney.  It's also evaluated by
9  looking at, at their decision making capacities.  It's -- I
10 think there's also an aspect of determining how easily that
11 person can develop a relationship with the examiner that might
12 be analogous to their ability to develop a relationship with an
13 attorney.  If somebody can speak to me reasonably about these
14 issues, then I don't have any reason to believe they couldn't
15 speak reasonably to others about the same issues.
16 Q    Calling your attention to Defendant's 12, the May 2nd,
17 2016 letter to you.  I'll give you a second to turn to that.
18 A    Yes.
19 Q    In general terms can you describe what this letter is
20 about.
21 A    This is the letter that Mr. Daoud asked to write to me
22 that details his understanding of the three cases against him.
23 Q    And as we noted, you previously reviewed reports and other
24 evidence setting forth those cases, is that correct?
25 A    That's correct.

DeMier - direct by Haxall

1  Q    When you reviewed Mr. Daoud's letter, how did you find his
2  understanding of the cases and the evidence against him to be?
3  A    Very thorough.  Very accurate.  A clear reflection of what
4  the charges and potential consequences actually are.  And that
5  was my impression not just in the letter but also in our
6  conversations about that topic.
7  Q    How did Mr. Daoud's recitation of the facts and applying
8  them in this case, how did that compare to most individuals you
9  have evaluated for competency?
10 A    I think his understanding was more thorough and perhaps
11 even at a deeper level than many of the people that I evaluate.
12 Q    Now, did you have conversations when you were going
13 through your interview with the defendant about the court
14 process regarding plea negotiations?
15 A    Yes.
16 Q    Can you please describe that for the Court.
17 A    He described a -- an event where he was asked to consider
18 a plea agreement, and he told me that he rejected it.
19 Q    Did he indicate why he rejected it?
20 A    He said he rejected it because the deal wasn't good
21 enough.
22 Q    Calling your attention again to page 4 of Dr. Xenakis'
23 report.
24          THE COURT:  One second, please.
25          MR. HAXALL:  Sure.

DeMier - direct by Haxall

1    (Short break taken.)

2          THE COURT:  All right.  Court's back in session.

3    Proceed, Mr. Haxall.

4          MR. HAXALL:  Thank you, Judge.

5    BY MR. HAXALL:

6    Q    Dr. DeMier, calling your attention to page 4 of Dr.

7    Xenakis' report.  The first sentence of the second paragraph.

8    Quote, Daoud is unable to rationally discuss proposals for an

9    effective defense.

10         Was that your opinion in your dealings with Mr.

11   Daoud?

12   A    No.

13   Q    Did the defendant express to you any concerns about his

14   attorneys?

15   A    Yes.

16   Q    Is that common or uncommon in your experience?

17   A    It's extremely common among criminal defendants to have

18   questions --

19         MR. DURKIN:  Judge, again could I --

20         THE WITNESS:  -- or suspicions of their attorneys.

21         MR. DURKIN:  Could I just go back for a moment and

22   interpose a motion to strike unless they put -- lay some

23   foundation.  I did not hear any testimony and foundation that

24   he was -- that they discussed the issue of an effec --

25   proposals for an effective defense.  And without that I think

DeMier - direct by Haxall

1     that that answer should be stricken.

2              THE COURT:  Which answer?

3              MR. DURKIN:  The answer that --

4              THE COURT:  Whether he expressed any concerns about

5     you?

6              MR. DURKIN:  Yes.  I mean --

7              THE COURT:  I mean, you can go into further, further

8     questioning and then the Court will decide how much weight to

9     give it.  But right now striking it, the Court's overruling

10    you.  Proceed.

11    BY MR. HAXALL:

12    Q    What did the defendant tell you -- first of all, how many

13    conversations did you have with Mr. Daoud about his attorneys

14    and concerns about them?

15    A    I don't remember.  I know we talked about it in detail at

16    least once.  It would not surprise me if we talked about it at

17    other times, but I just don't -- I don't recall which topics we

18    discussed during which interviews.

19    Q    You indicated the defendant was in your facility for

20    approximately two months, and you had approximately eight

21    meetings with him, is that correct?

22    A    Yes.

23    Q    Are there times that your recollection of which specific

24    meeting certain things were said isn't clear?

25    A    Yes.

DeMier - direct by Haxall

1  Q    During each of these meetings who would be present for
2  them?
3  A    Only Mr. Daoud and myself.
4  Q    During these meetings, what did the defendant express to
5  you about his experience with respect to his attorneys?
6  A    May I clarify my previous answer.
7  Q    Sure.
8  A    During the very first interview there may have been a
9  physician's assistant in the room at least for part of it.
10 Often his history and physical occurs in conjunction with or
11 right before or right after the initial psychological
12 interview.  So it's possible that there was somebody present
13 for part of that first interview.  I don't remember.  Other
14 than that, it was just Mr. Daoud and me.
15 Q    What did the defendant tell you with respect to his
16 concerns about his attorneys?
17 A    He told me that he was unsure that his attorney was
18 working hard enough for him.  He said he was unclear about
19 where the attorney's loyalties lie.  He said that he -- you
20 know, he understood the attorney was supposed to be working for
21 him based on the fact that he was being paid, but that he often
22 saw the attorney on the other side of the courtroom.  And he
23 wasn't sure what his attorney's true affiliations were.
24 Q    Did the defendant indicate a certainty that his attorneys
25 weren't fully assisting him or did he express ambivalence?

DeMier - direct by Haxall

1  A    It was ambivalence.  He acknowledged that he didn't really

2  know.

3  Q    To the extent that the defendant expressed distrust of his

4  lawyers, is that the result of a mental disease or defect?

5  A    No.

6  Q    In your opinion does Mr. Daoud's distrust of his attorneys

7  prevent him from adequately assisting in his own defense?

8  A    No.

9  Q    Did the defendant provide you with any specific examples

10 in which he declined to cooperate with his attorneys?

11 A    No, he didn't.

12 Q    Dr. DeMier, do you have an opinion as to whether the

13 defendant is competent to stand trial in this case?

14 A    Yes.

15 Q    What is that opinion?

16 A    I believe he is competent to proceed.

17        MR. HAXALL:  May I have one moment, please.

18        THE COURT:  You may.

19    (Brief pause.)

20        MR. HAXALL:  No additional questions, Your Honor.

21        THE COURT:  All right.  Go ahead, Mr. Durkin or Mr.

22 Herman, or whoever is going to step up.

23        MR. DURKIN:  I'll step up.

24        THE COURT:  All right.

25        MR. DURKIN:  If I could have one second.

DeMier - cross by Durkin

1      THE COURT:  Sure.

2      (Brief pause.)

3                  CROSS-EXAMINATION

4  BY MR. DURKIN:

5  Q    Dr. DeMier, do I understand you to be saying that even if

6  Dr. Xenakis is correct that Mr. Daoud is suffering from a

7  delusional disorder, that in your opinion he could still

8  satisfy the second prong of the statute, that he could

9  cooperate in his defense?

10 A    I don't think that's what I said.

11 Q    I understand that's not exactly what you said.  But I

12 asked you do I understand you to be saying that?  Would that be

13 a takeaway from your overall testimony?  Would that be correct?

14 A    Based on all the information I have, yes, I believe that

15 he's currently competent to proceed.

16 Q    And but my question is you believe that regardless of

17 whether he is, in fact, suffering from the delusional order

18 that Dr. Xenakis opines he is suffering from; correct?

19 A    If Dr. Xenakis is correct, then I would need to talk to

20 the defendant again.  So I -- so I think --

21 Q    And what -- and if Dr. Xenakis is correct, what --

22             THE COURT:  All right.  And just for the Court.  If

23 he is correct in his opinion that Mr. Daoud suffers from a

24 delusional disorder?

25             MR. DURKIN:  That's correct.

DeMier - cross by Durkin

1        THE COURT:  All right.  Thank you.

2        MR. DURKIN:  Let me rephrase it.

3        THE COURT:  Thank you.

4        MR. DURKIN:  Thank you, Judge.

5   BY MR. DURKIN:

6   Q    If Dr. Xenakis is correct that Mr. Daoud is, in fact,

7   suffering today from a delusional disorder, what is it that you

8   would then be required to do to reevaluate your opinion with

9   respect to his competency to stand trial?

10  A    I would need to determine whether or how his delusional

11  beliefs impacted the competency related abilities of

12  understanding the procedures and being able to work with you.

13  Q    And what would you have to do in order to get to that?

14  Would there be more testing that would be in order?

15  A    Not necessarily testing.  I think interviews would

16  probably suffice to answer those questions.  But I'd want to --

17  assuming that he had delusions at this point, I would want to

18  talk to him about those delusions, his basis for them.  Kind of

19  test whether they were firm and determine what impact they

20  would have on his ability to make decisions in his own best

21  interest.

22  Q    Well, you would agree with me, would you not, that the

23  scholarly writings with respect to delusional disorder refer to

24  issues of semantics with respect to whether something is either

25  a disorder according to the DSM-V or something like you say as

DeMier - cross by Durkin

1    idiosyncratic, am I right?

2    A    I think it's more than just semantics.  I think there's an

3    important qualitative difference there.  It is a difference

4    that is sometimes difficult to articulate on paper.

5    Q    Well, all of this is difficult to articulate on paper,

6    isn't it?

7              MR. HAXALL:  Objection.

8              THE COURT:  As to the form of the question --

9              MR. HAXALL:  Yes, Your Honor.

10             THE COURT:  -- sustained.

11   BY MR. DURKIN:

12   Q    Well, you said I believe at the beginning of your

13   testimony something to the effect that there's no bright lines,

14   correct?

15   A    Correct.

16   Q    And that it depends on -- and that there's certainly no

17   score or definitive answer, correct?

18   A    I said that, yes.

19   Q    You also said that while the language of the statute is

20   clear, it's not easy to determine in practice, is it?

21   A    That's right.  It's -- the task here is to determine what

22   somebody else's internal experience is.  And that's not

23   something that can be observed directly.  You have to rely on

24   inferences from their statements or from their behavior, from

25   what other people have observed about them to form those

DeMier - cross by Durkin

1  opinions.

2  Q    And that's what you did here to the best of your ability,

3  correct?

4  A    Yes, sir.

5  Q    And you relied on your experience, correct?

6  A    In part, yes.

7  Q    Well, you didn't give much weight to any of the testing,

8  correct?

9  A    I didn't discount the testing, but I did not think that

10 the results of the testing were definitive in terms of

11 answering the question regarding competency.

12 Q    Even though you admit, as you told us, that there was a

13 significant discrepancy between Dr. Bres -- Dr., is it Green?

14 A    Goldstein?

15 Q    Goldstein and Dr. Bresler's tests on one particular

16 scoring, correct?

17 A    Correct.  We're talking about one score among many

18 subtests of many tests.  I perceived --

19 Q    Go ahead.

20 A    I'm sorry.  I perceived the results to be more consistent

21 than I would have expected.

22 Q    Well, except that the, the one score where there was a

23 significant increase over time was with respect to paranoia, am

24 I right?

25 A    The score with the biggest discrepancy was in respect to

DeMier - cross by Durkin

1    mania.

2    Q    And would you take a look at tab --

3            MR. DURKIN:  I'm sorry, Judge.  I thought I had this

4    at my fingertips and --

5            THE COURT:  Or if you can go to some other area while

6    your colleagues find it and then you can come back.

7            MR. DURKIN:  Yes.  Let's have them find it and we can

8    come back.

9            THE COURT:  Yes, you can come back.  In order to keep

10   going, let's see if they can keep looking for it.

11           MR. DURKIN:  That's fine.  I'll go back to it.

12           THE COURT:  All right.  Thank you.

13   BY MR. DURKIN:

14   Q    Regardless of anyone's opinion on those scores, it was

15   your opinion that no more testing was necessary, correct?

16   A    That's correct.

17           MR. DURKIN:  Judge, I found the document.  I thought

18   it was in the book, but apparently it didn't make it into the

19   book.

20           MR. HAXALL:  Your honor, just if I may assist.

21   There's a defense charts tab.  I think it is in there, if

22   that's what you're looking for.

23           MR. DURKIN:  Yes.

24           MR. HAXALL:  The comparison chart.

25           THE COURT:  What exhibit?  Exhibit what?

DeMier - cross by Durkin

1    MR. DURKIN:  I'm going to mark this, Judge.  It's
2  actually more of a demonstrative exhibit, but I'll mark it as
3  32 and add it to the notebooks later.
4    THE COURT:  And the government has that?
5    MR. HAXALL:  We do, Judge.  And no objection to
6  admitting it.
7    THE COURT:  All right.
8  BY MR. DURKIN:
9  Q    Let me just show you this, Doctor, quickly.  Would you
10  take a look at this three-page exhibit No. 32 and see if that
11  comports with the results you compared.  I mean, whether those
12  numbers are accurate.
13  A    Yes, this is consistent with what I saw.
14  Q    And, in fact, there was a 73 percent increase in the mania
15  score between August 2013 and September 2015, correct?
16  A    Yes.
17  Q    It went from 49 to 85?
18  A    Yes.
19  Q    But you don't add any significance to that with respect to
20  your opinion?
21  A    I -- again, I don't think that is dispositive, and it did
22  not change my opinion.  I think there are explanations for why
23  that scale score would increase over the span of two years.
24  Q    And what would that explanation be?
25  A    I think a possible explanation is the extent to which Mr.

DeMier - cross by Durkin

1   Daoud was confined and the circumstances under which he was

2   confined.  He is an energetic young man, and I think it's

3   possible he was frustrated by being in special housing units

4   and didn't have as many outlets for his energy, is one of the

5   things that that scale measures.

6   Q    You certainly would agree with me, would you not, that

7   there's considerable scholarly literature in your field with

8   respect to the negative impacts on an incarcerated individual's

9   mental health in special housing units?  Would you agree with

10  that, at least that there is considerable scholarly literature

11  in that regard?

12  A    Yes.

13  Q    And it is a concern in your field, is it not?

14  A    It is.

15  Q    And, in fact, most of that literature points in the

16  direction of suggesting that prolonged confinement in isolation

17  or the S-H-U or what -- what does S-H-U mean?

18  A    It stands for special housing unit.

19  Q    And that's what Mr. Daoud had been in for some time as a

20  result of the incident -- the third incident in which he's

21  charged, correct?

22  A    Correct.

23  Q    And you know that has an impact on someone's mental

24  health, don't you?

25  A    Well, I know it can have an impact.  I think the

DeMier - cross by Durkin

1   literature suggests that there's a lot of variability.  That

2   some people are able to withstand prolonged isolation better

3   than others.  It's, it's an area of significant concern and a

4   place I think corrections across the country is paying more

5   attention to.

6   Q     And you do agree with me as you just said that confinement

7   in the SHU could be an explanation for the 73 percent increase

8   in the mania test score, correct?

9   A     I think that's one hypothesis, yes.

10  Q     Now, you talked about him being energetic, am I right?

11  A     Yes.

12  Q     And you even note that in your report, don't you?

13  A     Yes.

14  Q     In fact, you note in your report that he would frequently

15  pace around, correct?

16  A     Correct.

17  Q     The fact of the matter is is that left to his own devices,

18  he's always pacing more or less like an animal in a cage, isn't

19  he?

20         MR. HAXALL:  Objection as to foundation.

21         THE COURT:  Objection sustained.

22  BY MR. DURKIN:

23  Q     Well, you did note his restlessness and his pacing,

24  correct?

25  A     Yes, I noted his restlessness and pacing, but he was

DeMier - cross by Durkin

1    certainly able to do other things.  He wasn't pacing when he
2    wrote the long letters to me.  I observed him on numerous
3    occasions when I was just making rounds on the unit sitting on
4    his bed studying the Quran.
5    Q    I'm not suggesting that he's pacing every moment of every
6    day.  I'm simply suggesting that it was a significant enough
7    observation that you noted it in your report that he was
8    frequently pacing, correct?
9    A    Correct.
10   Q    And had you ever seen him do what he calls pace in place
11   by bending his knees like, like I'm doing right now back and
12   forth?
13   A    I don't recall seeing that.
14         THE COURT:  All right.  The record will reflect the
15   in-court demonstration by Mr. Durkin.
16         MR. DURKIN:  Quite a good one, wasn't it?
17         THE COURT:  Proceed.
18   BY MR. DURKIN:
19   Q    Now, with respect to -- you placed a lot of -- you placed
20   some emphasis, if not a significant emphasis in your opinion as
21   to competency with respect to your conversations with him
22   regarding his understanding of the legal system, am I right?
23   A    That's correct.
24   Q    How many times did you discuss the legal system with him?
25   A    Again, I don't know that I can differentiate one interview

DeMier - cross by Durkin

1  from the next without my notes in front of me.  I mean,

2  that's -- I imagine that was part of the discussion at almost

3  every interview.  There was one specific interview where I went

4  into more detail, and that was the focus of the interview.  But

5  that's why he was at our facility was to talk about those

6  issues.  So we talked about them in some way I think during

7  every interview.

8  Q    Well, let's, let's take a look at page 11 of your report.

9  Under the heading competency related abilities, do you see

10 that?

11 A    Yes.

12 Q    And that's where you begin relating in your report that he

13 was questioned regarding his understanding of the legal system,

14 correct?

15 A    Correct.

16 Q    But you did note that although he had a solid

17 understanding of the workings of the legal system, he voiced

18 some idiosyncratic beliefs.  Some of which were specific to his

19 own case, correct?

20 A    That's correct.

21 Q    What are those idio -- what idiosyncratic beliefs were you

22 referring to?

23 A    His assertion that many of the people who play a role in

24 this proceeding are Freemasons, and his belief that Judge

25 Coleman is a member of the Illuminati.

DeMier - cross by Durkin

1  Q    Have you ever had a case where the defendant thought that
2  the judge herself was a member of the Illuminati?
3  A    I don't believe so.
4  Q    And have you ever had a case involving somebody who
5  believed that the Freemasons were in charge of the world as Mr.
6  Daoud expressed to you?
7  A    I believe that I have.  I cannot --
8  Q    What, what case was that?
9  A    I can't recall the specific name of the case.  But over
10 the, the many years I've been at the medical center I know
11 those are themes that I've heard from time to time.  And it is
12 also possible that I've heard that from people who are not
13 referred for competency evaluation but who are referred for,
14 for other reasons.
15 Q    Are you aware of the fact that he also believes that his
16 lawyers are part of the Illuminati?
17 A    Well, I want to be careful when we talk about what he
18 believes.  Because like I said before, trying to assess what's
19 going on in his, in his mind I'm hesitant to say with certainty
20 what he believes or doesn't believe.  I'm more comfortable
21 talking about, you know, what he said or what he's written,
22 because I don't -- I don't know what he believes.  I don't
23 recall him telling me that his attorneys were members of the
24 Illuminati.  Although I think he said that he thought you were
25 probably Freemasons.

DeMier - cross by Durkin

1  Q    Okay.  Well, let me, let me ask you this:  Are you telling

2  us then that you don't really even know what he believes?

