1
2
3

|  |  |
|---|---|
| IN THE UNITED STATES DISTRICT COURT | |
| FOR THE NORTHERN DISTRICT OF ILLINOIS | |
| EASTERN DIVISION | |

4    UNITED STATES OF AMERICA,                )  No. 13 CR 703
                                             )
5                 vs.                         )  Chicago, Illinois
                                             )
6    ADEL DAOUD,                              )
                                             )  August 19, 2016
7                      Defendant.             )  9:00 a.m.

8
9

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HON. SHARON JOHNSON COLEMAN

10

APPEARANCES:

11

12    For the Government:    MR. BOLING W. HAXALL
                             MR. WILLIAM RIDGWAY
13                           United States Attorney's Office,
                             219 South Dearborn Street, Room 500,
14                           Chicago, Illinois  60604

15    For the Defendant:     MR. THOMAS A. DURKIN
                             MS. ROBIN V. WATERS
16                           Durkin, Roberts & Grohman,
                             2446 North Clark Street,
17                           Chicago, Illinois  60614

18                           MR. JOSHUA G. HERMAN
                             Law Office of Joshua G. Herman,
19                           53 West Jackson Boulevard, Suite 1650,
                             Chicago, Illinois  60604

20

21

22

23                           PATRICK J. MULLEN
                             Official Court Reporter
24                     United States District Court
                 219 South Dearborn Street, Room 1412
25                       Chicago, Illinois 60604
                            (312) 435-5565

1      THE CLERK:  2012 CR 723, U.S.A. versus Adel Daoud.

2      THE COURT:  Good morning, all.

3      MR. RIDGWAY:  Good morning.  William Ridgway and

4  Bolling Haxall on behalf of the United States.

09:46:05   5      MR. HERMAN:  Good morning, Judge.  Josh Herman.  Tom

6  Durkin was here.  He stepped out just before you came out.

7      THE COURT:  I seem to just time it perfectly, don't I?

8      Good morning, Mr. Daoud.

9      MR. HERMAN:  I'm with Mr. Robin Waters and Mr. Daoud,

09:46:16  10  who is present and in custody.

11      THE COURT:  Yes, he is.  All right.  Defense, where

12  were you going?  We still have to have your witness?

13      MR. HERMAN:  Dr. Xenakis is here, and he can take the

14  witness stand.  I had finished my direct examination at the

09:46:29  15  conclusion yesterday, so I believe the Government -- the ball

16  is in the Government's court.

17      THE COURT:  All right.  Here's Mr. Durkin.  Let's make

18  sure there's nothing else that needs to be done as far as he's

19  concerned; otherwise, we'll have Dr. Xenakis take the stand.

09:46:45  20  All right.  Thank you very much.  Have a seat, everyone.

21      (Witness resumes the stand.)

22      THE COURT:  You're still sworn, sir.

23      THE WITNESS:  Yes, ma'am.

24      THE COURT:  Once you're comfortable, Mr. Ridgway,

09:47:01  25  proceed.

Xenakis - cross by Ridgway

194

1     MR. RIDGWAY:  Thank you, Your Honor.

2                STEPHEN XENAKIS,

3     DEFENDANT'S WITNESS, PREVIOUSLY DULY SWORN,

4                 CROSS-EXAMINATION

09:47:16   5   BY MR. RIDGWAY:

6   Q.  Good morning, doctor.

7   A.  Good morning.

8   Q.  I had a couple questions for you just in terms of your

9   experience in the context of competency hearings if that's

09:47:25  10  okay.

11  A.  Okay.

12  Q.  I believe you testified that you have testified at

13  competency hearings in the past, is that correct?

14  A.  Yes.

09:47:30  15  Q.  Have you testified in a federal criminal competency hearing

16  before?

17  A.  I think so.  I mean, I've testified in a number of

18  hearings, not like this.

19  Q.  Any --

09:47:46  20  A.  I'm sorry.

21  Q.  Any hearings in which the issue of competency was at issue?

22  A.  Yes, certainly any number of the times.

23  Q.  Okay.  In a federal criminal setting?

24  A.  Yes.

09:47:58  25  Q.  Okay.  When was that?

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 4 of 135 PageID #:1847
Xenakis - cross by Ridgway
195

1  A.  Well, it's been over the past several years in a number of

2  cases in federal district court involving detainees in

3  Guantanamo.

4  Q.  And is that the issue of the same federal guide -- the

09:48:12  5  statute governing competence that was at issue in those cases,

6  or is it a different standard?

7  A.  I think it's the same issue.

8  Q.  Okay.  I saw that you have testified a number of times.

9  A.  Right.

09:48:24  10  Q.  Is that correct?

11  A.  Yes.

12  Q.  In particular, a number of times since you have left the

13  army, is that right?

14  A.  Yes.

09:48:32  15  Q.  I'm wondering how many times.  It's not clear here how many

16  times you've testified on behalf of the Government in those

17  proceedings.

18  A.  I've testified on behalf of the courts.  I've been a

19  court-appointed advisor but not on behalf of the Government as

09:48:47  20  the prosecution.

21  Q.  Okay.  So in any of these I'm going to say several dozen

22  cases that you've testified at, it's either on behalf of the

23  court or --

24  A.  For the defense.

09:48:58  25  Q.  -- for the defendant.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 5 of 135 PageID #:1848
Xenakis - cross by Ridgway
196

1    A.  Right.

2    Q.  All right.  I want to talk a little bit just about the

3    basis for your opinion, if that's okay.

4    A.  Yes.

09:49:06    5    Q.  In terms of your in-person meetings, I understand that you

6    met with the defendant on July 9th and 10th.

7            THE COURT:  Excuse me, Mr. Ridgway.

8            If we can find out, how many times have you testified

9    on behalf of the court, do you know.

09:49:17    10           THE WITNESS:  About three times.

11           THE COURT:  Thank you.

12           MR. RIDGWAY:  Thank you.

13    BY MR. RIDGWAY:

14    Q.  In terms of your in-person meetings with the defendant, I

09:49:28    15    think the first one was July 9th, 2015, is that right?

16    A.  Yes.

17    Q.  And then the next day on July 10th, 2015?

18    A.  Yes.

19    Q.  And then you met with him again on October 9th, 2015?

09:49:37    20    A.  Yes, uh-huh.

21    Q.  Was anyone else present for those meetings?

22    A.  No.

23    Q.  Okay.  I understand that you also met with him just this

24    past Wednesday, a couple days ago.

09:49:46    25    A.  Right, and I met with him in early July as well.

Xenakis - cross by Ridgway

197

1    Q.  In early July?  Sorry.  So in addition to early July of

2    this year.

3    A.  Of 2016, right.

4    Q.  So let me get that.  So early July?

09:50:00    5    A.  Right.

6    Q.  And how long was your meeting in early July?

7    A.  A couple hours.

8    Q.  A couple hours at the MCC?

9    A.  Yes.

09:50:18    10    Q.  And I assume it was just you and the defendant?

11    A.  Yes.

12    Q.  Okay.  Then what about this past couple of days on

13    Wednesday?

14    A.  A couple hours.

09:50:26    15    Q.  A couple hours?

16    A.  Yeah.

17    Q.  And what about phone calls?  Have you had phone calls with

18    the defendant?

19    A.  No.

09:50:38    20    Q.  No?

21    A.  No.

22    Q.  And in terms of your written products for this hearing, let

23    me make sure I understand what you've developed.  You've

24    created or drafted a declaration back in, I think, December of

09:50:49    25    this past year, is that correct?

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 7 of 135 PageID #:1850
Xenakis - cross by Ridgway
198

1    A.  Yeah.

2    Q.  And that was following your first three in-person meetings

3    with the defendant?

4    A.  Yes, right.

09:50:56   5    Q.  And then we also have your more recent reports from, I

6    think, the end of July, is that correct?

7    A.  Right.

8    Q.  All right.  Did you have notes from your meeting a couple

9    of days ago on Wednesday?

09:51:11   10   A.  I don't.  I did not make notes from that meeting.

11   Q.  You did not make notes from that meeting?  What about the

12   early July 2016 meeting?  Did you make notes?

13   A.  I did make notes.

14   Q.  Okay.  Is it --

09:51:28   15          MR. DURKIN:  I'm sorry.  I didn't hear the last

16   answer, Judge.

17          THE COURT:  He said he did make notes.

18          MR. DURKIN:  He did or did not?

19          THE COURT:  Did.

09:51:35   20          MR. DURKIN:  Thank you.

21   BY MR. RIDGWAY:

22   Q.  In terms of your meeting this past Wednesday, is it common

23   for you to meet with a client and not generate any notes?

24   A.  No, that was unusual for me not to generate notes on that

09:51:49   25   meeting.

Xenakis - cross by Ridgway

1  Q.  Is there any particular reason why?

2  A.  Yes.  I had -- as I think you've been told, I was more

3  concerned that he might be suicidal and that his psychosis may

4  be worsening, and I'm very concerned about his thinking of me

09:52:11    5  now as being part of this conspiracy against him because of the

6  way that his state of mind is in the court.  And I feel often

7  that when I take notes in meetings that the individuals, the

8  clients or patients really start to think that this is like an

9  interrogation.  I don't want to at all convey that, and I'm

09:52:44   10  here to do the best job I can and to keep as neutral a role as

11  I can and to optimize the chances that he will be disclosing

12  and straight with me.  So I decided not to take notes at that

13  meeting.

14  Q.  Okay.  So I'm going to have to rely on your recollection of

09:53:06   15  that meeting if you don't mind.  Can you tell me what you

16  talked about with the defendant?

17  A.  Yeah, I talked about what his thinking was, what he meant

18  and what his motives were for drafting his will, what he was

19  otherwise talking about with his family and with his lawyers,

09:53:28   20  and why he felt as he did, what he felt about the courts and

21  what he felt about his case.

22  Q.  Did he say anything about the Illuminati during that

23  conversation?

24  A.  Yes, I mean, he was very -- as he has been, he's been very

09:53:42   25  consistent in feeling and thinking that the Illuminati are

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 9 of 135 PageID #:1852
Xenakis - cross by Ridgway
200

1    really what's directing these entire proceedings and that

2    everyone in the court, except for his family and him, are in

3    one way involved or part of the Illuminati.

4    Q.   Okay.  So did he mention the Free Masons as well then?

09:54:03    5    A.   No, we didn't specifically talk about the Free Masons.

6    Q.   Okay.  What about reptilian forces?

7    A.   Well, I mean, that was really pretty vivid because I was

8    trying to sort of, you know, neutralize that a bit.  And I

9    would say I used the term "reptilian overlords" or "creatures,"

09:54:29    10    and then all of a sudden he would just stand up in this very

11    theatrical, dramatic way and spread his arms and say they are

12    reptiles, and he'd underscore "are."  He said it several times,

13    and he was as convincing as, you know, I've heard anyone be

14    about thinking that these kinds of, you know, considerations

09:54:49    15    are at play.  So I was impressed by that.

16    Q.   What about in your early July meeting?  Did he mention that

17    as well?

18    A.   Yes.

19    Q.   Let me ask you a little bit about the evaluations.  I don't

09:55:05    20    know that you've discussed much about what you actually did

21    when you met with him.  Did you perform a competency

22    evaluation?

23    A.   As part of the mental status examination, I mean, it's an

24    implicit part of the mental status evaluation.

09:55:16    25    Q.   But you don't regard it as -- you don't use the term

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 10 of 135 PageID #:1853
Xenakis - cross by Ridgway
201

1  "competency evaluation."

2  A.  I do when I have to write a report and discuss it in a

3  legal proceeding.

4  Q.  Okay.  But you did a mental status examination.  Did you

09:55:31  5  perform any -- did that consist of clinical interviews as part

6  it?

7  A.  Yeah, that's what it is.  It's a clinical interview and

8  examination.

9  Q.  Okay.  Any tests that you performed?

09:55:43  10  A.  Tests?  I mean, I didn't, any paper-pencil tests or any

11  other questionnaires.

12  Q.  Okay.  Just so I kind of get a sense of your findings, I

13  know that you said a lot yesterday, but I do understand that

14  it's your opinion the defendant suffers from delusional

09:55:58  15  disorder.  Is that correct?

16  A.  Yes.

17  Q.  And also that the defendant uses fractured thinking, is

18  that correct?

19  A.  Yes.

09:56:08  20  Q.  And I understand that to mean that in his oral and written

21  communications, one item doesn't follow from the other in your

22  opinion.

23  A.  They're -- right, one often doesn't follow, right.  I mean,

24  it's a very sophisticated evaluation.  I mean, there's been

09:56:23  25  extensive research looking at these kinds of problems, what we

1    call thought disorders.

2    Q.  Okay.  Then finally I think you mentioned also the term

3    "paranoia."

4    A.  Right.

09:56:35   5    Q.  Have you used that term to describe the defendant?

6    A.  Right.

7    Q.  Not necessarily in the full DSM-5 sense, but there is signs

8    of paranoia, is that correct?

9    A.  Yes.

09:56:45  10    Q.  All right.  In terms of what you've reviewed, I understand

11    that you've reviewed obviously all the exhibits that are in

12    front of you, is that correct?

13    A.  Yes.

14    Q.  That includes the defendant's letters that are in that

09:56:55  15    binder?

16    A.  Yes.

17    Q.  Expert reports?

18    A.  Yes.

19    Q.  Have you reviewed the jail calls in this case?

09:57:01  20    A.  I've listened to them.

21    Q.  Have you listened to all the jail calls?

22    A.  Not all of them.  I don't know how many there are.  I just

23    listened to the ones that defense attorneys had.

24    Q.  Okay.  So how many did you listen to?

09:57:14  25    A.  I think two or three.

1  Q.  Okay.  So if there were more jail calls, you only had

2  listened to the ones that the defense presented to you, is that

3  correct?

4  A.  Yes, right.

09:57:31  5  Q.  You also reviewed some of the defendant's writings, is that

6  right?

7  A.  Yes.

8  Q.  This set of binders called "Not Guilty by Me," is that

9  correct?

09:57:44  10  A.  Yes.

11  Q.  All right.  Then I also heard you say you've reviewed

12  things like the complaints.  What were you referring to when

13  you said that?

14  A.  I think the affidavits, the sworn statements by the FBI

09:57:59  15  agents.

16  Q.  Okay.  Have you reviewed other evidence as part of that

17  underlying case?

18  A.  I saw transcripts.  I mean, there's been so much material

19  here, so let me recall.  I saw transcripts of recordings by the

09:58:17  20  undercover agents.

21  Q.  And you read all of those transcripts?

22  A.  I read through them, yes.

23  Q.  Okay.  Have you looked at like the defendant's online

24  chats?

09:58:26  25  A.  Yes.

1   Q.  You read all of the online chats?

2   A.  I don't know if I read all of them.  I read what was

3   provided.  I mean, I try and go through all the materials

4   presented to me.

09:58:35   5   Q.  Right.  I'm just wanting to understand exactly what was

6   presented to you.  In terms of who selected what was presented

7   to you, that was from --

8   A.  Yes.

9   Q.  -- the defense.

09:58:44   10   A.  Right.

11   Q.  Okay.  In terms of the defendant's Internet activity from

12   the time of the underlying case, did you review any of that?

13   A.  Whatever the defense had and they presented to me, I

14   reviewed it.

09:58:56   15   Q.  Okay.  But you don't know whether they gave you the full

16   set of all the evidence in the case.

17   A.  I don't know, yeah.

18   Q.  Well, did you review about 20,000 products?

19   A.  Well, I don't know what you mean by "products."  Do you

09:59:05   20   mean 20,000 lines?  20,000 words?  I mean, what are you talking

21   about?

22   Q.  20,000 different items.

23   A.  I don't know what you mean by "items."

24   Q.  Well, let's assume an e-mail is a separate item.

09:59:16   25   A.  I don't -- I doubt that I reviewed 20,000.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 14 of 135 PageID #:1857
Xenakis - cross by Ridgway
205

1  Q.  Okay.  Have you reviewed the recordings from the Kankakee

2  jail that was part of the second case?

3  A.  I don't think so.

4  Q.  Okay.  In your interview, just to understand some of the

09:59:36  5  questions that were asked, did you ask questions associated

6  with the nature of the case and along those lines of the

7  defendant?

8  A.  What do you mean by "nature of the case"?

9  Q.  Well, did you ask him what he's charged with?

09:59:47  10  A.  Yes.

11  Q.  And did the defendant say what he was charged with?

12  A.  Yeah.

13  Q.  And you asked him kind of what the evidence consisted of?

14  A.  Yes.

09:59:54  15  Q.  And the defendant was at least capable of saying what the

16  evidence generally consists of, is that right?

17  A.  Yes.

18  Q.  You asked him generally about the facts of a plea and a

19  trial, and the defendant gave answers to that, the fact that

10:00:10  20  the options are either a plea or a trial?

21  A.  Yes.  Sure, we talked some.  We discussed that.

22  Q.  And did you ask him about sentencing?

23  A.  We've discussed sentencing, yes.

24  Q.  Okay.  It's fair to say that at least from just a strictly

10:00:23  25  factual matter, the defendant is able to recount facts about

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 15 of 135 PageID #:1858
Xenakis - cross by Ridgway
206

1    the case that he faces, is that correct?

2    A.  Now, look, you lawyers use the word "facts" differently

3    than we use them in medicine, so I'm not going to go --

4    Q.  Sure.  Maybe let me rephrase.

10:00:40    5    A.  I mean, he knows some information.  He discloses

6    information.  That information looks like some of the stuff

7    that I've read in the complaints.  He knows what the complaints

8    are.  So he knows that.

9    Q.  Okay.  Right.  So if you ask him what the charges are, the

10:00:55   10    defendant will state the actual charges and doesn't mention the

11    Illuminati, is that correct?

12    A.  No, that's a -- that's where I started to think that maybe

13    he's got a psychotic disorder because, yeah, he says -- well,

14    you'll say what does the papers say, and he'll say that's what

10:01:12   15    the papers say.  But then he'll say:  Here's what's going on.

16    I've been kidnapped, and I'm part of an anti-Muslim plot.

17          So that's where you get the thought disorder that

18    comes out.

19    Q.  Okay.  But you've reviewed Dr. DeMier's and Dr. Goldstein's

10:01:27   20    reports, is that correct?

21    A.  Yes.

22    Q.  And you don't dispute the fact that at least in their

23    interviews the defendant was able to recount certain --

24    A.  They went through a checklist.  He can go through a

10:01:35   25    checklist.  He can answer questions on a checklist.  He does

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 16 of 135 PageID #:1859
Xenakis - cross by Ridgway
207

1    good in multiple choice exams.  I've got it.

2    Q.  Okay.  So he's good at what you called the checklist.

3    A.  He's good at the checklist.

4    Q.  Do you understand in the case law the checklist is

5    something that courts look to at deciding the competency of a

6    defendant to --

7    A.  I am not -- I won't pretend to understand that.

8              THE COURT:  Excuse me one second, doctor.  Excuse me

9    one second.  My court reporter can only take down one person at

10   a time, and that's it.

11             THE WITNESS:  Oh, I'm sorry.  I'm sorry.  I apologize.

12             THE COURT:  I understand sometimes we talk in normal

13   conversation differently.

14             THE WITNESS:  Yes.

15             THE COURT:  All right.  Again, let's end the question,

16   and let him start the answer again.  It's an important

17   question.

18   BY MR. RIDGWAY:

19   Q.  Do you understand in the case law that those checklist

20   factors are significant to courts in deciding the competency of

21   a defendant to stand trial?

22             MR. HERMAN:  Objection, Judge.  He's asking him to

23   opine on case law.

24             THE REPORTER:  I'm sorry?

25             THE COURT:  Say that again.

|   | |
|---|---|
| 1 |     MR. HERMAN:  He's asking Dr. Xenakis to opine on the |
| 2 | law.  It's a question for a lawyer, not a doctor. |
| 3 |     THE COURT:  Well, the Court disagrees.  Overruled. |
| 4 | He's just asking if he's aware of the factors. |

10:02:29   5     Proceed.

6   BY THE WITNESS:

7   A.  I don't feel competent to answer.  I mean, I'm aware of the

8   factors.  I don't feel competent to really answer it in a way

9   that I can give an expert opinion on that.

10:02:41  10   BY MR. RIDGWAY:

11   Q.  Okay.  You understand that -- let's just talk about that

12   second prong, whether the defendant is able to assist properly

13   in the defense.

