1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )    No. 12 CR 723-1
                                     )
4                  Plaintiff,        )
                                     )
5            v.                      )    Chicago, Illinois
                                     )    November 26, 2018
6   ADEL DAOUD,                      )    1:35 p.m.
                                     )
7                  Defendant.        )    Guilty Plea

8              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
9

10  APPEARANCES:

11  For the Government:      HON. JOHN R. LAUSCH, JR.
                             United States Attorney, by
12                           MR. BARRY JONAS
                             MR. BOLLING W. HAXALL
13                           MS. TIFFANY ARDAM,
                             Assistant United States Attorneys
14                           219 South Dearborn Street
                             Suite 500
15                           Chicago, Illinois  60604

16
    For the Defendant:       DURKIN & ROBERTS
17                           2446 North Clark Street
                             Chicago, Illinois  60614
18                           BY:  MR. THOMAS A. DURKIN
                                  MS. ANDREA D. LYON
19
                             LAW OFFICE OF JOSHUA G. HERMAN
20                           53 West Jackson Boulevard
                             Suite 1650
21                           Chicago, Illinois  60604
                             BY:  MR. JOSHUA G. HERMAN
22
              TRACEY DANA McCULLOUGH, CSR, RPR
23                  Official Court Reporter
                 219 South Dearborn Street
24                        Room 1426
                  Chicago, Illinois  60604
25                    (312) 435-5570

1            THE CLERK:  12 CR 723, USA versus Adel Daoud.

2            THE COURT:  Counsel.

3            MR. JONAS:  Good afternoon, Your Honor.  Barry Jonas,

4    Bolling Haxall, and Tiffany Ardam for the United States.

5            MR. DURKIN:  Good afternoon, Judge.  Tom Durkin,

6    Andrea Lyon, and Joshua Herman on behalf of the defendant,

7    who's present and in custody.

8            THE COURT:  All right.  We're one less, is that

9    correct?

10            MR. DURKIN:  Miss Waters is --

11            THE COURT:  Unavailable?

12            MS. LYON:  Stranded.

13            MR. DURKIN:  -- somewhere, somewhere either on a

14    train or waiting for a train that she missed this morning

15    because she missed her -- couldn't get her flight out last

16    night.  So she's --

17            THE COURT:  Okay.  All right.  Well, I didn't want, I

18    didn't want her shortchanged.  I know she's been working hard

19    on this case also.

20            MR. DURKIN:  Yes.

21            THE COURT:  All right.  It's my understanding based

22    on all of the filings, based on our last date that we had here

23    that there is a request for a change of plea, is that correct?

24            MR. DURKIN:  There is, Your Honor.  That's right.

25            THE COURT:  All right.  You ready to proceed today?

 1              MR. DURKIN:  Yes, we're ready to proceed.

 2              THE COURT:  All right.  And the government's ready to

 3    proceed?

 4              MR. JONAS:  We are, Your Honor.  Of course, over our

 5    objection.

 6              THE COURT:  Over your objection --

 7              MR. JONAS:  Yes, we are.

 8              THE COURT:  -- you're ready to proceed, is that

 9    correct?

10              MR. JONAS:  Yes, Your Honor.

11              THE COURT:  All right.  So let me have a talk with

12    Mr. Daoud here.  Good morning, or afternoon.  Good afternoon.

13              DEFENDANT DAOUD:  Good afternoon.

14              THE COURT:  All right.  And I need you to raise your

15    right hand.

16         (Defendant duly sworn.)

17              THE COURT:  All right.  Thank you.  All right.  So

18    just speak in your normal voice.  As long as you're in front of

19    the mike, you will be fine.  Do you understand?

20              DEFENDANT DAOUD:  Yes.

21              THE COURT:  All right.  Sir, before -- I'm going to

22    talk to you a little bit before I ask you some specific

23    questions.  But before I can accept what's been told to me is

24    to be a change of plea in the cases originally brought as 12 CR

25    723, 13 CR 703, and 15 CR 487, before I can accept your plea,

1   there -- change of plea to something other than not guilty, I

2   have to make certain determinations.  Sir, I first have to find

3   out if you're competent to make that change.  And that refers

4   to everybody who comes before me who seeks to change a plea.

5   It's not just in your case.  Do you understand that?

6          DEFENDANT DAOUD:  Yes, ma'am.

7          THE COURT:  I will also have to make a determination

8   that you've had the assistance of counsel and enough time to do

9   that.  Do you understand?

10          DEFENDANT DAOUD:  Yes, ma'am.

11          THE COURT:  Do you understand that the Court has to

12   make sure you understand your trial rights?  And we were going

13   to start a trial today, but the Court needs to make sure you

14   understand what you would be giving up if you decide to go

15   through with the change of plea.  Do you understand that?

16          DEFENDANT DAOUD:  Yes, ma'am.

17          THE COURT:  Do you understand, sir, that I need to

18   make sure that you understand what the charges against you are

19   about?  Do you understand that?

20          DEFENDANT DAOUD:  Yes, ma'am.

21          THE COURT:  Do you also understand that I have to

22   make sure that any change of plea is going to be voluntary and

23   knowing?  Do you understand?

24          DEFENDANT DAOUD:  Yes, ma'am.

25          THE COURT:  I also need to find out, sir, if there is

1   a factual basis for you to change your plea.  Do you understand
2   that?  So I need to know whether there are facts to support
3   what you are saying you want to do today.

4           DEFENDANT DAOUD:  Yes, ma'am.

5           THE COURT:  That you just can't change your plea just
6   for any old reason.  Do you understand that?

7           DEFENDANT DAOUD:  I think so, yes, ma'am.

8           THE COURT:  All right.  Let me -- I'm going to do
9   something that I was going to tell you you get to do.  But
10  throughout this process if you ever don't understand something,
11  then you need to let me know, or I'll hear you say something
12  like I think so, and I'll tell you to step to the side and talk
13  to your lawyer, okay.  Don't be offended when I do that.  All
14  right.  Please step to the side and make sure he understands
15  factual basis.

16      (Brief pause.)

17          THE COURT:  All right.  Mr. Daoud, has your lawyer
18  been able to talk to you about what my making sure there's a
19  factual basis for you to change your plea means?

20          DEFENDANT DAOUD:  Yes.

21          THE COURT:  Do you think you understand now?

22          DEFENDANT DAOUD:  Yes, ma'am.

23          THE COURT:  All right.  Again, you'll be able to talk
24  to him at any time during these proceedings.  You only have to
25  ask.  All right?

1           DEFENDANT DAOUD:  Yes, ma'am.

2           THE COURT:  Do you understand that?

3           DEFENDANT DAOUD:  Yes, ma'am.

4           THE COURT:  All right.  And again, don't be insulted

5    or say, Judge, I want you to hurry up.  If I see you do

6    something or say something that causes me concern on whether

7    you're able to understand what's going on, I'll take a break if

8    I see that.  Do you understand that?

9           DEFENDANT DAOUD:  Yes, ma'am.

10          THE COURT:  Sir, if you do change your mind during

11   these proceedings, you can.  That is your right.  I will warn

12   you, though, in this particular case, we had a trial scheduled

13   for three weeks.  And it would not be all of a sudden a trial

14   would be back on that day.  Just letting you -- full disclosure

15   of what would happen.  But you are not obligated despite what

16   you have put in writing or your lawyer has put on your behalf.

17   If you go through these proceedings and you change your mind,

18   this Court -- that, that you are able to do that.  You are not

19   forced to go through it despite all the preparations.  Do you

20   understand that?

21          DEFENDANT DAOUD:  Yes, ma'am.

22          THE COURT:  Please understand, sir, that any false

23   answers to any of the questions that I ask you could subject

24   you to a perjury prosecution.  Do you understand that?

25          DEFENDANT DAOUD:  Yes, ma'am.

1          THE COURT:  The answers that you may be giving here,

2    they are expected not only to be truthful but you must be put

3    on notice that they may incriminate you or cause you some harm

4    or issues with -- under the law.  I'm not sure of what's going

5    to be asked today, but there is a chance of that.  That you'd

6    be saying that something happened.  I know this is a special

7    plea, and it's going to have special twists and turns.  But

8    generally you'd be asked to admit to something that you would

9    not otherwise admit to.  Do you understand?

10          DEFENDANT DAOUD:  Yes, ma'am.

11          THE COURT:  And so again, you'll be able to have

12   conversations with your counsel as we get into that area.  Do

13   you understand?

14          DEFENDANT DAOUD:  Yes, ma'am.

15          THE COURT:  All right.  Let's start.  Sir, what is

16   your full name?

17          DEFENDANT DAOUD:  Adel Daoud.

18          THE COURT:  All right.  And, Mr. Daoud, how old are

19   you?

20          DEFENDANT DAOUD:  25.

21          THE COURT:  25.  When is your birthday?

22          DEFENDANT DAOUD:  9/21/93.

23          THE COURT:  So you just had a birthday fairly

24   recently in the fall?

25          DEFENDANT DAOUD:  Yes.

1           THE COURT:  All right.  And where do you live when

2    you're not in custody?  What state -- what city, what state?

3           DEFENDANT DAOUD:  Hillside, Illinois.

4           THE COURT:  Hillside, Illinois.  Who do you live

5    with?

6           DEFENDANT DAOUD:  My parents.

7           THE COURT:  And who are your parents?

8           DEFENDANT DAOUD:  Ahmed and Mona Daoud.

9           THE COURT:  All right.  And, sir, did you finish

10   elementary school?

11          DEFENDANT DAOUD:  Yes, ma'am.

12          THE COURT:  And did you -- I heard yes, right?  And

13   did you finish high school?  Did you graduate?

14          DEFENDANT DAOUD:  I just graduated.

15          THE COURT:  When did you just graduate?

16          DEFENDANT DAOUD:  I mean, right before getting

17   kidnapped.

18          THE COURT:  Okay.  You graduated at what age?

19          DEFENDANT DAOUD:  In January 2012.

20          THE COURT:  You graduated in January of 2012?

21          DEFENDANT DAOUD:  Yes.

22          THE COURT:  From high school?

23          DEFENDANT DAOUD:  Yes.

24          THE COURT:  All right.  And then you came to be

25   incarcerated shortly after that?

1      DEFENDANT DAOUD:  Yeah.

2      THE COURT:  Question.  You graduated from high school

3   in January.  Is -- was that -- why were you graduating in

4   winter?

5      DEFENDANT DAOUD:  Because I, I finished a semester

6   early so I could take a school in Arabic.

7      THE COURT:  Ah, okay.  So you finished school early.

8   Okay.

9      DEFENDANT DAOUD:  Yes.

10      THE COURT:  And, sir, did you ever work outside of

11   the prison system like have a job, get paid for it?

12      DEFENDANT DAOUD:  No.

13      THE COURT:  All right.  Are you on any medication

14   prescription for any medical physical issues?  Like -- not

15   mental health.  We'll get to that in a second.  Medical issues

16   such as diabetes, asthma?

17      DEFENDANT DAOUD:  I have asthma medication, but I

18   don't take it.

19      THE COURT:  All right.  You have asthma medication.

20   When were you diagnosed as asthmatic?

21      DEFENDANT DAOUD:  Maybe when I was six years old.

22      THE COURT:  All right.  And so you've had medication

23   in the past, is that correct?

24      DEFENDANT DAOUD:  Yes.

25      THE COURT:  What did you have?

1    DEFENDANT DAOUD:  Advair and Albuterol.

2    THE COURT:  All right.  And you were on inhalers, is

3 that correct?

