```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )   No. 12 CR 723-1
                                      )
 4                  Plaintiff,        )
                                      )
 5            v.                      )   Chicago, Illinois
                                      )   April 29, 2019
 6   ADEL DAOUD,                      )   10:35 a.m.
                                      )
 7                  Defendant.        )   Sentencing Hearing

 8                         VOLUME 1
                   TRANSCRIPT OF PROCEEDINGS
 9      BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

10   APPEARANCES:

11   For the Government:       HON. JOHN R. LAUSCH, JR.
                               United States Attorney, by
12                             MR. BARRY JONAS
                               MS. TIFFANY ARDAM,
13                             Assistant United States Attorneys
                               219 South Dearborn Street
14                             Suite 500
                               Chicago, Illinois  60604
15
     For the Defendant:        DURKIN & ROBERTS
16                             2446 North Clark Street
                               Chicago, Illinois  60614
17                             BY:  MR. THOMAS A. DURKIN
                                    MS. ANDREA D. LYON
18
                               LAW OFFICE OF JOSHUA G. HERMAN
19                             53 West Jackson Boulevard
                               Suite 1650
20                             Chicago, Illinois  60604
                               BY:  MR. JOSHUA G. HERMAN
21

22   U.S. PROBATION:          MS. KELLY KWONG

23            TRACEY DANA McCULLOUGH, CSR, RPR
                     Official Court Reporter
24               219 South Dearborn Street
                         Room 1426
25               Chicago, Illinois  60604
                       (312) 435-5570
```

1          THE CLERK:  12 CR 723, 13 CR 703, and 15 CR 487, USA
2    versus Adel Daoud.
3          MR. JONAS:  Good morning, Your Honor.  Barry Jonas
4    and Tiffany Ardam for the United States.
5          THE COURT:  Thank you.  Good morning.  Good morning,
6    Mr. Daoud.
7          DEFENDANT DAOUD:  (Waving).
8          MR. HERMAN:  Good morning, Judge.  Josh Herman on
9    behalf of Adel Daoud, and I'm expecting Mr. Durkin shortly.
10   All right.
11         THE COURT:  All right.  Thank you.
12         MS. KWONG:  Good morning, Your Honor.  Kelly Kwong on
13   behalf of the Probation Office.
14         THE COURT:  All right.  You may have a seat, Miss
15   Kwong.
16         MS. KWONG:  Thank you.
17         THE COURT:  All right.  And you wanted to wait I'm
18   assuming --
19         MR. HERMAN:  Yes, he's, he's --
20         THE COURT:  -- for Mr. Durkin?
21         MR. HERMAN:  -- very close.
22         THE COURT:  He stepped out.  Very close.
23         MR. HERMAN:  Yes.  Yes.
24         THE COURT:  All right.  And, Mr. Daoud -- is everyone
25   ready for sentencing?

1          MR. JONAS:  Your Honor, we are having a technical

2     issue with the U.S. Attorney's office laptop that has all the

3     exhibits on it.  It's being worked on it right now.  We can

4     start if you want.  I can use the Elmo.  It's not --

5          THE COURT:  Sure.

6          MR. JONAS:  -- nearly as efficient, but until the

7     laptop is prepared.

8          THE COURT:  Well, we are going to start.  I'll give

9     you some breaks in time.  But the Court has reviewed, I'm not

10    going to say all of the discs, but most of them.  And again,

11    this isn't a retrying of the case.  So we'll see where we go,

12    or a trying of the case that never was tried.  So have a seat

13    everybody, and we'll give a few minutes for Mr. Durkin.

14         MR. HERMAN:  Thank you.

15         THE COURT:  All right.  You can have a seat too,

16    Counsel, at least till he comes in, and then we'll have ...

17        (Short break taken.)

18         THE COURT:  Do I need to be out here, Counsel?  Or

19    you ready?  All right.  Thank you.

20         MR. DURKIN:  Sorry, Judge.

21         THE COURT:  That's okay.

22         MR. DURKIN:  I'm always ready.

23         THE COURT:  All right.  That's why I waited --

24         MR. DURKIN:  Never sure what --

25         THE COURT:  -- so you all could have that

1  conversation.

2          MR. DURKIN:  Never sure what for, but I'll answer

3  ready.

4          THE COURT:  All right.  Well, you stand in front of

5  me.  I've been told everyone is ready to begin this sentencing

6  hearing.

7          MR. DURKIN:  I think so.

8          THE COURT:  And so -- Mr. Daoud, if you want to stand

9  up here, you can and be seated again.  Why don't you come up

10  for right now.

11          All right.  So you understand that we're going to

12  start the sentencing hearing today, is that correct?

13          DEFENDANT DAOUD:  Yeah.

14          THE COURT:  All right.  Good.  Are you ready?

15          DEFENDANT DAOUD:  As ready as I'm going to be.

16          THE COURT:  All right.  Good answer.  As ready as

17  you're going to be.  All right.  So I've been already told and

18  I know you have seen and everybody has a copy of the -- the

19  parties participating, of the presentence investigation report,

20  which is quite lengthy.  As well it should be.  You remember

21  seeing that document?

22          DEFENDANT DAOUD:  I --

23          THE COURT:  It's the big thick -- I think it's 166

24  pages, something like that.

25          DEFENDANT DAOUD:  I didn't --

1    THE COURT: You participated and you went over at
2 least part of it.
3    DEFENDANT DAOUD: Oh, the PSR?
4    MR. DURKIN: Yes.
5    THE COURT: Right.
6    DEFENDANT DAOUD: Yes, I saw that.
7    THE COURT: Right. PSR. You've got the lingo down.
8 Yes, that's it. All right. And Miss Kwong helped prepare it
9 and talked to you, is that correct?
10    DEFENDANT DAOUD: Yes.
11    THE COURT: All right. And so you've seen that and
12 gone over that with your lawyer, is that correct?
13    DEFENDANT DAOUD: Yes.
14    THE COURT: That document, sir, and the calculations
15 and the sentencing calculations and the document that your
16 counsel put together, which was also quite lengthy and bound;
17 the document that the government put together, along with all
18 the different discs that they wanted to give me; I did get a
19 disc from defense too, all of that is going to assist me in
20 doing the hardest job that I have as a District Court judge,
21 which is sentencing another person.
22    I'm also looking at statutory requirements and
23 guidelines. I'm looking at the sentencing calculations and
24 guidelines. I'm also going to look at the 3553 (a) factors
25 under the federal statutes to rely on to also again help me put

together a sentence for you that is sufficient but not greater
than necessary.  It takes into account many factors.  Do you
understand that?

DEFENDANT DAOUD:  Yes.

THE COURT:  All right.  In addition to all of that
and the argument and the testimony and exhibits that may be
shown to me over the next couple of days, this Court can hear
from you also.  Do you understand?

DEFENDANT DAOUD:  Yes.

THE COURT:  All right.  And so we're going to
proceed.  Despite the length of time this case has been here
and the complexity of the various cases and charges here, it
appears that when it comes to the presentence investigation
report, which I just talked to you about, the PSR, it appears
to this Court that I don't see any objections.  But I'll ask
each side how they feel about this.  Government.

MR. JONAS:  The government has no objections to the
presentence report, Your Honor.

THE COURT:  All right.  And defense.

MR. DURKIN:  Judge, we don't have any objections
either.

THE COURT:  All right.  So --

MR. JONAS:  Let me just say --

MR. DURKIN:  Other than --

THE COURT:  Okay.  Start again.  Government, do you

1  have any objections?

2          MR. JONAS:  The only objection we have is the

3  presentence report sentencing recommendation.

4          THE COURT:  Oh, well, that's not part of the

5  presentencing.

6          MR. JONAS:  Correct.  I just want to be clear on

7  that.

8          THE COURT:  All right.

9          MR. JONAS:  Other than that, no objections.

10         THE COURT:  Thank you.  Any objections?

11         MR. DURKIN:  No.

12         THE COURT:  All right.  So both sides are telling me

13  there's no objections, which actually is a rarity for a

14  presentence investigation report.  Miss Kwong is to be

15  commended and the Probation Department for the thorough work

16  and the fact that this -- the recommen -- or at least the

17  calculations as to -- under the Sentencing Guidelines, which is

18  the -- put together by the Sentencing Commission of the United

19  States, which includes judges, prosecutors, defense attorneys

20  criminal justice experts of various disciplines, come up with a

21  calculation of the offense and of your criminal history.

22         The total offense level in this case is 43.  The

23  criminal history category is 6.  And the Court will adopt the

24  presentence investigation report as it has been prepared.

25  There are statutory provisions here, sir.  The statutory

provisions on the case 12 CR 723 on Count 1 is zero to life.
Count 2 is 5 years to 20 years.  That's the statute provides
that.

As to docket 13 CR 703 or case No. 13 CR 703, as to
Counts 1 and 2, there's a statutory provision of zero to 10
years.  As to Count 3, it's zero to 30 years.  That's what's
part of the statute.

As to docket No. -- case No. 15 CR 487, Count 1 is
zero to 20 years in the statutory provisions.  Count 2 is zero
to 10 years.  Count 3 is zero to 10 years.  Count 4 is zero
years to 5 years.  And Count 5 is up to one year.  Do you
understand that, sir?

DEFENDANT DAOUD:  Yes.

THE COURT:  The guideline provisions based on what I
have just adopted from the presentence investigation report
would be as to all of those -- as to the -- I'm sorry.  As to
12 CR 723 is a life sentence.  Do you understand that?

DEFENDANT DAOUD:  Yes.

THE COURT:  And there's supervised release.  The
supervised release, docket 12 CR 723 would be up to life on
both Counts 1 and 2.  On 13-703, Count 1 and 2 are up to three
years of supervised release.  Count 3 is up to five years
supervised release.  On 15 CR 487 Counts 1, 2, 3, and 4 are up
to three years supervised release.  And Count 5 is up to one
year supervised release.  Do you understand that?

1    DEFENDANT DAOUD:  Yes, ma'am.

2    THE COURT:  And you understand the supervised release

3    is what comes after incarceration?  Do you understand that?

4    DEFENDANT DAOUD:  Yes.

5    THE COURT:  Under 12 CR 723 under the guidelines it

6    would be a calculation of life.  Supervised release on Counts 1

7    and 2.  On 13 CR 703 you would have a minimum of one year

8    supervised release on Counts 1 and 2, Count 3 is a minimum of

9    two years to five years, on Count 3 of 13 CR 703.  On 15 CR

10   487, again, as to each of those there's a minimum of five

11   years.  And Counts 1 through 4 would be from one year to

12   three-year range.  Do you understand that?

13   DEFENDANT DAOUD:  Yes.

14   THE COURT:  The fine that is recommended under the

15   statute under 17 -- I'm sorry, under 12-723 and also under 13

16   CR 703, is a $250,000 fine as to each count.  On 15 CR 487 it's

17   as to the first four counts, $250,000.  As to Count 5 it would

18   be $100,000.

19   As to the guidelines, under the guidelines based on

20   the calculations that have now been adopted by the Court, the

21   fine is 25,000 to 250,000 throughout the sentencing, the

22   guideline calculations.  So instead of $250,000, you're talking

23   about a range of 25,000 to 250.  Do you understand?

24   DEFENDANT DAOUD:  Yes.

25   THE COURT:  There's a special assessment of $100 on

1  each count under 12 CR 723, under each count under 13 CR 703.

2  And as to 15 CR 487, the first four counts, $100 each

3  assessment and Count 5, $25 assessment.  Do you understand

4  that?

5          DEFENDANT DAOUD:  Yes.

6          THE COURT:  Then obviously after the Court hears and

7  considers all the arguments, which are going to include special

8  emphasis on 3553 (a) factors, and the Court will look at all of

9  those before this Court reaches a sentence sufficient but not

10  greater than necessary.  Do you understand?

11          DEFENDANT DAOUD:  Yes.

12          THE COURT:  All right.  You can have a seat, sir.

13          MR. DURKIN:  Judge, just so the record is clear,

14  when, when we said we didn't have any objections to the PSR or

15  the guidelines calculations, it's not that we agree with them.

16  As we said in our position paper, we strongly disagree with the

17  one size fits all terrorism enhancement, but we acknowledge

18  that the state of the law is such that that's well settled and

19  applicable.  But we disagree with it.

20          THE COURT:  All right.  The Court -- the record makes

21  note of your overall disagreement, but your acknowledgment that

22  the calculations are done correctly in accordance with the law.

23          MR. DURKIN:  Yes.

24          THE COURT:  All right.  Okay.  So at this point I

25  know that you all have more than the normal presentations to

1  present.  The Court believes it's better for the government to
2  go first, the defense to go last, and then Mr. Daoud.  Anybody
3  have any problem with that setup?

