1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3  UNITED STATES OF AMERICA,    )  No. 12 CR 723-1
                           )
4            Plaintiff,    )
                           )
5        v.           )  Chicago, Illinois
                           )  November 13, 2018
6  ADEL DAOUD,             )  2:05 p.m.
                           )      Final
7            Defendant.    )  Pretrial Conference

8

9              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

10  APPEARANCES:

11  For the Government:     HON. JOHN R. LAUSCH, JR.
                       United States Attorney, by
12                      MR. BARRY JONAS
                      MR. BOLLING W. HAXALL
13                      MS. TIFFANY ARDAM,
                      Assistant United States Attorneys
14                      219 South Dearborn Street
                      Suite 500
15                      Chicago, Illinois  60604

16  For the Defendant:     DURKIN & ROBERTS
                      2446 North Clark Street
17                      Chicago, Illinois  60614
                      BY:  MR. THOMAS A. DURKIN
18                          MS. ANDREA D. LYON
                          MS. ROBIN V. WATERS
19

20                      LAW OFFICE OF JOSHUA G. HERMAN
                      53 West Jackson Boulevard
                      Suite 1650
21                      Chicago, Illinois  60604
                      BY:  MR. JOSHUA G. HERMAN
22

23        TRACEY DANA McCULLOUGH, CSR, RPR
             Official Court Reporter
           219 South Dearborn Street
24                Room 1232
           Chicago, Illinois  60604
25            (312) 435-5570

1          THE CLERK:  12 CR 723, USA versus Adel Daoud.

2          MR. JONAS:  Good afternoon, Your Honor.  Barry Jonas,

3    Bolling Haxall, and Tiffany Ardam for the United States.

4          THE COURT:  All right.  Thank you.  Anytime defense

5    wants to start saying who they are.

6          MR. DURKIN:  I'm sorry?

7          THE COURT:  I know who you are, but I need you to

8    state for the record.  And then we have your client coming out.

9    Go ahead, Mr. Durkin.

10          MR. DURKIN:  For the record Tom Durkin, Andrea Lyon,

11    Joshua Herman, and Robin Waters for the defendant, who is

12    present and in custody.

13          THE COURT:  All right.  Hello, Mr. Daoud.

14          DEFENDANT DAOUD:  Hi.

15          THE COURT:  All right.  And sorry we're a bit late

16    starting.  We couldn't start the show without you.

17          MR. DURKIN:  That's true.

18          THE COURT:  All right.

19          MR. DURKIN:  That's true.

20          THE COURT:  Okay.  All right.  So we've got a lot of

21    things to discuss.  If you'd like to be seated, you may.

22    Hopefully that won't slow us down.  But I know your client

23    may -- there's no need for him to stand the whole time, so ...

24          MR. DURKIN:  And then when we're done with that, we

25    have some other issues we'd like to raise.

1        THE COURT:  Oh.  I assume so.

2        MR. DURKIN:  Okay.

3        THE COURT:  Yes.  All right.  Have a seat.

4        MR. DURKIN:  That's fine.

5        THE COURT REPORTER:  Counsel, can you please turn

6   your microphones toward you also.  Thank you.

7        THE COURT:  That's right.  So if Mr. Herman is going

8   to be talking, we need to have it set up somehow so that --

9   maybe, Mr. Herman, I don't know if you want to be on the other

10  side or whether you'll get up and go on Miss Lyon's side.  I

11  don't know who's going to be talking more.  But you guys need

12  to understand -- or pull the mike back and forth.

13       MR. HERMAN:  Understood.

14       THE COURT:  However you do it.  That's what Miss

15  McCullough needs.  Let's get it there.

16       All right.  So we've got several things to go over.

17  We have got some motions that we need to address, and then we

18  have some logistics that we need to address.  And I'm certain

19  you all have more.  So, first of all, let's take a look at the

20  motions.

21       257, that was regarding the motion to reconsider the

22  constitutionally of FISA, is that correct?

23       MR. HERMAN:  Yes, Your Honor.

24       THE COURT:  All right.  And that will be out either

25  tomorrow or the day after.  I'll just do a written opinion.

1      MR. HERMAN:  Thank you.

2      THE COURT:  All right.  And then 268 is the next one

3 I have.  This is the supplemental motion of the government for

4 a protective order.  Government.

5      MR. JONAS:  Yes, Your Honor.  I'm sorry.  I have it

6 as 270, but I could have written the wrong number down.

7      THE COURT:  Oh, I have 270, ex parte in camera

8 motion?

9      MR. JONAS:  Yes, they're, they're related.

10      THE COURT:  They're all together.  Okay.  Let's do

11 the two of them together.  I know that there are certain -- I

12 was going to bring this up too because you supplied a witness

13 list and a proposed list of witnesses.  And I'm looking at this

14 witness list thinking, okay.  Is this the complete list?  Are

15 there names on there that are not names, but obviously the

16 defense has a right to at least be able to know who those

17 people are on the witness list by name.

18      MR. JONAS:  Yes, Judge.

19      THE COURT:  And obviously without necessarily

20 depending on who it is disclosing everything.

21      MR. JONAS:  So, Your Honor, there are two names on

22 the witness list that are the names of the online covert

23 employees, and there's a third name.  That's the undercover

24 employee.

25      THE COURT:  Okay.

1          MR. JONAS:  As -- the way the defendant knows them.

2   So --

3          THE COURT:  Oh, okay.  All right.  That's the way the

4   defendant knows them.

5          MR. JONAS:  Correct.

6          THE COURT:  So those are the names?

7          MR. JONAS:  Correct, Your Honor.

8          THE COURT:  All right.  Okay.

9          MR. JONAS:  And at least two of them, and I can't

10  remember if it's the two online covert employees are on the

11  defendant's witness list as well I believe.

12         THE COURT:  Okay.  So everybody knows them under

13  these names.  This isn't a new name just for this proceeding?

14         MR. JONAS:  That's correct, Your Honor.

15         THE COURT:  That's what I wanted to know.

16         MR. JONAS:  And if I can point out a footnote to all

17  this.  So the way we are gearing things up, and we've had

18  discussions with defense counsel about this so that this is not

19  something that they're not aware of.  It's unlikely the

20  government's going to call the online covert employees.  We

21  anticipate admitting the communi -- the written communications

22  that they had with the defendant through our summary witness.

23  The defense has said, though, that they would like to call

24  these online covert employees.  We told them we'll make them

25  available.

1    THE COURT:  Okay.

2    MR. JONAS:  You know, we'll make those arrangements.

3  But with the understanding, and, and they may not agree to

4  this, that the conditions we require -- we ask for in the

5  motion would apply whether they're called by the government or

6  the defense.

7    THE COURT:  You're speaking of any type of anonymity

8  measures, is that correct?

9    MR. JONAS:  Anonymity measures as well as either

10  direct or cross-examination on background as outlined in the

11  motion.

12    THE COURT:  Okay.  All right.  Defense.

13    MR. HERMAN:  Judge, I think we pointed out in, in, in

14  detail in our pleading is that it's hard to respond to that

15  particular argument about whatever programs that they're

16  involved in without even knowing about it.  And, and that, that

17  I think also goes into when we cross any lines.  And which we

18  disagree there should be lines in the, in the first place on

19  cross-examination, because even in the reports that we cited

20  in -- or I guess it would be direct examination, but perhaps we

21  will be asking permission to treat them as hostile witnesses

22  and proceeding with the examination as if on cross.

23    I think it's clear that there were certain mission

24  objectives in the communications that the two online OCEs had

25  with Mr. Daoud over the course of many months.  And the reason

1    why certain communications happened, certain -- it's obvious to

2    us at least, and I think it will be to the jury that there was

3    a -- there was priming going on.  There were certain lang --

4    there was certain language that was being inserted into

5    communications.  There were times when a week would go by

6    without communication from Mr. Daoud to the OCE, and all of a

7    sudden the OCE would reengage the conversation.  And this was

8    all again to triangulate these communications so that there

9    would be the introduction of this UCE.

10           So we've -- what we've set forth in our pleading, I

11   think it was, what, 270 or 270 -- I'm sorry.  271 is, is really

12   a, a tip of -- tip of the iceberg here in, in terms of what we

13   may be going into in, in terms of their background.  And, and

14   it's one thing to say that we can limit cross-examination when

15   we know what the, the -- their limit -- what the -- where the

16   lines are.  But when we don't even -- when, when the -- and

17   this -- I'm not -- this is not meant to be critical to what

18   they need to do for the agencies that they're speaking on

19   behalf of.  But when something is submitted in a classified

20   manner, there's no ability for us to respond to the, the merits

21   or demerits of whatever was submitted.

22           THE COURT:  Well, you all know what you're working

23   with.  You're not strangers to this.  But the Court will also

24   say the -- it's not a fishing expedition either.  So you can't

25   just say, okay.  Well, we don't know, so we want to ask

1    everything we need to ask because we don't know.

2              MR. HERMAN:  And, and --

3              THE COURT:  That won't work.

4              MR. HERMAN:  And that's, and that's why, Your Honor,

5    that we, we set forth specific examples, and why I just

6    mentioned specific language.  And, and the other matter is --

7    which we pointed out, is we would object to I think any type of

8    courtroom closure or disguise, because again, these individuals

9    were simply operating online with Mr. Daoud.  For all we know

10   their existence may be limited to undercover internet missions.

11   So this isn't -- you know, again I'm, I'm -- I may speaking

12   completely out of turn in light of what was submitted in a

13   classified manner; but these, these aren't people at least in

14   terms of this investigation six years ago that were out

15   prowling the streets as opposed to prowling the web.

16             THE COURT:  That you know of.

17             MR. HERMAN:  That we know of.  Well, that my point.

18             MR. JONAS:  Real quick, Your Honor.  I think we've

19   addressed a lot of Mr. Herman's concerns in our ex parte

20   filing, so I'm not going to restate them in an open courtroom.

21   What he said about cross-examination in my mind falls into two

22   categories.  And one goes into -- again, I'm going to be very

23   general here, Your Honor, because we covered it in the motion,

24   but basically what the FBI does generally, if I can leave it at

25   that.  And then the other goes to specifically as to this case

1    and asking the OCE, online covert employee, why did you say

2    this.  Why did you say that.

3            I'm not saying we would agree to that, but I think

4    there's less problematic asking those very specific questions

5    on cross -- on -- well, however it is, direct or

6    cross-examination, as it pertains to this matter.  I think

7    going beyond that is irrelevant.  What, what matters here

8    really is was the, was the defendant entrapped, and the

9    entrapment is based upon the interaction, not based upon a

10   program or, or training or anything like that.

11           THE COURT:  So what you're telling me, Mr. Haxall, is

12   that you're going to -- Mr. Jonas, you're going to -- you

13   object, but if they're looking at focusing on this case and

14   what happened between these people and the defendant, you

15   wouldn't have as strenuous an objection as long as they kept

16   the parameters.  And this is general.  Obviously you have some

17   more specific concerns, but in general that's what you're

18   telling me?

19           MR. JONAS:  That's correct, Your Honor.

20           THE COURT:  All right.  And your response to that?

21           MR. HERMAN:  My, my res -- well, it's not our intent

22   to go so far afield as to talk about other investigations that

23   aren't relevant to this one.  But to -- responding to one

24   specific point that Mr. Jonas just made, and I think it, it

25   proves our point as we set forth on pages 7 and 8 of our

1    pleading, is that there are certain -- we believe that there

2    were certain guidelines that were in place from the Attorney

3    General, which include, and we attach these to docket I think

4    54, a whole section about how to protect innocent parties

5    against entrapment.

6           Whether or not a law enforcement agent was trained in

7    a certain way, and -- once you, once you see these

8    communications, these were very carefully crafted, deliberate

9    communications.  Very deft.  And an inquiry about what their

10   training was as to how to be wary about entrapping people who

11   were not predisposed to commit a crime is fair game.  I don't

12   understand how we cannot ask any FBI agent about their training

13   on a, a particular issue tied to the facts of a case that is

14   material to the defense.

15          THE COURT:  Well, one thing, first of all, it's going

16   to be -- obviously it's adversarial.  Whether it's cross or

17   they put him on direct, I think they would definitely meet

18   that, that level.  And then some of this, though, the Court --

19   again, just because you say you're going to use them, I also

20   don't know exactly who you're going to use and how.  So that's

21   one of the questions.  Normally if we didn't have this other

22   layer of confidentiality involved, a lot of these would be I

23   have to hear it.  We have to get there.  You may be to a point

24   where you say, okay.  We're calling this person next in our

25   case, and I want to hear an offer of proof as to where you're

1    going to go with it.  That would -- that may change during the

2    course of how you're putting on your case and what you have

3    left to put on.

4            And so to orchestrate it all down to the dotting the

5    I and crossing the T, that's not litigation even here

6    particularly where you have to see -- everybody has their own

7    strategy and their own basis.  So I'm going to put some

8    parameters around it.  I'll take what you've written.  Is there

9    anything else to add?

10           MR. JONAS:  There is a logistical issue I can add,

11   but it doesn't go to the merit -- the substance of the

12   argument, so I can wait till Your Honor's done before I raise

13   it.

14           THE COURT:  Well, I'm -- I'm done with this issue.

15   I'm going to take it under advisement, and I'll get it out

16   tonight or tomorrow.

17           MR. JONAS:  The -- because our understanding, Your

18   Honor, and we -- I know we're going to discuss this, but I'll

19   raise it while we're on the subject.  Is you're going to close

20   the courtroom.  Is that, is that correct?

21           THE COURT:  Close the courtroom?

22           MR. JONAS:  In other words, exclude the public and

23   lock the door --

24           THE COURT:  Oh, the public --

25           MR. JONAS:  When the undercover and the OC --

1    THE COURT:  Those particular issues -- those

2 particular witnesses, and again, we'll have to address who they

3 are again, but yes, the Court will take some steps that we have

4 an overflow or a separate courtroom where the public can watch

5 and listen to what -- we can let them watch and listen, but

6 they won't be in the courtroom.

7    MR. JONAS:  Yes.  And I'm sorry.  I meant it

8 specifically for these witnesses that we've been addressing.

9 The undercover agent, because the courtroom -- because he will

10 not be exposed to the public would prefer not to appear in the

11 way that he did to the defendant as your order states, and just

12 appear the way he is today.

13    THE COURT:  Oh.  That's the change they're going to

14 make?  Not makeup, but just --

15    MR. JONAS:  Just --

16    THE COURT:  -- change whatever -- however he was

17 looking then, he's going to look his normal way.

18    MR. JONAS:  However he's been looking then, he's

19 going to look the way he does today.  No makeup, no changes in

20 his, in his appearance.  He feels -- this is his preference.

