In the

# United States Court of Appeals

### For the Seventh Circuit

_____

Nos. 19-2174, 19-2185 & 19-2186

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

ADEL DAOUD,

*Defendant-Appellee*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:12-cr-00723, 1:13-cr-00703 & 1:15-cr-00487
**Sharon Johnson Coleman**, *Judge*.

_____

ARGUED SEPTEMBER 25, 2020 — DECIDED NOVEMBER 17, 2020

_____

Before RIPPLE, BRENNAN, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Adel Daoud pressed the button to
detonate a bomb that would have killed hundreds of innocent
people in the name of Islam. Fortunately, the bomb was fake,
and the FBI arrested him on the spot. Two months later, while
in pretrial custody, Daoud solicited the murder of the FBI
agent who supplied the fake bomb. Two and a half years later,
while awaiting trial on the first two charges, Daoud tried to

stab another inmate to death using makeshift weapons after the inmate drew a picture of the Prophet Muhammad. Daoud eventually entered an *Alford* plea, and the cases were consolidated for sentencing. The district court sentenced Daoud to a combined total of 16 years' imprisonment for the crimes. The government appeals that sentence on the ground that it was substantively unreasonable. We agree. We vacate the sentence and remand for resentencing.

## I. Background

### A. FBI Investigation and Bomb Plot

Daoud came to the FBI's attention after a series of online posts, communications, and searches that evinced a desire to engage in violent jihad (terrorist attacks in the name of Islam). This online activity began as early as September 2011, the month that Daoud turned 18. At the time, Daoud was living with his parents in a suburb of Chicago. In his online posts and communications, Daoud described himself as a "terrorist;" wrote that he wanted to die a martyr; shared songs about violent jihad; and encouraged killing and dying in the name of Allah and committing violent acts of jihad against the United States as revenge for its killing of Muslims. Daoud also sought out, consumed, and shared violent jihadist materials, including *Inspire* magazine, an English-language publication by al-Qaeda that promotes violent jihad and teaches readers how to create and use weapons and destructive devices like bombs.

In May 2012, to assess Daoud's threat level, two undercover FBI agents initiated online contact with him using fictitious identifies. One of the agents posed as a 17-year-old Arab youth living in Australia. The other posed as an older Arab

Nos. 19-2174, 19-2185 & 19-2186                    3

man living in Saudi Arabia. One of the agents contacted Daoud by email to praise a song that Daoud had posted on Yahoo Answers and described as "Terrorist Music." The other agent initiated contact a few days later. With the agents' (false) interest and encouragement, Daoud began sharing jihadist materials with them, including *Inspire*. He also conveyed his interest in engaging in violent jihad and referenced his recruitment efforts and plans for an attack in the United States or overseas. When one of the agents questioned the propriety of taking lives, Daoud explained why it was justified. At one point, Daoud said: "I want to be even worse to the Americans, the [sic] Osama bin Laden and sheikh Anwar al-Awlaki put together. I want to be a great terrorist … and be great encouragement for Muslims to do the same." Other times, though, Daoud himself questioned the propriety of terrorism. He also referenced his "procrastination" and "laziness," saying, "All I do is talk." Sometimes he mentioned plans to go to college abroad. While communicating with the undercover agents, Daoud continued researching and sharing jihadist materials. For example, he inquired about the price of an AK-47 and sought information about the propriety of blowing up a train, bringing down a flight, and assembling explosives.

In conversations with Daoud, one of the agents referenced a fictitious cousin named "Mudafar," who was supposedly an operational terrorist living in the United States. Eventually, the agent connected Daoud with a third undercover FBI agent posing as Mudafar. Between July and September 2012, Daoud and the 38-year-old Mudafar communicated electronically and met in person six times. At their first meeting, Daoud identified himself as a terrorist and expressed his interest in committing a terrorist attack in the United States or overseas.

He suggested using "flying cars" or driving a truck with knives on it through a crowded area. At Mudafar's urging, Daoud compiled a list of potential locations for a terrorist attack. The list included shopping malls, nightclubs, bars, liquor stores, and military bases. Daoud shared the list with Mudafar at their second meeting. He also latched onto Mudafar's idea of using a car bomb. Daoud emphasized the importance of inflicting mass casualties, making international news, and ensuring that people knew "Muslim extremists" were responsible for the attack. When Mudafar questioned Daoud's resolution, Daoud assured him, "this is in my heart." Nevertheless, Daoud wavered at some points and sought religious guidance from Mudafar and Mudafar's fictional sheikh (leader) about the propriety of killing people. Daoud also clarified his personal limitations, saying he could not make a bomb or "do anything" by himself, and describing his ideas as "crazy fantasies."

