UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | Nos. | 12 CR 723 |
| v. | ) | | 13 CR 703 |
| | ) | | 15 CR 487 |
| ADEL DAOUD | ) | | |
| | ) | | Judge John Z. Lee |

### GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTION FOR HEARING PURSUANT TO THE BAIL REFORM ACT AND DEFENDANT'S JUDICIAL NOTICE PURSUANT TO RULE 201

The United States of America, by JOHN R. LAUSCH, JR., the United States Attorney for the Northern District of Illinois, respectfully files this consolidated response to defendant's motion for a hearing pursuant to the bail reform act and his judicial notice. On or about January 12, 2022, defendant filed a pro-se motion requesting a hearing pursuant to the Bail Reform Act. R. #396 (12 CR. 723).[1] On the same day, the defendant filed a pro-se notice to the Court containing a statement of facts and an affidavit. R. #397.

### DEFENDANT'S MOTION FOR A BAIL HEARING

### I. PROCEDURAL BACKGROUND

On September 20, 2012, a grand jury returned an indictment in case number 12 CR 723 charging defendant with attempted use of a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332(a)(2)(D) (Count One), and

---

[1] For ease of reference, unless otherwise noted, all docket citations will be to 12 CR 723.

attempt to destroy a building with an explosive, in violation of Title 18, United States Code, Section 844(i) (Count Two).

On August 29, 2013, a grand jury returned an indictment in case number 13 CR 703 charging defendant with attempted use of force against the person of another in violation of another felony, specifically 18 U.S.C. § 1114, in violation of Title 18, United States Code, Section 373(a) (Count One), using a phone in interstate commerce with the intent to commit murder, in violation of Title 18, United States Code, Section 1958(a) (Count Two), and obstruction of justice, in violation of Title 18, United States Code, Section 1512(a)(1)(A) (Count Three).

On August 13, 2015, a grand jury returned an indictment in case number 15 CR 487 charging defendant with assault with the intent to commit murder, in violation of Title 18, United States Code, Section 113(a)(1) (Count One), assault with a dangerous weapon with the intent to do bodily harm, in violation of Title 18, United States Code, Section 113(a)(3) (Count Two), assault resulting in serious bodily injury, in violation of Title 18, United States Code, Section 113(a)(6) (Count Three), possession of a weapon by an inmate, in violation of Title 18, United States Code, Section 1791(a)(2) and (b)(3) (Count Four), and simple assault, in violation of Title 18, United States Code, Section 113(a)(4) (Count Five).

On November 26, 2018, pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), defendant acknowledged that the government could present sufficient evidence at trial for his convicted of each count of the indictments.

On or about May 20, 2019, the defendant was sentenced to 16 years'

incarceration and a lifetime term of supervised release. R. #336. On or about March 15, 2021, the Seventh Circuit vacated the defendant's sentence and remanded the case back to the district court. R. #366. The case was subsequently reassigned to this Court.

## II.    FACTUAL BACKGROUND

**12 CR 723**

In May 2012, two FBI online covert employees ("OCE") contacted Adel Daoud in response to material the defendant posted online, and thereafter exchanged several electronic communications with him. During these online communications, defendant expressed an interest in engaging in violent jihad, either in the United States or overseas, referred to his ongoing efforts to recruit other individuals to engage in violent jihad, and mentioned that he had discussed plans for an attack with "trusted brothers."

*September 11, 2011 through May 13, 2012*

For months prior to the defendant's first interaction with a government representative, the defendant expressed his desire to die as a terrorist while committing jihad. As early as September 10, 2011, eight months prior to engaging with the online covert employees, the defendant wrote a message to a third party stating that the defendant wanted to die a Shaheed, meaning a martyr. On that same day, defendant stated that he was against the U.S. government "for what they are doing against my brothers and sisters, and i am also against anyone who supports them or keeps silent about what they are doing because keeping silent is like

3

approving and accepting what they are doing."

On February 6, 2012, the defendant sent a video to two other individuals, including his friend Abduallah Tounisi. The video was entitled "Short clips of Jihad songs. With English translation." The first song encouraged the listeners to "Get up and shake off your slumber, because Islam is back. We have come for the sake of Allah and we have declared Jihad. We have returned with sub-machine guns. We have the leadership today. We have awakened our generation, individually and as a whole." On January 29, 2012, prior to sending the video to his friends, the defendant posted on YouTube, regarding the video, "I listen to these on my ipod! Including the terrorist one! . . .I say I want to be a terrorist! And i meant to be cause terror to oppression!!!!!" That same day, regarding a different video, defendant wrote, "If you are a Muslim KILL AND DIE FOR THE SAKE OF ALLAH!!!!!!!!"

