IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 12 CR 723, 13 CR 703, 15 CR 487 |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| ADEL DAOUD | ) | |
| | ) | |

<u>DEFENDANT ADEL DAOUD'S MOTION TO WITHDRAW ALFORD PLEA</u>

NOW COMES defendant, ADEL DAOUD, by and through his attorney, QUINN A. MICHAELIS, pursuant to Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure, and respectfully requests that this Honorable Court vacate his plea of November 26, 2018. In support of this motion, Mr. Daoud states as follows:

1. INTRODUCTION

On September 20, 2012, Mr. Daoud was charged pursuant to indictment with attempting to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332(a)(2)(D) and attempting to destroy a building used in an activity affecting interstate commerce, in violation of 18 U.S.C. § 844(i). (Case no. 12 CR 723). On August 29, 2013, Mr. Daoud was indicted separately in case number 13 CR 703, with solicitation of murder, in violation of 18 U.S.C. § 373(a), murder for hire, in violation of 18 U.S.C. §1958(a), and witness tampering, in violation of 18 U.S.C. § 1512(a)(1)(A). Then, on August 13, 2015, Mr. Daoud was indicted in a third case, number 15 CR 487, with assault with the intent to commit murder, in violation of 18 U.S.C. §113(a)(1), assault with a dangerous weapon, in violation of 18 U.S.C.§

1

113(a)(3), assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6), possessing a prohibited object while in federal custody, in violation of 18 U.S.C. § 1791(a)(2), and assault in violation of 18 U.S.C. § 113(a)(4).

As a result of the incidents leading to the third indictment against Mr. Daoud, counsel filed an Emergency Motion for an Evidentiary Hearing to Determine the Mental Competency of the Defendant." (Doc. 188)[1]. After a finding that Mr. Daoud was not competent to stand trial, he was placed in a psychiatric facility, where he underwent medication and treatment. After approximately one year of treatment, the staff at his treatment facility determined that Mr., Daoud was restored to competency. (The Butner Report). After a hearing on the report from the treatment facility, the Court determined that "Mr. Daoud's competency had been restored by consistent treatment with psychotropic medication." (Doc. 246). At that competency hearing, Mr. Daoud presented testimony from his own retained expert, Dr. Stephen N. Xenakis, who concurred with the Butner Report's conclusion that Mr. Daoud's competency had been restored so long as he continued his medication.

Mr. Daoud's cases in 12 CR 723, and 13 CR 703 were consolidated for trial purpose, and a final pre-trial conference was scheduled for November 13, 2018. Prior to that pe-trial conference, both the government and Mr. Daoud submitted jury instructions that included instructions related to an entrapment defense. (Doc. 260, 264).

---

[1] Unless otherwise noted, all citations to the docket refer to the docket under case number 12 CR 723.

2

During the final pretrial hearing, both parties engaged in extensive discussions concerning protecting witness identities, motions in limine regarding the scope of examinations, proposed voir dire, and courtroom trial procedure. At the end of final pretrial conference, counsel announced that he intended to file a pleading requesting the Court accept Mr. Daoud's plea pursuant to *North Carolina v. Alford.*

After the pretrial conference concluded, Counsel for Mr. Daoud filed the Defendant's Motion for Leave to Enter Guilty Pleas Pursuant to North Carolina v. Alford following the Courts Order Reassigning Case No. 15 CR 487 a Related and Requests for same. (Doc. 295). Mr. Daoud Advanced two arguments for allowing him to enter a plea pursuant to *North Carolina v. Alford*. First, Mr. Daoud had "credible bona fide defenses, particularly with respect to the entrapment defense concerning the charges involving the FBI's creation for the fake bomb ostensibly capable of destroying a large portion of a downtown city block." (Doc. 295 at 10). Secondly, with respect to the third case, number 15 CR 487, Mr. Daoud had a legitimate mental health defense, but believed that raising such a defense would be against Mr. Daoud's best long-term interests. Expanding on that, counsel expressed significant concern over Mr. Daoud's mental health, should he proceed to trial:

> While counsel for Defendant will readily attest that they have observed, on balance, a marked improvement in Defendant's condition after prescription of medication, counsel—as well as Defendant's family—are very concerned about the impact of stress and rigor of a three or more week trial that will involve amongst other things, hours of recordings of Defendant's own statements; extended evidence of how own writings; numerous witnesses questioning Defendant's statements, including his religious beliefs; and possibly even his own testimony. In short, while

3

undersigned counsel are not concerned with competency, they can represent to the Court in good faith that they are legitimately concerned that these proceedings could adversely affect the medical progress Defendant has made since his treatment at FMC Butner. (Doc. At 295).

