UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    12 CR 723 |
| v. | ) | 13 CR 703 |
| | ) | 15 CR 487 |
| | ) | Honorable Matthew F. Kennelly |
| ADEL DAOUD | ) | |

### Government's Motion for a Protective Order Pertaining to the Sentencing Testimony of FBI Online Covert Employees

The United States, through its attorney, Morris Pasqual, Acting United States Attorney for the Northern District of Illinois, respectfully submits this motion for a protective order authorizing the government to use certain measures to protect the identity and security of the FBI Online Covert Employees (OCE) when they testify at the sentencing.

### <u>Background</u>

On September 14, 2012, the defendant attempted to detonate a 1,000-pound car bomb that he believed was going to kill hundreds of people at the Cactus Bar and Grill. That conduct led to the charges in 12 CR 723. During the course of the investigation leading to events of September 14, the defendant engaged, online, with two FBI OCEs (OCE 1 and OCE 2).

At the upcoming sentencing hearing, the defendant stated that he intends to call the OCEs as witnesses. The defendant has stated that he intends to question the OCEs about "the circumstances of their interactions with" him, "what they learned in their investigation of him, and what they did and did not report to their superiors."

He also intends to question them regarding "any instruction or training on inducement and what that training included."

Public disclosure of the OCEs' true identities or physical appearance could jeopardize other undercover investigations and pose a risk of danger to the witnesses and their family.[1] In addition, exposure of the inner workings of the FBI's online undercover program could undermine the effectiveness of the program. As such, in order to protect the witnesses' true identities and physical appearance, as well as the integrity of the FBI online undercover employee program, the government requests certain security measures be implemented with the OCEs testify, consistent with measures used in other national security cases.

## **Protective Measures Sought**

Based on the need to prevent disclosure of the OCES' true identities and physical appearances, so as to protect the safety of the OCEs and their family, to protect the integrity of the FBI's Online Cover Employee programs and to avoid compromising other investigations, the government respectfully requests the adoption of certain security measures for the testimony of the OCEs.

The proposed measures are based on similar measures adopted by this Court with regards to the testimony of the FBI Undercover Agent, as well as by other courts

---

[1] Accompanying this motion is the Government's Classified *Ex Parte* and In Camera Motion for a Protective Order Pursuant to Section 4 of the Classified Information Procedures Act (CIPA) and Fed. R. Crim. P. 16(d)(1), and a classified declaration from Robert B. Wells, the Assistant Director of the FBI's Counterterrorism Division. The Wells Declaration sets forth the basis for the implementation of the requested protective measures during the testimony of the witnesses.

and are narrowly tailored. Namely, they assure that the identity of the OCEs and the integrity of other undercover investigations will not be compromised without impairing the defendant's confrontation rights under the Sixth Amendment or the public's right of access. Specifically, the government requests the Court implement the following measures:

1.      The OCEs may testify at sentencing using a pseudonym without publicly disclosing their true identity;

2.      The defense shall be prohibited from asking any questions seeking personal identifying information from the OCEs, including true name, address, or place or date of birth;

3.      The defense shall be prohibited from asking any questions that would illicit the monikers used by the OCEs;

4.      The defense shall be prohibited from asking any questions about the OCEs' participation in past or pending investigations or undercover operations;

5.      The defense shall be prohibited from asking any questions regarding any FBI undercover program writ large to include training and operations;

6.      Only the Court, essential courtroom personnel, the defendant and his standby counsel, the defendant's immediate family members, and the government's trial team shall be present in the courtroom when the OCEs testifies. The government shall arrange for contemporaneous CCTV video or similar broadcast of the courtroom proceeding during the testimony to an overflow courtroom. The CCTV video will not show the OCEs;

7.      No public disclosure of any audio recording, or similar reproduction of the voice or visual image of the witness while testifying, shall be permitted; and

8.      The witnesses shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom.

## Argument

Protecting an FBI employee's safety and the integrity of other ongoing investigations are compelling interests that courts have long recognized in crafting

security measures for witness testimony. Courts, for example, have allowed witnesses to testify under a pseudonym and behind a screen or while otherwise concealed, concluding that those measures do not interfere with the defendant's right to a fair and public trial. That precedent readily justifies the reasonable security measures proposed here.