3  A    Yes.

4  Q    So are you telling us then that if he truly believes this,

5  you might have a different opinion?

6  A    That's true.  If he -- if we could determine with

7  certainty that he believed these things, then that opinion

8  might change.  But I -- you know, this isn't just about my

9  perception of Mr. Daoud.  We don't really know what anybody

10 believes.  It's beyond our capabilities as psychiatrists to

11 determine with certainty what somebody believes.

12 Q    Of course.

13 A    Like I said before, we have to make inferences based on

14 what they do and say.

15 Q    Of course.  Because otherwise you'd be out of a job and

16 there would be no reason to have any competency hearings,

17 correct?

18           MR. HAXALL:  Objection.

19           THE COURT:  Objection sustained.  Argumentative.

20 BY MR. DURKIN:

21 Q    Well, all of this is -- I mean, how did you define

22 forensic?  Explain -- I heard you define forensic.  I thought

23 it was a good definition.  What was your earlier description of

24 forensic?

25 A    I don't recall specifically.  But forensic psychology is

DeMier - cross by Durkin

1  the application of ideas and theories and methods of psychology
2  to evaluate individuals when there's a question before a legal
3  decision maker.
4  Q    And you, of course, have to do that simply based on the
5  totality of all the evidence you're able to gather, correct?
6  A    Absolutely.
7  Q    And in that regard you do agree with me that the question
8  is where that particular person is at today, correct, not
9  necessarily just when you examined him?  Would I be correct in
10 that?
11 A    Yes.
12 Q    That's why you were asked to review other things that were
13 tendered to the government by us or Dr. Xenakis or anyone else
14 post the time you saw him in Springfield in the spring of 20 --
15 of this year, correct?
16 A    Correct.
17 Q    Let me ask you this in that regard:  Have you listened to
18 phone calls between Mr. Daoud and his sister in the last two
19 weeks?
20 A    No.
21 Q    Let me ask you a question about -- going back to the legal
22 system and his ability to understand things.  You, you
23 testified earlier, if I'm not mistaken, that you thought he
24 understood the penalties that were involved in this case; am I
25 right?

DeMier - cross by Durkin

1   A    Yes.

2   Q    And I believe you testified something to the effect that

3   you thought he understood the system better than most people

4   you've talked to, correct?

5   A    Correct.

6   Q    Do you know anyone that you've ever talked to in the 350

7   or 400 examinations you've done that thought they were going to

8   be executed in a noncapital case?

9   A    No.

10  Q    But that's what he has expressed, has he not?

11  A    Yes, according to, to the information I reviewed.

12  Q    According to his own words, correct?

13  A    Yes.  As relayed -- what I saw were e-mails that described

14  his words.

15  Q    And you -- well, I also believe if you -- take a look at

16  page 12 of your report.

17  A    Yes.

18  Q    That, that was something that he, in fact, himself told

19  you; correct?

20  A    You're correct.

21  Q    In the very conversation that you attribute to him having

22  this terrific understanding of the legal system, am I right?

23  A    Yes.

24  Q    And what you say is that when asked about the most adverse

25  possible outcome, Mr. Daoud said they'd kill me.  And then you

DeMier - cross by Durkin

1   asked him to elaborate, is that right?

2   A    That's correct.

3   Q    And then he said either officially or unofficially, am I

4   right?

5   A    Yes.

6   Q    And he told you that he understood he's not facing capital

7   punishment, but he said that authorities could, quote, make it

8   look like I killed myself or like prisoners killed me; am I

9   right?

10  A    Yes.

11  Q    And then he also told you that he would be vigilant as

12  that outcome is, quote, very likely, unquote, correct?

13  A    Correct.

14  Q    Well, that's a totally ridiculous understanding of the

15  outcome of this case, is it not?

16  A    If that is actually his understanding, then I would

17  certainly agree that that is preposterous.  But I -- you know,

18  one of my tasks is to, to form opinions about what he actually

19  believes.  And the way he was talking about this at that time I

20  was not convinced that just because he said it, he actually

21  meant it or that he actually believed it.

22  Q    I thought you just told us that there was no way you could

23  ever tell what anyone actually believed?

24  A    You can't with certainty.  You have to, you have to do

25  your best to reach conclusions about what they're most likely

DeMier - cross by Durkin

1    to believe.

2    Q    So are you saying you don't believe -- or that it is your

3    opinion that he doesn't really believe he's going to be killed

4    here?

5    A    At the time of my evaluation I did not believe that he

6    really believed that.  He mentioned it this, this one time.

7    And, and that was it.  And he -- I would expect for somebody

8    that really believed that was going to happen, that they'd be

9    rather preoccupied with it.  And he did not seem to be.

10   Q    Well, let me ask you this:  Would it affect your opinion

11   if you learned that he has had telephone calls with me or other

12   lawyers in our office over the course of the last two weeks in

13   which he repeatedly wanted to know when the date of his

14   execution or beheading was set?

15              MR. HAXALL:  Objection.

16              THE COURT:  Basis.

17              MR. HAXALL:  To the form of the question.  It's

18   putting forth evidence that's not admitted that the doctor has

19   not reviewed.  The hypothetical nature obviously is somewhat

20   acceptable for experts, but this goes far beyond --

21              MR. DURKIN:  Well, Judge, let me, let me explain.  I

22   was --

23              THE COURT:  Are you trying to argue your motion now

24   or what?

25              MR. DURKIN:  No.  No.  I was under the impression,

DeMier - cross by Durkin

1    and perhaps I'm mistaken and we'll have to correct this over
2    the lunch hour.  I thought that he had reviewed -- we have two
3    phone calls between him and his sister.  One on July 29th of
4    this year and the other on August 11th.  And I also thought the
5    government had collected, because I had asked them for them,
6    phone calls of --
7              THE COURT:  Well, why don't we do this:  Why don't
8    you set a better foundation to see if this doctor was ever
9    aware of this.  All right.  Proceed.
10   BY MR. DURKIN:
11   Q    Let me ask you this:  Do I understand from your last
12   question that you've never listened to any recent telephone
13   calls between Mr. Daoud and either his sister, me, or others in
14   our office?
15   A    That's correct.  I have never listened to any of his phone
16   calls.
17   Q    All right.  Well, let me ask you this hypothetical then:
18   Let's assume hypothetically that there are two phone calls to
19   his sister within the last two weeks or three weeks in which he
20   repeatedly told his sister that they were going to execute or
21   behead him, and he persisted in that -- in making those
22   statements even when his sister told him that was ridiculous
23   and it would not happen.  Would --
24             MR. HAXALL:  Objection.  Your Honor, I'm perfectly
25   happy, I know we're going to have a break, to allow the doctor

DeMier - cross by Durkin

1  if the defense wishes to listen to those calls.  But the

2  hypothetical I think extends beyond an appropriate question.

3          MR. DURKIN:  That's fine.  We can, we can --

4          THE COURT:  Objection sustained.  All right.

5          MR. DURKIN:  I mean, I --

6          THE COURT:  Let's move on.

7          MR. DURKIN:  I think it's --

8          THE COURT:  Let's move to something --

9          MR. DURKIN:  I think it's an appropriate

10 hypothetical, but that's -- we can do it that way.  That will

11 even be better.

12          THE COURT:  I'm assuming that the doctor will be

13 available.

14          MR. HAXALL:  We'll make sure that he's available to

15 listen to those calls --

16          THE COURT:  All right.  Thank you.

17          MR. HAXALL:  -- if that is what the defense wishes.

18          MR. DURKIN:  Thank you.  I do.

19 BY MR. DURKIN:

20 Q    Take a look at page 12 of your report again.  After the

21 paragraph I was just earlier questioning you on, there's,

22 there's a heading general legal knowledge and it starts out,

23 "Because Mr. Daoud had expressed some unusual beliefs about the

24 legal system, I explained that I wanted to assess his knowledge

25 about the way courtroom proceedings are supposed to work."  You

DeMier - cross by Durkin

1   see that?

2   A     Yes.

3   Q     What were the unusual beliefs about the legal system you

4   were referring to there?

5   A     The beliefs about Freemasons and the Illuminati.

6   Q     And you then went through a whole number of issues

7   contained on page 13 with respect to the kinds of pleas and so

8   forth, am I right?

9   A     That's correct.

10  Q     Now, one of the things that you noted and if I understood

11  your testimony correctly is that you were taken specifically

12  with his understanding of an Alford plea.  Do you remember

13  that?

14  A     Yes.

15  Q     Did he explain in any detail to you how it is he came to

16  understand what an Alford plea was?

17  A     No, he didn't.

18  Q     Did you ever ask him?

19  A     No.  I probably made an assumption that this was something

20  that he had discussed with you or one of your colleagues.  But

21  I, I did not pursue that.

22  Q     Well, that's exactly why I'm asking, because you decide

23  not to ask him about that?

24  A     Yes, I decided not to ask him about that.

25  Q     Would it surprise you to learn that he heard about the

DeMier - cross by Durkin

1   context of -- he heard about an Alford plea in the context of

2   his being unable to cooperate with us, and maybe that would be

3   a way out of this case?

4          MR. HAXALL:  Objection, Your Honor.  Foundation.

5   It's outside the --

6          THE COURT:  Foundation and form of the question

7   sustained.

8   BY MR. DURKIN:

9   Q   Well, let me ask it this way:  If -- you understand at

10   least based on your report here and I believe you've even

11   written some scholarly journal -- in a scholarly journal

12   yourself about understanding the requirements of the rule with

13   respect to competency, correct?

14   A   Correct.

15   Q   And you do understand as you testified earlier that the

16   second prong require -- one of the things of the second prong

17   is that he has to under -- he has to be able to cooperate with

18   counsel, correct?

19   A   Oh, I don't think there's a statutory requirement that

20   somebody cooperate with counsel.  The requirement is the person

21   has the ability to do so.  I've worked with numerous defendants

22   who chose to be very obstinate and not cooperate with their

23   counsel.  But as long as they have that ability and can choose

24   to do so, I will offer an opinion that they are competent to

25   proceed.

DeMier - cross by Durkin

1  Q    But you're not suggesting that that instance, that this

2  obstinence or refusal is what's going on with Mr. Daoud, are

3  you?

4  A    Not in the same way, no.  I know that he has, he has

5  spoken to you and your colleagues many times.  I do not

6  perceive him as being obstinate.  The point I was trying to

7  make is that what the law calls for is the ability to

8  cooperate, not necessarily that somebody chooses to cooperate.

9  Q    I understand that.  But my question went to what do you

10 understand that cooperation to necessarily entail?

11         For someone to have the ability to cooperate, what do

12 you understand that ability to entail?

13 A    Well, I think it entails the ability to communicate

14 effectively, to listen to ideas from one's attorney.  To

15 consider those in a way that's not adversely affected by mental

16 illness.  And to, to make choices in conjunction with the

17 attorney.  For example, a common choice is whether or not a

18 defendant who chooses to go to trial should testify.  I mean,

19 that's a decision that should be made in conjunction with the

20 attorney.

21 Q    Well, one of the things you mentioned earlier was you were

22 impressed by the fact that Mr. Daoud was able to tell you that

23 he had rejected a plea agreement, am I right?

24 A    I don't know that impress is quite the right word.  But I

25 certainly remember him talking about that.

DeMier - cross by Durkin

1   Q    You took it as -- let me ask it this way then:  I
2   understood you to be saying that you took that as a positive
3   indicator, at least one of the positive factors that he's
4   competent, correct?
5   A    Yes.  He, he was able to describe his thought process
6   regarding that plea agreement and give me a reason for the
7   choice he made that did not appear to be irrational.
8   Q    And I believe you said that what he told you was that it
9   wasn't good enough, correct?
10  A    Yes.
11  Q    And you took that to mean that, therefore, he was mentally
12  functioning correctly because he could make some type of
13  rational choice over what was good or bad in terms of a plea
14  agreement, right?
15  A    Yes.  That's part of the overall calculus, sure.
16  Q    Did he ever discuss with you the fact that what he wanted
17  out of a plea agreement with the government was that he wanted
18  to be able to be free and sent to Syria to fight for the Free
19  Syrian Army?
20  A    I believe that he did mention that, yes.
21  Q    And did that fact not enter into your equation?
22  A    Well, it did.
23  Q    Well, in what fashion?
24  A    I, I interpreted that statement as another example of him
25  being what I would call provocative for kind of poking, poking

DeMier - cross by Durkin

1  fun at the system by making a demand that I believe he
2  certainly understood was not possible within the parameters of
3  how the legal system works.
4  Q    And so when he says something like that, you treat it as
5  simply provocative and not as a symptom of some type of
6  condition, am I right?
7  A    Well, I think about it carefully, but ultimately that was
8  my conclusion there.  I don't -- I was not convinced that he
9  really believed that was a possibility.
10 Q    That's because you know full well that if he truly
11 believed that, he would not be competent to stand trial,
12 correct?
13 A    No, that's not why I came to that conclusion.  I have no
14 investment in whether he's found competent or not competent.
15 Q    Well, let's put it this way:  When you talked about this
16 plea agreement with him, did, did he tell you that he had
17 instructed us specifically to obtain that result in a plea
18 agreement?
19 A    I -- I don't remember that specifically.  He may have.
20 Q    Okay.  And that is -- take a look at, take a look at
21 Exhibit 11, if you would.  And it's page 5.  And it may be a
22 little bit confusing because he wrote on both sides of the
23 paper.  So you might have two page 5s.  This is the first page
24 5 that has 4 slash 19/16 at the top of it.
25 A    Yes, that's my handwriting.  I wrote 5.  And then on the

DeMier - cross by Durkin

1  next page I wrote back of 5.

2  Q    Okay.

3  A    So --

4  Q    Good.  All right.  So you're looking at number -- just No.

5  5, not back of 5, correct?  Am I right?

6  A    Yes.

7  Q    Okay.  And do you see in the middle of the page, maybe

8  let's see, 11 lines down, "Speaking of Obama, I sent him a

9  letter recently.  He didn't answer.  Just unbelievable.  I told

10  my lawyers and even the judges that if they are afraid I'll

11  fight in jihad, they can train me and send me to join a

12  moderate force in Syria."  You see that?

13  A    Yes, I do.

14  Q    And did you also see where he says, I pushed the issue,

15  and my lawyer says that the prosecutors just laughed at me?

16  A    Yes.

17  Q    And he goes on to say, My lawyer said even the judge might

18  not have the authority to do that.  So I have -- so I said ask

19  her to ask someone higher than her.  I mean, if that's the

20  case, right?

21  A    Yes.

22  Q    And then he says, so I wrote to Obama and told him to

23  release me under the supervision of the Saudi government,

24  correct?

25  A    Yes.

DeMier - cross by Durkin

1   Q    So you think that he's just trying to be provocative
2   there, right?
3   A    Yes.
4   Q    Who's he attempting to provoke?  You?
5   A    Not me.  I think probably the prosecution and the judge --
6   I mean, I -- I don't have any basis to conclude that he doesn't
7   understand how outlandish that suggestion is.
8   Q    This is a letter he wrote to you, correct?
9   A    Yes.
10  Q    This isn't a letter to the *Chicago Tribune* or a TV
11  station, is it?
12  A    No, but he -- during our initial interview I told him that
13  nothing he provided to me was confidential.  And that anything
14  I learned about him I could use to form my opinion.  I suspect
15  he understood that this is some -- that something that could
16  end up in my report, or as it is now being discussed in court.
17  Q    But when he wants -- you know full well that when he wants
18  to directly report to the Court or the media for that matter,
19  he does it directly on his own, doesn't he?
20  A    He has done that.
21  Q    This was a letter written to you on August 19th by him to
22  assist you in --
23              THE COURT:  April 19th.
24              MR. DURKIN:  I'm sorry.  What did I say?  August?
25              THE COURT:  August.

DeMier - cross by Durkin

1    MR. DURKIN:  I'm sorry.

2  BY MR. DURKIN:

3  Q    April 19th to assist you, correct?

4  A    It's a letter he wrote to me.  I don't know if his intent

5  was to assist me or not.  I think in large part it was.  But

6  he -- that doesn't mean he would not throw something else in

7  there that wasn't genuinely trying to assist me.

8  Q    But in all your other conversations about the legal

9  system, you, you took what he said as indicative of the fact

10 that he understands things, correct?

11 A    When I asked him to talk to me about how the system is

12 supposed to work, he displayed what I thought was a very

13 thorough and accurate understanding of how the legal system

14 works.  But I devoted a separate section of my report to my

15 analysis of how he believes it's working in his case, or what

16 he says about how it's working in his case.

17 Q    Well, but for someone to cooperate with their counsel they

18 have to have an under -- they have to have the ability to

19 cooperate in the case they're in, not in some theoretical

20 civics book test, correct?

21 A    Correct.

22 Q    So the relevant question for the judge to decide is

23 whether he can cooperate as he perceives this case against him,

24 correct?

25 A    Yes.

DeMier - cross by Durkin

1  Q    And he told you that he believes that Judge Coleman, the

2  prosecutors, me, or President Obama has the ability in this

3  federal criminal proceeding to permit him to be released and

4  trained to go fight with the Free Syrian Army, correct?

5  A    That's what he said, yes.

6  Q    And you would agree with me that if he truly believes

7  that, he cannot cooperate with counsel, correct?

8  A    Yes.

9  Q    And let's go back to the death penalty issue.

10          THE COURT:  You're fine.

11          MR. DURKIN:  I'm sorry?

12          THE COURT:  You're fine.  Keep going.

13          MR. DURKIN:  I'm just trying to pace myself.

14          THE COURT:  Death penalty issue.

15  BY MR. DURKIN:

16  Q    Certainly no rational person would think that in a

17  noncapital case or even in a capital case that they would be

18  beheaded in the United States of America in the year 2016 as a

19  punishment for a federal criminal offense, correct?

20  A    Absolutely.  And that's one of the reasons that I don't

21  believe that he genuinely holds that belief or at least that he

22  did not when I evaluated him, because he did not seem to be

23  irrational in any other way.  He seemed to be a rational

24  person.  He did not have symptoms of mental illness that would

25  account for such an outlandish belief.

DeMier - cross by Durkin

1  Q    Well, let's talk about mental illness and delusional

2  disorder for a minute.  We already talked about the fact that

3  the scholarly material discusses semantics, correct --

4  A    Yes.

5  Q    In fact, one of the articles you refer to in your report

6  is this article about Anders Breivik in the *Journal of American*

7  *Academy of Psychiatry and the Law.*  And it's a 2016 article

8  that you referred to in your report?

9  A    Yes.

10 Q    And that's an article entitled, "Anders Breivik,"

11 B-R-E-I-V-I-K:  "Extreme Beliefs Mistaken for Psychosis,"

12 correct?

13 A    Correct.

14 Q    And in plain point of fact you think this article supports

15 your belief that Dr. Xenakis is wrong, correct?

16 A    Yes.

17 Q    In other words, you think that Dr. Xenakis is mistaking

18 extreme beliefs for psychosis, correct?