14   A.  Yes.

10:02:54  15   Q.  You understand that the standard here is whether the

16   defendant is unable, not whether the defendant is unwilling, is

17   that right?

18   A.  Yes.

19   Q.  Okay.  So, for example, if a defendant makes an irrational

10:03:09  20   decision to proceed to trial, that doesn't mean he's

21   incompetent to stand trial, is that right?

22   A.  It depends on how he's arrived at that decision.

23   Q.  Sure.

24   A.  It depends on the thinking that underlies his decision.

10:03:25  25   Q.  Let me ask it this way.  Do you think it's common that

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 18 of 135 PageID #:1861
Xenakis - cross by Ridgway
209

1   defendants make decisions that are against the advice of their

2   attorneys?

3   A.  I don't know.

4   Q.  Okay.  Is it uncommon in your experience in your competency

10:03:42   5   evaluations to see that a defendant has unrealistic

6   expectations about an outcome for a case?

7   A.  Is it uncommon, I mean, in the cases that I do?

8   Q.  Yes.

9   A.  I don't know how to -- you know, most or many of the cases

10:03:56   10   I do involve either soldiers and veterans or detainees at

11   Guantanamo, and I don't know if they really can realistically

12   appreciate what's going to be the outcomes of those cases.

13   Q.  So if I ask you just generally about the average federal

14   inmate, you don't have expertise in that regard.  Is that fair

10:04:15   15   to say?

16   A.  I don't, right.  That's not my practice.

17   Q.  Okay.  I want to ask you a little bit about some of these

18   personal writings, the "Not Guilty by Me" document.

19   A.  Yeah.

10:04:30   20   THE COURT:  Counsel, let me just go back.  You said

21   "average federal inmate."  There's no presumption that

22   Mr. Daoud is an average federal inmate, is there?

23   MR. RIDGWAY:  No presumption?

24   THE COURT:  I mean, you're presuming.  Your question

10:04:41   25   presumes that he's an average federal inmate.

1          MR. RIDGWAY:  No.  My question is that in order to

2    compare, he needs to have what is the baseline, and so I'm

3    trying to see what his baseline is.

4          THE COURT:  Okay.  So you're not referring to

10:04:53    5    Mr. Daoud in that.

6          MR. RIDGWAY:  No, no.

7          THE COURT:  Okay.  Thank you.

8          MR. HERMAN:  And, Judge, just for the record, I didn't

9    object because I was going to try to address it on redirect.

10:05:02   10    But I'll interpose an objection now because the standard isn't

11    what the average federal defendant did, if there is such a

12    thing.

13          THE COURT:  And as he said, he's just cleared it up.

14    It's not that he was trying to put Mr. Daoud in that category.

10:05:16   15    So I think if you wish to address anything else, then you can.

16          MR. HERMAN:  In a comparison, but the standard is not

17    a comparison in terms of competency.

18          THE COURT:  Well, that may be true, but the Court has

19    just removed this when he's not seen as being the average.

10:05:27   20    He's just looking for a baseline.  Proceed.

21    BY MR. RIDGWAY:

22    Q.  All right.  So I just want to look at some of these

23    personal writings.  I know that you may not have looked at

24    these in a little while, so let me just hand you a copy.  I've

10:05:40   25    marked it for identification purposes as Daoud Writings.

```
        1   A.  Are they in this binder?

        2   Q.  A separate binder.

        3   A.  Oh, a separate binder.

        4           MR. RIDGWAY:  Permission to approach, Your Honor?

10:05:53 5           THE COURT:  Yes.

        6   BY MR. RIDGWAY:

        7   Q.  All right.  So these are -- if you look at the binder, are

        8   you able to open up the binder?

        9   A.  All right.

10:06:15 10  Q.  And these are writings that you reviewed?

       11   A.  Yes.

       12   Q.  Okay.  I think you referred to them as the fifth item that

       13   you reviewed in your report, quote, "extensive personal

       14   writings from October 2015."  Does that ring a bell from your

10:06:34 15  report?

       16   A.  Yeah, I mean, that sounds about right.

       17   Q.  Okay.  So these were provided to you by the defense, is

       18   that correct?

       19   A.  Yes.

10:06:41 20  Q.  And they came from approximately the October 2015 time

       21   frame?

       22   A.  Yes.

       23   Q.  And that's near the time of your meeting with him in that

       24   October time frame, is that right?

10:06:52 25  A.  Yes.
```

1    Q.  Okay.  So did you review those after you reviewed with him

2    on the October date?

3    A.  I think so.  I mean, I think I met on October 9th with him,

4    and then these arrived afterwards.

10:07:04    5    Q.  Okay.  So you evaluated these writings as part of your

6    opinion in this case?

7    A.  Yes.

8    Q.  I'd just like to go to a couple of pages, and I think it

9    might be easier just to publish this on the overhead, if that's

10:07:15    10    okay, than having you go through this.

11    A.  Yes, I see it here.

12    Q.  So let's start with the introduction page.  Are you able to

13    see what's on the screen there?

14    A.  Yes.

10:07:24    15    Q.  All right.  Do you see at the top of it the term

16    "entrapment"?

17    A.  Yes.

18    Q.  And it has two parts, "inducement" and "predisposition"?

19    A.  Yes.

10:07:34    20    Q.  Do you understand that?  Are you familiar with the

21    entrapment defense?

22    A.  No.

23    Q.  So you're not?  You don't know whether entrapment involves

24    inducement and/or predisposition?

10:07:45    25    A.  No.

Xenakis - cross by Ridgway

213

1  Q.  Well, did you ask the defense whether this was an accurate

2  statement of the law when you were evaluating these writings?

3  A.  No.

4  Q.  So wouldn't it matter to you in your opinion, though,

10:07:56  5  whether this is -- whether his writing is irrelevant law versus

6  actually the pertinent law?  Wouldn't that matter to your

7  analysis?

8  A.  Some.  I mean, not -- I mean, I don't -- some, but not

9  necessarily.

10:08:11  10  Q.  If he had hundreds of pages of legal gobbledygook, that

11  would probably be something you would be citing as part of your

12  opinion, would you not?

13  A.  You know, what I'm looking at again, as I've explained in

14  terms of the thinking or the thought disorder and the psychotic

10:08:33  15  disorder, is how he organizes his thoughts.

16  Q.  Okay.

17  A.  If they're factual, quote, or consistent with the law, you

18  know, it may or may not.  You know, it can have some relevance.

19  I mean, it made sense common to a layman.  Those two items made

10:08:57  20  sense to me, and it looked to me that these were issues that

21  the lawyers were going to argue.  I was looking to see how he

22  had organized his thinking here.

23  Q.  Okay.  Well, let's look a little at that.

24  A.  Okay.

10:09:08  25  Q.  So recognizing that you don't know what the elements of the

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 23 of 135 PageID #:1866
Xenakis - cross by Ridgway
214

1    entrapment defense are, would it surprise you that this is

2    actually a correct statement of the entrapment defense?

3    A.  No.

4    Q.  It wouldn't surprise you?

10:09:24    5    A.  No.

6    Q.  And the factors that are outlined in terms of inducement,

7    would it surprise you that those, in fact, are factors that the

8    case law recognizes as part of inducement?

9    A.  No.  I've seen this kind of thing in many paranoid

10:09:38    10    psychotic patients.  They're very good at identifying what are

11    commonly held facts and are publicly known.

12    Q.  Okay.  Let's look now at the bottom portion of the page.

13    Do you see the examples of inducement?

14    A.  Okay.

10:09:50    15    Q.  And do you see what are quotations from references from the

16    transcript of the undercover recording?

17    A.  I assume they are.

18    Q.  Okay.  Do you see the date at the bottom of the page here,

19    7/17/2012?

10:10:06    20    A.  Yes, I see.

21    Q.  Do you understand that to be the date of the first

22    undercover meeting in the case?

23    A.  I don't know if I recognized it at the time.

24    Q.  Okay.  You didn't verify that.

10:10:14    25    A.  I didn't verify that.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 24 of 135 PageID #:1867
Xenakis - cross by Ridgway
215

1   Q.  And you understand the UCE name, that's typically referred

2   to as the undercover employee in the case?

3   A.  Yes.

4   Q.  All right.  So these are quotes from the transcript.  Is

10:10:27   5   that what you understand those to be?

6   A.  I don't know.  I mean, I didn't cross-check.

7   Q.  Okay.  But let's assume that they are quotes from the

8   transcript.  All right?

9   A.  Okay.

10:10:36   10   Q.  And that, for example, the undercover said:  They're the

11   ones terrorizing innocent people.

12   A.  Okay.

13   Q.  You'd agree with me that that would be an example of

14   inducement.

10:10:48   15          MR. HERMAN:  Objection, Judge.  He's already said that

16   he's not familiar with the law.

17          THE COURT:  Objection sustained.

18   BY MR. RIDGWAY:

19   Q.  Well, sir, you said you're assessing whether this is

10:10:55   20   fractured thought or whether it's rational thought, is that

21   correct?

22   A.  Right, but that's the linkages.  That's the way one thought

23   associates to another, not the content.

24   Q.  Well, if the defendant is linking the content of a fact to

10:11:11   25   a legal principle --

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 25 of 135 PageID #:1868
Xenakis - cross by Ridgway
216

1  A.  Well, that's not the way we use it in a mental status

2  examination.

3         THE COURT:  One at a time.  One at a time.

4  BY MR. RIDGWAY:

10:11:18  5  Q.  So this is not an example.  Is this an example of fractured

6  thinking?

7  A.  No.  I mean, we're not -- this is not -- right now this is

8  open for me to probe further and try and uncover his thinking

9  processes.

10:11:40  10  Q.  All right.

11  A.  So I'm not making a judgment on this checklist.

12  Q.  If you go through the next 20 pages in that binder, you

13  would see a list of other quotations from the transcript, is

14  that correct?

10:11:56  15  A.  I guess, yeah, all right.

16  Q.  And those quotations happen in chronological order?

17  A.  I don't know.  What I've seen in paranoid people is that

18  they vary what they will do depending on --

19  Q.  Sir, there's no question pending right now.

10:12:18  20  A.  Oh, I'm sorry.  All right.

21  Q.  So let's now turn to -- I'll give you another example, item

22  31.

23         MR. HERMAN:  What page is it?

24     (Discussion off the record.)

10:12:42  25         MR. RIDGWAY:  16.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 26 of 135 PageID #:1869
Xenakis - cross by Ridgway
217

1  BY MR. RIDGWAY:

2  Q.  Do you see a statement about some -- the statement from the

3  defendant about videos that he had?

4  A.  I mean, before I forget, I have said I have 1200.  I

10:13:05  5  couldn't read that word.  I don't even know what it is.

6  "Videos" is misspelled.  Okay.

7  Q.  "A lot of jihad."

8  A.  Jihad.

9  Q.  "I want my favorite videos listed and given to me."

10:13:17  10  THE REPORTER:  I'm sorry, counsel.

11  THE COURT:  You all have to do this one at a time.

12  THE REPORTER:  Would you restate the question?

13  MR. RIDGWAY:  Can I read it to the doctor?

14  THE COURT:  Sure, sure.

10:13:19  15  BY MR. RIDGWAY:

16  Q.  "I want my favorite videos listed and given to me.  A lot

17  are jihadi, but also more are not, and this has to be pointed

18  out predisposition."

19  THE COURT:  Is there a question after that?

10:13:41  20  BY MR. RIDGWAY:

21  Q.  So the question is:  If he possesses a lot of the videos

22  that are not jihadi, that would be an example of evidence that

23  he was not predisposed, isn't that correct?

24  MR. HERMAN:  Objection, Judge.  Again, he's asking for

10:13:53  25  a legal conclusion.

1        THE COURT:  Objection sustained.

2    BY MR. RIDGWAY:

3    Q.  Is this an example of fractured thinking?

4    A.  What's an example is that he's going down in a list in this

10:14:11  5    way, and I'm wondering is he -- I'm questioning what really in

6    my own mind I need to probe it further and figure out what his

7    thinking processes are and how good his logic is.

8    Q.  All right.  Did you confirm that information when you

9    examined this evidence?

10:14:33  10   A.  What information?

11   Q.  Well, did you look through this information and try to make

12   that determination?

13   A.  I read it all and tried to identify or tried to in my own

14   mind describe his logic, his thinking processes.

10:14:52  15   Q.  Okay.  Towards the back portion of the fourth volume or

16   fourth tab, you will see the defendant's evidence, the

17   defendant's review of evidence.  Do you remember that section?

18   A.  I'm sorry.  Could you repeat that?

19   Q.  In the fourth volume under the fourth tab --

10:15:23  20   A.  Yes?

21   Q.  -- there's a lengthy description of all of the evidence in

22   the case?

23   A.  I don't remember.  Where are you pointing?  What page is

24   that on, or where is it?

10:15:33  25   Q.  All those pages.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 28 of 135 PageID #:1871
Xenakis - cross by Ridgway
219

1  A.  Oh, I see, this long list of things.

2  Q.  Yes.

3  A.  All right.

4          MR. DURKIN:  Can we have the specific page?  I'm

10:15:41  5  sorry.  I can't follow it.

6      (Discussion off the record.)

7          THE COURT:  Wait a minute.  Is everybody on the same

8  page?

9          MR. DURKIN:  No, I'm not.  I'm confused.

10:15:56  10          MR. RIDGWAY:  The fourth section.

11          MR. DURKIN:  Is that the whole fourth section?

12          MR. RIDGWAY:  Yeah.

13          MR. DURKIN:  Oh, I thought you were referring --

14          MR. RIDGWAY:  Yeah.

10:16:02  15          THE COURT:  All right.  Is everybody clear,

16  Mr. Durkin?

17          MR. DURKIN:  As clear as -- yes, I guess, if he's

18  talking about the whole fourth section.

19          THE COURT:  All right.  I'm going to let him go ahead,

10:16:15  20  and if you're still lost let me know.

21          MR. DURKIN:  All right.

22          THE COURT:  All right.  Proceed, Mr. Ridgway.

23  BY MR. RIDGWAY:

24  Q.  And you reviewed that section as well?

10:16:21  25  A.  Yes.

1  Q.  And it reflects notations about different pieces of

2  evidence in the case.  Is that fair to say?

3  A.  Right.

4  Q.  The phone calls and e-mails, is that right?

10:16:31   5  A.  Right.

6  Q.  And the chats?

7  A.  Yeah.

8  Q.  And there's a section in which the defendant is identifying

9  certain pieces of evidence that go towards his defense, is that

10:16:41  10  correct?

11          MR. DURKIN:  Well, I'm getting lost now.

12          THE COURT:  All right.  All right.  Wait, wait.  Where

13  are we?  It seems like you're going over a lot of sections.  Is

14  it all on one page you have him looking at?

10:16:48  15          MR. RIDGWAY:  No, it's a multipage document.

16          THE COURT:  Oh, all right.

17  BY MR. RIDGWAY:

18  Q.  I can present to you a page.

19  A.  Okay.

10:16:53  20          THE COURT:  All right.  Let's do that, at least for

21  the record.

22  BY MR. RIDGWAY:

23  Q.  Unfortunately, I don't believe these have pages numbers, so

24  I'll show it to you and show it to the rest.

10:17:13  25      (Discussion off the record.)

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 30 of 135 PageID #:1873
Xenakis - cross by Ridgway
221

1    THE COURT:  All right.  There's a paper on the screen.

2  If you wish to try to find it in your binder, can you see that

3  in your binder, sir, that page?

4    THE WITNESS:  No, I don't.  Sorry, Your Honor.

10:17:31    5  There's a lot here.

6    MR. RIDGWAY:  That's my fault.  I should have Bates

7  stamped this.

8    THE COURT:  Don't worry, sir.  It's up to the

9  Government to be able to tell you where to look.

10:18:19   10    (Discussion off the record.)

11  BY MR. RIDGWAY:

12  Q.  If you look at the page on the screen, if you don't mind,

13  do you see the notation "evidence of plans to go to Medinah"?

14    THE COURT:  Excuse me.  When we do a page on the

10:18:30   15  screen, perhaps we need to label it as something, Mr. Ridgway.

16    MR. RIDGWAY:  Sure.  I'm going to independently label

17  it, if you don't mind.

18    THE COURT:  Yes, that would probably be a good idea.

19    MR. DURKIN:  Okay.  Is it closer to the back or the

10:18:47   20  front?

21    (Pause.)

22    THE COURT:  Right now, I believe, Mr. Durkin, everyone

23  is working off the screen.

24    MR. DURKIN:  Thank you.

10:18:58   25    THE COURT:  Proceed, Mr. Ridgway.

1    MR. RIDGWAY:  Thank you.  It will be brief.

2    THE COURT:  All right.  This is marked as Government

3  what for the record?

4    MR. RIDGWAY:  Volume 4.

10:19:04    5    THE COURT:  Government Volume 4, let's put a letter on

6  it.  A?

7    MR. RIDGWAY:  Sure.

8    THE COURT:  There you go.  All right.  Thank you.

9  BY MR. RIDGWAY:

10:19:11   10  Q.  All right.  Do you see there is reference to "evidence of

11  plans to go to Medinah"?

12  A.  Yes.

13  Q.  And do you understand that one of the defense theories is

14  that the defendant was intending to go overseas to school?

10:19:23   15  A.  Yes.

16  Q.  Okay.  And following this page and the next page, there's a

17  list of items that appear to reflect evidence of the

18  defendant's desire to go to Medinah, is that correct?

19  A.  Yes.

10:19:37   20  Q.  Okay.  Now, in this document, the couple hundred pages, did

21  you see any reference to the Illuminati?

22  A.  I don't remember if I did or not.  I mean, that was an

23  extensive document, and I reviewed it as carefully as I could.

24  Some of it, I could read.  Some of it, I couldn't.  I don't

10:20:04   25  recall if I saw anything there.

1  Q.  Okay.

2          THE COURT:  Is this document Volume 4?

3          MR. RIDGWAY:  Volume 4.  Sorry.

4  BY MR. RIDGWAY:

10:20:11  5  Q.  Let me target the whole binder, Volumes 1 through 4.

6  That's what I'm referring to when I ask the question.

7  A.  I don't recall frankly if I did at the time.

8          THE COURT:  And this whole binder is one that has been

9  prepared by the defendant himself, is that correct?

10:20:22  10          MR. RIDGWAY:  That's correct.

11          THE COURT:  All right.  Now I think the record is

12  clear.  Proceed.

13          MR. RIDGWAY:  Thank you.

14  BY MR. RIDGWAY:

10:20:27  15  Q.  All right.  So I want to talk a little bit about switching

16  gears here to the notion of delusions, if that's okay.

17  A.  Sure.

18  Q.  And I want to make sure we're kind of on the same page so I

19  understand it correctly.  DSM-5 has a definition of "delusion,"

10:20:41  20  is that right?

21  A.  Uh-huh.

22          THE COURT:  You need you to say yes or no, sir.

23          THE WITNESS:  Yes, yes.

24          THE COURT:  Thank you.

10:20:45  25  BY MR. RIDGWAY:

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 33 of 135 PageID #:1876
Xenakis - cross by Ridgway
224

1  Q.  And I understand it to be a false belief firmly held

2  despite what almost everyone else believes.  Is that one of the

3  components from the DSM-5 definition?

4  A.  Essentially, yes.

10:20:56   5  Q.  And does it also note that ordinarily the belief is not

6  accepted by members of a person's culture or subculture?  Is

7  that something you recall from the definition?

8  A.  Yes.

9  Q.  So if I understand the DSM-5, the belief is one that almost

10:21:12  10  know one else believes.

11  A.  I don't think that's -- that's not the way I interpret that

12  criterion.

13  Q.  Okay.  Let me just go back to the start then.  If the

14  definition says it's a belief despite what almost everyone else

10:21:28  15  believes, isn't it a matter of formal logic that the belief

16  must be one that almost no one else believes?

17  A.  No, and that's because a clinical experience is that very

18  commonly in people who have paranoid delusions and are

19  psychotic, there will be a commonality of what the qualities

10:21:50  20  are of those delusions.  In fact, parts of what their

21  delusional -- elements of their delusional thinking are also

22  believed by other people who are otherwise not considered

23  psychotic.  So however the people wrote that criterion, I think

24  that they understand that those of us who are clinicians will

10:22:14  25  interpret it and apply it based on our clinical experience.  So

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 34 of 135 PageID #:1877
Xenakis - cross by Ridgway
225

1    that's not correct, what you just stated.

2    Q.   Okay.   I understand, and that's fine.   Your experience is

3    different from the DSM-5 definition.