4    DEFENDANT DAOUD:  An inhaler, yeah.

5    THE COURT:  And did you also do steroids, like pills

6 or anything like that?

7    DEFENDANT DAOUD:  No.

8    THE COURT:  And when is the last time you had an

9 asthma attack?

10    DEFENDANT DAOUD:  I can't remember.

11    THE COURT:  All right.  So you have not used it and

12 do not think you needed to use it while you were incarcerated,

13 is that correct?

14    DEFENDANT DAOUD:  See, I thought I needed to use it

15 when I was in North Carolina.  So I thought I was having an

16 asthma attack, but I'm not sure right now.

17    THE COURT:  That was in the Butner facility?

18    DEFENDANT DAOUD:  Yeah.

19    THE COURT:  In North Carolina.  All right.  But other

20 than that time, you haven't needed it, is that correct?

21    DEFENDANT DAOUD:  Right.

22    THE COURT:  Is there any other medical condition

23 that's not mental health?

24    DEFENDANT DAOUD:  Not that I can think of.

25    THE COURT:  That you can think of.  When was the last

1   time you saw a physician?

2           DEFENDANT DAOUD:  Like last week or two weeks ago.

3           THE COURT:  All right.  And that was a psychiatrist?

4           DEFENDANT DAOUD:  No.  A regular --

5           THE COURT:  A regular medical physician?

6           DEFENDANT DAOUD:  Yeah.

7           THE COURT:  And they told you you were fine, is that

8   correct?

9           DEFENDANT DAOUD:  Yes.

10          THE COURT:  All right.  When's the last time you saw

11  a psychiatrist?

12          DEFENDANT DAOUD:  Maybe last court date or the court

13  date before that.  I'm not sure before that.

14          THE COURT:  So that would be in the last two weeks?

15          DEFENDANT DAOUD:  Maybe within the last month.

16          THE COURT:  All right.  And who was that?

17          DEFENDANT DAOUD:  Dr. Dana.

18          THE COURT:  All right.  And that's a doctor with the

19  federal facility, is that correct?

20          DEFENDANT DAOUD:  Yes, ma'am.

21          THE COURT:  All right.  And you're on medication, is

22  that correct?

23          DEFENDANT DAOUD:  Yes, ma'am.

24          THE COURT:  Can you tell me what you're on medication

25  for?

1      DEFENDANT DAOUD:  My mental one?

2      THE COURT:  Yes.

3      DEFENDANT DAOUD:  Abilify.

4      THE COURT:  All right.  And can you tell me what the

5  diagnosis is.  What are they saying that -- why, why do you

6  have to be on medication?

7      DEFENDANT DAOUD:  My understanding is that I have

8  delusional disorder.

9      THE COURT:  All right.

10     DEFENDANT DAOUD:  Or some kind of schizophrenia.

11     THE COURT:  Some type of seizure thing.  And I know

12  we have some specifics.  And I'll --

13     MR. DURKIN:  He said schizophrenia, Judge.

14     THE COURT:  And I'll get to that, Counsel.

15     MR. DURKIN:  No, he said schizophrenia.

16     THE COURT:  Oh.  He said schizophrenia.

17     MR. DURKIN:  Yes.

18     THE COURT:  Okay.  It sounded like he said seizures.

19  All right.  Schizophrenia.  Yes.

20     MR. JONAS:  Your Honor, can we have the mike -- move

21  the microphone closer.

22     THE COURT:  Sure.

23     MR. JONAS:  I'm having a hard time hearing.

24     THE COURT:  Sure.  I guess if you're having a hard

25  time, everybody must be having a hard time.  All right.  Go

1   ahead.  And keep your voice up.  And so you're on medication,
2   is that correct?

3              DEFENDANT DAOUD:  Yes, ma'am.

4              THE COURT:  And have you taken your medication
5   regularly?

6              DEFENDANT DAOUD:  Yes, ma'am.

7              THE COURT:  All right.  And the Court knows it was
8   adjusted within the last six weeks or so.  And have you taken
9   it per the adjustment as has been given?  You've been given the
10  adjusted amount, is that correct?

11             DEFENDANT DAOUD:  Yes, ma'am.

12             THE COURT:  Are you on any other medication other
13  than what you've told us?

14             DEFENDANT DAOUD:  No, ma'am.

15             THE COURT:  All right.  So again, what medication are
16  you on?

17             DEFENDANT DAOUD:  Abilify.

18             THE COURT:  And for how much?

19             DEFENDANT DAOUD:  200 milligrams.

20             THE COURT:  All right.  And how much do you take
21  that?  How often?

22             DEFENDANT DAOUD:  Once a month.

23             THE COURT:  And you don't take any daily medication,
24  is that correct?

25             DEFENDANT DAOUD:  I mean, no -- I mean, minor things

1    like, like eardrops.

2           THE COURT:  Okay.  But nothing for your --

3           DEFENDANT DAOUD:  But nothing --

4           THE COURT:  -- mental health status?

5           DEFENDANT DAOUD:  No, ma'am.

6           THE COURT:  It's every month?

7           DEFENDANT DAOUD:  Yes, ma'am.

8           THE COURT:  Is that correct?

9           DEFENDANT DAOUD:  Yes, ma'am.

10           THE COURT:  And counsel -- so counsel for defense,

11   you agree that your client was found incompetent on

12   August 25th, 2016 due to mental health issues and competent on

13   March 12th, 2018?

14           MR. DURKIN:  Yes, ma'am.

15           THE COURT:  Does the government agree --

16           MR. JONAS:  Yes, Your Honor.

17           THE COURT:  -- that those findings were made by the

18   Court on both of those dates, August 25th, 2016 and then

19   competent on March 12th, 2018?

20           MR. JONAS:  Yes, Your Honor.

21           THE COURT:  And you both --

22           MR. DURKIN:  I think it would be more to say

23   competent provided he's on medication.

24           THE COURT:  I was going to that question next.  Thank

25   you, Mr. Durkin.  And that competency was based on him being

1   under medication, prescribed medication, is that correct, Mr.
2   Durkin?

3          MR. DURKIN:  Yes.

4          THE COURT:  Is that correct?

5          MR. JONAS:  Yes, Your Honor.

6          THE COURT:  All right.  Thank you, Mr. Jonas.  Are
7   you under any counseling also, Mr. Daoud?  Like do you have a
8   therapist?

9          DEFENDANT DAOUD:  Not really.

10         THE COURT:  Well, when is the last time you talked to
11  a mental health professional?

12         DEFENDANT DAOUD:  Other than Dr. Dana and the other
13  doctors like Xenakis and other psychologists, I haven't talked
14  to any.

15         THE COURT:  All right.  And how often have you talked
16  to any of the other doctors?  Like is it once a month?

17         DEFENDANT DAOUD:  I talk to -- they have me talk to
18  Dr. Dana once in a while.  I wouldn't say once a month, though.

19         THE COURT:  All right.  But you don't see a regular
20  therapist?

21         DEFENDANT DAOUD:  No.

22         THE COURT:  And go to counseling sessions as group
23  counseling or individual?

24         DEFENDANT DAOUD:  No, ma'am.

25         THE COURT:  Is that correct?

1     DEFENDANT DAOUD:  Yes, ma'am.

2          THE COURT:  Did you do that when you were at Butner?

3          DEFENDANT DAOUD:  I saw Miss Wadsworth periodically.

4     Like every -- I forgot how often, but I used to see her.  And I

5     used to see Dr. Herbel.

6          THE COURT:  All right.  And, and was that in group

7     therapy or individual?

8          DEFENDANT DAOUD:  Individual.

9          THE COURT:  Mr. Durkin, have you spoken with Mr.

10    Daoud's parents?  I know he is an adult, but they have been

11    here nearly every date of the last six years for the court

12    date.  Have you spoken to his parents about your client's

13    competency?

14         MR. DURKIN:  Yes.

15         THE COURT:  All right.  And have you explained to the

16    parents the steps you're taking today?

17         MR. DURKIN:  Yes.

18         THE COURT:  Although this is Mr. Daoud's decision,

19    the Court will ask to your knowledge, do they agree with your

20    strategy?

21         MR. DURKIN:  Yes.

22         THE COURT:  Will the parents please stand.  All

23    right.  Each state your name, please.

24         MR. AHMED DAOUD:  Ahmed Daoud.

25         MRS. MONA DAOUD:  Mona Daoud.

1          THE COURT:  All right.  You're the father and the

2    mother of Mr. Adel Daoud, is that correct?

3          MR. AHMED DAOUD:  Yes, we are.

4          MRS. MONA DAOUD:  Yes.

5          THE COURT:  All right.  You heard me ask the counsel

6    several questions about whether or not -- about your son's

7    competency.  You heard me ask that question, is that correct?

8          MR. AHMED DAOUD:  Yes.

9          MRS. MONA DAOUD:  Yes.

10         THE COURT:  All right.  You agree with his answer, is

11   that correct?

12         MR. AHMED DAOUD:  Yes.

13         THE COURT:  All right.  Have you also heard me ask if

14   he has talked to you about the step that's being taken today?

15   Meaning there's no trial today.

16         MR. AHMED DAOUD:  I didn't hear --

17         THE COURT:  I'm sorry.  That there's no trial today.

18   Do you agree with his statement?

19         MR. AHMED DAOUD:  Yes.  Correct.  He will enter a

20   plea.

21         THE COURT:  That's what you expect to happen, is that

22   correct?

23         MR. AHMED DAOUD:  Yes.

24         THE COURT:  All right.  And he's explained that to

25   you also, is that correct?

1          MR. AHMED DAOUD:  Yes.

2          THE COURT:  And were you there and you had

3    discussions with your son also, is that correct?

4          MR. AHMED DAOUD:  Well, I don't, I don't talk to my

5    son --

6          THE COURT:  Excuse me, sir.  There was one point I

7    did have you talk to your son.

8          MR. AHMED DAOUD:  Yes.  Yes,

9          THE COURT:  Did you talk to your son?

10         MR. AHMED DAOUD:  Not about that.

11         THE COURT:  Not about that at all?

12         MR. AHMED DAOUD:  No, ma'am.

13         THE COURT:  All right.  And the mother didn't either?

14         MR. AHMED DAOUD:  Just to say hello.  I sit with him,

15   I see him --

16         THE COURT:  All right.  I, I need you to just answer

17   my questions.  All right.  Mother, were you --

18         MR. DURKIN:  Could I --

19         THE COURT:  Did you also --

20         MR. DURKIN:  Could I have a second, please.

21         THE COURT:  Yes.  Go ahead.

22      (Brief pause.)

23         THE COURT:  All right.

24         MR. DURKIN:  Judge, the reason I asked to speak to

25   Mr. and Mrs. Daoud, when Mr. -- Mr. Daoud was permitted to

1    visit up in the lockup.  And while he himself, Mr. Ahmed

2    Daoud --

3                DEFENDANT DAOUD:  Thank you.

4                THE COURT:  You're welcome.  Just in case you need

5    it.

6                MR. DURKIN:  While Ahmed did not speak to Adel about

7    this tactic and this decision, I believe all three of us and

8    Miss -- all four of us, Miss Waters included, did say in Mr.

9    Daoud's -- the defendant's presence and the father's presence

10   what we were doing and if everyone was in agreement.