4        MR. JONAS:  No, Your Honor.

5        MR. DURKIN:  No.  I do have a procedural question,
6  however.

7        THE COURT:  Yes.

8        MR. DURKIN:  It's my understanding the government
9  intends to call two live witnesses.

10        MR. JONAS:  Correct.

11        MR. DURKIN:  Their agent and the undercover employee,
12  or is he an agent?

13        MR. JONAS:  He's an agent.

14        MR. DURKIN:  The undercover agent.  My proced -- and
15  then they're going to put the video in for the victim impact,
16  as I understand it, on the third case.  My procedural concern
17  is with the evidence that's coming in.  I know the government
18  has intended, and I'm willing to go along with it but this is
19  why I need to understand what we're doing.  They're putting in,
20  as I understand it, every trial exhibit they would have put in.

21        MR. JONAS:  I don't think it's every.  I think we
22  pulled some.

23        MR. DURKIN:  Pretty close.

24        MR. JONAS:  We're putting in a lot, Judge.  And just
25  so we're clear, the witness is not going to -- the summary

1   witness that's going to go on first is not going to testify or
2   publish every single exhibit.  But it's, it's a large number of
3   them.  We've included every communication with the online
4   employees, but we're only going to publish I don't know how
5   many, but not even half.  Because we want them in the record,
6   because we want Your Honor to have an opportunity to see the
7   full interaction between the government and the defendant to
8   respond to defense arguments.

9          They're also there for the defense if they want to
10  question the witness about them.  They're available and in
11  evidence at that point.  So we thought a more fulsome
12  presentation, or at a fulsome moving into evidence of a large
13  number of exhibits would be beneficial both to the Court and to
14  the parties.

15         THE COURT:  Are you totally discounting the fact the
16  Court made certain rulings in this case?  Or they've made
17  motions.  They've asked for, they've asked for certain
18  evidence.  And pretty much this Court has agreed with the
19  government on several of them after the Alford.  Why do we need
20  to totally put on a trial with I'm assuming we're talking
21  about, you know, I mean, a lot of evidence and exhibits.  I
22  mean, I have right here, what, 20 discs.  What are --

23         MR. JONAS:  Again, Your Honor, we're not going to
24  publish all of those today.  It's for the Court to be able to
25  have them if Your Honor wants to look at them as well as to

1　make a fulsome record.  This is -- the presentation is going to

2　be a fraction of what it would have been had we gone to trial.

3　But you also saw the defense sentencing memo.  They make a lot

4　of accusations against the government, and they make all of

5　these assertions that the defendant had no predisposition

6　whatsoever to commit this offense.

7　　　　　They put it upon us to counter that.  And that's what

8　we plan on doing over the next day or next several days.  It's

9　important for us not only to counter what the defense is

10　saying, but for Your Honor to get a full understanding of where

11　the defendant's mind-set was and how much he wanted to kill

12　people.

13　　　　　THE COURT:  All right.  We're not going to make the

14　argument now.  But one thing the Court is not going to allow is

15　a trying of the case in a way that you couldn't have tried it

16　before.  Again, this is about the sentencing.  And the fact

17　that the defense put forth a large and very detailed sentencing

18　memorandum for a 25-year-old client who's looking at life, is

19　that surprising?

20　　　　　MR. JONAS:  It's not surprising, Your Honor.  But

21　because this is multiple cases and because it's a very --

22　there's a lot here.  It requires us to -- under 3553 (a) to

23　explain the full nature of the circumstances of the offense --

24　offenses.

25　　　　　THE COURT:  And the Court doesn't expect any less.

1    There's full nature, and there's overkill.

2            MR. JONAS:  I, I -- Your Honor --

3            THE COURT:  And the Court just let's you know, that I

4    take it within my prerogative to stop and say enough.  So I'm

5    not certain if I'm going to be there in general.  I don't know

6    what you're going to actually present.  It may all be extremely

7    relevant to the Court, relevant to these proceedings.  But this

8    Court does reserve the right, which it has, to limit just how

9    much it does.  You can enter stuff into evidence, but as to how

10   much you put on here and the manner that you put your case on

11   and defense, this Court will be watching carefully to see if

12   you are trying to assist me in making my decision or whether

13   either side is trying to do more playing to who's in the

14   courtroom.  I'm going to be very cognizant of that.  All right.

15   That's for both sides.

16           MR. DURKIN:  Here's, here's my concern.

17           THE COURT:  Yes.

18           MR. DURKIN:  Succinctly as I can.  We have said in

19   our pleading that we believe because we've pled guilty under

20   Alford or not, we have acknowledged that the government has

21   evidence to prove him guilty beyond a reasonable doubt.

22   Otherwise we could not have entered the plea.  You could not

23   have accepted it.  We are simply raising what we call imperfect

24   entrapment, and we've explained that and you're familiar with

25   that.

What I'm concerned with is that the government wants to have it both ways. They want to be able to put in the record, and I think it's not just for the people in the gallery, I think it might be for the Seventh Circuit, all of its evidence. But they would not consent to a bench trial. So I, I don't want to get in a position here where we're defending their attempt to prove beyond -- I mean, if we had a trial, they would have to prove beyond a reasonable doubt that he was not entrapped. We're not raising that.

And, and I'm concerned -- I mean, first of all, if you were to review everything that they've given you and want to put in the record as evidence, you -- maybe you can rule by the 4th of July. I mean, I guess one question is, is this going to be a traditional sentencing hearing as untraditional as it is with you ruling at the end? If we're done this week, do you intend to go ahead and rule? Because otherwise --

THE COURT: That -- excuse me. That's my plan. Okay. This sentencing, whole procedure is not going to be ruled by the government or the defense.

MR. DURKIN: Okay.

THE COURT: The plea has been entered. He is guilty, and the Court is sentencing him on that guilty plea.

MR. DURKIN: Then --

THE COURT: The fact that you have discussed your imperfect entrapment, and this Court will consider it for how

1  much weight to be given to the sentencing on the initial case.

2  It just goes maybe to the weight.  It may go to, you know,

3  whether or not this Court gives the amount that the government

4  is looking for.  And it may go to help you get into the range

5  of what you're looking for.  I don't know.

6          MR. DURKIN:  That's fine.

7          THE COURT:  But again, this Court is not going to

8  allow this to be hijacked and turned into a mini trial by

9  anybody.  And the Court just wants to hear the sides.  And if

10 you say, Judge, you know what, we think that you should give

11 this under the guidelines because, you know, he -- you know,

12 it's clear that he may not have known or he may have been

13 jeopardized, that's valid.  On the other side it's valid for

14 the government to say, you know, Judge, you need to know that

15 really there was no mental illness problem.  Nobody tried to

16 encourage him.  But I'll only let it go so far.  I don't need

17 it beaten like a dead horse or like we have a jury in the box.

18 We don't.  I'm warning everyone that you've given your brief

19 arguments here.  Let's get started, government.  You all can

20 have a seat.  Thank you.

21         MR. DURKIN:  That's fine.

22         MR. JONAS:  Your Honor, before -- just one other

23 issue I just want to raise real quick before Your Honor.

24         THE COURT:  Okay.  You open it, I'm going to let them

25 argue.  So --

1          MR. JONAS:  Well, I --

2          THE COURT:  I'm just saying there's no reason -- you

3    can go ahead and start.  There's no reason to give me another

4    argument on what you're doing and why you're doing it.

5          MR. JONAS:  No, it's unrelated.

6          THE COURT:  Okay.  Proceed.

7          MR. JONAS:  It's unrelated.  On Friday the defense

8    gave the government a disc that's a video of three people.

9          THE COURT:  The green disc.

10         MR. JONAS:  They told us that this is just the same

11   as letters that would be attached to the defense version or

12   sentencing memo.  It's not.  It's a direct examination by

13   Miss Lyon, and we object to that.  I think they could either

14   call these people in here to testify as character witnesses and

15   allow the government to cross-examine them, or they could

16   present letters.  They didn't have to do an edited video of

17   these witnesses testifying.  I don't think that's proper, and

18   we don't think the Court should consider it.

19         THE COURT:  All right.  Your objection's overruled.

20         MR. JONAS:  Thank you, Your Honor.  And I will

21   argue -- I have another request regarding that.  Under Federal

22   Rule of Criminal Procedure 12 (i) 2 we're entitled to the

23   entire statement of these witnesses and not just what they

24   edited onto the disc.

25         THE COURT:  Response.

1    MR. DURKIN:  I'm not, I'm not sure what else there

2  is, but I, I'm not --

3    MR. HERMAN:  I'll take a look at the rule.

4    THE COURT:  I'm sorry.  What are you saying, Mr.

5  Herman?

6    MR. HERMAN:  I'll take a look at the rule.  And if

7  there's footage, we'll provide it if the rule -- if that's what

8  the rule requires.

9    THE COURT:  I think we -- if that's what you want to

10  have presented, that's fine.  All right.  So if they -- they

11  can present their evidence.  If you believe that this has been

12  edited to the point of that there is information that would be

13  helpful to the Court or statements that will be helpful to the

14  Court as to their credibility one way or the other, then the

15  Court will want to hear it.  Okay.

16    MR. DURKIN:  That's fine.

17    THE COURT:  All right.

18    MR. JONAS:  Your Honor, one quick procedural

19  question.  With regard to --

20    THE COURT:  This is with regard to some of your

21  witnesses?

22    MR. JONAS:  Yes, the first witness.

23    THE COURT:  Step over to the side, please.

24    (Side bar proceedings out of the hearing of open court:)

25    THE COURT:  All right.  I'm assuming you guys worked

1  this out.  We had mentioned it.  You didn't know how you were
2  going to work it.  What do you want to do?

3            MR. JONAS:  Yes, we did work this out.  And I just
4  wanted to inform the Court.  So of the exhibits that the
5  government plans on introducing through the witness, I think
6  the most efficient way, and I believe there's no objection, is
7  the witness can describe the category of exhibits.  In other
8  words, the government collected e-mails, the government
9  collected whatever.  And then I would offer into evidence by
10  category what's on the exhibit list that's been submitted.  I
11  think that's the most efficient way of doing it, if that's
12  okay.

13            THE COURT:  All right.  And how -- this is with
14  your -- which witness is this?

15            MR. JONAS:  The first witness is the summary witness.

16            THE COURT:  The undercover or the summary witness?

17            MR. JONAS:  The summary witness.

18            THE COURT:  How long do you expect him to take?  Till
19  lunch or longer?

20            MR. JONAS:  His testimony is going to take most of a
21  good part of the day.

22            THE COURT:  You know about this already?

23            MR. DURKIN:  I'm sorry.

24            THE COURT:  Did you know about this already?

25            MR. DURKIN:  Yes.  No.  No.  I don't --

1        THE COURT:  Okay.  Let me --

2        MR. DURKIN:  Other than what I just talked about --

3        THE COURT:  Yes.

4        MR. DURKIN:  -- I don't, I don't object.

5        THE COURT:  Okay.

6        MR. DURKIN:  For the sake of time they can put it in.

7   I don't care if they just put it in.

8        THE COURT:  Yes.  Okay.

9        MR. DURKIN:  But the only thing I'm concerned about

10  is what I said earlier.

11       THE COURT:  Yes.  No, I get that.  The other thing

12  I'm asking is, is we thought we were streamlining this

13  somewhat.  I didn't think it would take -- so it's not four

14  days anymore.  Are we looking at three days, two and a half

15  maybe?

16       MR. JONAS:  If I can give you an outline of what we

17  expect.

18       THE COURT:  Yes, that would be good.

19       MR. JONAS:  So I'm, I'm -- we're starting a little

20  later than we expected, but I'm hoping we get this witness on

21  and off today.  I think it depends upon cross-examination.  Our

22  hope is we get the undercover on and off tomorrow.

23       THE COURT:  Okay.

24       MR. JONAS:  Again, it depends upon cross-examination.

25       THE COURT:  And you all know how he's being

1   presented?  How is he being presented?  You have the

2   undercover.  Before you wanted screens.  You wanted all kinds

3   of stuff.

4           MR. JONAS:  Correct.

5           THE COURT:  So what are we doing?

6           MR. JONAS:  It's our understanding from your ruling

7   before the trial that the courtroom was going to be locked, and

8   that there's an overflow courtroom.

9           THE COURT:  Okay.  For trial is one thing.  This

10  isn't -- we had jurors and everybody.

11          MR. JONAS:  Sure.  I understand.

12          THE COURT:  So what are you -- well, you all need to

13  get that ready like either during lunch to explain it to me

14  fully so I can make sure that our, our staff -- I mean, we have

15  done what we need to --

16          MR. JONAS:  Sure.

17          THE COURT:  -- from an office procedure, but I have

18  heard nothing since then about now with sentencing how you

19  would address that.