21 So we're just letting Your Honor know.

22    With regard to the OCEs, we haven't discussed with

23 them whether they want to do the same or whether they want the

24 light disguises.

25    THE COURT:  Okay.  All right.

1      MR. JONAS:  I just wanted to inform the Court of

2  that.

3      THE COURT:  No.  Thank you for that.  And Mr. Durkin

4  looks like he wants to have a say on it.  Mr. Durkin.

5      MR. DURKIN:  Well, just in -- I was going to say

6  something else, but in relation to what he just said, I, I

7  think the issue -- I mean, is this --

8      MR. JONAS:  Timeout, Your Honor?

9      THE COURT:  Timeout.

10      MR. DURKIN:  Excuse me.  This is the absurdity we

11  operate under.

12      THE COURT:  That's okay.  Timeout.

13    (Brief pause.)

14      MR. DURKIN:  There was -- apparently they're going

15  to -- apparently this man had a, a big beard when he was doing

16  this.  And it's my understanding he won't now.  So but there's

17  going to be a picture I guess where his face will be pixelated,

18  but the beard will be there.  So it will be --

19      MR. JONAS:  So, Your Honor, just -- I'm staying with

20  the same issue.

21      THE COURT:  And again, which one of the three is

22  this?

23      MR. JONAS:  We're talking about the undercover.

24      THE COURT:  Okay.

25      MR. JONAS:  Who the government will be calling in its

1  case in chief.

2         THE COURT:  All right.  Okay.  Go ahead.

3         MR. JONAS:  So the undercover will testify as he

4  appears today, no light disguise, no beard as he, as he had a

5  beard when he interacted with the defendant.  There are some

6  undercover videos that we have.  We had -- well, Mr. -- I'll

7  let Mr. Haxall address it.

8         MR. HAXALL:  Your Honor, we had presented the defense

9  with a version where the undercover's face was pixelated.

10  It's -- I sent an e-mail, and to be fair they haven't had a

11  chance to fully digest it.  In speaking with the undercover, as

12  Mr. Jonas indicated, because the public and sketch artists and

13  the like won't be here, he's fine testifying as he appears

14  today.  Because the jury is going to see him, our view is it's

15  kind of silly to present the jury with a mosaic version of the

16  exhibits that show -- that would cover his face.  It would seem

17  to raise some questions about why that was being done.  So our

18  recommendation to the defense was that we be -- that we use the

19  non-mosaic version.

20         THE COURT:  With the beard?

21         MR. HAXALL:  And they'll see his full face.  They'll

22  see his beard.  But that we would then ask the Court to seal

23  the exhibits where his face is visible.  And we can either

24  present the mosaic version if Your Honor is inclined to release

25  them to the public or something like that.  But the jury would

1  get the real version where you see his face, and they can cross

2  him on the face -- you know, the beard and, and things like

3  that.

4        THE COURT:  So the jury sees the full version with

5  the beard the way he looked to Mr. Daoud --

6        MR. HAXALL:  Exactly.

7        THE COURT:  -- when they were interacting?

8        MR. HAXALL:  Exactly.

9        THE COURT:  He comes into court and testifies without

10  all of that extra, right?

11        MR. HAXALL:  Yes.  How he appears today, correct.

12        THE COURT:  And what's the issue with the mosaic that

13  caused Mr. Durkin to shake his head no?

14        MR. HAXALL:  I think he wants to be able to talk

15  about -- and I don't want to speak for Mr. Durkin.

16        THE COURT:  Mr. Durkin, why don't you tell me.

17  What's, what's -- what's your issue with what they're

18  suggesting?

19        MR. DURKIN:  I'm not sure I have one now.  I, I was

20  just concerned about whether we could talk about the beard.

21  That's what I took them aside about.

22        THE COURT:  Well, if it's being presented out here, I

23  don't see any reason why that should be ignored.  It's there.

24  He's going to -- you've got a picture of him with the beard?

25        MR. HAXALL:  It's video, but yes.

1      THE COURT:  By video.

2      MR. DURKIN:  Yes.  No, that's fine.

3      THE COURT:  Okay.

4      MR. DURKIN:  That's fine.

5      THE COURT:  All right.

6      MR. DURKIN:  What I'm not fine with is, is the

7  closing of the courtroom, and I assume my record is protected

8  on that?

9      THE COURT:  Yes.

10      MR. DURKIN:  But can I ask a practical question.

11  Let's assume that there are -- let's assume the courtroom's

12  crowded the whole time, and all of a sudden we go to this

13  closed courtroom.  What's the jury going to be told about that?

14      THE COURT:  What do you -- that the next witnesses

15  are going to be presented to you but -- why should the jury

16  really be told anything?  Why do I have to tell -- the jury

17  gets to see them.  They're not coming behind a screen.  They're

18  going to see a guy who's sitting there.

19      MR. DURKIN:  But, but is there going to be -- what

20  I'm concerned about is the jury drawing some inference that we

21  had to close the courtroom because of some safety of this man.

22  That's what I'm concerned about.

23      THE COURT:  Well, you think that's the only thing to

24  be safety?  Aren't you keeping him in his orange jumpsuit the

25  whole time?  You don't want him in clothes, street clothes,

1  right?  Isn't that my understanding, or are you putting him in
2  street clothes?  I'm talking about safety, what the jury's
3  going to think about safety.  There may be several issues, and
4  some of them I think you're deciding to choose on your own.
5  You know, my big thing with the jury is all the steps we would
6  take.  Obviously we're going to have to have more jurors to
7  be -- people to be questioned, the venire.  We're going to have
8  to do a lot more.

9         But I want to focus on the judicial expediency of
10  going through so many jurors, the judicial expediency of having
11  a three-week trial.  I'm going to focus a lot of the Court's
12  procedures on expediency more than focus on security or
13  security reasons.  If I can avoid that at all, that's what I'm
14  going to do.  That obviously benefits your clients as much as
15  anybody.  And I was even going to ask that.  If you're going to
16  have him -- I understand the tactical reasons for if you decide
17  not have to him in clothes; but, on the other hand, it could
18  backfire and the jury gets more concerned about security just
19  seeing him in clothes.  So it may not work exactly the way I
20  would be thinking that you would want it to work.

21         So when we talk about worrying about whether the jury
22  sees people in the room or not -- and again, there's a lot
23  going on that week.  We've got the Van Dyke extras being tried
24  that exact same week.  We've got -- who knows what's happening
25  in the news, who's happening everywhere.  So I don't --

1          MR. DURKIN:  No.  No.  No.  I'm not complaining.

2          THE COURT:  Yes, I don't know if it's going to be a

3 big issue of having necessarily the courtroom full every time.

4 I don't know.

5          MR. DURKIN:  I'm not complaining.  I just was asking,

6 if, if there's going to be any instruction or not.  And maybe

7 we can just play it by ear.

8          THE COURT:  I am, I am not sure.  You have brought

9 a -- that part about whether the jury needs to be told that,

10 oh, the courtroom is closed and for safety, yes, I agree with

11 you.  I don't like that terminology.  We'll figure out

12 something, but I think the step taken and the fact that they

13 aren't coming in with screens and all of the other, I think

14 that brings everything down a notch.  It makes it fair to

15 everyone as opposed to having, you know, drapes and screens.

16          MR. DURKIN:  No, I'm not, I'm not complaining.

17          THE COURT:  Yes, right now --

18          MR. DURKIN:  I was just asking.

19          THE COURT:  Right now we're at that point.  That may

20 well be one step the Court takes.  I do have a reserve, and

21 we're going to talk about it later -- we might as well now.

22 We're going to have a courtroom for overflow.  So if press is

23 there and they want to be able to use their devices, they can

24 use them there and see the trial and hear the trial, but not in

25 my courtroom.  All right.  That's one thing we're going to

1    take.

2           If we have the big huge crowd we think we're going to

3    have, they'll have an overflow room.  That room is going to be

4    also used for the first day or two of selecting a jury.  We're

5    going to have like 64 people here.  That first day to be able

6    to, to be able to separate, have a room where they can -- who's

7    not being questioned can wait.  So we're trying to address it

8    in such a way that makes it smooth, that makes it explainable

9    and understandable for us to do that without causing any alarms

10   for any of the people of why they would or would not want to

11   serve.  I want to minimize that.  I want to be able to --

12           MR. DURKIN:  That's fine.

13           THE COURT:  -- pick this jury.

14           MR. DURKIN:  That's fine.

15           THE COURT:  So yes, we're looking at your concerns,

16   Mr. Durkin.  Definitely I'm of that mind right now.

17           MR. DURKIN:  That's fine.

18           THE COURT:  Okay?  All right.  And I did want to

19   bring up the double edged sword of your client's dress.

20           MR. DURKIN:  I haven't fully decided that yet.

21           THE COURT:  Okay.  All right.  Well, I could

22   understand that.

23           MR. DURKIN:  I mean, I, I understand it could

24   backfire.

25           THE COURT:  I just don't -- I want to minimize any

1  fear with my jury because there shouldn't be any.  That's the
2  way I feel.  All right.  All right.  So -- and you'd be
3  surprised what they get concerned about.  Maybe you wouldn't,
4  but, you know --

5            MR. JONAS:  From the jury room?

6            THE COURT:  Well, not even just the jury room.  I
7  just have, you know, mom suburban who will say because somebody
8  has a sex trafficking charge that, oh, are they going to know
9  who I am?  So -- oh, yes, we are going to use numbers, again,
10 for judicial expediency in picking the jury.  So we have 64
11 people.  They're going to get 64 numbers, and I'll be able to
12 question them, and you'll be able to see what's going on and be
13 able to address the right person without -- I don't want them
14 to get rattled by constantly saying their name if they have an
15 issue.  But we'll, again, deal with it in terms of expediency
16 as opposed to for their safety.

17           MS. LYON:  Does that mean we won't know their names
18 at all?

19           THE COURT:  No.  You'll know their name.

20           MS. LYON:  Okay.

21           THE COURT:  I said I'm referring to them --

22           MS. LYON:  Oh, I gotcha.

23           THE COURT:  -- by number so that we don't keep saying
24 their names.  No, you're going to get a list just like you
25 always get a list.

 1          MS. LYON:  Okay.

 2          THE COURT:  And their information.  You'll be seeing

 3  the backs of their -- you'll be seeing their questionnaires,

 4  so -- and we'll talk about -- I was going sort of down the road

 5  with that.  We have a whole logistic thing that I have your --

 6  I have information to hand out about some of my supplemental to

 7  my original standard one.  That will be handed out before we

 8  stop today.

 9          MS. LYON:  Okay.

10          THE COURT:  All right?  Okay.  Thank you, Miss Lyon.

11  All right.  Let's move on.  What else do we have?  So I'll make

12  a -- as to how we set up the -- we dealt with the undercover.

13  He's not sure.  It doesn't sound like they have any objection.

14  What about the other two people?

15          MR. JONAS:  The online covert employees, the OCEs.

16  In terms of how they're going to appear?

17          THE COURT:  Yes.

18          MR. JONAS:  We haven't discussed it with them.  I

19  think right now we should go on the assumption that they will

20  appear in the light disguise as Your Honor has granted the

21  government's motion.

22          THE COURT:  And no screens still, though?

23          MR. JONAS:  If we can just do the same setup as we do

24  with the undercover so that if the courtroom is locked during

25  their testimony, I think that's probably the best.

1    THE COURT:  Yes.  Okay.  And again, we'll have the

2  overflow.

3    MR. JONAS:  And, and --

4    THE COURT:  Yes.

5    MR. JONAS:  And I'm sorry, Your Honor.  Also that

6  they come up into the courtroom through maybe the prisoner

7  elevator.

8    THE COURT:  Oh, the -- that's, that's almost out of

9  my control as to where those witnesses will come up from, but

10  they won't be at the front, front.

11    MR. JONAS:  Thank you.

12    THE COURT:  I'm, I'm deferring to security for them.

13    MR. JONAS:  Okay.

14    THE COURT:  All right?  And they will actually -- we

15  have Matt here, Marshal Matt.  And then we also have Chris

16  Dammons, who they're going to be giving you all some

17  information of what they can give you.  All right.  Okay.

18    MR. HERMAN:  And, and just so our record is clear,

19  the -- we do maintain our objections to having the OCEs, the

20  online people for any closure of the courtroom just given the

21  difference and on maybe again not knowing what they submitted

22  in the classified submission.

23    THE COURT:  All right.  Your objection is noted.

24    MR. HERMAN:  Thank you.

25    THE COURT:  All right.  So that gives me a little

1    further information on that.  That deals with 268, 270.  284 is

2    what I have next on my to do list.  That's the supplemental

3    motions in limine.  Government.

4              MR. JONAS:  Yes, Your Honor.

5              THE COURT:  Go ahead.

6              MR. JONAS:  So, Your Honor, there's two parts to the

7    supplemental motion in limine.  If you recall, last time we

8    were before Your Honor, Mr. Durkin read portions of an FBI

9    agent's 302 regarding a ruse interview of the defendant's

10   father.  And the agent put -- I don't have it in front of me,

11   so I'm paraphrasing.  But there was a line in there about, you

12   know, maybe going to the father, maybe it would help.  And

13   we've talked to the agent because I couldn't remember exactly

14   the answer to this question, and asked him, well, why didn't

15   you go to the father?  And there's a response.

16             But before I get to that point, it's the, it's the

17   government's position that it's, it's irrelevant.  That the

18   defense shouldn't be able to inquire of the FBI you should have

19   gone to the father.  That doesn't go to entrapment.  That

20   doesn't go to anything really other than the FBI's

21   investigative decisions.  And it's -- if anything, it's just a

22   jury nullification argument.  So that's, that's part one of the

23   motion.  Part two of the motion --

24             THE COURT:  No, let's deal with part one.  All right.

25   And so you're saying that the fact that any questions as to --

1    I understand some of what you're saying, but your concern as to

2    they should not be allowed to ask -- who's this agent?

3           MR. JONAS:  His name is, is Jason Schachner.

4           THE COURT:  Mr. Schachner, Agent Schachner what he

5    did or did not do during the course of his investigation?

6           MR. JONAS:  Well, not what he did or did not do, so

7    much as why didn't you do X.  Why didn't you go to the father.

8    I think --

9           THE COURT:  Well --

10          MR. JONAS:  -- that's not a proper question.

11          THE COURT:  Okay.  So --

12          MR. JONAS:  It's irrelevant.

13          THE COURT:  So let's say they didn't use that term.

14   They didn't say why.  Let's say what if they asked him what he

15   did, and did you talk to the father, not why, but did you talk

16   to the father.