Eventually, Daoud found "the perfect place" for a car-bomb attack: Cactus Bar & Grill in Chicago. Daoud explained that Cactus was a prime target because it was a crowded night-time destination. Daoud and Mudafar began planning the attack. Daoud surveilled and photographed the location and picked a site for the car bomb. Mudafar described the bomb that he would supply and the mass carnage it would cause. Daoud expressed pleasure with the bomb's size. On the day before the planned attack, Mudafar showed Daoud the (fake) 1,000-pound car bomb, which he had installed in a Jeep Cherokee. Daoud said he wanted to have "direct action" in the attack and asked if he could press the button to detonate the bomb.

Nos. 19-2174, 19-2185 & 19-2186                    5

On the night of September 14, 2012, Mudafar and Daoud met to carry out the planned attack. On the drive over, Daoud prayed aloud for the many people who would be killed. He also prayed for the attack to make international news, and that it not be his last operation. Once there, Daoud parked the Jeep in front of the Cactus bar. In a nearby alley, Mudafar told Daoud that there were 200 people in the area. Daoud responded: "[T]his is like the lottery." Shortly before pressing the button, Daoud asked if women could be killed in the United States. Mudafar said yes. Daoud was arrested upon pressing the button.

Daoud was charged with attempting to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2)(D) (Count 1) and attempting to destroy a building used in interstate commerce with an explosive, in violation of 18 U.S.C. § 844(i) (Count 2).

## B. Solicitation of FBI Agent's Murder

Approximately two months later, while Daoud was in pretrial custody, he solicited the murder of the undercover FBI agent who had posed as Mudafar. Daoud offered to pay his cellmate, a gang member, to enlist one of his gang associates to kill the undercover agent. He gave his cellmate the agent's phone number to help track him down. Daoud's cellmate reported the offer to federal authorities and agreed to record future conversations with Daoud. In exchange for his cooperation, authorities paid the cellmate $15,000, which he used to pay his bond and get out of jail.

In recorded conversations, Daoud called the undercover agent a "spy" and suggested different ways of killing him. He asked that the killing be quick and untraceable. More than

once, Daoud's cellmate asked Daoud if was sure he wanted to go through with the plan. Daoud said yes. Daoud's cellmate purportedly made the arrangements and confirmed the target by showing Daoud a photograph of the undercover agent (supposedly taken by his associates but actually provided by authorities). Finally, the cellmate instructed Daoud to make a phone call authorizing the killing, which Daoud did. When the job was done (or so Daoud thought), Daoud asked for the "gory details." Daoud's cellmate asked Daoud if he regretted the decision and Daoud said, "Hell no."

On August 29, 2013, Daoud was charged with soliciting a crime of violence, in violation of 18 U.S.C. § 373(a) (Count 1); murder-for-hire, in violation of 18 U.S.C. § 1958(a) (Count 2); and obstruction of justice, in violation of 18 U.S.C. § 1512(a)(1)(A) (Count 3).

The recorded conversations between Daoud and his cellmate reveal that Daoud's cellmate was verbally abusive toward him. For example, he mocked Daoud's religious beliefs, called him homosexual as an insult, and threatened to hurt him.

## C. Assault on Another Inmate

In December 2014, a little over two years after soliciting the FBI agent's murder, Daoud physically attacked a fellow inmate because the inmate drew a picture of the Prophet Muhammad. Daoud jumped on the inmate and punched him. Before his September 2012 arrest, Daoud had suggested in online posts that people who drew pictures of the Prophet Muhammad should be killed.

Daoud and the other inmate later reconciled. But in May 2015, Daoud sent the same inmate to the hospital after

Nos. 19-2174, 19-2185 & 19-2186                                    7

approaching him in his sleep and stabbing him repeatedly in the throat and head using sharpened toothbrushes and a toothbrush with a razor blade attached to it. The attack ended when the inmate's cellmate intervened.

The day before the attack, a news story had aired on the jail television about violence toward individuals who drew pictures of the Prophet Muhammad. According to another inmate, Daoud was near the television when the story aired and seemed agitated. An inmate who witnessed the attacked described Daoud as "zoned out" and "not there." Daoud described experiencing hallucinations before the attack.

In August 2015, Daoud was charged with assault with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1) (Count 1); assault with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. § 113(a)(6) (Count 2); assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6) (Count 3); possession of a weapon by an inmate, in violation of 18 U.S.C. §§ 1791(a)(2) and (b)(3) (Count 4); and simple assault, in violation of 18 U.S.C. § 113(a)(4) (Count 5).