On February 13, 2012, the defendant wrote to a third party "Everyone is going to slack until Allah punishes them. People need to fight in the sake of Allah or evil will go through! Arrrrgghh but I'm just considered crazy and people say that i 'understand wrong' when i talk about jihad just as something we all should do. ESPECIALLY against the states."

On April 23, 2012, the defendant searched online for a video called "Erhaby Ana with English translation i am a terrorist." The defendant then viewed a video called "Erhaby Ana." The defendant posted a comment to the video stating, "I know some of the meaning which is 'I am a terrorist, I look up the hills of hittin, I am a terrorist, I terrorize the enemies of the Deen (Islam)' very beautiful nasheed. I don't

4

know why i see Muslims here saying they are not terrorists and so forth. Muslims need to be terrorists but the ones who don't just terrorize anyone, but terrorize the enemies of Allah."

On the same day, April 23, 2012, the defendant wrote a note in his Kindle about the book Ibn-Taymiyya-Opinion-on-Tassawwuf "so the united states only stopped the war cuz the Muslims were winning. disis not the first time I read or heard this. may Allah destroy America."

Prior to engaging with the OCEs, the defendant also created a lengthy PowerPoint presentation entitled "The Osama Bin Laden I know." The presentation was a book review of Peter Bergen's book of the same name and defendant created it for school. In the presentation, the defendant expressed his support for Bin Laden and the 9/11 attacks. For example, the defendant wrote, "You cannot kill Muslims and expect them to be nice to you. Osama wasn't crazy for wanting to destroy the USA. This superpower killed millions of people!" In response to a cartoon mocking an interrogation of the Times Square Bomber, the defendant wrote, "The solution is simple. Stop killing Muslims and trying to destroy Islam and NO ONE WILL BOMB YOU." The defendant further stated that "If 3000 Americans are supposedly killed by Muslims, it's never forgotten for over 10 years. Americans prior to 9/11 killed over half a million Muslims (most if not all are innocent of doing anything) yet no one stop to point at the U.S. 'Might is Right' it seems."

Prior to engaging with the OCEs, the defendant sought out and consumed radical, jihadist material, including Inspire magazine, the Book of Jihad and 44 Ways

to Support Jihad. Inspire magazine is an English-language magazine published by al-Qaeda in the Arabian Peninsula, and was intended to promote violent jihad, including in the United States. Inspire magazine contained articles that taught readers how to train with weapons and how to make explosives, including Acetone Peroxide; one such article was entitled "How to Build a Bomb in the Kitchen of Your Mom." The defendant professed to enjoy the magazine and bookmarked sections of various issues in his Kindle.

The defendant distributed Inspire magazine and other pro-jihadist material to third parties for the purpose of radicalizing them. In the defendant's words, he was attempting to "brainwash" the third parties.

*May 14, 2012 forward*

On May 14, 2012, OCE One sent an electronic communication to the defendant in response to the defendant's online posting of "Terrorist Music." This was the first contact between a U.S. government actor and the defendant. Thereafter, the two began to communicate online. On May 19, 2012, the defendant sent OCE One a link to the nine issues of Inspire magazine. The defendant told OCE One "I'll help insha'Allah to send you stuff. don't blind follow but read and listen and look into the matter yourself. but be very careful not to let people see you read parts of these magazines. you'll get what i mean when you see it."

On May 21, 2012, the defendant suggested that OCE One go to the website Kalamullah.com, an online Islamic bookstore. The defendant said it "has a lot of books, lectures, and they are pro jihad i mean they have lectures by Anwar al awlaki,

6

books by syed qutb so that's why i really like the site. it has information and it warns against deviant sects, and it supports jihad so masha'Allah awesome site."

On May 29, 2012, the defendant posted on the web forum Deen Haqq (a website described by the defendant as a "terrorist website"), "So hypocrites. America has always been a nation of evil from it's birth to now and it's the most hypocritical nation today. Islam however and Terrorists are in fact in between America and it's evil goals."