The government objected to consolidation of Mr. Daoud's three cases and to the proposed plea pursuant to *North Carolina v. Alford*, arguing that "a jury determination would increase public trust in the proceedings and show defendant, the community, and the public at large that his entrapment claims are without merit." (Doc. 297, at 1). It further characterized Mr. Daoud's *Alford* plea as "an attack on our system of justice." (Doc. 297, at 8).

Mr. Daoud now submits his motion to withdraw his guilty plea.

## 2. ARGUMENT

Federal Rule of Criminal Procedure 11(d)(2)(B) allows a defendant to withdraw his guilty plea at any point before sentencing, upon a showing by the defendant of "any fair and just reason." The fair and just standard does not create an automatic right to withdrawal. *United States v. Merriweather*, 294 F.3d 930, 931 (7th Cir. 2002).

Claims of innocence alone do not constitute fair and just reasons to withdraw a guilty plea, however, "being legally innocent of the crime is a fair and just reason to withdraw a guilty plea." *United States v. Caban*, 962 F.2d 646, 649 (7th Cir. 1992), *United States v. Groll*, 992 F.2d 755 (7th Cir. 1992) (Defendant allowed to withdraw her plea on the basis of a valid entrapment defense.)

When evaluating a motion to withdraw a plea, "the court should consider whether the proffered reasons are consistent with the testimony and other evidence

introduced at the Rule 11 hearing, which has a presumption of verity." *Groll*, 992 F.2d at 758 (citing *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir. 1987).

Here, the plea colloquy demonstrates that Mr. Daoud had several legitimate defenses amounting to legal innocence which he abandoned at the last minute, based on his counsel's concerns over his mental health. The government acknowledged that Mr. Daoud had made a threshold showing pre-trial to raise an entrapment defense at trail:

> In order to warrant an entrapment jury instruction, generally the defendant must proffer some evidence "that the government induced him to commit the crime and that he was not predisposed to commit it." United States v. Mayfield, 771 F.3d 417, 440 (7th Cir. 2014). The government recognizes that, at least pre-trial, the defense would meet this bar and will not require the defense to make a pre-trial showing. The government reserves the right to challenge the appropriateness of the defense, and an entrapment instruction, during the charging conference.

(Doc. 284, footnote 1).

During the final pretrial hearing, both parties engaged in extensive discussions concerning protecting witness identities, motions in limine regarding the scope of examinations, proposed *voir dire*, and courtroom trial procedure. At one point, counsel for Mr. Daoud discussed the defenses available to Mr. Daoud:

> Mr. Durkin: It's kind of like having to, to – to give up the, the cross. I mean, the, the -- the government seems to take a position that the only defense here is entrapment or, or nullification, which is not the case. And nullification's a red herring also. Part of the entrapment defense is based on what we intend to argue is the government's inability, and, and we believe this will come out through their expert, to sort out inherently non-dangerous people with mental issues or with immaturity issues, identification issues, what have you, as to whether or not they're, they're fully dangerous and whether -- or dangerous at all. And, and whether or not that's a, a fact, and it is a fact.

(Final Pretrial Conf., 11/13/2018 Tr. 25)

5

However, despite engaging in a lengthy final pretrial conference, counsel announced that he had a resolution to the case that would obviate the need for the impending *Daubert* hearing the Court intended to have the following day, as well as the need for a trial at all:

MR. DURKIN: (referring to Doc. 87, previously filed on January 17th, 2014) I thought today we had a solution to this case, or we were going to tell you that there was a solution. And I'm going to make another motion after this, but these requests would be related to the motion that I would like to make orally to permit Mr. Daoud to plead guilty to -- under Alford versus the United States to both the two charges here and the third charge before Judge Dow on the condition that the Judge Dow case be brought to your court under relatedness. And let me explain. We had a –

THE COURT: Is this the first the government's

MR. JONAS: Yes, Your Honor.

MR. DURKIN: Yes.

THE COURT: Why, Mr. Durkin?

MR. DURKIN: Pardon me?

THE COURT: Why is this the first they're hearing of this suggestion?

MR. DURKIN: Well, because I, because I thought -- because I didn't think I was going to have to make this request.

(Final Pretrial Conf., 11/13/2018, Tr. 72-73)

\*\*\*\*\*\*\*\*\*\*\*

MR. DURKIN: But going back to Alford. You know what his mental condition is. You know he is under medication. You know that in the past stress has caused him considerable difficulty. I am concerned. I'm not saying that he's not competent to stand trial. He, he -- he is by all indications. I'm simply saying as a reason to submit an Alford plea, he, he does have issues regarding stress. And I think Dr. Xenakis would back that up. So that's, that's a reason.