## I.  The Court Should Not Require the Disclosure of the Witnesses' True Identities.

The Confrontation Clause of the Sixth Amendment gives a defendant the right to confront and cross-examine the government's witnesses who testify against the defendant. *See Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968). The "elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier or fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846. "The rule is that once cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983).

The Confrontation Clause does not require that a jury hear a witness's true name. The Supreme Court recognized in *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns

about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant."

In a similar vein, the Seventh Circuit has observed that "where there is a threat to the life of the witness, the right of the defendant to have the witness's true name, address, and place of employment is not absolute." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (citing *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969)); *see also Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992); *United States v. Contreras*, 602 F.2d 1237, 1239-40 (5th Cir. 1979) (where there was reasonable fear the disclosure of DEA agent's home address and frequented locations would endanger him/her and his/her family, no error in precluding cross-examination as to home address and other background information even though agent was "instrumental in defendant's arrest"); *United States v. Maso*, 2007 WL 3121986, *4 (11th Cir. Oct. 26, 2007) (*per curiam*) (unpublished) ("The district court did not violate [the defendant's] right to confront witnesses by allowing the [cooperating witness] to testify using a pseudonym."); *Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name).

Courts, including those in the Seventh Circuit, have approved alias testimony in a variety of contexts. In *United States v. Abu Marzook et al.*, this Court permitted witnesses from the Israel Security Agency to testify for the government at trial using the pseudonyms by which the defendant knew them, and to testify outside the view of the public. No. 03-cr-978, Doc. #652 at 2 (N.D. Ill. Aug. 29, 2006) (J. St. Eve)

5

("[E]ven if their true identities were not classified, the safety concerns faced by these witnesses justify their use of pseudonyms when testifying.") (Attached as Exhibit 3). The same measures had been used in a pretrial suppression hearing in *Abu Marzook*, 412 F. Supp. 2d 913, 923-24 (N.D. Ill. 2006); *see also United States v. El-Mezain*, 664 F.3d 467, 492 (5th Cir. 2011) (finding a "serious and clear need to protect the true identities" of the two Israel Security Agency witnesses who testified by pseudonym); *United States v. Abu Ali*, 395 F.Supp.2d 338, 344 (E.D. Va. 2005) (permitting use of pseudonyms by witnesses who testified during a pre-trial Rule 15 deposition that was conducted via satellite real-time video from Saudi Arabia to the federal courthouse in Alexandria, Virginia); *United States v. Dumeisi*, No. 03-cr-664, Doc. #83 at 1 (N.D. Ill. Jan. 2, 2004) (permitting government witness to testify under a pseudonym and appear in light disguise, and prohibiting questioning about the witness's current or former address). More recently, similar protective measures were approved in terrorism cases in this district as well as in the District of Oregon and in the Middle District of Florida. *See United States v. Thomas Osadzinski*, 19 CR 869, Doc. #116 (N.D. Ill, September 20, 2021); *United States v. Edward Schimenti and Joseph Jones*, 17 CR 236, Doc. #168 (N.D. Ill. May 31, 2019); *United States v. Mohamud*, No. 10-cr-475, Doc. #341 (D. Or. Dec. 19, 2012); *United States v. Osmakac*, No. 12-CR-45, Doc. #217 (M.D. Fla. February 12, 2014); as well as in the initial sentencing of this matter, *United States v Adel Daoud*, 12 CR 723, Doc. #155 (N.D. Ill. March 19, 2015).

The declaration from FBI Assistant Director for Counterterrorism Robert B Wells, lays out the compelling reasons to adopt the proposed security measures. The

FBI's Online Covert Employee programs plays a vital role in the detection, prevention, and prosecution of national security cases. This program is highly valuable, and the FBI has a substantial interest in protecting the personal safety of its undercover personnel. As such, and as further detailed in the FBI declaration, disclosing the witnesses' identities would pose a risk their safety. In addition, discussion of the FBI's Online Covert Employee programs undermine the security of other undercover investigations and the integrity of the government's undercover procedures. In light of these interests, and as further explained in the Assistant Director's declaration, in conjunction with their online covert roles, the true names of the witnesses are classified.