19 A    Well, I don't know.  I don't know what Dr. Xenakis'

20 thought process is.  I know that prior to this article -- I

21 don't know if he was familiar with this article before I

22 mentioned it in my report or not.  But he had talked about his

23 perception that Mr. Daoud was hallucinating in the courtroom.

24 And yes, I certainly -- I don't want to speculate about what

25 the foundation for Dr. Xenakis' beliefs are.

DeMier - cross by Durkin

1   Q    Okay.  But one of the things that this article talks about

2   is, is the psychotic spectra, correct?

3   A    Yes.

4   Q    And it specifically says we believe -- and I'm referring

5   now on page 30.  "We believe that the psychotic spectra, which

6   may be helpful in clinical settings to make differential

7   diagnosis may unintentionally contribute to confusion for the

8   forensic examiner and ultimately for the legal system,"

9   correct?

10  A    I believe so.  Is that in this book?

11  Q    I don't think that's an exhibit.

12  A    Okay.

13  Q    Let me give you a copy of it just to show it to you.

14            MR. DURKIN:  Do you have a copy for the judge?

15            THE COURT:  I'm fine.  I'll listen later.  As long as

16  the government has it, we're good.

17            MR. HAXALL:  I do have one, Your Honor.

18  BY MR. DURKIN:

19  Q    Did you see that?  It's the last sentence in the first

20  full paragraph on the right-hand column.

21  A    Yes.

22  Q    And the next sentence says, "The psychotic spectrum of

23  disorders also does not yet have rigorous scientific data

24  supporting a definitive line between schizophrenia and some

25  type of personality disorders," am I right?

DeMier - cross by Durkin

1  A    Yes.

2  Q    And that's the dilemma that we're faced with medically

3  here today, isn't it?

4  A    I think that's an accurate statement, yes.

5  Q    Because the DSM-V has listed several psychotic spectra in,

6  in the manual, correct?

7  A    Yes.

8  Q    And only one of those is delusional disorder, correct?

9  A    Correct.

10 Q    And so would I be correct in saying that the delusional

11 disorder that Dr. Xenakis finds is a subcategory or one of the

12 spectra that is referred to in the Breivik article?

13 A    Yes.

14 Q    And that's differentiated from schizophrenia, isn't it?

15 A    Yes.  I think that's part of the point of this passage is

16 there's long been some debate in the field about whether it's

17 better to conceptualize mental illnesses as discrete entries or

18 along a continuum or spectrum for very mild symptoms to very

19 severe symptoms.

20 Q    And that's where the rubber hits the road, so to speak, in

21 this, isn't it?

22 A    Yes.

23 Q    So we are attempting to gauge -- strike that.

24       You don't disagree with me that Mr. Daoud exhibits

25 issues that could be interpreted as delusional, correct?

DeMier - cross by Durkin

1    A    Correct.  He has made statements that could be interpreted
2    as delusional.
3    Q    And you don't believe that that qualifies under the DSM-V
4    because of the issues you've, you've told us before, that it
5    simply doesn't rise to that level in your opinion?
6    A    Exactly.
7    Q    Okay.  But you would agree with me that someone suffering
8    from a delusional disorder under the DSM-V would not have to be
9    found to be schizophrenic, correct?
10   A    No.  The DSM-V classifies schizophrenia and delusional
11   disorder as separate disorders.
12   Q    Yet in your report you discuss the absence of any
13   hallucinatory incidents or reports from Mr. Daoud, am I right?
14   A    Yes.
15   Q    And that's a significant factor to you, isn't it?
16   A    Yes.
17   Q    But that leans more towards the schizophrenic than it does
18   just delusional disorder, doesn't it?
19   A    Yes.  I was considering -- you know, both of those were on
20   the table, so to speak, as, as diagnostic considerations at the
21   time I did my evaluation.  I was not trying to determine
22   whether he had or didn't have delusional disorder specifically.
23   Q    Right.  And you were also trying to rule out
24   schizophrenia, correct?
25   A    Yes.

DeMier - cross by Durkin

1  Q    And the absence of hallucinatory events doesn't really

2  have anything to do with the delusional disorder, does it?

3  That affects only psychotic disorders, right?

4  A    Well, I think it can cut both ways.  If a person has

5  hallucinations that are separate from the content of the

6  delusion, then by definition it's not a delusional disorder.

7  So I think if you're trying to determine whether or not

8  somebody has delusional disorder, part of that process is

9  seeing if those delusional beliefs are accounted for by another

10 illness, specifically schizophrenia.

11 Q    Now, you reported in your report or you have stated in

12 your report that he never reported any hallucinatory events to

13 you, correct?

14 A    Correct.

15 Q    Did he -- did he not tell you that prior to the incident

16 involving the inmate that got stabbed, that he had looked out

17 the window of the MCC and seen a sacred chair from his masjid

18 outside his window hanging in the sky, so to speak?

19 A    I don't remember that.

20 Q    Did he tell you anything similar to that?

21 A    I don't think so.

22 Q    Did you not have a discussion with him about dreams and

23 whether or not he could distinguish something that he professed

24 to see in either a dream or while he was awake?

25 A    Yes, I do recall that.

DeMier - cross by Durkin

1   Q    And what was that about?

2   A    I remember him saying that he was kind of in that, in that

3   twilight zone between sleep and wakefulness.  And I have some

4   memory of talking to him about whether a perception he had at

5   that point was a dream or not a dream.  I'm not, I'm not

6   recalling more details than that right now.

7   Q    Well, let me, let me help you with your report.  Take a

8   look at page 8.

9   A    Yes.

10  Q    Under the heading hospital course and behavioral

11  observations.

12  A    Yes.

13  Q    You state the defendant was asked about typical psychotic

14  symptoms.  He stated he had never experienced auditory or

15  visual hallucinations.  Correct?

16  A    Yes.

17  Q    He said, I don't hear voices and smiled, right?

18  A    Yes.

19  Q    And you state after you report that he smiled, it was my

20  impression that his tone reflected some exasperation with the

21  frequency with which he had been asked that question.  What do

22  you mean by that?

23  A    I mean that he was probably getting tired of hearing that

24  question.  It was probably asked to him numerous times while he

25  was at MCC Chicago.  I would imagine that Dr. Goldstein asked

DeMier - cross by Durkin

1  him about that.  I am fairly confident that when he got to our
2  facility I was probably the third person to ask him about that,
3  because it's part of the standard series of questions that's
4  asked on admission by a psychiatric nurse, by a physician's
5  assistant, and maybe even by correctional staff.
6  Q    Do you recall seeing anything in any of the BOP records
7  that you said you were able to obtain electronically as to
8  whether or not he was ever asked whether he suffered from
9  hallucinations?
10 A    I don't remember looking at those records.  I know that
11 the -- those interviews tend to follow a standard format, and
12 that's one of the questions in the format.  So that's why I
13 believe that he had probably been asked that question several
14 times.
15 Q    Did he ever tell you that his lawyers asked him that
16 question several times?
17 A    I don't recall him telling me that.
18 Q    Okay.  Do you -- you're familiar with the facts of the
19 third case he's charged with, correct?
20 A    Yes.
21 Q    And I don't want to belabor them and get into that issue,
22 but I just want to ask you one or two questions.
23         You're aware in that case that the evidence points to
24 the fact that while he was observed stabbing the fellow inmate,
25 he was saying he was sorry?

DeMier - cross by Durkin

1  A    I remember you telling me that.  I don't recall whether I
2  saw that in other places or not.  I certainly may have.  I did
3  not review that aspect of this evaluation preparing for the
4  competency hearing.
5  Q    Would -- but assuming that to be the case for the sake of
6  this question, would that cause you concern that he may have
7  been hearing voices or having some other hallucinatory episode
8  at that time?
9  A    Not necessarily, no.
10 Q    Not necessarily no, but not necessarily yes is right,
11 correct?
12 A    Now I've lost the original question.
13 Q    Well, let me put it this way:  It wouldn't necessarily
14 mean that he was experiencing hearing voices or some other
15 hallucinatory effect, but it could point to that.  You would
16 agree with me at least with that, that that's possible,
17 correct?
18 A    It's possible, but it would not suggest to me that that
19 was something that I needed to ask.  I mean, people will often
20 have to do things that they don't want to do.  I -- you know,
21 without getting too personal, I have heard as a child this is
22 going to hurt me more than it hurts you, you know.  So I think
23 that the fact that he's conflicted about some discrepancy
24 between his, his beliefs and his feelings for this person and
25 his behavior doesn't necessarily suggest that he's experiencing

DeMier - cross by Durkin

1   hallucinations.

2   Q    Well, you understand, do you not, that he believed at that

3   time when he was stabbing this person that he had an

4   obligation, a religious and personal obligation to do so,

5   correct?

6   A    Correct.

7   Q    And you would simply discount that as not a mental illness

8   issue.  You would discount that as a religious belief issue,

9   correct?

10  A    I would, yes, attribute it to his religious beliefs, yes.

11  Q    And that's because you know that the law at least at this

12  point doesn't recognize extreme fundamentalist beliefs as a

13  mental illness or disease, correct?

14  A    Correct.

15  Q    You would agree with me, would you not, however, that

16  there is some developments in the scholarly literature that

17  suggests that that should be reconsidered?

18  A    I'm not familiar with that literature, but it would not

19  shock me to, to see.  I'd be interested in reading it.

20  Q    Now -- well, let's put it this way:  In laymen's terms

21  most people call extreme religious fundamentalists crazy

22  people, right?

23  A    Yes.  And that's not specific to any particular faith.  I

24  mean, if you look at the, the most extreme beliefs in, in

25  numerous faiths, people do characterize it that way.

1  Q    And again, we have to have some definitions in the law to

2  avoid these semantical issues that they refer to in the Breivik

3  article, correct?

4  A    Yes.

5            THE COURT:  All right.  We're going to stop there.

6            MR. DURKIN:  Okay.

7            THE COURT:  All right.  The Court is going to be in

8  recess until -- I'd like you to be back here at 1:45.  The

9  Court hopes to be there at that time or shortly thereafter.  So

10 if everybody can reconvene in the court at 1:45, and we'll go

11 on from there.

12           All right.  Sir, once again you can go have lunch.

13 You shouldn't be reviewing any documents at all, but you can

14 have lunch.  All right.

15           MR. HAXALL:  Judge, just one caveat to that.  We'll

16 arrange for him to hear the recordings that the defense

17 requested.

18           MR. DURKIN:  That's fine.

19           THE COURT:  With the exception of hearing the

20 information that the defense has brought up and wants to

21 question him about.  All right.

22           All right.  Anything else before the Court steps off?

23 No.  Thank you very much.

24     (Whereupon, said trial was recessed at 12:15 p.m., until

25       1:45 p.m.)

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )   No. 12 CR 723-1
                                      )
 4                    Plaintiff,      )
                                      )
 5           v.                       )   Chicago, Illinois
                                      )   August 18, 2016
 6   ADEL DAOUD,                      )   2:30 p.m.
                                      )
 7                    Defendant.      )   Hearing

 8              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
 9

10   APPEARANCES:

11   For the Government:    HON. ZACHARY T. FARDON
                            United States Attorney, by
12                          MR. WILLIAM RIDGWAY
                            MR. BOLLING W. HAXALL,
13                          Assistant United States Attorneys
                            219 South Dearborn Street
14                          Suite 500
                            Chicago, Illinois  60604
15

16   For the Defendant:     DURKIN & ROBERTS
                            2446 North Clark Street
17                          Chicago, Illinois  60614
                            BY:  MR. THOMAS A. DURKIN
18                               MS. ROBIN V. WATERS

19                          LAW OFFICE OF JOSHUA G. HERMAN
                            53 West Jackson Boulevard
20                          Suite 1650
                            Chicago, Illinois  60604
21                          BY:  MR. JOSHUA G. HERMAN