4    A.   No, my experience informs my understanding of the DSM-5.

10:22:34   5    Q.   So when it says despite what almost everyone else believes,

6    you believe that several other people can believe that belief

7    and it can still be a delusion, is that right?

8    A.   Despite what almost -- I mean, you have to -- the context

9    is almost everyone else.

10:22:49   10    Q.   Okay.   You'd agree with me, though, it's not a belief

11    that's accepted by a culture or subculture, is that right?

12    A.   Well, I mean, that's the way it's written, yes.

13    Q.   Okay.   And just in terms of keeping track of some of the

14    delusions you've identified, if I could just go through them,

10:23:13   15    one is surrounding the Illuminati, is that right?

16    A.   Yeah.

17    Q.   Second is the Free Masons-related beliefs, is that right?

18    A.   Yeah.

19    Q.   All right.   A third category seems to be surrounding his

10:23:27   20    belief that he'll be killed, something along those lines?

21    A.   Yeah.

22    Q.   Is that fair?

23    A.   Uh-huh.

24    Q.   And there's a fourth category, I believe, associated with

10:23:36   25    reptiles or reptilian overlords, is that right?

```
         1  A.  Yes.
         2  Q.  I guess I'd like to start with the Illuminati and Free
         3  Masons, if that's okay.
         4  A.  All right.
10:23:45 5  Q.  I think that seems -- well, let's just talk to those.  Now,
         6  at a general level, you are familiar with the concept of
         7  conspiracy theories, right?
         8  A.  Yes.
         9  Q.  And are you familiar with the academic literature on
10:23:56 10 conspiracy theories?
         11 A.  Some.
         12 Q.  That literature does reflect that conspiracy theories are
         13 remarkably common, beliefs that remarkably common among the
         14 U.S. population.  Is that fair to say?
10:24:09 15 A.  No.  I mean, I don't know.  I mean, I don't have the
         16 literature in front of me.  I have not -- when you say
         17 "remarkably common," I don't even know if you're putting a
         18 percentage to it.  I think that that's not a useful way of
         19 discussing it.
10:24:21 20 Q.  Okay.  Well, let me -- are you familiar with the article
         21 "Conspiracy Theories and the Paranoid Styles of Mass Opinion"
         22 from professors at the University of Chicago?
         23 A.  No.
         24 Q.  Okay.  If I --
10:24:40 25       MR. DURKIN:  Judge, I'm sorry, but we haven't seen any
```

1  of these.

2         THE COURT:  Counsel?

3         MR. DURKIN:  Can we have a copy?

4         THE COURT:  Yes.

10:24:47  5  BY MR. RIDGWAY:

6  Q.  Do you want me to present a copy to you, if you don't mind?

7  A.  Sure.

8  Q.  All right.

9  A.  I mean, I'll try to review it as best I can.

10:25:10  10  Q.  I think it might be useful to turn to a page that's been

11  marked 956.

12         MR. HERMAN:  Objection.

13         THE COURT:  Before we go into it, counsel, I think one

14  of the things you have to do, you said it's an article from the

10:25:21  15  University of Chicago.  He's not familiar with it.  You haven't

16  named -- you just said some professors.  You're just throwing

17  the article up there.  Obviously, you can impeach him with

18  various literature, but I think you need to lay a little bit

19  more foundation than just sticking an article by some

10:25:35  20  professors in his face.

21         MR. RIDGWAY:  Sure.

22  BY MR. RIDGWAY:

23  Q.  Is this --

24         MR. HERMAN:  Judge, I'm sorry.  We haven't had an

10:25:40  25  opportunity to review this.  This looks like it's a 14-page

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 37 of 135 PageID #:1880
Xenakis - cross by Ridgway
228

1    article.  It doesn't seem like it's from a psychiatric journal.

2         THE COURT:  I will say one thing.  I'm going to take a

3    real brief break here.  This would have been something very --

4    even though you have a right to try to impeach the witness and

5    challenge his expertise with other documents and treatises and

6    articles, you have to lay the proper foundation.  It would have

7    been nice to at least tell them this is coming, even if it's

8    just a few minutes before.  I'm going to take a brief break.

9         Doctor, please put that down.  Don't look at it any

10   further.  All right.  Five minutes.  Thank you.

11        MR. RIDGWAY:  Thank you.

12        THE COURT:  You may step down, doctor.  Don't discuss

13   your testimony with anyone.

14        THE WITNESS:  Thank you.

15      (Recess.)

16        THE COURT:  Be seated, everyone.

17        All right.  As you're being seated and getting

18   comfortable, Dr. Xenakis and counsel can both step up.

19   Everyone is clear on what's going on?

20        MR. RIDGWAY:  We're going to withdraw reference to the

21   articles.

22        THE COURT:  All right.  Thank you very much.  Proceed.

23   BY MR. RIDGWAY:

24   Q.  All right.  I think we were talking a little bit about

25   conspiracy theories when we left off.  Do you remember that?

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 38 of 135 PageID #:1881
Xenakis - cross by Ridgway
229

1    A.  Yes.

2    Q.  Putting aside the defendant for a little bit, are you

3    familiar with the prevalence of people who believe that the

4    Free Masons exert undue influence over U.S. politics?

10:37:03    5    A.  I don't know the number.

6    Q.  Okay.  What about -- is that the same for the Illuminati

7    and people who believe that the Illuminati exert undue

8    influence over U.S. law?

9    A.  I don't know the number.

10:37:14    10   Q.  You don't know the prevalence of that?

11   A.  I don't know the actual prevalence.

12   Q.  Did you look that up?

13   A.  I did and I read about it, but it didn't -- what I read

14   didn't really give me a good idea of how common the idea was.

10:37:26    15   I mean, I didn't think it was good research that I found.

16   Q.  Sure.  Did you do Google searches for that?

17   A.  I did, and I looked through my journals that I had, you

18   know, both medical and psychiatric journals, to see what had

19   been published in terms of that, and it just wasn't good

10:37:51    20   scholarship.

21   Q.  And when you did the searches, did you find a number of

22   forums devoted to these theories?

23   A.  I didn't go into the forums.  I saw that there were

24   references to them.

10:38:00    25   Q.  Are you familiar with the sovereign citizen movement?

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 39 of 135 PageID #:1882
Xenakis - cross by Ridgway
230

1  A.  I've read about it, yeah.

2  Q.  Okay.  I don't want to get into the intricacies, but

3  generally it's people who generally believe that they're

4  sovereigns and that U.S. laws, they're not subject to those

10:38:16  5  laws.  Is that something you're familiar with?

6  A.  Yes.

7  Q.  And you'd agree with me that those views are preposterous?

8  A.  As I've read about them, yes, you know.

9  Q.  And are you aware that they are almost uniformly held to be

10:38:32  10  competent to stand trial?

11  A.  Yes, I read an article on --

12          MR. HERMAN:  Objection.

13          THE COURT:  Objection to vague?

14          MR. HERMAN:  Form, vague, relevance.

10:38:40  15          THE COURT:  Form?  Objection sustained.  Let's tighten

16  it up just a little bit, Mr. Ridgway.

17          MR. RIDGWAY:  Okay.

18  BY MR. RIDGWAY:

19  Q.  Are you aware of the fact that sovereign citizens have

10:38:49  20  generally been held to be competent to stand trial?

21          MR. HERMAN:  Same objection.

22          MR. RIDGWAY:  Well, he said yes before.

23          THE COURT:  He did say yes before, but that's not the

24  point.  The point is that the question is a general question,

10:39:03  25  and you need to tighten it up.  Even though I think everybody

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 40 of 135 PageID #:1883
Xenakis - cross by Ridgway
231

1    in the courtroom knows inside that the person makes a decision

2    here, I understand, about sovereign citizens, but let's find

3    out what he knows in a little bit different manner.

4    BY MR. RIDGWAY:

10:39:17    5    Q.  Okay.  Do you have information about sovereign citizens in

6    connection with competency issues?

7    A.  I have read the articles published in the journals that I

8    receive about their cases.

9    Q.  Okay.  Based on your review of those articles, are you

10:39:35    10    familiar with whether they are typically found competent or not

11    competent to stand trial?

12    A.  As I recall, yes, they're typically found competent.

13    Q.  Okay.  I have one article, and maybe this is one you're

14    referring to.  Do you read the Journal of American Academy of

10:39:53    15    Psychiatry and the Law?

16    A.  Yes.

17    Q.  Are you familiar with the article "Competence to Stand

18    Trial, Trial Evaluations of Sovereign Citizens, A Case Series

19    on Odd Political and Legal Beliefs"?

10:40:04    20    A.  Yes.  I mean, I read it last year.

21    Q.  Okay.

22         THE COURT:  And who's the author?

23         MR. RIDGWAY:  The author for the record is George F.

24    Parker, M.D.  I believe he's a psychiatrist at Indiana

10:40:11    25    University.

1    BY MR. RIDGWAY:

2    Q.   Is that someone you're familiar with?

3    A.   That's the article I'm familiar with.

4    Q.   Okay.  Are you familiar with that individual as well?

10:40:20    5    A.   Well, I've met him.  He attends the meetings that I attend.

6    Q.   Okay.  One of the things that's reflected in that article

7    is the point that sovereign citizens are almost uniformly found

8    competent to stand trial, is that right?

9    A.   As I recall.

10:40:38    10    Q.   Okay.  Do you understand about sovereign citizens and their

11    conduct in court generally?

12    A.   I didn't.  I don't recall that I got a good understanding

13    of that from reading the article or hearing any of the lectures

14    from the meetings.

10:40:54    15    Q.   Okay.  What about other material that you reviewed on this

16    topic.  Are you familiar with --

17    A.   Which topic are we talking about?

18    Q.   The topic of sovereign citizens and their behavior in

19    court.  Are you familiar with that at all?

10:41:08    20    A.   I don't recall that I got any good understanding of that.

21    Q.   Okay.  Let's talk a little bit about religious beliefs and

22    its connection to delusion disorder, if that's okay.

23    A.   Sure.

24    Q.   I know in your report you made mention that, you know,

10:41:25    25    belief in God, for example, is not something that's going to

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 42 of 135 PageID #:1885
Xenakis - cross by Ridgway
233

1  necessarily in and of itself put someone in a delusion

2  disorder.  Is that fair?

3  A.  Yes.

4  Q.  Okay.  The DSM-5 exempts religious beliefs or ones held by

10:41:40  5  religious subculture, is that correct?

6  A.  Yes.

7  Q.  And certainly that's the case for Islam, is that not

8  correct?

9  A.  Yes.

10:41:48  10  Q.  All right.  Are you familiar with certain mythologies

11  associated with Islam?  How familiar are you with that?

12  A.  I mean, I've read as much as I could.

13  Q.  Okay.  Are you familiar with the belief in demons or the

14  jinn?

10:42:03  15  A.  Some.

16  Q.  All right.  Are you familiar with that being part of the

17  mythology?

18  A.  Yes, some.

19  Q.  Okay.  Belief in mythologies associated with Islam is not

10:42:17  20  in and of itself a delusional disorder, is it?

21  A.  Well, belief in mythology?  That's, you know -- I mean, it

22  gets into the specifics.  I mean, these are very general

23  questions.  Anytime I see a case, I really probe what the

24  individual believes and the conviction of that belief and how

10:42:42  25  they are applying it to themselves and framing it.  So, you

1  know, that they believe in it, I mean, there are any number of

2  cultures that, quote, believe in things like that.  The

3  question is, you know, how they believe in it and what the

4  depth of belief is.

10:43:01  5  Q.  Okay.  But generally speaking, I'm speaking at a general

6  level now.  Commonly held cultural beliefs, even if perhaps not

7  seemingly factually accurate, are not the sort of signs of

8  delusions that you're looking for, is that right?

9  A.  I'm sorry.  Say that again.

10:43:16  10  Q.  Commonly held cultural beliefs are not the sort of things

11  or signs of delusion that you're looking for when you examine

12  patients?

13  A.  Not necessarily.  I mean, if I think that a person has what

14  would be a common culturally held belief, I want to know more

10:43:36  15  about the texture of that belief and the depth of that belief.

16  I mean, I grew up in a culture as a Greek American where we

17  believe in the evil eye, and we heard about it, you know, from

18  the time we were children.  But I also appreciated that

19  different people believed in it differently, and it sort of

10:43:57  20  influenced their life differently.  And that's really what I

21  learned early on and appreciated, how it influenced their life

22  and how much importance they put to it.

23  Q.  Okay.  Well, let's turn to the topic of radical Islam.

24  That's something you've written about, is that correct?

10:44:15  25  A.  Yes.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 44 of 135 PageID #:1887
Xenakis - cross by Ridgway
235

1  Q.  And you feel strongly that radical Islam itself is not,

2  quote, within the domain of psychiatric experts?  Is that what

3  you wrote?

4  A.  That it's not to be pathologized is really what I was

10:44:29  5  trying to say in that.

6  Q.  Okay.  But the quote, I restated the quote correctly, is

7  that right?

8  A.  Yeah.

9  Q.  I want to talk a little about this notion of reptiles and

10:44:44  10  reptilian forces.  Is that okay?

11  A.  Sure.

12  Q.  You mentioned that this is something that he said recently,

13  is that correct, meaning the defendant?

14  A.  I'm sorry?

10:44:55  15  Q.  Is this something that the defendant said to you recently,

16  last Wednesday, something about reptiles?

17  A.  He mentioned it again last Wednesday, yes.

18  Q.  Okay.  And he mentioned it back in July as well?

19  A.  Yes.

10:45:05  20  Q.  He didn't mention it during those first three meetings that

21  you had with him, is that right?

22  A.  I don't recall him mentioning it.

23  Q.  Okay.  You saw Dr. DeMier's report, is that right?

24  A.  Yes.

10:45:16  25  Q.  And you saw that when they discussed that topic, the

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 45 of 135 PageID #:1888
Xenakis - cross by Ridgway
236

1   defendant was laughing about that belief, is that right?

2   A.  That's what he said.  That's what he wrote.

3   Q.  Okay.  The defendant was distinguishing himself with those

4   who believe that concept, is that right?

10:45:34   5   A.  I didn't -- I didn't get that message from the way he wrote

6   that.

7   Q.  All right.

8   A.  I wasn't sure.  I thought it was ambiguous.

9   Q.  Okay.  You also have referenced letters that he has

10:45:52   10   written.  Is that something else that you've relied on in that

11   determination?

12   A.  Which determination are we talking about?

13   Q.  About reptiles and reptilian forces or whatever.

14   A.  Yes.

10:46:01   15   Q.  Okay.  And the letters consist -- well, how many letters

16   did you find mention something along those lines, the topic of

17   reptiles?

18   A.  I don't know, three or four.  I don't remember, I mean, how

19   many I found.

10:46:14   20   Q.  When is the first time you saw a letter that mentioned that

21   topic?

22   A.  I don't know when the first time was that I saw a letter.

23   Q.  Is one of the things that you're assessing whether the view

24   is a fixed belief?  Is that something you're looking at?

10:46:27   25   A.  Yes.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 46 of 135 PageID #:1889
Xenakis - cross by Ridgway
237

1  Q.  Meaning it's not changing through time.

2  A.  Well, I mean, as used in the field of mental health, fixed

3  is not like we use it in physics.  It's not like -- well, even

4  though in physics, matter changes.  I mean, what we mean is

5  kind of how much a person has invested in the idea and how long

6  they might hold that idea, and that's why I think the criterion

7  is a month or more.

8  Q.  If you -- if it was true that the defendant was

9  disassociating himself with that concept two months ago when he

10  was talking to Dr. DeMier, that would be something that would

11  influence your decision, is it not?

12  A.  If he was disassociating himself from it?

13  Q.  Yes.

14  A.  I don't recall him disassociating himself from it.

15  Q.  I'm asking if it was true that he was, that's something

16  that you would consider, is it not?

17  A.  I would consider it in my thinking, yes.

18  Q.  If he said "other people believed it, not myself," that

19  would have been something that you would consider, is it not?

20  A.  Right.  The problem is that I've seen many paranoid people

21  who essentially, you know, as an idea is coming into their

22  thinking, will first attribute it to somebody else when, in

23  fact, it really is something that they believe.

24          THE COURT:  All right, doctor.

25          THE WITNESS:  Sorry.

10:46:43
10:47:05
10:47:18
10:47:32
10:47:47

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 47 of 135 PageID #:1890
Xenakis - cross by Ridgway
238

1          THE COURT:  When he asks you a question, if it's a yes

2    or no, you need to try to confine it --

3          THE WITNESS:  All right.  I'm sorry.

4          THE COURT:  -- even though I'm sure I'll eventually

10:47:58    5    hear the answer.

6          THE WITNESS:  All right.  I apologize.

7          THE COURT:  All right.  Proceed.

8    BY MR. RIDGWAY:

9    Q.  All right.  Let's talk about this notion of the defendant

10:48:01   10    believing that he is going to be killed.  Is that something you

11    testified about yesterday?

12    A.  Right.

13    Q.  And you said you listened to some of the jail calls in this

14    case, is that right?

10:48:10   15    A.  Right.

16    Q.  And you listened to two or three calls?

17    A.  Yes.

18    Q.  Were they similar to the calls you listened to in court

19    yesterday?

10:48:20   20    A.  Yes, yes.

21    Q.  Were there any other calls that you listened to other than

22    those calls?

23    A.  I don't recall.  I can't say specifically.  I don't recall.

24    Q.  We listened to three calls yesterday.

10:48:29   25    A.  I think those are the ones I listened to.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 48 of 135 PageID #:1891
Xenakis - cross by Ridgway
239

1    Q.  Okay.  Those are -- are you aware that there are other jail

2    calls in this case?

3    A.  I assumed there are.

4    Q.  Okay.  Would it surprise you if the defendant does not

10:48:45    5    mentioned his impending death in these other jail calls?

6    A.  It would not surprise me at all.

7    Q.  Okay.  So you think that a person can genuinely believe

8    that they're about to be killed but it's not something they

9    talk about with great frequency.

10:49:00    10   A.  That's the problem we have with suicide.  That's why so

11   many people go undetected who end up committing suicide.  They

12   don't put it on a banner and walk down the street.

13   Q.  Did you listen to the phone calls with the sister in this

14   case?

10:49:16    15   A.  Yes.

16   Q.  And you said --

17          THE COURT:  Excuse me.  The Court would like a time

18   frame.  When we start talking about the calls, are you talking

19   about calls that just happened in the last three months?  Are

10:49:23    20   we talking about calls that happened prior to the beginning of

21   the year?  When are we talking about?

22   BY MR. RIDGWAY:

23   Q.  Let me ask you this.  These are calls from July and August

24   of this year, is that correct?

10:49:34    25   A.  I think those were the dates of the calls.  I think they're

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 49 of 135 PageID #:1892
Xenakis - cross by Ridgway
240

1    more recent, in the past several months.

2              THE COURT:  All right.  Thank you.

3              THE WITNESS:  The past several months.

4    BY MR. RIDGWAY:

10:49:45    5    Q.  And I noticed in your direct testimony that you didn't lend

6    much credence to the notion that the defendant may be being

7    provocative, is that right?

8    A.  I don't find him provocative.

9    Q.  Okay.  The notion that the defendant may be seeking

10:50:05   10    attention is not something that you see in your assessments of

11    the evidence in this case.

12    A.  Well, that's actually a more difficult question to answer

13    because I find particularly patients who are very distressed

14    and may be considering suicide in a very odd way seeking

10:50:35   15    attention so that they won't kill themselves, but they'll do it

16    in a very indirect and obscure way.  So if he's -- we have what

17    we call the cry for help and the plea for help, and it's not

18    very direct and it's often missed.  So, you know, when I think

19    suicide is at play or something, or death is at play, I think

10:51:00   20    we have to keep our antennas out and be very aware and

21    sensitive of what might be coming.

22    Q.  All right.  But when someone is engaging in

23    attention-seeking behavior, some of the things they may be

24    saying may not even be things they, in fact, believe, is that

10:51:19   25    right?

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 50 of 135 PageID #:1893
Xenakis - cross by Ridgway
241

1   A.  I mean, there's a whole spectrum of attention-seeking

2   behavior.  I can't answer that question.

3   Q.  So the answer is no in your opinion.

4   A.  I mean, you make a judgment.  You make a judgment with each

10:51:29   5   patient.

6   Q.  All right.  So when the defendant calls the prosecutors

7   thugs, it's because he, in fact, believes that they're thugs as

8   opposed to being provocative?