11               THE COURT:  All right.

12               MR. DURKIN:  And he was in agreement.

13               THE COURT:  Is that correct, sir?

14               MR. AHMED DAOUD:  Yes.

15               THE COURT:  Is that correct, ma'am?

16               MRS. MONA DAOUD:  Yes.

17               THE COURT:  All right.

18               MR. DURKIN:  She was not there.

19               THE COURT:  You were -- were you there or not?

20               MS. LYON:  She was there.  She was there.

21               MR. DURKIN:  Oh, that's right.

22               THE COURT:  I thought --

23               MR. DURKIN:  I'm sorry.  She was there.

24               THE COURT:  Yes.

25               MS. LYON:  She was there too.

1    THE COURT:  I sent her up.  I don't know what
2  happened to her.
3    MR. DURKIN:  No, that's correct.
4    THE COURT:  All right.  You were both there.
5    MRS. MONA DAOUD:  Yes.
6    THE COURT:  All right.  And you all -- I didn't swear
7  them in.  Raise your right hands.
8    THE CLERK:  You do affirm that all the testimony
9  you're about to give --
10    THE COURT:  That they just gave.
11    THE CLERK:  That you just gave in the case now before
12  the Court will be the truth, the whole truth, and nothing but
13  the truth?
14    MR. AHMED DAOUD:  Yes.
15    MRS. MONA DAOUD:  Yes.
16    (Witnesses duly sworn.)
17    THE COURT:  All right.  Thank you very much.  You may
18  be seated.
19    Mr. Durkin, do you have any doubt as to your client
20  Adel Daoud's competency to participate in this hearing today?
21    MR. DURKIN:  No.
22    MRS. MONA DAOUD:  Mr. Jonas, on behalf of the
23  government, do you have any doubt as to the defendant's current
24  competency to proceed today?
25    MR. JONAS:  No, no doubt.

1    THE COURT:  Based on this Court's longtime

2  interaction with Mr. Daoud, seeing him both as incompetent and

3  in this Court's opinion and finding competent, hearing that

4  he's on his medications and hearing the statements he's made

5  today and those of his parents and those of his lawyers, and

6  counsel both sides not finding any reason to determine that he

7  was incompetent today, the Court makes a finding that Mr. Daoud

8  is competent to offer a change of plea on today's date

9  November 26th, 2018.

10    Mr. Daoud, tell me the names of your lawyers.

11    DEFENDANT DAOUD:  Thomas Durkin, Andrea Lyon, Joshua

12  Herman, Robin Waters.

13    THE COURT:  All right.  Thank you very much.  And

14  have you had enough time to talk to them?  And I know you

15  talked to different ones more than others or at different

16  times.  But overall have you been able to communicate with your

17  lawyers?

18    DEFENDANT DAOUD:  Yes, ma'am.

19    THE COURT:  And you've told them all the information

20  they asked you for over the years, is that correct?

21    DEFENDANT DAOUD:  Yes, ma'am.

22    THE COURT:  And you've also had the chance to ask

23  them questions, give them information, talk to them in general;

24  is that correct?

25    DEFENDANT DAOUD:  Yes, ma'am.

1      THE COURT:  And you believe your lawyers know

2   everything about your case?

3      DEFENDANT DAOUD:  Everything about my case?

4      THE COURT:  Yes.  That's charged here.  Do you

5   believe they know everything based -- you told them everything,

6   is that correct?

7      DEFENDANT DAOUD:  I would think so.

8      THE COURT:  Yes.  Okay.  All right.  So, sir, before

9   I get into what your rights are as far as trial, government

10  just briefly again set forth the charges that are here now that

11  we have had multiple ones consolidated before the Court.

12      MR. JONAS:  Yes, Your Honor.  In case 12 CR 723 the

13  defendant's been charged with two counts.  The first is a

14  violation of Title 18 United States Code Section 2332 (a),

15  Subsections (a)(2)(D), which is use of a weapon of mass

16  destruction.  The second count is a violation of 18 United

17  States Section -- United States Code Section 844, subsection

18  (i), which is attempt to destroy a building.  Obviously

19  summarizing.

20      In case 13 CR 703 the defendant's been charged with

21  three counts.  Count 1 charges him violating 18 United States

22  Code Section 373, subsection (a), which is solicitation.  Count

23  2 charges 18 United States Code Section 1958, subsection (a),

24  which is murder for hire.  Count 3 charges 18 United States

25  Code Section 1512, subsection (a)(1)(a), which is witness

1  tampering.

2          The third case, 15 CR 487 charges the defendant in

3  five counts.  The first count is 18 U.S.C., if I may, Judge,

4  for short, 113, subsection (a)(1), which is assault with intent

5  to commit murder.  Count 2 is 18 U.S.C. 113, subsection (a)(3),

6  which is assault with a dangerous weapon.  Count 3 is 18 U.S.C.

7  113, subsection (a)(6), which is assault to commit serious

8  bodily injury.  Count 4 is 18 U.S.C. Section 1791, subsections

9  (a)(2) and (b)(3), which is an inmate in possession with

10 contraband.  And Count 5 is 18 U.S.C. subsection -- I'm sorry,

11 18 U.S.C. 113 subsection (a)(4), which is assault by striking.

12         THE COURT:  All right.  And is that your

13 understanding of the charges also, Mr. Durkin?

14         MR. DURKIN:  Yes.

15         THE COURT:  All right.  And since this is expected to

16 be an Alford plea if it goes through, I'm assuming that all of

17 the -- the plea covers all of these charges?

18         MR. DURKIN:  Yes.

19         THE COURT:  All right.  So, sir, right now and as you

20 know, there has been -- had been scheduled a trial.  And under

21 our Constitution and the laws of the United States you have a

22 right if you are charged with criminal offenses, be them one or

23 many, you have a right to have a trial.  Do you understand

24 that?

25         DEFENDANT DAOUD:  Yes, ma'am.

1      THE COURT:  And you have a right to have a trial by

2  jury, and in limited circumstances in federal court you have a

3  right to have a trial by bench.  That would be just the judge.

4  In this case and in this court, we're in federal jurisdiction,

5  the government can block any right to a bench trial that you

6  might have had in state court.  You don't have that right here.

7  Do you understand that?

8      DEFENDANT DAOUD:  Yes, ma'am.

9      THE COURT:  And so, sir, since we were just about to

10  do the jury and you were here for pretrial conferences and, and

11  all of the preparations that we made over the months, your

12  lawyers made, the government made, and the Court made to have a

13  jury, you do understand that there are certain steps that we

14  would take to have a jury trial, and you would have those

15  rights?  Do you understand that?

16      DEFENDANT DAOUD:  Yes, ma'am.

17      THE COURT:  And you have a right, sir, to have a

18  trial as soon as possible.  In this case we tried several

19  times, but it got derailed for various reasons.  But you have a

20  right to have a trial as soon as possible.  You also have a

21  right to see and hear all of the witnesses that would be called

22  to testify against you.  You have a right to have the -- use

23  the subpoena power of the Court to bring witnesses in your own

24  defense.  Do you understand that?

25      DEFENDANT DAOUD:  Yes, ma'am.

1    THE COURT:  You understand, sir, that your lawyers

2  would have the right to cross-examine any witnesses or

3  challenge any evidence brought against you?  Do you understand

4  that?

5    DEFENDANT DAOUD:  Yes, ma'am.

6    THE COURT:  Do you understand, sir, that as we would

7  go through a trial, at all times you would be presumed innocent

8  until the government had proven its case on each and every

9  charge beyond a reasonable doubt?  Do you understand that?

10    DEFENDANT DAOUD:  Yes, ma'am.

11    THE COURT:  Do you understand, sir, that at no time

12  would you have to prove your innocence?  Do you understand

13  that?

14    DEFENDANT DAOUD:  Yes, ma'am.

15    THE COURT:  Do you understand, sir, that if you wish

16  to put on a defense, you could?  And if you wished to testify

17  in your own defense, you could.  Do you understand that?

18    DEFENDANT DAOUD:  Yes, ma'am.

19    THE COURT:  Do you understand you'd also have the

20  right not to testify and if you chose not to testify, it could

21  not be used against you?  It could not mean that, oh, he didn't

22  testify, therefore, he must be guilty.  Do you understand that?

23    DEFENDANT DAOUD:  Yes, ma'am.

24    THE COURT:  Do you also understand, sir, that as we

25  go through this proceedings -- or the start of these

1    proceedings, and again, I think you heard us discuss it, you'd

2    be able to help select your jury?  Do you understand that?

3              DEFENDANT DAOUD:  Yes, ma'am.

4              THE COURT:  Do you understand, sir, that in this case

5    I think we had 80 people coming today, on this wintry day that

6    were scheduled to come in and be questioned about being part of

7    your jury trial?  Do you understand that?

8              DEFENDANT DAOUD:  Yes, ma'am.

9              THE COURT:  And those questions -- that questioning

10   would have taken place, and you would have been present with

11   your lawyers for that, and the government would be present and

12   all the government lawyers would be present.  And this Court

13   would question those people about their appropriateness to be

14   on this jury.  Do you understand that?

15             DEFENDANT DAOUD:  Yes, ma'am.

16             THE COURT:  And you would be able to hear all those

17   answers and -- those questions and answers.  And at a time

18   outside the presence of the jury you'd be able to ask for

19   certain persons to be excused for cause or because they had

20   some conflict or bias.  Do you understand that?

21             DEFENDANT DAOUD:  Yes, ma'am.

22             THE COURT:  You understand the government would have

23   that same right?

24             DEFENDANT DAOUD:  Yes, ma'am.

25             THE COURT:  Do you also understand, sir, that after

1    we went through those cause challenges, you'd also have a right

2    to have a limited number of persons excused for -- by

3    discretion?  It's called peremptory.  Do you understand that?

4                    DEFENDANT DAOUD:  Yes, ma'am.

5                    THE COURT:  If you felt those people just couldn't be

6    fair to you based on maybe what they did for a living, whether

7    they lived in a certain neighborhood, what they said, various

8    reasons you would have the discretion to ask those people be

9    excused.  Do you understand that?

10                   DEFENDANT DAOUD:  Yes, ma'am.

11                   THE COURT:  Do you understand the government would

12   also have that right, although they would not have as many

13   peremptory or discretionary strikes to take as you?  Defendants

14   always have more in criminal cases.  Do you understand that?

15                   DEFENDANT DAOUD:  Yes, ma'am.

16                   THE COURT:  All right.  After a jury would be

17   selected, sir, it would be 12 people, and we'd have some

18   alternates.  I think we would probably be looking at about 16

19   people in this case.  You would have the opportunity to

20   present -- hear the government present its case and see if they

21   could prove you guilty beyond a reasonable doubt by their

22   presentation of evidence.  The jury would then take all of that

23   evidence and any that you wished to present and go and

24   deliberate after hearing the instructions given by this Court.

25   Those are the instructions on the law.  Do you understand that?

1          DEFENDANT DAOUD:  Yes, ma'am.

2          THE COURT:  After that happened, the jury would go

3   and deliberate and have to decide on each separate count

4   whether the government had met its burden of proof on that

5   count before you could be found guilty.  Do you understand

6   that?

7          DEFENDANT DAOUD:  Yes, ma'am.

8          THE COURT:  Do you understand, sir, that if you were

9   found guilty of any of the counts, that you would have a right

10  to appeal that conviction?  If you were found guilty of any of

11  those, do you understand?

12         DEFENDANT DAOUD:  Yes, ma'am.

13         THE COURT:  Do you understand, sir, that if you go --

14  if you go forward with a change of plea today, whether it is,

15  you know, plea agreement, whether it's an Alford plea, any

16  change of plea today, you forego, you waive, you will not have

17  those trial rights?  Do you understand that?