20          MR. JONAS:  I'm sorry, Your Honor.  I thought it was

21  going to be the same procedures as trial.

22          THE COURT:  That was a lot.  That was using somebody

23  else's courtroom, which, you know --

24          MR. JONAS:  Okay.

25          THE COURT:  -- I mean, technically we could do.  But

1  I just need to be able to make sure people have notice.  We

2  have an overflow courtroom.  We can say everybody can go to the

3  overflow courtroom.

4          MR. DURKIN:  My opinion is if he's going to be in his

5  disguise, there's no reason that --

6          THE COURT:  Is he going to be in his disguise?

7          MR. JONAS:  No.  He's going to testify without a

8  disguise.

9          THE COURT:  And why would that be?

10         MR. JONAS:  Because this is what he prefers.  As long

11  as he --

12         THE COURT:  That's what the witness prefers?

13         MR. JONAS:  Well, go ahead.

14         MS. ARDAM:  Also because we thought that this

15  courtroom would not be open to the public and no one would be

16  seeing him, and they would just hear him in an overflow

17  courtroom.

18         THE COURT:  Okay.  Well, he needs to get that

19  disguise out.  I'll make my decision later about that.

20         MR. JONAS:  Your Honor, Your Honor, if I can --

21         THE COURT:  I want to know, you know -- but how much

22  of a disguise?  I mean, he doesn't have to put prosthesis on

23  and all that stuff.  Then the disguise would be what he was

24  wearing I'm assuming when he was talking to him.  Or he can do

25  a different disguise.  Let's deal with this later.  Let's start

Parsons - direct by Jonas

1    getting on.  Okay.

2           MR. JONAS:  Sure.

3       (In open court:)

4           THE COURT:  All right.  Your first witness.

5           MR. JONAS:  Your Honor, the government calls Special

6    Agent Jeff Parsons.

7           THE COURT:  All right.  Please step forward.

8     JEFFREY PARSONS, GOVERNMENT'S WITNESS, DULY SWORN

9           THE COURT:  Keep your voice up so everyone can hear

10   you.  You don't have to get too close to the mike, though.  All

11   right.  Thank you.

12          MR. JONAS:  May I proceed, Your Honor?

13          THE COURT:  You may.

14          MR. JONAS:  Thank you.

15              DIRECT EXAMINATION

16   BY MR. JONAS:

17   Q    Would you please state and spell your name.

18   A    My name is Jeffrey Parsons.  Spelled J-E-F-F-R-E-Y.  Last

19   name Parsons, P-A-R-S-O-N-S.

20   Q    What do you do for a living?

21   A    I'm a special agent with the FBI.

22   Q    How long have you been with the FBI?

23   A    Approximately 16 years.

24   Q    Where are you currently based?

25   A    I'm currently assigned to the Washington field office of

Parsons - direct by Jonas

1   the FBI.

2   Q    What do you do there?

3   A    I am a supervisory special agent, where I lead a squad

4   conducting counterterrorism investigations.

5   Q    And prior to being in Washington, where were you?

6   A    My tour before this I spent two and a half years assigned

7   to our headquarters unit, where I was in the counterterrorism

8   division, overseeing, overseeing investigations on the west

9   coast.

10  Q    And prior to that?

11          MR. DURKIN:  I didn't hear that last answer.

12          THE WITNESS:  I apologize, sir.  Prior to that, I was

13  at our headquarters in the counterterrorism division, where I

14  oversaw investigations.  Program managing west coast

15  investigations.

16          THE COURT:  All right.  Thank you.  And Mr. Durkin,

17  can you address your issues on sound to me, please.  Not to the

18  witness directly.  I appreciate it.  Proceed.

19          MR. JONAS:  Thank you, Your Honor.

20  BY MR. JONAS:

21  Q    I'm sorry.  And prior to being at headquarters, where were

22  you?

23  A    Prior to that I was in Chicago field office for 11 years,

24  where I conducted counterterrorism investigations.

25  Q    Were you the case agent assigned to the case investigation

Parsons - direct by Jonas

1   of the defendant?

2   A    No, I was not.

3   Q    Did you help out at all in the investigation?

4   A    I conducted an interview as part of this.

5   Q    And prior to the FBI, where were you?

6            MR. DURKIN:  Judge, I apologize.  I can't hear.

7            THE COURT:  I'm sorry.  You're having trouble.  You

8   know what, bring this down.

9            THE WITNESS:  Okay.

10           THE COURT:  And you know what's happening, I think

11  it's more that you're speeding.

12           THE WITNESS:  Okay.

13           THE COURT:  So if you could slow your answer down

14  just a little bit.

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  All right.

17           THE WITNESS:  Okay.

18           THE COURT:  All right.  Proceed.  Thank you.

19  BY MR. JONAS:

20  Q    I'm sorry.  Before you were with the FBI, where were you?

21  A    Prior to that, I served in the United States Navy.

22           MR. DURKIN:  I'm sorry, Judge.  I didn't hear clearly

23  what he said about his participation in this investigation.

24           THE COURT:  I'm sorry?

25           MR. DURKIN:  There was a question -- never mind.

1    THE COURT:  All right.  Let's, let's -- if you can

2 repeat the question.  You know what he's talking about, Mr.

3 Jonas?

4    MR. DURKIN:  I got it.  Mr. Herman gave -- Mr. Herman

5 heard it.

6    THE COURT:  All right.  Well, I want you to be able

7 to hear it too.  All right.  Proceed.

8    MR. JONAS:  Thank you, Your Honor.

9 BY MR. JONAS:

10 Q    And, Mr. Parsons -- Agent Parsons, if you can just slow

11 down a little bit, please.

12 A    Of course.

13 Q    I'm sorry.  You said prior to the FBI, you were in the

14 Navy?

15 A    That's correct.

16 Q    What did you do in the Navy?

17 A    I was a surface warfare officer.

18 Q    And anything else?

19 A    So I did three tours in the Navy.  My first tour I served

20 on a special operations platform.  My second tour I was a

21 nuclear officer onboard a U.S. aircraft carrier.  On the third

22 tour I was assigned to the Pentagon, where I worked in the

23 antiterrorism branch for the Chief Naval Operations.

24 Q    And what's your education?

25 A    I received a bachelors degree in engineering from the

1   United States Naval Academy.  And I received a masters degree

2   from Georgetown University in international securities studies.

3   Q    Have you studied Arabic?

4   A    Yes, I have.

5   Q    Are you fluent in it?

6   A    I'm not fluent, no.

7   Q    During the course of the investigation -- I'm sorry.

8          For preparation for your testimony, have you reviewed

9   a large amount of the material the government gathered during

10  the course of the investigation?

11  A    Yes, I have.

12  Q    And can you explain to the Court not by exhibit but by

13  category the type of material that was collected and that

14  you're going to testify about.

15  A    Of course.  As part of this investigation, or part of the

16  review for this -- my testimony, I reviewed text messages sent

17  by the defendant, I reviewed e-mails sent by the defendant.

18  There was internet activity conducted by him.  I reviewed the

19  results of a search of his computer.  I reviewed postings the

20  defendant wrote on the YouTube website.  In addition to

21  communications sent on the YouTube forum.

22  Q    Did you also review communications between online covert

23  employees by the FBI and the defendant?

24  A    Yes, I did.

25  Q    You're familiar with the -- how the exhibits are named?

Parsons - direct by Jonas

1    A    Yes, I am.

2    Q    So exhibits that are marked Broadband, what are those?

3    A    Broadband are the results of surveillance of his internet

4    activity.

5    Q    And exhibits marked Computer?

6    A    Those are the results of a search of his computer.

7    Q    Exhibits marked Deen Haqq?

8    A    Deen Haqq are postings by the defendant to the Deen Haqq

9    website.

10   Q    Exhibits marked Kindle.

11   A    Kindle are the result of a search of the defendant's

12   Kindle device.

13   Q    Exhibits marked Inspire.

14   A    Inspire is the *Inspire Magazine*, copies or postings or

15   markings he had on *Inspire Magazine*.

16   Q    Exhibits marked OCE One, O-N-E.

17   A    OCE One are the communications between the defendant and

18   the first online covert employee.

19   Q    Exhibits marked OCE Two.

20   A    Those are communications between the defendant and the

21   second online covert employee.

22   Q    An exhibit marked RCFL.

23   A    RCFL is again results of the, the forensics review of data

24   found on the computer.

25   Q    Exhibits marked Video?

Parsons - direct by Jonas

1    A    Video are videos that were referenced in communications by

2    the defendant that we were able to find online afterwards.

3    Q    Exhibit marked Web History?

4    A    Web history is a review of the web activity conducted by

5    the defendant.

6    Q    Exhibit marked Yahoo Answers.

7    A    Yahoo Answers is, is a question posted by the defendant on

8    the Yahoo Answers website.

9    Q    Exhibit marked YouTube?

10   A    YouTube are public postings.  Actually those are the

11   e-mails conducted.  So on YouTube forum you can send e-mails,

12   the equivalent of e-mails between yourself and other YouTube

13   users.

14   Q    And exhibits marked YouTube Postings 1 or 2.

15   A    YouTube postings are the postings written by the defendant

16   and a way of commenting on other people's videos that were on

17   the website.

18   Q    And I assume exhibits marked E-mails and Texts are

19   self-explanatory?

20   A    Yes.

21         MR. JONAS:  Your Honor, at this time I'd offer into

22   evidence by category the exhibits marked Broadband on the

23   defendant's exhibit list, Computer, Deen Haqq, E-mail, Inspire,

24   Kindle.  All the OCE Ones and OCE Two exhibits, including ones

25   marked DH.  RCFL exhibit, Text exhibits, exhibits marked Video,

Parsons - direct by Jonas

1   exhibit marked Web History, Yahoo Answers.  Exhibits marked

2   YouTube, YouTube Comments, and YouTube Postings.

3               THE COURT:  Any objection?

4               MR. DURKIN:  Judge, I, I want to preserve my

5   objection that I made earlier.  I'm not sure what -- since the

6   rules of evidence doesn't necessarily apply in sentencing

7   hearings, I'm not sure what it means to have it introduced into

8   evidence.  So I object on those due process grounds

9   procedurally.  But there's a second objection, and I don't

10  want --

11              THE COURT:  A little louder, Mr. Durkin.

12              MR. DURKIN:  I'm sorry?

13              THE COURT:  A little louder.

14              MR. DURKIN:  I said I, I want to preserve the

15  objection I had before, which is to moving into evidence since

16  the rules of evidence don't apply in a sentencing hearing, and

17  it's much more informal.  I didn't object to procedurally that

18  we do it this way for the sake of time.  But I, I'm -- I don't

19  understand the meaning of evidence in this.  And, and I object

20  to the extent that the government expects you to look at every

21  piece of evidence they're going to put in the record.

22              The second issue is if on any of these exhibits that

23  they're offering and he's going to be testifying about and any

24  of the search terms or in any way were derived from FISA, we

25  don't want to waive any objection to that.  But since we have

1  no idea what they got under FISA, we have no -- I can't

2  articulate that any better.

3  THE COURT:  All right.  Thank you.  I do know,

4  counsel for the government, he is correct as to saying they

5  have no objection as to the exhibits being used.  The Court

6  will grant that.  As to it being admitted into evidence --

7  MR. JONAS:  I'm not quite -- into the record.

8  Accepted by the Court.  I'm not quite sure how to phrase it in

9  a sentencing proceeding.

10  THE COURT:  I don't know if it really needs phrasing

11  as long as they aren't objecting.  Right now it's just part of

12  the information that you are submitting in support of your

13  recommendation.

14  MR. JONAS:  That's fine, Your Honor.

15  THE COURT:  All right.  And I'll accept them with

16  that.  Your objection as to them being admitted into evidence

17  is sustained.  All right.

18  MR. DURKIN:  Thank you.

19  THE COURT:  Thank you.  Proceed.

20  MR. JONAS:  Your Honor, may I approach the witness.

21  THE COURT:  You may.

22  MR. JONAS:  Thank you.

23  BY MR. JONAS:

24  Q    Agent Parsons, I'm showing you what's marked as Government

25  Exhibit RCFL.  Is this a document that basically summarizes

Parsons - direct by Jonas

1  items found on the defendant's computer and when they were

2  accessed or downloaded?

3  A    Yes, it is.

4  Q    Is that going to help you during your testimony?

5  A    Yes, it will.

6          MR. JONAS:  And, Your Honor, we're going to be using

7  the screen.

8          THE COURT:  The Elmo or the --

9          MR. JONAS:  The laptop.

10         THE COURT:  Okay.  You're going to be using I'm

11  assuming the VGA or HDMI?