17          MR. JONAS:  Okay.  So let's say --

18          THE COURT:  And there's a difference.

19          MR. JONAS:  There is a difference.  That's, that's

20   more of a fact.  Now, we have issues with that as well.  But if

21   we can play it out for Your Honor.  If the next question is

22   what did the father say, well, that's clearly hearsay.  So if

23   it's just merely to put the agent on the stand and say did you

24   talk to the father; yes, we did an interview of the father on

25   such and such date, I don't see the relevance of that, but I

1  think that's less objectionable as opposed to if you asked,

2  well, why didn't you go to the father and try to stop all this?

3  That gets into internal decision making processes, which is not

4  relevant to the entrapment defense.

5           THE COURT:  Again, some of it depends on how they ask

6  what they ask.  Mr. Durkin or Mr. Herman or Miss Lyon or Miss

7  Waters.

8           MR. DURKIN:  It's kind of like having to, to -- to

9  give up the, the cross.  I mean, the, the -- the government

10  seems to take a position that the only defense here is

11  entrapment or, or nullification, which is not the case.  And

12  nullification's a red herring also.  Part of the entrapment

13  defense is based on what we intend to argue is the government's

14  inability, and, and we believe this will come out through their

15  expert, to sort out inherently non-dangerous people with mental

16  issues or with immaturity issues, identification issues, what

17  have you, as to whether or not they're, they're fully dangerous

18  and whether -- or dangerous at all.  And, and whether or not

19  that's a, a fact, and it is a fact.

20           And, and the problem here that I don't understand how

21  the government can -- thinks they can have it both ways, and we

22  raise this in our motion in response to this, they -- I think

23  you've seen the whole 302 of that interview.  We cite some of

24  it on page 3 of our response.  Well, starting at the back -- at

25  the end of page 2, his background on June 29th, 2012.  More

1    than one month after the FBI opened its investigation of Mr.

2    Daoud and began interacting with him online through the use of

3    the two OCEs, the FBI surreptitiously interviewed Mr. Daoud's

4    father.  And they say that right in the 302.  They admit that.

5            Counsel for Mr. Daoud has read portions of the

6    relevant FBI report into the record at the status conference.

7    To reiterate the key points from that report, the FBI

8    utilized -- and this is -- we're quoting right from the 302,

9    quote, suitable pretext, end quote, to interview Mr. Daoud and

10   to, quote, assess his overall behavior and cooperation level

11   with law enforcement period, end quote.  The FBI's report makes

12   the following concluding statement:  Ahmed, the father,

13   portrays himself as a family oriented individual that is

14   involved with his children and is raising them right.

15           It is further assessed that Ahmed may not know his

16   son Adel is doing on -- may not know his son Adel is, and then

17   there's some redacted, is doing online.  We don't know what

18   that says in between.  Even though Ahmed claims to oversee his

19   children's computer use.  Ahmed would likely be open to future

20   contact with the FBI and might even encourage his son to

21   cooperate with the FBI if he felt his son was in trouble with

22   the law.  And then we say, despite this interaction, the FBI

23   decided to escalate the sting operation.

24           I think that's fair game.  I don't see why not.  This

25   is -- and, and the theory behind it is, is that the

1    entrapment -- one of the reasons the FBI ends up entrapping

2    people in this kind of a sting is that they can't distinguish

3    one way or the other, and they have a motive to turn anyone

4    into a terrorist, because that's all they know how to do.

5             THE COURT:  All right.  Go ahead.

6             MR. JONAS:  Your Honor, it's clear Mr. Durkin's

7    defense is going to be to attack the FBI in this case, and the

8    FBI is not on trial.  The question is whether or not the

9    interactions with the agents led the defendant to do something

10   he would not otherwise have done, generally speaking, of

11   course.  So what he's proposing to do is simply not a defense,

12   and it's a distraction, and it does go to jury nullification.

13            THE COURT:  Well, I don't --

14            MR. DURKIN:  That's not true.

15            THE COURT:  I think both of you all are taking

16   extreme positions.  There's a more middle of the road position.

17   There's some things that are clearly relevant information that

18   he may be able to ask in such a way to actually get out and,

19   and make his argument on his theory of the case, which isn't

20   necessarily what the government in general can and cannot do.

21   But, on the other hand, they should be able to talk about

22   something that happened.  You know, there's no sure thing.  I

23   just sentenced a young person almost the same age as the

24   defendant who had plenty of family support back there, and

25   who's to say they knew anything about what was going on.  And

28

1   this isn't even an issue of -- entrapment is nowhere in the

2   picture.

3           So, you know, the fact that just because a parent

4   says one thing about their child and how they're wonderful and

5   not dangerous doesn't guarantee that that's how they are.  So

6   that's a -- that's a leap right there.  So I'd like to read

7   again a little more closely after hearing your arguments what

8   you've set forth.  The 302 I am not as familiar with as you are

9   clearly, so I want to read it a little more closely.  I think

10  it's there.  It should be there for me to read it.

11          MR. HERMAN:  I, I do not believe it is, but we will

12  provide a copy.

13          THE COURT:  If you don't have any objection, I will

14  need to read that, so ...

15          MR. JONAS:  We have no objection to Your Honor seeing

16  it.

17          THE COURT:  All right.  So make sure you provide it

18  to me.

19          MR. DURKIN:  So you know, Judge, part, part of what

20  I'm saying is, and I don't know whether this will come out or

21  not, which is why I don't think this is something that should

22  get ruled on pretrial.  But --

23          THE COURT:  And I might not -- I might decide not to

24  do that.

25          MR. DURKIN:  Right.

1    THE COURT:  I have to -- again, I'm, I'm one that

2    likes to see a lot of stuff play out.

3    MR. DURKIN:  I mean, that's what I would encourage

4    you to do.  Because, for example, the government can't deny

5    that in some cases they do send -- go back to the parents.  To

6    use my classic Irish Catholic rationale, you know, it's a

7    public record that they took Shannon Conley, who was arrested

8    around the same time as the -- in Colorado around the same time

9    as the defendant, and they took her -- they went, took her back

10   to her parents four or five times.  And maybe that was not this

11   defendant.  Maybe that was like two years later.

12   MR. JONAS:  Right.  But she was also ended up being

13   prosecuted because --

14   MR. DURKIN:  I understand that.  But I'm just saying

15   I can envision -- I'm not saying it's going to happen, but I

16   could envision one of their agents saying something on direct

17   that would open up the door to, well, but, but you know you go

18   do that sometimes, don't you?

19   THE COURT:  And what relevance would that be to this

20   time?  The fact that you go do it sometimes --

21   MR. DURKIN:  It supports it because --

22   THE COURT:  This isn't a, this isn't a civil case.

23   This is a criminal case.

24   MR. DURKIN:  Because that supports the theory that

25   the government -- the FBI, the FBI is on trial here.  That's

1  what the entrapment is all about.  What they did is, is on

2  trial.  And what they did is take someone in our opinion we

3  think the evidence will show who's not dangerous and turn him

4  into a bomber.

5       THE COURT:  All right.  If they haven't already asked

6  that in a motion in limine, I'll just tell you, you can argue

7  that to me, but you can't argue that in front of the jury; that

8  the FBI is on trial.

9       MR. DURKIN:  I'm not -- no.  No.  I'm not --

10       THE COURT:  I'm just letting you know as you --

11       MR. DURKIN:  Of course, I wouldn't argue the FBI is

12  on trial, but --

13       THE COURT:  I'm just making sure.

14       MR. DURKIN:  -- he's using that rhetorically.  But

15  the tech -- the FBI's techniques is certainly at issue in an

16  entrapment case.  What they did investigatively is, is --

17  that's what I mean.  I don't mean, yes --

18       THE COURT:  All right.

19       MR. DURKIN:  -- literally --

20       THE COURT:  All right.

21       MR. DURKIN:  -- the FBI is on trial, but --

22       THE COURT:  I just want to make sure.  It will be a

23  very nice argument, but I'm just letting you know that that one

24  won't be allowed.  All right.  Or any inferences.  I know you

25  know better, Mr. Durkin.  I'm just making sure that no lines

1 │ are crossed and that we don't -- that your whole idea of where

2 │ you're going with this is being put out there totally that the

3 │ Court actually would have to lean to the other side --

4 │         MR. DURKIN:  I think --

5 │         THE COURT:  -- if that's where you're going.  All

6 │ right.

7 │         MR. DURKIN:  I think you'll realize that I'm capable

8 │ of getting very close to lines and not stepping over it.

9 │         THE COURT:  I'm not at all surprised by that.  All

10 │ right.

11 │         MR. JONAS:  Your Honor, if I may continue this.  So,

12 │ so assuming for a moment that Mr. Durkin puts Agent Schachner

13 │ on the stand and elicits from Agent Schachner what's in the

14 │ 302, the natural question on cross-exam -- my cross-examination

15 │ or one of our cross-examinations would be why didn't you go to

16 │ the -- why didn't you go to the dad.  This is something -- I'm

17 │ going to talk very generally here.  The answer as we stand here

18 │ right now is classified.  There is a very good answer.  The

19 │ defense is aware of it.

20 │         We under the provisions of the protective order you

21 │ signed last week or the week before had a conversation with

22 │ them.  We are -- we, the government is working with multiple

23 │ bureaucracies in Washington to get the information in a manner

24 │ that the agent will then be able to respond accurately.  I may

25 │ be filing -- we may be filing yet another classified motion

1    before Your Honor just requesting a substitution of the

2    original form of the information so that we can relate it in

3    court.  And this also relates back to the CIPA motion that we

4    filed before Your Honor years ago.

5            So I just wanted to give Your Honor a heads up that

6    we're probably -- we may -- I don't want to say probably, but

7    may be doing this.  And again, we've talked about it with

8    defense counsel, so this is not a surprise to them.

9            THE COURT:  All right.

10           MR. DURKIN:  It's not.  We, we know what they're

11   talking about.  And we, we don't quite see it the same as they

12   do, but it, it --

13           THE COURT:  That's not surprising, but it sounds

14   like -- the one thing it sounds like they're at least trying to

15   move a little bit to adjust, which I think was one of the

16   Court's original problems with this is I didn't see any

17   movement to try to address something that might be something

18   that they need to be able to defend their client.  And I wasn't

19   looking for the whole ball of wax.  I was just trying to say

20   give something so that they would be able to actually put on a

21   defense if they wished to do that.  It sounds like that's where

22   you're trying to go.

23           MR. JONAS:  We are trying, Your Honor, yes.

24           THE COURT:  All right.  Well, you know what then,

25   there's no need for me to rule right away on this.  I will take

1  it under advisement at this point anyway or reserve it for

2  closer to trial till I see what else you do.

3              MR. DURKIN:  That's what I think.

4              THE COURT:  Yes.

5              MR. JONAS:  Your Honor, and just to the, to the -- to

6  the issue that we're raising, one thing.  And this is obviously

7  up to, up to Your Honor.  It may be more efficient given how

8  close we are to the trial.  Instead of requiring -- and we, we

9  can certainly do this if Your Honor wants, but instead of

10  requiring us to file a, a classified motion, we could also have

11  the option of what we can do in 15 minutes is a classified CIPA

12  II status ex parte where we can show you the original document.

13  Show you this proposed substitution, and then explain to you

14  what we're going with this.

15              Again, I think largely the defense is going to know

16  what we're talking about other than the origin of the original

17  information.  It would just be more efficient, if Your Honor

18  wishes.  Otherwise we're happy to write a motion.

19              THE COURT:  It may be.  Right now I mean our days are

20  numbered here.

21              MR. JONAS:  They are.

22              THE COURT:  You all have me doing Daubert tomorrow.

23  Then I have -- today is Tuesday.  Wednesday, Thursday.  Friday

24  and Monday, right now those are the days I have, you know.

25              MR. DURKIN:  Well, when we --

1      THE COURT:  So unless I get some -- I get the
2  appropriate --
3      MR. DURKIN:  I have, I have something that --
4      THE COURT:  Oh.
5      MR. DURKIN:  When we're done, that might maybe
6  alleviate all that.
7      THE COURT:  Really?  Okay.  Well, let me just say
8  this --
9      MR. DURKIN:  Believe it or not.
10      THE COURT:  Let me just say this --
11      MR. DURKIN:  They're not going to agree to it, but --
12      THE COURT:  Say for Tuesday the 20th even if I came
13  in, I don't know if I'd have the staff to be able to staff me.
14  So I mean that possibility is here.  But as far as the court
15  reporter and, you know, they, they are --
16      MR. DURKIN:  No, we don't need --
17      THE COURT:  -- allowed to go --
18      MR. DURKIN:  We don't need --
19      THE COURT:  -- and take care of their families.
20      MR. DURKIN:  Nobody, nobody should wreck their
21  Thanksgiving for this.
22      THE COURT:  Yes.  So I mean I will be around not fit
23  for company --
24      MR. DURKIN:  I have an idea.
25      THE COURT:  -- but ...

1          MR. DURKIN:  I have an idea, but --

2          THE COURT:  All right.  Do you want this on the

3  record, this idea?

4          MR. DURKIN:  I do, but I don't know --

5          THE COURT:  Okay.

6          MR. DURKIN:  I don't know if it's in the correct

7  order.  If you want to --

8          THE COURT:  Well, before we -- before we get to that,

9  I just want to make sure I have at least addressed the, the

10  other -- there was a part two to your -- let's do, let's do

11  this first.  Hold that thought, Mr. Durkin.

12          MR. DURKIN:  That's fine.

13          THE COURT:  Obviously anything that can alleviate

14  some work is always welcome.

15          MR. DURKIN:  I can alleviate a lot of work.

16          THE COURT:  Well, always welcome.  Okay.  Go ahead.

17          MR. JONAS:  Your Honor, the part two of the motion

18  regards impossibility.  And while we recognize that the

19  defendant at the time of the offense may not have built the

20  bomb as the FBI built it, it doesn't mean necessarily that he

21  didn't have the capability of building a destructive device.

22  So I think the motion lays it out there that they should not be

23  able to argue that there's no way under any circumstances the

24  defendant could ever have built a destructive device.

25          THE COURT:  Response.

 1          MR. DURKIN:  Well, that depends on what evidence they

 2   put in the record to prove -- that we just can't argue it, but

 3   I don't, I don't agree with that statement.

 4          THE COURT:  Well, I have a hard time not seeing that

 5   it's an impossibility in terms of the internet today you can

 6   figure out how to build anything.  You don't need any

 7   assistance from anybody in particular, but --

 8          MR. JONAS:  Your Honor, can I suggest, I think this

 9   is a good motion to reserve on and see how it plays out.

10          MR. DURKIN:  Yes, I mean, I -- I mean, I, I --

11          THE COURT:  I mean, it sounds -- I need to hear the

12   evidence.