As a result of the assault, Daoud spent seven continuous months in the jail's segregated housing unit. In January 2016, while in segregated housing, Daoud witnessed his cellmate commit suicide. In total, Daoud spent over 400 days in the segregated housing unit during his period of pretrial incarceration.

### D. Pretrial Proceedings and Guilty Plea

The three criminal cases against Daoud were consolidated amidst lengthy pretrial proceedings. In August 2013, after the government gave notice of its intent to present evidence

obtained under the Foreign Intelligence Surveillance Act
(FISA), Daoud moved for disclosure of the government's
FISA-related materials. The district court granted Daoud's
motion in part and ordered disclosure. This Court reversed
that decision, holding that "there was no basis for disclosure."
*United States v. Daoud*, 755 F.3d 479, 485 (7th Cir. 2014).

In December 2015, Daoud's counsel moved for a compe-
tency hearing based on Daoud's assault on a fellow inmate
and his erratic in-court behavior. At one hearing, for example,
Daoud told the district court: "I would with the following
condition be willing to plead guilty to like whatever the hell
you want to charge me for if you all admit that you're part of
the Illuminati and that you arrested me because I'm a Mus-
lim." Daoud also blamed the district court for his cellmate's
suicide.

After hearing competing psychological testimony, the dis-
trict court found Daoud incompetent to stand trial because he
"lack[ed] a rational understanding of the proceedings." The
court ordered Daoud to undergo psychological treatment.
While in treatment, Daoud was diagnosed with unspecified
schizophrenia and other psychotic disorder (a rule-out diag-
nosis), and antisocial personality disorder. With medication,
Daoud's condition improved significantly. On March 12,
2018, the court found Daoud competent to stand trial.

The court scheduled Daoud's trial for November 26, 2018.
On the eve of trial, however, Daoud moved to plead guilty
while maintaining his innocence, pursuant to *North Carolina
v. Alford*, 400 U.S. 25 (1970). The court granted his motion over
the government's objection. Daoud pled guilty to all the
counts against him, admitting that the government's evidence

supported a conviction on each count but denying culpability and persisting in his innocence.

## E. Sentencing

The parties agreed that the advisory Guidelines range was life imprisonment. The government recommended 40 years' imprisonment, stressing Daoud's predisposition to commit acts of terrorism, the seriousness of his three interrelated crimes, and sentences imposed in similar cases. Daoud's lawyer asked for nine years' imprisonment, with credit for the seven years that Daoud had already served. He stressed Daoud's age, mental health issues, the harsh conditions of his pretrial confinement, his susceptibility to influence, and the government's "imperfect entrapment." Without the FBI's involvement, he argued, Daoud would have lacked the ability and drive to attempt an act of mass terrorism. Daoud's probation officer recommended a sentence of 15 years.

The court held an evidentiary hearing that spanned four days. The government called two FBI agents, including the undercover agent who had posed as Mudafar, to testify about the investigation. The government also presented video testimony from the inmate whom Daoud had attacked. The inmate testified to his belief that Daoud would have killed him if his cellmate had not intervened. Daoud introduced video recordings from his former teacher, counselor, and sheikh about their positive interactions with him. Daoud's father testified about Daoud's mental health and the impact of Daoud's crimes on their family.

After the parties presented evidence, Daoud presented his allocution. He told the court, "I can't express how sorry I am for my actions." Upon reflection, Daoud concluded that he

had been "naive, gullible, and confused" in his beliefs about
fighting for Islam. He attributed those views to a misinterpre-
tation of the teachings of Islam. With respect to the bomb plot,
he stated that he "should have been more assertive" with
Mudafar. "I learned that I have to make my own decisions
and not let someone else make them for me." Still, he apolo-
gized for "whatever part I took in the events." He disavowed
any intent to engage in terrorism. "I don't want to kill people
or join a terrorist group whether it's something condoned by
my religion or not." On the topic of his online postings, he
stated, "the way I see myself in 2012 is some idiot trying to
make friends." He apologized for the inmate attack, adding,
"I do not think I would have done that if I was on the medi-
cation I'm taking." "Now that I'm aware of my mental disor-
ders, I'm working to make better decisions." He closed by
apologizing to the court, his parents, the Muslim community,
and the United States.

The court sentenced Daoud to a total of 192 months (16
years) of prison, with 45 years of supervised release to follow.
The breakdown of prison terms was: 192 months for both
counts in the attempted-bombing case, to run concurrently;
120 months on counts 1 and 2 and 140 months on count 3 in
the solicitation case, all to run concurrently with each other
and the other sentences; and 120 months on counts 1 through
3, 60 months on count 4, and 12 months on count 5 in the as-
sault case, all to run concurrently with each other and the
other sentences.