On May 31, 2012, the defendant posted on Deen Haqq that he wanted to, in the future, go for jihad. He stated that Inspire magazine encouraged Muslims to attack in America. He stated "by all means this is something I would consider. But i know if I started attacking in America I would probably not be able to go to Yemen or anywhere else for Jihad in the Cause of Allah." Defendant then asked if there was a way he could do both. He wrote, "I personally think it's easier and more rewarding to go to Yemen but at the same time I had the oppression of the USA and I would love to do something that would hurt it from the inside."

On June 1, 2012, defendant texted a third party to make a prayer that they become a "mujahideen and die Shaheed."

On the same day, June 1, 2012, defendant wrote OCE One that he would look back at Inspire magazine when he had a target and that he would give OCE One updates in case defendant started his own group or decided to go anywhere.

On June 22, 2012, defendant emailed the Book of Jihad to a friend and wrote "this is addel. Here you go buddy. your first book towards terrorism." On the same

day, he wrote a second OCE who had reached out to the defendant (OCE Two) that, with regard to protests, defendant did not believe in protesting, he "believes in Jihad!"

From late May to mid-June, 2012, relying principally on internet resources, defendant sought information on whether it was acceptable to commit a terrorist attack in the United States. In a communication with one of the FBI online covert employees, defendant confirmed his belief in the propriety of killing Americans in a terrorist attack. Defendant then began seeking online resources regarding how to carry out an attack.

For example, on June 21, 2012, defendant researched the cost of an AK-47 assault rifle. The defendant also downloaded to his Kindle a book on how to make weapons called the Improvised Munitions Handbook.

On July 1, 2012, the defendant sent a message to a friend, asking the friend to make a prayer for him "That Allah uses me to destroy Shirk and Kufr [non-believers] and to destry America iran Russia and their allies along their oppression against the Muslims."

On July 4, 2012, defendant sent a message asking a friend to teach him about guns. In exchange, the defendant offered to teach the friend about jihad.

On July 5, 2012, defendant viewed online the "Illustrated Manual of Sniper Skills" and the "Organic Chemistry of Explosives."

On July 8, 2012, the defendant viewed a manual entitled "How Can I Train Myself for Jihad." The manual stated, in part, "A Muslim who spends a life empty of any physical or military training for Jihad, let alone for Jihad itself, should fear dying

8

on a branch of hypocrisy according to the above hadith. True Iman (faith) is manifested in actions and if someone truly wishes to fight Jihad, he will prepare himself in all possible ways."

On July 26, 2012, the defendant sent a message asking a friend to pray that the defendant goes "to the highest place in paradise w the prophets and dat im among the shuhada. Dat Allah guides me and my family and dat i become a great mujahid will put FEAR in the hearts of the enemies of Allah and put them in great distress." On July 30 and August 3, 2012, defendant wrote OCE One that he hoped they both become mujahideen and die shaheeds. Defendant also sent OCE One a link to defendant's YouTube page, which he referred to as his "jihadi channel", and where defendant posted videos of Osama Bin Laden, Anwar al Alwaki, Abu Mansoor Ameriki and other well-known jihadists.

On August 9, 2012, defendant wrote OCE Two that he planned on committing an attack in the United States.

*Meetings with the Undercover Agent*

In June 2012, one of the FBI OCEs told defendant about a purported cousin who resided in New York and was an operational terrorist. Defendant expressed an interest in meeting the cousin, who, unbeknownst to defendant, was an FBI undercover employee (UCE). Between July 17, 2012, and September 14, 2012, defendant met with the UCE on six occasions; these meetings were all recorded. The two also exchanged electronic communications. In the course of his dealings with the UCE, defendant researched and suggested multiple locations in the Chicago area to

9

commit an attack. Once the defendant selected the target of the attack—Cactus Bar & Grill and Cal's Liquors in downtown Chicago—the defendant conducted surveillance of the target for the purpose of committing a terrorist attack with an explosive device supplied by the FBI undercover employee. Defendant also attempted to recruit others to assist in the attack.