6

  There are also what I would call evidentiary reasons. There are also issues with respect to the sheer prejudice that he will inure, and I don't know how we can avoid it, and some of it is certainly his own doing. Obviously we're going to be admitting by the entrapment defense that he did certain things, and they're going to parade this bomb in, and it's going to speak for itself. I think that's asking an awful lot for a jury to ignore the evidence.
  The government, I always laugh when they get worried about nullification in a case like this. How anybody would ever nullify this case is -- and I've been trying cases I think longer than the three of them put together. If, if there's a jury in the United States that would nullify this case, then I'll be shocked. But that's another reason. The other case is further complicating it.

  THE COURT: And that's the one where somebody was attacked because they had written something or done something –

  MR. DURKIN: Yes.

  THE COURT:  -- on the face of the illustration or something?

  MR. DURKIN: Yes. Yes.  Well, I was talking about -- we, we refer it to as three cases. I mean, there's, there's really one case, which is the two counts that the -- let's do --

  MR. JONAS: Two CRs.

  MR. DURKIN: -- bombing -- let's do bombing, solicitation.

  THE COURT: Those are the two.

  MR. DURKIN: Which is here. The solicitation case on top of this case, and I, I consented to it, so I'm not arguing; but it's kind of the similar issue I have with respect to the case with Judge Dow. We -- it's, it's impossible to have another case hanging over your head, to be blunt. And the solicitation case is very very difficult to defend. We believe there are legitimate defenses to it. Whether they're sufficient to arise to an acquittal, I don't know. But I think, again, there are facts that we could set forth that would justify an Alford plea in that case as well.
  The third case is an even more classic example, because the fact remains that the only defense available to him in the third case is a mental defense, which for all the reasons we've discussed ad nauseam when we were going through the competency issues, we don't want to raise a mental defense. We don't think that's in his interests either. We, we don't want him locked up forever on a mental defense, to be perfectly blunt. Again, that's another reason for -- that, that would justify an extraordinary circumstance for an Alford plea.

THE COURT: All right. I understand. So government you want to state what your knowledge is on this, and then particularly state the -- let's say I pretty much know what your position is on the Alford plea. But as to -- they're going to put it in writing, but just generally about the other case position of -- you know, at one time I was just overwhelmed with the case and all the different parts of it. But even if I did not agree with counsel's position as to Alford, as to the idea of having another trial with another judge on a case that has been pending all this young man's adult life, I have a little bit of a problem with that. Me not handling that one too. What's your position on that?

MR. JONAS: There's multiple issues here, Judge. My head is swimming. This just came out of left field.

THE COURT: All right. Well, why don't you go ahead and write your motion, and then you can respond.

(Final Pretrial Conf., 11/13/2018, Tr. 76-80).

In both the Motion for Leave to Enter a Guilty Plea, and the subsequent plea colloquy, Mr. Daoud's counsel expressed concerns that proceeding to trial would cause Mr. Daoud's mental state to deteriorate:

THE COURT: If you were to focus on one particular element over another, would it be that it would be the mental health issues—I don't think despite the time that the Court has had Mr. Doud before it that we've never had a full vetting in front of him of all of the evidence in a hearing like setting. I don't believe we've ever had that, isn't hat correct?

MR. DURKIN: That's right.

THE COURT: Is that correct, Mr. Jonas?

MR. JONAS: that's correct, Your Honor.

THE COURT: And so would that be your pecking order, your first and foremost reason for following through here—

MR. DURKIN: I think—

THE COURT: --as opposed to the—

8

MR. DURKIN: I think that would be the most, the most overwhelmingly clear choice if I had only one choice.

THE COURT: Well, you don't only have one choice.

MR. DURKIN: No, I understand.

THE COURT: The Court just wanted to, to find out if it was his own personal mental health situation—

MR. DURKIN: Yes.