Balanced against these interests, the use of a pseudonym by the witnesses will not prejudice the defendant's confrontation rights. It is their online interaction with the defendant—not their personal identity—that make their testimony relevant at sentencing. Because the defendant has only known the OCEs by their pseudonym, withholding their true identity will not detract from the substance of any cross-examination and will not impair the defendant's Sixth Amendment right to confront the witnesses. The OCEs will be present in the courtroom, so the defendant will be able to see them during his examination of them.

Along those same lines, the defendant should be restricted from eliciting questions that would publicly reveal any personal information about the OCEs that could disclose their identities. Personal information about the OCEs is not relevant to the charges; it is their contacts and communications with the defendant that

matter. Public disclosure of personal information about the OCEs, such as names and addresses, will compromise their safety and that of their family, as well as substantially impact other investigations. Cross-examination into completely irrelevant personal information should be prohibited.

## II. The Court Should Permit the OCEs to Testify Outside the View of the Public

The Sixth Amendment guarantees the right to a public trial. That right assures the defendant receives a fair trial, promotes the integrity of the fact-finding process, preserves public confidence in the criminal justice system, and affords the community an outlet to address crime. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). But the right to a public trial is not absolute—a trial judge may implement reasonable procedures to protect other compelling interests without infringing the Sixth Amendment. *Id.* at 45.

*Waller* provided a four-factor test for determining whether courtroom closure is appropriate:

> The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. 39, 48 (1984). Although the government is not seeking to close the proceedings entirely during the OCEs' testimony, these factors remain instructive in assessing the appropriateness of the government's proposal.

First, courts have recognized that "The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest,

8

and . . . this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom." *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997); *see also Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008) ("It is clear that the State has an 'overriding interest' in protecting the identity of its undercover officer." In *Brown v. Artuz*, 283 F.3d 492, 501-02 (2d Cir. 2002), the Second Circuit held that protecting an undercover officer's safety satisfied the first prong of the *Waller* test and was an overriding interest likely to be prejudiced if the courtroom was open to the public during the officer's testimony. Taken together, *Ayala*, *Rodriguez*, and *Brown* instruct that protecting other investigations and ensuring a law enforcement officer's safety are both compelling government interests, in satisfaction of the first *Waller* factor.

As discussed in the declaration attached to the classified companion to this motion, the FBI has serious concerns about the disclosure of the witnesses' identities, both by name and appearance. As this Court is no doubt aware, given the ubiquity of smart phones, it is difficult for court security to stop a spectator from taking a photograph of court proceedings; indeed, those incidents occasionally arise, despite rules barring such conduct. The government need not "prove that particular individuals likely to attend the trial will disclose the officer's identity," *Ayala*, 131 F.3d at 72. The risk remains that anyone in the courtroom may reveal the appearance of the OCEs to others, which would endanger the OCEs and would risk jeopardizing ongoing FBI investigations.

As to the second *Waller* factor, the proposed measures are no broader than necessary to protect the government's core interests. Rather than seeking the more

drastic measure of closing the courtroom completely during the OCEs' testimony, the government requests moderate protections against the disclosure of their true identities and appearances, while still permitting the public to hear their testimony.

Specifically, when the OCEs testifies, the Court, essential personal, the defendant, his standby counsel and immediate family members, and the government's trial team would be present in the courtroom. The government will arrange for a contemporaneous CCTV video or similar broadcast of the courtroom proceeding to an overflow courtroom which will not show the OCEs' faces during their testimony. In other words, the camera will be turned away from the OCEs and from any monitors. The purpose of this proposal is to protect the OCEs' images and identities from being revealed to the public.

The Wells declaration submitted in support of the classified motion details the government's substantial interests here in protecting the OCEs' safety and that of their families as well as maintaining the continued effectiveness of ongoing and future undercover investigations. *See Ayala*, 131 F.3d at 72. Thus, the Court would be justified in concluding that these interests "would be seriously prejudiced by requiring the officer to testify in an open courtroom." *Id.*

Importantly, the government's proposed protective measures would prevent only the public—not the defendant—from viewing the OCEs faces during testimony. This procedure will not deprive the defendant of the ability to confront the OCEs, nor will it deprive the Court of the ability to evaluate their demeanor. The transcript of their testimony would be made available to the public in its entirety after the

testimonies are concluded. On balance, the moderate restriction to the public pales in comparison to the government's interest in concealing their identities during their continued work for the FBI.