22

23              TRACEY DANA McCULLOUGH, CSR, RPR
                      Official Court Reporter
24                  219 South Dearborn Street
                            Room 1426
25                  Chicago, Illinois  60604
                        (312) 435-5570
```

DeMier - cross by Durkin

 1        THE COURT:  Court is back in session.  The Court

 2   truly appreciates everybody's patience.  This was one of the

 3   times when being a parent intersected with my job, and I could

 4   not extricate myself from the situation.  Thank you very much

 5   for your patience.

 6        All right.  Let's get started.  Doctor, take the

 7   stand.  You are still under oath, Doctor.

 8        THE WITNESS:  Yes, ma'am.

 9    RICHART DeMIER, GOVERNMENT'S WITNESS, PREVIOUSLY

10                       SWORN

11        THE COURT:  Mr. Durkin, take your time getting ready.

12   You missed my apology.  You can ask everybody about it later.

13   All right.  Thank you.

14        MR. DURKIN:  That's fine.  Judge, I knew you wouldn't

15   abandon us.

16        THE COURT:  Proceed whenever you're ready.

17              CROSS-EXAMINATION (Resumed)

18   BY MR. DURKIN:

19   Q    When I left off, Doctor, I had asked you a question about

20   in laymen's terms people that act out with these extreme

21   fundamentalist religious beliefs, they get called crazy, right?

22   A    Correct.

23   Q    But that's laymen's terms.  And I think my last question,

24   and again, we have -- have to have some definitions in the law

25   to avoid a lot of these semantical issues that they refer to in

DeMier - cross by Durkin

1   the Breivik report, correct?

2   A    Well, I think so.  I mean, I -- I think that both the law

3   and the fields of psychology and psychiatry are trying to

4   figure out the best way to communicate effectively about these

5   issues.

6   Q    Right.  And the Breivik report itself talks about the need

7   for further clarification because of all these violent acts

8   that are beginning to happen under the auspices, for want of a

9   better term, of fundamentalist religious belief, right?

10  A    Yes.

11  Q    And, in fact, they even propose some term that's not even

12  in the DSM-V in that article about -- they call it extreme,

13  the -- extreme overvalued belief instead of an overvalued

14  belief, correct?

15  A    That's correct.

16  Q    And the overvalued belief versus a delusion is one of

17  those lines on the spectrum where we have to do our best to

18  just find -- we do the best we can do, right?

19  A    Correct.

20  Q    And like you said, you can't ever be sure what somebody

21  really believes, right?

22  A    For the most part, yes.

23  Q    Now, you'd said before that you did find some things that

24  Daoud said to you as provocative, correct?

25  A    Yes.

DeMier - cross by Durkin

1  Q    But you agree with me and you testified earlier that you
2  don't find him to be a malingerer, correct?
3  A    That's correct.
4  Q    And you also know that he thinks he is competent.  He
5  wants to be found competent, correct?
6  A    That's what he told me.  That's what I believe, yes.
7  Q    So that's evidence to you that he's not a malingerer
8  because malingerers would do the opposite, correct?
9  A    That's right.
10  Q   The same would be true for someone who is trying to be
11  provocative.  They would try to disrupt the proceedings or
12  delay things or just not go forward, correct?
13  A    It depends on what their goals are.  I think generally
14  that would be correct.
15  Q   Okay.  Now, those issues, be it described as a delusional
16  disorder or an overvalued belief, are things that regardless of
17  what we call it could interfere with a defendant's ability to
18  cooperate with his lawyer; couldn't they?
19  A    Yes.
20  Q    In fact, you spent a considerable amount of time in your
21  report discussing with Mr. Daoud his relationship with his
22  attorneys, correct?
23  A    Correct.
24  Q    And if you take a look at page 19 of your report.  You
25  spend a considerable -- you spend actually the whole page,

DeMier - cross by Durkin

1  maybe a page and a half discussing what he told you about his

2  lawyers, correct?

3  A    That's right.

4  Q    And you said that three things struck you as relevant in

5  consideration of Mr. Daoud's relationship with his attorneys,

6  correct?

7  A    Yes.

8  Q    The first one was is that you said that you had no basis

9  to judge whether his negative perceptions of his attorneys are

10 accurate, correct?

11 A    Correct.

12 Q    Because he told you that he wasn't happy with his

13 attorneys because they haven't gotten him out yet, correct?

14 A    Yes.

15 Q    Did you do anything to pursue whether or not he had any --

16 whether you could find any basis to determine whether or not he

17 was overvaluing or -- did you do anything to determine whether

18 or not his negative perceptions of his attorneys were accurate?

19 A    No, I didn't.

20 Q    But you could have, couldn't you?

21 A    I'm not sure exactly how I would go about that.

22 Q    Well, did you ever think to ask the prosecutors whether he

23 has a competent attorney who knows what he's doing versus a

24 fool?

25 A    No.

DeMier - cross by Durkin

1  Q    When you spoke to me, did I sound like a fool?

2  A    No.

3  Q    Well, the second thing you said is he can point to no

4  solid evidence that his attorneys are not properly advocating

5  for him, correct?

6  A    That's right.

7  Q    And in that same vein he said to you it's perhaps -- you

8  say, it was maybe simpler for him to conclude that the system

9  is rigged against Muslims, correct?

10 A    Yes.  Simpler than acknowledging what it is that he's

11 facing.

12 Q    You knew that he was facing and is facing incredibly

13 serious charges, correct?

14 A    Yes.

15 Q    And yet you knew him to be saying that he was dissatisfied

16 with his attorneys because they hadn't gotten him out yet,

17 correct?

18 A    That's right.

19 Q    And you knew that based on your own experience to be

20 preposterous, correct?

21 A    Yes.

22 Q    And did you tell him that?

23         THE COURT:  Excuse me, Counsel.  The question was and

24 you knew him to be saying that he was dissatisfied with his

25 attorneys because they hadn't gotten him out yet, and it was

DeMier - cross by Durkin

1    that's right.  And you knew that based on your own experience
2    that to be preposterous.
3              MR. DURKIN:  The that meaning that someone could have
4    just gotten him out already on charges this serious.
5              THE COURT:  Okay.  All right.  Thank you.
6    BY MR. DURKIN:
7    Q    You understand my question?
8    A    Yes, I do.  And --
9    Q    Same answer?
10   A    Yes.
11             THE COURT:  All right.  Thank you.
12             THE WITNESS:  Sure.
13   BY MR. DURKIN:
14   Q    Now, you also mentioned something about negative
15   perceptions.  That it was important to recognize where he's
16   been or what environment he's been in since he got arrested
17   which might affect the negative perceptions of his attorneys,
18   correct?
19   A    Correct.
20   Q    And you said that negative perceptions of defense
21   attorneys are almost ubiquitous in prison environments,
22   correct?
23   A    That's right.
24   Q    Now, you didn't bother to check and see what my reputation
25   is in the MCC, did you?

DeMier - cross by Durkin

1  A    No, I didn't.  I wasn't thinking about you in particular.
2  I was thinking about what I've heard from defendants about
3  defense attorneys throughout my whole career.
4  Q    If I were to tell you that I hear from people in the MCC
5  that they think I'm one of the best lawyers in town, would that
6  affect your opinion?
7  A    Not necessarily.  Because I think -- and I acknowledge in
8  that report that this is speculation.  But I think that most
9  people in prison environments hear mainly negative things about
10 attorneys.  And the attorneys are painted, especially defense
11 attorneys are painted with a very broad brush.
12 Q    Now, I was a little confused by the last two lines on that
13 page about -- you say, there's a common belief that privately
14 retained attorneys are far more effective than public
15 defenders.  And that that common belief may have reinforced his
16 unrealistic expectations.
17       Do you mean the fact that we were retained?
18 A    Yes.  Yes.
19 Q    Because he told you we were retained, correct?
20 A    I don't recall if he told me or if I learned some other
21 way.  But it's my understanding that you're not a public
22 defender.
23 Q    Okay.
24 A    And public defenders have bad reputations among prisoners.
25 And so what I'm trying to say there, and I apologize if it

109

DeMier - cross by Durkin

1    wasn't clear, is that he may have had greater expectations

2    regarding what you could do because you weren't one of the

3    public defenders.

4    Q    Okay.  Now, we had talked earlier about these

5    hallucinations.  Remember that?

6    A    Yes, I do.

7    Q    And what he told you.  Remember that?

8    A    Yes.

9    Q    Would you look at Exhibit 11 again.  And I may have asked

10   you this before, but if I, if I -- and if I did, forgive me.

11   But on page 6 of that document, which you have written 6 and

12   4/19/16 up at the top.

13   A    Yes, I see that.

14   Q    He -- he's telling you there in this letter to you that he

15   told you about three instances when he saw or heard something

16   that wasn't there, correct?

17   A    Yes.

18   Q    Do you recall what those were?

19   A    No, I would have to review the letter.

20   Q    I don't -- just for the sake of time and maybe the

21   government will agree.  I don't think it's referred to in the

22   letter.  I think he's referring to things he told you orally.

23           MR. HAXALL:  I believe they're in the letter, Mr.

24   Durkin.  I told you about the three incidents and he continues

25   on.

110

DeMier - cross by Durkin

1     THE COURT:  You all are talking to each other, right,
2 not on the record?
3     MR. HAXALL:  Yes.  I apologize.  I'm just trying to
4 show Mr. Durkin where it is.
5     THE COURT:  All right.  Off the record.
6     (Off the record discussion.)
7     MR. DURKIN:  Well, the letter will speak for itself,
8 and it's in evidence.  So we don't need --
9     THE COURT:  The Court has the letter, and --
10     MR. DURKIN:  We don't need to belabor that, Judge.
11     THE COURT:  -- will review it again in light of the
12 questions that are asked.
13     MR. DURKIN:  Right.
14 BY MR. DURKIN:
15 Q    Now, when I -- you do recall, however, that he told you
16 when he was discussing the third incident involving the attack
17 that shortly before the attack he had a vision that Mr. Hancock
18 had been attacking him, correct?
19 A    Again, I don't specifically recall that.  I'm not saying
20 it's not the case.  I just -- I don't remember that detail.
21 Q    Take a look at Exhibit 3, page 5.  The fourth full
22 paragraph.
23 A    Okay.  Yes.
24 Q    So he did tell you that, correct?
25 A    Yes, but I did not interpret that as a hallucination, a

111

DeMier - cross by Durkin

1   visual hallucination for a couple of reasons.

2   Q    Tell us why.

3   A    Visual hallucinations tend to be rather rare in psychotic

4   disorders.  Visual hallucinations are more commonly associated

5   with intoxication or a brain injury.  So when people talk about

6   hallucinations in the sense of a psychotic illness, I'm usually

7   looking for an auditory hallucination, a voice.  Now, I want to

8   be clear that that is not a hard and fast rule.  But that's,

9   that's typically the case.

10         The more important thing is that he talked about it

11  in the context of he couldn't say whether it was a vision or a

12  dream.  And I noticed in some of his other writings he had

13  talked about experiences that happened when it sounded like he

14  was in a state of partial wakefulness.  I'm interpreting this

15  as likely something different than an actual hallucination.

16  Q    What would you describe somebody who doesn't know the

17  difference between a true vision or a true dream?

18  A    Well, I would want to ask them what do you mean by true

19  vision.

20  Q    Well, did you?

21  A    I don't remember.

22  Q    Well, if you had, would you have put it in your report?

23  A    I don't know.  It depends on what the answer was and how

24  relevant it was.  I mean, when you're writing a report, you're

25  constantly making choices about what to include and exclude.

DeMier - cross by Durkin

1    Q    Well, he told you when -- concerning Mr. Hancock -- take a

2    look up at the paragraph just above it -- that this incident

3    had gone all the way back to Hancock's drawing a picture of the

4    Prophet in December, correct?

5    A    Yes.

6    Q    And that's forbidden in Islam, correct?

7    A    That's right.

8    Q    Making depictions of the Prophet?

9    A    That's my understanding.

10   Q    And this was a particularly egregious picture or cartoon,

11   correct?

12   A    Based on what I read, yes.

13   Q    And he told you that in the spring of '16 that even though

14   this incident with the cartoon happened in -- months before --

15   in December of 2014, it just ate at him over time, correct?

16   A    Yes.

17   Q    And he also told you that he had seen signs prior to the

18   incident that suggested his first action wasn't sufficient,

19   correct?

20   A    That's correct.

21   Q    What were the signs he told you that he saw?

22   A    The attack on the publication in France, the *Charlie*

23   *Hebdo*.  And then there was an event where there was I believe

24   gunfire at a -- an event in Dallas, Texas which was advertised

25   as some type of contest for drawing pictures of Mohammad, which

DeMier - cross by Durkin

1    was -- you know, I think he clearly -- well, I would say a

2    political gesture that I think many people not just people of

3    the Muslim faith would find offensive.

4    Q    Which is that?  The --

5    A    The --

6    Q    The cartoon?

7    A    -- drawing a picture of Mohammad contest.

8    Q    But my question isn't so much concerned with those two

9    events in particular.  My question is what did you make of him

10   telling you that this was a, a sign that he had seen.  What

11   kind of sign did you interpret that as?

12   A    My interpretation of that is that he, he was seeing that

13   as evidence that what he had done in the past wasn't sufficient

14   when he had allegedly assaulted the, the same victim.  That

15   that wasn't enough and that he had a religious obligation to

16   end his life.  And I think the signs were these two incidents.

17   He interpreted that I think as, you know, divine guidance

18   telling him that what he had done previously wasn't sufficient.

19   Q    But you don't consider that delusional?

20   A    No, not necessarily.  People of all sorts of faiths will

21   see something happen in their environment and ascribe some

22   particular meaning to it as -- you know, in terms of this is a

23   message for me or a sign to me that I'm supposed to do

24   something different in my life.

25   Q    What if -- what if on top of that you knew that he had

114

DeMier - cross by Durkin

1  also seen just before that attack this chair from the masjid
2  floating outside his window?
3      MR. HAXALL:  Objection.
4      THE COURT:  Basis?
5      MR. DURKIN:  I'll -- I'll tie it up.
6      THE COURT:  You'll tie it up?  Okay.  Right now I'll
7  reserve ruling.  Proceed.
8      THE WITNESS:  That's something I'd certainly want to
9  ask him more about.
10  BY MR. DURKIN:
11  Q    Now, you are very familiar with issues surrounding radical
12  religious beliefs, are you not?
13  A    I think I am, yes.
14  Q    In fact, you received a fair amount of notoriety for
15  testifying in a case in Salt Lake City, Utah in 2009 or 2010
16  concerning an individual by the name of Brian David Mitchell,
17  correct?
18  A    I don't know if notoriety is the word I would choose, but
19  it was certainly in the press.
20  Q    Well, you testified on Mitchell's behalf in that case
21  because you had previously found him incompetent, correct, to
22  stand trial?
23  A    I had offered an opinion that he was not competent to
24  stand trial.  He was found competent by the judge.  I was
25  subpoenaed by the defense to testify at his trial.  I would not

DeMier - cross by Durkin

1  say I was testifying on his behalf because the work that I did
2  was court ordered.
3  Q    Okay.  But you were called as a witness for the defense,
4  correct?
5  A    Yes.
6  Q    And in that you concluded that Mitchell -- Mitchell's
7  religious beliefs were bizarre delusions and you opined that he
8  had a delusional disorder, correct?
9  A    Yes.
10 Q    And you acknowledged in that case that even though the
11 bulk of Mitchell's beliefs were shared by fringe Mormon groups,
12 his delusions were bizarre because he had placed himself and
13 his belief system into this -- into a divinely ordained role,
14 correct?
15 A    Correct.
16 Q    In other words, this man thought that he too was acting in
17 some divinely ordained role, correct?
18 A    He expected to be identified as a prophet in that faith
19 and to sit at the right hand of God.
20 Q    That's a little more extreme than Daoud's, at least what
21 he told to you?
22 A    Definitely.
23 Q    But have you seen that Daoud has compared himself when
24 he's claiming he's a hostage, that's he's compared himself to
25 Sayyid Qutb, Q-U-T-B, the leader of political Islam, the

DeMier - cross by Durkin

1   founder -- the actual man who's credited with founding
2   political Islam?
3   A    I don't know if I've seen that before, because I would not
4   have recognized that name.
5   Q    Would it concern you if you knew when you were writing
6   your report that Daoud was fancying himself in the same league
7   as someone like Qutb?
8   A    Again, I would want to ask more about it.  I think that
9   would be -- yes, I don't want -- I don't want to say that I
10  would be particularly concerned about it, but I could be.  It
11  would depend on what, what the follow-up led to.
12  Q    You would agree with me, would you not, that that would be
13  for a kid with Daoud's background, a young kid who did
14  virtually nothing but graduate from high school prior to his
15  arrest -- and I don't mean that in a demeaning way.  I simply
16  mean it in a relative fashion.  It would be awfully grandiose
17  of him to be thinking that he was in a similar position than
18  Sayyid Qutb, who was ultimately executed by Egypt I believe?
19  A    Yes.  If he's comparing himself to a -- you know, a
20  prominent or recognized world leader, I would say that that is
21  grandiose.  I'd still draw a distinction between that and
22  equating somebody with God.
23  Q    Well, but you do acknowledge that on -- take a look at
24  Exhibit 12, if you would.
25  A    Yes.

DeMier - cross by Durkin

1  Q     Page 15.  Fourth line from the top.  He's talking about

2  acting -- I'll fast forward.  After my vision, my legs shaking

3  and my eventual divine purpose to attack him even after we were

4  friends in reference to the third incident?

5  A     Yes.

6  Q     So he's at least there saying he's doing it for a divine

7  purpose, correct?