9          MR. HERMAN:  Objection, Judge.  He's asking him to

10:51:42   10   opine as to what Mr. Daoud believes in terms of when he says

11   "thugs."

12          MR. RIDGWAY:  I think he's testified on --

13          THE COURT:  Objection sustained to the form of the

14   question.  You need to rework it.

10:51:50   15   BY MR. RIDGWAY:

16   Q.  Are you familiar with the fact that the defendant has in

17   filings regarded the prosecutors as thugs?

18   A.  No.

19   Q.  You haven't seen the filing?

10:51:58   20   A.  I have not.  I don't think I've seen the filing.  I may

21   have, but I don't recall it.

22   Q.  It's in the caption of the filing.  Does that ring a bell?

23   A.  I guess.  I mean, I don't really specifically recall that

24   one.

10:52:10   25          THE COURT:  Then please don't guess.  If you don't

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 51 of 135 PageID #:1894
Xenakis - cross by Ridgway
242

1    recall, say that.

2           THE WITNESS:  I don't specifically recall.

3        (Discussion off the record.)

4    BY MR. RIDGWAY:

10:52:29    5    Q.  All right.  I think or I believe it's Defendant's Exhibit

6    13.

7    A.  In the first binder that I have?

8    Q.  Yes, the first binder.

9    A.  All right.

10:52:41   10    Q.  Sorry.  We're back.

11    A.  Okay.  I see that.

12    Q.  All right.  So the question was:  The defendant in this

13    situation, your opinion is he believes that the prosecutors are

14    thugs, or do you see another potential explanation for this?

10:53:26   15    A.  I'm sorry.  What was the question again?

16    Q.  Well, the question is:  Is it your opinion that this is an

17    effort to be provocative?

18    A.  I haven't asked him about it.  I don't know.

19    Q.  Okay.  What about when the defendant called a local news

10:53:41   20    agency to endorse Donald Trump.  Did you see that as an attempt

21    to be provocative?

22    A.  No.

23    Q.  All right.  You mentioned in your testimony about paranoia

24    and that the defendant has a belief that the Government is out

10:53:57   25    to get him, is that correct?

1   A.  Yes.

2   Q.  Now, it is correct in this case that the Government -- that

3   the defendant was arrested as part of a sting operation.

4   You're familiar with that, right?

10:54:08   5   A.  Yes.

6   Q.  And, in fact, there was a second sting operation that led

7   to additional charges in this case, is that correct?

8   A.  Yes.

9   Q.  And so you'd agree with me that he has some reasons to have

10:54:23   10   some paranoid feelings about the Government, isn't that right?

11   A.  Yes.

12   Q.  He's been in custody for a number of years?

13   A.  Yes.

14   Q.  He's been a part of two undercover sting cases?

10:54:33   15   A.  Yes.

16   Q.  I want to talk a little bit about the hallucinations.  You

17   believe he appears to be responding to voices, is that right?

18   A.  I don't know.  I mean, I thought, as I had mentioned to

19   Dr. DeMier, I wondered and felt it needed to be probed and

10:54:54   20   explored.

21   Q.  All right.  You told Dr. DeMier that you believed the

22   defendant hears voices, isn't that correct?

23   A.  It's not -- I don't -- I recall my conversation with him as

24   I believe he may be hearing voices, that he's responding to

10:55:13   25   voices at times, that he has instances where that can occur,

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 53 of 135 PageID #:1896
Xenakis - cross by Ridgway
244

1    and I specifically referred to, as I've seen, we used to call

2    them brief psychotic episodes.  There would be times that

3    people would be more dramatically or more vividly psychotic,

4    and in those moments they would be hearing voices.

10:55:35    5    Q.  Okay.  Then Dr. DeMier asked you what was your basis for

6    believing that, isn't that correct?

7    A.  Yes.

8    Q.  And you told him that he appears to be responding to voices

9    in court, isn't that correct?

10:55:44    10    A.  Yes.

11    Q.  And, doctor, you have not attended court sessions, is that

12    correct?

13    A.  Yes.

14    Q.  So you're relying on someone else's recounting of the

10:55:54    15    information, is that correct?

16    A.  And that's why I said it the way I said it to him.  I said

17    I've gotten reports of that and I think it needs to be probed.

18    Q.  So you're relying on what Mr. Durkin told you about court

19    then?

10:56:06    20    A.  I don't know which attorney mentioned it to me.

21    Q.  Okay.  There was a point in your report where you talked

22    about some of the underlying case that the defendant is facing,

23    is that correct?

24    A.  I don't know.  Where are you?  What are you referring to?

10:56:31    25    Q.  Sure.  Let me pull it up for you, page 3 of your report.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 54 of 135 PageID #:1897
Xenakis - cross by Ridgway
245

1    A.  Which tab is my report?

2    Q.  Oh, sorry.  Government Exhibit 6 -- or Defense Exhibit 6.

3    This is where you're commenting on -- let me start and just

4    read here:

5              "The defendant encountered the undercover FBI agent

6    implicated in the charges against him at the height of his

7    paranoia and mental confusion."

8    A.  Yes.

9    Q.  Did I read that correctly?

10   A.  Right.

11   Q.  All right.  The third sentence in that paragraph reads:

12             "Despite his misgivings about the agent's insistence

13   on undertaking" -- quote -- "jihad, he agreed to comply with

14   the agent's wishes out of fear and trepidation of opposing him

15   and invoking the wrath of Allah."

16   A.  Right.

17   Q.  So you're offering an opinion on the undercover case, and

18   that's part of your competency evaluation in this case?

19   A.  No.

20             MR. HERMAN:  Objection, Judge.

21             THE COURT:  Well, he said no.

22             MR. RIDGWAY:  Okay.

23   BY MR. RIDGWAY:

24   Q.  And you're relying in this paragraph on statements from the

25   defendant, is that right?

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 55 of 135 PageID #:1898
Xenakis - cross by Ridgway
246

1    A.  Yes.

2    Q.  You're relying on statements from Mr. Durkin, I assume, is

3    that correct?

4    A.  No.  This is my mental status examination.  This is my

5    evaluation of his state of mind.

6    Q.  Okay.  So the focus here is on your interviews or meetings

7    with the defendant himself, is that right?

8    A.  And the other material that I've reviewed in the course of

9    the year here, all the material I have to try and formulate a

10   diagnosis and an opinion of his state of mind.

11   Q.  Is there any material that was particularly relevant to

12   your opinions in this paragraph?

13   A.  Almost everything.  I mean, my mental -- my clinical

14   examinations, mental status examinations, my interpretation of

15   the psychological testing, my reviews of the psychological

16   reports, I mean, it all was information that I processed to

17   arrive at my conclusions and formulations.

18   Q.  Okay.  But you didn't listen to the recordings in the case,

19   is that correct?

20   A.  At the time I drafted this, I had not heard the recordings.

21   Q.  And you had not reviewed all of the Internet activity?

22           MR. HERMAN:  Judge, objection.

23   BY THE WITNESS:

24   A.  No, no, no.

25           THE COURT:  One second.  One second.  There's an

1  objection.

2      Yes?

3      MR. HERMAN:  The question of recordings is vague.

4  Which recordings?

10:59:41   5      THE COURT:  Objection sustained.

6      MR. RIDGWAY:  Sure.  That's fair.

7  BY MR. RIDGWAY:

8  Q.  You have not reviewed the recordings of the defendant with

9  the undercover agent, is that correct?

10:59:47  10  A.  No, I had.  I had transcripts.

11  Q.  But you didn't listen to the recordings.

12  A.  I did not listen to them.

13  Q.  That's correct, and you did not review -- we're talking

14  about a lot of evidence, and you only reviewed the evidence as

11:00:06  15  provided to you by the defense, is that right?

16  A.  Yes.

17  Q.  And when you're doing your mental health examination,

18  you're relying in part on Mr. Daoud's statements from events

19  from three years earlier, is that correct?

11:00:21  20  A.  Yes.

21  Q.  All right.  One of the things that you've given an opinion

22  on -- let me ask if this is still your opinion -- is that it's

23  your belief that the defendant's mental state has deteriorated.

24  A.  Is deteriorating.

11:00:43  25  Q.  Is deteriorating, yes.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 57 of 135 PageID #:1900
Xenakis - cross by Ridgway
248

1    A.  Yes.

2    Q.  It's getting worse.

3    A.  Yes.

4    Q.  In fact, you believe from July 9th, 2015, to the present

5    it's your belief that the defendant's mental state is worse, is

6    that correct?

7    A.  Yes, right.

8    Q.  So it's plausible, you'd agree, that when you met with him

9    on July 9th, 2015, his mental state was worse than it was

10   during those undercover meetings three years earlier, right?

11   A.  Yeah, it's plausible, sure.

12   Q.  In fact, under your analysis it's probably likely, isn't

13   that correct?

14   A.  Probably.  I mean, it's hard to tell.  I mean, I have to be

15   -- I mean, these conditions wax and wane.  They emerge in late

16   adolescence, and they have a variable course, particularly

17   during the next ten years up until age 30.  So, you know, you

18   have to be very vigilant as a clinician in observing and

19   working with the respective individual.

20   Q.  But just so I understand it, you agree with the fact that

21   it may well be the defendant's mental state in July of 2015 was

22   different from what it was three years earlier, is that right?

23   A.  Well, that's a broad statement.  Different in what ways?  I

24   mean, you have to go into the details.

25   Q.  Well, you've just testified that you believe that the

1  defendant's mental state from a year ago was worse than it is

2  today, is that right?

3  A.  Right, but that's a finding based on what I feel is his

4  imminent -- what he feels is his imminent demise and that his

11:02:17  5  life is threatened.  I think that's a significant

6  deterioration.

7  Q.  Okay.  And you're not granting the fact that that could be

8  the case as of July of 2015, though.  I'm confused.

9  A.  I'm not sure what you're trying to get me to say.

11:02:30  10  Q.  No, I'm just -- it seems that you have said that there has

11  been a downward slope in this case, is that correct?

12  A.  But that's a broad term clinically.  The question here is,

13  you know, how organized is his thinking, how logical is his

14  thinking.  The case, the incident occurred when he was 18, and

11:02:50  15  the 18-year-old brain is not the same as the 21-year-old brain.

16  Not only that, I mean, there's a natural progression of these

17  kinds of psychotic conditions, and they wax and wane.  So there

18  are like innumerable variables here, and that's what makes this

19  a profession, the challenges of trying to treat people with

11:03:16  20  these kinds of illnesses.

21  Q.  Given the number of variables that are at play, though, you

22  speak very stridently about your opinion of the defendant's

23  mental state from three years earlier, is that correct?

24  A.  I'm not sure what you're asking.

11:03:30  25  Q.  Well, this paragraph does not lend itself to equivocation.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 59 of 135 PageID #:1902
Xenakis - cross by Ridgway
250

1    Is that fair?

2    A.  I don't know.

3         MR. HERMAN:  Judge, we'll stipulate that there's some

4    type of deterioration.  I don't know what this line of

5    questioning is trying to get to.  The issue is competency to

6    stand trial today, not his condition in 2012.

7         THE COURT:  All right.  Thank you for that, but I

8    think the proper objection is maybe as to form so that there

9    can be more clarity as to where we're going here.

10        MR. HERMAN:  Then we'll make that objection.

11        THE COURT:  Sustained.

12        MR. RIDGWAY:  One moment, Your Honor.

13        THE COURT:  Okay.

14      (Discussion off the record.)

15   BY MR. RIDGWAY:

16   Q.  Sir, a few more questions for you.  Doctor, I want to ask

17   you about another case that you testified in, if that's okay.

18   That's the -- you testified in United States versus Abu Ghaith.

19   Do you recall that?

20   A.  Yes, I do.

21   Q.  Okay.  That was a terrorism trial in the Southern District

22   of New York?

23   A.  Yes.

24   Q.  And you testified for the defendant in that case?

25   A.  Yes.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 60 of 135 PageID #:1903
Xenakis - cross by Ridgway
251

1    Q.  As a psychiatric expert, is that correct?

2    A.  Yes.

3    Q.  On the issue, there was an evidentiary hearing in that case

4    that you testified in?

11:04:46    5    A.  I don't know if it was evidentiary.  I mean, that's legal.

6    That's beyond --

7    Q.  Sure.  There was a hearing in which the judge was assessing

8    your credibility, is that correct?

9    A.  Assessing my credibility?

11:04:59    10    Q.  Correct.

11    A.  He may have.

12    Q.  Well, you understand when you testify, there's a finder of

13    fact deciding your testimony --

14    A.  Yeah, right.

11:05:08    15    Q.  -- how much weight to give it?

16    A.  Yeah, right.

17    Q.  Do you understand that?

18    A.  Right.

19    Q.  And there was a judge in that case who was making an

11:05:13    20    assessment of the weight of your testimony.

21    A.  Right, right, right, absolutely.

22    Q.  In that case, the judge made some findings about your

23    testimony, is that right?

24    A.  Yes.

11:05:22    25    Q.  And the judge found you to be, quote, obviously partisan,

1    is that correct?

2    A.  I think that's what he said, yes.

3    Q.  And the judge said that you, quote, expressed opinions with

4    little basis, is that correct?

11:05:34    5    A.  I think that's what he said, yes.

6    Q.  And the judge in that case afforded your testimony, quote,

7    minimal weight, is that right?

8    A.  Yes.

9        MR. RIDGWAY:  No further questions, Your Honor.

11:05:44    10       THE COURT:  Thank you very much, Mr. Ridgway.

11       Redirect?

12                    REDIRECT EXAMINATION

13   BY MR. HERMAN:

14   Q.  Dr. Xenakis, you were asked to render an opinion as to

11:05:57    15   competency for Mr. Daoud to stand trial today, correct?

16   A.  Yes.

17   Q.  You weren't asked to render an opinion about his sanity in

18   2012, correct?

19   A.  Yes.

11:06:10    20   Q.  You weren't asked to render an opinion about his competency

21   to stand trial in 2012, correct?

22   A.  Yes.

23   Q.  You were asked some questions about whether or not your

24   experiences or knowledge involved defendant's having

11:06:41    25   unrealistic expectations of legal proceedings.  Do you recall

1    those questions --

2    A.  Yes.

3    Q.  -- that the prosecutor asked you?

4    A.  Yes.

11:06:50    5    Q.  And would you say in your opinion that whether or not the

6    result of a competency hearing could result in a release by

7    some miracle or one's execution constitute realistic

8    expectations?

9    A.  No, they're not realistic.

11:07:11    10    Q.  Do you believe that Mr. Daoud has realistic expectations

11    regarding this legal proceeding?

12    A.  No.

13    Q.  Is there a reason in your medical opinion why he does not

14    have realistic expectations?

11:07:27    15    A.  Because I think he construes this as an anti-Muslim

16    campaign and that he has been individually targeted as an

17    individual targeted for his efforts and goal to be a scholar,

18    and by him being a scholar, he will take down all the forces of

19    the anti-Christ.  I think he's delusional.

11:07:58    20    Q.  So you --

21             THE COURT:  I'm sorry.  You think he's?

22             THE WITNESS:  Delusional.

23    BY MR. HERMAN:

24    Q.  You mentioned one --

11:08:03    25             THE COURT:  Excuse me one second.

1      So, doctor, let's say everything you said was true.

2  How does that mean that he isn't necessarily competent as to

3  the trial?  Plenty of people feel they're being prosecuted

4  unfairly, don't they?  That doesn't mean they are not

11:08:21  5  competent.

6      THE WITNESS:  Right.  I mean, there are many people

7  who feel that the case against them is unfair, that what is

8  being presented as the facts are -- they dispute the facts, but

9  I think they recognize or acknowledge that there's a -- that

11:08:42  10  all this occurs within a particular legal framework and they

11  have respect for or have an appreciation for that legal

12  framework.

13      I think he primarily does not -- even though he's

14  answered those facts about this legal framework, I think he is

11:09:05  15  completely preoccupied by his idea that this is all about his

16  role as a key figure to fight the anti-Christ, and I think

17  that's what dominates his thinking.

18  BY MR. HERMAN:

19  Q.  So, for instance, you had mentioned in your answer to my

11:09:23  20  question the University of Medinah.

21  A.  Yes.

22  Q.  And I asked you questions yesterday about your opinion

23  about Mr. Daoud, the realistic expectations of him and his

24  ability to become a Muslim scholar of some fame.

11:09:41  25  A.  Yes.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 64 of 135 PageID #:1907
Xenakis - redirect by Herman
255

1    Q.  And I believe your testimony was that that was an element

2    of his grandiosity.

3    A.  Yeah.

4    Q.  Which fell within a subtype of delusional disorder.

11:09:51    5    A.  Yeah.

6    Q.  Okay.  So if Mr. Daoud believes that this prosecution was

7    instituted against him to prevent him from being a scholar,

8    does that have an impact on this?  Is that an example, would

9    you say, of his delusional disorder?

11:10:11   10    A.  Yes.

11    Q.  Could you explain that?

12    A.  Because it primarily is the basis for his thinking of how

13    this case is being conducted, it is -- it dominates his entire

14    perspective on the case.

11:10:26   15    Q.  So would you say that -- well, let me take it a step back.

16    You testified that you have some familiarity with the Muslim

17    faith, correct?

18    A.  Yeah.

19    Q.  To your knowledge, is the Illuminati mentioned anywhere in

11:10:46   20    the Koran?

21    A.  Not that I -- I mean, I've read the Koran.  I don't recall

22    it in any part of the Koran.

23    Q.  Are reptile overlords part of a major religious tenet of

24    Islam?

11:11:03   25    A.  I don't think so at all.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 65 of 135 PageID #:1908
Xenakis - redirect by Herman
256

1   Q. All right. Now, you were familiar with -- you were asked

2   questions about the DSM definition of "delusion."

3   A. Yes.

4   Q. Okay. You're familiar that that definition states:

11:11:15   5       "The belief is not ordinarily accepted by other

6   members of the person's culture or subculture" --

7   A. Yes.

8   Q. -- "i.e., it is not an article of religious faith."

9   A. Right.

11:11:26   10   Q. Would you say Mr. Daoud's views are an expression of his

11   religious faith?

12       Well, let me rephrase that. Would you say that his

13   belief in the Illuminati is a mere expression of his religious

14   faith?

11:11:42   15   A. No.

16   Q. Would you -- when we're talking about the Illuminati, do

17   you think that this is Mr. Daoud's belief to be put on the same

18   level as other conspiracy theorists about the Illuminati?

19       Let me rephrase that.

11:11:56   20   A. Yeah.

21   Q. Daoud's beliefs about the Illuminati are much more

22   particularized than a generalized conspiracy theory.

23   A. That's the way I've interpreted them.

24   Q. And in what way?

11:12:10   25   A. Because they truly are -- he has a conviction about them.

1    It's been a consistent conviction all along, and it is the

2    basis for him to understand and explain why he is now a

3    defendant in this court case.

4    Q.  And is there any specific -- in terms of the players and

11:12:32    5    the parties and the Court, is there any specific relevance to

6    his belief in the Illuminati in connection with his delusional

7    disorder?

8    A.  I mean, there's a specific aspect that has to do with that

9    when you as defense attorneys are in the court, he feels that

11:12:51    10    you are part of the Illuminati and, therefore, are adversarial

11    agents to him.

12    Q.  And in your opinion, is that reflective of this circular

13    reasoning that you had discussed before?

14    A.  Yes.

11:13:11    15    Q.  Again, could you please explain why, because I think it's a

16    very important point.

17    A.  So I believe -- so I see his thinking going this way:  I

18    have been unfairly targeted.

19         It starts with:  I'm going to become an Islamic

11:13:32    20    scholar.

21    Q.  Which we would believe -- I'm sorry to interrupt -- which

22    we would believe would be preposterous.

23    A.  Unlikely.

24    Q.  Okay.

11:13:39    25    A.  At 18.  But he states that.  He believes it, and he has a

1    particular perspective on it that even as he was describing his

2    self, you know, himself at that time, it seemed grandiose and

3    unrealistic.

4              THE COURT:  Excuse me.  Why?

11:14:03    5              THE WITNESS:  Because when you --

6              THE COURT:  Why at 18 can't you make plans about what

7    you're going to be?  Why is that grandiose?

8              THE WITNESS:  No, I don't think that.  I think that's

9    exactly the issue.  I think that we want 18-year-olds to make

11:14:15   10    plans about what they're doing.  We also know how hard it is

11    sometimes when we're talking with 18-year-olds to be realistic

12    about what their goals and objectives are.