18         DEFENDANT DAOUD:  Yes, ma'am.

19         THE COURT:  All right.  There's no going back.  Do

20  you understand?

21         DEFENDANT DAOUD:  Yes, ma'am.

22         THE COURT:  All right.  And do you understand, sir,

23  that if you plead guilty not only will there not be a trial if

24  you change your plea, not only will there not be a trial, but

25  then the sentencing that will happen after happens after?  It's

1    not tied up to anything that happens today.  Do you understand
2    that?

3                 DEFENDANT DAOUD:  Yes, ma'am.

4                 THE COURT:  All right.  You understand that the
5    sentence will be decided by this Court on the statute, on
6    advisory guidelines, and on sentencing factors?  This Court
7    makes the final decision.  Do you understand that?

8                 DEFENDANT DAOUD:  Yes, ma'am.

9                 THE COURT:  Has anyone promised you anything to take
10   this step of changing your plea today?

11                DEFENDANT DAOUD:  No, ma'am.

12                THE COURT:  Has anybody threatened you, forced you to
13   change your plea today?

14                DEFENDANT DAOUD:  No, ma'am.

15                THE COURT:  All right.  You've heard from your
16   lawyer.  You've heard their advice.  You had a chance to
17   briefly speak with your family.  Any step you're taking today,
18   sir, is it of your own free will?

19                DEFENDANT DAOUD:  Yes, ma'am.

20                THE COURT:  Will the government please give me a list
21   of the statutory sentences that might happen here at the
22   maximum.  Also the expected advisory guideline, or at least
23   what you expect to -- what the range to be.

24                MR. JONAS:  Yes, Your Honor.  With regard to Count 1
25   in 12 CR 723, which is the weapons of mass destruction count,

1    the period of incarceration -- the statutory maximum period of

2    incarceration is life.  And the statutory maximum period of

3    supervised release, release is life.  With regard to the

4    sentence, the advisory sentencing guideline, the government's

5    preliminary calculation -- well, let me do, let me do the

6    guidelines by, by indictment.

7           With regard to Count 2 of 12 CR 723, which is the

8    destruction of a building, the statutory maximum period of

9    incarceration is 20 years.  There's a five-year mandatory

10   minimum, which is kind of moot at this point.  And supervised

11   release, release of life.

12          THE COURT:  All right.  Let's be clear since we

13   have -- it's moot at this point because he's already served --

14          MR. JONAS:  Correct.

15          THE COURT:  -- a certain amount.

16          MR. JONAS:  It's moot because he's served more than

17   five years at this point.

18          THE COURT:  All right.  That's why it's moot.

19          MR. JONAS:  So we've exceeded the five-year mandatory

20   minimum.

21          THE COURT:  I just wanted it clarified --

22          MR. JONAS:  Yes, Judge.

23          THE COURT:  -- as to why it was moot.  All right.

24   Proceed.

25          MR. JONAS:  With regard to the sentencing guidelines,

1    the advisory sentencing guidelines for 12 CR 723, it's the
2    government's estimate that the guideline range is a level 45,
3    with a criminal history category of 6, which results in a
4    guideline range of life.

5           For the second indictment, 13 CR 703, for Count 1,
6    the solicitation count, the statutory maximum period of
7    incarceration is 10 years and the supervised release is 3
8    years.  With regard to Count 2, which is the murder for hire,
9    the statutory maximum is 10 years, with supervised release of 3
10   years.  In regard to Count 3, the witness tampering, the
11   statutory maximum is 30 years, with a supervised release of 5
12   years.  The government's estimate of the sentencing guidelines
13   for 13 CR 703, 7-0-3 is a level 32, criminal history category
14   1, which results in a range of 121 to 151 months.

15          With regard to 15 CR 487, for Count 1 the assault
16   with intent to commit murder, the statutory maximum is 20
17   years, with supervised release of 3 years.  Count 2, assault
18   with a dangerous weapon, the statutory maximum is 10 years,
19   with supervised release of 3 years.  Count 3, assault with a
20   serious -- to commit serious bodily injury, the statutory
21   maximum is 10 years, with supervised release of 3 years.  Count
22   4, an inmate in possession of contraband, statutory maximum is
23   five years, with a maximum of three years supervised release.

24          And Count 5, assault by striking is a misdemeanor.
25   The statutory maximum is one year and one year of supervised

1    release.  With regard to that indictment, 15 CR 487, the

2    government's estimate of the guidelines is level 33, criminal

3    history category 1, with a range of 135 to 168 months.

4              THE COURT:  And ...

5              MR. JONAS:  In total -- I was going to say in total,

6    Your Honor --

7              THE COURT:  No, but and?

8              MR. JONAS:  Sorry?

9              THE COURT:  And the hundred dollars.

10             MR. JONAS:  Well, I was going to get there.

11             THE COURT:  Oh, okay.

12             MR. JONAS:  In total incarceration is, is life.

13   Supervised release is life.  The fine is $250,000 per count,

14   for a total fine of $2.5 million.  And a special assessment is

15   a hundred dollars per count, for a total special assessment of

16   $1,000.

17             THE COURT:  All right.  And so, Mr. Daoud, what the

18   government has just set forth is both the maximum that you

19   could get, the top end.  Do you understand?

20             DEFENDANT DAOUD:  Yes, ma'am.

21             THE COURT:  All right.  And in addition, they've gone

22   through each separate count, also the question is -- and as

23   they have stated, there is a possibility of consecutive

24   sentences, which means, you know, you take one and you back up

25   another one and you back up another one.  There's also other

1    possibilities of concurrent, which means you'd serve them at

2    the same time.  There's also an issue of the fact you've been

3    in jail for six years, so I don't want you to totally not

4    understand what's happening.

5            The ultimate decision on what the sentence will be

6    outside of maximums that are required by the Court is up to me,

7    the Court.  I can stay within guidelines.  I can go above the

8    guidelines.  And I can below the guidelines.  Do you

9    understand?

10            DEFENDANT DAOUD:  Yes, ma'am.

11            THE COURT:  Is there any question that you have about

12    the possibility of sentence?  The Court will also state in

13    addition to being assisted in the difficult task of sentencing

14    anyone by the guidelines and the statutes, the Court is

15    assisted by a presentence investigation report that will be put

16    together, and it's a lengthy presentation.  They'll talk to

17    your parents and other people on your behalf to get a bigger,

18    fuller picture of you.  And your lawyer will get to present a

19    written and oral statement about what they believe your

20    recommendations.  They can even call witnesses, and the

21    government can also present written and oral presentations on

22    what they believe the sentence should be and witnesses if they

23    choose to.  Do you understand that?

24            DEFENDANT DAOUD:  Yes, ma'am.

25            THE COURT:  All right.  So the final sentencing

1  decision does not stop with the government's overall totaling
2  up of everything you could possibly get in the world.  It ends
3  with me.  Do you understand?

4          DEFENDANT DAOUD:  Yes, ma'am.

5          THE COURT:  But this Court is making no promises, and
6  no one should have made any promises to you about what the
7  Court's decision will be.  Have you been made any promises on
8  sentencing?

9          DEFENDANT DAOUD:  No, ma'am.

10          THE COURT:  Have you been told any possibilities you
11  would get on sentencing, that I might sentence you to?  Has
12  anyone said something that I might sentence you to?

13          DEFENDANT DAOUD:  Yes, ma'am.

14          THE COURT:  Well, throw that out of your mind
15  whatever it is.  Do you understand?

16          DEFENDANT DAOUD:  Yes, ma'am.

17          THE COURT:  My possibilities are what he just said.
18  I can do anything in that realm.  Do you understand that?

19          DEFENDANT DAOUD:  Yes, ma'am.

20          THE COURT:  So whatever your lawyer may recommend,
21  which is what I perceive is probably what he told you, that
22  recommendation is different from what I will -- may be
23  different from what I will actually give.  Do you understand
24  that?

25          DEFENDANT DAOUD:  Yes, ma'am.

1    THE COURT:  All right.  So you need to know that.
2    Step to the side and make sure you want to go any further.
3    Step over.
4        (Brief pause.)
5        THE COURT:  Mr. Durkin, is your client clear that I
6    make my own decisions, and I really have never been known to
7    give exactly what anybody recommends I give on either side?
8        MR. DURKIN:  We told him that any predictions that we
9    made or any other numbers that were thrown around in any other
10   negotiations were just numbers.  And that you're not bound by
11   any of that, and you can sentence him to whatever you see fit.
12       THE COURT:  All right.  You understand that, sir?
13       DEFENDANT DAOUD:  Yes, ma'am.
14       THE COURT:  All right.  Do you wish to continue?
15       DEFENDANT DAOUD:  Yes, ma'am.
16       THE COURT:  All right.  At this point we're going to
17   be looking at a factual basis for this plea.  And before we get
18   to that, the Court has received extensive briefings, first of
19   all, by each side getting to this point that the Court would
20   even entertain the possibility of an Alford plea.  In that plea
21   as has been stated in all the filings and in the case law, this
22   is one where once the Court determines there is a factual
23   basis, that you would agree to the factual basis, but you would
24   claim -- still claim your innocence -- your position of
25   innocence of any wrongdoing and that you voluntarily, knowing,

1    and understandably based on what this Court hears agree to
2    enter a plea of guilty based on the factual basis that has been
3    provided on each of the charged offenses.

4          And also the Court needs to know again, stated here
5    in open court your reason for taking this step to make sure
6    that it complies with the factors in Alford.  All right.  So
7    how are you going to present -- the government -- the Court
8    knows that the government presented somewhat unusually, they
9    gave me a pre-copy at my request, but they filed it, and it was
10   quite extensive.  What is your position on factual basis before
11   I turn to them?  I know what their factual basis is.

12         MR. DURKIN:  Judge, as we said in our pleading on No.
13   295 that was filed on November 14th on pages 9 and 10, we said
14   defendant certainly acknowledges -- this is at the bottom of 9.

15         THE COURT:  You need to -- a little louder, please.

16         MR. DURKIN:  I said this is at the bottom of 9.
17   Defendant certainly acknowledges the strength of the evidence
18   against him.  And we said the Court which has presided over the
19   matter over the past six years surely must also acknowledge the
20   overwhelming and serious and prejudicial nature of that
21   evidence with respect to the terrorism charges and the
22   solicitation to murder the undercover FBI agent.

23         We went on to say that he also has credible bona fide
24   defenses, particularly with respect to the entrapment defense.
25   But as we concluded in the first paragraph on 10, still given

1   the very nature of the terrorism charges and the extensive

2   evidence that will be marshaled against him, defendant

3   understands the likelihood of a guilty verdict notwithstanding

4   his defenses and protestations of innocence.  And then --

5              THE COURT:  Hold it right there.  So you're not

6   trying to say, Mr. Durkin, that he can't get a fair trial, are

7   you?

8              MR. DURKIN:  No.  I'm not saying -- I'm not saying

9   that he can't get a fair trial by the legal definition of a

10  fair trial.  I'm simply saying the reality of the situation

11  today in light of the nature of the government's evidence,

12  which is certainly strong, that he has a reason to want to

13  plead guilty and yet persist in his innocence.  It's in -- it

14  is in, in keeping with Alford.  I think this is a classic case

15  where the evidence is strong, but there are other reasons for a

16  defendant to want to persist in his innocence and to proceed in

17  this fashion.