12         MR. JONAS:  It should be HDMI.

13         THE COURT:  All right.  Under the prosecution or just

14  a straight --

15         MR. JONAS:  I don't know, Your Honor.  May I have one

16  moment, Your Honor.

17         THE COURT:  Yes, sure.

18     (Brief pause.)

19         MR. JONAS:  Your Honor, I also seem to be having an

20  issue on my end as well.  Can I ask my paralegal to assist me

21  to --

22         THE COURT:  Sure.

23         MR. JONAS:  Thank you, Your Honor.

24         THE COURT:  Step forward, please.  Thank you.  And I

25  assume the only thing that the summary witness is doing is

Parsons - direct by Jonas

1   explaining what you put up on the screen.

2           MR. JONAS:  I can -- I mean, there's some videos we

3   are going to play snippets of, and --

4           THE COURT:  Well, the problem is I don't know what --

5   what source?  I'm just not sure what's not working or what is

6   working.

7           THE CLERK:  It's not picking up HDMI.

8           THE COURT:  It's not picking up HDMI at all.  All

9   right.  Well, we have tech people coming.  As soon as they come

10  and take a look, I'll continue.  All right.

11          MR. JONAS:  Thank you, Your Honor.

12      (Short break taken.)

13          THE COURT:  Are we all set?

14          MR. JONAS:  Yes, Your Honor.  Apparently it was a

15  different function on your screen.  I see an HDMI cable, I

16  assume it's HDMI, but it's something that starts with a V.

17          THE COURT:  VGA?

18          MR. JONAS:  VGA.

19          THE COURT:  All right.  Thank you.  The record will

20  reflect that it wasn't just Judge Coleman's lack of technical

21  knowledge.  All right.

22          MR. JONAS:  I will take the blame for that, Judge.

23          THE COURT:  All right.  Proceed.

24          MR. JONAS:  Thank you, Your Honor.

25  BY MR. JONAS:

Parsons - direct by Jonas

1   Q   So, Agent Parsons, you testified that you reviewed some
2   material taken from the defendant's material.  And, and before
3   we go to the first exhibit, is your testimony going to largely
4   be in chronological order?
5   A   Yes, it will be chronological.
6   Q   Okay.  So Computer 1.
7   A   Yes.
8   Q   Is that a video that was taken from the defendant's
9   computer?
10  A   Yes, it was.
11  Q   Do you have based upon your RCFL spreadsheet when that
12  video was accessed last or downloaded?
13  A   So Computer 1 was accessed according to this on August of
14  2011 or December of 2000 -- also December 2010.  Depending on
15  the version of it.
16          MR. HERMAN:  Judge, may --
17          THE COURT:  All right.  Again --
18          MR. HERMAN:  I'm sorry.  May I intercede for a
19  second.  And I think that during the break he -- Mr. Durkin may
20  have stepped out for a quick second.  And Miss Lyon is here.
21          THE COURT:  All right.  Again, you've got three
22  lawyers --
23          MR. HERMAN:  No, I get it.  He's, he's -- he's coming
24  in right now.
25          THE COURT:  Okay.  I can't -- every time this happens

1  I can't do that.  All right.  But now we have another cord
2  going in.
3          MR. JONAS:  Your Honor, it's just a mouse to make it
4  a little easier for me.
5          THE COURT:  A mouse.  Okay.
6          MR. DURKIN:  Judge, could I, could I just interpose
7  another objection, not to be --
8          THE COURT:  You walked in with an objection?
9          MR. DURKIN:  I did.  Because I walked out and just
10  saw that they now have set up a metal detector outside the
11  courtroom, which was not there when I walked in at 10:30.
12          THE COURT:  Okay.  Mr. Durkin, obviously this Court
13  since I haven't been out front, I have no clue that that was
14  happening.  I don't know why.  They may have heard something.
15  I'm sure we'll hear about it.  Right now I'm not getting into a
16  full discussion about this.
17          MR. DURKIN:  That's fine.  I just --
18          THE COURT:  I will note it, and I will find out if
19  there is some reason that I don't know about that that just
20  happened.  All right.  Thank you.  Proceed.
21          MR. JONAS:  I had no idea, Judge.
22          THE COURT:  Proceed.
23  BY MR. JONAS:
24  Q    Agent Parsons, is Government's Computer 1, is that a
25  nasheed?

1   A    Yes, it is.

2   Q    What's a nasheed?

3   A    A nasheed --

4   Q    I'm sorry.

5            THE COURT:  Wait a minute.  When you say government's

6   exhibit, we have nothing --

7            MR. JONAS:  I'm sorry.

8            THE COURT:  We have nothing on our screens.  You

9   haven't done it yet?

10            MR. JONAS:  I haven't done it yet, Your Honor.

11            THE COURT:  Okay.

12            MR. JONAS:  I apologize.

13            THE COURT:  No problem.

14   BY MR. JONAS:

15   Q    Are you familiar with what --

16            MR. DURKIN:  If it's foundational --

17            THE COURT:  Excuse me.  You know what, we need a mike

18   that's put down by you so that you can speak.

19            MR. DURKIN:  If, if this is foundational, we, we

20   won't object.  We're not going to object to the foundation.

21            THE COURT:  All right.  Yes.  Let's please move

22   forward again.

23            MR. JONAS:  That's fine, Your Honor.

24   BY MR. JONAS:

25   Q    Agent Parsons, what's, what's a nasheed?

Parsons - direct by Jonas

1   A    A nasheed is a vocal musical piece usually done to Islamic
2   religion to recall history or Islamic events or sometimes
3   jihadi material.
4           MR. JONAS:  Your Honor, I'm just going to play just a
5   snippet of Government's Exhibit Computer 1.
6       (Whereupon, said video was played in open court.)
7           THE COURT:  How long are you playing this?  Thank
8   you.
9           MR. JONAS:  That's enough, Your Honor.
10  BY MR. JONAS:
11  Q    Agent Parsons, does the rest of that exhibit go on in a
12  similar fashion?
13  A    Yes, it does.
14          MR. DURKIN:  Well, if that's all it does, then I'd
15  move to strike it because it's offensive and it's, it's --
16          THE COURT:  It will not be stricken.  It will be
17  given the consideration that it is due.  All right.  Proceed.
18          MR. JONAS:  Thank you, Your Honor.
19  BY MR. JONAS:
20  Q    Just for the record, Agent Parsons, where was that video
21  found?
22  A    That was found on the defendant's computer.
23  Q    You talked about YouTube communications?
24  A    Yes.
25  Q    What exactly are they?

Parsons - direct by Jonas

1  A      YouTube communications are the equivalent of an e-mail,

2  where users on YouTube can send private messages from one

3  YouTube user to another YouTube user.

4  Q      Did the defendant do that?

5  A      Yes, he did.

6  Q      On the screen is YouTube 1.

7  A      Yes.

8  Q      If you can look at the top.  I'm going to enlarge it for

9  you.  You see the time March 27th, 2011 at 2:13?

10 A      Yes, I do.

11 Q      Can you read that.

12 A      Yes.  That is a communication from the defendant to the

13 user with the name Qwertyfshag, where the defendant writes,

14 Yeah.  InshaAllah.  I gotta do like some every day is a lot of

15 work.  I'm also putting the life of the Prophet Muhammad, may

16 peace be upon him, by Anwar al Awlaki.  You should listen when

17 you could.

18 Q      And if you can read the one that's March 30th at 10:43.

19 A      At that time the defendant wrote to the same user,

20 Qwertyfshag, Yeah.  Yeah.  Check out Anwar al Awlaki's

21 lectures.  He very knowledgeable.  Mashallah aiight asalamu

22 alaykum.

23 Q      Do you know who Anwar Al Awlaki is?

24 A      Yes, I do.

25 Q      Who is he?

1  A    Anwar Al Awlaki was a very prominent Islamic scholar who

2  was aligned with Al-Qaeda in the Arabian peninsula and was

3  known for promulgating many a lectures advocating violence.

4  Q    Is he alive?

5  A    No, he is not.

6  Q    Are his lectures still used to radicalize and recruit

7  people?

8  A    Yes, they are.

9  Q    Turning to Government's Exhibit YouTube 3.  If you can

10  look at -- I'm sorry.  This is YouTube postings.  What's a

11  YouTube posting versus a YouTube communication?

12  A    So postings are comments written by a user of YouTube that

13  are publicly viewable in relation to a video.  So if you look

14  at a video, you can scroll down and you see comments that

15  people post for other people to read.

16  Q    And are these postings by the defendant?

17  A    Yes, they are.

18  Q    If you can look at the posting on March 27th, 2011, 3:14.

19  A    I don't see that on my screen.

20       MR. JONAS:  Sorry, Judge.

21  BY MR. JONAS:

22  Q    You see it now?

23  A    March 27th at 3:14 p.m.?

24  Q    Yes.

25  A    So that is public --

1    MR. DURKIN:  Mr. Jonas, what page is that?

2    THE COURT:  I'm sorry.

3    MR. DURKIN:  Could I have the page number.

4    MR. JONAS:  That's page 2 of YouTube -- I'm sorry.

5  Page 25 of YouTube Postings 1.

6  BY MR. JONAS:

7  Q    If you can read March 27th, 2011 at 3:14.

8  A    Yes.  The defendant publicly posted the comment, LMAO kill

9  the terrorists.  He is teaching people to give charity

10 exclamation point.  Such bull poo.  Chances are if they want

11 him killed, then he must be a hero.  If an evil government

12 wants him, cough cough.

13 Q    Can you read the comment that he made right above it.

14 A    Yes.  At 3:22 p.m. on the same day, the defendant posted

15 Anwar al Awlaki Woooooooooooooooo.  Allahu Akbar.  Ha, ha, ha.  I

16 love that guy.

17 Q    Agent Parsons, I forgot to ask you.  This is -- we're

18 looking at March 2011.  When did the undercover -- the online

19 covert employees first engage with the defendant?

20 A    They engaged with the defendant in May of 2012.

21 Q    So that's over a year -- 14 months after this?

22 A    That is correct.

23 Q    Staying with YouTube Postings 1, page 23.  Do you see May

24 3rd at 3:44?

25 A    Yes, I do.

1 Q    What's that say?

2 A    So at May 3rd at 3:44 p.m. of 2011, the defendant publicly

3 posted, Go kill yourself.  At least hear from the people before

4 you judge them.  Virgins is not even a good translation for

5 hoor al ayn.  Hoor al ayn are women for the believers in

6 paradise.  You don't go to paradise by doing nothing.  You get

7 paradise by worshiping and listening to God, and fighting for

8 his cause has a high rank.  I'll tell you this, just knowing

9 the kind of people who usually go to hell, I wouldn't think

10 there would be any virgins there.  Smiley face.

11 Q    Is this a comment to the same video that he made the

12 comments to in the prior exhibit?

13 A    Yes, it was.

14 Q    And do you know what hoor al ayn is?

15 A    Hoor al ayn is an Arabic or Islamic term for virgins.

16 Specifically virgins that are found in paradise.

17 Q    Are you familiar with Government's Exhibit Computer 2?

18 A    Yes, I am.

19 Q    And what is this?

20     (Whereupon, said video was played in open court.)

21         THE WITNESS:  This is another nasheed.

22 BY MR. JONAS:

23 Q    Go ahead.

24 A    Nasheed is a video actually produced.  It displays a

25 reproduction of a fight between unnamed western forces and it

1  appears to be --

2          THE COURT:  I can see the video.  Proceed.

3          MR. JONAS:  Your Honor, I'm fast forwarding to 5

4  minutes and 29 seconds of this video.

5     (Whereupon, said video was played in open court.)

6          THE WITNESS:  It has been narrated by the authority

7  of --

8          THE COURT:  Once again, Counsel, how long do I have

9  to listen to this?

10          MR. JONAS:  Your Honor, I just wanted you to see what

11  was written on this video.

12          THE COURT:  I see.  Thank you.

13  BY MR. JONAS:

14  Q    Going back to YouTube Communications, Agent Parsons.  Do

15  you see YouTube 3 on the screen, September 10th at 7:40?

16  7:40 p.m., what is the defendant saying on September 10th?

17  A    At 7:40 p.m.?

18  Q    Yes.

19  A    I think it's still a little bit lower on the screen.

20  Q    I'm sorry.

21          THE COURT:  No, it's at the top.

22          THE WITNESS:  I'm sorry.  I apologize.  There it is.

23  So in this one the defendant wrote to the user Qwertyfshag, I

24  just saw that video.  This is my favorite video from you.  That

25  is very clever.  I never thought of it that way.  Thanks, man.