13          MR. DURKIN:  They may be right.  I mean --

14          THE COURT:  But I will just tell you that, it's not

15   much impossibility for anything you can put -- you can look up

16   on YouTube, so ... yes.

17          MR. HERMAN:  Thanks.  We agree that, that to see how

18   the evidence comes in is, is probably the best way to handle

19   this, but we'll just direct you -- you and your staff probably

20   already looked at our response, but we cite cases that we think

21   are on point in terms of this issue.  Specifically the

22   Hollingsworth case, so --

23          THE COURT:  Okay.  All right.  Well, one thing too,

24   this is I guess a good point if I haven't brought it up

25   already, just logistically speaking, I'm not going to treat you

1   all any different from any other case where I will do my best

2   to minimize sidebars.  The only sidebars that I'm looking

3   forward to having are the ones when we have -- we question the

4   jury and that it may be either motions for cause or additional

5   questions that you want me to ask a particular juror.

6          The way we're going to have it set up is each juror

7   by number comes in here, and I question them separately.  And

8   then you get a chance at the sidebar to say, oh, Judge, can you

9   ask this person this other question.  Then I'll consider doing

10  it.  That's the sidebars that I'm looking forward to as opposed

11  to general sidebars as we have the trial.  I don't give many.

12  What I do is before the jury comes out, I allow you to present

13  questions.  Every time I'll say government, defense.  You can

14  ask me anything from I need more water, to, Judge, we need more

15  time, to can we do this, that, or the other or something

16  substantive.

17         We do that before the jury comes out.  When the jury

18  takes a break, I will -- before I leave the bench, I ask each

19  side again, is there anything you have.  Is there anything you

20  have.  That's the time to bring up anything.  Hopefully you've

21  discussed a little bit before I hear it even if you don't agree

22  to -- again, to ask me questions.  If for some reason we have

23  20 minutes out here of getting ready for the case and then the

24  jury comes out, you say there's nothing else, and then they

25  come out, and then all of a sudden somebody at one of the

tables pops up, oh, Judge, we need a sidebar, chances are I'm
going to say no.

        MR. DURKIN:  That's fair.

        THE COURT:  So just letting -- that's what -- but
every time I will give you time before they come out, time
after.  I don't care what the break is or what it is, I will
always before I leave the bench or bring somebody out I will
address whatever you have to talk about.  Just letting you know
that's the way my courtroom works normally, and it's not going
to be any different with this.

        MR. DURKIN:  That's fair.

        THE COURT:  All right.

        MS. LYON:  Your Honor, may I ask a question.  You
said regarding sidebars during jury selection.  Do you expect
to have one after each juror you question or after a group,
or --

        THE COURT:  No, after each individual is
questioned --

        MS. LYON:  Individual.  Okay.

        THE COURT:  -- I will just say to you --

        MS. LYON:  That's what I thought, but I want to make
sure I heard you.

        THE COURT:  Yes.  While we have them here --

        MS. LYON:  Yes.

        THE COURT:  -- in this particular -- it's just going

1   to be more efficient.  While we have them here, instead of what

2   I'd normally do, I'll do 16 or so.

3              MS. LYON:  Yes.

4              THE COURT:  They hang around.  They wait and see if

5   they're going to be called to get asked questions.  I don't

6   want to do that with this many people.  I want to see what we

7   get with each one.

8              MS. LYON:  In and out each person.  Gotcha.

9              THE COURT:  That's my plan.

10             MS. LYON:  Okay.

11             THE COURT:  All right.  Okay.  So is there -- I mean,

12  I agree.  I should wait until you hear.  Even though I should

13  know -- we should be bringing this issue up ahead of time

14  enough that we can deal with it on the impossibility that we'll

15  be able to deal with whatever issues you all want to deal with.

16  If you don't think it can come up or if it's something that's

17  more about the jury instructions or something else, then you

18  can let me know.

19             MR. JONAS:  And, and because it's an unresolved

20  motion, Your Honor, I'm assuming the defense can't raise it in

21  opening.

22             THE COURT:  Oh, it can't be in opening statement, no.

23  If it's, if it's -- if I'm reserving for trial, then that's not

24  something specifically that should be brought out in opening

25  statement.  Okay?  And opening statements right now I'm

1    planning on them for Tuesday.  We start on Monday.  And

2    Tuesday, it will either be Tuesday morning.  Or if we need a

3    little bit of Tuesday to have more jury selection, it will be

4    Tuesday afternoon.  All right.

5            MR. DURKIN:  That's fine.

6            THE COURT:  The only thing I request on jury

7    selection is, is that the individual questionnaires that are

8    written out, you keep the printouts of all the jurors all you

9    want, I get what they hand wrote.  I get it back.  You each

10   will have a copy of it during the proceedings.  Before you

11   leave here on Monday or even on Tuesday before you give opening

12   statement if we're still doing jury selection, I get those

13   copies.

14           MR. DURKIN:  That's fine.

15           THE COURT:  Okay.  All right.  Where else are we

16   other than the -- any more motions I need to deal with right

17   now or take under advisement or discuss?

18           MR. JONAS:  Your Honor, I think the only outstanding

19   one is the government had some objections to some of the

20   defense proposed voir dire questions.  I don't know if you want

21   to address that now.

22           THE COURT:  You can address it.

23           MR. JONAS:  So I'm going to tag -- Mr. Haxall wrote

24   that motion, so I'm going to tag him --

25           THE COURT:  All right.

1      MR. JONAS:  -- as soon as he's done conferring with

2  Mr. Herman.

3      THE COURT:  Oh, let me -- and before you do that,

4  this I guess would be a good time, and I don't know where all

5  my externs are, but this would be a good time for me to go

6  ahead and give you some additional questions that will be part

7  of my questionnaire.  And I will hand these to you if you want

8  to look at them for a second.  I'll give you four copies right

9  now for convenience.  What I'll also do, and even leave the

10  bench for a quick second, I'll go ahead and give you my

11  standing rules, which will include issues of -- that we

12  basically already talked about sidebars, jury selection.

13      All right.  I'm going to just step away for two

14  seconds while you can review the questions real quick, and then

15  let me know if there's -- then we can start again on the

16  questions you have objections to.

17      MS. LYON:  Okay.  Thank you, Judge.

18     (Short break taken.)

19      THE COURT:  All right.  Have you had a chance to

20  review my additional supplemental questionnaire?

21      MS. LYON:  Yes, Your Honor.

22      MR. HAXALL:  Yes, Judge.

23      THE COURT:  Again, these are questions that will be

24  attached to the original questionnaire and will be filled out.

25  So --

1          MS. LYON:  I would like if it -- if it's all right,

2     Your Honor, if I can sort of address all of the, the jury

3     selection issues at once instead of us kind of going back and

4     forth.  Would that be okay?  Like the objections I have to you,

5     would that be all right if I do it that way?

6          THE COURT:  Yes.  Or you, you want to go first?

7          MS. LYON:  Yes.

8          THE COURT:  Oh.  Any problem, Mr. Haxall?

9          MR. HAXALL:  No, Your Honor.

10         THE COURT:  All right.

11         MS. LYON:  Okay.  That's what I was asking.  As I'm

12    sure is not news to Your Honor, jury selection in the case is

13    of extreme importance and is extremely difficult to do,

14    particularly given in our fraught and divisive political world

15    that we live in right now.  We cannot ignore the obvious, and

16    the obvious is, is that in addition to whatever ordinary

17    prejudice anybody charged with a crime is facing, we are

18    talking about terrorism charges; and we're talking about a

19    client who is Muslim, who believes in Islam, and who the

20    government's position is is also violent.

21         And to not ask questions that directly deal with the

22    issue of prejudice against this particular religion and hope

23    that by having a list of, of questions like you do here of

24    positive or negative opinions about any of the following

25    religions with just a checkmark by, by them --

1      THE COURT:  Let me stop you there.  First of all,

2  these are written questions.  I am asking questions.  I use

3  this as my template.  I go off of this.  I build onto

4  questions.  I have never gone through jury selection and

5  focused -- everybody just looked at the back and we go from

6  there.  I ask questions as a former trial attorney.  I ask

7  questions as a judge for over 22 years.  So it is not in a

8  vacuum.  I appreciate your speech.  I'm the one that has had,

9  what, three juries in the last two months.  And I'm the one

10  that has dealt with --

11      MS. LYON:  Yes, ma'am.

12      THE COURT:  -- the, the atmosphere.  I had a Spanish

13  speaking -- Spanish speaking defendants and I had somebody in

14  the jury tell me a person who -- a Hinsdale doctor I think,

15  people have to speak English.  On a jury venire.  Those -- I

16  know better than you and probably a lot of people this stuff

17  has seeped into our jury system, and you don't have to be

18  Muslim, and you don't have to be charged with a crime of

19  terrorism.

20      MS. LYON:  I'm aware.

21      THE COURT:  A basic civil trial where I had a

22  Hinsdale physician, woman with kids tell me I think people

23  should have to speak English.  And three people down, a man who

24  looked like Duck Dynasty agreed with her.  So I know what I'm

25  dealing with, and that's why I worry about people and say

1  everybody better take a look at this because it's seeping into

2  our jury system, and there were other people who agreed.  And

3  so I had to worry about that, and I've had to deal with this to

4  get a fair jury in jury selection.  And so we can move past the

5  generalities.  It's here.

6          MS. LYON:  I, I wasn't -- what I -- my concern is

7  that the questions are, are not open ended.  And if Your Honor

8  is going to follow up with open-ended questions, then my -- a

9  lot of my concerns drop away.

10         THE COURT:  Yes.  I, I will follow up with specific

11 questions --

12         MS. LYON:  Okay.

13         THE COURT:  -- based on this.  And if I could keep

14 somebody from -- in this case that's another reason why I went

15 one on one.  I didn't want anybody poisoning --

16         MS. LYON:  Agreed.

17         THE COURT:  -- my venire.  Not this big and not with

18 this situation.  I normally wouldn't do it like this.  I

19 normally just have 16 in here, and then I take those 16.  So at

20 least if people get poisoned, I don't have a whole group.  I

21 can't do that here.

22         MS. LYON:  No, I don't disagree with you, Your Honor.

23         THE COURT:  All right.

24         MS. LYON:  And I, and I appreciate that.

25         THE COURT:  Okay.

1     MS. LYON:  I did want to respond to the government's

2   objection to the question that those of us who write perhaps

3   articles that only other law professors read about jury

4   selection would refer to as a continuum kind of question.

5   That's question 20 on our proposed questions.

6         THE COURT:  All right.  One second.

7         MS. LYON:  And -- do you want me to give you a moment

8   to find it?

9         THE COURT:  If you just give me a quick --

10        MS. LYON:  Of course.

11        THE COURT:  -- moment, I'd appreciate it.  So many

12  papers.

13        MS. LYON:  Would you like my copy.

14        THE COURT:  All right.  Go ahead.

15        MS. LYON:  Okay.  You've got it.

16        THE COURT:  I got it.

17        MS. LYON:  It's, it's question 20 where there's like

18  an A through an E choice.

19        THE COURT:  Oh.  Is this a defendant's or -- I mean,

20  of the government?

21        MS. LYON:  This is the defendant's, yes.

22        THE COURT:  The defendant's.

23        MS. LYON:  And the government has objected to it.

24        THE COURT:  All right.  Go ahead.

25        MS. LYON:  And I, I want to --

1        THE COURT:  20-A?

2        MS. LYON:  20.  It's got -- you've got some choices

3 there.  You know, you can circle any one of the answers and

4 then explain your answer.  And the psychological theorizing as

5 to why a question like this is more likely to get you good

6 information from which to ask good follow-up questions is that

7 it is a way of saying to the jury that lots of people have

8 opinions.  Here's a group of them.  If you, you know, fall into

9 one of these opinions, you're not alone, because sometimes

10 people feel uncomfortable just saying I have a negative or

11 positive opinion about Islam or Judaism or whatever religion it

12 might be or religion in general.

13        And so I, I believe that we are far more likely to

14 get actual information from which Your Honor can ask some more

15 follow-up questions if we, if we use a continuum question like

16 that.

17        THE COURT:  Position of the government.

18        MR. HAXALL:  Your Honor, we filed our, our response.

19 I mean, essentially they're not tethering this to this case at

20 all.  And this is probably an unfair way of putting it, but

21 essentially the question is how much do you like members of

22 this particular religion, rate 1 to 10 and then go from there.

23 Here the government's question that we proposed, Your Honor, is

24 specifically targeted to this case, to the facts of this case,

25 to the issues the jury is going to, to be required to confront.

1    And I think it is much better shaped to get to the heart of the

2    issue, which is finding a jury that is not biased that is --

3              THE COURT:  You're talking about question 18?

4              MR. HAXALL:  I believe that's where we put it.

5              MS. LYON:  Which we object to.

6              MR. HAXALL:  So, so, Your Honor, I do think the

7    continuum question, as Miss Lyon put it, it, it -- it is so

8    broad and open, it is likely to interject issues into this case

9    simply by the phraseology of the question.  It is essentially

10   offering that people think this about Islam, and it's going to

11   put that into the jury when the question has not yet been -- is

12   not out there otherwise.

13             THE COURT:  All right.  I'm going to tell you this:

14   I -- again, I will look at you all's questions.  I think the

15   question is too generic, No. 18 for the government.  And right

16   now I think it's too specific for the defense.  However, I

17   believe the question I ask will give me something to work with.

18   And if I can put it into specifics for you, taking a little bit

19   as a follow-up depending on what they answer, then I will put

20   it down.  You know, I'm going to be -- try to be much more

21   formal and give you more of an idea what to expect.

22             But again, some of my -- it just depends on --

23             MS. LYON:  Understood.

24             THE COURT:  -- what is said.  If I get something

25   crazy like was said before, I ended up questioning that person

1   in front of everybody for many minutes and asked questions and

2   followed up on the other questions just to -- actually to save

3   my jury.  I won't have that situation here.  People will be

4   individual.  It will be with us.  But if somebody, somebody

5   checks any of these religions as something they have strong

6   opinions to -- I actually had people write down how they felt

7   about other languages, and that was not -- again, from all

8   walks of life.  Very surprising.

9         MS. LYON:  It sounds not encouraging.

10        THE COURT:  It was -- that's an understatement.

11        MS. LYON:  Yes, ma'am.

12        THE COURT:  It was very upsetting to everybody.  The

13   parties, lawyers.  Everybody was sort of with their mouths

14   dropped open that this was coming from different -- totally

15   different demographics, and they were agreeing.  I agree with

16   that lady down there.  I think she was appalled, but she had

17   already done it.  So -- and we had another case that brought

18   in -- it was an interpreter, and they just didn't want it.