The court explained the factors that it had considered in
arriving at its sentence. It began with the nature and circum-
stances of the offense. It described the bomb plot as "a violent
and heinous act to kill or harm others," the seriousness of

which "cannot be understated or downplayed." "[S]uch an attempt clearly deserves the possibility of a prolonged sentence, including life in prison." Similarly, on the solicitation offense, the court remarked that "[a]ny attempt to harm the law enforcement personnel for doing to job they swore to do must be addressed with serious consequences." Turning to the inmate assault, the court noted that "the harm caused to the inmate was serious and violent." In short, "the crimes the defendant has pled guilty to are all serious and deserve serious sentences."

The court next addressed Daoud's history and characteristics. The court described Daoud in 2012 as an "awkward" and "immature" youth "with few friends" who "giggled constantly." As such, he was "immediately drawn" to the undercover agents, who validated his political and religious beliefs. The court described Daoud's misguided and sometimes fantastical comments (about flying cars, for example) as "bravado," and credited Daoud's argument that it was the FBI, and not Daoud, that chose the 1,000-pound bomb, when it could have selected a less severe option. After all, Daoud "did not know how to build a bomb." At the same time, Daoud's "teenage goofiness" and sometimes "nonsensical comments" did "not equal a finding that in 2012 the defendant was mentally ill." "Clearly he believed he was detonating a bomb that would cause human deaths and injuries and would put him in a place of favor with the Prophet Muhammad, Allah himself, or his religion."

With respect to the solicitation offense, the court stressed that Daoud was sharing a cell with a "multi-convicted gangbanger" who verbally abused him. Still, Daoud admitted "to following through on some of the steps directed by [the

cellmate] that support his conviction and a sentence for deter-
rence." "Cellmate banter should not outweigh the seriousness
of threats on the lives of law enforcement." Prior to the inmate
assault, the court noted that Daoud "had been in restrictive
confinement for more than one year." Nonetheless, Daoud's
"inability to control himself where someone is not physically
attacking him deserves punishment," even if Daoud was
"zoned out" during the attack.

The court moved next to deterrence and public safety. It
discussed the need for both general and specific deterrence
for each of Daoud's crimes. It was hopeful that Daoud would
not reoffend, given his maturity, remorse toward his parents,
and improvement with medication. But "[t]he possibility that
Daoud could be co-opted or persuaded again is one that can-
not be ignored. At least not at this time."

The court then turned to additional mitigating factors.
These included Daoud's "laudable" college aspirations, his
diagnosed mental illness, his family and teacher support, and
his long and "traumatizing" period of pretrial incarceration,
which began when he was only 18. The court also noted that
Daoud had generally "been respectful and pleasant to this
Court at all times. More so than probably any defendant in
custody I have had." Finally, the court emphasized that it did
"not consider the *Alford* plea that [Daoud] made in November
a failure to take responsibility. In fact, through the plea on the
eve of trial and his allocution this Court finds that Mr. Daoud
has taken responsibility."

Before finalizing its sentence, the court addressed the par-
ties' sentencing recommendations. It stressed that the cases
cited by the parties in support of their recommendations were
all distinguishable "on one very important point that the

Nos. 19-2174, 19-2185 & 19-2186                                    13

Court is going to rely on, and that is the lengthy detention that
Daoud has endured," ever since he was first detained at the
age of 18. The court responded to the government's argument
(which the government disputes making) that Daoud's three
convictions were for "one course of conduct" by saying, "the
Court will continue to consider it so even though they came
at different times and must receive different sentences. But the
Court does not see one case as being aggravating of the other
case."

After imposing its sentence, the court walked through the
terms of Daoud's supervised release. Those conditions in-
cluded mental health treatment, electronic monitoring, and
"violent extremism counseling." Daoud's counsel clarified on
the record that violent extremism counseling did not cur-
rently exist but "it's the intention of the government that it's
going to exist."