The defendant first met the UCE on July 17, 2012. Within minutes, the defendant began talking about violent jihad, his hate of kaffiers—non-believers—quoted Osama bin Laden, and stated "we're terrorists in a good way . . . we're terrorizing, no, enemies of Allah." The defendant also sent a text message link to the UCE so that he could download Inspire magazine. During this first meeting, the UCE asked the defendant what he wanted to do. In response, the defendant stated that he wanted to travel to Yemen, meaning that defendant wanted to travel overseas participate in jihad. The defendant also referenced Inspire magazine, said that it did inspire him, and noted that the magazine talked about doing something "here," meaning the United States. The defendant also said, "See that's the thing like, I always think, I wanna go overseas, I wanna go overseas. But, I wanna do something here at the same time." By this, the defendant meant that he wanted to engage in violent jihad both abroad and in the United States. The defendant started to provide ideas for a violent attack in the United States, and said that he would write down similar ideas to provide at their next meeting.

Between July 17, 2012, and his next meeting with the UCE on August 6, 2012, the defendant researched potential locations to attack. The defendant brought a list

of prospective targets to the second meeting, which included movie theaters, Woodfield Mall in Schaumburg, numerous Chicago bars and nightclubs, and military recruiting centers. The defendant's hand-written notes also made reference to a "big bomb." During the meeting, the defendant discussed the pros and cons of attacking each type of target on his list. The defendant also stated that people "have to know it's a terrorist attack."

In subsequent meetings and electronic communications with the UCE, the defendant continued to plan the attack and repeatedly pushed to carry it out as soon as possible.

On September 13, 2012, Daoud again met with the UCE, who showed defendant the purported explosive device, a 1,000 lb. bomb, which was inside a green Jeep Cherokee located in a storage unit. After being shown the car bomb, the defendant stated that he wanted it to kill "[a]t least a hundred people." Defendant also informed the UCE that the defendant wanted to park the car by the target and asked if he, the defendant, could "press the button" to detonate the bomb. Unbeknownst to defendant, the explosive device was inert and constructed by FBI bomb technicians. On September 14, 2012, at about 7:12 p.m., defendant met with the UCE and the two drove to downtown Chicago. During the drive to the target, defendant prayed for the success of the attack and that it would kill many people and cause destruction.

After arriving in Chicago, defendant picked up the Jeep containing the purported explosive device and parked it directly outside of the target location he had

previously selected – a bar in downtown Chicago that served alcohol that had been transported in interstate commerce from outside of Illinois to the bar in Illinois. Defendant then exited the Jeep, walked to an alley approximately a block away, and twice attempted to detonate the explosive device by pressing the triggering mechanism, after which he was taken into custody by the FBI.

**13 CR 703**

Between November 23 and November 28, 2012, and while defendant was in custody in Kankakee County Jail, defendant solicited and offered to pay his cellmate to have the FBI UCE murdered. Unbeknownst to defendant, the cellmate then contacted law enforcement and informed them of defendant's request.

More specifically, the cellmate told FBI agents that the defendant offered to pay $20,000 in exchange for the cellmate to have his "guys" track down and kill the UCE.

The defendant told the cellmate that he (Daoud) wished to have the UCE, whom the defendant knew as and referred to as "Mudaffer"—the pseudonym used by the UCE during the investigation—killed. The defendant indicated that he would give the cellmate "a gift" if he could arrange to have one of his Gangster Disciples kill the UCE. The defendant provided the cellmate with the phone number that the UCE used during the investigation (which the defendant memorized and believed was the UCE's real phone number), in an effort to have the cellmate's henchman locate the UCE.

The defendant explained that "Mudaffer" was "a spy" and that "all spies must

12

die." When the cellmate asked the defendant why it was OK to kill Mudaffer, the defendant said "[H]e's a hypocrite and a spy. That's the reason why it's OK." The defendant said to the CHS, "I could let things go, like I don't hold grudges, but he still has to die." The defendant also confirmed on multiple occasions that Mudaffer was a federal agent.

The defendant also suggested different ways the defendant would like the UCE killed. The defendant's suggestions included running the UCE over with a vehicle, shooting him with a gun and then robbing him, stabbing or beheading him. However, the defendant repeatedly expressed that his paramount concern was that he would not be linked to the crime and that the UCE was actually killed. The defendant stated, "I just care that he does it, and he gets away with it... I just care that he gets it done and he gets away and no one can find us... Get rid of him, you know what I mean, throw out the trash." On another occasion, the defendant said "If he's dead, Alhamdullilah. You know what I mean? As, you know, if he's not, I'm gonna be really worried.... I don't want them to get in trouble. You know. That's really most stressful part of this I can't get in any more trouble."