THE COURT: -- that was paramount over, and then obviously you're saying the environment that potential jurors might be exposed to in this case might affect the second—

MR. DURKIN: Well, let me explain the first one, Judge. It has been our experience with Mr. Daoud that stress has not been good for him in light of his condition. As you know, he was incarcerated for lengthy periods of time in the SHU or segregated housing. That was never helpful, although I'm sure necessary from the MCC standpoint or Bureau of Prisons' standpoint. It has been our experience that since he's come back from Butner he has been a different person. He has been very cooperative with us. He has been very helpful in, in discussing the case with us.
 Inf act, he provided us with considerable written documents written by his own hand that were cogent and intelligent and, and very supportive, particularly of the entrapment defense. It was well reasoned. It was certainly beyond what I would have expected from someone with a high school education. He has been very very thorough with the discovery. He has inundated us sometimes with more information than we probably needed, but he certainly gave us his view of the evidence. That said, in our experience stress has not been good for him. And I think that as is obvious from the government proffer, having to sit through all of this evidence would have been extremely stressful.
 So I think while that is our first and foremost reason and the other reasons I've set forth, I think there is more than enough of a basis for the Court to use its discretion and accept an Alford plea under the circumstances.

THE COURT: The other question the Court has is there's a 19-page – 18 and a half pace factual basis that the government has presented. Has your client read and looked at that?

MR. DURKIN: Yes.

THE COURT: Okay.

9

>	MR. DURKIN:  He's – not only has he read it, we have discussed it with him in great detail.  And he does not contest those facts per se as they're written.  The discussions we've had with him, and they've been largely with Mr. Herman and Miss Lyon, his comments have been not to challenge the actual evidence that's presented, but to challenge the context in which the—some of the statements are made.
>
>	THE COURT:  Not surprising.  All right.  The other question—the court just wanted to make sure, since this is so detailed if you were worried about –again, even something like this has not been set forth over the course of these six years.  I wanted to make sure that your concern about how he would be affected wouldn't be affected by a factual basis being presented by the government with my presumption that the government intends to read all 18 and a half pages, correct?

(Change of Plea Hrg., 1/29/2019, Tr. 39-41).

Here, it appears that Mr. Daoud's previous counsel's concerns about Mr. Daoud's mental health trumped all other paths forward, despite the Court's findings that Mr. Daoud had been restored to competency, and counsel's admissions that Mr. Daoud presented to him well-reasoned analysis of his entrapment defense. Further, the specific conditions that counsel cited as contributing to Mr. Daoud's destabilizing stress-- his long periods of isolated confinement, his inability to receive visitors or practice his religion, had been remedied by the date of the change of plea hearing.

Additionally, Mr. Daoud's attorney expressed doubt that Mr. Daoud could receive a fair trial in light of the charges he was facing and prevailing attitudes about the type of charges he was facing:

>	MR. DURKIN:  But fair trials on a legal standard and the reality of dealing with a jury in 2018 in a case such as this, it is my judgment that this is the correct and appropriate way to proceed.

(Change of Plea Hrg. 1/29/2019, Tr. 38).

10

Finally, when previous counsel proposed proceeding by way of an Alford plea, the government objected to both the consolidation of cases under one cause number, as well as to the court's acceptance of the plea. The government noted that "[d]efendant has spent the six years emphasizing in court appearances and filings and during press conferences what he views as the impropriety of the government's actions, its policies, and its agents' conduct…Defendant's claims serve to foster public distrust of the government –indeed that is the very reason defendant makes them. Moreover, defendant impugns the entire judicial system." (Doc. 297, at 11)

At the conclusion of the recitation of the statement of facts during the change of plea hearing, the government restated their objection, "we object to the taking of the Alford plea. We believe it's the public interest that a defendant should either be found guilty at trial or should admit his guilty and not reserve innocence." (Change of Plea tr. 63).

The government seemed primarily concerned about Mr. Daoud's continued assertion of legal innocence and how this continued assertion undermined the integrity of the judicial process. During the change of plea hearing, Mr. Daoud reasserted his reasons for entering a plea while maintaining his innocence, and the government reasserted its desire to have Mr. Daoud publicly admit guilt. The government's proffered reasons for opposing Mr. Daoud's *Alford* plea present further fair and just reasons for allowing Mr. Daoud to withdraw his plea.

11

WHEREFORE, ADEL DAOUD respectfully requests that this Honorable Court grant his request to withdraw his plea pursuant to *North Carolina v. Alford,* and set the matter for trial.

Respectfully Submitted,

s/ Quinn A. Michaelis

Quinn A. Michaelis
Attorney For ADEL DAOUD
73 W. Monroe, suite 106
Chicago, Illinois, 60603
312-714-6920

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the foregoing MOTION TO WITHDRAW PLEA was served on October 3, 2022 in accordance with Fed.R.Crim.P.49, Fed.R.Civ. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), pursuant to the district court's system as to ECF filers.

s/ Quinn A. Michaelis
Quinn A. Michaelis