Prohibiting the public dissemination of any reproduction of the audio or video of the testimony will not impair any Sixth Amendment rights. Federal judicial policy prohibits the taking of in-court photographs or videotape of criminal trials, in any event. Here, a written transcript of the testimony will be available to the public. Only the visual images of the OCEs on the witness stand will be obscured from the public. Thus, all the measures proposed by the government are narrowly tailored to protect the important and substantial government interests at issue.

As to the last *Waller* factor, the government requests that the Court make the following findings based on the law cited above and the information presented in the Wells declaration: (1) the reasonable measures proposed by the government are necessary to protect from disclosure the OCEs' true identities at sentencing; (2) disclosure of the OCEs' true identities would jeopardize ongoing and future undercover investigations and the government's undercover investigative procedures; (3) the OCEs and their families face a real and substantial risk of danger if their true identities are disclosed; and (4) disclosure of the FBI's online undercover program would jeopardize other ongoing and future undercover operations.

## III. Similar Measures Have Been Approved in Prior Cases

This Court has already approved the same measures to be put into place during the testimony of the FBI Undercover Agent. In addition to the current sentencing

proceeding, at the initial sentencing hearing in this matter similar protective measures were approved by Judge Coleman. *United States v Adel Daoud*, 12 CR 723, Doc. #155 (N.D. Ill. March 19, 2015). Judge Coleman ordered the following protective measures, among others that were not implemented: the courtroom was closed during the testimony, the Undercover Agent testified using the pseudonym that the defendant knew him/her as, his/her appearance matched how the Undercover Agent appeared to the defendant during the undercover operation, and the Undercover Agent entered the courthouse and the courtroom through a non-public entrance.

In *United States v. Thomas Osadzinski,* 19 CR 869, Doc. #116 (N.D. Ill, September 20, 2021), Thomas Osadzinski was charged with attempting to provide material support to ISIS. During the investigation, Osadzinski engaged with multiple FBI OCEs and with a FBI confidential human source. For the same justifications presented here, Judge Gettleman approved the same protective measures requested by the government for the testimony of the OCEs and the source.

The protective measures requested by the government have also been approved by Judge Wood in the terrorism trial of *United States v. Edward Schimenti and Joseph Jones*, 17 CR 236, Doc. # 168 (N.D. Ill. May 31, 2019). Schimenti and Jones were charged with conspiring to provide material support to ISIS. During the investigation, Schimenti and Jones engaged with multiple OCEs, undercover agents and a CHS. Judge Wood, in granting the motion for the same protective measures for requested here, found that "the . . . [proposed] procedures are necessitated by a compelling interest in protecting from public disclosure highly-confidential and

sensitive matters of national security relating to this case and will also ensure the integrity of the proceedings." *Id.* The Court further found the "procedures [were] narrowly-tailored for these purposes." *Id.*

In this district, Judge St. Eve implemented more strict security protections in *Abu Marzook et al.*, No. 03-cr-978, Doc. #652 at 3 (N.D. Ill. Aug. 29, 2006), during the testimony of witnesses from the Israel Security Agency. At a pretrial suppression hearing earlier in that case, the court closed the courtroom entirely during the testimony of the ISA witnesses. No CCTV footage of the testimony was broadcast. *Abu Marzook*, 412 F. Supp. 2d at 919.

Under the government's proposed protective measures, the transcript of the witnesses' testimony will be available for review by the public or press, but there will be no public disclosure of any video or photographic evidence that depicts the witnesses. *See United States v. Trofimoff*, No. 8:00-CR-197-T-24EAJ, 2001 WL 1644230 at *3 (M.D. Fla. June 12, 2011) (blurring the image of the undercover officer was "a narrow remedy carefully tailored to protect the effectiveness of the undercover agent while allowing the media access to the full substance of the video tape"). Thus, although the public will not be in the same courtroom, the public will have full access to the proceeding, except for the facial images.

## Conclusion

The government requests that the Court grant the government's motion for a protective order and adopt the government's proposed protective measures to assure the security and safety of the OCEs and their family, other undercover investigations, and the government's undercover investigative procedures.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Barry Jonas*
        BARRY JONAS
        TIFFANY ARDAM
        Assistant United States Attorneys
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604

Dated: July 17, 2023