8  A     Yes, I think what he's saying there is that he has to

9  follow the, the religious law as he understands it.  I don't

10 think he's saying that his purpose there would be different

11 than anybody else of his faith.  So that's the kind of

12 distinction I'm making.

13 Q     Do you think the majority of people of his faith have that

14 belief, that they would somehow be obligated to go stab

15 somebody?

16 A     No.  That was a poor choice of words on my part.  But

17 somebody who shared the same extremist beliefs.

18 Q     Well, one of the reasons that you thought Mitchell was

19 delusional as compared to somebody with just this extreme idea

20 or whatever you call it, extreme -- I always forget it.  What

21 is it?  Extreme, this over -- forget the extreme.  The

22 overvalued belief is that you didn't think that Mitchell could

23 rationally assess his possible sentence if he believed that God

24 would release him from jail in two years, correct?

25 A     Yes.

DeMier - cross by Durkin

1    Q    But Daoud also thinks that God can release him, correct?

2    A    I don't know for sure.

3         MR. DURKIN:  Judge, let me do this:  Let me -- we

4    have a couple of recordings I wanted to play, and that will

5    help my next question.  I'd like to play first a call between

6    Mr. Daoud and me on July 30th.

7         THE COURT:  Any objection?  Is this something you all

8    have had a chance to review or talk about --

9         MR. HAXALL:  This one call --

10        THE COURT:  -- during my long break before you all --

11        MR. DURKIN:  I thought we had.

12        MR. HAXALL:  This call we had not, Your Honor.

13        THE COURT:  All right.  I'm going to give you --

14        MR. HAXALL:  There's two additional calls that as you

15   may recall --

16        THE COURT:  You talked about, right.

17        MR. HAXALL:  They were played for them in the

18   entirety.

19        THE COURT:  I'm going to give you two minutes to work

20   this out.  Do what you need to do.

21        MR. DURKIN:  Thank you.

22        THE COURT:  Remain seated.

23      (Short break taken.)

24        THE COURT:  Do we have it straightened out for the

25   rest of the time this witness is on the stand?

DeMier - cross by Durkin

1           MR. DURKIN:  I'm sorry.

2           THE COURT:  Do we have it straightened out, what we

3      need to show for the rest of the time?  I'm not taking a -- I'm

4      not having another break because he doesn't have the

5      information he's supposed to have or somebody hasn't shown him

6      something.

7           MR. DURKIN:  That's fine.  We're ready.

8           THE COURT:  Okay.  All right.  Good.

9           MR. HAXALL:  And, Judge, for the record we were

10     informed by the defense that it is a call between Mr. Durkin

11     and his client.  Obviously we have not listened to that.  We

12     have no objection, though, for stipulating to foundation for it

13     to be admitted and played.  And I believe there might actually

14     be two additional calls, and we'd stipulate to the foundation

15     for those as well.

16          THE COURT:  All right.  And when you say you haven't

17     listened to it, you didn't even get to listen to it during my

18     break right now?

19          MR. HAXALL:  We were provided a synopsis.

20          MR. DURKIN:  We told them what was in it.

21          THE COURT:  Okay.  All right.  Okay.  Thank you.

22     That is made clear for the record.

23          MR. DURKIN:  And Mr. -- for the record the government

24     was concerned about whether there was any attorney/client

25     privilege.  And, one, it would be my position that in a

DeMier - cross by Durkin

1   proceeding like this the privilege is not necessarily intact if

2   it's relevant under the rules of ethics.

3           THE COURT:  And isn't that also your decision?

4   You're bringing up whether or not -- you're trying to bring

5   this in.  This is your conversation you're trying to bring in?

6   They're claiming --

7           MR. DURKIN:  Well, it's partly my -- it's both

8   conversations.  But for the record Mr. Daoud doesn't object, in

9   any event.

10          THE COURT:  All right.  Is that correct, Mr. Daoud?

11  Yes or no.

12          DEFENDANT DAOUD:  Yes.

13          THE COURT:  All right.  You understand they're

14  playing a tape that involves information, a conversation

15  between you and your lawyer, is that correct?

16          DEFENDANT DAOUD:  Yes.

17          THE COURT:  All right.  And is that correct that

18  you're okay with them playing this?

19          DEFENDANT DAOUD:  Yeah.

20          THE COURT:  All right.  Thank you.

21  BY MR. DURKIN:

22  Q    And just so it's clear, Doctor, there's two issues I'd

23  like you to be thinking about as you listen to this because

24  I'll ask some questions about it.  One is whether this would

25  affect your thoughts on the relationship -- his ability to

DeMier - cross by Durkin

1    cooperate with counsel.  And secondly, the issue of divine
2    intervention.
3         (Whereupon, said tape was played in open court.)
4              THE COURT:  Is there a question?
5              MR. DURKIN:  Judge, for the record that's -- that
6    call was made on July 30th, 2016.
7              THE COURT:  All right.  Proceed with a question.
8    BY MR. DURKIN:
9    Q    You heard him say that -- words to the effect either he
10   was going to be killed or unless God saves him through a
11   miracle, correct?
12   A    Yes.
13   Q    That is similar to the divine purpose he mentioned to you
14   in May of 2016, correct?  May 2nd?
15   A    I don't know that it is.  Again, I think that was his
16   interpretation of what the law that he was supposed to follow
17   is.  I don't know that I would equate that with him saying that
18   God has to save me.  And I -- yes, I just don't know what to
19   make of that statement without talking to him about it.
20   Q    Is it possible that that could change your opinion?
21   A    It's possible.
22   Q    Because it's -- and the reason it's possible because if
23   you came to the conclusion that that's what he truly believed.
24   In other words, if he truly believed that his only two choices
25   were execution or being saved from God, that would change your

DeMier - cross by Durkin

1  opinion, wouldn't it?

2  A    If he truly believed that those were the only outcomes,

3  then he would not have a rational understanding of what the

4  proceedings are all about.

5          MR. DURKIN:  Judge, could I have leave now then to

6  play the call with his sister, which was July 23rd, 2016.

7          THE COURT:  Any objection?

8          MR. HAXALL:  No, Your Honor.

9          THE COURT:  All right.  Proceed.

10         MR. DURKIN:  Judge, for the record it's a 15-minute

11  call.  We're only -- we're not going to play the whole thing.

12  We're going to just play a little bit of the beginning and then

13  skip to the last portion.

14         THE COURT:  Sounds good.

15     (Whereupon, said tape was played in open court.)

16  BY MR. DURKIN:

17  Q    Now, you heard him say several times to his sister that

18  they -- he thinks they might kill him, correct?

19  A    Yes.

20  Q    Would you agree with me that he certainly wasn't trying to

21  provoke his sister?

22  A    No, I would not necessarily agree with you there.  I think

23  that he may have been trying to provoke his sister or

24  manipulate his sister.  I listened to two telephone calls over

25  lunch, and it was my impression that this stuff about he's

123

DeMier - cross by Durkin

1    going to be taken out and killed came at the end of both phone

2    calls after a conversation in at least one of the calls about

3    how she wasn't writing him letters.

4           The other thing that I found really important when I

5    was listening to these phone calls is his demeanor as much as

6    his words.  He doesn't have any of the emotions that you would

7    expect to be associated with somebody who believed he was going

8    to be killed.  He doesn't sound frightened.  He doesn't sound

9    angry.  He doesn't sound concerned.  He's actually laughing

10   while he's talking about these things.  There's only one point

11   during the phone calls that I notice a change in his kind of

12   general jovial demeanor that I always saw at Springfield, and

13   there was only one time that he really became serious.  And

14   that was about a completely different topic.

15   Q    So it's your testimony as you sit here today that somebody

16   with a delusional disorder, it's rather obvious because he's

17   always on -- appearing delusional?  Is that what you're saying

18   or words to that effect?

19   A    I'm not, I'm not sure I'm following you.

20   Q    Let me ask it this way:  Are you suggesting that someone

21   with a delusional belief cannot appear quite unimpaired?

22   A    No, a person with a delusional belief can appear

23   unimpaired.  But when he's talking about being dragged out of

24   his cell in the middle of the night and killed, I would expect

25   there to be more emotion associated with that.  I don't think

124

DeMier - cross by Durkin

1  it's a laughing matter if he really believes it.  And his, his

2  tone is the same as it is throughout most of the call where

3  it's rather upbeat and jovial.  And I believe in the clip that

4  you just played he was actually laughing at one point when he

5  was talking to his sister about that very topic.

6  Q    So you think that he's just joking with the sister?

7  A    I don't think he's joking with her.  I'm not sure what his

8  intent is.  My interpretation of it was that -- my best guess

9  is that he's being manipulative with his sister and trying to

10 frighten her or punish her for not writing more letters to him.

11 Q    Do you think he was being manipulative with me, in the

12 call with me?

13 A    I don't know.  I'm not sure what he would stand to gain.

14 But even in the call with you he didn't sound the way I would

15 expect somebody to sound if they were expecting to be, you

16 know, taken out of -- taken out of their cell and illegally

17 killed.  But all this I say without the advantage of having had

18 a chance to talk to him about it.

19 Q    And again, if you did talk to him and came to the

20 conclusion that it was a sincere belief and you could opine as

21 close as you could that he really believed that, that would

22 change your opinion, would it not?

23 A    Yes.  Yes, it would.

24 Q    He'd be incompetent, correct?

25 A    That would be my opinion, yes.

125

DeMier - cross by Durkin

1    MR. DURKIN:  Judge, there's one -- one more call
2  on -- let me ask just this one other question.
3  BY MR. DURKIN:
4  Q    You mentioned in your report something to the effect that
5  he frequently laughs, correct?
6  A    Yes.
7  Q    And that was a trait you observed in him, right?
8  A    Yes.
9  Q    You said he frequently laughed, although some of his
10  laughter seemed to be the product of frustration or
11  exasperation, correct?
12  A    Yes.
13  Q    For example, he laughed when talking about the slow pace
14  of his legal case, correct?
15  A    Correct.
16  Q    So there you, you took the laughing to be something that
17  he truly meant.  He was exasperated, right?
18  A    Yes, I think so.
19  Q    Well, that's what you said here, isn't it?
20  A    Yes.
21  Q    And that's what you thought at the time, correct?
22  A    Yes.  Yes.
23  Q    So you know that there are times when he's laughing when
24  he's actually saying something that he's genuinely trying to
25  express, don't you?

DeMier - cross by Durkin

1   A    That's true.

2        MR. DURKIN:  Judge, we have one other call on -- that

3   took place with his sister on August 11th.  And again I think

4   we're, we're shortening that.

5        MR. HAXALL:  No objection.

6        THE COURT:  All right.

7      (Whereupon, said tape was played in open court.)

8   BY MR. DURKIN:

9   Q    Doctor, you heard him reference me Durkin, saying he

10  was -- he kept asking -- he keep -- he's telling his sister he

11  keeps asking Durkin when they're going to kill me.

12  A    Yes.

13  Q    That's delusional, isn't it?

14  A    I don't know that it's delusional.  I believe it's false.

15  And one of the things that he said was that you told him you'd

16  tell him tomorrow what day they would kill him.  I doubt that

17  you said that.  So I think there's some stuff in there that's

18  not credible.  I don't have enough information to say that it's

19  a delusion.  I think there are alternative explanations.

20  Q    But you would concede, would you not, that a potential

21  interpretation is that that's delusional, correct?

22  A    Yes.

23  Q    Because, of course, it is delusional for someone to think

24  that his lawyer would know when the government was going to

25  execute him, correct?

DeMier - cross by Durkin

1    A    Well, it would, it would be false in these circumstances

2    to suggest that you would know when he was going to be killed.

3    Q    But, Doctor, it's more than false, isn't it?  It's

4    preposterous.

5    A    I would agree that it's preposterous.

6    Q    It's absurd.

7    A    And the question then becomes is it what he truly

8    believes.

9    Q    Right.  And all we have in order to come to that

10   conclusion is our collective experience and his own words,

11   correct?

12   A    Our experience and his words and the way he says them.

13   This was the phone call where he -- where I noticed the change

14   in his demeanor at another point in the call that I would have

15   expected him to exhibit during the time that he's talking about

16   his impending execution or murder.

17   Q    Okay.  But assuming that he believes that he is going to

18   be executed and that his lawyer would know when that date would

19   be, he couldn't possibly be considered competent to stand

20   trial, could he?

21   A    Not if those facts are true.

22   Q    Now, did you also hear him say that he thought he might be

23   able to go home this week?

24   A    Yes.

25   Q    Referring, of course, to the competency hearing, correct?

128

DeMier - cross by Durkin

1  A    Yes.

2  Q    Okay.  You know that that's not a potential outcome from

3  this proceeding, is it?

4  A    That's not a potential outcome.

5  Q    And again, not knowing what anybody truly believes, take a

6  look, though, at Defendant's Exhibit 14, if you would.  Have

7  you looked at that before?

8  A    Yes, I have.  It was sent to me earlier this week by

9  e-mail.

10 Q    This is a will that Mr. Daoud wrote on August 6th,

11 correct?  Or at least it says it was written on August 6th.

12 A    Correct.

13 Q    Which would be after the first phone call with me that we

14 played on the 30th and the call with his sister on the 23rd,

15 but before the last call to his sister on the 11th, correct?

16 A    Correct.

17 Q    And you would at least agree with me that this would be

18 evidence that he believes he's being ex -- going to be killed

19 or executed, isn't it?

20 A    Again, I can't say that for certainty.  I mean, there's

21 some inconsistencies here that, you know, I think need to be

22 noticed.  For example, in this will he says something about

23 them taking him to a different floor and chopping his head off

24 as part of a satanic ritual.  I didn't hear him say anything

25 about satanic rituals in the call to you that you played, and

DeMier - cross by Durkin

1  that's the only part of that call I've heard, or in either of

2  the calls to the sister that I listened to.

3          So if this were a genuine delusional belief, I would

4  expect there to be a little bit more consistency in the

5  content.

6  Q    You expect consistency in delusional beliefs, is that your

7  testimony?

8  A    Yes.  Delusions are fixed beliefs.  They're very firmly

9  held and tend to be quite consistent.

10 Q    So we do know that he's at least consistently saying he's

11 going to be executed or killed, correct?

12 A    Correct.

13 Q    You'd agree with me he's been totally consistent in that?

14 A    Well, for the -- yeah, for whatever period of time going

15 back to July 23rd, the things that I've heard.  But I -- I

16 can't speak to his consistency over time.  I've just heard

17 like -- or been exposed to snapshots on the 23rd, the 6th, the

18 11th.  I don't remember the date of the phone call with you.

19 Q    And you would agree with me that there's virtually no

20 benefit to his case for him to have written this will, is

21 there?

22 A    If he believes -- and I'm not saying that he does.  I'm

23 just hypothesizing.  If he believes that it would delay the

24 proceedings by, you know, leading to a finding of incompetency

25 where he'd go back to a mental health hospital as opposed to

DeMier - cross by Durkin

1   the MCC, he might see some advantage there.  I don't know if
2   that's the case or not, but I think --
3   Q    Well, I -- excuse me.  But I thought you just told us
4   maybe 10 minutes ago that you understood him to want to be
5   found competent and not found incompetent.  That's what he told
6   you -- isn't that what you just said 10 minutes ago?
7   A    Yes.
8   Q    Okay.  And that's what he told you in Springfield, isn't
9   it?
10  A    Correct.
11  Q    And he didn't want to stay at Springfield, did he?
12  A    I don't recall.  I don't think he did.
13  Q    Well, you heard him tell me that he didn't want any
14  therapy or medication, correct?
15  A    Right.
16  Q    Somebody who might want to be found incompetent or delay
17  things might jump at the chance to have to take medication,
18  wouldn't he?
19  A    We see that with some regularity, yes.
20  Q    And you don't see it here, correct?
21  A    Correct.
22          MR. DURKIN:  That's all I have.
23          THE COURT:  All right.  Thank you.  Redirect.
24          MR. HAXALL:  Thank you, Your Honor.
25                  REDIRECT EXAMINATION

131

DeMier - redirect by Haxall

1  BY MR. HAXALL:

2  Q    Good afternoon, Doctor.

3  A    Hello.

4  Q    I'm going to for the most part go in chronological order
5  of Mr. Durkin's questions.

6          One of the questions Mr. Durkin asked you is about
7  the literature with respect to individuals being in isolation
8  or segregated housing units, is that correct?

9  A    Yes.

10 Q    Did you consider when you were evaluating Mr. Daoud the
11 impact that his prior incarceration could have had on his
12 mental state?

13 A    I did to the extent that I consider it with anybody that I
14 evaluate.  I try to consider the totality of their
15 circumstances.  I don't know that I paid particular attention
16 to the fact that he had been housed in a special housing unit.

17 Q    But to the extent that isolation or time in the SHU
18 impacted his mental state, that would have been something that
19 came out in his interactions with you, is that fair to say?

20 A    Yes.  I think if I had seen distress, the type of distress
21 that's associated with extended time in a special housing unit,
22 that's when I would have asked -- I would have saw the symptom
23 first.  And if the symptom was there, the cluster of symptoms
24 were there, then I would have looked for the explanation.

25 Q    I want to talk to you a little bit about the way you

DeMier - redirect by Haxall