13              THE COURT:  And what is unusual about that?

14              THE WITNESS:  Nothing.  That is not unusual.  So this

11:14:30   15    is a qualitative perception in the way that he explained it to

16    me and his -- and the openness he had to understanding what the

17    steps were going to be to, in fact, achieve that goal.  I know

18    that there's a lot of variation, and that's why it took me a

19    year to decide, you know, was this just a variant of normal,

11:15:01   20    quote-unquote, or was this delusional.

21              It is qualitative, but the way that I -- now that I

22    look at that, I mean, I don't know what he was at 18 because I

23    did not examine him.  So now I'm having to sort of reformulate

24    and try and establish some idea of his thinking at that time.

11:15:20   25    So I think at 18 one would say, all right, he's an 18-year-old

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 68 of 135 PageID #:1911
Xenakis - redirect by Herman
259

1  and he's got high objectives.  They're unrealistic for a number

2  of reasons, but perhaps he's got the capacity to achieve those

3  objectives.  He's going to go to Medinah, and he's going to do

4  that.  We'll see how that unfolds.  I think that's very, you

11:15:40  5  know --

6          THE COURT:  Doctor, does delusional disorder

7  necessarily negate competency to stand trial?  Is that -- can

8  they not exist together?

9          THE WITNESS:  Well, they can.  I mean, they can exist

11:15:58  10  together.

11          THE COURT:  So someone can have that disorder and

12  still be competent to stand trial.

13          THE WITNESS:  And still be able to do all sorts of

14  things.  I mean, you know, look, we had a Nobel Prize winner

11:16:09  15  who was probably paranoid, a delusional disorder, and wrote a

16  paper as a graduate student that ended up getting a Nobel

17  Prize, and he was clearly psychotic.  That is very unusual, but

18  he was able to compartmentalize his delusion from his work.

19          So you can, in fact, have both.  They can occur.  The

11:16:37  20  question is how much does, for lack of a better term, the

21  delusion infect, influence, or form what is your daily work

22  process, right?  He fell apart as his delusions got worse,

23  right?  He could no longer work at the high level that he had

24  worked before.  I'm talking about the movie.

11:16:57  25          So it's not an either/or.  I mean, you can have a

1   delusional disorder and be competent and do very good work.  On

2   the other hand, if you have a delusional disorder that, in

3   fact, informs your daily life and your capacity to work and to

4   have relationships, then I think in my expert opinion you lose

11:17:20   5   your competence in those areas.

6            THE COURT:  And how much did the death of his cellmate

7   come to play into this?

8            THE WITNESS:  At this point, I think significantly.

9            THE COURT:  And that would be recent.

11:17:32   10            THE WITNESS:  That would be recent.

11            THE COURT:  You can ask questions on that, obviously.

12            MR. HERMAN:  Thank you, Judge.

13            THE COURT:  So can the Government.

14   BY MR. HERMAN:

11:17:40   15   Q.  So, doctor, based on what you have just said in response to

16   Judge Coleman's questions, is there anything particular about

17   those questions that would inform your opinion about why

18   Mr. Daoud cannot cooperate with the defense specifically?

19   A.  Yeah.  I think these ideas at this point in time and the

11:18:03   20   events have now so affected his mental state that he cannot

21   engage and act in a way that will effectively assist him in his

22   defense.

23   Q.  And in particular with respect to the death of his

24   cellmate, is there anything specific with that aspect of the

11:18:24   25   more recent background of Mr. Daoud that would affect his

1    ability to properly assist the defense?

2    A.  I think it really shocked him.  I think as I've -- I asked

3    the family.  It was the first death of someone who he had been

4    close to that he had witnessed, and I think in his mind it now

11:18:44    5    affirms that he's a target and that now he will be the next

6    person to be killed.

7    Q.  And you're aware that that other individual had a case

8    before the same court?

9    A.  Yes, I am aware of that.

11:18:58    10    Q.  And are you aware that, again, Mr. Daoud believes the Court

11    is part of the Illuminati?  Is that your understanding?

12    A.  Yes, yes.

13         THE COURT:  Let me ask this.  So, doctor, when someone

14    is incarcerated and not really available and doesn't have a lot

11:19:17    15    of outside stimulus and information, that belief that he's a

16    target, would that be unreasonable and mean that he's

17    incompetent?  I think it's a very reasonable --

18         THE WITNESS:  Right, but I have not seen -- it's

19    qualitatively different in the other inmates that I've seen.  I

11:19:34    20    mean, they think that they're being treated unfairly, but it

21    has a different character than this has.  Even if they --

22         THE COURT:  Well, there's a difference between being

23    treated unfairly and saying:  Oh, he died.  He was a friend.

24    Therefore, I might go.

11:19:51    25         THE WITNESS:  I'm next.

1        THE COURT:  Is that unreasonable?

2        THE WITNESS:  Yes, I think that's an idea of

3   reference.  That's what we see as -- depending on

4   circumstances, depending on how this person died, depending on

11:20:05   5   what happened, you get all sorts of different accounts that

6   this person was set up, you know, or this person was ignored or

7   he tried to tell people, I mean, indicated and conveyed that he

8   was suicidal or he had an illness.  I had a case of a person

9   who died of a heart attack.

11:20:24   10       It's all those bit details.  But depending on how

11   those are processed by the individual, the question is:  Is

12   this an idea of reference?  Is it a reasonable way of fear and

13   shock?  Is it something that really is an indication of more of

14   a serious mental illness?

11:20:39   15       THE COURT:  And my next question would be:  Still,

16   would that be a separate a matter of this fear because of what

17   had happened and the fear about his own safety from competency

18   to stand trial?  Could they be, as you stated earlier,

19   compartmentalized?

11:20:58   20       THE WITNESS:  They can be, and the question is:  Does

21   the person compartmentalize or not?  That is probed, you know.

22   So there's a set of questions.  You know, in his specific case:

23   The Judge has ordered me to be executed.

24       How do you come to that conclusion, and what is the

11:21:21   25   association and linkage to that individual's suicide.

1    BY MR. HERMAN:

2    Q.  Doctor, can I go into one other example that may relate to

3    this idea of reference or circular reasoning that's connected

4    to Mr. Daoud's ability to assist properly in his defense, and

5    we touched on it yesterday, which is Mr. Daoud's idea that he

6    can resolve the case by going to Syria?

7    A.  Yeah.

8    Q.  Okay.  I believe it's germane to the Court's questions.

9    Can you explain again how that is an idea of reference or it

10   represents that?

11   A.  Well, the sequence of that, I mean, he conjured that as he

12   was thinking that the President was going to direct the outcome

13   of his case and that the President could, therefore, arrange

14   this particular solution for him.

15   Q.  And are there similarities between that thought process and

16   the thought process connected to a belief that Judge Coleman,

17   being part of the Illuminati, will order his execution because

18   his cellmate died and he had a case before Judge Coleman?

19   A.  So he thinks that he really is the focus of this and the

20   President.  So it's the grandiosity that we see unfortunately

21   in these kinds of illnesses, that he really has that attention

22   and focus and that people will have the power and are concerned

23   to act in that particular way.

24   Q.  And does that in your opinion affect his ability to assist

25   properly with his defense?

1  A.  I think it preoccupies his thinking, and I don't think that

2  the attorneys can effectively work with him.

3       MR. HERMAN:  One second.

4       (Discussion off the record.)

11:23:12  5  BY MR. HERMAN:

6  Q.  Sir, I know you're not a lawyer, but you've testified in

7  court proceedings before.  Are you generally familiar with the

8  plea agreement process?

9  A.  Yeah.

11:23:39  10  Q.  Okay.  What's your understanding of that in a criminal

11  case, what a plea agreement involves?

12  A.  You know, I guess as I understand it there's conversations

13  between the attorneys of what might be a solution in the case,

14  a plea.  I'm not sure.  I haven't figured out who really drafts

11:24:03  15  the plea, but it seems that the Government or the prosecution,

16  you know, is really the actor here.

17  Q.  So if the prosecution were to present the defense with a

18  potential plea agreement which would involve a sentence of some

19  sort for this particular case and it was then presented to the

11:24:25  20  defendant, in light of his belief about going to Syria, do you

21  think he could, the defendant, Mr. Daoud, properly assist the

22  defense in analyzing the plea agreement?

23  A.  No.  I mean, let me make sure I understand your question.

24  If there's a plea agreement on the table and the defendant,

11:24:45  25  Mr. Daoud, feels that the solution or the only acceptable

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 74 of 135 PageID #:1917
Xenakis - redirect by Herman
265

1  solution is to join the Free Syrian Army and that's not part of

2  the plea agreement, in his delusional state he would reject the

3  plea.

4           MR. HERMAN:  One second, please.

5           THE COURT:  While you're getting your other question,

6  I have a question, doctor.  You talked about his grandiose

7  views.  Does having grandiose views, again, necessarily mean

8  that you can't participate in your defense?

9           THE WITNESS:  No.

10          THE COURT:  There's plenty of people who may say the

11 system is rigged against all green people.

12          THE WITNESS:  Absolutely.

13          THE COURT:  And they will stick with that until the

14 trial.

15          THE DEFENDANT:  Right.

16          THE COURT:  Till the end of the trial.

17          THE WITNESS:  Right.

18          THE COURT:  But that doesn't mean that they can't

19 participate in their defense, does it?

20          THE WITNESS:  Right, right.  It doesn't mean that at

21 all.

22          THE COURT:  And what's your solution with someone if

23 you feel that they do have an issue where they're not

24 competent, such as this person in this case?  How do you

25 resolve that?  I mean, is there -- will that person ever be

11:25:01 (line 5)
11:25:14 (line 10)
11:25:26 (line 15)
11:25:33 (line 20)
11:25:42 (line 25)

Xenakis - redirect by Herman

1    competent?

2        THE WITNESS:  I mean, they can.  I mean, they can.  I

3    mean, it's all about the treatment and how that's delivered.

4        THE COURT:  And what would the treatment plan be in

11:25:59    5    this case?

6        THE WITNESS:  If I were treating him, I would -- and

7    he would reject it, undoubtedly.  My clinical experience is

8    very low-dosed medications and lots of verbal therapy in

9    support and work with the family and employment and school.  I

11:26:20   10    mean, there's a whole wrap-around system here that has to be

11    provided.

12        THE COURT:  As an aside, do you think if there had

13    been more support at the time of the death of his cellmate that

14    we might not be at this position?

11:26:37   15        THE WITNESS:  It's possible.

16        THE COURT:  Do you know if there was any support

17    whatsoever for him at that time?

18        THE WITNESS:  I don't know.  I didn't glean that from

19    the notes, the medical notes.

11:26:50   20        THE COURT:  It was an aside.

21        THE WITNESS:  Okay.  I'm sorry.

22        THE COURT:  No, it's me.

23        THE WITNESS:  Okay.

24        THE COURT:  All right.  Anything further, counsel?

11:26:57   25        (Discussion off the record.)

1      THE COURT:  Anything further?  I've gotten quite a bit

2    of information.  Anything further?

3      MR. HERMAN:  Just one second.

4      (Discussion off the record.)

11:27:21   5      MR. HERMAN:  That's it.

6      THE COURT:  All right.  Anything further, particularly

7    on the Court's questions, Mr. Ridgway?

8      MR. RIDGWAY:  Just a couple of questions.

9      THE COURT:  Okay.

11:27:29  10                    RECROSS-EXAMINATION

11   BY MR. RIDGWAY:

12   Q.  A couple of questions I think you were asked --

13      MR. DURKIN:  Judge, excuse me.

14      THE COURT:  I'm sorry?

11:27:42  15      MR. DURKIN:  The reason we were discussing earlier,

16   rather than inquire with more questions, we'd like to submit

17   the written opinion of the Second Circuit -- or the district

18   court that Mr. Ridgway referred to so that you have it in its

19   entirety.

11:27:57  20      THE COURT:  Well, obviously you can do that.  We'll

21   discuss it, but let's finish him up.

22      Mr. Ridgway?

23   BY MR. RIDGWAY:

24   Q.  You had a couple of questions about distinguishing between

11:28:09  25   people who think the system is unfair and people who are

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 77 of 135 PageID #:1920
Xenakis - recross by Ridgway
268

1    incompetent for reason of thinking the system is unfair.  Do

2    you recall those questions?

3    A.  Yeah.

4    Q.  And one of the things which I think you said that

5    distinguishes them is that the ones who are competent at least

6    have, quote, an appreciation for the legal framework.  Is that

7    something that you said?

8    A.  Yes.

9    Q.  So it's your opinion that an appreciation for the legal

10   framework is one of the distinguishing features between those

11   who are competent and those not competent?

12   A.  Yes.  I mean, right.  I used the word "appreciation" just

13   as a shorthand.

14   Q.  Sure.

15   A.  There's a lot that goes into that.

16   Q.  And let's assume that, you know, the defendant is suffering

17   from delusional disorder and that there are some questions

18   about just competency and an ability to work and aid in his

19   defense.  Is that okay?

20   A.  Okay.

21   Q.  One of the questions I had is this.  So if he suffers from

22   delusional disorder, that doesn't prevent a defendant from

23   being able to, for example, recommend witnesses for the trial,

24   is that right?

25   A.  No.

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 78 of 135 PageID #:1921
Xenakis - recross by Ridgway
269

1  Q.  And if he's suffering from delusional disorder, that

2  doesn't prevent the defendant, for example, from recounting

3  events about the case, is that right?

4  A.  No.  Oddly, paradoxically, sometimes they're even better

11:29:28  5  at, because of the paranoia, remembering facts.

6  Q.  Right.  And that's reflected in part in that

7  couple-hundred-page document recounting the facts?

8  A.  Sometimes we use that as a sign.  Oh, this person has got

9  real paranoia and/or real manic process going on because they

11:29:45  10  will give you what we call circumstantiality.  They'll just

11  inundate you with details.

12  Q.  And one of the things that you said on redirect is that the

13  defendant is, you believe, unable to compartmentalize the

14  issue, is that right?

11:30:02  15  A.  Yes.

16  Q.  And that he is unable to effectively assist in the trial,

17  is that what you said?

18  A.  Yeah.

19  Q.  What do you mean by "effectively assist"?

11:30:12  20  A.  I think that when there are certain questions or issues

21  that the attorneys want to discuss with him, even though he may

22  even acknowledge the facts, his impulses and his thinking so

23  overwhelm him that they intrude in that conversation and in the

24  decision-making that is being required of him at that point of

11:30:37  25  the interaction between the attorneys and him.

1   Q.  Can you be more specific about what scenario in trial you
2   think it's going to infect the process?
3   A.  I mean, I'm not part of the legal team.  I don't know how
4   they're working their process.
11:30:55  5   Q.  You understand, though, your ultimate conclusion is that he
6   is unable to assist in his defense, is that correct?
7   A.  Right, because I see his impulses interfering as I talk to
8   him about issues, and I cannot envision how those -- it seems
9   to me, take the plea agreement as an example.  His impulse that
11:31:22  10  the President is preoccupied with him or at least has him in
11  his radar scope and, therefore, he would arrange to go to the
12  Free Syrian Army is so preposterous and absurd that it is hard
13  for me to conceive that he can effectively assist in his
14  defense.
11:31:41  15  Q.  What about in a trial, though?
16          MR. HERMAN:  Judge, objection.  This legal standard is
17  to effectively assist in a defense, not the --
18          THE COURT:  Objection sustained.  He just said his
19  defense at the trial.  How is that different, Mr. Ridgway?
11:31:54  20          MR. RIDGWAY:  Right.  My question is --
21          THE COURT:  Your question is basically the same.
22          MR. RIDGWAY:  Yeah, that's right.  I just don't know
23  that I got an answer to that question.
24          THE COURT:  All right.  Go ahead and ask it.
11:32:07  25  BY MR. RIDGWAY:

Case: 1:12-cr-00723 Document #: 222 Filed: 10/03/16 Page 80 of 135 PageID #:1923
Xenakis - recross by Ridgway
271

1   Q.  Just more specifically in the context of a trial, I'm

2   trying to understand specific examples you think would be

3   situations in which the defendant is unable to assist the

4   defense in the trial.

11:32:23   5   A.  I don't know.  I mean, that's so broad.  I don't know how

6   to answer, honestly.  I mean, there are so many scenarios here

7   to be thought through.  I don't know how to answer that

8   question.

9           THE COURT:  All right.  That's your answer, sir.

11:32:41   10          MR. RIDGWAY:  Nothing further.

11          THE COURT:  All right.  Thank you.

12          Is there anything further before I let him step down?

13          MR. HERMAN:  No, Judge.  Thank you.

14          THE COURT:  All right.  Thank you very much, doctor.

11:32:48   15          THE WITNESS:  Oh, thank you.

16          THE COURT:  I hope you get out since it's been raining

17   outside.

18          THE WITNESS:  I hope so.

19      (Witness excused.)

11:32:58   20          THE COURT:  All right.  Who do we have next, defense?

21          MR. DURKIN:  Could I have a -- could we just take a

22   short recess, Judge?  I think the defendant is next.

23          THE COURT:  Five minutes.  Five minutes.

24          MR. DURKIN:  All right.

11:33:07   25          THE COURT:  We've got to keep going here.  Five

272

minutes.

MR. DURKIN:  That's all.  I just wanted to say something to him.

THE COURT:  All right, five minutes.  If he's going to testify, perhaps we need to take him for a break.  Thank you.

(Recess.)

11:33:12

1    THE COURT:  All right.  You may be seated.  How are
2  you proceeding, Mr. Durkin?

3    MR. DURKIN:  Judge, pursuant to the statute we have
4  discussed with Mr. Daoud that he has a constitutional right and
5  a statutory right to testify under 18 U.S.C. 4247 (d), "the
6  person shall be afforded an opportunity to testify."  And we've
7  told him that it's against our advice, but he wishes to testify
8  in any event.

9    THE COURT:  All right.  Anything to add here,
10  government.

11    MR. RIDGWAY:  No, Your Honor.

12    THE COURT:  All right.  Then Mr. Daoud can testify.
13  Marshals, will you please escort him to the witness stand.

14    ADEL DAOUD, DEFENDANT, DULY SWORN

15    THE COURT:  Please step up.  When you get up here,
16  push that mike back so you can sit down.  All right.  Listen to
17  each question your lawyer asks before you answer.  I will warn
18  you, Mr. Daoud, if you go off on a long rambling speech, it
19  will be cut short --

20    THE WITNESS:  My speech is over there --

21    THE COURT:  Sir.  Sir, you're starting already.  Just
22  listen.  Just listen.  Okay.  All right.  So you'll get to tell
23  your side or get to say what you want to say, but you have to
24  do it in a respectful, concise manner.  Okay?

25    THE WITNESS:  Okay.

Daoud - direct by Durkin

1        THE COURT:  All right.  Thank you.  Proceed.

2                       DIRECT EXAMINATION

3    BY MR. DURKIN:

4    Q    Would you state your name and spell your last name for the

5    court reporter, please.

6    A    Adel Daoud.  My last name?

7    Q    Spell it?

8    A    D-A-O-U-D.

9    Q    And are you the defendant in these proceedings?

10   A    I am the hostage, yes.

11   Q    You consider yourself to be a hostage, am I right?

12   A    Yes, sir.

13   Q    Would you explain to the judge why you think you're a

14   hostage as compared to a defendant.

15   A    When you put someone in a car, you know he isn't going to

16   do nothing wrong, even if you try and justify it, it makes you

17   a hostage.  When you are arrested -- not arrested, same thing.

18   When they nap you, you know what I'm saying.  Yeah, when --

19   when they take you in custody, and it's basically just because

20   your affiliation with a certain group of people, that's what

21   usually a hostage situation is like.