18             THE COURT:  All right.  Mr. Daoud, do you understand

19  what your lawyer has just stated?

20             DEFENDANT DAOUD:  Yes, ma'am.

21             THE COURT:  All right.  And he's talked to you about

22  this, is that correct?

23             DEFENDANT DAOUD:  Yes, ma'am.

24             THE COURT:  All right.  What else, Mr. Durkin?

25             MR. DURKIN:  Well, I've also -- we've, we've read the

1   government's proffer, which someone would have to be a fool to

2   try to say that that's not a sufficient factual basis for a

3   guilty plea.  It covers, at least as I read it, it covers each

4   and every element of each and every offense, and it is very

5   thorough.

6           THE COURT:  And more.

7           MR. DURKIN:  Yes.  And that's not to say there aren't

8   two sides to it, or that there aren't issues that we might

9   differ with in terms of the evidence.  But as we also said and

10  as your order acknowledges, he does not think -- the defendant

11  doesn't think a lengthy trial would be in his interest in light

12  of the stress that would result from relitigating the beliefs,

13  statements, and conduct that resulted in having him spent a

14  quarter of his life in jail.  It would be an incredibly

15  stressful trial for him.

16          And as I said in my pleading, particularly, you know,

17  with a third case hanging over his head, it would be an

18  incredibly stressful event for any defendant, much less anyone

19  who's on medication.  That's not to say he couldn't proceed to

20  trial or he could not get a fair trial.  I, I don't doubt for

21  one second that the Court would do everything in its power, as

22  it had been doing, to ensure he would get a fair trial.  But

23  fair trials on a legal standard and the reality of dealing with

24  a jury in 2018 in a case such as this, it is my judgment that

25  this is the correct and appropriate way for him to proceed.

1          THE COURT:  If you were to focus on one particular

2  element over another, would it be that it would be the mental

3  health issues -- I don't think despite the time that the Court

4  has had Mr. Daoud before it that we've never had a full vetting

5  in front of him of all of the evidence in a hearing like

6  setting.  I don't believe we've ever had that, is that correct?

7          MR. DURKIN:  That's right.

8          THE COURT:  Is that correct, Mr. Jonas?

9          MR. JONAS:  That's correct, Your Honor.

10         THE COURT:  And so would that be your pecking order,

11 your first and foremost reason for following through here --

12         MR. DURKIN:  I think --

13         THE COURT:  -- as opposed to the --

14         MR. DURKIN:  I think that would be the most, most

15 overwhelmingly clear choice if I had only one choice.

16         THE COURT:  Well, you don't only have one choice.

17         MR. DURKIN:  No, I understand.

18         THE COURT:  The Court just wanted to, to find out if

19 it was his own personal mental health situation --

20         MR. DURKIN:  Yes.

21         THE COURT:  -- that was paramount over, and then

22 obviously you're saying the environment that potential jurors

23 might be exposed to in this case might affect the second --

24         MR. DURKIN:  Well, let me explain the first one,

25 Judge.  It has been our experience with Mr. Daoud that stress

1   has not been good for him in light of his condition.  As you

2   know, he was incarcerated for lengthy periods of time in the

3   SHU or segregated housing.  That was never helpful, although

4   I'm sure necessary from the MCC standpoint or Bureau of

5   Prisons' standpoint.  It has been our experience that since

6   he's come back from Butner he has been a different person.  He

7   has been very cooperative with us.  He has been very helpful

8   in, in discussing the case with us.

9           In fact, he provided us with considerable written

10  documents written by his own hand that were cogent and

11  intelligent and, and very supportive, particularly of the

12  entrapment defense.  It was well reasoned.  It was certainly

13  beyond what I would have expected from someone with a high

14  school education.  He has been very very thorough with the

15  discovery.  He has inundated us sometimes with more information

16  than we probably needed, but he certainly gave us his view of

17  the evidence.  That said, in our experience stress has not been

18  good for him.  And I think that as is obvious from the

19  government proffer, having to sit through all of this evidence

20  would have been extremely stressful.

21          So I think while that is our first and foremost

22  reason and the other reasons I've set forth, I think there is

23  more than enough of a basis for the Court to use its discretion

24  and accept an Alford plea under these circumstances.

25          THE COURT:  The other question the Court has is

1    there's a 19-page -- 18 and a half page factual basis that the

2    government has presented.  Has your client read and looked at

3    that?

4              MR. DURKIN:  Yes.

5              THE COURT:  Okay.

6              MR. DURKIN:  He's -- not only has he read it, we have

7    discussed it with him in great detail.  And he does not contest

8    those facts per se as they're written.  The discussions we've

9    had with him, and they've been largely with Mr. Herman and Miss

10   Lyon, his comments have been not to challenge the actual

11   evidence that's presented, but to challenge the context in

12   which the -- some of the statements are made.

13             THE COURT:  Not surprising.  All right.  The other

14   question -- the Court just wanted to make sure, since this is

15   so detailed if you were worried about -- again, even something

16   like this has not been set forth over the course of these six

17   years.  I wanted to make sure that your concern about how he

18   would be affected wouldn't be affected by even the factual

19   basis being presented by the government with my presumption

20   that the government intends to read all 18 and a half pages,

21   correct?

22             MR. JONAS:  Yes, Your Honor.

23             THE COURT:  All right.  So that's what I wanted to

24   make sure --

25             MR. DURKIN:  I mean --

1          THE COURT:  -- that he had seen it, he had heard

2     it --

3          MR. DURKIN:  He has read it.

4          THE COURT:  -- and he understands it's going to be

5     read.

6          MR. DURKIN:  I would certainly propose that it could

7     be simply made of record.  I think it's a public document.  I

8     don't know what -- and he's been given a copy of his own.  He

9     has read it.  We've gone through it page by page with him.  I

10    don't think any purpose would be served.  The press --

11         THE COURT:  Let's see, let's see --

12         MR. DURKIN:  The press has already written stories

13    about it.  So I mean --

14         THE COURT:  They have it since it got filed on the

15    docket.

16         MR. DURKIN:  It's not like the press isn't going to

17    get it so -- and hasn't already seen it.

18         THE COURT:  They have it I'm sure.

19         MR. DURKIN:  Yes.

20         THE COURT:  Mr. Jonas, do you have a slightly

21    summarized, shorter version?

22         MR. JONAS:  Not one that's written out, Your Honor.

23    And might I just make a comment.  The reason why we filed such

24    an extensive brief -- factual basis is because this is an

25    unusual situation, as Your Honor knows.  And you need an

1    extensive factual basis to accept this Alford plea, especially

2    with the third case of which you know nothing about.

3             THE COURT:  The Court agrees -- the Court knew a

4    little bit about that.

5             MR. JONAS:  Well, I say nothing, but certainly not to

6    the extent that you're familiar with the first two cases.  The

7    third case wasn't before you, Your Honor.  In addition, the

8    public has a right to know --

9             THE COURT:  I'm going to stop you right there, Mr.

10   Jonas.  The Court knew about it because the Court after that

11   found a competency issue, and that's when we got to the next

12   part.  So this Court knew a lot about that.

13            MR. JONAS:  I stand --

14            THE COURT:  But go ahead.

15            MR. JONAS:  I apologize, Your Honor.  I stand

16   corrected.  But in addition to Your Honor needing to have a

17   sufficient factual basis because of the situation here in the

18   Alford plea, the public also has a right to know.  And as the

19   government set forth in its response to the defendant's motion,

20   our objection is because the public has to have a belief that

21   the judicial system works, that someone's not pleading guilty

22   just because they feel like the weight of the government is

23   against them and not because they actually acknowledge their

24   guilt.  That's not something we'd like to see here.

25            From day one the defense has accused the government

1    and the FBI of overreaching in this case, of entrapping the

2    defendant.  They accused the government of not taking other

3    measures that would have been more appropriate in their view.

4    I couldn't agree -- I couldn't disagree more wholeheartedly.  I

5    consider this is an FBI success story.  I believe the FBI

6    stopped somebody who was on a direct path --

7                THE COURT:  This is not time for a full argument,

8    Counsel.

9                MR. JONAS:  No, I understand that, Your Honor.  I'm

10   getting to the point of the public has to understand that as

11   well, because they're not hearing the defendant acknowledge his

12   guilt.  And that's why we filed the very extensive factual

13   basis, which is not as extensive as the evidence we plan on

14   presenting at sentencing, Your Honor.  That's why we went --

15   why I filed it publicly.  That's why we made it very detailed

16   is because the public has a right to know what's going on here.

17               THE COURT:  All right.  One of the things the Court

18   is used to, again, I'm used to not getting factual basis filed.

19   I'm used to getting factual basis just presented to the Court

20   in chambers.  The public has it on the public docket.  But the

21   Court does understand since this is so unusual, Alford plea,

22   the Court does not want to take any chances that there is

23   something here that he has some other type of objection to and

24   that's not put of record.

25               However, I do believe that it is a practice of the

1   very experienced U.S. Attorney's office that you all can

2   summarize as you read, and that happens on a regular basis.

3   And so the Court definitely believes that you should be able to

4   take some steps and not go through every single quote of

5   everything he said in areas where maybe one quote and others

6   like it could be summarized in places, and I think you know

7   what I'm talking about, Mr. Jonas.

8           MR. JONAS:  I do, Your Honor.

9           THE COURT:  So again, it is of record.  It's on the

10  docket.  He has read it thoroughly.  His lawyer has said on the

11  record that he has read it thoroughly, and the Court is going

12  to allow you to proceed, but let's see if we can be somewhat

13  expedient.  Have a seat.  Have a seat.

14          MR. DURKIN:  And the other reason that I think that's

15  prudent is that while I agree there's a factual basis, I don't

16  agree with everything Mr. Jonas said.  And I don't want to have

17  to be put in a position of having to respond.  I've, I've said

18  that there are a lot of things in the factual basis that are

19  not provided context.  So for the government to get on its high

20  horse and start talking about, you know, how -- what the public

21  needs to know, that's a two-way street as well, which I don't

22  think is necessary today.

23          THE COURT:  Well, let me say this as far as the

24  public needs to know part:  That's just coming up today, but it

25  was clear from their very thorough recitation of what they

1   believe their factual basis was that if you felt like they had

2   really gone out on a limb in some way, that there was plenty of

3   time to file even an objection or responses.  I'm not going to

4   allow that here.  I did not know it was going to be publicly

5   stated, and I did not know that it would be quite to this

6   extent.

7               So but as you have stated, Mr. Durkin, there is

8   enough here as to each and every count.  They've gone

9   specifically count by count, to establish a factual basis.  And

10  the fact that you have stated that and left it at that would

11  hopefully be of some good will that the government can curtail

12  it somewhat since he's already made that statement and did not

13  take the step to somehow try to engage in whether certain

14  quotes should be there, what's needed for a factual basis,

15  which usually is almost usually less than more.  In this case

16  it's the more.

17              So whatever their reason, policy reason in addition

18  for putting it forth, it's not that it is not correct.  And so

19  what the Court would just ask, as Mr. Durkin has been careful

20  in his presentation today, I ask that the government somehow

21  curtail this.  All right.