1  InshaAllah.  I'll remember this and I'll accomplish my goals,
2  in capitals, in life.  InshaAllah.  Make dua that I accomplish
3  my goals and I die shaheed and I come back with Allah pleased
4  with me, and that he forgives me.  Thanks.  Assalamu alaykum.
5  Q    Agent Parsons, are you familiar with the term shaheed?
6  A    Yes, I am.
7  Q    What is your understanding what that term means?
8  A    That is an Arabic term for murder.
9  Q    Agent Parsons, do you see the passage on September 11th,
10 2011 at 1:40?
11 A    Yes, I do.
12 Q    So where it says so yeah in the middle, can you read that
13 the portion?
14 A    So beginning there, the defendant wrote to user
15 Clevonamerica, So yeah, I'm against the U.S. and why not?  If
16 you see how many Muslims they killed, I do not understand why
17 any Muslim would like America.  But everyone is different.  So
18 it doesn't mean I'm against every person who lives here.  I
19 live here.  A lot of Muslims live here and decent sincere
20 people exist here, but I'm against the government for what they
21 are doing against my brothers and sisters, and I'm also against
22 anyone who supports them or keeps silent about what they are
23 doing.  Because keeping silent is like approving and accepting
24 what they are doing.
25 Q    Agent Parsons, you talked about e-mails that the defendant

1   sent that the government collected.  Government's Exhibit

2   E-mail 1, what is this?

3   A    This is an e-mail sent from the defendant to an individual

4   named Sa'ad Quadri on September 13th, 2011.

5   Q    What's he say?

6   A    So he writes in the e-mail, This is a short book.  I

7   forgot or never know who it's written by.  Subhanallah.  I

8   wasn't looking for any book like this, but it is solid, man.

9   It's not some bull expletive.  It's kind of funny too.  Short

10  book, not that long, 180 pages.  Great book.  Verses of Quran,

11  hadith with sources you can check as you go along.  Solid, man.

12  Awesome book.  This book testify to lazy bull most Muslims say

13  about this.

14  Q    What's the book?

15  A    The book is *The Book of Jihad*.

16  Q    You testified earlier that there are exhibits marked

17  Kindle?

18  A    That is correct.

19  Q    What are those exhibits?

20  A    Exhibits marked Kindle are publications or manuscripts

21  found on the defendant's Kindle device.

22  Q    Was *The Book of Jihad* found on the defendant's Kindle?

23  A    Yes, it was.

24  Q    Showing you Government's Exhibit Kindle 5.  Are you

25  familiar with *The Book of Jihad*?

1  A    Yes.

2  Q    And have you reviewed it?

3  A    I've read it for my preparation for this testimony.

4  Q    Just based upon what you reviewed, can you -- well, you

5  know what, can you just read some of the chapter headings.

6  A    Sure.  Chapter 1 is entitled On The Command of Jihad

7  Against the Nonbelievers and Its Mandate and the Stern Warning

8  Against Those Who don't Practice Jihad.  Chapter 2 is entitled

9  the --

10         THE COURT:  All right.  Counsel, I'm sorry.  This

11  Court doesn't need that.  I have that on --

12         MR. JONAS:  Okay.  Your Honor, that's fine.

13         THE COURT:  Thank you.

14  BY MR. JONAS:

15  Q    Can you very briefly just summarize what the book is.

16  A    This book generally explains why Jihad is meant to be a

17  violent jihad or attacking --

18         MR. DURKIN:  Judge.  Judge, with all due respect, I'm

19  going to object.

20         THE COURT:  Objection sustained.  I don't need his

21  interpretation of what -- you haven't labeled him as an expert

22  in interpreting different works of, of this type.  He's already

23  talked about how he was the -- the defendant was referring to

24  this, which is important that it was something clearly he was

25  interested in.  That's something the Court can take into

1  consideration.

2      MR. JONAS:  That's fine, Your Honor.

3      THE COURT:  I know it's not a fairytale.  All right.

4      MR. JONAS:  I can move on.

5      THE COURT:  All right.  Thank you.

6  BY MR. JONAS:

7  Q    Is there a section in the Kindle where the defendant made

8  notes with bookmarks?

9  A    Yes, there is.

10 Q    And if you look at Government's Exhibit Kindle 9, page 2,

11 is there any bookmarks to *The Book of Jihad*?

12 A    Yes, there are two bookmarks on January 24th of 2012.

13 Q    And what does he say about *The Book of Jihad* in those

14 bookmarks?

15 A    So in reference to page 20 of *The Book of Jihad*, the

16 defendant wrote, I love this verse.  And in reference to page

17 21 the defendant wrote, damn abu bakr.

18 Q    And did you look to see in *The Book of Jihad* what he was

19 talking about?

20 A    Yes, I did.

21 Q    Is there a quote here, a verse -- is there -- on page 20

22 is there only one verse?

23 A    Yes, there's only one verse on that page.

24 Q    And is that the verse on the screen?

25 A    Yes, it is.

1    MR. JONAS:  Your Honor, I won't have him read it, but
2  if you can just -- the title is the punishment of those who
3  don't participate in jihad.
4    THE COURT:  I see it, and I have read it.  Thank you.
5    MR. JONAS:  Thank you, Your Honor.
6  BY MR. JONAS:
7  Q    And then did he make -- on page 21 is there a reference
8  abu bakr?
9  A    Yes, there is.
10  Q    And he said damn abu bakr, but what does it say about abu
11  bakr on the bottom?
12    MR. JONAS:  Or, Your Honor, you can read it yourself
13  if you wish.
14    THE COURT:  That's fine.  All right.  Proceed.
15  BY MR. JONAS:
16  Q    Did he make any other comments to *The Book of Jihad* in his
17  Kindle?
18  A    Yes, he did.
19  Q    On page 12 of Kindle 9, did you see that?
20  A    Yes, I do.
21  Q    What's the reference to *The Book of Jihad*?
22  A    On page 100 -- in reference to 107 he types the best jihad
23  with best in capital letters.
24  Q    And did you look on page 107 of *The Book of Jihad* in his
25  Kindle to see what the best jihad is?

1    A    Yes, I did.

2    Q    Is that on the screen right now?  The best jihad is the

3    one in which a horse is slain and blood is spilled?

4    A    Yes, that's correct.

5            MR. DURKIN:  Well, again, with all due respect, I

6    mean, can, can we introduce the Bible?  I mean, this is going

7    to get way off.

8            THE COURT:  Well, first of all, it's not your time to

9    introduce.

10           MR. DURKIN:  No, but --

11           THE COURT:  And if you, if you want to bring that up

12   and talk to the Court about it, the Court will consider your

13   request if it's relevant, again.  Proceed.

14           MR. JONAS:  And right now --

15           THE COURT:  And no argument needed.

16           MR. JONAS:  Moving on, Your Honor.

17           THE COURT:  Thank you.

18   BY MR. JONAS:

19   Q    Agent Parsons, did the defendant distribute *The Book of*

20   *Jihad* to anybody?

21   A    Yes, he did.

22   Q    Government's Exhibit E-mail 2.  Can you tell us the date

23   and what's this e-mail.

24   A    This is an e-mail sent from the defendant to the user of

25   the e-mail address Abdurahmansharif@yahoo.com on January 16th

1  of 2012.

2  Q    And is he sending *The Book of Jihad* to this person?

3  A    Yes, he does.

4  Q    In Government's Exhibit E-mail 3 does he send it to this

5  person as well?

6  A    Yes, he does.  He also attaches *The Book of Jihad*.

7  Q    And any other books he sends this person?

8  A    He sends the *Hoor al ayn Full Description* and *100*

9  *Fabricated Hadith*.

10  Q    And he includes a message that says I added two more short

11  books.  They're really good?

12  A    That is correct.

13  Q    And --

14        THE COURT:  Can you go back, Counsel.

15        MR. JONAS:  Sure, Your Honor.  Give me one second.

16        THE COURT:  Yes.  Can you block it again.  That was

17  the one with the two short books.

18        MR. JONAS:  Sure.

19        THE COURT:  All right.  And the subject matter says

20  what?

21        MR. JONAS:  We didn't write it, Your Honor.  Do you

22  want me to read that?

23        THE COURT:  That's the point.  The point is the

24  subject matter says what, sir?

25        THE WITNESS:  Yes, Your Honor.  The defendant wrote

1  an e-mail, Here's the book.  I added two more really short
2  books --
3           THE COURT:  No.  No.  No.  Go to the subject.
4           THE WITNESS:  I'm sorry.
5           THE COURT:  Okay.  I'll say it.  Yo nigga is Adel
6  David.
7           THE WITNESS:  David, yes, Your Honor.
8           THE COURT:  All right.  So that's in part of with all
9  the other stuff, is that correct?
10          THE WITNESS:  That's correct, Your Honor.  Yes.
11          THE COURT:  All right.  Proceed.
12          MR. JONAS:  Thank you, Your Honor.
13          THE COURT:  Thank you.
14  BY MR. JONAS:
15  Q    So did he send *The Book of Jihad* to other people as well?
16  A    Yes, he did.
17  Q    And you see that on April 22nd in Government's Exhibit
18  E-mail 11?
19  A    Yes.  He also sent *The Book of Jihad* on that date.
20  Q    E-mail 5, he sends it to someone named Abdella Tounisi?
21  A    Yes, he does.  On January 24th of 2012.
22  Q    Does he send more than *The Book of Jihad*?
23  A    He also attaches *Hoor al ayn Full Description*.
24  Q    YouTube 7 is a communication from the defendant.  Turning
25  to December 31st, 2011 at 4:00 o'clock.  Can you read what he

51

Parsons - direct by Jonas

1  says on December 31st, 2011.

2  A    This is at 4:00 p.m.  The defendant writes to Qwertyfshag,

3  You have 2100 subscribers?  Fudge.  MashaAllah.  Yeah, I could

4  see why. Your videos have you speaking and it's short and

5  simple.  They're usually worth seeing.  Keep making videos,

6  man, because InshaAllah when you die, Allah will keep adding

7  good deeds in your record.  Make dua for me, man.  I want to

8  die shaheed InshaAllah and get a good wife.  Two things I'm

9  thinking about right now.

10 Q    Agent Parsons, what's Government's Exhibit E-mail 6?

11 A    This is an e-mail sent from the defendant to the e-mail

12 account muslim@allaahukbar.net on January 26th, 2012.

13 Q    You don't have to read the whole thing, but if you can

14 just summarize.

15 A    So this is an e-mail written by the defendant where he

16 discusses his complaint over the website.  And that it should

17 be more in line with jihad being required by Muslims.

18 Q    Government's Exhibit E-mail 8.

19 A    This is an e-mail sent from the defendant to two

20 individuals, Abdurahmansharif@yahoo.com and Abdella Tounisi on

21 February 6th of 2012.

22 Q    Did you find this video?  Did you find this video?

23 A    Yes, I did.

24 Q    What is this video?

25 A    This is a series of clips, nasheeds basically discussing

1 | jihad.

2 | MR. JONAS:  Your Honor, I'm just going to play the

3 | first clip.

4 | (Whereupon, said video was played in open court.)

5 | THE COURT:  All right.  This is a little bit

6 | repetitive.

7 | MR. JONAS:  I understand, Your Honor.  Right there I

8 | think is an important point.  I just wanted to make the point,

9 | Your Honor, that there's a discussion of violence.

10 | THE COURT:  A discussion of violence in the song like

11 | so many today on the radio.  Proceed.

12 | MR. JONAS:  I understand, but --

13 | THE COURT:  I just want to make sure.

14 | MR. JONAS:  Moving on.

15 | THE COURT:  All right.  Thank you.

16 | BY MR. JONAS:

17 | Q    YouTube Postings 1, page 14.  At 7:02 a.m. on

18 | January 29th, 2012, do you see that posting by the defendant?

19 | A    Yes, I do.

20 | Q    And what's he saying?

21 | A    This is a public posting where the defendant wrote,

22 | SubhanAllah.  I listened to all these on my iPod, including the

23 | terrorist one.  Ha ha ha ha.  Wallah.  I say I want to be a

24 | terrorist, and I meant to cause terror to oppression

25 | exclamation points.  Oh, my God, I didn't know that's what this

1  song meant.  These nasheeds are already in my heart.  Thanks

2  for the translation.  SubhanAllah atheem.

3  Q    And, Agent Parsons, did you take the URL for this video

4  and actually find the video?