19        MS. LYON:  I understand.

20        THE COURT:  So that's, that's what we're dealing

21   with, and you don't even have to get to terrorism.  That's what

22   we're dealing with.

23        MS. LYON:  Yes.  No, it's not -- unfortunately it's

24   not limited to that.  The other thing I wanted to, to just say

25   is as a general matter, the questions tendered by the

1   government are questions where, where there's no way to -- for

2   a juror to express an opinion other than the one that is, you

3   know, for lack of a better word, you know, correct.

4           For example, at various times of the case the

5   Court -- this is question 20 -- will instruct you about the

6   applicable law.  It's your obligation to follow the law.  If

7   you were to find that you disagreed with it, would you

8   nonetheless be able to follow the law?  Well, that's an

9   instruction that the jury's going to get, and that's a

10  legitimate instruction.  But if you don't ask the question in

11  an open-ended way, someone who doesn't feel that way is going

12  to feel obligated to answer correctly.

13          There is a -- there's an implication that you're not

14  fair if you don't answer the question.  Or, you know, it's --

15  it's do you hold religious, philosophical, moral, or other

16  beliefs that make it difficult for you to sit in judgment of

17  another person?  You know, do you have views about the Islamic

18  faith that would make it difficult for you to be fair?  All of

19  these questions presume that if you have an opinion, it makes

20  you kind of a bad person for not being fair.  And I think all

21  of us want to know if we have someone whose opinions might get

22  in the way of them being able to hear the evidence and fairly

23  weigh it.  Nobody wants that.

24          And so -- but just as a general statement, but I

25  think I might be preaching to the choir here a little bit, so I

1    apologize, as I've never tried a case in front of you.  My

2    guess is that you do ask open-ended questions, and that we

3    would get actual answers from jurors.  Am I --

4              THE COURT:  I ask both open-ended and I ask specific.

5    Again, I would -- in the words of your partner Mr. Durkin, who

6    I probably won't quote too much, but, you know, I, I think I

7    know how to get to the line that I need to get to without

8    crossing the line.  And then additionally, after that, after

9    they're questioned, you're going to have the opportunity to

10   say, Judge, based on what we've heard, what she -- this witness

11   has -- this person has said, can you ask this question.

12             MS. LYON:  Okay.

13             THE COURT:  And if that's --

14             MR. DURKIN:  If I could order a page of that

15   transcript.

16             THE COURT:  -- the appropriate way to go, then the

17   Court will follow up if it's -- if it makes sense based on all

18   the answers that have been asked.

19             MR. HAXALL:  And, Judge, I've used these questions

20   many times.  And contrary to what counsel is saying, jurors do

21   speak up.  Because they know and they will say, yeah, I do have

22   a problem sitting in judgment of people -- of other people.  Or

23   they, they respond affirmatively to those questions all the

24   time.

25             THE COURT:  Even if they don't have a problem,

1  they'll say they have a problem.  So yes, the jurors -- yes,

2  the only -- the thing I'm struggling most with actually to get

3  jurors right now is how to bring up three weeks between

4  Thanksgiving and Christmas.  How I can best bring that up and

5  not incur a run.

6            MS. LYON:  Yes, that is a --

7            THE COURT:  And so that's, that's what I'm

8  actually --

9            MS. LYON:  That's challenging.

10           THE COURT:  -- going to do individually.  That's

11 always the challenge as to whether or not somebody's going to

12 be on for a certain amount of time or a certain amount -- yes,

13 I will -- let me tell -- interject this.  Teachers are my

14 heart, and I try to accommodate them whenever possible.  The

15 three weeks we are doing this is the time that's most crucial

16 for most kids.

17           MS. LYON:  Teachers, yes.

18           THE COURT:  And you can object all you want for the

19 record, but I'm letting a teacher off if they're a teacher.

20 Not if they're an administrator, not if they're a librarian,

21 not if they're a coach unless it's basketball season.

22           MS. LYON:  I'm a teacher's daughter, Your Honor.

23           THE COURT:  I'm just letting --

24           MS. LYON:  You get no argument out of me.

25           THE COURT:  I'm just letting you all know that

1   teachers get to come back on a different jury.  Okay.

2         MS. LYON:  Yes, ma'am.

3         THE COURT:  So I'm just letting you all know that.

4   Subject matter, I don't want kids getting screwed because --

5   with a substitute because they're doing this.  As important as

6   it is, teaching is important too.

7         MS. LYON:  It really is.

8         THE COURT:  All right.  That's my position.  You're

9   on notice, so I don't mind objections.  I'm just -- and I don't

10  excuse them right from wherever they are.  Now, the way we're

11  doing it, if a teacher is sitting here talking and she's a --

12  he or she is a teacher, I will let them go from here without

13  anybody else knowing, and they'll be escorted out, and nobody

14  will know why they're leaving.  Okay?

15        MS. LYON:  Okay.

16        THE COURT:  So everybody won't all of a sudden grow

17  teaching degrees.

18        MS. LYON:  Your Honor, I, I think that I've made all

19  the points that I need to make that -- and anything else I had

20  to say is in writing.

21        THE COURT:  And again, I will be looking at these

22  again.

23        MS. LYON:  Okay.

24        THE COURT:  If I make adjustments to them based on

25  some of the things I hear and the way the defense or the

1    prosecution is presenting them, I'll make the adjustment, and

2    you'll be aware of it.  And I really am open to additional

3    questions at the close of my questions, because like you say,

4    we don't know what they're going to say.

5              MS. LYON:  And we can just tell you that orally,

6    right?  You don't need for us to write --

7              THE COURT:  Yes.  No.  No.  No.

8              MS. LYON:  Okay.

9              THE COURT:  We'll be over to the side and we'll say,

10   Judge -- yes, you just say, Judge, you know, we already

11   submitted this.

12             MS. LYON:  Okay.

13             THE COURT:  Can we ask this particular question?

14             MS. LYON:  Thank you, Judge.

15             THE COURT:  So if you want to have it in writing for

16   the record, I have no problem with it.  Just refer back to what

17   you've already --

18             MS. LYON:  Yes, ma'am.

19             THE COURT:  That will be fine.  And, and -- and then

20   individual -- I will question them after that.  If you give me

21   the question, I will ask the questioning.  Or if there's --

22             MS. LYON:  I understand.

23             THE COURT:  If there's something on their background

24   that they might not have been -- they may have been hinky about

25   or somehow I think I can do it and I haven't rehabilitated them

1  enough you feel like or you don't think there is any

2  rehabilitation, then, you know, we'll deal with causes later.

3  But it's something either to write down, or if you have other

4  questions, Judge, I've got one more question, I don't mind

5  that.  But I am going to move quickly.  So I would write down

6  the questions while I'm questioning them if you can, because --

7         MS. LYON:  Yes, ma'am.

8         THE COURT:  -- I just want to move them in and move

9  them out.  All right?

10        MS. LYON:  Gotcha.

11        MR. HAXALL:  And, Judge, there is only one other

12 issue the government had, and I know it's one of your, your

13 standard questions.  But in kind of asking around and our own

14 memories, I don't think we've ever had a situation collectively

15 where a juror was asked for the verdict of the prior case on

16 which they sat.  In fact, I've always had it couched in the

17 without getting into your verdict in the prior case --

18        THE COURT:  Oh, what it was?

19        MR. HAXALL:  Yes.

20        THE COURT:  Oh.  I always just ask was there a

21 verdict.

22        MR. HAXALL:  Okay.  Your -- I think your question

23 indicates the specific verdict.

24        THE COURT:  My question is was there a verdict unless

25 somebody changed it, but my issue is was there a verdict.  Not

1  what the verdict was.  And I'll double check what that says.

2           MR. HAXALL:  And that might be my misreading.  I

3  apologize.

4           THE COURT:  Yes.  Usually --

5           MR. HAXALL:  Yes, that's --

6           THE COURT:  That's what I usually do is say was there

7  a verdict and were you the foreperson.

8           MS. LYON:  Yes.

9           MR. HAXALL:  Yes.

10           THE COURT:  If there is something in that that

11  somehow on the new one got changed, I will let you know, and

12  I'll look at it because I don't think that --

13           MS. LYON:  Auto correct.

14           THE COURT:  I don't, I don't want to do that.  So it

15  might be that this is a new form and --

16           MR. HAXALL:  This might have been, Your Honor, the

17  defense in 267, what was the outcome, guilty or not guilty?

18           THE COURT:  Yes, I don't ask that.

19           MR. HAXALL:  Okay.

20           THE COURT:  That is not my plan.  I haven't asked it.

21           MR. HAXALL:  Thank you, Judge.

22           MS. LYON:  All right, Judge.  Thank you.

23           THE COURT:  Okay.  Thank you very much for

24  presentations.  They were thorough, and it gives me something

25  to work with.  I appreciate that.  All right.  What else do we

1    have?

2             MR. JONAS:  Your Honor, I have some items logistical,

3    some questions on your procedure.  If we can just tick through

4    them.

5             THE COURT:  Yes.

6             MR. JONAS:  So in no particular order, Your Honor.

7             THE COURT:  Yes.

8             MR. JONAS:  Just in terms of your procedure when it

9    comes to admitting evidence, do you do it we offer and then

10   it's accepted, or I understand --

11            THE COURT:  Okay.  No.  No.  That's very good.  So,

12   so my, my general procedure is because so many of these cases

13   are so well scripted and thought out and everybody knows what

14   everybody's evidence is and there's nothing that's going to be

15   smoking gun, there may be a few things that everybody stands by

16   we just don't want that in, it's too prejudicial.  We have our

17   arguments before trial starts, and we deal with that.  All the

18   other exhibits, all the other evidence obviously you've got to

19   set a foundation for or bring it in properly.  But the other

20   side knows you can get it in.  So there's generally no

21   objection.

22            It's a question of do you have any objections to the

23   evidence, or do you have any objections to it being published,

24   two separate things.  So many of the cases over here everybody

25   plays so nice that they say, oh, Judge, except for this one

1    exhibit, we agree to everything, you know, as long as they just

2    put it in.  I don't do strike the identifying marks from the

3    record.  We move to admit this in front of the jury.  I don't

4    like all that number stuff, because the jury gets too into it,

5    you know.  And so I just think it's better just to keep

6    referring to it as exhibit, and then either at the close of

7    that particular day when the jury's excused, I come out.  Is

8    there anything else on the record?  You can move everything

9    into evidence then, state any objections that are for the

10   record because you already know it's going to get in.

11           Or at the close of your case I always before I ask

12   you to rest outside the presence of the jury, I say now's the

13   time even if we've moved some stuff in, let's go through the

14   list and move it in.  That's the way I prefer.  I do not want

15   the formalities and the disruption of striking identifying

16   marks from every bit of evidence.

17           MR. JONAS:  Thank you, Your Honor.  And, and to that

18   point we've been discussing with defense counsel I think

19   productively a number of stipulations, which I think will --

20           THE COURT:  Fabulous.

21           MR. JONAS:  -- save the government multiple witnesses

22   and, and move things along as well as make the process of, of

23   the evidence go easier.

24           THE COURT:  And if you have the stipulations, again,

25   I speak to them all about what a stipulation is before we

1   start.  If you all want to read it, that's fine.  If you want

2   me to read it, just let me know ahead of time we have the

3   written stipulation.  Also I just -- with the exhibits you've

4   got the identifying -- the exhibits that are presented, and

5   maybe it's not for a reason that you want to even admit them

6   into evidence, I don't know, but sometimes you have the exhibit

7   list, you have what's moved into evidence, and then you have

8   what's published during the trial, and then you have what goes

9   back to the jury.  Not the same.

10          So what goes back to the jury is not going to be

11  everything that came in in the trial, unless everybody agrees

12  it should be everything.  So if you don't agree on that, then

13  that's a problem because my, my usual decision is if both sides

14  don't agree, it's not going back.  But what I'll warn you is if

15  it's something that everybody's paraded in front of them, the

16  first time they ask for it, they get it.  All right.  And I

17  think --

18          MR. JONAS:  Okay.

19          THE COURT:  I think jurors less is more.

20          MR. JONAS:  Staying with exhibits.  So we've

21  discussed with defense counsel, and I think we're on the same

22  page, Judge, is we would like to bring in the components of

23  what was the bomb at issue here.  And it comprises -- it's not

24  a working bomb and the components aren't going to be put

25  together in any way, shape, or form.  But to have them on a

1    table --

2         THE COURT:  Or not readily available to put together

3    like the gun case I had.

4         MR. JONAS:  Not readily available.  I think if these

5    were even put together it still wouldn't work.  But we want to

6    make sure that you're aware of that and are okay with it.

7         THE COURT:  What's your position?  Components of the

8    bomb.

9         MR. DURKIN:  I, I don't -- if they want to bring it

10   in, that's fine with us.

11        THE COURT:  All right.  And just again, the show and

12   tell thing especially the tell, letting people know the day

13   before, at least the day before on what exhibits, demonstrative

14   or otherwise you're bringing in; letting people know what

15   witnesses are going to be on for the next day, also gives us a

16   chance to -- the Court a chance to address things.  Our trial

17   schedule going to be pretty much for this trial 10 to like 4:45

18   pretty much every day.  You can bank on it.

19        So whatever cases I'm doing ahead of time are going

20   to be 8:45 and won't bleed into your time for a trial.  I would

21   suggest you all be here no later than 9:30 every day.  That

22   gives us a chance to get Mr. Daoud over in time by having at

23   9:30 and then we start with the jury at 10.  Okay.

24        Also in this case as far as press is concerned, there

25   will be no press conferences outside my room.  And just go --

1    the first floor there'll be -- they'll have a place with Mr.

2    Durkin's name on it on the first floor and that area, but not,

3    not in front of my -- not in front of my room or in the halls.

4    Okay?

5              MR. DURKIN:  I think there's a plaque down there.

6              THE COURT:  Is there a plaque already?

7              MR. DURKIN:  Yes.

8              THE COURT:  Okay.  Well, that's where you'll stand.

9              MR. JONAS:  A few more quick matters, Your Honor.

10             THE COURT:  And, and let me say this too about press.

11   You know, you can -- I'm just going to be monitoring.  So if

12   anything comes up, anybody thinks anything has been said that's

13   untoward, you bring it to me, and we'll address it.  Right now

14   my only requirements are that it be on the first floor.  Okay.

15   All right.  Go ahead, Counsel.

16             MR. JONAS:  Jury instructions, do you do that before

17   or after closing argument?