After the sentencing hearing, the court issued a written
statement of reasons for its sentence:

> This sentence addresses the safety of Americans and
> the future of Adel Daoud who has spent his entire
> adulthood in the bureau of prisons including more
> than a year in the Special Housing Unit. Daoud com-
> mitted 3 violent or potentially violent offenses born out
> of immaturity, bad judgment and the problems with
> growing up in an intensely anti-Muslim environment
> where violence against Muslims is referred to directly
> or indirectly by Americans. The federal undercover
> employee sympathized with Daoud's angst and en-
> couraged his feelings. Most of all, the [agent] was a
> friend who had no friends. The line between teenaged
> awkwardness and zealot violent Jihad can be grey but

> clearly this young man might have been susceptible to
> a much less violent method of revolution if it had been
> presented instead of a 1000 lb. bomb. During his time
> in federal custody he has also witnessed a cellmate's
> suicide, been cellmates with a truly hardened and abu-
> sive prisoner and been taunted by others about his re-
> ligion and faith while being separated from his close
> family for 7 years. During this incarceration he has
> mentally deteriorated requiring constant psychotropic
> drugs after violent outbursts or no responsiveness.
> Daoud entered prison barely 18 and won't leave until
> mid-30s. Supervised Release for 45 years of monitoring
> should address the safety of the public with the possi-
> bility of salvaging the life of a young man.

The government appeals the district court's sentence as sub-
stantively unreasonable.

## II. Discussion

The government argues that the district court's 16-year
sentence was substantively unreasonable given Daoud's "ex-
ceptionally serious" criminal conduct and the corresponding
need to protect the public. It faults the district court for rely-
ing on mitigating factors that could not "bear the weight" that
it assigned to them, and for failing to sentence Daoud in ac-
cordance with similar offenders.

District courts must impose sentences that are "'sufficient,
but not greater than necessary, to comply with' the basic aims
of sentencing." *Rita v. United States*, 551 U.S. 338, 348 (2007)
(quoting 18 U.S.C. § 3553(a)). Those "basic aims" are just pun-
ishment, deterrence, incapacitation, and rehabilitation. *Id.* at
347–48. Before selecting a sentence, a district court must

Nos. 19-2174, 19-2185 & 19-2186                    15

consider the factors set forth in § 3553(a): the nature and cir-
cumstances of the offense; the defendant's history and char-
acteristics; the need for the sentence to reflect the seriousness
of the offense, promote respect for the law, provide just pun-
ishment, deter crime, protect the public, and provide the de-
fendant with training, medical care, or other correctional
treatment; the kinds of sentences available; the United States
Sentencing Commission's recommended sentencing ranges
and policy statements; the need to avoid unwarranted sen-
tencing disparities among similar defendants; and the need
for victim restitution. § 3553(a).

We review the substantive reasonableness of the district
court's sentence for abuse of discretion. *Gall v. United States*,
552 U.S. 38, 51 (2007). "When conducting this review, the
court will, of course, take into account the totality of the cir-
cumstances, including the extent of any variance from the
Guidelines range." *Id.* A "major departure" from the advisory
Guidelines range "should be supported by a more significant
justification than a minor one." *Id.* at 50. "In reviewing sen-
tences for substantive reasonableness, we do not substitute
our judgment for that of a district judge, who is better situated
to make individualized sentencing decisions." *United States v.
Porraz*, 943 F.3d 1099, 1104 (7th Cir. 2019). We will not reverse
unless the district court's sentence falls outside "the broad
range of objectively reasonable sentences in the circum-
stances." *United States v. Warner*, 792 F.3d 847, 856 (7th Cir.
2015) (internal quotation marks and citation omitted).

For several reasons, the district court's sentence in this
case fell outside the range of reasonable sentences. First, the
court downplayed the extreme seriousness of Daoud's of-
fenses in ways that conflict with the undisputed facts. Second,

the court failed to account for the need to protect the public from Daoud's demonstrably high risk of reoffending. Third, the court improperly distinguished the sentences of similar offenders by relying on Daoud's long period of pretrial confinement. Finally, the court premised its well-below-Guidelines sentence on mitigating factors that could not bear the heavy weight that it assigned to them, given the facts in this case.

### A. Seriousness of the Offenses

Section 3553(a)(2)(A) instructs district courts to consider the need for the sentence imposed to reflect the seriousness of the offense. In this case, the district court's sentence failed to account for the extreme seriousness of Daoud's offenses.

To be sure, the district court acknowledged that Daoud committed three serious crimes that "deserve[d] serious sentences." It described the bomb plot as "a violent and heinous act to kill or harm others" that "clearly deserve[d] the possibility of a prolonged sentence, including life imprisonment." And it recognized that Daoud "believed he was detonating a bomb that would cause human deaths and injuries and would put him in a place of favor with the Prophet Muhammad, Allah himself, or his religion." Similarly, the court remarked that any attempt to harm law enforcement "must be addressed with serious consequences," and that light sentences for threats on the lives of law enforcement put law enforcement at risk. It also called Daoud's assault on a fellow inmate "serious and violent."