The defendant also asked the cellmate, on November 23, 2012, if he had ever taken care of a case where only one witness "pointed against" him and how soon he went home.

The cellmate asked the defendant if he was sure he wanted to kill Mudaffer on multiple occasions. For example, on November 25, 2012, the cellmate asked "Are you sure...your conscience not gonna kick in and start bothering you?" "Like, you know

after it's all said and done… then you wish you wouldn't have did it?" Daoud responded, "Who do you think I am. I think you should at least give me some credit." The cellmate told the defendant that they were able to locate Mudaffer in upstate New York. After the defendant asked for a picture of Mudaffer multiple times, the cellmate brought defendant a photograph purportedly taken by Gangster Disciples conducting surveillance of Mudaffer, to confirm that this was the individual the defendant wanted killed. The defendant pointed out the FBI undercover agent in the photograph and confirmed it was Mudaffer.

Later that day, the cellmate told the defendant that he had to place a phone call to a specific number in order to have Mudaffer killed. The cellmate stated, "Once you call today, man, he dead." The defendant responded, "Inshallah." The defendant then "ordered" the murder by placing a coded phone call to the purported hit man. One or both of the telephones used during the phone call utilized an interstate telephone service provider. The defendant then watched the news for reporting regarding the death of the undercover. The following day, the cellmate reported that the UCE had been killed, which made the defendant pleased and "relieved." Later that day, the defendant asked the CHS to tell him the "gory details" as to how the UCE was killed.

**15 CR 487**

On or about December 29, 2014, Victim A, an inmate at MCC who was pending sentencing in an unrelated matter, drew a picture of the Prophet Muhammad and showed it to other inmates, including the defendant. A short time later, the defendant

14

entered the common room where Victim A and others were playing cards. The defendant then jumped on Victim A and started punching him. Victim A did not fight back, instead covering his head as he laid on the ground until inmates intervened. The defendant acknowledged attacking Victim A to MCC staff and stated that he did so because Victim A was mocking the defendant's religion.

*May Attack*

A short time after the December attack, Victim A was asked if he had on-going issues with the defendant. Victim A stated that he did not and the defendant returned to Victim A's floor at MCC in approximately March. By all appearances, the two got along well: they would hang out together daily, eat food together, and Victim A would ask the defendant questions about Islam.

On or about May 22, 2015, a news story aired about violence directed toward individuals drawing pictures of the Prophet Muhammad. At least one inmate stated that the defendant was near the television as the story aired and appeared to become agitated. That same day, Victim A told the defendant that he intended to sleep in late the following morning. According to Victim A, he slept with headphones and an eye covering, which the defendant knew.

The next morning, on May 23, 2015, Victim A was sleeping in his cell when the defendant entered and attacked him. Victim A fell from his bunk and was tangled in his sheets as the defendant stabbed at him with weapons in each hand. According to Victim A, the weapons appeared to have been fashioned from toothbrushes—he described one as having been "sharpened." The defendant bit Victim A's finger and

15

arm as Victim A struggled to get away. Victim A also yelled for help. Victim A's cellmate entered the cell and initially thought the two were rough-housing. As Victim A called for help, the cellmate attempted to intervene. The defendant then bit the cellmate on the arm and the cellmate left the cell to seek help from the corrections officer. Another inmate, Inmate A, heard the commotion and approached the cell. Other inmates were gathered and one said, "Daoud is killing him." Inmate A entered the cell and grabbed the defendant, escorting him back to the defendant's cell. According to timestamps on the surveillance footage, the defendant was in Victim A's cell for approximately 4 ¼ minutes. As Inmate A walked the defendant to his cell, the defendant said "Hum du Allah [Praise be to Allah.]" The defendant's cellmate woke up as Inmate A and the defendant entered the cell and agreed to keep the defendant inside the cell; Inmate A then left. The defendant's cellmate saw that the defendant had a weapon in his hand, which he described as a toothbrush with the bristles removed, wrapped with a piece of white cloth and what appeared to be a razor blade affixed to it. The defendant's cellmate asked what he had, and the defendant replied, "a jailhouse shank." The defendant then broke the toothbrush in half. The defendant lifted his shirt and the defendant's cellmate saw that the defendant had another item that appeared to be a toothbrush stuck to his stomach. The defendant broke that item in half and flushed both down the toilet. When staffed asked the defendant where the weapon was located, he smiled and said, "You won't find it." Later that day, the toilet flooded, but neither weapon was recovered.