1  qualified some of your answers.  You indicated, quote, I don't

2  know what he believes speaking about Mr. Daoud and also that

3  you can't be certain.

4         When you formulated your opinion, did you do so to a

5  reasonable degree of psychological certainty?

6  A    Yes, I formulated it to the extent that I usually

7  formulate my opinions.  I think there's actually been -- the

8  reason I'm hesitating to answer that is I've actually written

9  about that phrase reasonable psychological certainty and what

10 it means.  And so I want to be, be careful to communicate

11 clearly about what I think it means.  My understanding is that

12 it means I had sufficient information to form an opinion, and

13 that other people with similar training in a similar situation

14 would likely form the same opinion.  If we can agree on that as

15 a definition, I'd readily say yes.

16 Q    And in this case is it -- in your opinion can you ever be

17 100 percent certain about what's going on in another person's

18 head?

19 A    No.  That's what I like about psychology.  That's part of

20 what drew me to the field to begin with is it's all about

21 making inferences about what's going on in somebody's head

22 because you can't observe it directly.

23 Q    Notwithstanding that belief that you can't get to

24 100 percent, were you comfortable at the time you issued your

25 report and the findings you made?

DeMier - redirect by Haxall

1  A    Yes.

2  Q    And as you sit here now, has anything you've heard -- and

3  I know you indicated that provided more opportunity to speak

4  with Mr. Daoud, you would ask him additional questions.

5       But up to this point has there been anything that

6  would cause you to change your opinion as to whether or not

7  he's competent?

8  A    No.  Primarily because of the, the consistency with which

9  he makes these statements.  He certainly made, and we talked

10 about them before, some unusual statements during the

11 evaluation with me.  The statements we -- that we just heard on

12 the telephone and some of the things that had been referenced

13 in things that he's written since he was at Springfield, kind

14 of have the same flavor.  The same, you know, casual approach

15 to the whole situation.

16 Q    Mr. Durkin spent obviously a lot of time talking about Mr.

17 Daoud's belief that he was going to be killed as a result of

18 this case.  I'd like to talk to you about that for a few

19 minutes.

20      Calling your attention to your report, which is under

21 Defense Exhibit 2.  The portion where you referred to the

22 understanding of charges and penalties and the likelihood that

23 they would kill him.  It's on page 12, the last paragraph

24 before the general legal knowledge.

25      When the defendant indicated that they, they will

134

DeMier - redirect by Haxall

1  kill him, you asked him to elaborate according to your report.

2  And he said either officially or unofficially.  Quote, he

3  understood that he is not facing capital punishment, but he

4  said that authorities can make it look like I killed myself or

5  like prisoners killed me.

6            Was it your understanding that the defendant was

7  indicating that it would be a potential punishment within the

8  court case or something outside of the actual criminal

9  prosecution?

10 A    Definitely outside the criminal prosecution.  I think he

11 said either, either officially or unofficially.  And my

12 recollection of that interaction is there was kind of a wink

13 wink at that point when he was saying that this -- this is

14 something that would be done on the sly and covered up.  At

15 least that was my interpretation of it.

16 Q    Let me ask you this:  Would it necessarily be delusional

17 for a self-professed jihadist to believe that some in the

18 government might want to kill him?

19 A    No.

20 Q    One of the other topics Mr. Durkin addressed with you was

21 the request of the defendant, which I believe is on page 5 of

22 Exhibit 11, the defendant's request to go fight for the Free

23 Syrian Army as a, as a negotiated plea.

24            Is there anything in that request in itself that

25 would be delusional notwithstanding the fact that it was an

DeMier - redirect by Haxall

1  unlikely result?

2  A    No.

3  Q    In your experience with criminal defendants do you find

4  that they sometimes have unrealistic views as to what a

5  potential outcome of their case might be?

6  A    Yes.

7  Q    Mr. Durkin also asked you kind of about the continuum with

8  delusional disorder and the Breivik article.  Is it fair to say

9  that there's kind of a continuum according to the Breivik

10 article between overvalued idea, next being their proposed term

11 of extreme overvalued belief, then to delusional disorder?

12 A    Yes.

13 Q    And I know counsel asked you about the semantics of it.

14 Is it your opinion that some of Mr. Daoud's beliefs fall within

15 that range but don't reach delusional disorder?

16 A    Yes, I, I believe that they represent overvalued ideas.

17 And that's a more accurate way to think about them than as

18 delusional beliefs.

19 Q    One of Mr. Durkin's questions to you had to do with the

20 defendant apologizing at the time of the incident at the MCC.

21 Do you recall that?

22 A    Yes.

23 Q    And I'm going to call your attention to page 15 of Defense

24 Exhibit 12, the May 2nd letter to you.

25 A    You said page 15 of Defense Exhibit 12?

136

DeMier - redirect by Haxall

1  Q    Correct.  And the first -- the first page 15, not the back
2  of page 15.
3  A    Yes.  All right.  I'm there.
4  Q    Did you find it, sir?
5  A    Yes.
6  Q    I'm going to just read it quote.  Quote, I kept hitting
7  him and he grabbed both of my wrists -- this is kind of in the
8  middle.  Quote, "I kept hitting him and he grabbed both of my
9  wrists.  I felt constrained.  I couldn't move from this skinny
10  little dude.  He said, what's wrong?  What happened?  I stopped
11  resisting.  I looked at him.  I almost thought it was over, and
12  I might just tell him what I was thinking.  I only said I was
13  sorry.  Then I found some strength and broke his grab and
14  started hitting him again."
15        Is there anything about that writing that leads you
16  to believe that Mr. Daoud was hearing voices or otherwise
17  hallucinating during this incident?
18  A    No.
19  Q    Why not?
20  A    It's consistent with what -- well, I guess I'm struggling
21  with the question because there's just nothing there that would
22  bring that out.  I mean, I -- he doesn't indicate in that
23  writing that he heard anything or that he saw anything.  He's
24  just describing what happened and describing a little bit his
25  thought process during it.  There's no indication of

DeMier - redirect by Haxall

1    hallucinations.

2    Q    I'm going to go a little bit earlier on that page.  Do you

3    recall Mr. Durkin asking you about the *Charlie Hebdo* and Texas

4    incidents and whether or not Mr. Daoud believed they were

5    divine signs?

6    A    Yes.

7    Q    I'm going to quote from towards the top of the page.

8    Quote, "The Texas thing happened the day I came back to 5,"

9    which I believe is a reference to floor 5.  "Could it be" --

10   "could it been a coincidence, stupidity, a conspiracy, a

11   miracle?"

12        Did the defendant indicate in his writing that it was

13   divine intervention at that point?

14   A    No.  Instead he's considering different possible

15   explanations, including the fact that it could have just been a

16   coincidence.

17   Q    Is that something you would expect to see in someone who's

18   delusional?

19   A    No.

20   Q    On page 18 of your report -- do you recall Mr. Durkin

21   asking you about his ability to cooperate with his attorneys?

22   A    Yes.

23   Q    Now, first of all, if a defendant declines to follow a

24   lawyer's advice, does that necessarily mean that they're unable

25   to cooperate?

DeMier - redirect by Haxall

1    A    No.

2    Q    So when we heard the call where the defendant was

3    contacting news outlets despite Mr. Durkin's contrary advice,

4    does that mean that Mr. Daoud does not have the ability to

5    cooperate with Mr. Durkin?

6    A    No.

7    Q    So page 18 of your -- of your statement, the relationship

8    with his attorneys, did Mr. Daoud indicate both positive and

9    negative interactions with his attorneys?

10   A    Yes, he did.

11   Q    And did he acknowledge that he may be inaccurate of his

12   perception of his attorneys?

13   A    Yes, he did.

14   Q    Is that something you would expect to find in someone

15   who's delusional?

16            THE COURT:  That's page 18 of which document?

17            MR. HAXALL:  Oh, I'm sorry.  Of -- it's Defendant's

18   2.  It's Dr. DeMier's report.

19            THE COURT:  Thank you.

20            MR. HAXALL:  I apologize, Your Honor.

21            THE COURT:  No problem.

22   BY MR. HAXALL:

23   Q    And I know Mr. Durkin asked you -- again, sort of going

24   back to the belief that he might be killed in this case.  You

25   indicated that that might change your opinion as to whether or

DeMier - redirect by Haxall

1    not Mr. Daoud can cooperate or fully understand the

2    ramifications of a conviction, is that correct?

3    A    Yes.  I think if he believed that he was going to be

4    killed, and that would indicate that he does not have a

5    rational understanding of the proceedings.

6    Q    But does that necessarily mean that he's delusional?

7    A    Not necessarily.  He could simply be wrong.  He could --

8    and given his self-professed identity as a conspiracy theorist,

9    he could believe that this sort of thing happens, that people

10   get dragged out of their cells and killed in the middle of the

11   night.  Although I'm quite certain that that's not true.

12   Q    In the call with his sister did you hear the portion --

13   and I hopefully won't have to play it again -- where the

14   defendant referred to some writings as a protest?

15   A    Yes.

16   Q    What did that mean to you?

17            MR. DURKIN:  Can I have some foundation as to which

18   writing?

19            THE COURT:  Objection sustained.

20   BY MR. HAXALL:

21   Q    The first call played with respect to Mr. Daoud -- the

22   first call played between Mr. Daoud and his sister, do you

23   recall that call?

24   A    Yes.

25   Q    And do you recall a portion where that defendant referred

140

DeMier - redirect by Haxall

1   to certain writings as a protest?

2   A    Yes.

3   Q    How is that relevant in your analysis of this case?

4   A    It provides an alternative explanation for his behavior if

5   he is writing something as a protest instead of as something

6   that's a generally held or delusional belief.

7   Q    Mr. Durkin also asked you about your involvement in the

8   Mitchell case.  In your opinion, Doctor, is there a difference

9   between a person who professes to be divine versus someone who

10  equates his incarceration to that of a political prisoner?

11  A    Yes.

12       MR. HAXALL:  May I have a moment, Judge.

13   (Brief pause.)

14  BY MR. HAXALL:

15  Q    Now, Mr. Durkin asked you several hypotheticals during his

16  cross-examination; is that accurate?

17  A    Yes.

18  Q    And certainly there are certain things that could change

19  your opinion in this case, correct?

20  A    Of course.

21  Q    If the defendant truly believed that this podium was

22  talking to him, that might impact your decision, is that

23  correct?

24  A    It would.

25       MR. DURKIN:  Objection.  That, that was never asked.

141

DeMier - recross by Durkin

1      THE COURT:  The Court will take the question for what
2  it is.  All right.  Overruled.
3  BY MR. HAXALL:
4  Q    At this point has any of the other information you've
5  learned in this case changed your opinion as to whether or not
6  the defendant is competent to stand trial?
7  A    No, it hasn't.
8      MR. HAXALL:  No additional questions, Your Honor.
9      THE COURT:  Anything on that, Mr. Durkin?
10      MR. DURKIN:  Just very briefly.
11      THE COURT:  It should be since that was brief.  Go
12  ahead.
13      MR. DURKIN:  Pardon me?
14      THE COURT:  Since that was brief, I expect you to be
15  brief.
16      MR. DURKIN:  It will be very brief.
17      THE COURT:  All right.
18                RECROSS-EXAMINATION
19  BY MR. DURKIN:
20  Q    Just with respect to Mr. Haxall's questions regarding
21  DX -- Defendant's Exhibit 12, would you turn back to that page
22  15 again.
23  A    Yes.
24  Q    And did I understand you to say that there was nothing on
25  that page that would be indicative of hallucinations?  Isn't

DeMier - recross by Durkin

1   that what you just said?

2   A    I think I was referring to the part that Mr. Haxall read

3   in the, in the middle of the page.

4   Q    I thought he asked you whether there was anything there

5   regarding that incident that referred to -- might possibly

6   refer to hallucinations.

7   A    That's what we were talking about, yes.  I, I said --

8   Q    Well, look at the fourth line, if you would please.  You

9   see the words after my vision?

10  A    Yes.

11  Q    What does that mean to you?

12  A    I don't know exactly what that means.  I think it could

13  mean several things.  It's certainly possible that it could

14  refer to a hallucination.  It's also possible it could refer to

15  a religious experience.  It could also refer to something that

16  happened in a dream because we had talked about that

17  previously, and I think he had used the, the word vision in

18  trying to determine whether or not something was or was not

19  part of a dream.  So I don't know exactly what that means.

20  Q    But we do know that it could mean a hallucination.  And we

21  also know that it means -- it's in the same line, in the same

22  sentence where he's talking about divine purpose, correct?

23  A    Yes.

24  Q    And this is a man who told you that he saw green that day,

25  correct?

143

DeMier - recross by Durkin

1   A    Yes.

2   Q    That was a hallucination, wasn't it?

3   A    I don't know what that was.

4   Q    Well, go ahead.

5   A    He described the feelings at the time of the alleged

6   attack as seeing green.  I've certainly heard the expression

7   seeing red.  I was not able to figure out if this was actually

8   a sensory stimulus or not.  I don't know if the things in his

9   visual field were actually green.

10  Q    And I take it, I take it that you didn't have much desire

11  to explore whether there were any hallucinations, did you?

12  A    Part of my job was to explore whether or not there were

13  hallucinations.  So it --

14  Q    Well, why didn't you ask more questions then if part of

15  your job was to try to figure out whether he was hallucinating?

16  Why did you pass over that so quickly?

17  A    I'm not sure I passed over it quickly.  I'm not

18  remembering that aspect --

19       THE COURT:  Let's get the tone down.  It's getting

20  late in the day.  We don't have to argue.  Proceed.

21       THE WITNESS:  I didn't review that aspect of the

22  evaluation in preparation for this hearing.  We're talking

23  about an interview that happened in April.  So I would have to

24  go back and look at the notes from that interview to see what

25  follow-up questions I asked.

144

DeMier - recross by Durkin

BY MR. DURKIN:

1

2 Q    But whatever follow-up questions, if you even asked any,

3 didn't get to any conclusion as to whether or not there was a

4 hallucination or not, did there?

5 A    I did not conclude that he was hallucinating.

6 Q    Right.  You said something about the reference in the

7 letter about being killed official -- page 12 of your report.

8 Being killed officially or unofficially, correct?

9 A    Yes.

10 Q    And you try to pass over the significance of officially,

11 don't you?

12 A    I don't believe I tried to pass over anything.

13 Q    Well, when you're talking to Mr. Haxall, you thought that

14 this was like some type of unofficial killing that he was --

15 A    That's how I interpreted it when he said it.

16 Q    -- talking about.  Even though he said officially or

17 unofficially, right?

18 A    Yes.  But I -- people's verbal expression doesn't always

19 translate really well to the page, as I'm sure everybody's

20 aware.  And there was something about the way he said it or the

21 tone that he said it, that what I thought he was communicating

22 to me had the emphasis on the unofficially.

23 Q    And that's, of course, because if he officially thought

24 that he was going to be executed, he would not have a correct

25 understanding of the nature of these proceedings, would he?

145

DeMier - recross by Durkin

1   A    He would not, but that's not why I interpreted it the way
2   I interpreted it.  I was not seeking any particular outcome to
3   the evaluation.
4   Q    I didn't ask you that.  I didn't suggest that.  I simply
5   said if it was official, then you would have to change your
6   opinion, wouldn't you?
7            MR. HAXALL:  Objection, form of the question and
8   asked and answered.
9            THE COURT:  Form of the question sustained.  And
10  let's move on.  If you're not getting the answer, save it for
11  argument.  Proceed.
12  BY MR. DURKIN:
13  Q    The last question I have -- I wrote down in my notes in an
14  answer that you gave to Mr. Haxall that you would presume there
15  were some people in the government who might want to kill Daoud
16  because he's a self-professed jihadi.  Did my ears -- did I
17  hear that correctly?
18           MR. HAXALL:  Objection.  Misstates the evidence.
19           THE COURT:  Well, then the witness can say he
20  misstated it.  Overruled.  Answer the question.
21  BY MR. DURKIN:
22  Q    Isn't that what you said?
23  A    Yes, in response to his question whether or not there are
24  some people in the government who want to kill a jihadist, I
25  think there are some people in the government.  And the

DeMier - recross by Durkin

1    government is huge.  It involves thousands and thousands of

2    people.  Some that would.  Some that would think that that is

3    an appropriate response.  I certainly was not saying that

4    that's something that I believe.

5    Q    You do realize that he was 18 years old when he was

6    arrested?

7    A    Yes.

8    Q    And you do know that the weapon -- the bomb was created by

9    the FBI.  You know that, right?

10            MR. HAXALL:  Objection, relevance to the competency.

11            THE COURT:  Yes.  And beyond the scope unless you're

12   tying this up some way.

13   BY MR. DURKIN:

14   Q    Well, I'm just wondering if you've ever met anybody in

15   this government who thinks that an 18-year-old kid ought to be

16   killed because he has extreme Islamic beliefs?

17            MR. HAXALL:  Objection.

18            THE COURT:  Objection sustained.  Let's move on.

19   BY MR. DURKIN:

20   Q    Well, or he's a self -- I'll use the term in his question,

21   a self-professed jihadi.

22            THE COURT:  This has no relevance to the competency

23   hearing, Mr. Durkin.

24            MR. DURKIN:  I know, but it was a bad question.

25            THE COURT:  I believe we're done with this witness.