22   Q    You mentioned the word nap you.  What do you mean by that?

23   A    Kidnap you.  I'm a kid.  They napped me.

24   Q    And do you believe you were kidnapped?

25   A    Yes.

275

Daoud - direct by Durkin

1   Q    Now, and you mentioned just a minute ago that you believed
2   this had to do with something that -- of a group or something
3   that you believe in or belong to.  What --
4   A    Are you talking about the Illuminati?
5   Q    No.  I'm talking --
6          THE COURT:  Mr. Daoud, again we have a court
7   reporter, and you have to speak one at a time.  You can't
8   interrupt him.  All right.  Proceed.
9   BY MR. DURKIN:
10  Q    I thought you just said that you thought that the reason
11  you were kidnapped was because of some affiliation that you
12  have.
13  A    Yeah.
14  Q    And which affiliation is that?  Your religion?
15  A    I'm Muslim.
16  Q    And what is it about your being relig -- being a Muslim
17  that makes you think that you were kidnapped?
18  A    Of course, a lot of people ask me that, oh, well, there's
19  a lot of Muslims in America and they're not in jail.  So you
20  weren't arrested because you're Muslim.  No, that's really not
21  true.  They -- to them, for lack of better terms, I'd say that
22  the, the ones who kidnapped me consider me too Muslim.
23  Q    What do you mean by that?
24  A    Well, when they think a Muslim knows too much or the
25  Muslim understands his religion and wants to properly teach and

Daoud - direct by Durkin

1   instruct their religion or promote their religion and they're
2   against that religion, you know, that, that's what I mean they
3   kidnapped me because I'm Muslim, because everything I believe
4   and everything I said was for Islam and it's for being Muslim.
5   If I wasn't a Muslim, I wouldn't be here period.
6   Q   And was there anything in particular you were trying to
7   become at the time you were kidnapped?
8   A   For over a year I have decided that I wanted to go to a
9   Madressa.  And I was thinking of different places here and
10  overseas, and I eventually came to the conclusion I wanted to
11  go to Medina University.  I wanted to become a scholar of the
12  sciences of Islam.  Two months before I was supposed to go or a
13  few months, I don't know exactly, I was kidnapped and stopped
14  from going to this school.
15  Q   Now, when we discussed with you the idea of your
16  testifying today, we told you we thought it was not in your
17  interests, correct?
18  A   That's how I took it, yeah.
19  Q   But you nevertheless thought the better of that and
20  decided you wanted to testify, correct?
21  A   Yeah.
22  Q   And I told you that you had a statutory and constitutional
23  right to do that, correct?
24  A   Yeah.  Whatever that means, but yeah.
25  Q   You told us in the lockup earlier that you wanted to

277

Daoud - direct by Durkin

1  explain to the judge why you believe you are incompetent and
2  everyone else is incompetent, is that correct?
3  A    Why I am competent, right?
4  Q    That you are competent and everyone else is incompetent.
5  A    Yeah.
6  Q    Yes.  Can you explain that?
7           THE COURT:  Before he explains that, Mr. Daoud, what
8  does competency mean?
9           THE WITNESS:  It can either mean --
10          THE COURT:  You need to speak in the mike.  I'm
11  sorry.
12          THE WITNESS:  My bad.
13          THE COURT:  That's okay.
14          THE WITNESS:  Because you're right next to me.
15          THE COURT:  No problem.
16          THE WITNESS:  The ability, I guess the ability to
17  stand trial.  The ability to be fair and just and logical to go
18  through court proceedings.
19          THE COURT:  All right.  So when you say you're
20  competent, you believe you're able to do that, is that correct?
21          THE WITNESS:  Yeah, absolutely.
22          THE COURT:  All right.  Proceed.
23  BY MR. DURKIN:
24  Q    And am I correct -- explain to the judge why you think you
25  have the competency to stand trial.

Daoud - direct by Durkin

1  A    I think I'm the same as I've always been.  In fact, since
2  I got arrested I consider myself in a better mental state than
3  I've ever been in my whole life.  So that's not saying --
4  that's not saying a lot because I still got like -- in many
5  ways oblivious.  You know, I'm not, I'm not totally, totally
6  like -- I'm not saying I'm like a genius or something or like
7  super super smart always.  I'm just saying, you know, if I was
8  crazy -- if I'm crazy now and this is the best state that I
9  think I've been in, I had to be crazy forever, you know what
10 I'm saying, like -- I mean, do you want me to elaborate more or
11 not?
12 Q    Sure.
13          THE COURT:  No, the Court wants a question.
14          MR. DURKIN:  All right.
15          THE COURT:  Thank you.
16          THE WITNESS:  Well --
17          THE COURT:  No, no.  He's got to ask a question.
18 Yes.  All right.
19 BY MR. DURKIN:
20 Q    When you say that you feel as though you are in the best
21 mental shape you've ever been in --
22 A    Yeah.
23 Q    -- does, does that mean you do not feel that you've had
24 any deterioration in your mental state or abilities since you
25 were arrested?

Daoud - direct by Durkin

1   A    That's right.

2   Q    In fact -- and you've heard Dr. Xenakis testify that he

3   believes you were deteriorating, correct?

4   A    I've heard this, yeah.

5   Q    So I take it you would disagree with his opinion that you

6   were deteriorating?

7   A    Highly so.

8   Q    Can you explain why it is that you not only think that you

9   haven't deteriorated but that you think your mental state has

10  improved since you've been locked up.

11  A    Okay.  This is -- I don't know if this is embarrassing.

12  Maybe it's a little personal.  But a classic big example is

13  that I've been talking to myself since I was seven years old

14  like nonstop so long as I didn't think people was in the room

15  until a year or two years after being in jail, you know.  And

16  the only reason I stopped talking to myself was because I had a

17  cellee who was nuttier than me.  And I didn't want to be like

18  him, so I stopped.  Sometimes I have to stop myself from

19  talking to myself, but generally I got it back, and I'm not

20  doing that.  So that's a huge improvement.

21  Q    All right.  And when you talk to yourself, would you

22  frequently get answers?

23  A    I don't even understand what that means.  Everybody,

24  everybody I've ever told that I talk to myself, they said,

25  okay.  When you talk to yourself, do you answer yourself?  I

280

Daoud - direct by Durkin

1  can have a conversation by myself.  I don't need a second

2  person.  I can imagine what that other person says.  You know,

3  I can just -- I can do this without you being here.

4  Q    Okay.

5  A    If I wanted to.  I don't do that no more.

6  Q    Who was the inmate that you were incarcerated with that

7  was talking to himself more than you did that caused you to be

8  able to break your habit of talking to yourself?

9  A    Do you want his name?

10  Q    Yes.

11  A    He was my 18th cellee.  He's Anthony Nugent.

12  Q    That's -- what's the name of the individual -- you have

13  been -- you were incarcerated with an individual who committed

14  suicide, correct?

15  A    Yes.

16  Q    What was his name?

17  A    Alex Gilbert.

18  Q    Where was -- when did -- when were you housed with

19  Mr. Gilbert in relation to being housed with Mr. Nugent?

20  A    Well, Anthony Nugent was my 18th cellee.  And Alex Gilbert

21  was my 49th cellee.  That's how I remember it.

22  Q    So you've had 49 different cellmates?

23  A    No.  Alex Gilbert was my 49th cellmate.  I am now on my

24  58th cellmate.

25  Q    Did, did Alex -- Alex Gilbert committed suicide, is that

Daoud - direct by Durkin

1  right?

2  A    Yes.

3  Q    Did that have any impact on you?

4  A    It was kind of messed up.  I knew him for two years.

5  Q    But you heard Dr. Xenakis testify today that he thought

6  that had an impact on your mental state.  Do you agree or

7  disagree?

8  A    I think the same way that other people are affected by the

9  death of loved ones shouldn't be different for me.

10  Q    Well, I don't disagree that it shouldn't be, but the

11  question was did it?

12  A    I don't think so.

13  Q    Okay.  Now, one of the things we discussed this morning is

14  that you wanted to tell the judge about other alternatives that

15  you thought the criminal justice system was capable of doing

16  for you.  Am I right?

17  A    Yes.

18  Q    Would you explain --

19       THE COURT:  Excuse me, Mr. Durkin.  What does this

20  have to do with the issue at hand?  If he just wants to tell me

21  his ideas about the system.

22       MR. DURKIN:  Let me put it this way.

23       THE COURT:  Thank you.

24  BY MR. DURKIN:

25  Q    There was a time when you and I and Mr. Herman and perhaps

Daoud - direct by Durkin

1  Miss Waters or maybe other people from my office over time

2  discussed possible plea agreements, am I right?

3  A    Okay.

4  Q    You remember that?

5  A    Yes.

6  Q    And do you recall there coming a time in the context of

7  discussing the plea agreement that you told me that you didn't

8  want the plea agreement the government had offered.  That you

9  wanted me to ask them about you being able to go fight for the

10  Free Syrian Army?

11  A    Yeah.

12  Q    And that was in the context of discussions about how to

13  resolve your case, am I right?

14  A    Yes, because they are trying to negotiate with me.

15  Q    Right.  And I told you the government wanted to negotiate

16  with you, correct?

17  A    Yes.

18  Q    I also told you that there had been conversations in court

19  about hoping to resolve this case, right?

20  A    Okay.  Yeah.

21  Q    And in that context you told me that you wanted me to talk

22  to the government about being permitted to go fight for the

23  Free Syrian Army, correct?

24  A    Yes, or Jaysh al-Islam or any other moderate Syrian group.

25  Q    Do you recall what I told you when you suggested that?

Daoud - direct by Durkin

1  A    The thing I remember is that you asked the prosecutor, and
2  you came back and said they laughed at you.
3  Q    You remember me telling you before I even went to talk to
4  the government that they would -- that I predicted they would
5  laugh at me?
6  A    I think you were skeptical about it, but I don't know what
7  you said.
8  Q    And after I spoke to the government, I told you that they
9  laughed at me, correct?
10  A    After you spoke?
11  Q    Strike that.
12        When I -- I told you that I had conveyed your request
13  to Mr. Ridgway, Mr. Haxall, and Mr. Jonas; correct?
14  A    Yes.
15  Q    And that was in a meeting that we had at the U.S.
16  Attorney's office where you had been present in another room,
17  correct?
18  A    Yeah.
19  Q    And that whole -- it was the hope of those meetings that
20  we could try to resolve your case, correct?
21  A    Yes.
22  Q    And after I told you that they had laughed at me, am I
23  correct that you then decided that you would write President
24  Obama because you thought he had the authority to do that?
25  A    I -- also I did write to Obama but it was because, you

1  know, you said they laughed at you.  So I said why don't you

2  just ask the judge.  You know, they work for her.  So ask the

3  judge.  Then you said something like I don't think the judge

4  could do that.  So I said ask someone higher than her or tell

5  her to ask someone higher than her.  And I was pretty sure I

6  got -- I got the impression from you that you weren't going to

7  do that.  So I guess if you want something done right, you got

8  to do it yourself.  So then I thought about writing Obama.

9  Q    Did I -- do you recall me telling you right after the

10  conversation I had with the prosecutors when they laughed at

11  me, that it was not within the range of alternatives in a

12  federal criminal case for the prosecutors or the Court or the

13  President, for that matter, to agree to let you go fight for

14  the Free Syrian Army?

15  A    So you're saying that you asked me if I knew this wasn't

16  possible?

17  Q    No.  I'm asking you do you recall me telling you that,

18  that that was outside the realm of possibility in the legal

19  system as it's designed to operate?

20  A    Something like that, yeah.

21  Q    Okay.  And you didn't believe me, did you?

22  A    I still don't believe you.

23  Q    You believe that Mr. Ridgway and his prosecutors or Judge

24  Coleman or President Obama could simply do away with these

25  proceedings and let you go get trained to fight for the Syrian

Daoud - direct by Durkin

1  army -- to fight for the Free Syrian Army or any of the other
2  groups you just mentioned?

3  A    More than, more than capable.  If they themselves are not
4  able to do it, then I know that they know what phone number to
5  call, and they can make it happen.  It's not just they're not
6  able to do it.  It's just apparently after asking they don't
7  want to do it.  So I can't make someone do nothing so ...

8  Q    So I take it that -- am I correct in recalling that you've
9  told me that you would accept no plea agreement other than that
10 resolution, am I right?

11 A    A reasonable resolution.

12 Q    And to you that's the most reasonable resolution, correct?

13 A    It is for a number of reasons.  Do you like me to explain?

14 Q    Sure.

15 A    So it's -- it is probably the best solution and it is the
16 best solution because I wouldn't write to the President about
17 this solution not just for me, but other Muslims with terrorism
18 charges.  For example, for me specifically you said you think
19 I'm going to blow up a bunch of stuff in your country, right?
20 So that's cool.  You want to protect your country.  Yeah, I --
21 yeah, I understand that.  But the problem with that is that I'm
22 offering you, okay, you think I'm going to go and blow a bunch
23 of things up.  Send me a thousand miles, send me a million
24 miles away, and you never ever have to see me ever again.

25                And then they also worry about that I'm going to join

Daoud - direct by Durkin

1  a jihadi group. Okay. Well, you give money, you give arms to
2  Free Syrian Army. You could send soldiers. I mean, this is
3  not that hard to understand. People cooperate all the time,
4  and their cooperation is not praiseworthy at all. All they do
5  is lie --
6          THE COURT: Mr. Daoud --
7          THE WITNESS: My bad.
8          THE COURT: -- I want you to stop -- I want you to
9  stop your question for a while. And, Counsel, please don't ask
10 questions that lead to speeches. That was an open-ended
11 question that begged for him to give his statement. So I
12 understand why he did it. I don't fault you, Mr. Daoud. Let's
13 ask a question that deals with the issue at hand. Thank you.
14         MR. DURKIN: So you want me to lead him instead?
15         THE COURT: That's what you were doing, and they
16 weren't objecting. So lead if you need to. I believe we have
17 enough information, but you can ask a few more questions.
18 BY MR. DURKIN:
19 Q   Now, you have -- when we have discussed your case and how
20 to handle it, you have told me on a number of occasions that
21 you believe that Judge Coleman is part of the Illuminati,
22 correct?
23 A   Yes.
24 Q   And you believe that the prosecutors are part of the
25 Illuminati, correct?

Daoud - direct by Durkin

1  A    Yes.

2  Q    And you also believe that Mr. Herman and I are part of the

3  Illuminati, correct?

4  A    I want to elaborate on that.  You know, I said that

5  originally that you believe the same thing they believe and you

6  work with them and you're working with them against me.  You

7  keep saying you're part of Illuminati is just kind of like

8  confessing it.  I said you're part of Illuminati or at least

9  you believe the same things as they do and you're working with

10 them against me.  You keep saying you're Illuminati.  Are you

11 confessing it?

12 Q    My question is do you believe that Mr. Herman and I and

13 your defense team are part of the Illuminati?

14 A    Yes.  And if not, then you are directly corresponding and

15 working with them against me.

16 Q    And you believe that the Illuminati is some enlightened

17 group that secretly runs the world, am I right?

18 A    They are a group that say and believe that they're

19 enlightened because that's their name, Illuminati.  And they

20 are -- they are currently dominant in the world's powers and

21 affairs.

22 Q    And do you think that the Illuminati is ultimately

23 controlling this federal criminal prosecution?

24 A    Yeah.

25 Q    And you have also discussed concerns -- you've discussed

Daoud - direct by Durkin

1  with us your concerns about Freemasons, am I right?

2  A    It's related, yeah.

3  Q    And is that related to the Illuminati?

4  A    Yes.

5  Q    Now, you heard Mr. Herman ask Judge -- or ask Dr. Xenakis

6  about whether the Illuminati is mentioned in the Quran,

7  correct?

8  A    Yes.

9  Q    You know the Quran very well, don't you?

10 A    Well, probably more than, yeah, most people in this room.

11 Q    There's no mention of the Illuminati in the Quran, is

12 there?

13 A    No.

14 Q    That's not an Islamic religious belief, is it?

15 A    You don't have to believe in Illuminati to be a Muslim.

16 Q    The Illuminati is not part of the Islamic theology or

17 doctrine, correct?

18 A    No.

19 Q    That's totally separate, correct?

20 A    Yeah.

21 Q    Now, you have told me and Mr. Herman and Miss Waters on

22 several occasions that you believe you are soon to be executed

23 by beheading, am I right?

24 A    Yes.

25 Q    How long have you held that belief?

Daoud - direct by Durkin

1  A    I don't know.  I mean, I always thought it was a
2  possibility, but I don't know how long I really thought that it
3  was going to happen soon.
4  Q    So do I understand your testimony to be that you always at
5  least considered that to be a potential consequence of this
6  case?
7  A    This actually is beyond my case.  It's just me being
8  Muslim in general probably since I was 17.
9  Q    Okay.
10  A    Maybe yeah.
11  Q    I'm talking about -- since we're talking about competency,
12  I'm talking about the context of this case.  So listen
13  carefully.
14         Are you telling us that since you were arrested, you
15  have always thought in your mind that one of the consequences
16  or one of the potential outcomes of this case is that you could
17  be executed and beheaded -- or strike that.
18         Executed by beheading?
19  A    The specific thought of being beheaded is probably more
20  recent than when I got arrested.
21  Q    How recent has the beheading thought come to you?
22  A    Sometime before today.
23  Q    Well, quite a bit sometime before today, correct?
24  A    I mean, I don't know exact dates, man.
25  Q    Well, would it, would it be correct to say that it's at

Daoud - direct by Durkin

1    least one or two months?

2    A    Yeah.

3    Q    Okay.  But let's forget about the beheading.  The idea

4    that of the execution -- that you could be executed as a

5    consequence of this case is something you have believed from

6    the beginning, is that what I understand you to think?

7    A    Yeah.

8    Q    And has that thought grown more serious in your mind over

9    time?

10   A    I would say recently, yeah.

11   Q    Is there any connection to that thought with the death of

12   Alex Gilbert?

13   A    I thought that Alex Gilbert death was kind of like a

14   signal that it could happen -- that it, in fact, could happen

15   to me.

16   Q    Explain what you mean by it was a signal that that was

17   something that could happen to you.

18   A    He -- I believe that he was potentially given drugs to

19   push him to kill himself, and it was a way of execution.

20   Q    And who is it that you think gave him the drugs that

21   caused him to be -- to die?

22   A    Do I have to answer that?

23   Q    Yes.  Truthfully.

24   A    The judge.

25   Q    Okay.

Daoud - direct by Durkin

1  A    Well, maybe not directly.  But, you know, ordered.

2  Q    You think that that -- that Alex Gilbert's death was in

3  some way ordered by Judge Coleman?

4  A    It really seems so when she said his name after he said

5  hello for me.  After I -- she talked about him saying hello for

6  me.

7  Q    Let's discuss that in a little more detail.  How is it

8  that you came to learn that Alex Gilbert had said hello for you

9  in open court to Judge Coleman?

10  A    I knew from two sources.  He told me.  He was my cellee.

11  She told me in court.

12  Q    Okay.  And what -- in your mind what you do you understand

13  the -- how do you make the connection between learning about

14  Alex Gilbert's saying hello to the judge and somehow the judge

15  being connected to his death?

16  A    It's kind of like the way she said his name and when

17  she -- she thought I meant something else by it like when --

18  like when -- when he said -- she said what do you mean hello?

19  I said I just said -- you know, I said you're seeing Sharon

20  Coleman, right.  He said, yeah.  I said, dude, say something

21  for me.  Stick up for me.  He said, I ain't going to do that.

22  You freaking crazy.  I'm like, all right.  Well, okay.  Tell

23  her I said hey.  Tell her I said what's up.

24  Q    Did you just say that Alex Gilbert said you were crazy?

25  A    A lot of people tell me that I'm crazy not just

Daoud - direct by Durkin

1   Alex Gilbert.

2   Q    Now, let me -- let me back up a minute.  There is a

3   history of mental illness in your family at least with your

4   older brother, am I right?

5   A    Yes.

6   Q    And do you understand what mental illness your older

7   brother suffers from?

8   A    No.  It's impossible to discern.

9   Q    But you do know that he has been in and out of state

10  mental institutions, correct?

11  A    Between hospitals and jails, yeah.

12  Q    And those hospitalizations have all been the result of

13  some diagnosis of his mental condition, correct?

14  A    Yeah.

15  Q    In fact, do you recall the phone call we played the other

16  day in court about -- between you and Heba, your sister in

17  which she -- you had a -- part of the discussion where the two

18  of you are -- she said that you were beginning to sound the

19  same as Amr your brother?  You remember that?

20  A    Yeah.  And I argued with her, and she said -- she said,

21  you're just the same as Amr.  I said, okay.  Look, slow down.

22  All right.  I'm not anything like Amr.  We're two different

23  types of people period.  She said, okay.  But you're similar.

24  Don't even say similar.  That's an insult.

25  Q    You took offense at that because you thought that she was

Daoud - direct by Durkin

1  comparing your current mental state in that conversation to

2  Amr's mental state, correct?

3  A    Uh-huh.

4  Q    Now, you -- you had two separate -- you heard both phone

5  calls that were played of conversations between you and Heba,

6  correct?