22              MR. DURKIN:  Thank you.

23              MR. JONAS:  I will, Your Honor.  If I could just make

24  one other, one other point.  The reason why -- you made a --

25  Your Honor made a comment about how factual basis is usually

1    given to the Court in chambers.  But then the plea agreements
2    that contain the factual basis are publicly filed after a plea
3    is taken.
4              THE COURT:  Afterwards, yes.
5              MR. JONAS:  So we weren't sure if we had given this
6    to you in chambers, whether this would have hit the record --
7    the docket or not, and that's another reason, another reason
8    why we --
9              THE COURT:  Why would I do something different here
10   unless you all asked?
11             MR. JONAS:  No.  Well, this is -- this whole
12   situation is different.  And that's why we weren't sure if this
13   would have been publicly filed.  So we went ahead and publicly
14   filed it, Your Honor.
15             THE COURT:  Well, again, if it had been asked, then
16   the Court would have at least had to have been in the position
17   where the Court could have granted that, and they could have
18   been happy.  But it's done.  The public has it.  Let's hear it
19   on the record.  If you wish to have a seat, Mr. Durkin, you
20   may.
21             MR. JONAS:  Yes, Your Honor.  With regard -- may I
22   proceed.
23             THE COURT:  And, Counsel, government, you can have a
24   seat too.  I won't make you stand up by Mr. Jonas.  All right.
25   Proceed.

1    MR. JONAS:  Thank you, Your Honor.  With regard to 12
2    CR 723, the government would prove beyond a reasonable doubt
3    had this case gone to trial that on September 14th, 2012 in the
4    Northern District of Illinois the defendant attempted to use a
5    weapon of mass destruction; namely, a destructive device
6    against people and property in the United States in a manner
7    that would have affected interstate and foreign commerce.  And
8    he would have attempted to maliciously damage and destroy a
9    building that was being used in activity affecting interstate
10   and foreign commerce.
11          More specifically, in conduct prior between
12   September 11th, 2011 and May 13th, 2012 -- and we selected that
13   date, Your Honor, because on May 14th is the defendant's first
14   interaction with the FBI's online covert employees -- the
15   defendant had viewed a significant amount of material that was
16   jihadist in nature, terrorism in nature.  The defendant had
17   made comments publicly regarding a desire to become a
18   terrorist, to use his own term.  The defendant has expressed
19   his hatred against the United States, which I think is --
20   certainly he has a right to do so.  But I think it's important
21   in this case when it came to his attempt to kill as many, as he
22   put it, Kufrs, nonbelievers as possible in the United States.
23          The defendant distributed --
24          THE COURT:  His attempt or his statements that he
25   wanted to do that?  You are talking about statements right now.

1    MR. JONAS:  I think his statements are important when

2  it came to his mental state regarding the attempt.

3    THE COURT:  Later on.

4    MR. JONAS:  Later on, yes.

5    THE COURT:  I just wanted to clarify that.

6    MR. JONAS:  Yes.  Thank you, Your Honor.  The

7  defendant distributed much of this material to friends of his

8  and other third parties, including *Inspire Magazine*, which was

9  a magazine created by Al-Qaeda, whose purpose is to inspire as

10  the title suggests, individuals to commit attacks in their

11  homeland, if not travel abroad.  *Inspire Magazine* has multiple

12  articles about how to commit attacks, how to make bombs, how to

13  make explosives.  How to train with weapons, including this one

14  article about training with an AK-47, which is important,

15  because the defendant later on inquired about how much an AK-47

16  costs.

17    From May 14th, 2012 forward the defendant began

18  engaging with an FBI online covert employee, who he believed at

19  first was a 17-year-old living in Australia.  That's OCE ONE,

20  and there was an OCE TWO, a different individual that was

21  portraying himself as an older individual.  The first OCE ONE

22  responded to the defendant's online posting as something that

23  the defendant called terrorist music.  That allowed the OCE ONE

24  to engage with the defendant, and thereafter they engaged in

25  numerous conversations regarding terrorism and committing acts

1    of, of violence.

2          At the same time while the defendant was engaging

3    with the FBI OCEs, he was continuing his online viewing of

4    jihadist material, online posting of, of terrorism statements,

5    and his intention to commit a terrorist act.  He talked about,

6    for example, on May 31st, 2012 on the web forum called Deen

7    Haqq, D-E-E-N, H-A-Q-Q, that he wanted in the future to go for

8    jihad.  He was debating whether to commit an attack in America

9    or go to Yemen to become a jihadist.  He was hoping to be able

10   to do both.  He stated numerous times that he wanted to die a

11   mujahid or a martyr.

12         At one point the defendant downloaded and viewed the

13   illus -- or viewed the *Illustrated Manual of Sniper Skills,* and

14   another article called *Organic Chemistry of Explosives*.  He

15   viewed a manual titled *How Can I Train Myself for Jihad.*

16   Eventually one of the OCEs introduced the defendant to an

17   individual the defendant believed was the OCE's cousin, and

18   that was the undercover agent.  And in June 2012 the defendant

19   began engaging with the undercover agent.  First they

20   communicated online, and then they met in person.

21         During the first meeting the defendant began talking

22   about violent jihad and his, his hatred of Kufrs, again

23   nonbelievers, people who don't believe the way he does.  He

24   talked about that they're terrorists but in a good way.

25   They're terrorizing enemies of Allah.  He talked with the, the

1   undercover agent about the places that he wants to blow up,

2   including a mall, a bar, and other locations.  Movie theaters,

3   military recruiting centers.  This was all the defendant's own

4   idea.  The defendant's handwritten notes that he gave to the

5   undercover agent, which the government will present during

6   sentencing, made references to a big bomb.

7          On September 13th the defendant met with the

8   undercover employee, who showed the defendant the purported

9   explosive device, the thousand pound bomb, which was inside a

10  green Jeep Cherokee.  The defendant after seeing the bomb

11  stated he wanted to kill at least a hundred people.  He also

12  said that he wanted to be the one to drive -- to park the car

13  by the target, the Cactus Bar & Grill, just a few blocks from

14  here.  And asked if he could press the button to detonate the

15  bomb.

16         On September 14th, 2012 at 7:10 -- at 7:12 p.m. the

17  defendant met with the FBI undercover employee, and the two,

18  two drove to downtown Chicago.  During the drive, the defendant

19  prayed for the success of the attack, and he hoped that it

20  would kill as many people as possible and cause destruction.

21  And, Your Honor, we will play that video for you at sentencing.

22  After arriving downtown Chicago, the defendant picked up the

23  Jeep containing the purported explosive device and parked it

24  directly outside the target location they had previously

25  selected, the Cactus Bar & Grill.

1        The defendant then exited the Jeep, walked to an

2   alley approximately a block away and twice attempted to

3   detonate the explosive device by pressing the triggering

4   mechanism.  He was then arrested by the FBI.  And, Your Honor,

5   as Mr. Haxall pointed out, the Cactus Bar & Grill served

6   alcohol that had been transported in interstate commerce from

7   outside of Illinois to the Cactus Bar & Grill in the Northern

8   District of Illinois.

9        With regard to 13 CR 703, as Your Honor's aware, the

10  defendant was detained as a result of the first indictment or

11  complaint.  And between no later than October 26th, 2012 and

12  continuing until November 29th, 2012 in the Northern District

13  of Illinois the defendant with intent to -- with intent that

14  another person engage in conduct constituting a felony that has

15  an element the use, attempted use, and threatened use of

16  physical force against a person of another; namely, Individual

17  A, in violation of the laws of the United States.  Specifically

18  Title 18 U.S.C. Section 1114, and under circumstances strongly

19  corroborative of that intent, solicited, commanded, induced,

20  and otherwise endeavored to persuade such other person to

21  engage in such conduct.

22       On November 28th, 2012 the defendant knowingly caused

23  another to use a facility of interstate commerce; namely, a

24  cellular telephone utilizing an interstate cellular telephone

25  service provider with the intent that a murder be committed in

1   violation of the laws of the United States.  Namely, the murder

2   of Individual A, the FBI undercover agent, in violation of

3   Title 18 U.S.C. Section 114 -- 1114.  As consideration for a

4   promise and agreement to pay for something of pecuniary value.

5           More specifically, the government would prove had

6   this case gone to trial that between October 26th, 2012 and

7   November 29th, 2012 the defendant knowingly attempted to kill

8   another person, the FBI undercover agent, with the intent to

9   prevent the attendance and testimony of that person in an

10  official proceeding, specifically the trial of this case.  As

11  it relates to these trials -- as it relates -- sorry.  As it

12  relates to these charges, while the defendant was in custody in

13  Kankakee, he solicited and offered to pay a cellmate to have

14  the FBI agent murdered.

15          The defendant told the cellmate that he wished to

16  have the undercover employee, the FBI agent, who the defendant

17  knew as Mudaffer, killed.  The defendant indicated he would

18  give the cellmate a gift if he could arrange to have one of his

19  gang members kill the FBI agent.

20          THE COURT:  Just to make sure.  So a gift, so there

21  was not -- you all weren't -- the whole case wasn't based on

22  some $20,000 that a high school kid who never worked had, is

23  that correct?

24          MR. JONAS:  That's what he offered the cellmate.

25          THE COURT:  And that's all?  It doesn't matter that

1    there would be like no way they would have that money?

2    MR. JONAS:  It doesn't matter that the actual payment

3    was not made.  It's the offer of the payment.

4    THE COURT:  Okay.  And, and you also have a gift,

5    which is something separate.  So those two things are there, is

6    that correct?

7    MR. JONAS:  No, I think the gift is, is the 20,000.

8    Confirming yes.

9    THE COURT:  The gift is --

10    MR. JONAS:  The gift is the 20,000.  I think

11    that's -- the gift is in quotes because that's the term the

12    defendant used.

13    THE COURT:  Okay.  I was wondering what the quote

14    was.  I was wondering if both of those things were.  Proceed.

15    MR. JONAS:  No.  No.  The gift is --

16    THE COURT:  Proceed.  Thank you.

17    MR. JONAS:  The defendant provided the cellmate with

18    a phone number that he believed belonged to the FBI agent, and

19    that was the phone number the FBI agent used during the

20    undercover operation of the first case.  The defendant made

21    suggestions on how the FBI agent should get killed, including

22    running him over, shooting him with a gun, stabbing him or

23    beheading him.

24    The cellmate told the defendant later on that he was

25    able to locate Mudaffer.  The.  Defendant asked for a picture.

1   The cellmate showed the defendant a picture of Mudaffer, the

2   undercover agent purportedly taken by a member of the Gangster

3   Disciples who was conducting surveillance of Mudaffer.  The

4   defendant identified the undercover agent in the picture.  The

5   cellmate told the defendant that he had to place a phone call

6   to a specific number in order to have Mudaffer killed.  A

7   trigger in a sense.  Not to make a pun, Your Honor.

8           THE COURT:  I didn't take it as that.  Proceed.

9           MR. JONAS:  The cellmate stated once you call today,

10  man, he's dead.  The defendant responded, Inshallah, which

11  means God willing.  The defendant then ordered the murder by

12  placing the coded phone call to the purported hitman.  One or

13  both of the telephones used during the phone call utilized an

14  interstate telephone service provider.  The following day the

15  cellmate reported that the FBI agent had been killed, which

16  made the defendant pleased and relieved.

17          With regard to the third case, 15 CR 487, the

18  defendant was housed at the MCC, which was a Bureau -- United

19  States Bureau of Prisons facility located here in Chicago.

20  Victim A was an inmate at the MCC.  On May 23rd, 2015 the

21  defendant at a place within the special maritime and

22  territorial jurisdiction of the United States; namely, the MCC,

23  did assault Victim A with intent to commit murder.  He

24  assaulted Victim A with a dangerous weapon.  He assaulted

25  Victim A resulting in serious bodily injury.  He possessed a

1    weapon and an object that was designed and intended to be used

2    as a weapon.  And he assaulted victim by striking, beating, and

3    wounding him.