5  A    Yes, I did.

6  Q    And is that another nasheed?

7  A    Yes, it is.

8  Q    Exhibit E-mail 9.  What is this, Agent Parsons?

9  A    This is an e-mail sent from Ansar Al-Mujahideen to the

10  defendant's e-mail account that provides him an account on the

11  Ansar Al-Mujahideen website.

12  Q    Are you familiar with what Ansar Al-Mujahideen is?

13  A    Yes, I am.

14  Q    What is that?

15  A    It is a website used to discuss jihadi material.

16  Q    And going back to the YouTube Communications.  YouTube 12,

17  page 2 at March 23rd -- I'm sorry.  YouTube 10, page 1.  On

18  February 13th, 2012 at 7:43 what is the defendant writing?

19  A    So at 7:43 the defendant wrote to the user

20  Khilafaklothing, I saw that video for "Every Believer."

21  Awesome video.  It had hadith and videos and everything.

22  MashaAllah good work.  InshaAllah.  We both die shaheed.  Yeah.

23  Everyone thinks it's a bad thing to want to do Jihad al-nafs,

24  but there is no such term.  Everyone is going to slack until

25  Allah punishes them.  People need to fight in the sake of Allah

1   or evil will go through.  Arrrrghhhhh.  But I am just

2   considered crazy, and people say that I understand wrong when I

3   talk about Jihad just as something we should all do especially

4   against the states.

5   Q    YouTube 12, 8:18 p.m.  This is page 2.  You see that on

6   March 30th?

7   A    March 30th at 8:18 p.m., the defendant wrote to the user

8   MujahidFeeSabilillah, Why did you take off those lectures by

9   Amriki?  I didn't get a chance to listen to them yet.  I was

10  going to listen to the rest of it now.

11  Q    Do you know who Amriki is?

12  A    Yes, I do.

13  Q    Who is that?

14  A    That in this case is a reference to Abu Mansoor Al-Amriki,

15  who's an individual that departed from the United States to

16  join the terrorist group Al-Shabaab.

17  Q    Did he make videos?

18  A    Yes, he did.

19  Q    What was -- do you know the purpose of the videos?

20  A    The videos were to discuss the benefits of Jihad, to

21  prepare people for joining Jihad, and discuss why it was

22  important to continue Jihad against America.

23  Q    Was the FBI able to collect the defendant's internet

24  activity?

25  A    Yes, we were.

1  Q    And you see Government's Exhibit Web History?

2  A    Yes, I do.

3  Q    This is page 1 of that exhibit.  Around this time, late

4  March, early April what was he searching for?

5  A    There are searches for urgent message from Abu Mansoor

6  Al-Amriki on YouTube.  Several searches for that and one for

7  Abu Mansoor al-Amriki leading a battle and rapping an American

8  terrorist Abu Mansoor.

9        MR. JONAS:  Judge, I missed one.  I want to go back

10  one item, if that's okay.

11  BY MR. JONAS:

12  Q    Back to YouTube 12 for a moment.  At 1:08 p.m. on

13  March 23rd, 2012, what's the defendant saying?

14  A    At 1:08 p.m. the defendant wrote to Qwertyfshag, Assalamu

15  alaykum.  I never said to kill innocent people.  But the better

16  opinion of the scholars, I can send you a book, is that a lack

17  of the caliphate does not abandon the act of Jihad in the Cause

18  of Allah.  Even when the Muslim Ummah wasn't one, like when

19  Spain separated and then more divisions were made, people still

20  did Jihad.  And people are being oppressed, killed, raped,

21  et cetera.  Muslims have to fight in self defense.  You cannot

22  just wait for a caliphate.  Your opinion is the opinion of the

23  majority of the Muslims, and this is a very wrong idea.  If the

24  forces of Taghoot come out, then where are the forces of Allah?

25  There are so many places that need help.

Q    Government's Exhibit E-mail 10.  What's this?

A    This is an e-mail sent from the defendant to two

individuals.  One e-mail account JM03745@yahoo.com, and

secondly to Abdella Tounisi on April 17th of 2012.

Q    Do you know what these are?

A    These are two videos entitled State of the Ummah.

Q    Are you familiar with that video?

A    Yes, I am.

Q    What is it?

A    State of the Ummah discusses the oppression being

experienced by Muslims throughout the world.  And then

secondly, it's a call to arms for people to rise up and help

stop their oppression through acts of violence.

Q    In the State of the Ummah is there an individual that they

portray or, or that we see clips of by the name of Abdullah

Azzam?

A    Yes, there is.

Q    Did the defendant -- did Abdullah Azzam write any books?

A    Yes, he did.

Q    Did you find any of his books on the defendant's Kindle?

A    Yes, I did.

Q    Did the defendant bookmark or make comments regarding any

of Abdullah Azzam's books?

A    Yes, he did.

Q    So on the screen is from Kindle 9, which are the bookmarks

1  and comments.  Is there anything here referencing one of

2  Abdullah Azzam's books?

3  A    Yes.  On April 20th of 2012 he makes a bookmark on page 9

4  of *In Defence of Muslim Lands* by Abdullah Azzam.  And also a

5  note on page 18 on the same date of April 20th, 2012 where the

6  defendant wrote, so the verse is abrogated but still applies

7  when Jihad is fard al ayn.

8  Q    Did you go to that book to see the passages he's referring

9  to?

10  A    Yes.

11  Q    And Government's Exhibit Kindle 1 is that *Defence of*

12  *Muslim Lands*?

13  A    That is the publication, yes.

14  Q    So I'm not going to have you read it, but is there a

15  discussion of fard ayn here?

16  A    Yes, there is.

17  Q    And does this advocate for people to go out and commit

18  Jihad if an enemy attacks a Muslim border or enters an Islamic

19  land?

20  A    Yes, it does.

21  Q    Does it call -- does it discuss permission needed from

22  parents?

23  A    Yes, it does.

24  Q    Could you read that portion, please.

25  A    It says, there is no permission for anyone from the other.

1  Even if the child goes out without the permission of his

2  parents, the wife without the permission of her husband, and

3  the debtor without the permission of his creditor.

4  Q    Is there a summary in that book for this chapter?

5  A    Yes, there is.

6  Q    What's the first thing in the summary?

7  A    So point one is Jihad by a person is fard ayn on every

8  Muslim in the earth.  Two, no permission for one from another

9  for Jihad, and no permission from parents for the child.

10 Q    And the next page has more discussions in the summary?

11 A    Yes, it does.

12 Q    What's it say about neglecting Jihad?

13 A    Point 4 says neglecting the Jihad is like abandoning

14 fasting and praying.  More than that, neglecting the Jihad is

15 worse in these days.

16 Q    Going back to the web history.  We are now in mid to late

17 April.  What's he searching for?

18 A    There are several searches conducted by him.  He's

19 searching for Abu Mansoor Al-Amriki.  There's one for Shaheed

20 Muhammad.

21 Q    On the bottom.

22 A    He searches for the YouTube video Erhabu Ana.

23 Q    Did you -- you found that video, didn't you?

24 A    Yes, I did.

25 Q    These are more searches for Erhabu Ana?

Parsons - direct by Jonas

1    A    Yes, they are.

2    Q    And what's it say regarding the title?

3    A    Erhabu Ana with English translation, I am a terrorist.

4    Q    Did you find that?

5    A    Yes, I did.  This is the video.

6         (Whereupon, said video was played in open court.)

7    BY MR. JONAS:

8    Q    Did he make comments --

9              THE COURT:  All right.  Excuse me.

10             THE WITNESS:  Yes.

11             THE COURT:  Yes.  We don't need the video sound and

12   your ...  Okay.  Proceed.

13             MR. JONAS:  Thank you, Your Honor.

14   BY MR. JONAS:

15   Q    Did he make comments to this video on YouTube?

16   A    Yes, he made several comments.

17   Q    When you pulled this video or went to watch it, were those

18   comments still there at that time?

19   A    Yes, they were.

20   Q    Government's Exhibit Video 6A.  Which is the defendant's

21   comments on here?

22   A    His account was known as Adelown.

23   Q    And what does he say about this video?

24   A    So at one point he writes, Ha ha ha.

25   Q    Then?

1   A    Above that he also he writes, This is one of my favorites.
2   I would kill for the translation.
3   Q    Were there any more comments by him?
4   A    Yes, there were.  He also wrote, LOL.  Thank you.  But
5   when I said that ha ha, it wasn't literal.  I know some of the
6   meaning, which is I am a terrorist.  I look up the hills of
7   hittin.  I am a terrorist.  I terrorize the enemies of the
8   deen.  Very beautiful nasheed.  I don't know why I see Muslims
9   here saying they are not terrorists and so forth.  Muslims need
10  to be terrorists, but the ones who don't just terrorize anyone
11  but terrorize the enemies of Allah.
12  Q    Back to YouTube Postings to what he's putting on the
13  internet.  On May 1st, 2012 at 2:54 p.m.  This is page 4,
14  YouTube Postings 1.  May 1st, 2012, what's he posting on the
15  internet -- on YouTube.  Sorry.
16  A    At 2:54?
17  Q    Yes.
18  A    At 2:54 the defendant wrote publicly, Jihad is referred to
19  in the Quran and Sunnah as fighting.  So when I say Jihad or
20  most of the time of Quran and Sunnah say Jihad, it means
21  fighting.  But you have to fight the disbelievers with your
22  hearts, tongues, and swords.  Fight them by your words and by
23  your swords.  And ha ha ha, yes, he got the hadith right.
24  Fight them with your wealth, tongues, and sword.  And in
25  parentheses selves.

1  Q    Now, at this point he hasn't interacted with any of the

2  OCEs yet, has he?

3  A    No, there has been no government interaction to this

4  point.

5  Q    So around this time, late April, early May what's he --

6          THE COURT:  Of what year?

7          MR. JONAS:  I'm sorry.  2012.  Sorry, Your Honor.

8  Thank you.

9  BY MR. JONAS:

10 Q    What's he accessing on the internet per Government's

11 Exhibit Web History?

12 A    So in late April there's searches for Al-Qaeda killing

13 hostage video, Al-Qaeda nasheed, Yemen Jihad, Jihad in Yemen,

14 Abu Mansoor Al-Amriki, Anwar Al-Awlaki, Anwar Al-Awlaki Yemen.

15 Q    All right.  Let me go to the next page as well.

16 A    There are further searches for anti-American Muslims,

17 mujahideen in Bosnia.  Jihad mujahideen, American flag burning.

18 Q    And let me direct you, Agent Parsons.  Do you see the one

19 on the bottom?

20 A    Yes, there's one Anwar Al-Awlaki forest fires --

21          THE COURT:  One second.  Let him ask the question.

22 You see the one on the bottom?  Make sure you have the same

23 bottom that you're talking about.  Let's do a date.

24          MR. JONAS:  Yes, Your Honor.

25 BY MR. JONAS:

1   Q   The one dated March 3rd, 2012 at 20:53.

2   A   Yes.

3   Q   What's he accessing?

4   A   Anwar Al-Awlaki forest fires.

5   Q   Is there somewhere in the holdings that you reviewed that

6   discuss forest fires as a means of a terrorist act?

7   A   Yes, there are.

8   Q   Where is that?

9   A   That was *Inspire Magazine* I believe.

10   Q   And you're seeing more similar searches in early May?

11   A   That is correct.

12   Q   Are you familiar with *Inspire Magazine*?

13   A   Yes, I am.

14         MR. JONAS: Your Honor, should I assume the Court is

15   familiar with it as well?

16         THE COURT: Yes, you can.

17         MR. JONAS: Thank you, Your Honor.

18         THE COURT: You've been mentioning this throughout

19   the whole case. Proceed.

20   BY MR. JONAS:

21   Q   Agent Parsons, did the defendant access *Inspire Magazine*?

22   A   Yes, he did.

23   Q   Do you see Government Exhibit E-mail 12?

24   A   Yes.

25   Q   What's this date and what's happening here?

1  A     This is an e-mail sent from defendant to himself on
2  May 8th of 2012.

3  Q     What's he sending?

4  A     He is sending a link to the archive dot web -- or archive
5  dot website where you can download *Inspire* issues one to nine.

6  Q     Do you know if there were more than nine issues at this
7  time?

8  A     I think there were only nine issues at that time.

9  Q     Did he have *Inspire* on his Kindle?

10 A     Yes, he did.

11 Q     And Government's Exhibit Kindle 4, is this one of the
12 *Inspire* issues found on his Kindle?

13 A     Yes, it is.

14 Q     Approximately how many issues did he have on the Kindle?

15 A     He had issues five, six and, seven that were found on the
16 Kindle.

17 Q     And is that five on the screen right now?

18 A     That is the cover of issue five.

19 Q     Okay.  Did he bookmark *Inspire* in the Kindle?

20 A     Yes, he did.

21 Q     Did he bookmark more than just the issues found on the
22 Kindle?

23 A     There were also bookmarks for issues one, eight, and nine.

24 Q     Is there anything -- well, let me turn to -- is this part
25 of *Inspire Magazine*?

1  A    Yes, it is.

2  Q    What's this called?

3  A    This is a section called Open Source Jihad that was found

4  in every *Inspire Magazine*.