18             THE COURT:  Oh, I do it before closing argument.

19             MR. JONAS:  Before.  Okay.

20             THE COURT:  Yes.  We'll, we'll -- I'll see how it's

21   going, and we'll pick either an afternoon where the -- and I'll

22   tell you I'm working Fridays, just so everybody knows.  Working

23   Fridays.  We should only have at least two here I'm assuming,

24   two or so.  Maybe three at the most.  But with three weeks the

25   Fridays are going to be worked.

1    And more than likely it will be like an early end for

2    the jury, and so we can pick one of those Fridays actually to

3    do jury instruction conference.  So more than likely it will be

4    like a 2, 2:30 end on the Fridays.  And then we would have time

5    after.  So just because the jury's leaving, I'm not.  So --

6         MR. JONAS:  Okay.

7         THE COURT:  And that will be every night too.  If the

8    jury gets released at 4:45, I will be here trying to do the

9    rest of my cases until 4 -- until at least an hour later.  So I

10   will be here.  If we need to discuss something, I will be here.

11   Okay.

12        MR. JONAS:  I noticed in your -- the handout you gave

13   out a moment ago talks about who can sit at counsel table.  Can

14   we have the case agent sit with us?

15        THE COURT:  Yes, that's fine.

16        MR. JONAS:  Okay.

17        THE COURT:  As long as it's not a cast of thousands.

18   Especially I don't want the person who has to move around all

19   the time.  What's happened a lot is we have a case agent, and

20   then we have somebody -- you have somebody sitting on the front

21   row that's like the person who's moving a lot, but you have you

22   three and then the case agent.  You know, that's fine.  I just

23   don't want a cast of thousands.

24        And my other issue is, and I'll get to this table

25   too, we'll have enough.  We have to have places for the

1    marshals.  They're going to be sitting, and they'll be in
2    suits.  They get to spiff it up, and -- but we have to have a
3    place for them too.  And usually it's more -- less obtrusive if
4    they sit back there where they're sitting.  I don't know if
5    anybody's going to need that table because of the people you
6    have or not.

7            My rule is with the courtroom, this has just been my
8    practice in state court where we had the swinging doors and
9    everything is that no one is in the well of my courtroom other
10   than the parties and the lawyers while the jury is out here,
11   which means there's no coming in with, you know, out of breath
12   handing a file from secretaries or assistants or somebody else.
13   No.  They sit in the pews until the jury is out of the room.
14   Or you can go to them and step out in the hall.  Lawyers can
15   move around as long as they are not distracting.

16           As long as you aren't popping up every time the other
17   side is questioning and just walking around and moving around,
18   I'm not going to say anything.  You're the lawyer.  Sometimes
19   you have to step out, especially with all the stuff we have
20   going on on our phones and everything.  I'd expect you to step
21   out and then come back.  And you come back to the table.
22   That's no problem with me.  All right.

23           MR. DURKIN:  Judge, with respect, with respect to the
24   table, in the past we usually put our boxes under the table.
25           THE COURT:  That's fine.

1        MR. DURKIN:  I don't think that will be a problem.
2    And --
3        THE COURT:  Not a problem.
4        MR. DURKIN:  Will it be --
5        THE COURT:  The cloak room is also open to both
6    sides.
7        MR. DURKIN:  Can we leave things overnight in the
8    cloak room?
9        THE COURT:  And you can leave things overnight,
10   whether it's here or in the locked witness -- you'll each have
11   a room.  The locked witness room, you have that too.  The
12   only -- my only pet peeve rule is is that all of you all drink
13   from paper cups.  So if you have coffee, Starbucks, paper cup.
14   You have pop, paper cup.  Don't tell me what else you have, but
15   paper cup.  I get a mug.  It's just the way it is.
16       MS. LYON:  Fair enough.
17       THE COURT:  That's my pet peeve.  Yes.
18       MR. DURKIN:  Did you say you get a milk?
19       THE COURT:  A mug.
20       MS. LYON:  Mug.
21       MR. DURKIN:  Oh.
22       THE COURT:  I have mugs.  I'll have like -- in a long
23   trial I might have three different ones, but I get mugs.
24       MR. DURKIN:  That would have, that would have totally
25   destroyed my image of you.

1          MS. LYON:  Judge Coleman, you were talking about us
2    not being particularly formal.  Do you want us to ask
3    permission every time we get up or approach a witness with an
4    exhibit, or --
5          THE COURT:  I mean, that's a good -- I mean, that's a
6    good question.  Do what you want.  I mean, I was trained --
7          MS. LYON:  I was trained to ask permission.
8          THE COURT:  I was trained by an office that required
9    me to stand up.  I was also trained by an office that I didn't
10   necessarily have to stand up.  I like it to be consistent.
11   That's my, that's my preference.  And only if you're asking the
12   questions, you make the objections.  I don't expect any double
13   teaming, tag teaming.  And when we actually go to trial, I
14   expect one person to present the argument.  I mean, a rarity if
15   as long as we're not in, in front of a jury, in a rarity if you
16   say, well, this issue this counsel's going to take, I can get
17   with that.  What I don't want is one person to be arguing and
18   then another person come up and just chime in.  I don't want
19   that.
20         MS. LYON:  I just chimed in.  Sorry about that.
21         THE COURT:  I want it to be -- but I'm saying once I
22   start trial, I don't want that.  Okay.  And so -- and then I
23   will make -- you know, you have to ask permission to keep
24   talking.  So usually I'll get one response, one reply, and it's
25   done.  I'm not going to ask for anything more.  If I want

1    something more, I'll tell you.  But the, the continuing to talk

2    and make arguments does not work at trial, and I don't want to

3    start down that road.  All right.

4            But yes, be -- just be consistent.  If you are

5    somebody who sits down -- I just had somebody who sat through

6    the whole trial for me, the lawyer sat through a whole trial.

7    Just don't stand up and make an objection all of a sudden when

8    you've been sitting down the whole time.

9            MS. LYON:  Gotcha.

10           THE COURT:  To me that's showing up the Court.  And I

11   don't want the jury to say, oh, that's important.  He's doing

12   that.  So that's what I don't go for.  I prefer formalities

13   especially if we have a lot going on.  It helps the trial.

14   But, you know, if -- once you go up to a witness, you don't

15   have to say may I approach the -- it's up to you, whatever is

16   comfortable.

17           MS. LYON:  Yes, ma'am.

18           THE COURT:  Okay?

19           MS. LYON:  Thank you.

20           THE COURT:  All right.

21           MS. LYON:  I'm sorry.  I interrupted you.  You had a

22   list and I interrupted your list.

23           MR. JONAS:  That's totally fine.

24           MS. LYON:  Sorry.

25           MR. JONAS:  It's okay.  A few more items, Your Honor,

1 │ real quick.

2 │          THE COURT:  Okay.  Go ahead.

3 │          MR. JONAS:  So if Your Honor recalls during the

4 │ competency hearing last spring, a high school class came in.

5 │ Is it okay with Your Honor if, if --

6 │          THE COURT:  Classes come in?

7 │          MR. JONAS:  -- classes come in to watch from the

8 │ nearby high school who are taking a law program?

9 │          THE COURT:  I don't mind.  I mean, if you all have

10 │ some reason why you think they shouldn't.  Obviously I've

11 │ already said where I will not let people in, but other than

12 │ that, they also have an overflow room.  So if they're coming in

13 │ and out, I might actually prefer for them to go there, but this

14 │ is a trial, and I think they have a right to come in here.

15 │ It's public.  But I mean, that would be -- if it's an extremely

16 │ large group that can't stay for a long time, I probably will

17 │ give directions to CSOs or whatever that they should be in the

18 │ overflow room.  I don't want to have them disrupt everything.

19 │          MR. JONAS:  I'm guessing it's probably going to be

20 │ around 25 students or something.

21 │          THE COURT:  Oh, you already know about them?

22 │          MR. JONAS:  I already know about it.

23 │          THE COURT:  Oh, okay.

24 │          MR. JONAS:  But I want to make sure you're okay with

25 │ it.

1          THE COURT:  Are these your students?

2          MR. JONAS:  No.  No.  No.  But it's, it's the high

3     school that I've worked -- has a law program that I've worked

4     with in the past, so ...

5          THE COURT:  No.  Oh, no, no, no.  I think I'm really

6     well known to allow students in.

7          MR. JONAS:  Great.

8          THE COURT:  I just won't be able to -- I doubt

9     whether I'd be able to talk to them, so ...

10          MR. JONAS:  That's fine, Your Honor.

11          THE COURT:  As long as they know that.  I usually do

12     talk to students.  I'll get to a certain point, and I will say

13     I'll kick you out of the room.  So if we get a break and

14     everybody wants to sit there and write and I got 10 students

15     who are sitting there wanting to talk to me, I'm going to talk

16     to them and give them an overview, and I'm not going to do it

17     with you guys looking over my shoulder.

18          MR. JONAS:  That's fine.

19          THE COURT:  So that's the way I handle that.  But on

20     this one, I think they'll be on their own for the most part.

21     They can come and watch and then get the 411 from somebody

22     else.

23          MR. JONAS:  Yes, Your Honor.  The defense has

24     provided us with their witness list, as we have provided

25     theirs.  I just want to flag an issue we raised with them.  But

1   as we get closer to them presenting their case, depending on

2   how things shake out, we may ask for proffers on some of their

3   witnesses.

4         THE COURT:  Oh, yes.  There will be a break, and I

5   mean, I'm sure based on even some of the motions you have today

6   as to who they're actually going to be calling, if they're

7   calling anybody.  Obviously we have to find out what the

8   defendant himself is going to do, and we can't prejudge that,

9   so we'll deal with that at the close of the case.

10         MR. JONAS:  There's one other issue, which I'm going

11   to let Mr. Haxall address.

12         THE COURT:  Okay.  And before you come up and address

13   it, just so we're all straight on the issue of you all have the

14   undercover agent.  They have -- possibly are going to call the

15   OCs, right?

16         MR. JONAS:  Correct.

17         THE COURT:  Okay.  We just don't know yet?

18         MR. JONAS:  Correct.

19         THE COURT:  All right.

20         MR. HAXALL:  Your Honor, just to -- I wanted to warn

21   you that there might be one additional motion based on the

22   defense --

23         THE COURT:  Only one?

24         MR. HAXALL:  Okay.  Fair enough.  I -- I'm confident

25   there will be one motion --

 1                THE COURT:  Okay.

 2                MR. HAXALL:  -- at least --

 3                THE COURT:  Okay.  There you go.

 4                MR. HAXALL:  The defense in their witness list filed

 5      a list of names that I believe relate to the defendant's

 6      cellmate in a criminal case that he had that -- about two years

 7      prior to his assistance in this case.  I anticipate, I just

 8      wanted to warn you, putting something on file.  I'm waiting for

 9      a little bit of more information from the FBI so I can do so,

10      but it's just -- it's --

11                THE COURT:  The defendant's cellmate?

12                MR. HAXALL:  Prior cellmate, so --

13                THE COURT:  Not the one who killed himself?

14                MR. HAXALL:  No.  This is the one who ultimately

15      assisted the FBI in the investigation that led to the 2013

16      number.

17                THE COURT:  Ah.  Okay.

18                MR. HAXALL:  So --

19                THE COURT:  Okay.

20                MR. HAXALL:  So I just wanted to let --

21                THE COURT:  And just making sure that I'm on -- we've

22      got -- for this trial we've got the supposed hit in this case

23      as well as the original trial --

24                MR. HAXALL:  That's correct.

25                THE COURT:  The original charges, right?  Those two

1    are here?

2         MR. HAXALL:  Correct.  So I just wanted to warn the

3    Court that there will be another filing relatively shortly.

4         THE COURT:  Okay.

5         MR. HAXALL:  Just to let you know.

6         THE COURT:  Okay.  Not unexpected.  And I'm sure it's

7    not unexpected by Mr. Durkin.  All right.  Anything else?

8         MR. JONAS:  That's all we have.

9         THE COURT:  All right.  Anything else, Mr. Durkin?

10         MR. DURKIN:  Yes.

11         THE COURT:  Go ahead.

12         MR. DURKIN:  We filed a motion on August 9th, 2013.

13    It's document No. 54.  And it was a motion for discovery, and

14    you denied that motion without prejudice in docket -- document

15    No. 8 --

16         THE COURT:  What did you say?  When was this?  2013?

17    Is that what you just said?

18         MR. DURKIN:  I said -- yes, we filed the motion

19    August 9th of 2013.

20         THE COURT:  All right.

21         MR. DURKIN:  And you denied it without prejudice in

22    document 87 on January 17th, 2014.  And you said at the time

23    when you were denying it that we had failed to provide any

24    basis for issuing such an order.  So we -- you denied it

25    without prejudice.  I would like to reraise that motion today,

1  and we'll put our reasons in writing, and perhaps we might have

2  to put some of them in camera but -- or I mean, ex parte.  But

3  I want to specifically raise -- reraise the request for

4  discovery that we made in paragraph 5 small E of that motion.

5            THE COURT:  Wait a minute.  Wait a minute.  Again,

6  what is the docket number?

7            MR. DURKIN:  54.

8            THE COURT:  Hold on a second.  All right.  Got it.

9  Okay.  Go ahead.  Where are we?

10            MR. DURKIN:  And I would refer you to page 8, what

11  the, the specific -- I, I may want to reraise other parts of

12  it, but for the moment I want to raise the request we made in

13  paragraph 5 (e) on page 8.  What we did, Judge, is that we, we

14  bolded -- we put small letters on the actual request and put

15  them in bold, and then we explained further either what we

16  wanted more specifically and why.  And it reads, all agency

17  documents, notes, memos and -- are you with me?

18            THE COURT:  Yes.

19            MR. DURKIN:  Okay.  Related to implementation of the

20  Attorney General guidelines on FBI undercover operations.  And

21  the most specific, while -- while I want to raise all of them

22  again, I want to raise E, small 2, 6, and 14, and those three

23  itemized requests.  2 is a copy of the letter from the

24  appropriate federal prosecutor agreeing with the proposed

25  undercover operation and indicating an intent to prosecute.

1    6 is any further communication or correspondence

2  regarding a proposed undercover operation with other entities,

3  such as the United States Attorney's Office, the Attorney

4  General's Office, Office of General Counsel of the FBI, the

5  Department of Justice, or any other appropriate divisions of

6  government agencies, as well as the director, deputy director,

7  or assistant director of the FBI.  And in that I would include

8  orally when I say the Attorney General's Office, I would also

9  include the National Security Division of the Department of

10  Justice.

11    And No. 14, which is any further communication with

12  the federal prosecutor with respect to the propriety of the

13  operation and the legal sufficiency and quality of the evidence

14  produced from the activity.  And, and we make reference to the

15  Attorney General guidelines.

16    I thought today we had a solution to this case, or we

17  were going to tell you that there was a solution.  And I'm

18  going to make another motion after this, but these requests

19  would be related to the motion that I would like to make orally

20  to permit Mr. Daoud to plead guilty to -- under Alford versus

21  the United States to both the two charges here and the third

22  charge before Judge Dow on the condition that the Judge Dow

23  case be brought to your court under relatedness.  And let me

24  explain.  We had a --

25    THE COURT:  Is this the first the government's

1  hearing this?