Yet the court went on to effectively negate these statements and the severity of the violent crimes by characterizing Daoud's crimes as the misguided actions of an

impressionable teenager who let others get the best of him. The court portrayed Daoud as an "awkward" and "immature" young man "with few friends" who was trying to impress his false friends, the undercover FBI agents. It credited Daoud's argument that he lacked the capacity to carry out a terrorist attack by himself, thus minimizing Daoud's agency in the bomb plot. The court described at length the verbal abuse and intimidation that Daoud's gang-member cellmate visited upon him, and then acknowledged in passing that Daoud admitted "to following through on some of the steps directed by [the cellmate] that support his conviction and a sentence for deterrence." It blamed the inmate assault on Daoud's mental health issues and the conditions of jail, which make "physical altercations" inevitable, while allowing that "Daoud's inability to control himself where someone is not physically attacking him deserves punishment." More broadly, the court framed Daoud's risk of reoffending as a risk that he would be "co-opted or persuaded again."

These sanitized accounts are impossible to square with the undisputed offense conduct and the objective seriousness and violent nature of the crimes to which Daoud pled guilty. Daoud committed three discrete, premeditated criminal acts that exhibited an extraordinary disregard for human life. First, he excitedly participated in a plot to detonate a bomb that would have killed hundreds of innocent people. In the year leading up to the attempted bombing, Daoud voraciously consumed violent jihadist materials, shared them with others, and repeatedly expressed his desire to commit a terrorist attack. He took an active role in the bomb plot, helping to plan it over the course of months and then asking to press the button to detonate the bomb that he anticipated would kill hundreds of people and receive national attention.

He had countless opportunities to back out, yet he continually reaffirmed his commitment. These are not the actions of an immature and impressionable youth trying to impress his friends. Although he occasionally expressed some doubts along the way, Daoud willingly and proactively participated in a plot to commit mass terrorism from start to finish, including pressing the button of what he thought was a 1,000-pound bomb.

Next, Daoud solicited the murder of the FBI agent who acted in the undercover capacity in the bomb plot. The record is not clear as to whether Daoud or his cellmate first broached the subject of murdering the FBI agent. But either way, Daoud played a central role. He gave his cellmate the FBI agent's phone number to help track him down. He gave instructions for how the murder should be carried out. He confirmed the target by photograph. He made a phone call authorizing the murder. And he expressed satisfaction, asked for the gruesome details, and disclaimed regret when he thought it was over. Undoubtedly, Daoud's cellmate had an interest in helping Daoud commit the offense. But the record does not reflect that Daoud's cellmate somehow pressured him into committing the crime. To the contrary, Daoud's cellmate gave him multiple attempts to back out, which Daoud rejected. Daoud's cellmate may have mistreated Daoud and had a long criminal history, but that does not detract from Daoud's full and active participation in the attempted murder of an FBI agent.

Finally, Daoud brutally attacked a fellow inmate with makeshift weapons while he was sleeping. He stabbed him repeatedly in the throat and head. The inmate testified that he thought he would have died absent quick intervention. The district court's view of this crime—embodied in its comment

that "Daoud's inability to control himself where someone is not physically attacking him deserves punishment"—reflects a misunderstanding of its severity. Daoud did not simply "fail to control himself." He planned and executed a deliberate attempt to murder a fellow inmate in his sleep.

In short, while the district court paid lip service to the seriousness of the offenses, it undercut its own statements by unreasonably downplaying Daoud's role in each offense. District courts have broad discretion as to how to weigh the § 3553(a) factors, but a district court's sentence must reflect a reasonable view of the facts and a reasonable weighing of the § 3553(a) factors. *See Warner*, 792 F.3d at 856; *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007). Here, the district court sterilized Daoud's offense conduct in ways that cannot be reconciled with the objective facts of these violent offenses. That unreasonable view of the facts prevented the district court from properly weighing the seriousness of the offenses when selecting its sentence. *See United States v. Mumuni Saleh*, 946 F.3d 97, 106 (2d Cir. 2019) (holding that a district court's sentence was substantively unreasonable because the court "drastically discounted the seriousness of Mumuni's offense conduct based on a sterilized and revisionist interpretation of the record").

**B. Need to Protect the Public**

Section 3553(a)(2)(C) instructs district courts to consider the need for the sentence imposed to protect the public from the defendant's future crimes. Although the district court referenced this factor in the abstract, it failed to account for the need to protect the public from Daoud's demonstrably high risk of recidivism.