Victim A was examined and treated for his injuries at a hospital. Victim A

16

received two surgical staples to close one of the wounds to his head. The treating physician described that laceration as 2 centimeters in length, and also noted a bite mark to Victim A's upper arm.

Prior to the attacks and prior to the defendant's incarceration, he had expressed outrage at people who drew pictures of the Prophet. On May 18, 2012, the defendant posted on YouTube "may Allah give anwar al awlaki the highest place of paradise! YES! I JUST READ ABOUT THIS! THEY WANT TO MAKE BLASPHEMY ABOUT THE PROPHET (MAY ALLAH'S PEACE AND BLESSINGS BE UPON HIM) THEY CAN COME TO ME. WAIT LET ME BRING MY KNIFE. LOL LOL."

On May 22, 2012, in response to a YouTube Video by Penn Gillette regarding a cartoonist who called for a "Draw the Prophet Day." Gillette respectively discussed his support for a person's right to draw what they wanted. The defendant, in response, posted "if it's your freedom to make blasphemy against our prophet (may Allah's peace and blessings be upon him) then it's OUR freedom to kill those who do it. (as it's part of OUR religion)."

III.  **ARGUMENT**

The defendant has filed a motion for a hearing to allow him to rebut the presumption of detention, pursuant to 18 U.S.C. § 3142(e). The defendant requests, as relief, to be released to the custody of his father and to remain in his father's house without the ability to leave save for medical conditions.

The defendant's motion should be denied for several reasons.

17

First, 18 U.S.C. § 3142, the statue relied upon by the defendant, is inapplicable. Section 3142 applies to "release or detention of a defendant pending trial." Defendant's cases are not pending trial. The defendant has been adjudicated guilty of every count from all three indictments (R. #366 (12 CR 723); R. #47 (13 CR 703); R. #55 (15 CR 487)) and is pending resentencing. *United States v. Holzer,* 848 F.2d 822, 824 (7th Cir. 1988) (A person awaiting resentencing does not fall under the purview of section 3142). The applicable statue is 18 U.S.C. § 3143, "release or detention of a defendant pending sentence or appeal." *United States v. Krilich*, 178 F.3d 859, 861 (7th Cir. 1999) ("§ 3143(a) deals with a person who has been found guilty of an offense and who is awaiting imposition or execution of a sentence, which includes sentencing on remand.").

Title 18, United States Code, Section 3143(a)(2) mandates that the court "shall" detain a person who is awaiting imposition of a sentence and who has been convicted of a offense described in 18 U.S.C. § 3142(f)(1)(A), (B) or (C), *unless* the court finds that either: (a) a motion for acquittal or new trial will likely be granted (Section 3143(a)(2)(A)(i)); *or* (b) the government has recommended no sentence *and* the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety or any other person or the community if release." (Section 3143(a)(2)(A)(ii) and (B)) (emphasis added).

Section 3142(f)(1)(A) refers to a crime of violence, a violation of section 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B). Section 2332b(g)(5)(B) sets forth a litany of offenses, including violations of 18 U.S.C. § 2332a (relating to use of weapons

of mass destruction), for which the defendant has been convicted (Count One, 12 CR 723). Therefore, pursuant to 18 U.S.C. § 3143(a)(2), the Court shall detain the defendant pending sentencing unless one of the two exceptions are met.

In this case, the exceptions do not apply. The first exception, under § 3143(a)(2)(A)(i), is not applicable because there are no motions for judgment of acquittal or for a new trial that are before this Court nor can there be since the defendant was found guilty by a plea. The second exception, under Subsection (A)(ii), is equally not applicable because the government has recommended, and will continue to recommend, a sentence of a significant period of imprisonment. Because the government has recommended a sentence of imprisonment that greatly exceeds the period of incarceration the defendant has already served, this Court need not address § 3143(a)(2)(B) and determine if the defendant has met his burden of proof that he is not a flight risk or danger to the community. Therefore, pursuant to § 3143(a)(2), there is no path for release for the defendant and the Court should summarily deny the motion.