```
 1              MR. DURKIN:  That shouldn't go unanswered.  I'm
 2   sorry?
 3              THE COURT:  Are we done with this witness?
 4              MR. DURKIN:  In more ways than one.
 5              THE COURT:  All right.  Government.
 6              MR. HAXALL:  No more questions, Your Honor.
 7              THE COURT:  All right.  You may step down, sir.
 8              THE WITNESS:  Thank you.
 9              THE COURT:  And the Court's going to take a -- leave
10   whatever paperwork is there.  I'll take a three-minute break.
11   I'll be right back out.
12              (Short break taken.)
13              THE COURT:  All right.  Where are we?
14              MR. RIDGWAY:  We have no further witnesses.
15              THE COURT:  No further witnesses for the government.
16   Government rests.  Defense.
17              MR. DURKIN:  We move for a directed finding.
18              THE COURT:  Denied.  Next.
19              MR. HERMAN:  The defense calls its first witness Dr.
20   Stephen Xenakis.
21              THE COURT:  All right.  Dr. Xenakis.
22     STEPHEN XENAKIS, DEFENDANT'S WITNESS, DULY SWORN
23              THE COURT:  Have a seat.  Thank you for your patience
24   today.  Serve yourself some water when you need it, and give
25   the Court a chance to rule on objections.  All right.
```

Xenakis - direct by Herman

1    Proceed whenever you're ready, Mr. Herman.

2    MR. HERMAN:  Thank you, Your Honor.

3    DIRECT EXAMINATION

4  BY MR. HERMAN:

5  Q    Sir, once you're done pouring yourself a glass of water,

6  could you please state your name for the record.

7  A    Stephen Nicholas Xenakis.

8  Q    And, sir, you're a -- you're a doctor, correct?

9  A    Yes.

10 Q    And what's your field of specialty?

11 A    Psychiatry.

12 Q    How long have you been a psychiatrist?

13 A    I finished my residency in 1978.  So 38 years.

14 Q    And where did you do your residency?

15 A    At Letterman Army Medical Center in Presidio, San

16 Francisco.

17 Q    And prior to that, just walk backwards for your

18 educational background, please.

19 A    I attended Princeton University on an Army ROTC

20 scholarship and graduated in 1970.  I attended the University

21 of Maryland School of Medicine the last two years on an Army

22 scholarship.  Graduated in 1974.  I did a medical surgical

23 rotating internship at Letterman Army Medical Center, finishing

24 in '75.  A residency in general psychiatry, finishing in 1978.

25 A fellowship in child and adolescent psychiatry at Letterman

1    and at the University of California San Francisco, finishing in
2    1980.  I received my boards in --
3  Q    Let me stop you right there.
4  A    Yes.
5  Q    You've mentioned the military on a number of occasions.
6    Were you ever -- were you, in fact, enlisted in the military?
7  A    I was not enlisted.  I was commissioned as a second
8    lieutenant Medical Service Corps in 1970, and I served 28
9    years.
10  Q    And did you -- at what rank did you end up achieving?
11  A    Brigadier general.
12  Q    And as a -- as -- in your capacity as a commissioned
13    military officer, what positions did you have?
14  A    I held various positions.  I was chief of psychiatry at
15    Fort Hood, Texas, Division surgeon for the First Cav Division,
16    First Calvary Division.  I was chief of child and adolescent
17    psychiatry at Eisenhower Army Medical Center at Fort Gordon and
18    at the Medical College of Georgia.  I was the deputy commander
19    for clinical services at Eisenhower Medical Center.  I was a
20    commander of the medical activity, the hospital at Fort
21    Campbell, Kentucky.  And I was the commanding general of the
22    Southeast Army Regional Medical command at Eisenhower Army
23    Medical Center.
24  Q    I may have missed it, but did you have any capacity
25    functioning within the Office of the Surgeon General for the

Xenakis - direct by Herman

1  Army?

2  A    I did.  I mean, there were as -- both as a colonel and as

3  a general I would be assigned responsibilities as an inspector

4  general or assistant inspector general.

5  Q    And did you mention whether or not you're retired now?

6  A    I am retired from the Army.  I retired in 1998.

7  Q    And again, with what rank did you retire?

8  A    I retired as a brigadier general.

9  Q    Now, you had mentioned a little earlier, a couple of

10  seconds ago about some board certifications.  Could you

11  please -- do you hold any board certifications?

12  A    I do.

13  Q    And what would those be?

14  A    General psychiatry, 1980.  And child and adolescent

15  psychiatry 1982.

16  Q    And are you currently employed in any capacity?

17  A    I'm self-employed.

18  Q    And is that in a private practice now?

19  A    I do private practice and consulting and I do some

20  research.

21         THE COURT:  Excuse me.  Is there, is there any

22  objection to --

23         MR. RIDGWAY:  No, to the qualifications.

24         MR. HERMAN:  We would, we would then move to qualify

25  Dr. Xenakis as an expert in the field of psychiatry with -- and

Xenakis - direct by Herman

1    capable of rendering an opinion on competency.  And I can --
2    there were some questions regarding competency in his training
3    that I'd be happy to get into, but if there's --
4              THE COURT:  Right.
5              MR. HERMAN:  -- no objection, we can --
6              THE COURT:  You can go right to those, if you will.
7    But his entire background, the Court has read his CV.  The
8    government has no objection.  And the Court finds that based on
9    that no objection and the Court's review of his background,
10   that he is qualified as an expert in the field of psychology --
11   psychiatry.
12             MR. HERMAN:  Psychiatry.
13             THE COURT:  Proceed.
14   BY MR. HERMAN:
15   Q    And you have, sir, received training in doing competency
16   evaluations, correct?
17   A    Yes.
18   Q    And in what capacity was that -- did you receive that
19   training?
20   A    Oh, in my military and in my residency, I mean because
21   that was a large part of our practice as military
22   psychiatrists.
23   Q    And you have testified in federal courts before, correct?
24   A    Yes, federal court.
25   Q    And you have testified in military proceedings before,

Xenakis - direct by Herman

1  correct?

2  A    Correct.

3  Q    And you have been qualified as an expert before, correct?

4  A    Yes.

5  Q    And you have testified in competency proceedings before,

6  correct?

7  A    Yes.

8  Q    As a qualified expert?

9  A    Yes.

10          MR. HERMAN:  And, Judge, just so the record is clear,

11  I would request that the, the qualification for his expertise

12  include his ability to render an opinion for competency as

13  well.

14          THE COURT:  All right.  And is there an objection?

15          MR. RIDGWAY:  Your Honor, we have a couple of

16  questions about that during the cross, but I'll be happy to

17  delay those till the -- till our turn.

18          THE COURT:  All right.  Well, subject to the

19  questions that they wish to ask on cross.  Proceed.

20  BY MR. HERMAN:

21  Q    Now, sir, you're familiar with the individual in the

22  orange jumpsuit sitting at counsel table?

23  A    Yes.

24  Q    And that's Adel Daoud, correct?

25  A    Yes.

Xenakis - direct by Herman

1    Q    You visited Mr. Daoud before, correct?

2    A    Yes.

3    Q    How often have you -- do you recall the approximate dates

4    of meeting with him?

5    A    I've had four visits.

6    Q    When was the most recent?

7    A    Yesterday.

8    Q    And where was it?  Where did that visit take place?

9    A    At the, at the MCC.

10   Q    In any particular location at the MCC?

11   A    Yes, sir.  It was in the special housing unit.

12   Q    And when -- do you recall when your prior visits were?

13   A    There was a visit I think in July 9th and 10th.  There was

14   a visit in October 9th, 2015.

15   Q    Those dates were all in 2015?

16   A    Yes.  And there was a visit in July 2016.

17   Q    In the course of your -- in connection with your

18   visitations with Mr. Daoud have you had an opportunity to

19   review any other material connected to this case?

20   A    Yes.  I've, I've reviewed the various complaints.  I've

21   reviewed the writings, his own personal journals.  I reviewed

22   reports by the psychologists.

23   Q    When you say the reports by the psychologists, do you

24   specifically mean the reports of Dr. DeMier?

25   A    Yes, Dr. DeMier and Dr. Goldstein.

Xenakis - direct by Herman

1  Q    And have you spoken with any other doctors, defense or
2  otherwise about, about Mr. Daoud in this case?
3  A    Yes, I spoke with Dr. Keram.
4  Q    And what -- do you know Dr. Keram's first name?
5  A    Emily.
6  Q    And who else have you spoken with?
7  A    Dr. Bresler.  Scott Bresler.
8  Q    And is that Dr. Scott Bresler?
9  A    Yes.
10 Q    And do you recall Dr. DeMier speaking about a Dr. Bresler
11 who performed neuropsychological testing?
12 A    Yes.
13 Q    Is that the same doctor?
14 A    Yes.
15 Q    And, sir, are you familiar with the legal standard for
16 competency in the federal court?
17 A    Yes.
18 Q    Okay.  Could you please tell us what that standard is.
19 A    Presence of a mental disease or defect that renders the
20 individual mentally incompetent to understand the nature and
21 consequences of the proceedings against him and to assist in
22 his defense.
23 Q    And have you reviewed this material and spoken with Mr.
24 Daoud for the purpose of rendering an opinion on whether or not
25 Mr. Daoud is competent?

Xenakis - direct by Herman

1    A    Yes.

2    Q    Do you, sir, without stating the opinion, do you have an

3    opinion about whether or not he has a mental disease or defect?

4    A    I do.

5    Q    Do you have an opinion of whether or not that mental

6    disease or defect renders him mentally incompetent to

7    understand the nature and consequences --

8    A    I do.

9    Q    -- of the proceedings?

10   A    I do.

11   Q    And you have an opinion about whether or not he can assist

12   properly in his defense?

13   A    I do.

14   Q    I want to turn first, sir, to the mental disease or

15   defect.  You've written a report in this matter, correct?

16   A    Yes.

17   Q    And if -- I want to ask you some questions about that

18   report and your conclusions.  If you need to refresh your

19   recollection, it's at tab 6 of the binder in front of you.

20   A    Okay.  Thank you.

21   Q    What is the mental disease or defect that you have

22   diagnosed -- you indicated earlier that you, you have an

23   opinion that Mr. Daoud has a mental disease or defect, correct?

24   A    Yes.

25            THE COURT:  And, Doctor, the Court would prefer that

Xenakis - direct by Herman

1  you not look at it unless it's in direct response to a

2  question.  So why don't we just let him ask the question.  If

3  you need something to help you answer that question, then you

4  look at it, not during the question.

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  Proceed.

7  BY MR. HERMAN:

8  Q    Sir, you testified earlier that it's your opinion that Mr.

9  Daoud has a mental disease or defect?

10  A    Yes.

11  Q    And that phrase is in the conjunctive, disease or defect?

12  A    Yes.

13  Q    Do you believe it's a disease or a defect?

14  A    I believe it is a disease.

15  Q    And what is that disease?

16  A    Delusional disorder.

17  Q    Now, you're familiar with something called the DSM?

18  A    Yes.

19  Q    What does that stand for?

20  A    The Diagnostic and Statistical Manual.

21  Q    And what is it?

22  A    It is a code book that is referred to in mental health for

23  assigning diagnoses.

24  Q    And does it have any significance with respect to a --

25  does it have significance to your conclusions about Mr. Daoud's

Xenakis - direct by Herman

1  mental disease?

2  A    I'm not sure --

3  Q    Let me withdraw that question.

4         What again is the mental disease that you have

5  diagnosed Mr. Daoud with?

6  A    Delusional disorder.

7  Q    And is that -- is a delusional disorder recognized as a

8  disease or disorder within the DSM?

9  A    It is.

10  Q    And are you familiar with the diagnostic criteria of a

11  delusional disorder?

12  A    Yes.

13  Q    Do you recall off the top of your head what the first

14  criteria is, or would anything help refresh your recollection?

15  A    I mean, I would like to be able to refer to it, but one of

16  them is that it doesn't satisfy what we call criteria A of

17  schizophrenia.  So it's different from schizophrenia, which is

18  another psychotic disorder.

19  Q    So is it -- are you then saying that schizophrenia and

20  delusional disorder are distinct?

21  A    Are different, yes.

22  Q    And is delusional disorder so we're speaking the same

23  language, is a subset of anything?

24  A    Well, it's one of the psychotic disorders recognized in

25  the field.

Xenakis - direct by Herman

1   Q    So if one has a delusional disorder, they then have a
2   psychotic disorder?
3   A    They have a psychotic disorder, yes.
4   Q    Now, do you recall any of the other criteria of --
5   diagnostic criteria of delusional disorder?
6   A    That it's an implausible belief.  Unrealistic belief
7   that -- the exact wording escapes me but --
8   Q    Would anything help refresh your recollection?
9   A    Yes.
10  Q    Could you turn to tab 30, please.  And then on there go to
11  page 90.
12  A    Excuse me?
13  Q    And then page 90 of tab 30.
14  A    Okay.
15  Q    If you would do you see where it says diagnostic criteria?
16  A    I do.
17  Q    Are those the diagnostic criteria that in your
18  professional experience are recognized as applicable for a
19  delusional disorder?
20  A    Yes.
21  Q    If you look at the first one, could you please read that.
22  A    "The presence of one or more delusions with a duration of
23  one month or longer."
24  Q    In layperson's terms, what does that mean?
25  A    It means that he has an unrealistic, implausible idea that

Xenakis - direct by Herman

1  he will hold to for at least a month.

2  Q    And we'll get into these in much greater detail, but

3  simply for the purposes of right now, do you -- do you find

4  that criteria to be met with Mr. Daoud?

5  A    I do.

6  Q    Criteria B is what I believe you were referring to

7  earlier, correct?

8  A    Correct.

9  Q    And what is that criteria?

10 A    The criterion A for schizophrenia has never been met.  And

11 that refers to the different five criteria that are considered

12 diagnostic for schizophrenia.

13 Q    And do you believe that condition to be met?

14 A    I do.

15 Q    And No. -- letter C, sir, could you please read that.

16 A    "Apart from the impact of the delusion or delusions or its

17 ramifications, functioning is not markedly impaired and

18 behavior is not obviously bizarre or odd."

19 Q    Now, what's your -- do you have an opinion about that

20 criteria and, and Mr. Daoud?

21 A    I do.  I think it is not markedly impaired and the

22 behavior's not obviously bizarre or odd.

23 Q    And you heard Dr. -- you were present in court for Dr.

24 DeMier's testimony, correct?

25 A    Yes, I was.

Xenakis - direct by Herman

1    Q    And you heard him mention experience with prior patients

2    who were the type of patient that if you saw them on the

3    street, you would call the ambulance, correct?

4    A    Yes.

5    Q    That's not the standard for competency or -- is it?

6    A    No, that's not the standard for this disorder, right,

7    because those people on the streets -- you know, lack of a --

8    just in layperson's terms that are -- that are obviously

9    bizarre or odd, we would call an emergency department.

10   Q    And could we proceed to letter D, please.

11   A    "If manic or major depressive episodes have occurred,

12   these have been brief relative to the duration of delusional

13   period."  So there are --

14   Q    And do you believe that --

15   A    I believe that's true.

16   Q    -- that's met for Mr. Daoud?

17   A    Yes.

18   Q    And the concluding criteria No. -- letter E.

19   A    "The disturbance is not attributable to the physiological

20   effects of a substance or another medical condition and is not

21   better explained by another mental disorder, such as body

22   dysmorphic disorder or excessive compulsive disorder."

23   Q    And do you believe that the criteria set forth in that

24   description are met here?

25   A    I do.

Xenakis - direct by Herman

1  Q    Now, are you familiar about whether or not a delusional
2  disorder may have various subtypes?
3  A    Yes.
4  Q    And what -- could you describe what some of those subtypes
5  are with -- I mean, if you need to refer to the -- to the DSM,
6  let us know first, but just -- just off your personal
7  knowledge.
8  A    Well, I mean, one has the -- what we call the sematic
9  subtype, that there are people who believe absolutely that they
10  have cancer.  They have a disease and that they're suffering
11  from that disease and they're going to die from it.
12  Q    And are you familiar with a grandiose subtype?
13  A    I am.
14  Q    And what does that mean?
15  A    So as it says here, these are people that have a
16  conviction of some great talent or insight or understanding,
17  and it's not recognized by the world.  And they are -- you
18  know, it gives them some particular importance or profile, you
19  know, and they think in the public's eye.
20  Q    And is there another subtype called the persecutory type?
21  A    There is, where the people feel because of delusion that
22  they are being conspired against, cheated, spied on, they're
23  being followed.  A very paranoid subtype of this.  And that
24  they're the object of, of some activity that's malicious and
25  directed against them.

Xenakis - direct by Herman

1  Q    And, sir, are you -- are you familiar with the -- using a
2  medical sense the term bizarre?
3  A    Yes.
4  Q    And is there -- does it have -- does bizarre have any
5  specific connotation vis-a-vis a diagnosis of delusional
6  disorder?
7  A    Yes.  I mean, it's a qualitative descriptor.
8  Q    And what does it mean?
9  A    And that it -- but that it is so odd and different from
10  what we commonly experience, that most people would consider it
11  implausible.  Would consider it, you know, not characteristic
12  of normal conduct.  Just out of the ordinary.
13  Q    So if -- have you ever used the term bizarre to describe
14  Mr. Daoud's -- to describe Mr. Daoud?
15  A    I have.
16  Q    And are you -- when you use the term bizarre, do you use
17  it -- in what sense do you use it?
18  A    I use it to describe his thinking that he's communicated
19  and the ideas that he holds to.  That he will -- you know,
20  continues to express.
21  Q    Now, you heard testimony earlier about a concept called or
22  a term called overvalued ideas, correct?
23  A    Right.
24  Q    And is there a distinction between overvalued ideas and
25  delusional beliefs?

Xenakis - direct by Herman

1   A    Well, that is being debated.  I mean, that's a term that's

2   just being introduced now.  I mean, although some people

3   hold -- feel that it is an aspect of delusional.  But that is

4   a -- that is being debated in the -- amongst in the field.

5   There is a difference.  I mean, there are people that are very

6   invested in ideas.

7   Q    And let me just --

8   A    Yes.

9   Q    -- move on --

10  A    Okay.

11  Q    -- from, from that.  Now, turning -- applying some of

12  these general principles to Mr. Daoud.  You mention in your

13  report that Mr. Daoud has expressed feelings of paranoia.

14  A    Yes.

15  Q    And could you please explain what role, if any, paranoia

16  has within a delusional disorder?

17  A    I mean it, in fact, is very common in delusional disorders

18  because there is an element of suspiciousness or people feel

19  that something malicious will be acted against them or they'll

20  be hurt.  That there are conspiracies against them or a group

21  that they identify with.

22  Q    Now, is this simply the same type of paranoia that, you

23  know, a JFK conspiracy theorist would have, or is it -- does it

24  have a different type of significance?

25  A    Well, I mean it's -- there are JF -- there are -- you

Xenakis - direct by Herman

1  know, there are conspiracy theorists.  It's really the
2  individual and the way that individual forms their ideas.
3  Q    And in the course of your examinations of Mr. Daoud and a
4  review of his writings and the reports of other doctors, have
5  you come to a conclusion about how Mr. Daoud forms his ideas?
6  A    I mean, I think he forms them in a particular paranoid
7  way.  I think --
8  Q    What do you mean by that?
9  A    By that means I think he has a very circular reasoning and
10  goes to that.
11  Q    Could you please explain what you mean by circular
12  reasoning.
13  A    That he finds infor -- he has a fixed idea that, that --
14  that there's a conspiracy against him, and that, that there
15  are -- that the government is anti-Muslim and that the society
16  is anti-Muslim.  And he will find information that affirms that
17  idea and discard information that doesn't affirm it.
18  Q    Are you familiar with a term called ideas of reference?
19  A    I am.
20  Q    And does that -- could you please explain to the Court
21  what ideas of reference means.
22  A    Ideas of reference has to do with an individual will
23  regard an event or remark that would otherwise not be
24  considered by anyone as referring to them as really referring
25  to them, and that things are happening in terms of everything

Xenakis - direct by Herman

1    is centered on their -- on them as an individual.  And what
2    they hear and see is a reference to them.
3    Q    So, for example, are you familiar with Mr. Daoud writing a
4    letter to President Obama?
5    A    Yes.
6    Q    And I believe that -- have you discussed this matter with
7    Mr. Daoud?
8    A    Yes.
9    Q    Have you reviewed documents regarding this letter?
10   A    Yes.
11   Q    And I believe there may have even been testimony earlier
12   today about Mr. Daoud's letter to Obama?
13   A    Yes.
14   Q    Have you -- and specifically in the course of your review,
15   have you reviewed a copy of -- a draft of the letter to Obama?
16   A    Yes.
17   Q    And if you could turn to page -- or excuse me, Defense
18   Exhibit No. 10, please.
19   A    Sure.  All right.
20   Q    Sir, is this the document that you reviewed that you
21   understand to be a, a draft or a copy of the letter to
22   President Obama?
23   A    Yes.
24   Q    Could you please read the first sentence of -- of this, of
25   this letter?

Xenakis - direct by Herman

1  A    "You and your organization are losing the war on Islam."

2  Q    And the next one, please.

3  A    "Not just that but you're going to lose, and there's

4  nothing you can do about it."

5  Q    Okay.  And if you would -- I don't want to -- the letter's

6  in evidence and it's late in the day.  I'm not going to have

7  you read the entire letter.  But if you could skip to the last

8  page and just read the request at the -- that comes at the very

9  end.

10  A    "I would like you to visit me as soon as possible to

11  discuss this of no less than two hours.  I want a two-hour

12  visit as soon as possible to discuss this."

13  Q    Is it bizarre for -- is it clinically bizarre in your

14  professional opinion for an individual --

15  A    It is.

16  Q    -- to write --

17  A    It is.

18  Q    -- a letter to --

19  A    It is.

20  Q    -- President Obama and --

21  A    Sure.

22  Q    -- then request a --

23  A    Yes.

24  Q    -- two-hour sit down?

25  A    Yes.

Xenakis - direct by Herman

1  Q    Now, is it -- do you have any information about whether or
2  not Mr. Daoud received any response to this letter?
3  A    I think he told me he has not received a response.
4  Q    Do you know if he's interpreted any events as being a
5  response to this letter?
6  A    He has.  I mean --
7  Q    And could you please explain what those -- what that event
8  was.
9  A    That he's interpreted this as that the President has
10 seen -- has seen this, read this letter.  And because he's not
11 responded, that his assertions about what -- and his fears --
12 his assertions about the anti-Muslim activities are true, and
13 that he would be a victim of those activities.
14 Q    And in the course of your discussions with Mr. Daoud, did
15 he ever mention anything about President Obama visiting a
16 mosque?
17 A    Yes.
18 Q    And did he explain anything to you about whether or not
19 that visit had any connection with this letter?
20 A    He did.  He thought that the President visited that mosque
21 because he had seen that letter -- because he had seen this
22 letter and clearly had him in mind in visiting the mosque.
23 Q    Now, would the fact that an individual writes a letter to
24 the President of the United States --
25 A    Right.

Xenakis - direct by Herman

1  Q     -- and then interprets the President subsequently visiting

2  a mosque as a personal message to that individual have any

3  bearing on your opinion on that individual's mental state?

4  A     Yes, I mean that qualifies as an idea of reference.

5  Q     Can you explain why it qualifies as an idea of reference.

6  A     Because the President no doubt had his own mind and ideas

7  and for what his visit to the mosque -- you know, what he

8  wanted to accomplish and why he had set it up.  And it is

9  almost completely implausible that it had anything to do with

10 Mr. Daoud.

11 Q     And are you familiar with a term called fragmented

12 thinking?

13 A     Yes.

14 Q     And could you explain what that means.

15 A     That means that the person's thinking is, is -- does not

16 logically connect.  And as they're expressing an idea, it's not

17 logically connected.  And even though it's all sort of in a

18 stream, there aren't the linkages that we would find in normal

19 logical conversation.

20 Q     Does that type of fragmented thinking appear as a

21 characteristic under the delusional disorder umbrella?

22 A     It can.  You can see it in delusional disorder.  It is

23 more common in schizophrenia.

24 Q     In what way could you see it in delusional disorder?

25 A     You'll see that there will be leaps.  Right there the

Xenakis - direct by Herman

1  link -- that the person as they're describing a particular

2  delusion or conspiracy against them, they'll leap from one item