7  A    The ones yesterday, yeah.

8  Q    Were you trying to provoke Heba?

9  A    Provoke means like what, intimidate?

10 Q    You heard Dr. DeMier testify, correct?

11 A    Yes.

12 Q    Dr. DeMier thought, if I remember his testimony correctly,

13 and you correct me if you heard it differently, that he thought

14 that it sounded like that was just a provocative call, an

15 intentional call on your part to be provocative.  Were you

16 trying to be provocative then?

17 A    The way he explained it is that he thinks I'm trying to

18 punish my sister for not writing letters to me.

19 Q    Right.

20 A    I mean, that's not what happened.  That's not how I meant

21 it.

22 Q    When you told your sister that you thought that you were

23 going to be executed soon, you genuinely believe that, don't

24 you?

25 A    Yeah.  She thinks like Muslims can't get killed for no

Daoud - direct by Durkin

1  reason.

2  Q    And you genuinely believe that you will be executed as

3  part of this legal proceeding, don't you?

4  A    Uh-huh.  Yes.

5  Q    And --

6          THE COURT:  If I can interrupt here.  You stated that

7  that was not how it went down with you and your sister.  Why

8  don't you explain the conversation between you and your sister

9  and why you talked to her the way you did and she talked the

10  way you did.

11         THE WITNESS:  She was arguing with me about --

12         THE COURT:  I need you to talk in the mike.

13  Everybody -- I can hear you, but everybody can't.

14         THE WITNESS:  It's kind of like when they give

15  lectures in the -- anyway, I get what you're saying.  You

16  asking me, I'm answering you but everyone's hearing me.  I got

17  you.

18         THE COURT:  Right.  Proceed.

19         THE WITNESS:  No.  We were just arguing about

20  something.  I don't even remember what it was about.  I

21  think -- I'm pretty sure she started the argument because I

22  don't, I don't argue with people like that.  Unless it's maybe

23  about religion.  But she was arguing about something.  It was

24  either about my endorsements of Donald Trump or something else.

25  So, you know -- so she argued with me.  She said, they might

295

Daoud - direct by Durkin

1  give you the death penalty.  The point is they don't have to

2  give me the death penalty, and they could kill me any time,

3  so -- and that's what they really might do really soon.  So

4  just don't -- you know.

5  BY MR. DURKIN:

6  Q   Now, when you say that right now, you really believe that?

7  A   I believe that I either will be executed or I'll be freed

8  by some miracle.

9  Q   The miracle, what type of miracle would it take for you to

10  be freed?

11  A   For any, for any reason if I get out of jail on these

12  charges, that's a miracle from Allah.  I don't even think it's

13  possible for me to get out without a miracle.  I get out of

14  this place, it's a miracle.

15  Q   Do you think that Allah would have the ability say to come

16  down here today and -- or send an angel down to swoop you right

17  out of here out of the hands of the two marshals that are

18  sitting there?

19  A   Yeah.

20  Q   You think that might happen?

21  A   I mean, Allah doesn't have to come down.  He doesn't have

22  to send angels, but he can send whoever he wants to help me.

23  Q   So far he hasn't sent you a good enough lawyer to do that,

24  right?

25  A   He can use you for whatever he wants.  And it might be a

Daoud - direct by Durkin

1  test.  Allah tests people by means of other people.

2  Q    Now, would you -- I want to go back to your conversation

3  with Heba.  Would you just open that up to tab 14.  That's

4  marked Defendant's Exhibit 14 at the bottom, correct?

5  A    Yeah.

6  Q    Now, you're familiar with that document, are you not?

7  A    I just wrote it, yes.

8  Q    Right.  This is something that you wrote yourself,

9  correct?

10 A    Yes.

11 Q    And it bears the date of August 6, 2016.  Does that date

12 reflect the day that was written?

13 A    Yes.

14 Q    And as you recall from listening to the calls yesterday,

15 that's between the -- that's after the first call with your

16 sister and before the second call, correct?

17 A    I think it's after the first call, and I don't know if

18 it's after the second.

19 Q    Well, if I told you that the second one was August 11th,

20 would that refresh your recollection?

21 A    If it was August 11th, then this is definitely written

22 before the second call.

23 Q    Okay.  And why did you write this?

24 A    Because there's two reasons.  And I mention this in my

25 will.  There's a Hadis that says if you have something to will

Daoud - direct by Durkin

1   before you die, you should do it before three days.  And I have

2   more reason to do so because I have more reason to believe that

3   I'll be executed.  So I wrote this will.

4   Q    And this is not a joke, right?

5   A    This is my real will.  I made wills -- I made probably two

6   or three wills before I got arrested.  I've done this before.

7   Q    But you genuinely believe -- believed at that time you

8   wrote this, as you still do now, that you were going to be

9   executed as a result of these proceedings, correct?

10  A    Yeah, a good possibility.

11          THE COURT:  Is there anything else, Counsel?

12          MR. DURKIN:  It sounds like there doesn't need to be.

13  Just one, Judge.  I just want to --

14  BY MR. DURKIN:

15  Q    Let me show you what the government showed Dr. Xenakis

16  today.  They had copies, but let me show you what I've

17  labeled --

18  A    Copies might be nicer.

19  Q    -- Defendant's, Defendant's Exhibit Daoud Letters

20  Originals.  Do you recognize those writings that are contained

21  in that plastic envelope?

22  A    Yes.

23  Q    And those are volumes that you wrote me and Mr. Herman and

24  our defense team in order to help us with your case, correct?

25  A    Yes.

Daoud - direct by Durkin

1  Q    Do you recall me telling you that when you sent the first
2  one that while I found it interesting, I found it very
3  difficult to read?
4  A    You say that about like most of the stuff I give you.  So
5  I wouldn't find that shocking.
6  Q    Well, but I'm talking about the very first one.
7  A    I don't remember the very first specific instance.  It
8  sounds like something you would say.
9  Q    Okay.
10 A    You say that a lot.
11 Q    And do you recall me telling you that there was such a
12 thing as too much information, or words to that effect?  That
13 this was too overwhelming to make a lot of sense?
14 A    I do remember I said to Joshua that there might be a lot
15 of useless information in there.  He's like, yeah.  But, you
16 know ...
17 Q    And we had asked you to try to tone it down, so to speak,
18 to not provide as much detail?
19         THE COURT:  And just so the record is clear, Joshua
20 Herman, not Mr. Joshua, am I correct?
21         THE WITNESS:  Yeah.
22 BY MR. DURKIN:
23 Q    Joshua Herman.
24 A    Yeah.  Yeah.  Yeah.
25 Q    My co-counsel.

299

Daoud - direct by Durkin

1    A    Yeah.

2    Q    You recall him telling you this was too much detail,

3    correct?

4    A    There was something wrong with it.  I remember that.

5    Q    But nevertheless you kept sending these, right?

6    A    I wasn't finished.  Of course, I did.

7    Q    Okay.  Oh.  I have one important thing.

8            You have a recollection, do you not, of telling Dr.

9    DeMier that you saw a sacred chair or some type of chair from

10   the masjid outside your MCC window the night of -- the night

11   before or near the time of the third incident with your fellow

12   inmate, correct?

13   A    I have to elaborate on that on what was actually said.

14   Q    Okay.

15   A    I told Dr. DeMier -- can I close this?  I don't need this,

16   right?  Okay.  I told Dr. DeMier, first of all, I am not

17   schizophrenia.  I don't hear voices.  I don't see or hear

18   anything that's not actually here.  So with that said, of

19   course, I think with everybody else I have had crazy moments

20   before, although I'm not crazy.  So I have -- I listed to him

21   three incidents.  The three incidents that I saw or heard

22   something that wasn't there.

23   Q    And was one of those incidents this issue -- this incident

24   of, of seeing the chair from the masjid outside the window?

25   A    I saw what -- this is the second incident or the third

Daoud - direct by Durkin

1    incident out of the three.  And it was walls in the SHU after

2    my third case.  And I was in the SHU, and I thought I saw my

3    masjid.  And one of the reasons I thought I saw my masjid, I

4    saw a similar chair outside.  And I thought I saw my masjid

5    outside.  So I know that, yeah, I know I see my masjid, but

6    it's not my masjid.  So I got down and I looked, you know.  So

7    then it wasn't my masjid.  So, you know, I was just making sure

8    because I saw my masjid.  It's not my masjid, though.

9    Q    Would you take a look at Exhibit No. 11.

10             THE COURT:  Before we take a look at Exhibit No. 11,

11   Mr. Daoud, can you tell me what are the three incidents you're

12   referring to.

13             MR. DURKIN:  That's what I was going to --

14             THE WITNESS:  Okay.

15             THE COURT:  I want to hear him say it.

16             MR. DURKIN:  Could I ask one preliminary question.

17   That's exactly where I was going.

18   BY MR. DURKIN:

19   Q    You mentioned these three incidents that the judge just

20   mentioned in a -- in a letter you wrote to Dr. DeMier on

21   April 19th, 2016, correct?

22   A    I made reference to it.  And I did not write any details

23   about it because I didn't feel like explaining again something

24   I told him in person.

25   Q    And like the judge just said, would you tell us what those

1    three incidents were when you saw or heard something that

2    wasn't there.

3              THE COURT:  No, that's not the question I was asking.

4    What are the three incidents that have happened in this case

5    that have been referred to?

6              THE WITNESS:  I wasn't talking about my case.  I said

7    in general terms I don't see and hear things that are not here.

8    And the exception to that are three occasions in my lifetime,

9    not in my case.

10             THE COURT:  All right.  Thank you.

11   BY MR. DURKIN:

12   Q    Can you tell us what those three occasions were.

13   A    The first occasion is when I was 10 years old.  We were in

14   Egypt.  This is embarrassing as hell.  This make me sound

15   crazy.

16             THE COURT:  Sir, you do not -- you do not have to go

17   into other incidents that aren't the recent ones.  I was

18   talking about what recently -- there are three incidents

19   that --

20             THE WITNESS:  I mentioned in a --

21             THE COURT:  No, sir.

22             THE WITNESS:  I mentioned --

23             THE COURT:  One second.  There are three incidents

24   that are part of sort of this case and the cases in other

25   courtrooms.  Can you tell me what those three incidents or

Daoud - direct by Durkin

1  three charges are.

2         THE WITNESS:  He had mentioned --

3         MR. DURKIN:  Oh, I'm sorry, Judge.  I thought you

4  were asking a different question.

5         THE COURT:  That's where I'm going.

6         THE WITNESS:  The three -- the three incidents are

7  not talking about something that happened in my case or

8  anything.  It's a reference to a letter I wrote to Dr. DeMier.

9  And I wrote to Dr. DeMier I already told you about the three

10 incidents where I saw or heard something that wasn't there.  It

11 was just about my basic mental state.  I don't know about any

12 other three specific incidents other than that.

13        THE COURT:  Okay.  And the most recent one was the

14 one you were talking about -- trying to explain with the chair?

15        THE WITNESS:  Yeah, the chair.  And then seeing the

16 message outside my cell.

17        THE COURT:  All right.  And what were the other two?

18 One when you were 10, and then you don't have to go into

19 detail, and when was the other one?

20        THE WITNESS:  The other one was a like a year or two

21 years, between a year and two years before I got arrested.

22        THE COURT:  All right.  Thank you.  Anything else,

23 Counsel?

24        MR. DURKIN:  No.

25        THE COURT:  Nothing else, Mr. Durkin?

303

 1          MR. DURKIN:  No.

 2          THE COURT:  All right.  Is there anything that the

 3   government wishes to ask at all?

 4          MR. RIDGWAY:  Your Honor, I -- I don't think so,

 5   there's any need to elaborate on.

 6          THE COURT:  Okay.  Thank you.  All right.  Then I'm

 7   going to let you step down.  Thank you, Mr. Daoud.

 8          THE WITNESS:  No problem.

 9      (Witness excused.)

10          THE COURT:  Be careful, please.  How many more

11   witnesses?

12          MR. DURKIN:  I don't think any, but could I have one

13   second.

14          THE COURT:  Sure.

15      (Brief pause.)

16          MR. DURKIN:  No, we rest.

17          THE COURT:  You rest.  All right.  The Court's going

18   to take -- would you like to present any argument today?

19          MR. DURKIN:  I think you know our position pretty

20   well.

21          THE COURT:  You can wind -- I'd like to hear some

22   type of windup.  So I'll take about 5 minutes or so or 10

23   minutes, and then you make a presentation to me.

24          MR. DURKIN:  One thing.

25          THE COURT:  One second.

304

1          MR. DURKIN:  We do want -- we did want to put in that

2   opinion.

3          THE COURT:  I'm not going to have any other briefing,

4   so don't even ask.

5          MR. DURKIN:  No.  No.  No.  No.  I'm talking about

6   the --

7          THE COURT:  Oh, no.  I know.  You can give me --

8          MR. DURKIN:  I wanted you to read --

9          THE COURT:  You can give me --

10         MR. DURKIN:  We just wanted to put it in context.

11         THE COURT:  You can give me case law.  If you have

12  stuff that's been mentioned here.

13         MR. DURKIN:  No.  No.  No.  This is regarding --

14  there was a question Mr. -- remember when he asked about what

15  this judge found?

16         THE COURT:  Yes.

17         MR. DURKIN:  There's further explanation of why the

18  judge --

19         THE COURT:  There's the entire case.  You want to

20  give me the opinion?

21         MR. DURKIN:  I only want to -- I'm going to give you

22  the opinion, but I'm just going to refer you to the context of

23  what I believe Mr. Ridgway --

24         THE COURT:  And you can do that if you wish to do

25  that in your closing argument or statement to me.  I'll give

1  you a few minutes to get that together.

2              MR. DURKIN:  That's fine.

3              THE COURT:  Each side.  All right.  And then if

4  there's actually an opinion or a cite to give me, you can give

5  that too.  Okay.

6              MR. DURKIN:  That's fine.

7              THE COURT:  10 -- anything else?

8              MR. DURKIN:  Just so it's clear, this is the

9  government's burden, so they go first?

10             THE COURT:  Sure.

11             MR. DURKIN:  Oh, right.  I think there was some --

12  Mr. Herman raises a good point.  There was some -- you withheld

13  a finding on Xenakis' qualifications as an expert on competency

14  until cross I think.

15             THE COURT:  He's an expert.  The Court will find that

16  subject to the weight that I will give it based on the

17  questions that have been asked.

18             MR. DURKIN:  Thank you.

19             THE COURT:  All right.  10 minutes.  A quarter till

20  we'll start up with your arguments.  Thank you.

21        (Short break taken.)

22             THE COURT:  All right.  The Court hears some

23  summations on this.

24             MR. DURKIN:  Judge, there were two exhibits that we

25  have that can be put in your binder.  One was Exhibit 32, which

1   was this psychological test demonstrative exhibit.  And then

2   there's -- the government has no objection to Defendant's

3   Exhibit 35, which is an article in the *Tribune*, October 11th,

4   2012, captioned *Teen Jokes While Pleading Guilty in Chicago*

5   *Bomb Plot.*

6           THE COURT:  Any objection to either of those?

7           MR. RIDGWAY:  No, Your Honor.

8           THE COURT:  All right.  Can you hand them to Miss

9   McCullough.  And did the government have anything else to

10   present to the Court?

11           MR. RIDGWAY:  Your Honor, I don't know that we ever

12   formally admitted the *Not Guilty by Me* binder that we referred

13   to with Dr. Xenakis, that --

14           THE COURT:  No, you did not.

15           MR. RIDGWAY:  Okay.  So I think we should probably

16   put it in the record.

17           THE COURT:  And I don't have it.

18           MR. DURKIN:  It might be easier, Judge, if we were to

19   mark them -- mark that as Exhibit 36.

20           THE COURT:  All right.

21           MR. DURKIN:  It's also -- I had done the -- I have

22   the originals here, but I don't know whether you care to

23   whether just have the copies or the originals.

24           THE COURT:  Copies are fine, yes.  As long as I can

25   read them.

1    MR. DURKIN:  I think it's probably best to just mark

2   that Exhibit 36.

3    THE COURT:  Exhibit 36.  Now, that's your copy that

4   was marked, or --

5    MR. RIDGWAY:  It is a clean copy.

6    THE COURT:  But it's clean.

7    MR. RIDGWAY:  It's a clean copy.

8   (Whereupon, Defendant's Exhibits 34, 35, and 36 were

9    received in evidence.)

10    THE COURT:  Okay.  Just leave it right there on

11   the -- that's fine.  That's fine.  All right.  The Court having

12   all of the documents that have been referred to here and

13   exhibits, proceed, Mr. Ridgway.

14    MR. RIDGWAY:  All right.  Thank you, Your Honor.  I

15   want to start off with a couple of cases to kind of frame the,

16   the standard because I think that sometimes that was -- we were

17   jumping around throughout these proceedings.

18    The first is the test here is competency not

19   necessarily the mental state of the defendant.  And the

20   standard is that a defendant, quote, need only be able to

21   follow the proceedings and provide the information that his

22   lawyer needs in order to conduct an adequate defense and to

23   participate in critical decisions.  And that's Price v.

24   Thurmer, 637 F.3d 831.

25    And the second quote I'd like to just start with is

308

1  from Holmes v. Buss, 506 F.3d 576.  And that is that while the

2  psychiatrist or a psychologist is the expert on mental

3  capabilities, the judge is the expert on what mental

4  capabilities the litigant needs in order to be able to assist

5  in the conduct of the litigation.  And with that framework I

6  just want to discuss briefly some of the testimony that we've

7  seen, and starting with Dr. DeMier.

8          And the thing that I think jumps out in terms of Dr.

9  DeMier's testimony -- there were a couple of things.  One is

10  that he comes to the witness stand with an immense amount of

11  experience, doing 350 to 400 competency evaluations.  I think

12  he comes off as someone who's quite reasonable.  He was willing

13  to give in on many points.

14          THE COURT:  One question.  Did Dr. DeMier mention --

15  he talked about his 75 times testifying I believe, maybe just

16  in this building but definitely testifying as to competency.

17  Is he always the government's witness?

18          MR. RIDGWAY:  He is --

19          THE COURT:  For 90 percent of the time?

20          MR. RIDGWAY:  He is.  Now, I think he explained on

21  the witness stand that when he makes a finding of not

22  competent, he normally is not -- there's just an agreement

23  that -- there's not a hearing when he makes a finding of a not

24  competent -- when someone's not competent.  So the reason why

25  he believes he's never called by the defense is there's

1  typically not a hearing when he makes a finding of

2  incompetence.  And he makes lots of findings --

3          THE COURT:  So if there's ever a dispute, he's

4  testifying for the government?

5          MR. RIDGWAY:  That's correct.  I think that's

6  typically the case.

7          THE COURT:  For him.

8          MR. RIDGWAY:  For him, that's right.  The case that

9  actually the defense pointed out was a pretty prominent one

10  where he was called by the defense in that case out in Utah.

11          THE COURT:  Utah.  Proceed.

12          MR. RIDGWAY:  So, so he's done this a number of

13  times, and I think he comes at it from a very cautious and also

14  relatively reasonable standpoint.  He's willing to kind of

15  actually acknowledge that he doesn't know everything and that

16  there are always limits to the ability for a, a psychologist to

17  assess these things.

18          And his -- you know, he -- that testimony I think can

19  be contrasted with what we heard from Dr. Xenakis, who's also,

20  you know, well meaning.  I'm not meaning to suggest otherwise,

21  but he does not seem to have the same experience in terms of

22  making that competency evaluation when Your Honor was posing

23  questions to him about, well, what does this actually mean in

24  terms of how he's going to be able to conduct himself at a

25  trial and things like that.  It seemed to me that Dr. Xenakis

1   does not have a firm of a grasp of what really these legal

2   proceedings look like and what a defendant really needs to be

3   able to do in order to just put that bare minimum standard in

4   order to be found competent.

5          In particular, this example like I mentioned of

6   sovereign citizens.  If a sovereign citizen was put on the

7   witness stand in a competency hearing, it would be -- Your

8   Honor probably could guess how that would go.  They are very

9   disruptive, tend to not work with their attorney very well.

10  And yet for the most part almost always they are found

11  competent to stand trial, which I think suggests it is a

12  relatively low bar.  That may be where we're kind of raising

13  how high of a bar this may, in fact, be.