4            More specifically, with regard to this indictment,

5    the defendant who was an inmate at the MCC along with Victim A,

6    Victim A on December 29th, 2014 had draw a picture -- drew a

7    picture of the Prophet Muhammad and showed it to other inmates,

8    including the defendant.  Shortly thereafter the defendant

9    entered the common room where Victim A was located.  He then

10   jumped on Victim A and started punching him.

11           A short time afterwards -- well, jumping forward to

12   May 22nd, 2015.  A news story had come out about violence

13   directed toward individuals drawing pictures of the Prophet

14   Muhammad.  Between the prior attack in December 29th, 2014 and

15   May 22, 2015, Victim A and the defendant resolved their

16   differences and became friendly.  But on May 22nd, that news

17   story aired.  At least one inmate stated that the defendant was

18   near the television as the story aired and appeared to become

19   agitated.  That day Victim A told the defendant he intended to

20   sleep in late the following morning.

21           The next morning when Victim A was sleeping in his

22   cell, the defendant entered and attacked him.  Victim A fell

23   from his bunk and was tangled in sheets as defendant stabbed at

24   him with weapons in each hand.  The weapons appeared to be

25   fashioned from toothbrushes.  One was sharpened.  The defendant

1    also bit Victim A's finger and arm as Victim A struggled.
2    Other inmates came in and broke up the fight.  One inmate
3    removed the defendant and took him back to his cell.

4            During -- while at his cell, the defendant broke a
5    toothbrush in half, lifted his shirt, and the cellmate saw
6    another item that appeared to be a toothbrush stuck to his
7    stomach.  The defendant broke that item in half and flushed
8    them both down the toilet.  When MCC staff asked the defendant
9    where the weapons were located, he smiled and said, you won't
10   find it.  Victim A required two surgical staples to close one
11   of the wounds to his head.

12           Prior to the attacks and prior to the defendant's
13   incarceration, the defendant had expressed outrage at people
14   who drew pictures of the Prophet.  Specifically on May 18th,
15   2012, several years earlier -- I'm sorry, several months
16   earlier -- several years earlier, the defendant posted on
17   YouTube may Allah give Anwar al-Awlaki the highest place of
18   paradise.  Yes, I just read about this.  They want to make
19   blasphemy about the Prophet.  They can come to me.  Wait,
20   the -- wait, let me bring my knife.

21           On May 22nd, 2012 in response to a YouTube video, it
22   was a YouTube video by a famous comedian, who was talking about
23   another individual who had posted a Draw the Prophet Muhammad
24   day, the defendant's response to the video by the famous
25   comedian said if it's your freedom to make blasphemy against

1   our Prophet, then it's our freedom to kill those who do it.

2              And that is a summary of some of the evidence the

3   government would have presented had this case gone to trial,

4   Your Honor.

5              THE COURT:  Thank you, Mr. Jonas.  So you wish to

6   step back up, Mr. Durkin.  And your client.  So taking the

7   summary, but more importantly the entire 19-page factual basis

8   that's been written and filed by the government and you've had

9   a chance to review with your client, and he has read it

10  himself.  Sir, Mr. Daoud, did you hear and have you read the

11  factual basis that's been presented?

12             DEFENDANT DAOUD:  Yes, ma'am.

13             THE COURT:  All right.  And this Court needs you to

14  tell me whether or not you disagree that that would be the

15  factual basis, that would be the evidence that would be

16  presented against you.

17             DEFENDANT DAOUD:  I understand that would be the

18  factual basis.

19             THE COURT:  And the evidence that would be presented

20  if you went to trial?

21             DEFENDANT DAOUD:  Yes, ma'am.

22             THE COURT:  All right.  And so now hearing this, at

23  the close of this, the Court is going to be asking you to tell

24  me what your plea is.  Is it still what it was before?  Do you

25  wish to change it, and how do you wish to present it?  So the

1   Court is asking that now.  And just to underscore, based on
2   both the written and oral presentations by the government, the
3   Court finds there is a factual basis for the charges that are
4   here, each of the charges.
5              MR. JONAS:  Thank you, Your Honor.
6              DEFENDANT DAOUD:  I can say that the government's
7   factual basis supports a conviction on each count, but I deny
8   culpability and persist in my innocence.  And I wish to plead
9   guilty.
10             THE COURT:  All right.  So I'm going to break that
11  down in portions for you.  First of all, your lawyer helped you
12  with that statement, is that correct?
13             DEFENDANT DAOUD:  Yes, ma'am.
14             THE COURT:  You spoke to him about it, is that
15  correct?
16             DEFENDANT DAOUD:  Yes.
17             THE COURT:  You understand that however you put this
18  right now, that the end game is that there will be a guilty
19  plea at the close of this based on what you just told me?  Do
20  you understand that?
21             DEFENDANT DAOUD:  Yes, ma'am.
22             THE COURT:  But in addition to that, before entering
23  that guilty plea, are you telling the Court that you disagree
24  that you wrongfully did anything in this case?  Meaning that
25  you are saying that you didn't do anything illegal or wrong in

1    this case?  Is that what you're saying?  Or you tell me what

2    you think you're doing.  You tell me what you just think you

3    did in your own words as best you can.

4          DEFENDANT DAOUD:  I mean, my understanding is I'm

5    pleading guilty but I'm retaining my innocence.

6          THE COURT:  All right.  So you believe that even

7    though they have this evidence that they presented, that you

8    didn't commit any offense, that you're innocent, is that

9    correct?

10         MR. DURKIN:  May I have a minute, Judge.

11         THE COURT:  Sure.  I need him to understand it.

12       (Brief pause.)

13         THE COURT:  Excuse me, Counsel.  I think the best

14   thing to do would be able to take a three-minute break, three-

15   to five-minute before he makes this next step.

16         MR. JONAS:  Your Honor, before we do that, there's

17   one thing I forgot to mention when I was talking about the

18   statutory maximums that my colleagues have pointed out.

19   There's a possibility, and we haven't fully researched, that

20   restitution may be ordered by the Court with regard to the

21   victim in the third case.  I just wanted to raise that as an

22   issue for the Court if you want to just --

23         THE COURT:  Oh, so he'd be aware of that.  The victim

24   is still --

25         MR. JONAS:  Yes, so he'd be aware of that.

1          THE COURT:  The victim is still in jail?

2          MR. JONAS:  Yes, Your Honor.

3          THE COURT:  So they may be asking, Mr. Daoud, just so

4    you know, the government may be asking for additional

5    restitution, meaning payment for the injuries of the person

6    that you attacked or alleged to have attacked.  Do you

7    understand that?

8          DEFENDANT DAOUD:  Yes, ma'am.

9          THE COURT:  All right.  So you just need to know that

10   that's a possibility.  And they will probably be asking for it.

11   All right.

12         MR. DURKIN:  Judge, could I have your last question

13   read back as to what you're asking him.

14         THE COURT:  All right.  I just -- I think I asked

15   him, but go ahead, Tracey.

16      (Record read.)

17         THE COURT:  Now, I will correct that last one.  It

18   wasn't that you tell me what you did in this case.  You tell me

19   what it is you think you're pleading -- what this plea is

20   about, how you understand it.  But before you answer, I'm going

21   to give you a few minutes to talk without everybody staring at

22   you off to the side in private with your lawyer because this is

23   a big moment.  All right?  All right.  Thank you.  Five

24   minutes.

25      (Short break taken.)

1      THE COURT:  All right.  So we are after the factual

2  basis that has been presented.  And there is agreement that the

3  factual basis presented by the government, again both as

4  summary here orally and also in writing and on the docket, that

5  it does support and is strong evidence of guilt of the charges

6  that have been brought against Mr. Daoud.

7      And so the question the Court has for Mr. Daoud is,

8  first of all, he understands what that factual basis is; is

9  that correct, sir?

10      DEFENDANT DAOUD:  Yes, ma'am.

11      THE COURT:  All right.  And you agree that the

12  government will be presenting evidence to the effect that what

13  has been presented if you went to trial, is that correct?

14      DEFENDANT DAOUD:  Yes, ma'am.

15      THE COURT:  And so with that understanding and the

16  understanding of the maximum penalties that you could face,

17  including the last addition of the possible restitution against

18  the victim in the case of 15 CR 487 case, with that

19  understanding of all the charges you could be facing, all the

20  penalties you could be facing, that at this time you still wish

21  to change your plea; is that correct?

22      DEFENDANT DAOUD:  Yes, ma'am.

23      THE COURT:  And you wish to change your plea to what?

24      DEFENDANT DAOUD:  Guilty.

25      THE COURT:  And as part of that guilty plea that

1    you're presenting to me today there's an exception to that, and
2    that exception is what?
3              DEFENDANT DAOUD:  That I'm pleading guilty pursuant
4    to Alford.
5              THE COURT:  All right.  And Alford is what
6    understanding?  That's a lawyer -- that's lawyer talk, Alford.
7    So you need to tell me.  So you are not admitting that the
8    facts are -- show your guilt, is that correct?  You maintain
9    your innocence, is that correct?
10             DEFENDANT DAOUD:  Yes.
11             THE COURT:  All right.  Even though you admit that
12   they have that evidence to present, is that correct?
13             DEFENDANT DAOUD:  Yes, ma'am.
14             THE COURT:  And you also are again maintaining your
15   innocence despite the fact that you agree that that is the
16   evidence that would be presented, and that evidence supports a
17   finding of guilty, is that correct?
18             DEFENDANT DAOUD:  Yes, ma'am.
19             THE COURT:  Government, you want to state your formal
20   objection briefly.
21             MR. JONAS:  Judge, we object to the taking of the
22   Alford plea.  We believe it's the public interest that a
23   defendant should either be found guilty at trial or should
24   admit his guilt and not reserve innocence.
25             THE COURT:  All right.  Well, as the government well

1    knows, and as I've stated in my order, the Alford plea is one

2    that the Court used its discretion and only its own discretion

3    as to whether to admit it.  One of the things the Court looks

4    at is, first of all, making sure that the defendant is

5    competent and understands the charges that are brought

6    before -- against him.  That he understands the consequences of

7    his plea should he decide to change his plea.  That he's had

8    the competent advice of the defense counsel in this matter, and

9    that there is a basis to believe, first of all, that it is to

10   his benefit to enter a guilty plea pursuant to Alford despite

11   the fact that he himself feels that he is not -- is innocent of

12   the charges overall.

13            And he's based that -- based that pronouncement on

14   the fact that he has a history, long history of mental illness

15   that seems to be under control, and he does not wish along with

16   his family to go through a three-week trial that would bring up

17   for the first time fully and in a courtroom with actual

18   witnesses the events that brought him here today.  They do not

19   believe that would be good for his mental health, which is

20   definitely on the mend.  And that he also has concerns about

21   the overall, not this court or this district in particular, but

22   the overall environment when the word terrorism is mentioned.

23   Is that correct, Counsel?  Is that correct, Counsel?

24            MR. DURKIN:  Yes, ma'am.

25            THE COURT:  All right.  Is that correct, Mr. Daoud?

1          DEFENDANT DAOUD:  Yes, ma'am.

2          THE COURT:  And you understand that if you again

3    persist with this plea, even according to Alford, that you have

4    a guilty plea on your record?  Do you understand that?