5  Q    And what's -- under this section what were the titles?

6  A    In this section there is Training with the AK Part 3 and

7  Making Acetone Peroxide.

8  Q    Does the magazine describe what Open Source Jihad is?

9  A    Yes, it does.

10  Q    As it relates to the magazine?

11  A    They provide a definition that they use on this page.

12  Q    What's the definition?

13  A    Open Source Jihad is a resource manual for those who

14  loathe the tyrants.  Includes bomb making techniques, security

15  measures, guerilla tactics, weapons trainings, and all other

16  Jihad related activities.  It further says, a disaster for,

17  repressive, imperialist nations, the Open Source Jihad is

18  America's worst nightmare.  It allows Muslims to train at home

19  instead of risking a dangerous travel abroad.  Look no further.

20  The Open Source Jihad is now at hands reach.

21  Q    It mentions AK.  Is this a page from that magazine?

22  A    Yes, it is.

23  Q    It's titled Training with the AK?

24  A    That is correct.

25  Q    Going back to his now internet searches and internet

1  activity on around May 10th.  What's he looking for?

2  A     You cut off the date so I think that's --

3  Q     Oh, sorry.

4  A     -- May 10th on top.  But there is -- so on May 10th there

5  are various searches for internet archive for *Inspire*.  *Inspire*

6  one, *Inspire* six.  Download terrorist magazines.  *Inspire* free

7  download.  *Inspire*.

8  Q     Okay.  And I just want to get to the bottom of that page

9  as well, the additional things on the internet searches and

10 history.

11 A     On the same day of May 10th there are further searches for

12 *Inspire Magazine* No. 3 special issue.  Operation Hemorrhage.

13 Ansar Al-Mujahideen.  Al-Qaeda magazine teaches how to kill

14 Americans, Ansar Al-Mujahideen.

15 Q     And are there additional searches later in that month that

16 are similar in nature?

17 A     Yes, there are.

18 Q     Government's Exhibit E-mail 14, May 17th, 2012.  What's

19 this?

20 A     This is an e-mail sent from the defendant to Abdella

21 Tounisi.

22 Q     Did you -- you found this video?

23 A     Yes, I did.

24        MR. JONAS:  Your Honor, we'll play a clip of the

25 video.  That's about a minute.

1      (Whereupon, said video was played in open court.)

2          THE COURT:  All right.  Again, that is all in his

3   native language, including the written subtitles underneath.

4   What purpose is this showing?  And you can take it off the

5   screen or I will.  Go ahead.

6          MR. JONAS:  This is a video that he sent to a friend

7   of his where Osama bin Laden talks about killing Americans.

8          THE COURT:  All right.  I think a summary would have

9   been fine --

10         MR. JONAS:  That's fine.

11         THE COURT:  -- for my purposes.  All right.  Proceed.

12  BY MR. JONAS:

13  Q    Agent Parsons, on his computer -- that was found on his

14  computer, correct, as well?

15  A    Correct.

16         MR. JONAS:  I'm not going to -- Your Honor, I have

17  this clip, but I'll just have him summarize it, if you prefer.

18         THE COURT:  Again, I don't know what they're saying.

19  And so if he can just summarize what he thinks they're saying

20  or what you all have written down of how this would be used.

21         MR. JONAS:  Yes, Your Honor.  There is English

22  translation on the bottom that was found on the, on the clip.

23  And then it was English translation on the last clip as well.

24         THE COURT:  All right.  Right now -- in the last

25  clip?

1    MR. JONAS:  It was on the --

2    THE COURT:  If it, if it was there, it must have been

3  cut off.  All I saw was Arabic language on mine.

4    MR. JONAS:  No, Your Honor.  That was actually

5  English.  It just wasn't very good font.

6    THE COURT:  Okay.  Well, either way if I can't read

7  it or understand it, then it -- you know, I'd rather have the

8  summary.  That's the point.

9    MR. JONAS:  The agent is familiar with it and can

10  read it as well, if that would help.

11    THE COURT:  If you wish.  It's just when I have a

12  tape going and you're going to have him talking.  So the point

13  is let's just summarize it.  I see who's in the video.  I see

14  that it's an official type of interview or something.  So a

15  summary will be fine for the Court.

16    MR. DURKIN:  Can we get the date of this?

17    THE COURT:  That's --

18    MR. JONAS:  Sure.

19    THE COURT:  Now, that's fine, yes.

20  BY MR. JONAS:

21  Q    Agent Parsons, looking on the RCFL spreadsheet for

22  Computer 8, when was this put onto the computer or accessed?

23  A    So it was created on May 11th of 2012.  It was also

24  accessed on that date as well.

25  Q    Is that before or after the defendant first interacted

1  with an online covert employee?

2  A    That is before.

3  Q    And, Agent Parsons, who's on the screen in this exhibit

4  Computer 8?

5  A    That is an interview with Anwar al Awlaki.

6  Q    Have you watched this video?

7  A    Yes, I have.

8  Q    Are you familiar with the clips we would have played for

9  the Court?

10 A    Yes, I am.

11 Q    With the English translation on the bottom?

12 A    Correct.

13 Q    What -- can you just summarize for the court what Anwar al

14 Awlaki is saying in this video, in these clips in particular.

15 A    In general he is calling for attacks against America.  He

16 references Nidal Hasan specifically, and calls for people to do

17 similar attacks such as Nidal Hasan did.

18 Q    You mentioned he discussed -- or the video discusses Nidal

19 Hasan.  Did the defendant in Government's Exhibit Web History

20 search for Nidal Hasan?

21 A    Yes, he did.

22 Q    And when was that?

23 A    That is on June 1st of 2012.

24 Q    Going back to his communications on YouTube.  I have

25 YouTube 14, page 11 on the screen.  If you can look at April --

1  April 6th at 4:24.  And I'm not going to ask you to read this
2  whole thing.

3         MR. JONAS:  Just give me one moment, Your Honor, so I
4  can find my marking.

5         THE COURT:  No problem.

6  BY MR. JONAS:

7  Q    Agent Parsons, can you read where it says Prophet
8  Muhammad.

9  A    Yes, I can.  Beginning there, Prophet Muhammad, may
10 Allah's peace and blessing be upon him, was sent to all
11 mankind, meaning everyone has to be introduced to the message.
12 Jizya is a very small fee to pay if you don't want to convert.
13 And when you said Jews changed over time, Islam doesn't change.
14 Islam is what it was yesterday and today and tomorrow.  Jihad
15 is part of Islam even if Muslims don't practice it correctly,
16 or at all to start with, but that's a bigger issue.

17 Q    That's enough.  That's April 6th?

18 A    That is correct.  2012.

19 Q    Staying with this exhibit, page 9 of YouTube 14,
20 10:31 a.m. on April 12th.  If you can read what the defendant
21 wrote, at least the top half.

22 A    It's at 10:31 a.m. on April 12 the defendant wrote to the
23 user Qwertyfshag, Jihad is a huge part of Islam and it's
24 mentioned in the Quran, hadith, and the seerah of the Prophet,
25 may Allah's peace and blessings be upon him.  And his sahaba is

1   full of Jihad.  And it is the solution to oppression in the
2   world.  With every unjust army, like American and Russian
3   soldiers, there should be mujahideen to protect people from
4   being hurt.  Jihad also destroys the oppression of other
5   government and religious systems and replaces them with Islam.
6   Q    Thank you.  And at 9 on the same page -- on the top
7   April 12th at 9:19 p.m..
8   A    Again to the user Qwertyfshag the defendant wrote, You
9   don't have to plan to go anywhere.  It's just for information
10  purposes and just for your knowledge and benefit.  Take all of
11  Islam.  Don't pick and choose.  Jihad is a part of Islam, and
12  we are not supposed to abandon it or change its meaning or
13  reinterpret it.  It will help because armies of oppression are
14  out there, and they need to be defeated by the justice of
15  Islam.  There's nothing wrong with giving charity, helping the
16  orphans, or relief work.  But it is wrong to say you want to do
17  these things and forget about the cause of Allah.  We need to
18  be more like the sahaba who are going to literally kill and
19  sacrifice their lives for the sake of Islam.
20  Q    Staying with the exhibit, page 3.  On May 12th at 7 -- May
21  12th, 2012 at 7:56 a.m. -- May 2nd.  Sorry.  May 2nd, 7:56.
22  Again, can you just read the top part.
23  A    Sure.  On May 2nd, 2012 the defendant wrote to the user
24  Qwertyfshag, I moaned when I saw the long message, but then I
25  thought that wasn't fair.  So focused and read what you said.

1  No, Muslims have to fight.  You want the Muslims to stand there

2  while their people are killed, women degraded, and children

3  murdered, tortured, mutilated?  Actually this would be a major

4  sin on the part of Muslims.  If kuffar come to a Muslim land,

5  it becomes fard on every person in that land to fight.  And if

6  they don't, they get a major sin as if they ran away.  So no,

7  Islam does not say sit there and let all your brothers and

8  sisters be killed.  Your accuse is the Makkan stage.

9          Do we continue?

10 Q    No, that's sufficient.  Staying with this exhibit.  On

11 May 4th at 3:28, what's he say?

12 A    May 4th at 3:28 p.m. the defendant wrote to 101AnaSheed,

13 What rule you break?  Man, you see that explosion.  Mujahideen

14 in Nigeria?  That's awesome.  Do they work together with

15 Al-Shabaab in Somalia?

16         MR. DURKIN:  I'm sorry.  Could we have who that was

17 to, please.

18         THE COURT:  Yes, you may.

19         MR. DURKIN:  Judge.

20         THE COURT:  I said yes, you may.

21         THE WITNESS:  So that was to the YouTube user

22 101Anasheed.

23         MR. DURKIN:  Do we know who that is?

24         THE COURT:  All right.  One second, Mr. Durkin.  All

25 right.  Other than knowing that was the title, do you have any

1  knowledge of that person?

2          THE WITNESS:  No, I do not know who the user was.

3          THE COURT:  All right.

4  BY MR. JONAS:

5  Q    Is there a reference --

6          THE COURT:  Proceed.

7          MR. JONAS:  May I proceed, Your Honor.

8          THE COURT:  Yes.

9  BY MR. JONAS:

10 Q    Is there a reference to what the defendant is talking

11 about in one of these columns?

12 A    That specific comment references a, a mujahideen attack in

13 Nigeria.

14 Q    But to the column to the left.  You see it says amazing,

15 mujahideen training?

16 A    Yes.  Yes, amazing mujahideen training, marshal arts.

17 Q    On May 6th, the same page at 10:09, what's he saying to

18 that same person, to Qwertyfshag?

19 A    Well, this is to Qwertyfshag at May 6th, 2012.  The

20 defendant wrote, I'm not telling my plans.  Even seeing when

21 they are finalized yet.  And if people are reading my messages,

22 LOL a little late.  But I'm not saying any plans.  I'm not that

23 stupid.

24 Q    And this is before he had any encounter with the

25 government, correct?

1    A    That is correct.

2            THE COURT:  This is before?  Be a little more clear

3    on that.

4            MR. JONAS:  I'm sorry, Your Honor?

5            THE COURT:  This is before and then your voice went

6    tailing down.

7            MR. JONAS:  Oh, I'm sorry, Judge.

8    BY MR. JONAS:

9    Q    This is before he had any interaction with the OCEs?

10   A    That is correct.

11           MR. JONAS:  Sorry, Judge.

12           THE COURT:  No problem.

13   BY MR. JONAS:

14   Q    And finally May 7th at 11:31, what's he saying?

15   A    On May 7th at 11:31 a.m. the defendant wrote to

16   101AnaSheed, Oh, okay.  Yeah, you should.  It's really good.

17   There are only nine magazines so far question mark.  Maybe I'll

18   download all of them, if you send me the links.  I like them.

19   Q    Agent Parsons, you earlier testified about Government's

20   Exhibit E-mail 12 where he sent himself the links to the nine

21   *Inspire* issues, correct?

22   A    That is correct.

23   Q    And that was May 8th, which is the day after he makes this

24   comment about maybe I'll download all of them, right?