2          MR. JONAS:  Yes, Your Honor.

3          MR. DURKIN:  Yes.

4          THE COURT:  Why, Mr. Durkin?

5          MR. DURKIN:  Pardon me?

6          THE COURT:  Why is this the first they're hearing of

7  this suggestion?

8          MR. DURKIN:  Well, because I, because I thought --

9  because I didn't think I was going to have to make this

10  request.

11          THE COURT:  Oh.

12          MR. DURKIN:  That's why.

13          THE COURT:  Okay.  All right.  Go ahead.

14          MR. DURKIN:  I thought we had this resolved or close

15  to resolved.  And --

16          THE COURT:  Okay.

17          MR. DURKIN:  -- we don't.  Which is their --

18          THE COURT:  Well, then I guess the question is if

19  you've already told them about it and they've rejected it, why

20  are we dealing with it?

21          MR. DURKIN:  No.  No.  They don't know the motion I'm

22  making now.

23          THE COURT:  Oh.

24          MR. DURKIN:  They don't know anything about the

25  Alford request.

1          THE COURT:  Okay.  All right.

2          MR. DURKIN:  Because I think I know the answer.

3    They're not going to agree to it.  But I believe the law is

4    they don't have to agree to it.  I believe the only one that

5    has to agree to it is the Court.  But the first issue, and

6    there are any number of reasons -- and I can put this in

7    writing, if you want, give everybody --

8          THE COURT:  I think it should be.

9          MR. DURKIN:  I will.

10          THE COURT:  But go ahead.

11          MR. DURKIN:  But so you know and so they know what's

12    coming, there are any number of reasons why I think as, as they

13    say, Alford is an extraordinary situation for the extraordinary

14    case.  This is that case.  There are any number of reasons why

15    he should be permitted to maintain his innocence, and yet have

16    a reason to plead guilty.  One of which is his -- simply his

17    mental condition and the conditions of confinement that he

18    currently finds himself in where he can't even have visits,

19    which that's --

20          THE COURT:  Oh, that was something you were supposed

21    to update me on.  Are we still in that same posture?  I know I

22    got a letter.

23          MR. JONAS:  Judge, we sent you a letter.

24          THE COURT:  But I mean, I didn't quite get the extent

25    of his restrictions from the letter.  Are you saying that he

1    can't prepare?  I was just thinking --

2              MR. JONAS:  No --

3              MR. DURKIN:  No, I'm not saying he can't prepare for

4    the trial.

5              THE COURT:  He just doesn't have, he just doesn't

6    have family contact.

7              MR. DURKIN:  He doesn't have any contact.

8              THE COURT:  And he still had an issue on his praying,

9    if I recall.

10             MR. DURKIN:  Well, that's, that's another related --

11             THE COURT:  Every two weeks.

12             MR. DURKIN:  That's related.  I think it's now almost

13   every four because of the separatee issue.

14             MR. JONAS:  Can I quickly address that, Your Honor.

15             THE COURT:  Yes, please do.

16             MR. JONAS:  With regard to the restrictions placed on

17   the defendant by the MCC with regard to email and phone

18   contact, that was a result of the disciplinary issue that's in

19   the letter.  With regard --

20             THE COURT:  With him sharing somebody's phone with

21   them or giving a message?

22             MR. JONAS:  Correct.  With regard to the

23   separation --

24             MR. DURKIN:  Judge, can I interrupt.  The separatee

25   issues, I've just been told by Mr. Daoud has been lifted.

1          THE COURT:  Oh.  Okay.

2          MR. JONAS:  We did that as soon as we left here,

3    because that's something we can control.  So I just want Your

4    Honor to be --

5          THE COURT:  Okay.

6          MR. JONAS:  I want to be clear that we have worked

7    with defense on this issue --

8          THE COURT:  To address this.

9          MR. JONAS:  -- and other issues.

10         THE COURT:  All right.  It sounded like you all were

11   working on it.  The one question I was having was the big thing

12   that got me was the praying.

13         MR. JONAS:  We did what we could, and it's been

14   resolved.

15         MR. DURKIN:  That's been resolved.

16         THE COURT:  Okay.  And what's it resolved to?  You

17   can pray every, every week, sir?

18         DEFENDANT DAOUD:  Yes.

19         THE COURT:  Okay.  Good.  Go ahead.  Thank you very

20   much, Mr. Jonas.

21         MR. JONAS:  You're welcome.

22         MR. DURKIN:  But going back to Alford.  You know what

23   his mental condition is.  You know he is under medication.  You

24   know that in the past stress has caused him considerable

25   difficulty.  I am concerned.  I'm not saying that he's not

1   competent to stand trial.  He, he -- he is by all indications.
2   I'm simply saying as a reason to submit an Alford plea, he, he
3   does have issues regarding stress.  And I think Dr. Xenakis
4   would back that up.  So that's, that's a reason.

5          There are also what I would call evidentiary reasons.
6   There are also issues with respect to the sheer prejudice that
7   he will inure, and I don't know how we can avoid it, and some
8   of it is certainly his own doing.  Obviously we're going to be
9   admitting by the entrapment defense that he did certain things,
10  and they're going to parade this bomb in, and it's going to
11  speak for itself.  I think that's asking an awful lot for a
12  jury to ignore the evidence.

13         The government, I always laugh when they get worried
14  about nullification in a case like this.  How anybody would
15  ever nullify this case is -- and I've been trying cases I think
16  longer than the three of them put together.  If, if there's a
17  jury in the United States that would nullify this case, then
18  I'll be shocked.  But that's another reason.  The other case is
19  further complicating it.

20         THE COURT:  And that's the one where somebody was
21  attacked because they had written something or done
22  something --

23         MR. DURKIN:  Yes.

24         THE COURT:  -- on the face of the illustration or
25  something?

1    MR. DURKIN:  Yes.  Yes.  Well, I was talking about --

2    we, we refer it to as three cases.  I mean, there's, there's

3    really one case, which is the two counts that the -- let's

4    do --

5    MR. JONAS:  Two CRs.

6    MR. DURKIN:  -- bombing -- let's do bombing,

7    solicitation.

8    THE COURT:  Those are the two.

9    MR. DURKIN:  Which is here.  The solicitation case on

10   top of this case, and I, I consented to it, so I'm not arguing;

11   but it's kind of the similar issue I have with respect to the

12   case with Judge Dow.  We -- it's, it's impossible to have

13   another case hanging over your head, to be blunt.  And the

14   solicitation case is very very difficult to defend.  We believe

15   there are legitimate defenses to it.  Whether they're

16   sufficient to arise to an acquittal, I don't know.  But I

17   think, again, there are facts that we could set forth that

18   would justify an Alford plea in that case as well.

19        The third case is an even more classic example,

20   because the fact remains that the only defense available to him

21   in the third case is a mental defense, which for all the

22   reasons we've discussed ad nauseam when we were going through

23   the competency issues, we don't want to raise a mental defense.

24   We don't think that's in his interests either.  We, we don't

25   want him locked up forever on a mental defense, to be perfectly

1    blunt.  Again, that's another reason for -- that, that would

2    justify an extraordinary circumstance for an Alford plea.

3              In order for that to happen, we would have to -- you

4    would have to grant a motion for relatedness, which we will

5    file.  We had one drafted in March, which we almost filed, and

6    the problem then was that we had one drafted on -- as of

7    March 4th, 19 -- 2018.  And it was pursuant to Local Rule 50.1,

8    which incorporates -- that's the criminal local rule, which

9    incorporates -- Criminal Rule 50.1, which incorporates Local

10   Rule 40.4.  And we also did it under 2, Section 2.  The problem

11   we had with it then, and I think we discussed this with the

12   government at the time, Mr. Jonas can correct me if I'm wrong,

13   but I think we had conversations in which the government told

14   us they would object on the basis that the cases couldn't be --

15   weren't susceptible to disposition in a single proceeding.

16             That was obviously the case if we were to have to try

17   the cases, which is why we ultimately didn't file the motion.

18   I filed that motion today simultaneous with the motion for an

19   Alford plea because then all three cases would be capable of

20   being disposed of in a single proceeding.  And I think -- I

21   think that's the right thing to do.  I think it's also the most

22   fair thing to do.  And I don't think that we should be forced

23   to try this case only to then wait until the sentencing here

24   and then see whether we have to go try the case in front of

25   Judge Dow.  I think that's wrong.  I, I think it's -- I think

1  it's wrong.

2          THE COURT:  All right.  I understand.  So government

3  you want to state what your knowledge is on this, and then

4  particularly state the -- let's say I pretty much know what

5  your position is on the Alford plea.  But as to -- they're

6  going to put it in writing, but just generally about the other

7  case position of -- you know, at one time I was just

8  overwhelmed with the case and all the different parts of it.

9  But even if I did not agree with counsel's position as to

10  Alford, as to the idea of having another trial with another

11  judge on a case that has been pending all this young man's

12  adult life, I have a little bit of a problem with that.  Me not

13  handling that one too.  What's your position on that?

14          MR. JONAS:  There's multiple issues here, Judge.  My

15  head is swimming.  This just came out of left field.

16          THE COURT:  All right.  Well, why don't you go ahead

17  and write your motion, and then you can respond.  And I don't

18  want to -- I just want that out there that that's the one

19  concern right now off the top of my head initially that I would

20  have is that if there's a way to sort of if not consolidate

21  this, but present this -- at least have this in a one stop shop

22  thing at the very least, especially if they're talking about

23  this type of outcome even if it doesn't quite come out like

24  that.  Just the idea of having another judge who really hasn't

25  had -- I mean, it's been there, but he hasn't had that much to

1  do with it, handle a case, again, that's been with me since

2  I've been on the bench and with him his entire adult life.

3  　　　　　MR. JONAS:  Can I raise a couple of points first.

4  　　　　　THE COURT:  Sure.

5  　　　　　MR. JONAS:  Just Mr. Durkin initially raised the

6  issue of re -- reviving their motion they filed for discovery.

7  The government filed its response, document 63.  I haven't

8  heard Mr. Durkin say anything that would justify Your Honor

9  changing your ruling, and we stand by what we filed back in

10  August of 2013.

11  　　　　　THE COURT:  Other than the fact that another five

12  years has gone by.

13  　　　　　MR. JONAS:  Well, right, but nothing has happened in

14  argument that's been made that would change -- that would

15  change the circumstances that would cause Your Honor to change

16  your ruling.  There's been nothing presented other than Mr.

17  Durkin just stating he wants to go back it to.  So I just want

18  to make sure on the record that Your Honor realizes we're

19  objecting to that request.

20  　　　　　THE COURT:  And it was without prejudice, so I did

21  allow -- he could bring it up again.

22  　　　　　MR. DURKIN:  Can I just speak to that issue --

23  　　　　　MR. JONAS:  No, I understand without --

24  　　　　　THE COURT:  Wait one second.  I want to go ahead and

25  hear it.

1     MR. JONAS:  I understand without prejudice, but

2  normally when you bring back a motion, you usually have

3  additional material to present, and there's nothing presented.

4  And if there is going to be additional material presented, we

5  would request that in writing so that we can appropriately

6  respond.

7     THE COURT:  The Court already stated it's going to be

8  in writing.  Proceed.

9     MR. JONAS:  Right.  I think that is a separate issue

10  from the Alford issue that Mr. Durkin has raised.  Yes, Your

11  Honor, the Department of Justice has a policy where we cannot

12  agree to an Alford plea.  So we're going to have to see what he

13  writes, and we will likely respond in motion.  That's one

14  issue.

15     The issue of relating the cases, I think we need to

16  deal with separately, and I think we need to see the motion and

17  appropriately respond as well.  Here's something I'd like to

18  raise, and I'd like to talk to Mr. Durkin about this, but we've

19  all -- and I know for a fact I speak for the defense as well.

20  We've been working 13, 14-hour days for the past several weeks.

21  We're flying in a witness tonight for a Daubert hearing

22  tomorrow.  If this is going to proceed, I think we'd like to

23  know sooner rather than later.  So if I can have one moment

24  with Mr. Durkin.

25     THE COURT:  Oh, you guys can have all the time you

1   want.  And this Court, I mean my, my case -- my court call has

2   been three times hijacked in a way by this case as far as

3   setting aside huge amounts of time.  We're on the third one.

4   This Court wants it over with as much as anybody else.  And so

5   one way or the other it doesn't matter.  I've had people get

6   married, leave who were on the case for seven, eight years and

7   upset because they had to go through all kinds of clearances,

8   and now they can't be here for the case after three tries.

9         So no, I have no problem with you all taking your

10  time and trying to at least get it right, because like you

11  said, otherwise you don't want to stop progress.  If he wants

12  to do something, you don't want to necessarily stop it just

13  because we've all been preparing.  He's the one that would be

14  in the position of getting the time.  So I, I -- that whole

15  reason of, oh, we prepared for so long, then we can't go

16  forward in a different direction.  But I would like you all to

17  take some time and talk to each other.

18        MR. JONAS:  And that's not what I meant.  I mean,

19  we're going to continue preparing over the holiday.

20        THE COURT:  I'm pretty sure.  I just wanted to --

21  it's not a matter for you continuing to prepare.  It's a matter

22  of not saying you don't want to consider other options just

23  because you've been preparing.  Just like the government will

24  say, well, they forced us to put us, put us to our proof and

25  don't want to give people in sometimes sentencing credit for

1    some things because they had to prepare.  I don't think that's

2    what you're saying, especially since everybody here has been

3    preparing.  And the Court just wanted to make the record clear

4    that it wasn't --

5                 MR. JONAS:  Thank you, Your Honor.

6                 THE COURT:  All right.  Thank you.

7         (Short break taken.)

8                 THE COURT:  Court's back in session.  What's up?

9                 MR. JONAS:  So, Your Honor, the defense is going to

10   file something as soon as possible, probably tomorrow.  We'll

11   get something on file maybe by the end of the day tomorrow so

12   that we have this papered.  And, and as we said before we

13   broke, the government's position is we object to Alford pleas.

14                And then if Your Honor were going to deny -- or grant

15   the motion, deny our objection, I think collectively the

16   parties would like to get this done as soon as possible.  Maybe

17   we're talking maybe Friday.

18                THE COURT:  I'm here Friday.

19                MR. JONAS:  If that happens.  But before we schedule

20   that, I've also talked to -- we've also talked to defense

21   counsel about the Daubert hearing tomorrow, and I think what --

22   I'll let Mr. Durkin address it, but I think we're going to ask

23   that the Daubert hearing be called off tomorrow.