The court acknowledged that it needed to fashion a sentence that would protect the public, but its discussion of public safety was otherwise perfunctory. It considered the need to protect the public alongside the related factor of deterring future crimes. *See* § 3553(a)(2)(B). It described Daoud as "contrite at causing his family so much pain," and said it did not think he would risk causing them pain again. The court expressed hope that Daoud's improvement with medication, along with his continued maturity, would prevent him from reoffending. Still, it acknowledged that the "possibility that Daoud could be co-opted or persuaded again is one that cannot be ignored. At least not at this time."

Noticeably absent from the court's discussion of protecting the public was any acknowledgment of Daoud's demonstrated commitment to reoffending in extremely serious ways. Daoud recidivated twice over a short period of time while he was in jail pending trial in the attempted-bombing case. He solicited the murder of an FBI agent, then he tried to stab another inmate to death. These additional life-threatening crimes—committed while in pretrial detention, under government supervision—show a remarkable propensity for criminal activity. Yet the court somehow thought that Daoud posed a minimal risk of recidivism and did not "see one case as being aggravating of the other case." The court apparently blamed Daoud's third offense partially on the conditions of confinement. But if Daoud was able to continue his streak of gravely serious criminal activity while detained, one can only imagine what he might have done if released.

To be sure, mental health issues may present a mitigating factor and "a sentencing judge may consider whether mental health treatment will succeed in reducing the defendant's

dangerousness or propensity to commit further crimes." *United States v. Kluball*, 843 F.3d 716, 718 (7th Cir. 2016). But, as Daoud concedes, there is no evidence that he was mentally ill when he committed the first two crimes. His improved mental health is thus no guarantee that he will not reoffend.

The need to protect the public was an especially relevant factor in this case. The court gave short shrift to it and essentially ignored facts showing that Daoud "plainly pose[d] a heightened risk of recidivism." *United States v. Jordan*, 435 F.3d 693, 697 (7th Cir. 2006). The court's analysis of this § 3553(a) factor was unreasonable.

### C. Need to Avoid Sentencing Disparities

Section 3553(a)(6) instructs district courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, both parties brought the sentences of similar offenders to the district court's attention. But the court found them all distinguishable, largely because of Daoud's lengthy pretrial detention. That was legal error. No matter what sentence he receives, Daoud will receive credit for his time in pretrial detention for his charged offenses. 18 U.S.C. § 3585(b); *United States v. Wilson*, 503 U.S. 329, 333 (1992). As such, there was no reason for the court here to consider the length[*] of pretrial confinement as a reason to impose a substantially lower sentence. *See United States v. Jayyousi*, 657 F.3d 1085, 1119 n.6 (11th Cir. 2011). Doing so could only result in a

---

[*] We discuss below the separate issue of whether the court properly considered the conditions of Daoud's pretrial confinement in mitigation.

windfall for Daoud, who would receive double credit for his time in pretrial detention.

Daoud's period of pretrial detention was not a valid basis for distinguishing the sentences of similar offenders. The court's legal error prevented it from appropriately weighing this § 3553(a) factor.

**D. Mitigating Factors**

Daoud's 16-year sentence was a significant downward departure from the advisory Guidelines range. Whereas the Guidelines recommended life imprisonment, the court's sentence would have released Daoud from prison around his 35th birthday (without regard to the possibility of good-time credit). A major departure from the Guidelines range requires a major justification. *See Gall*, 552 U.S. at 51. The district court spent most of its time discussing mitigating factors, but the factors it relied on do not justify its significant downward departure.

In the district court's telling, Daoud's age, mental health, and general awkwardness and impressionability converged to render him uniquely susceptible to criminal influence. A sentencing court is well within its rights to consider a defendant's mental limitations in mitigation. *See, e.g.*, *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005). But that factor only goes so far in this case. Daoud committed the attempted bombing around his 19th birthday. He was 19 when he solicited the FBI agent's murder and 21 when he tried to stab a fellow inmate to death. In other words, he was college aged at all relevant times. He may have been immature, but, as the court recognized, he was old enough to know what he was doing. As for mental health, the court properly considered

Daoud's diagnosed mental illness as a mitigating factor in the inmate assault. *See id.* But there is no evidence that Daoud suffered from a mental illness at the time of the first two offenses, so that factor had limited significance as well. The court's more general emphasis on Daoud's awkwardness, goofiness, and impressionability is puzzling. We do not see how social ineptitude could excuse repeated violent criminal behavior that reflected an extraordinary disregard for human life. And even if it could, the record does not support the court's apparent conclusion that Daoud's crimes were the product of his social shortcomings and impressionability. Daoud had help from others in committing the first two crimes, but he played a very active role in both offenses and his motivation to commit serious criminal conduct, including deadly terrorist attacks, preceded his interactions with the FBI and his cellmate.