Second, the defendant is likely facing a period of incarceration that is significantly greater than the time he has already served. Bail pending resentencing would only meet the purpose of the statute if this Court sentenced the defendant to time served. *Holzer*, 848 F.2d at 824 ("The reason for not imprisoning a convicted defendant (unless he is likely to flee or is a public nuisance) before he is sentenced is that the sentence may not be a sentence of imprisonment or may be a sentence for a shorter period of imprisonment than the interval between conviction and

19

sentencing."). As this Court is aware, defendant was initially sentenced to 16 years' imprisonment, a sentence which the appellate court found to be substantively unreasonable. Under that sentence, the defendant is scheduled to be released on May 3, 2026.[2] Even under the current release date, the defendant will not complete his sentence in the near future. Granting the defendant's motion with a significant sentence pending would contradict the purpose of the statute.

Third, given the accusations the defendant has made against his counsel, and their subsequent motion to withdraw, it is likely that new counsel will be appointed. New counsel will need time to review the extensive and voluminous discovery to prepare for the multi-day sentencing hearing. As such, it is reasonable to conclude that the defendant's re-sentencing is not likely to occur for several months, if not longer. It is also reasonable to conclude that it may be months before the Court even sets a re-sentencing date. If the defendant's motion for release were to be granted at this time, it would, therefore, be for an open ended, indefinite period of release. Pre-sentence release, however, "is subject to tight time limits. An indefinite presentence release, or even one exceeding 60 days, is an abuse of discretion." *United States v. Hanhardt*, 173 F. Supp. 2d 801, 805 (N.D.IL 2001).

Fourth, the defendant has effectively been serving his sentence since he was first arrested in 2012. Releasing him now would serve no purpose. *See Krilich*, 178 F.3d at 861 - 62. ("Breaking a sentence in the middle does not promote any end other

---

[2] https://www.bop.gov/inmateloc/

than reducing the effective penalty by allowing a holiday, or worse, providing an opportunity to escape.")

Fifth, if the Court were to consider whether the defendant is a danger to the community, the defendant's conduct has proven in spades that he is in fact a danger. First, the burden is on the defendant to prove, by clear and convincing evidence, that he is not a danger to the community. *Harnhardt*, 173 F. Supp. 2d at 809. The defendant has failed to meet that burden. His motion only states that he promises to not leave his father's home. This is an empty promise, as he committed the first offense while living with his parents and the other offenses while in pre-trial detention. Neither custodial setting deterred him from committing the serious offenses. Second, the evidence presented at the defendant's sentencing hearing (and will be presented to this Court at the re-sentencing), as outlined above, overwhelmingly establishes that the defendant attempted to commit indiscriminate violence against individuals in a bar, attempted to murder an FBI agent, and committed a brutal attack against a fellow inmate. Simply put, the defendant is dangerous. The appellate court put it best when it said, "[b]ut if Daoud was able to continue his streak of gravely serious criminal activity while detained, one can only imagine what he might have done if released." *United States v. Daoud*, 980 F.3d 581, 593 - 594 (7th Cir. 2020). In short, there is a real risk that, if released, the defendant would continue committing, or attempting to commit, acts of violence.

For the reasons addressed herein, both individually and collectively, the defendant's motion should be denied.

**DEFENDANT'S JUDICIAL NOTICE PURSUANT TO RULE 201**

On or about January 12, 2022, the defendant filed a handwritten, pro-se document entitled "Judicial Notice Pursuant to Rule 201" ("Judicial Notice" R. # 397). The filing has a statement of facts with an attached affidavit signed by the defendant. The document follows (and precedes) other pro-se filings in which the defendant makes accusations against his counsel. In short, the defendant accused his counsel of receiving payments from his father while also receiving CJA payments (R. 86 and 87 (13 CR 703)) and, in the Judicial Notice, the defendant accused his counsel of directing the defendant to feign mental health issues.

The Court has directed the government to respond to the Judicial Notice. The government is unable to do so. The government has no firsthand information which would allow the government to provide a response to the filing or take a position on the issue. The defendant's accusations are premised on presumably private, attorney/client conversations for which the government was not privy.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny defendant's motion for a hearing pursuant to the Bail Reform Act.

JOHN R. LAUSCH, JR.,
United States Attorney

By:    s/ *Barry Jonas*
        BARRY JONAS
        TIFFANY ARDAM
        Assistant United States Attorneys
        219 S. Dearborn St., Rm. 500
        Chicago, IL 60604

Date: January 25, 2022