3  to another and these -- each of these items are not logically

4  connected.

5  Q    And what type of clinical significance does that type of

6  fragmented thinking have?

7  A    I mean, that's -- that is one of the signs that we

8  identify as -- as, as occurring in psychotic disorders.  I

9  mean, that's how we identify that there's a serious -- what we

10 call serious thought disorder.  And because of this kind of, of

11 illogical thinking and the way that the person expresses their

12 thoughts, that they have a serious mental illness.

13 Q    And do you believe that Mr. Daoud in your review of the

14 voluminous written material that he has produced and in your

15 meetings with him, does he exhibit fragmented thinking?

16 A    Yes.

17 Q    And do you believe that that fragmented thinking indicates

18 he has a delusional disorder?

19 A    I do.

20 Q    As another example, are you familiar with letters that Mr.

21 Daoud has, has written to the Court?

22 A    Yes.

23 Q    Are you familiar with in your conversations with Mr. Daoud

24 or a review of the letters the fact that he had a former

25 cellmate who had, who had committed suicide?

Xenakis - direct by Herman

1   A    Yes.

2   Q    Are you familiar that that individual had a case before

3   this Court?

4   A    Yes.

5   Q    I'd like to turn your attention to Defense Exhibit No. 9,

6   please.  Have you reviewed this -- have you had a chance to

7   take a look at this letter?

8   A    I have.

9   Q    And have you reviewed it?

10  A    Yes.

11  Q    This is a letter that was filed February 29th, 2016.  And

12  I'd like to turn your attention to the bottom of the first

13  page.  And if you could read seven lines up beginning with

14  people, the word people.  And this is a letter for the record

15  that's addressed to, to Judge Coleman, correct?

16  A    Yes.

17  Q    Could you please read with the word with -- beginning with

18  people.

19  A    Beginning with people.

20  Q    Could you read it out loud to the Court, please.

21  A    Yes.  I'm trying to find out where are you --

22  Q    It's all the way to the -- on the right-hand side.

23  A    Oh, I see.  "People believe that you are not even human

24  but reptiles.  Literally reptiles, exclamation point.  Lizards

25  with makeup, exclamation point.  Mrs. Coleman, you killed my

Xenakis - direct by Herman

1  cellee for saying hi for me.  Don't you think that's crazy,

2  question mark."

3  Q    Okay.  Do you -- would you agree in your medical

4  professional opinion that this sentence about Mrs. Coleman --

5  Judge Coleman --

6  A    Yes.

7  Q    -- exhibits signs of a delusional disorder?

8  A    Yes.

9  Q    Could you please explain the ways that it does.

10  A    Well, I mean this was highly implausible, and that he

11  would attribute to the judge the -- either the intent or means

12  to kill one of his cellmates.  And the ideas of reference that

13  he would -- that she would, in fact, order that because he

14  acknowledged him or greeted him.

15  Q    And are you familiar with Mr. Daoud's opinions or views

16  about the Illuminati?

17  A    Yes.

18  Q    And if you would look at the, the -- the top of the

19  letter.  Could you please read the first, it looks like two

20  sentences -- three sentences, please.

21  A    "Mrs. Coleman, the President's ignoring me and you keep

22  ignoring me.  My lawyers are calling me crazy, and your lawyers

23  are laughing at me.  You put me in jail because I am Muslim and

24  you're the Illuminati.  Don't say religion has nothing to do

25  with this."

Xenakis - direct by Herman

1   Q    And does this -- does that sentence exhibit any
2   indications to you that Mr. Daoud is suffering from a
3   delusional disorder?
4   A    Yes.
5   Q    In what way?
6   A    Well, I mean that he has now constructed a theory of why
7   he has been charged and being tried in this court based on
8   his -- on this assertion that it's because he's a Muslim and
9   because the Court is occupied by the Illuminati and, therefore,
10  are working against him maliciously.
11  Q    Now, you heard some recordings that were played earlier
12  today about Mr. Daoud believing that he was going to be killed,
13  correct?
14  A    Yes.
15  Q    And you've reviewed a will that he submitted, correct?
16  A    Yes.
17  Q    And in that will he believes he's going to be killed in
18  some type of satanic ritual?
19  A    Yes.
20  Q    And is it your understanding whether or not the -- at
21  least Mr. Daoud perceives the Illuminati to have any connection
22  with satanism?
23  A    He does because he sees them as agents of the Antichrist.
24  Q    So when Mr. Daoud indicates that he will be killed, his
25  head will be chopped off at the MCC in a satanic ritual, do you

Xenakis - direct by Herman

1   interpret that to have any connection with his opinions of
2   Judge Coleman and all of us being a part of the Illuminati?
3   A    I think it's all that -- it's the linkages there.
4   Q    Does that exhibit to you what you described earlier as
5   circular reasoning?
6   A    Yes.
7   Q    Does that exhibit to you what you described earlier as
8   evidencing ideas of reference?
9   A    Yes.
10  Q    And is there any evidence there as to his paranoia?
11  A    Yes.
12  Q    And that -- those connections all together, is it
13  important to view them in the totality when making an opinion
14  as to whether or not Mr. Daoud has delusional disorder?
15  A    Yes.
16  Q    So if -- would it be inappropriate in your mind to
17  conclude that simply because Mr. Daoud may opine that the
18  country is anti-Muslim, that it is a product of a -- that that
19  sentiment is a product of a -- of a naive -- naivete?
20  A    I mean, for him it's not naivete.  It's linked to his
21  ideas of the Illuminati and their subordination to the
22  Antichrist or direction of the Antichrist.
23  Q    So when Dr. DeMier -- you're familiar with Dr. DeMier's
24  competency report, correct?
25  A    Yes.

174

Xenakis - direct by Herman

1    MR. HERMAN:  One second, please.

2    (Brief pause.)

3  BY MR. HERMAN:

4  Q    Well, for the, for the sake of moving on, I'll paraphrase.

5  There is a -- you're familiar with a conclusion that Dr. DeMier

6  makes about Mr. Daoud's anti-Muslim views, correct?

7  A    Yes.

8  Q    And it's -- if, if I have it incorrect, the government

9  will correct me.  But I believe the -- he uses a term such as

10  it's a convenient way to look at the world, correct?

11  A    Yes.

12  Q    Do you agree with that conclusion?

13  A    No.

14  Q    Do you find flaws in that conclusion?

15  A    I do.

16  Q    And what are those flaws?

17  A    Well, I mean I think the major flaw is because it's -- he

18  attributes the -- he sees the source of that anti-Muslim

19  sentiment in the Illuminati.  And, and the conspiracy -- and he

20  also adds to that what he's felt in a grandiose way was his

21  particular mission as a -- someone who is going to become a

22  Muslim scholar to take on an activity against the Antichrist

23  and to prevent the Antichrist forces and the Illuminati from

24  destroying the Islam and the Muslim population.

25  Q    So would it be fair to say that Mr. Daoud's opinions about

Xenakis - direct by Herman

1  the anti-Muslim attitudes of the west are not just an isolated
2  perception of current events?
3  A    No, they aren't just his perception of current events.
4  Q    Now, you heard Dr. DeMier also use the word provocative to
5  describe some things that Mr. Daoud was saying such as, for
6  example, Mr. Daoud describing himself as a hostage.
7  A    Right.
8  Q    Correct?
9  A    Right.
10 Q    And I believe in that context saying that he -- Mr. Daoud
11 saying that he was kidnapped?
12 A    Right.
13 Q    Now, do you agree with Dr. DeMier's conclusion that Mr.
14 Daoud's view that he is a hostage is merely an attempt to
15 provoke others?
16 A    No.
17 Q    Why not?
18 A    I believe he does believe that he was set up and that he
19 has said that the, that the government, the U.S. government
20 conducted this operation against him to prevent him from going
21 to Medina to study and become an Islamic scholar.
22 Q    Now, you've, you've mentioned now twice that Mr. Daoud
23 wanting to become a scholar.
24 A    Right.
25 Q    Now, does that self-perception or desire that he has

Xenakis - direct by Herman

1  expressed have any relevance on your opinion of his mental

2  state?

3  A    I mean, on the diagnosis it does not directly have --

4  affect my, you know, arriving at this diagnosis.

5  Q    Well, let me put the question another way.  You've spent a

6  fair amount of time --

7  A    Right.  Right.

8  Q    -- speaking with Mr. Daoud, correct?

9  A    Right.

10 Q    And you've reviewed a fair amount of his writings,

11 correct?

12 A    Right.

13 Q    Do you believe that he has the capacity to became a Muslim

14 scholar?

15 A    No.

16 Q    Do you understand whether or not he can even read -- he's

17 even fluent in Arabic?

18 A    He told me he was not.

19 Q    Do you under -- do you have any sense of whether or not he

20 has any capacity to lead a sermon or a lecture in, in the

21 Quran?

22 A    I have not seen anything that indicates to me that he

23 could do that.

24 Q    So would you, would you conclude based on your review of

25 the material, meetings with Mr. Daoud, and medical opinion that

Xenakis - direct by Herman

1    his, his aspirations to become a Muslim scholar have grandiose

2    qualities?

3    A    Yes.

4    Q    Is that grandiosity -- does the grandiosity of his

5    opinions have any bearing on your opinion of his mental state?

6    A    Well, it would have -- because that kind of grandiosity is

7    seen in delusional disorder.  I think it's unrealistic.

8    Q    Now, you also heard -- so you also heard Dr. DeMier talk

9    about conspiracy theories, correct?

10   A    Yes.

11   Q    And specifically in the context of the Illuminati?

12   A    Yes.

13   Q    And there was a point I believe on direct examination when

14   he was asked about whether or not he believes a statement in

15   your report, your July 27th report that says, the finding that

16   a belief is not delusional because it is held by others is

17   flawed.  That's your -- that's from your report?

18   A    Yes.

19   Q    And this is at page 7 of your report.

20   A    Right.

21   Q    Which is Exhibit 6?

22   A    Right.

23   Q    And Dr. DeMier disagreed with that?

24   A    Right.

25   Q    Do you agree with Dr. DeMier's position on, on your

Xenakis - direct by Herman

1  conclusion there?

2  A    No.  I mean -- I mean, I agree with myself.

3  Q    Yes.  I know obviously.  Why is Dr. DeMier wrong about --

4  A    Because, I mean, in the course of my clinical

5  experience -- I mean it goes back to 1971, 45 years -- I've

6  seen any number of people who have psychotic disorders, both

7  delusional and schizophrenic and hold to ideas very -- at time

8  they would seem to be almost a fad of what those ideas were.  I

9  mean, we had a period of time in the cold war where all the

10  Russians were spreading radioactive material, and people's

11  behavior was being affected by that.

12  Q    So the mere fact that Mr. Daoud may believe in some

13  Illuminati cabal and others may have the same beliefs doesn't

14  disqualify his beliefs from having a delusional disorder?

15  A    Absolutely.

16  Q    Now, do you believe that Mr. Daoud's belief in the

17  Illuminati is a little more nuanced than simply general

18  conspiracy theories?

19  A    I mean, nuanced or --

20  Q    More specific.  I'm sorry.  For the question.

21       Does his belief in the Illuminati, is it the same

22  from what you understand others may or may not believe, or is

23  it -- is there something very specific to this case?

24  A    No, I think it's organizing.  I think it organizes his

25  activities and his attitudes.

179

Xenakis - direct by Herman

1    Q    What do you mean by organizes?

2    A    I mean, I think it's one of the -- he uses it as a

3    reference.  As a way of, of perceiving what's going on and

4    explaining what's happening in the world and what's happening

5    to him.

6    Q    And why does he --

7    A    It's not just an ideal.

8    Q    I'm sorry.  Why does he need or in your opinion why do you

9    believe that he needs that point of reference?

10   A    I mean, I think he, he has his paranoid -- fundamentally

11   paranoid feeling that something's going to hurt him or

12   someone's going to hurt him, and that his life is in danger.

13   And he's talked about it and felt it since he was 17.  It's the

14   kind of feeling that I've seen in a number of patients who go

15   on to have serious paranoid psychotic disorders and delusional

16   disorders.  And it, and it completely dominates their thinking

17   and way of life.

18   Q    So would you say in your professional opinion that Mr.

19   Daoud's belief in the Illuminati is just a conspiracy theory,

20   or is it something more?

21   A    I think it's something more.

22   Q    And that something more is directly related to his -- is

23   it directly related to his paranoia?

24   A    It's directly related to his paranoia.

25        MR. HERMAN:  Your Honor, how much time should I --

Xenakis - direct by Herman

1           THE COURT:  Keep going.

2           MR. HERMAN:  Okay.  I don't want to keep the Court

3  from --

4           THE COURT:  Keep going.

5           MR. HERMAN:  Very well.

6  BY MR. HERMAN:

7  Q    Now, you also in -- in the course of reviewing Dr.

8  DeMier's report are you -- do you recall his use of --

9  description of idiosyncrasy?

10  A    Yes.

11  Q    In the terms of -- I'm sorry.  Let me take a step back.

12           And you recall that Dr. DeMier used the description

13  of idiosyncratic beliefs for both Mr. Daoud's beliefs in

14  reptile rulers and the Illuminati, correct?

15  A    Right.

16  Q    Now, do you believe that describing those as idiosyncratic

17  beliefs is an appropriate conclusion based on your review of

18  the material and conversations with Mr. Daoud?

19  A    No.

20  Q    Why not?

21  A    Because I believe that his beliefs -- Mr. Daoud's beliefs

22  about the Illuminati and the reptilian over lords and the

23  Freemasons, these ideas are, are his framework for being -- for

24  explaining the conspiracies against Muslims and how he's being

25  victimized.

181

Xenakis - direct by Herman

1  Q    So would it be appropriate to -- in your professional

2  medical opinion to -- not appropriate but correct, excuse me,

3  to conclude that those beliefs are merely peculiar?

4  A    They're not merely peculiar.  They're paranoid and

5  delusional.

6  Q    And you're familiar that Dr. DeMier concluded that they

7  were merely peculiar?

8  A    Yes.

9  Q    Now, sir, in your experience are there factors that can

10 affect the, the manifestation of a delusional disorder?

11 A    Yes.  There are many factors.

12 Q    And is one of those factors the environment --

13 A    Yes.

14 Q    -- that one is in?

15 A    Yes.

16 Q    And is one of those factors genetic or hereditary traits?

17 A    Yes.

18 Q    And did you have an oppor -- do you have an opinion about

19 whether or not either of those factors are in play here?

20 A    Yes.

21 Q    Could you speak about the genetic factor.

22 A    I think genetic factors may be at play.  I mean, I've

23 reviewed records or I've reviewed documentation regarding his

24 brother, his older brother.

25 Q    And this is his brother Amr Daoud?

Xenakis - direct by Herman

1    A    Yes.

2    Q    And is it your understanding that it's -- Amr is Adel's

3    older brother?

4    A    Yes.

5    Q    And what is your understanding of Amr Daoud?

6    A    He suffers from a very serious psychotic disorder.

7    Probably schizophrenia.

8    Q    And turning to the environment.  You indicated earlier

9    that you saw Mr. Daoud in the SHU, correct?

10   A    Yes.

11   Q    Do you believe that long-term incarceration in -- in the

12   SHU has any effect on -- had any effect on Mr. Daoud?

13   A    Yes.

14   Q    And did it have any effect on his mental state?

15   A    Yes.

16   Q    Are you familiar with any -- you're familiar with the

17   medical testing or neuropsychological testing that was done,

18   correct?

19   A    Yes.

20   Q    And those -- that was done in August 2013 and

21   September 2015 approximately.

22        Are you familiar with the scores that were produced

23   as a result of this testing?

24   A    Yes.

25   Q    Could you turn to page 32 -- or excuse me.  Exhibit No.

183

Xenakis - direct by Herman

1  32, please.  Actually I'm going to --

2  A    I don't have a 32 I don't think.

3          THE COURT:  Yes, there is no 32.

4          THE WITNESS:  No.

5          MR. HERMAN:  This is the comparison chart that was

6  admitted into evidence earlier.

7          THE COURT:  Proceed.

8  BY MR. HERMAN:

9  Q    Sir, do you -- are you familiar with the -- an increase in

10  the -- those are for MMPI scores, correct?

11  A    Right.  Right.

12  Q    And Dr. DeMier explained what MMPI was, so we won't go

13  into that.

14  A    Right.

15  Q    But you, you notice an increase in the scores, correct?

16  A    Yes.

17  Q    And what is -- for the record what is the increase in

18  mania?

19  A    73 percent.  From 49 to 85.

20  Q    And what is the increase in the relative scores for

21  paranoia?

22  A    An 8 percent increase.  From 83 to 90.

23  Q    And do you believe that -- starting with the elevation of

24  the scores, do you believe that the scores themselves are

25  significant?

Xenakis - direct by Herman

1   A    I do.

2   Q    In what way for paranoia?

3   A    Well, I mean, they're consistent with -- you know, that

4   they're indications that he has some paranoid disorder, and

5   it'd be of psychotic proportions.

6   Q    And with respect to the mania score --

7   A    Yes.

8   Q    -- do you believe that that increase is significant?

9   A    I do.

10  Q    In what way?

11  A    I mean, there -- in terms of considering is this -- does

12  he suffer from bipolar disorder or schizo effective disorder.

13  And is some of the phrenetic activity we're seeing because of

14  this underlying serious medical illness.

15  Q    Are you familiar with the term of taking a step -- I'll

16  move on.

17          Are you familiar with the term of like fixed beliefs

18  or unchangeable views?

19  A    Yes.

20  Q    And do those have any clinical significance in the

21  diagnoses of a delusional disorder?

22  A    Sure.

23  Q    And in what way?

24  A    Well, I mean the idea -- I mean, that they are seen as a

25  way of describing what would be considered unrealistic belief

Xenakis - direct by Herman

1  that a person holds to for a month or longer.

2  Q    And do you believe that Mr. Daoud has exhibited fixed

3  briefs or unchangeable views?

4  A    Yes, I do.

5  Q    In what way?

6  A    Well, I think he's consistently said that he thinks that

7  the Illuminati and the Freemasons and the reptilian over lords

8  are all agents here in the case against him.

9  Q    So to, to conclude, you -- you testified that you do have

10  an opinion that Mr. Daoud suffers from a mental disease or

11  defect, correct?

12  A    I do.

13  Q    And again, that mental disease or defect is?

14  A    A delusional disorder.

15  Q    And you have an opinion of whether that delusional

16  disorder affects Mr. Daoud's mental competence to understand

17  the nature and consequences of the case?

18  A    I do.

19  Q    And what is that opinion in that regard?

20  A    I think that he is not competent to understand the nature

21  and consequences, and that he cannot assist his defense

22  attorneys.

23  Q    Would Mr. Daoud's understanding of the nature and

24  consequences -- strike that.

25          We spoke earlier about a letter to President Obama?

Xenakis - direct by Herman

1  A    Yes.

2  Q    And in that letter Mr. Daoud, you're familiar that he

3  makes a proposal to go overseas, correct?

4  A    Yes.

5  Q    Does that indicate to you whether or not he has an

6  understanding of the nature and consequences?

7  A    Yes.  I mean, I think he -- I mean, I think that proposal

8  is so preposterous and absurd that he could not make it if he

9  truly understood the nature and consequences of the

10 proceedings.

11 Q    Is there any doubt in your mind that Mr. Daoud was jesting

12 in that letter?

13 A    No.

14 Q    That he was joking?

15 A    No.

16 Q    And why not?

17 A    I have not seen that.  I mean, I think he was serious.

18 He's repeated it several times.  He, he -- as I inquired about

19 it, he went on to explain how the President could do that in

20 his mind.  And I think that he was very sincere in the way he

21 constructed that proposal.

22 Q    Would Mr. Daoud's opinion that he could very well either

23 be released after this hearing or executed have any bearing on

24 your opinion of whether or not he can understand the nature and

25 consequences of the case?

Xenakis - direct by Herman

1    A    I think he -- I think it means -- it signifies that he
2    does not understand the nature and consequences of this
3    hearing.
4    Q    And do you believe that his, his view that the case is
5    either going to result in a release or execution, does that
6    have any connection with his delusional disorder?
7    A    Yes.
8    Q    In what way?
9    A    I mean, he thinks that, that this is a conspiracy,
10   anti-Muslim conspiracy.  And it would -- and the end that he
11   sees for this anti-Muslim conspiracy is that he would be
12   executed.  But if Allah intervenes, he will be set free.
13   Q    And specifically regarding the last point that you
14   mentioned about Allah intervening --
15   A    Yes.
16   Q    -- could you discuss how that plays a role not only in his
17   ability to understand the nature and consequences of the case
18   but also in his ability to assist counsel.
19   A    I think that he cannot be realistic and fact based in his
20   conversations with counsel about what the particular -- what
21   was in his best interest in his defense.
22          MR. HERMAN:  One second, please.
23       (Brief pause.)
24   BY MR. HERMAN:
25   Q    Sir, you spoke about Mr. -- well, you heard some phone

188

Xenakis - direct by Herman

1  calls earlier today.

2  A    Yes.

3  Q    And you heard Dr. DeMier opining about or making

4  characterizations of Mr. Daoud's demeanor on the phone calls?

5  A    Yes.

6  Q    That he wasn't -- that he was laughing and --

7  A    Right.

8  Q    Do you, do you -- so do you attach any significance to Mr.

9  Daoud's demeanor on the phone calls that we listened today --

10  to today?

11  A    Well, I mean I feel he has an incongruent and

12  inappropriate affect with the content of the conversation

13  that -- and/or issues that are being discussed.  And I find

14  that is diagnostic, supporting a diagnosis of a psychotic

15  disorder.  And I think that he is, is incongruent.  I think

16  it's -- what I mean it doesn't fit.

17  Q    So are you saying that you interpret the -- Mr. Daoud's

18  demeanor in the exact opposite manner that Dr. DeMier does?

19  A    Yes.

20  Q    We spoke earlier about Mr. Daoud's deterioration based on

21  those scores as he's in the SHU.

22  A    Right.

23  Q    Do you have an opinion of -- or have you thought about

24  what will happen if Mr. Daoud remains in, in such an

25  environment?

Xenakis - direct by Herman

1   A   Yes.  I believe things will get much worse.  He'll

2   deteriorate significantly.

3   Q   Do you believe there are any risks for him staying in

4   that, in that position?

5   A   Yes.  I mean, I think that my clinical experience is

6   people who have a psychotic disorder of the nature that he has,

7   get worse over time.  And unfortunately you have a number that

8   will commit suicide.

9           MR. HERMAN:  Nothing further.

10          THE COURT:  Thank you.  Do you wish to go now or do

11   you wish to start tomorrow at 9:30 is now when he's ordered,

12   and we will start then?

13          MR. RIDGWAY:  I think we'll just hold off till 9:30,

14   if that's okay.

15          THE COURT:  All right.  That's fine.  Whichever.  I'm

16   ready for either one.  All right.  Sir, you can return

17   tomorrow, is that correct?

18          MR. DURKIN:  Judge --

19          THE WITNESS:  Yes.

20          THE COURT:  All right.

21          MR. DURKIN:  Judge --

22          THE COURT:  So -- I'm sorry.  Yes.

23          MR. DURKIN:  Dr. Xenakis is traveling.  Can I just

24   get an estimate of how long they're going to be.

25          MR. RIDGWAY:  I think an hour at most.

1       THE COURT:  There's nothing else set in the morning
2   but you.  All right.
3       MR. DURKIN:  You don't want to go till 6?
4       THE COURT:  Well, I mean --
5       MR. DURKIN:  He said he'd be an hour.
6       THE COURT:  He's asking not to, and I'm going to --
7   this is a big witness.  I'm not going to push it down his
8   throat.
9       MR. DURKIN:  That's fine.
10      THE COURT:  All right.
11      MR. DURKIN:  No.  No.  I'm not trying to do that.
12  I'm just --
13      THE COURT:  Yes.  Well, I'm going to wait.  You had a
14  nice break courtesy of the Court to make sure you had all your
15  ducks in a row with their witness.  So I'm going to --
16      MR. DURKIN:  I'm not trying to do that.  I'm --
17      THE COURT:  I'm going to go ahead and take a break
18  now.
19      MR. DURKIN:  He's on the government's --
20      THE COURT:  What time is your -- what time is your
21  flight tomorrow, sir?
22      THE WITNESS:  3:15.
23      THE COURT:  Oh.  They'll be done before that.  All
24  right.  Thank you very much, ladies and gentlemen.  Sir, you
25  are still under oath.  And so you limit anything to do with

1  this case until you finish your testimony.  All right.

2         THE WITNESS:  Yes, ma'am.

3         THE COURT:  Anything else from the government?

4         MR. RIDGWAY:  No, Your Honor.

5         THE COURT:  All right.  Anything else -- I'm sorry,

6  sir.  Just, just stand -- stay right there.  Stay right there.

7  You're fine.  Stay right there.

8         Anything else, Mr. Durkin?

9         MR. DURKIN:  No, Judge.

10        THE COURT:  On behalf of your client.  All right.

11  Then, Mr. Daoud, we'll see you tomorrow morning at 9:30.  Thank

12  you everyone again for your patience with the Court today and

13  the schedule.  All right.

14        THE CLERK:  All rise.

15     (Whereupon, said trial was recessed at 5:15 p.m., to

16      reconvene on 8/19/16, at 9:30 a.m.)