14         THE COURT:  One question.  I think the sovereign

15  citizen example is a good one.  On the other hand, though, most

16  of the sovereign citizens nobody knows if they're going to use

17  that whole defense, as it were, until after they've already

18  been in the -- charged with something and the trouble that

19  they've been in.  That's when it first seems to pop up as

20  opposed to possibly somebody who has had at least at the

21  minimum some type of issues before that the government even got

22  involved with them.

23         Isn't that a little bit different, especially when

24  the person themselves is admitting that they've got some

25  issues?

1    MR. RIDGWAY:  Right.  The -- you know, and the, the
2  article that we referenced during the cross-examination
3  identifies a lot of the ones where they have a competency
4  evaluation are sovereign citizens who have been sovereign
5  citizens before the offense.  And, in fact, that's what led to
6  the offense.  For example, tax protesters, those who believe
7  that the system does not apply to them.  So at least those are
8  folks who have a preexisting viewpoint that is arguably, you
9  know, delusional but not delusional at least from a, from a
10  competency standpoint.
11    THE COURT:  And we'll be careful with that word
12  delusional.
13    MR. RIDGWAY:  That's fair, yes.  It's a term that --
14    THE COURT:  Proceed.
15    MR. RIDGWAY:  Fair enough.  So, so -- and, and that's
16  the struggle with trying to draw that distinction here, is what
17  really does the defendant need to do.  And I guess I'd call on
18  a little bit of the experience that you had with the defendant.
19  We've had a lot of proceedings in this case.  And he, you know,
20  in contrast to other defendants you may have had, he, you know,
21  abides by the rules for the most part of the Court.  He -- we
22  see examples of him providing information for his defense.
23  It's not as if he's not aware of the evidence in this case.
24    He knows those kind of basic -- I know we
25  characterize it as a checklist, but it's an important checklist

312

1    into the case law.  You've got to know what you've been charged

2    with.  You've got to know what the evidence is.  You've got to

3    know that there's -- you can either plead or go to trial.  And

4    he knows those things.  If you ask him those things, he would

5    answer those things.  And so, so we have that -- the case of,

6    you know, his conduct in this courtroom.  And even -- and I

7    grant you that on the witness stand even today obviously

8    there's points where he's saying things that are concerning,

9    and that's -- you know, I think that was echoed by Dr. DeMier

10   and echoed by Dr. Xenakis.

11            But there's also I think and I -- at least I sense

12   time when he was focused in terms of his questions and focused

13   in terms of the inquiry.  He answered the questions that were

14   posed of him and did so in a manner that was appropriate of a

15   witness.  The type that you probably wouldn't have seen were

16   this a sovereign citizen or were this someone who is suffering

17   from schizophrenia or something along those lines.  He was able

18   to understand the questions and answer those.

19            And I think that that's -- you know, we, we -- I

20   think sometimes we are losing sight of the underlying standard

21   here.  And that's, that's the thing I wanted to just focus on

22   or at least emphasize in terms of the remarks is that we can

23   have lots of debates about the various range and the spectrum

24   and the categories.  But ultimately this is kind of a -- a

25   question of whether he can proceed through a trial adequately

1    assisting his defense.  And I think the answer is that he's
2    capable of doing that.  At least in terms of what the, the, you
3    know, Seventh Circuit and other case law would hold.  If there
4    are no other questions, I don't have anything else to, to add.
5    Thank you.

6          THE COURT:  Thank you.  And the Court appreciates
7    that.  Response.  And as whoever steps up to argue, Mr. Durkin
8    I'm assuming, the Court agrees that a lot of information has
9    come out.  Some that may or may not be relevant to the specific
10   issue at hand.  However, the Court very much understands the
11   reason that some of the information has come out.  Basically I
12   guess one of the questions for the defense is what is the, the
13   end game.  What's the total picture here.  But I'd like you to
14   focus your remarks more on the specific question at hand.

15         MR. DURKIN:  Well, I think if it's -- I think this is
16   a sad situation, and I think it's a difficult situation.  But I
17   think exactly the same way I did when we filed this motion now
18   all the way back in -- on December 7th, 2015.  We said at the
19   time we had concerns, and the Seventh Circuit in a case we
20   referred you to in that pleading, Savage, 505 F.3d 754,
21   specifically says that significant weight is given to counsel's
22   representations concerning his client's competence.

23         I think we laid out for you in that pleading back in
24   December of 2015 what our concerns were, what Dr. Xenakis'
25   concerns were.  And we even cited the -- we attached as an

1    exhibit the transcript in which you noted that you had observed

2    his mental deterioration since he was locked up.  Obviously I

3    think the elephant in the room here is his being housed in the

4    SHU.  I was -- I don't want to criticize Dr. DeMier because I

5    think he was genuinely trying to do a good job.  But I thought

6    his hesitancy over the SHU was kind of intriguing.  If we're

7    talking credibility, I think Dr. Xenakis was far more credible

8    in terms of his testimony.

9         The problem I had with Dr. DeMier's testimony is that

10   he didn't even want to concede that if there was -- that -- he

11   wanted to try to have it both ways.  That, one, he was not

12   suffering from a delusional disorder.  And two, even if he was,

13   he could still cooperate or meet the standard of the statute,

14   which I think the biggest prong is cooperation.  That's the one

15   we've been concerned about from day one.  It remains my firm

16   opinion after doing business in this court for 43 years that

17   this man cannot cooperate with us.

18        What troubled me about DeMier and what I think should

19   trouble you is that in his own report he says, a central issue

20   in this case -- page 16.  "A central issue in this case is

21   whether Mr. Daoud's unusual beliefs regarding Freemasons, the

22   Illuminati, the apocalyptic beliefs are delusions which are

23   symptoms of a psychotic illness."  I would have expected that

24   he would never have taken the position that even if he did have

25   a delusional disorder, he could still meet the, the other two

1    prongs.  And I think you can take that into consideration.

2              THE COURT:  And didn't Dr. Xenakis also say that you

3    could be delusional and --

4              MR. DURKIN:  You could in general, yes.  And there's

5    no question.  There's no question the law says and the

6    psychiatric literature says you could have a mental illness

7    that would still prohibit you from doing it.  But if you read

8    this report, this is a report that tries to block out and argue

9    that he doesn't have a disorder.  And he goes to I think almost

10   absurd lengths to try to, to claim that it's not some type of

11   delusional disorder.  And that's where you get into exactly the

12   semantics and this report he was talking about and so forth.

13             I -- I'm no doctor, but I can read the DSM-V.  And I

14   think the biggest liability with Dr. DeMier's problem with

15   trying to turn it into this -- what was that thing we had

16   earlier?  If you look just at this definition, you can see what

17   I think is, is wrong with, with the whole -- with his whole

18   testimony.  He hinges everything on the fact that this is --

19   some belief is some -- like ordinarily accepted as part of some

20   culture or subculture.  It specifically reads, though, the

21   belief is not ordinarily accepted by other members of the

22   person's culture or subculture.  It is not an article of

23   religious faith.

24             And yet the suggestion is is that somehow it is.  The

25   Illuminati and the Freemasons are not a subculture of Mr.

1    Daoud's cultural background.  It's just not.  It comes out of

2    sky blue.  It just doesn't -- this has no connection to Islam.

3    He has a whole series of problems in my opinion connected to

4    Islam.  And I think that the law is all -- with all due

5    respect, what do they say, the law is an ass sometimes.  The

6    whole idea that you can't have some type of delusional disorder

7    or mental illness that's based on fundamentalist religious

8    values, I -- with all due respect to the Courts, I think is

9    more of a policy decision than it is of a medical decision.  I

10   think -- and I think we ought to own that.

11          But, but this is different.  This, this guy believes

12   and Dr. DeMier says if he believes -- if you believe that

13   that's what he believes, that he truly believes, then you have

14   to come to a different opinion.  And he even admitted that.  He

15   also admitted yesterday, if I heard his testimony correctly,

16   that in order to truly believe -- in order to understand

17   whether Daoud firmly believes what he's now saying about the

18   executions and the beheadings, he'd have to talk to him some

19   more.  He concluded that he doesn't even know himself whether

20   he firmly believes that.

21          I thought his trying to dance around the whole idea

22   that he didn't -- that he came to a conclusion he didn't

23   believe it was, was suspect.  But I'll give him the benefit of

24   the doubt.  I think that there is a, a simpler answer here.  I

25   think you could find and you should find that even if DeMier is

1  correct, he's not correct today.  And I think he all but

2  conceded that under cross-examination yesterday.  The truth of

3  the matter is, is that he has severely deteriorated even

4  between the time of DeMier's examinations in the spring and

5  now.

6          I don't know what weight you can give to my opinion

7  at all.  But it's like would someone please tell me how I am

8  supposed to counsel a man who believes that, one, he's -- that

9  you have the power -- that you're the Illuminati, that I might

10  be part of the Illuminati, that he is subject to being beheaded

11  or executed as part of this system and -- either officially or

12  unofficially.  And that if you refuse to let him go fight for

13  the Free Syrian Army, and unlike the prosecutors who laughed at

14  me over it, that he can write to the President of the United

15  States.

16          And worse than that he takes as a message from the

17  President on TV apparently some type of message to him.  He's a

18  man who also, you know, equates himself to Sayyid Qutb.  Those

19  are all factors that I think -- and everything you've seen.

20  I'm not going to go through all the indicia, but the

21  grandiosity is, is so abundant here.  But what do I do?  How in

22  God's name do I counsel this man?  That's why I said in my

23  pleading and --

24          THE COURT:  Mr. Durkin, in all your 43 years have you

25  had difficult clients?

1      MR. DURKIN:  Absolutely.  All kinds of difficult

2  clients.

3      THE COURT:  All right.  And so you don't ask for them

4  to be found incompetent, is that correct?

5      MR. DURKIN:  The only time I've ever asked prior to

6  this to have somebody be found incompetent that I can recall

7  was a case in front of Judge Shadur, where I believe the client

8  was ultimately found insane or mentally ill.

9      THE COURT:  And outside of some of the things that

10 your client says, and he does say a lot, he does, as far as

11 just working with him, the level of difficulty -- I mean, I'm

12 sure you've had other clients who are more difficult to work

13 with than Mr. Daoud.  Would that be correct?

14     MR. DURKIN:  It depends on what you mean by work

15 with.

16     THE COURT:  Be able to sit down, strategize with.

17 Have a conversation about the case with.

18     MR. DURKIN:  No, I've never had someone more

19 difficult, because you can't strategize with him.  He can, he

20 can write this gibberish.  And some of it makes sense.  I grant

21 the government that.

22     THE COURT:  Is that the first time -- this Court gets

23 a lot of submissions from --

24     MR. DURKIN:  You haven't seen these.

25     THE COURT:  -- defense attorneys, so -- I've seen a

319

1   lot of his work.

2            MR. DURKIN:  But you haven't seen these.  These --

3   this should show you the -- if you have any question about

4   whether you can work with this man, you need to look at this.

5   That's why I asked him the question about didn't I tell you and

6   didn't Mr. Herman tell you to tone it down.  Don't -- I can't

7   make -- one, I can barely read it, but that's not necessarily

8   an issue.  It's -- I'm no expert, but this is the work of

9   someone whose mind is on some different wavelength.  Certainly

10  the mind.  This is, this is really scary to me when you look at

11  the minutia here and the underlying.

12           I mean, he has --

13           THE COURT:  I'll take a look.

14           MR. DURKIN:  But I mean, you can't --

15           THE COURT:  I'll take a look.

16           MR. DURKIN:  But this will answer your question in

17  that regard.

18           THE COURT:  All right.  I'll take a look.

19           MR. DURKIN:  I mean, and so you know -- you know, I'm

20  not making this up.  When you try to talk to him about these

21  issues, you can't stay on point because he's -- will break off

22  into, you know, that he's a hostage.  That he's going to be

23  executed.  The calls, I don't know if all those calls are in

24  evidence.  But he was calling me I want to say for at least the

25  last two or three weeks around the time of the calls with the

1  sister.  We only played one of those calls.  He would call me

2  almost every night and ask did I get the date yet.

3       And I, and I -- I'm -- you're in a very delicate spot

4  there because I, I don't want to insult him.  I don't want

5  to -- you know, I don't want to lose his confidence in me.  I

6  think he still has some confidence in me.  I don't -- he would

7  call every night and ask did I find -- get the date yet when

8  he's going to be killed.  How do you respond to that, you know,

9  after you've said to somebody, no, you don't have to worry

10 about that?  You're not going to get killed here.  His own

11 sister tells him.  I mean, I think that's the most amazing

12 exhibit that you could ever have.

13      Totally spontaneously he calls his sister.  They get

14 into that type of debate.  And Dr. DeMier -- and this I think,

15 I think affects his credibility, you know.  Somehow he's trying

16 to provoke his sister.  I don't think so.  Okay.  Or he needed

17 attention.  Now, I grant you that, yes, does he want attention.

18 But I, I agree with Dr. Xenakis in this regard.  That the

19 attention is all part of his grandiosity.  This is a man who

20 calls Channel 7 and discusses with Chuck Goudy his endorsement

21 of Donald Trump as if the whole world is watching.

22      You can't discuss a plea bargain with someone like

23 that.  You can't discuss a -- and that's one of the most

24 fundamental issues in this proceeding.  This man has three

25 cases now.  You can't discuss a potential resolution of a case

1    with someone who believes that they can really go fight for the
2    Free Syrian Army.  That that would be a reasonable way to
3    dispose of his case.  And that issue, that inability to deal
4    with reality affects all of our conversations.  Whether it's,
5    you know -- you could sit there with him with this gibberish
6    here and go through it.  But five minutes into it it's going to
7    be all over the ballpark.

8          You know, I mean we thought of calling a witness
9    from -- which we didn't for the sake of time from the marshals
10   lockup because one day we were all there and he -- and he does
11   pace back and forth all the time.  And he just started yelling.
12   And they thought he was yelling at us.  He was actually just
13   making this pitch that he was a hostage, and it was, it was
14   really sad.  I mean, I really like this kid.  He is a really
15   nice kid.  He comes from a family that really cares about him.

16         And I'm sorry, but I believe that the government
17   picked up the eggshell skull psychiatric patient.  And I'm not
18   criticizing them or anything else.  But I think we have to face
19   up to the fact that we're attempting to -- and this gets maybe
20   more philosophical than you want to hear.  But this is the
21   problem that happens when you try to shoehorn national security
22   and national --

23         THE COURT:  Yes, you're getting way more
24   philosophical.

25         MR. DURKIN:  But, but listen to me because it's

1  important.  Those things happen.  Do you think that we'd still
2  be here if this was some type of --

3       THE COURT:  Counsel, I want a narrow argument.  I
4  know what your argument is.  I understand it.  And I'm not
5  saying it might have merit in some other context.  I'm dealing
6  with the competency issue.

7       MR. DURKIN:  But the context here --

8       THE COURT:  Whether or not the government should or
9  should not have brought this case, you know, I mean, they
10 brought it.  And we have it here, and the Court has to deal
11 with the competency issues.

12      MR. DURKIN:  My issue --

13      THE COURT:  It's the government that has to look at
14 whether or not their resources were used appropriately.

15      MR. DURKIN:  I was, I was not going anywhere near the
16 fact that they shouldn't have brought the case.  I'm simply
17 saying it just adds a layer of difficulty in terms of trying to
18 resolve it.  That's all.  And that --

19      THE COURT:  Well, I will tell you this:  One of the
20 layers of difficulty with trying to resolve it is that this
21 Court has set this case for trial at least two other times.
22 And for various reasons, including the one that's brought here,
23 it's been continued.  And one of the problems with the layers
24 here is that we've had -- your client has been in custody for
25 almost four years, all of his adult life.  And now we're at

1   this point.

2          MR. DURKIN:  And I don't, I don't quarrel with that.

3   I'm not, I'm not quarreling one bit with that.  But the

4   question we have today is not how we got here, but the fact

5   that we are here and, and --

6          THE COURT:  The Court agrees with that.

7          MR. DURKIN:  And the question is regardless of how

8   that happened, the question is is he competent today.  And I

9   think that a fair reading of this evidence even accepting Dr.

10  DeMier is -- I think you could accept both of the testimony and

11  simply say I think there's a -- I don't think the burden has

12  been met that he is competent.  And, you know, the cases --

13  there's a -- the case -- I was actually referred to the case

14  out of Utah where Dr. DeMier had actually found this guy to be

15  incompetent.  And that was one instance where they didn't go

16  along with his decision.

17         He ended up being called to tes -- because the judge

18  ruled he was competent, but then they called him as a defense

19  witness at trial where he said several things that I thought

20  were contradictory to what he said in his report here.  Be that

21  as it may, the point in that case is that it's a debate over

22  who really has the burden.  And that the question only becomes

23  relevant when, when you have equipoise.  I would submit to you

24  that's at least where we're at here.  I think you have -- I

25  think you could say that there are two credible witnesses here.

1  And that's enough for you to be -- to cause you concern and

2  that the scale doesn't tip in favor of the government and that

3  he is not competent.

4          I don't believe he's competent.  I don't believe -- I

5  believe he suffers from a delusional disorder.  I think that

6  that was very well established by Dr. Xenakis regardless of

7  what you might think.  You know, you've seen as many witnesses

8  as I have.  He's a credible witness.  Maybe he doesn't have as

9  much forensic skill, but I thought his answer about that was,

10 was awfully informative, which is he's really a clinician and

11 this was a clinician's type issue.

12         And, you know, he's a former brigadier general of the

13 Army.  You know, he's, he's going to come in here and somehow

14 put his reputation on the line and not -- and testify to

15 something he doesn't believe.  He has -- he believes that he's

16 been consistent completely.  I think he was far more consistent

17 with Dr. DeMier, but I don't think you have to knock Dr. DeMier

18 to still rule that he's incompetent.  I think there's enough

19 time between DeMier and today for you to say, sorry.  Statute

20 applies.  He's not competent.  He can't cooperate.  He does

21 suffer from a -- I think this record is sufficient to show that

22 he suffers from a delusional disorder, which is a mental

23 disease or defect, which also precludes him from understanding

24 the nature of this -- these proceedings, which I think is

25 crystal clear.

1    Someone who thinks they can be beheaded as part of

2    these proceedings, whether he understands the nuances of

3    entrapment or not, does not understand the nature of these

4    proceedings.  And this is where I think what we have to say

5    should influence you.  Can he cooperate with his attorneys.

6    THE COURT:  Thank you very much, Mr. Durkin.  Was

7    there any last word from the government, or no?  You stand on

8    your argument.

9    MR. RIDGWAY:  Your Honor, I think nothing else.

10   THE COURT:  All right.  Thank you.  What the -- the

11   Court would like to rule as soon as possible.  However, I do

12   need to review my notes and the testimony, the case law that's

13   been presented to me and the exhibits one more time.  However,

14   I don't want to take a lot of time.  Ambitious would be to try

15   to have you back in here next week.  And if I can't, I would

16   let you know.  Is there a date, either the 24th or 25th where

17   either of you -- that would be amenable to everyone?

18   MR. RIDGWAY:  It sounds like the 25th might work

19   better on our side.

20   THE COURT:  Mr. Durkin, how about your side and Mr.

21   Herman's and counsel.  It will not be a lengthy proceeding, and

22   actually this Court is not scheduled to be here, but I will

23   adjust my schedule.

24   MR. DURKIN:  Thursday, the 25th, Judge?

25   THE COURT:  Yes.

 1              MR. DURKIN:  Could we do it at like 10 or 10:30?  Or
 2  the afternoon?
 3              THE COURT:  No.  No.  10 or 10:30 is fine.  10:00?
 4              MR. DURKIN:  10:30.
 5              THE COURT:  10:30.  Is that a problem?
 6              MR. DURKIN:  10:30 on the August 25th, no, that's
 7  fine.
 8              THE COURT:  10:30 on August 25th.  That's next week.
 9  This matter is entered and continued.  There was -- and the
10  Court really doesn't want to discuss it right now.  There was
11  a -- there may be some other motions.  I'll have to take a look
12  on the docket that the Court needs to review.
13              MR. DURKIN:  Yes.
14              THE COURT:  I more than likely believe I've heard
15  enough information that I can take care of that on that date
16  also.  Okay.
17              MR. DURKIN:  That's fine.
18              THE COURT:  All right.
19              MR. DURKIN:  Thank you.
20              MR. RIDGWAY:  Thank you, Judge.
21              THE COURT:  All right.  Thank you very much.
22              MR. RIDGWAY:  Thanks for your patience.
23          (Whereupon, said trial was recessed at 1:30 p.m., to
24            reconvene on 8/25/16, at 10:30 a.m.)
25