5          DEFENDANT DAOUD:  Yes, ma'am.

6          THE COURT:  All right.  And that we will proceed to

7    sentencing at a later date.  Do you understand that?

8          DEFENDANT DAOUD:  Yes, ma'am.

9          THE COURT:  And everything you have done has been

10   done with the full support and counsel of your lawyers, is that

11   correct?

12         DEFENDANT DAOUD:  Yes, ma'am.

13         THE COURT:  Including a more than five-minute break

14   just before the entry of this statement, is that correct?

15         DEFENDANT DAOUD:  Yes, ma'am.

16         THE COURT:  You have any questions about what you're

17   doing here today?

18         DEFENDANT DAOUD:  No, ma'am.

19         THE COURT:  Over your objection, government, the

20   Court does find there's a basis to accept this plea.  And the

21   Court does so in accordance not only with Alford, but Davis of

22   the Seventh Circuit.

23         So, sir, as to each and every one of the charges that

24   has been presented or charged in this case this Court enters a

25   guilty plea, again, based on a finding of competency, a finding

1  that you've been told about what the charges are, that you have

2  had adequate assistance of counsel, that you know about the

3  maximum possible punishments in this case; and that everything

4  you have stated here today has been knowing and voluntary

5  without any coercion or any promises, including as to

6  sentencing.

7         And the Court finds you guilty and a judgment of

8  guilty on each of the charges.  All right.  So let's set a

9  sentencing date.

10         MR. JONAS:  Your Honor, we expect to put on a

11  small -- a percentage of the evidence we would have presented

12  at trial, but even putting on a smaller amount, we still expect

13  this is going to go for a few days.

14         THE COURT:  All right.

15         MR. JONAS:  So we, we would ask considering it's

16  three cases and what we, what we anticipate doing at this time

17  for three days for sentencing.

18         THE COURT:  It sounds like it would be better to set

19  aside a week.

20         MR. JONAS:  That would probably be better, yes,

21  Judge.

22         MR. DURKIN:  How many days did they say they wanted?

23         THE COURT:  They said they wanted three days.  Now,

24  will those be full days --

25         MR. DURKIN:  They don't know when to quit.  They

1   don't know when to quit when they're ahead.  But if they want

2   to put on three days of evidence, then we'll put on three days

3   of evidence.

4           THE COURT:  Okay.  You all get a week.  I'm going to

5   set aside a week for this.  And it will not be from

6   9:00 o'clock in this morning.  I have other cases.  All right.

7   And so the government needs to keep that in mind, as does

8   defense.

9           MR. DURKIN:  How about two and a half days each then?

10          THE COURT:  We'll see how it goes.  We're going to

11  get started, and it will be in the afternoon of what week?

12          THE CLERK:  The first available week we have is

13  March 18th, 2019.

14          THE COURT:  That should be enough time.  Also, Mr.

15  Daoud, we also need time to get that presentence investigation

16  report done.  It's going to be very thorough.  They need time

17  to present it.  We also need time to be able to have all the

18  witnesses, if there are any, to adjust their schedules to be

19  here.  How is that date?  Check your spring break dates, guys.

20          MR. JONAS:  It works for the government, Your Honor.

21          THE COURT:  All right.  Everybody certain?  Mr.

22  Durkin, are you certain?

23          MR. DURKIN:  Judge, no, I'm not because --

24          THE COURT:  No weddings.  No nothing going on?

25          MR. DURKIN:  Well, one, I'm not sure that if there's

```
 1   going to be that much evidence whether the March date is, is
 2   realistic.  But we have a -- I have a trial presently set in
 3   the Northern District of Indiana on the 25th of March.  And I
 4   couldn't possibly spend a week here and be ready to try that.
 5            THE COURT:  How long is that trial, if it goes?
 6            MR. DURKIN:  I want to say it's -- let me just see.
 7   It looks like it's like seven days from what I can gather --
 8   well, no.  Maybe only a week.  I guess I only -- maybe I only
 9   have it in for a week.
10            MS. LYON:  Can we do like a couple weeks after this
11   trial is over?
12            THE COURT:  I'm not sure.  I do have other trials.  I
13   had to put all the other trials off for this three weeks.
14   There is a trial I had --
15            MR. DURKIN:  Well --
16            THE COURT:  -- scheduled today, and I had to push it
17   back.  And now they came in today, and unfortunately --
18            MS. LYON:  Is there an April week?
19            THE CLERK:  The next one is in April.  The week of
20   April 22nd --
21            THE COURT:  I'm off part of that week.
22            MR. DURKIN:  Well, Judge, could we --
23            THE COURT:  Hold on one second.  We can start in the
24   middle of the week before.  I don't know.  We just can't do it
25   that week.  And we don't need to get into May unless it's --
```

 1    because we start getting into other trials.

 2              THE CLERK:  The week of the 29th.

 3              THE COURT:  April 29th.  April 29th.  That's as late

 4    as I want to go to start.

 5              MR. DURKIN:  That would be all right.

 6              THE COURT:  If we end up having to break it up --

 7              MR. DURKIN:  That works.

 8              MS. LYON:  That sounds good, Your Honor.

 9              THE COURT:  April 29th.

10              MS. LYON:  And when you say in the afternoon, you

11    mean like 1:00 o'clock?

12              THE COURT:  My thought is that I may suggest -- and

13    actually I might have a whole day free up.  If I do, I'll do

14    that to help try to curtail it all in one week.  But it is my

15    intent that you should be able to get through this --

16              MS. LYON:  We shouldn't need more than five days.

17              THE COURT:  Yes, we should be able to get through

18    this in the afternoon.  Okay.

19              MR. DURKIN:  That's fine.  So we're talking April

20    29th at 1:00 o'clock?

21              THE COURT:  One second.  April 29th at 10:30.

22              MR. DURKIN:  That's fine.

23              MR. JONAS:  That's fine, Your Honor.

24              THE COURT:  All right.  I'd like to start out with

25    more time the first day.  All right.

1    MR. DURKIN:  That's fine.

2    MR. JONAS:  Your Honor, we have, we have one request.

3    THE COURT:  Yes.

4    MR. JONAS:  So at this point we anticipate calling

5    the FBI undercover agent.  And if Your Honor recalls, you

6    granted the government's motion to allow that person to testify

7    under certain protective measures.  We would request that the

8    measures apply to the sentencing hearing as well if we choose

9    to call him.

10    THE COURT:  Well, the Court will hear that -- we'll

11    do a status date.  Because the question is now if it is

12    sentencing and you have other ways to present him, I don't know

13    if we need to take all of the efforts of all the marshals to

14    deal with one witness for a sentencing when you can present him

15    in a different way.  Whether it be by video and be disguised or

16    something like that.  You're just trying to get to me and not

17    the gallery.  So I'm the one that counts.  So, you know, I'll

18    consider that, but I ask you to also look at other

19    opportunities because it takes a lot of effort on behalf of the

20    marshals and the rest of the building to make some of the, the

21    accommodations that you are seeking.  All right.  So maybe we

22    can do it by video.

23    MR. JONAS:  Yes, Your Honor.  That would be fine.  As

24    I said, we haven't really -- hadn't planned anything --

25    THE COURT:  Yes, so since we haven't crossed that

1    bridge, you all think about it.  And before we get to writing

2    your memos and all of that, I think we could have a status and

3    then set a memo date to be due.  So we also will try to put

4    this on the fast track with the Probation Department so that it

5    gets the appropriate attention as soon as possible.  Is that it

6    from the government?

7              MR. JONAS:  Yes, Your Honor.

8              THE COURT:  All right.  Defense, is there something

9    else?

10             MR. DURKIN:  The only thing that, that we would need

11   to be sure of and I, I think it would be Dr. Xenakis, but we

12   can --

13             MS. LYON:  We'll figure out a --

14             THE COURT:  You'll check out a schedule for that.

15             MS. LYON:  Right.

16             THE COURT:  All right.  The Court isn't surprised by

17   that.  The Court is asking -- so there was an issue with his

18   visitation or lack thereof.  What's happening with that issue?

19   Is he on permanent non-visitation?  What is going on?  So that

20   his family can talk to him or see him in the next four months

21   at least a few times.

22             MR. JONAS:  Your Honor, I haven't looked at the

23   report that we sent you in a few weeks, but my recollection is

24   it was I think two months' restrictions.  And I believe it's --

25             MS. LYON:  Four months.

1      MR. JONAS:  Was it four months?

2      MS. LYON:  It was four months.

3      THE COURT:  Okay.  I'm hearing three months.  I'm

4  hearing two months.

5      MR. JONAS:  90 days.

6      THE COURT:  Do we have one month?  Do we have six

7  months?  Come on.  Come on, guys.  Yes, Marshal.

8      MARSHAL DAMMONS:  Correct, 90 days.

9      THE COURT:  90 days from -- how long do we have left

10  in the 90-day ...

11      MARSHAL DAMMONS:  October 17th --

12      DEFENDANT DAOUD:  I think January.

13      THE COURT:  So January sometime.  It will be lifted

14  in January sometime?

15      MARSHAL DAMMONS:  Yes, ma'am.

16      MR. DURKIN:  Mid-January.  He says January 14th, the

17  defendant says.

18      THE COURT:  He has just made a very big step.  I

19  don't see why he should have to wait almost two months to talk

20  to his family.  So it's going to be my recommendation and

21  request that he get at least one meeting with his family before

22  the next status.  Okay.  I know that I said I can't, I can't

23  dictate what they do, but that would seem to be fairly humane.

24  All right.

25      DEFENDANT DAOUD:  Your Honor, thank you.

1          THE COURT:  You're welcome.  As long as you stick
2     with your medication and you comply with the rules.  All right.
3     Now, will he be at MCC or Kankakee?
4          MR. DURKIN:  He's at MCC.
5          THE COURT:  All right.  Where he should stay so that
6     the Probation can get to him and do what they need to do in
7     preparing for a very contentious sentencing.
8          MR. DURKIN:  I agree.
9          THE COURT:  That would be my order.  All right.
10     Let's do a January status.
11          THE CLERK:  January 30th for status, Your Honor.
12          THE COURT:  How is that?  Again, it's a status.  So
13     if all the -- seven of you all can't be present, I think we'll
14     make it.
15          MR. DURKIN:  What time?  What time do you want to do
16     it?
17          THE COURT:  Give me a suggestion.  10 or later?
18          MR. DURKIN:  How about 11?
19          THE COURT:  11 is fine.
20          MR. DURKIN:  Perfect.
21          THE COURT:  How is that for the government?
22          MR. JONAS:  That's fine with the government, Your
23     Honor.
24          THE COURT:  11:00 o'clock is fine.  Is there anything
25     else from the government?

 1                    MR. JONAS:  No, Your Honor.

 2                    THE COURT:  Anything else from defense?

 3                    MR. DURKIN:  No, Judge.  Thank you.

 4                    THE COURT:  Thank you very much for your

 5     presentations and your assistance in this matter.  Sir, we'll

 6     see you soon.

 7                    MR. DURKIN:  Thank you.

 8                    MR. JONAS:  Thank you, Judge.

 9                         CERTIFICATE

10          I HEREBY CERTIFY that the foregoing is a true,

11     correct and complete transcript of the proceedings had at the

12     hearing of the aforementioned cause on the day and date hereof.

13

14     */s/TRACEY D. McCULLOUGH*                *January 2, 2019*

15     Official Court Reporter                        Date
       United States District Court
16     Northern District of Illinois
       Eastern Division
17

18

19

20

21

22

23

24

25