25   A    That is correct.

Parsons - direct by Jonas

1  Q    YouTube 16.  On May 13th, 2012, this is page 3, at
2  4:03 a.m.
3          MR. JONAS:  I'm sorry.  Wrong one, Judge.  Hard to
4  see here as well.
5          THE COURT:  Really?
6          MR. JONAS:  Can you believe it.
7  BY MR. JONAS:
8  Q    Is the top one the 4:03 a.m., that's a continuation from
9  the prior page?
10 A    Yes, it is.
11 Q    Can you read from -- you see where it says the generation
12 after that?
13 A    Yes, I do.
14          THE COURT:  Is there a way to make this a little
15 larger or isolate it?
16          MR. JONAS:  Give me one moment.  Okay.
17     (Brief pause.)
18          THE WITNESS:  So beginning with the generation after
19 that.  Then the generation after that.  I do research myself.
20 I don't blindly follow a sheikh.  And if I do, prove it because
21 I don't.  I study Quran and Sunnah, and then I study from the
22 scholars.  I don't blindly follow anyone.  I hear both sides
23 and decide what's right.  Innocent civilians?  May I remind you
24 that the government also does false flag attacks and blames it
25 on Mujahideen.  But you would rather believe kuffar?  Bring me

1  the hadith if you are truthful.

2  BY MR. JONAS:

3  Q    That's good.  Staying with this exhibit, May 13th at 5:24,

4  what's he saying there?

5  A    At 5:24 a.m. the defendant wrote to the user

6  MujahidFeeSabilillah, No, this is crap.  I never saw that.  And

7  no, the Prophet, may Allah's peace and blessings be upon him,

8  said there will always be Jihad.  And there is disgrace on

9  Muslims when they abandon it.  I'm not going to abandon it till

10 the mahdi comes here.

11 Q    And finally at 4:51 p.m. on the same day -- all right.

12 May 14th.  I think this is the one.  4:51 p.m.

13 A    At 4:51 p.m. on May 14th the defendant wrote to the user

14 MujahidFeeSabilillah, That's stupid.  The kuffar are liars that

15 say that Mujahideen killed Muslims.  And he provides a video

16 link.  The only reason they would say that all the Mujahideen

17 are Wahabis, kill Muslims, and are part of the CIA so that

18 people don't go for Jihad.  There will always be Jihad.  When

19 Abu Bakr became calipha, he said do not abandon Jihad.  And

20 there is shame on the Muslims who do so.  The Prophet, may

21 Allah's peace and blessings be upon him, said if you transact

22 in iynah, a kind of interest and follow the tails of cows,

23 tilling the land, become content with agriculture, that was

24 their business, and abandon Jihad, fisabilillah, Allah will

25 send you disgrace that he will never remove until you return to

1  your religion.

2  Q    During this time, early May 2012 the defendant's also

3  searching for nasheeds, continuing to search for nasheeds, is

4  that correct?

5  A    Yes, he was.

6  Q    Let me show you what's Government Exhibit Yahoo Answers.

7  What is this?

8  A    Yahoo answers is a forum on the Yahoo website where users

9  can post questions, and then other users can post answers to

10  those questions.

11  Q    Did the defendant post something on here?

12  A    Yes, he did.

13  Q    What did he post?

14  A    So he posted a question with the title Terrorist Music

15  explanation point, What You Think, a series of question marks

16  explanation point.  He provided a video link.  And then he

17  wrote, Even if you don't like Muslims, Islam, terrorists, and

18  so on and so forth, listen to this.  It's two minutes.  And

19  tell me your opinion.  Does this sound awesome or what?

20  Q    That video wasn't there any longer so the FBI couldn't

21  grab it, right?

22  A    That is correct.  I could not find it.

23  Q    Was that posting online that you just read, the foray that

24  the FBI used to reach out to the defendant and start

25  communications with, with these OCEs?

1  A    Yes.  The first OC used that as a way to communicate, to
2  initiate communication with the defendant.
3  Q    And how did the OCEs communicate with the defendant?
4  A    Initially they used e-mails and then used YouTube, or
5  e-mails on YouTube.
6  Q    So on the screen now is OCE 1-1.  Can you just tell the
7  Court what the persona of OCE 1 was.
8  A    OC 1 portrayed himself to be a 17-year-old Arab who was
9  born and living in Australia.
10 Q    And OCE 2, it was a few days later that he first
11 interacted with the defendant?
12 A    It was four days later, correct.
13 Q    And what was the persona of OCE 2?
14 A    OC 2 portrayed himself to be an older Arab living in Saudi
15 Arabia.
16 Q    So can you summarize the e-mail communication.
17 A    This first one, OC 1-1 is the initial contact and exchange
18 between OC 1 and the defendant.  Initially OC 1 uses the
19 question posed by the defendant on Yahoo Answers regarding the
20 nasheed, and the defendant responds back, and that's how the
21 conversation began.
22 Q    There's one line on page 2 of OCE 1 I'd like you to read.
23 This is from the defendant.
24 A    This is the defendant's initial response to OC 1 where the
25 defendant wrote, Yeah, even Muslims against Jihad is crazy.

1  Jihad al-nafs, Jihad al-nafs.  I say fight your nafs by stop
2  being a coward and fight like a man.

3  Q    What's the date of that?

4  A    That is May 14th of 2012.

5  Q    And OCE 1-2 is just a continuation of the e-mail
6  communication?

7  A    That is correct.

8  Q    Government's Exhibit Video 3-A, what is this?

9  A    This is a video on the YouTube website.  In this case this
10  is a, a nasheed based on a lecture by Anwar al Awlaki called
11  The Dust Will Never Settle.  This is entitled Dust.

12  Q    And I don't know if you can see when this was posted.
13  It's cut off from the top.  Are you familiar with the date it
14  was posted?

15  A    That was in May of 2012.

16  Q    Have you viewed Dust?

17  A    Yes, I have.

18  Q    And can you briefly explain to the Court what your viewing
19  of that is.

20  A    It's a summary, like I said, from a longer lecture by
21  Anwar al Awlaki that generally calls for attacks against the
22  West to defend the Prophet Muhammad.

23  Q    Did the defendant respond, or did the defendant post a
24  comment to this video on YouTube?

25  A    Yes.  There are four comments posted publicly by the

1  defendant.

2  Q    And are those on the screen now as part of Government's

3  Exhibit Video 3-A?

4  A    That is correct.

5  Q    Could you read those.

6  A    Beginning at the bottom the defendant wrote, I love this

7  nasheed, smiley face.  He then wrote, I love this nasheed.

8  Smiley face.  Allahu Akbar.  This boy gets it.  He then wrote,

9  Not all people who stick up for the kuffar are not all

10 hypocrites.  But it's heavy trait of hypocrisy.  And they need

11 to be given wisdom and guidance.  And lastly, defendant wrote,

12 May Allah give Anwar Al Awlaki the highest place of paradise.

13 Yes, I just read about this.  They want to make blasphemy

14 against the prophet.  May Allah's peace and blessings be upon

15 him.  They can come to me.  Wait.  Let me bring my knife.  LOL.

16 LOL.

17 Q    Did he send this video to anybody?

18 A    Yes, he did.

19 Q    Who did he send it to?

20 A    On May 18th of 2012 the defendant sent it to Abdella

21 Tounisi.

22 Q    That's the link?

23 A    That is a link to that video we just saw.

24 Q    This is Government's Exhibit OCE 1-6.  Just briefly can

25 you explain how they're communicating and how do you know who's

1   sending and who's receiving.

2   A    So at this point they had shifted from an e-mail to the

3   YouTube e-mails.  These are screen shots of the OCEs' YouTube

4   inbox.  So we can see here on the inbox is from the defendant

5   whose YouTube account was Adelown.

6   Q    And what's the date of this communication?

7   A    This was sent on May 18th of 2012.

8   Q    Okay.  I'd like you to read just the first few paragraphs.

9   What is the defendant saying?

10  A    The defendant writes, I am 18.  And I'm kind of the same

11  situation with you in Arabic.  So I'm in the process of

12  learning, InshaAllah.  There are two kinds of guidance.  The

13  first is that only from Allah, because he has the power to

14  change a person's heart more so than that someone who has his

15  hand on a dial.  The second is a limited human guidance, where

16  you try to guide or advise someone else.  The best human

17  guidance is from the Prophet, may Allah's peace and blessings

18  be upon him.  So in the future to be clear, and don't confuse

19  yourself and others by directly saying help or guide me.

20  InshaAllah.  If I have anything good, I will share it with you.

21  But if I say anything against the Quran and Sunnah, leave it.

22  Q    And I just want to jump down to one of the paragraphs near

23  the bottom, where he says what articles do you read.

24  A    So there in the same e-mail the defendant wrote, So what

25  articles did you read?  Do you read *Inspire*?  InshaAllah.  We

1  will both be guided.  Yes, I can give you a few books actually.

2  I can give you lectures from truthful scholars as well as those

3  scholars who are doing Jihad or have done Jihad in the cause of

4  Allah, et cetera.

5  Q    OCE 1-8 is a short communication.  This was sent by the

6  defendant.

7  A    Yes.  This was sent by the defendant to OC 1 on May 18th

8  of 2012, where the defendant wrote, Ha ha.  See this nasheed?

9  This was in response to those filthy pigs who drew pictures of

10 the Prophet.  May Allah's peace and blessings be upon him.

11 Q    We now see OCE 2 communicates with the defendant?

12 A    Yes.

13 Q    And Government's Exhibit OCE 2-1, what's the date of the

14 first communication?

15 A    The first communication was on May 18th of 2012.

16 Q    OCE 1-10, what's the defendant doing here?  You can

17 summarize this.

18 A    In this e-mail dated May 19th, 2012 the defendant sends OC

19 1 links to *Inspire Magazine*.

20 Q    And underneath where he sends the link, could you read

21 just that, that line.

22 A    Yes.  The defendant next wrote, I'll help InshaAllah to

23 send you stuff.  Don't blind follow, but read and listen and

24 look into the matter yourself.

25 Q    YouTube Posting 2.  This is postings to the internet, page

13.   Did the defendant comment on a video regarding drawings of

the Prophet Muhammad?  Specifically May 20th, 2012 at

11:03 a.m.

A    Yes, he did.

Q    What did he say?

A    So in a public posting the defendant wrote, Okay.  It's

not okay to draw picture of any human being in Islam, not just

the Prophet.  May Allah's peace and blessings be upon him.

They are drawing him, May Allah's peace and blessings be upon

him, to not only bother Muslims, but to insult the Prophet.

May Allah's peace and blessing be upon him.  And commit

blasphemy.  That's why it's a big deal.

Q    Did you find this video?

A    Yes, I did.

Q    And we're not going to play it, but can you just summarize

for the Court what the video is about.

A    The video is a commentary by, I think this is the comedian

Penn Jillette, who discusses the drawings of the Prophet

Muhammad and the cartoons that were published earlier.

Q    Does he essentially support people's ability to draw the

pictures, or is he against it?

A    The video is in support of a person's right to draw those

cartoons.

Q    Government's Exhibit OCE 1-13, can you read this one --

now, before you do that, is this from the defendant or from the

1  OCE?

2  A    This is an e-mail sent from the OC to the defendant.

3  Q    And could you read this one, please.

4  A    Sure.  On May 21st, 2012 the OC wrote to the defendant, Al

5  salamu alaykum akhi and jazaka for the link.  It took forever

6  to download the files, but al Hamdu lillah I am done.  Baracka

7  Allahu feek for the reader recommendation.  I can't see

8  carrying all these files around.  I took a look -- I took a

9  look online at the first issue akhi.  MashaAllah and Allahu

10 Akbar.  It is full of information and InshaAllah I will be

11 asking questions.

12 Q    That's, that's enough.  Does he then talk about a cousin?

13 A    Yes, he does.

14 Q    And this is May 21st, 2012.  Does that cousin ultimately

15 become an undercover agent?

16 A    Yes, he does.

17 Q    Or the persona of the cousin is the undercover agent?

18 A    The OC introduces an idea of him having a cousin as a way

19 to potentially in the future, if it's necessary, introduce a

20 real undercover.

21 Q    OCE 1-14 is a response by the defendant?

22 A    Yes, it is.

23 Q    Can you summarize this.

24 A    This is -- in this the, the defendant also discusses his

25 reading of *Inspire*, where he says, I read eight and nine and he

1  started issue No. 1.  He also provides some other information.

2  He continues to say you should educate yourself and learn for

3  yourself.

4  Q    Is that where he says don't follow -- don't blind follow

5  me or anyone else?

6  A    That is correct.

7         THE COURT:  And, Counsel, we're getting ready to take

8  a five-minute break.

9         MR. JONAS:  Sure.

10        THE COURT:  All right.  Unless everybody wants to go

11 ahead and take it for lunch.  One way or the other.  We can do

12 lunch and be back -- it's 12:30.  Be back at 1:30.  You all

13 ready for that?

14        MR. JONAS:  Yes, Your Honor.

15        THE COURT:  Mr. Durkin.  Take our break now?

16        MR. DURKIN:  You want to break for lunch?  That's

17 fine.

18        THE COURT:  Take our break now.  1:30.  All right.

19 1:30.  Thank you.

20     (Whereupon, said trial was recessed at 12:30 p.m., until

21     1:30 p.m.)

22

23

24

25