24                MR. DURKIN:  I, I think we can, and I'll -- let's --

25                THE COURT:  Based on conversations you all have had.

1          MS. LYON:  Yes, that's right.

2          MR. DURKIN:  Yes.

3          THE COURT:  Because you know --

4          MR. DURKIN:  Yes.

5          THE COURT:  -- there's not time for another one.

6          MR. DURKIN:  No.  But if --

7          MS. LYON:  Yes, we do know that.

8          MR. DURKIN:  Let's put it this way:  I have enough

9 that this is going to work that I'll forego it.

10         MR. JONAS:  Which means if it doesn't work, then we

11 call Dr. Levitt, and there's no issue regarding a Daubert.

12         THE COURT:  Is that correct, Counsel?

13         MR. DURKIN:  Yes.

14         THE COURT:  All right.

15         MS. LYON:  That's our understanding.

16         THE COURT:  All right.

17         MR. DURKIN:  We agree to that --

18         THE COURT:  I mean, it's on the record --

19         MR. DURKIN:  No, I agree to that.  I mean, that's

20 only fair.

21         THE COURT:  Okay.  All right.

22         MR. DURKIN:  But I -- I'm confident that --

23         THE COURT:  Okay.

24         MR. DURKIN:  -- this, this will work.

25         THE COURT:  And, Mr. Daoud, do you understand what's

1    going on here?

2            DEFENDANT DAOUD:  Yeah.

3            THE COURT:  All right.  They've been talking to you,

4    right?

5            DEFENDANT DAOUD:  Yep.

6            THE COURT:  All right.  Good.

7            MS. LYON:  What time would you like us here on

8    Friday, Judge?

9            THE COURT:  On Friday?

10           MR. JONAS:  Your Honor, would you rather -- I'm

11   sorry.  I don't want to pre, pre -- just assume you're going to

12   grant --

13           THE COURT:  I'm keeping the time we have unless

14   there's some reason -- I know Daubert isn't here, but unless

15   you all want to just go ahead and do the -- tomorrow you're

16   responding to their motion.  You want to have that all briefing

17   tomorrow?

18           MR. JONAS:  Yes.

19           THE COURT:  Is that correct?

20           MR. HAXALL:  That can be used to do the briefing.

21           THE COURT:  Okay.  All right.  So then we can do

22   Friday, a status/ruling date on Friday.

23           MS. LYON:  Yes, and then hopefully --

24           MR. DURKIN:  And possible change of plea.

25           THE COURT:  And a possible change of plea.

1       MR. DURKIN:  Or whatever you call it.

2       MR. JONAS:  If Your Honor grants their motion.

3       THE COURT:  If I grant their motion.

4       MR. DURKIN:  Right.

5       THE COURT:  Okay.  So let me look at this.

6       MS. LYON:  Your Honor, I have an appearance on a

7   death penalty case at 11, but I'm otherwise available.

8       MR. DURKIN:  I have a 10:30 hearing in front of Judge

9   Norgle.

10      THE COURT:  Okay.  Let me say this:  It's going to be

11  in the afternoon.

12      MS. LYON:  Okay.  That's fine then.

13      MR. DURKIN:  That's fine.

14      THE COURT:  My morning I have a detention hearing and

15  other hearings.  I have a settlement conference at 1:30, but we

16  can sort of work around it.  Unless you all are available at

17  2:30.

18      MS. LYON:  Sure.

19      MR. JONAS:  It works for the government, Your Honor.

20      THE COURT:  2:30?

21      MS. LYON:  Yes.

22      THE COURT:  All right.

23      MR. DURKIN:  Could I have a minute, Judge.

24      THE COURT:  Yes.  Take a look, but I -- and I

25  definitely have to be out at 4:30 on this Friday.

1           MS. LYON:  That works fine, Judge.

2           MR. DURKIN:  I'm sorry.  What time did you say?

3           THE COURT:  So 2:30, and I have to be out at 4:30.

4           MR. DURKIN:  We can get it done by then.

5           THE COURT:  On Friday.

6           MS. LYON:  Yes.

7           MR. DURKIN:  It shouldn't be --

8           THE COURT:  Okay.

9           MR. DURKIN:  Well, maybe we should --

10          THE COURT:  I'll have a ruling before noon.  So when

11 you come in --

12          MR. DURKIN:  The problem, the problem would be can we

13 get the third case transferred here then in order to do the

14 plea on Friday?  Should we come, come in maybe --

15          THE COURT:  You may not be able to get that done.

16          MR. JONAS:  Your Honor, I'll just -- can I make a

17 suggestion.

18          THE COURT:  Yes.

19          MR. JONAS:  And I know this may not be completely

20 efficient, but I think it would help.  If, if Your Honor is

21 going to grant their motion, if we do come in Friday and we go

22 through the Alford proceeding on the current case that's before

23 Your Honor, and then we come back a separate time if Your Honor

24 grants the, the consolidation motion as well, at least at that

25 point we can have the -- taken the trial off the trial calendar

1  and know we're not going to have --

2       THE COURT:  And we can step back from the edge.

3       MR. JONAS:  Exactly.  Thank you.

4       MR. DURKIN:  But there -- just so it's cleared, the,

5  the motion --

6       THE COURT:  Is, is --

7       MR. DURKIN:  -- is contingent on the granting of the

8  relatedness motion.

9       MS. LYON:  Yes.  It just might not be --

10      MR. DURKIN:  So we at least have to have the record

11  clear.  I'd be willing to come back at another time if we can't

12  get it from the Clerk's Office, but I, I want -- assuming you

13  approve, if, if we do this, we'll have to have a ruling on the

14  consolidation motion.  We could do the plea on it at some other

15  time, but we don't have to --

16      THE COURT:  You're saying as part of my ruling --

17      MS. LYON:  Yes.

18      MR. DURKIN:  Yes.

19      THE COURT:  -- on Alford is also -- it's --

20      MS. LYON:  The relatedness.

21      MR. DURKIN:  The motions are --

22      THE COURT:  The relatedness --

23      MS. LYON:  Yes.

24      THE COURT:  -- they're combined.

25      MS. LYON:  Yes.

1          THE COURT:  They're intertwined.

2          MR. DURKIN:  The Alford --

3          THE COURT:  Do you agree with that, government that

4  I've got to --

5          MR. JONAS:  Well --

6          THE COURT:  -- rule on both of them?  Either way.

7          MR. JONAS:  Right.  We don't agree you have to rule

8  on both of them, but we recognize that that's the way the

9  defendant is postering it.

10          THE COURT:  That's the way they're presenting it?

11          MS. LYON:  Yes.

12          THE COURT:  All right.

13          MR. JONAS:  Yes.

14          MR. DURKIN:  Yes.

15          THE COURT:  So if I address them both, then we might

16  not have an issue.

17          MS. LYON:  That's, that's correct.

18          THE COURT:  Either way.

19          MR. DURKIN:  I mean, the issue --

20          THE COURT:  It all depends --

21          MR. DURKIN:  The issue will be as I intend to phrase

22  it, we are submitting an Alford plea on all three counts

23  contingent upon the Court granting the simul --

24          THE COURT:  Relatedness.

25          MR. DURKIN:  The filing of the simultaneous motion

1    for relatedness.

2              THE COURT:  All right.

3              MR. DURKIN:  So that I think all you'd have to do is

4    rule on that.  We could then plead on the Counts 1 and -- case

5    one and two.  And then we could come back when the clerk gets

6    it moved on case three.  And I think that would, that would at

7    least get us away from the cliff.

8              THE COURT:  Okay.

9              MR. DURKIN:  And everybody can plan on eating turkey

10   in peace.

11             THE COURT:  I plan on eating turkey in peace.  Y'all

12   ain't bothering me.  All right.

13             MR. DURKIN:  Frankly it wasn't going to bother me

14   either.  It's these other people that --

15             THE COURT:  I'll be here ready to go, but either way,

16   either way this thing is going to get done one way or the

17   other.  All right.

18             MR. DURKIN:  This is the way to do it.

19             THE COURT:  So 2:30 --

20             MS. LYON:  2:30 on Friday, yes.

21             THE COURT:  -- on Friday the 16th.  And that is for a

22   status on the trial.

23             MR. JONAS:  Thank you, Judge.

24             MR. HERMAN:  And we're, we're striking tomorrow's

25   date and the hearing?

```
 1              THE COURT:  Tomorrow's date is stricken, and it will
 2   also be put in the minute -- in the order the issue of Daubert.
 3   And what's his name?  Dr. ...
 4              MR. JONAS:  Dr. Levitt.
 5              THE COURT:  -- Levitt is resolved.
 6              MR. JONAS:  Thank you, Your Honor.
 7              THE COURT:  Okay.  Thank you.
 8              MR. DURKIN:  Well --
 9              THE COURT:  Ah.  Is there a well or not?
10              MR. DURKIN:  No.  No.  No.
11              THE COURT:  Because tomorrow --
12              MR. DURKIN:  I, I --
13              THE COURT:  -- either way --
14              MR. DURKIN:  The, the request for Daubert is
15   stricken.  I wouldn't call it resolved.
16              THE COURT:  Oh.  I'm saying resolved here.
17              MR. DURKIN:  Yes.
18              THE COURT:  Yes.
19              MR. DURKIN:  We're not conceding --
20              THE COURT:  The issues that you're bringing up --
21              MR. DURKIN:  Right.
22              THE COURT:  -- the Court agrees, there's no Daubert
23   hearing.  That's what you're agreeing to.
24              MR. DURKIN:  That's right.  Thank you.
25              THE COURT:  All right.
```

1    MR. JONAS:  Thank you, Judge.

2    THE COURT:  Thank you.

3    MR. DURKIN:  Judge, there's one, one other thing.

4    THE COURT:  Wait, Mr. Jonas.  You know not to step

5    away unless Mr. Durkin is really walking away.

6    MR. DURKIN:  Is there, is there any way that Mr.

7    Daoud could get a visit with his son?  I know --

8    THE COURT:  Oh.

9    MR. DURKIN:  I know what all --

10    THE COURT:  Wait a minute.  When did that happen?

11    Okay.  You're talking about his dad Daoud?

12    MR. DURKIN:  Ahmed Daoud, his father.

13    THE COURT:  All right.  Thank you.

14    MR. DURKIN:  And --

15    THE COURT:  Because I call him Mr. Daoud.

16    MR. DURKIN:  And I think it would be helpful for all

17    our purposes.  And --

18    THE COURT:  I'm not security, Mr. Durkin.  I can't

19    order that.

20    MR. DURKIN:  Is -- would it be, would it be possible

21    if the marshals were to agree that he be put in a room in, in

22    the lockup with maybe even one of the lawyers present, if need

23    be.  Just -- I mean, he wouldn't have any contact with him or

24    anything.  But is there some way that they can at least --

25    THE COURT:  So when was the -- wait.  Wait.  One

1    second.  When is the last time he saw his dad?  How long has it

2    been, sir?

3           MR. AHMED DAOUD:  Less than two months.  Over two

4    months.

5           THE COURT:  Two months?

6           MR. AHMED DAOUD:  Yes, ma'am.  Over two months.

7           THE COURT:  All right.  I --

8           MR. AHMED DAOUD:  No phone call.

9           THE COURT:  Mr. -- marshal.  Deputy.

10           MARSHAL DAMMONS:  Deputy Christopher Dammons, U.S.

11    Marshals, on the record.  That would have to be cleared by the

12    supervisor upstairs.  And which policy basically is a no on

13    that, but --

14           THE COURT:  You know, make the ask.  I'll have them

15    make the ask.  Okay.  They ask the question, but I don't --

16    security is not my area.  All right.  But they will ask.  And,

17    you know, you can go up and wait and see what happens.  That's

18    what I would suggest.  Go up to 24 and wait and see what

19    happens.

20           MR. AHMED DAOUD:  Your Honor, I'm sorry.  You know,

21    he cut off the phone and the commissary.

22           THE COURT:  All right.

23           MR. AHMED DAOUD:  And the visitation.

24           THE COURT:  All right.

25           MR. AHMED DAOUD:  And this is very bad for his

 1 | health.

 2 | THE COURT: Sir, and I, I understand that. Everybody

 3 | hears you. And it would be, it would be bad for anybody's

 4 | health.

 5 | MR. AHMED DAOUD: Thank you so much.

 6 | THE COURT: But they are not here to explain to us.

 7 | We are not privy to everything that went on there or what their

 8 | reasons are for that other than what they tell us. And so the

 9 | deputies are going to make an ask for you. Okay.

10 | MR. DURKIN: Judge, I think it --

11 | THE COURT: All right. Go to the 24th floor.

12 | MR. DURKIN: Could it be -- Mr. Marshal --

13 | THE COURT: The lawyers will be on the 24th floor

14 | also. And we can see if we can get this --

15 | MR. DURKIN: Could we --

16 | THE COURT: -- accommodated, if possible.

17 | MR. DURKIN: Could we make -- Judge, I think I know

18 | that that's too much pressure to put on the marshals right now.

19 | It's late in the day, and they're going to want to take him

20 | back. Could we try to arrange this for Friday?

21 | THE COURT: They brought him over here by himself.

22 | MR. DURKIN: Oh, they did.

23 | THE COURT: Because he wasn't set.

24 | MR. DURKIN: Oh, okay.

25 | THE COURT: So that -- for them to take him back to

1    the MCC, they'll be all right if that's -- just because it's a

2    little later.  We're not talking about a long visit anyway.

3                    MR. DURKIN:  No.

4                    THE COURT:  So -- all right.  So go to 24, and

5    they'll let you know --

6                    MR. DURKIN:  That's fine.

7                    THE COURT:  -- what the decision is.  Mr. Daoud,

8    they're going to ask for you.  All right.  So that's a step in

9    the right direction.  Okay?

10                   MR. DURKIN:  Thank you.

11                   THE COURT:  All right.  Thank you very much.  I'll

12   see you all.  Marshal, can I talk to you and Marshal Matt real

13   quick.  Once you all get him secreted away, I'll just have a

14   quick talk with you guys.  All right.  I look forward to your

15   submissions.  Thank you.

16                   MR. DURKIN:  Thank you, Judge.

17                              CERTIFICATE

18           I HEREBY CERTIFY that the foregoing is a true,

19   correct and complete transcript of the proceedings had at the

20   hearing of the aforementioned cause on the day and date hereof.

21

22   /s/TRACEY D. McCULLOUGH                        June 29, 2020

23   Official Court Reporter                            Date
     United States District Court
24   Northern District of Illinois
     Eastern Division

25