In a similar vein, the court accepted Daoud's argument that the FBI shared responsibility for the seriousness of the attempted bombing because it chose to supply a 1,000-pound bomb when it could have selected a less severe option. But the FBI agent who supplied the bomb testified that he chose a large bomb to ensure that Daoud understood the gravity of the crime that they were plotting. The FBI agent repeatedly reminded Daoud of the mass casualties that the bomb would cause. Far from deterring him, the undisputed record shows that the possibility of mass casualties excited and motivated Daoud. He described the prospect of killing hundreds of people as "like the lottery." At best, the size of the bomb is a "two-edged" factor. *United States v. Roberson*, 474 F.3d 432, 435 (7th Cir. 2007), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017). On one hand, the government could have supplied a smaller bomb. On the other hand, the large

bomb illustrates that Daoud had an apparently large appetite for mass carnage.

Another factor that the court found mitigating was Daoud's harsh experience in pretrial confinement—which included more than a year in the segregated housing unit. "Pretrial conditions of confinement are not included in the § 3553(a) factors," and the Seventh Circuit has "not decided whether extraordinarily harsh conditions of confinement could ever justify a reduced sentence." *United States v. Campos*, 541 F.3d 735, 751 (7th Cir. 2008). Other circuits have held that extreme conditions of pretrial confinement may allow for a downward departure. *See, e.g., United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (holding that five years spent in 23-hour-a-day lockdown with no outside access permitted a two-and-a-half-year downward departure).

We need not decide in this case whether harsh conditions of pretrial confinement could ever justify a downward departure. We decide only that Daoud should not receive credit for his time in segregated housing. The record does not support the conclusion that Daoud's time in segregated housing involved extraordinarily harsh conditions. Moreover, Daoud earned his time in segregated housing by committing violent offenses while housed in the general jail population. Daoud spent seven months in segregated housing because he tried to murder a fellow inmate with makeshift weapons. All told, it appears that he spent more than a year in segregated housing. Although the record is not entirely clear, it appears that all of Daoud's time in segregated housing resulted from his own dangerous and criminal behavior that he engaged in while incarcerated. Under these circumstances, Daoud's time in segregated housing is not a mitigating factor. At the same time,

we do not fault the district court for considering the effect that Daoud's cellmate's suicide may have had on Daoud's mental health.

Finally, the other factors that the court found mitigating do not justify its substantial downward departure. The court found, for example, that Daoud had accepted responsibility for his crimes. Even if that were true, it would have limited relevance in mitigation. Acceptance of responsibility normally factors into the advisory Guidelines calculation if a defendant pleads guilty. *See* USSG § 3E1.1. Here, Daoud did not receive this benefit because he pled guilty while maintaining his innocence. The court was entitled to credit Daoud's statements of remorse in allocution. But a defendant's apology, even if sincere, does not justify a significant downward departure in a case involving such extremely serious criminal conduct that reflects a disdain toward other human lives. Even less relevant was Daoud's polite in-court behavior. A defendant's good behavior in court has minimal value in mitigation. *Cf. Mumuni*, 946 F.3d at 112 ("[N]o substantially mitigating weight can be borne here by the fact that Mumuni did what was plainly required of him—that is, behaving himself in prison."). And the other factors that the court found mitigating—Daoud's college aspirations and family support—were not weighty enough to justify the extent of the downward departure.

In sum, the district court relied on factors that could not "bear the mitigating weight assigned to them." *Mumuni*, 946 F.3d at 112. As a result, the court's mitigation analysis did not justify its substantial downward departure from the advisory Guidelines range.

For his part, Daoud defends the district court's sentence because it was higher than probation's recommended sentence of 15 years, and because it included 45 years of supervised release. But probation's sentencing recommendations only inform a judge's sentencing decision—they do not bind a judge or otherwise limit the judge's discretion. *United States v. Schuler*, 34 F.3d 457, 461 (7th Cir. 1994). And while supervised release is part of a sentence, and an appellate court should consider it when reviewing the sentence, *see Gall*, 552 U.S. at 48, a long term of supervised release cannot save a sentence that rests on an unreasonable application of the § 3553(a) factors.

### III. Conclusion

We do not call into question a district court's broad discretion in fashioning sentences. District courts are best situated to develop sentences that fit the facts of a crime and the characteristics of a defendant. We substantively review sentences only to ensure that they fall within the wide range of options that are reasonable under the circumstances. We find that this is one of those rare cases where the district court stepped outside of what was permissible under the circumstances. Accordingly, we VACATE the district court's sentence and REMAND for resentencing. Circuit Rule 36 will apply on remand.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit